

# LOAN DOCUMENTS

Greystone Hotel Miami, LLC
4901 NW 17th Way, Suite 503, Fort Lauderdale, FL 33309
(954) 606-0586

Dear Sirs,

We are pleased to inform you that Greystone EB-5 LLLP ("Lender") has approved your loan request. The loan ("Loan") is being made to Greystone Hotel Miami, LLC ("Borrower") to assist in the establishment of its commercial for-profit business within the Regional Center Territory (defined below) pursuant to the U.S. EB-5 Immigrant Investor Program ("Program").

The Borrower understands that the making of the Loan described herein is dependent upon the successful offering of Units of limited partnership interests by the Lender pursuant to the Program, including approval by the United States Citizenship and Immigration Services (USCIS) of Alien Entrepreneur Petitions (I-526) pursuant to Section 203(b)(5) of the Immigration and Nationality Act, as amended. Lender agrees to make a Loan, subject to such conditions, and on the following terms and conditions:

| | |
|---|---|
| Lender: | Greystone EB-5 LLLP, a Florida limited liability limited partnership of 197 S. Federal Hwy, Suite 200, Boca Raton, FL 33432. |
| Borrower: | Greystone Hotel Miami, LLC, a Florida limited liability company of 4901 NW 17th Way, Suite 503, Fort Lauderdale, FL 33309. |

| | |
|---|---|
| Principal Loan Amount: | Minimum Loan Amount of $500,000<br>Target Loan Amount of $22,000,000 |
| Regional Center Territory: | Miami-Dade, Broward, and Palm Beach Counties, Florida, USA. |
| Advances: | The Loan may be issued in multiple Advances, each of which will be in an amount equal to or greater than the Minimum Loan Amount. Interest starts accruing on each Advance as of the date that Advance is issued. |
| Term: | Five (5) years from each Advance ("Initial Term"), including any Extension Periods ("Maturity"). |
| Interest Rate: | Six percent (6.00%) per annum. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable. |
| Payment: | The balance of each Advance and all accrued unpaid interest thereon shall be repaid as follows: |

(1)     Borrower shall make interest only payments monthly on the balance of each Advance during the Term of the Loan;

(2)     Upon Maturity of each Advance, Borrower shall pay the then outstanding balance of that Advance and all accrued unpaid interest thereon.

(3)     Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of each Advance and all accrued unpaid interest thereon upon Maturity of the Initial Term. If Borrower cannot refinance such amounts on commercially reasonable terms, or at all, within 30 days of the expiration of the Initial Term, or any Extension Period (as defined below), Borrower may, upon written notice to Lender, and in its sole discretion, extend the Maturity date for up to three additional one-year periods (each an "Extension Period"). During each Extension Period, Borrower shall make interest payments on the outstanding principal balance of each Advance and all accrued unpaid interest thereon then outstanding. Upon the commencement of the first Extension Period, the Interest Rate for that advance shall increase to 8.00%; upon the commencement of the second Extension Period, the Interest rate for that advance shall increase to 10.00%;

upon the commencement of the third Extension Period, the Interest rate for that advance shall increase to 12.00%.

(4)     Borrower's obligation to make commercially reasonable efforts to repay the outstanding principal balance of each Advance and all accrued unpaid interest thereon after Maturity shall continue thereafter until the balance of the Loan and all unpaid interest thereon is repaid in full.

| | |
|---|---|
| Estimated Use of Proceeds: | The proceeds of this Loan will be used for Greystone Hotel Miami, LLC to develop the Greystone Hotel Project (described in the accompanying Business Plan), in Florida. |
| Pre-payment: | The Borrower may not, without Lender's prior express written consent, prepay this Note prior to Maturity. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of Lender. |
| Re-Payment on Denials: | Each Advance is issued to Borrower as part of an offering of investment Units to EB-5 Investors, and may be advanced before those investors' I-526 applications with USCIS are approved. In such a case, if an individual investor's I-526 application is denied without possibility of cure, Borrower shall, within 60 days, refund the full amount of the Advance attributable to that investor to Lender. |
| Collateral: | The Borrower shall execute in favor of the Lender a Loan and Security Agreement and Promissory Note (altogether the "Loan Documents") and provide Lender with a security interest in all assets of the Borrower as security for the satisfaction of the Loan (collectively, the "Collateral"). |
| Loan Advance: | The Loan shall be advanced to the Borrower from time to time as it becomes available to Lender and in accordance with the requirements of the Project (each an "Advance"). It shall be a condition of each advance that as of such time there shall not have been a material adverse change that threatens the ability of the Borrower to repay the Loan or create the required number of jobs (see below) from the date of this commitment in the operations, assets or financial condition of the Borrower or its affiliates (considered as a whole). |
| Job Requirement: | The Borrower must create and maintain a minimum of ten (10) new full-time direct and/or indirect jobs per EB-5 investor through the end of five years from the date of the latest Advance. |

The Borrower shall be responsible to submit to Lender such documentary evidence of direct or indirect job creation as requested by Lender or USCIS in conjunction with immigration applications filed on behalf of investors. The Borrower shall provide the most recent quarterly Form I-9 Employment Eligibility Verification forms, W-2 forms, or other such proof of direct employment as requested by Lender. Borrower shall also provide documentation of construction expenditures, operational revenue, or such other evidence related to indirect job creation as requested by Lender. The Borrower shall be responsible to create jobs and provide documentation thereof as projected in the Economic Analysis for the Project.

Remedies:

If the Borrower shall fail to repay the Loan in accordance with the terms of the Loan Agreement, Lender shall have the right, at its sole option, to declare the Loan in default and exercise remedies under the Loan Documents, including, but not limited to, foreclosure.

Reporting:

The Borrower shall provide to Lender semi-annual unaudited statements in connection with the operations of the Borrower, no later than 30 days after the end of each semi-annual period and shall provide unaudited, accountant reviewed financial statements no later than 120 days after the Borrower's fiscal year-end. The Borrower shall provide at 12 month intervals, or as requested by Lender, the most recent Form I-9 Employment Eligibility Verification forms and W-2 forms for each new employee reported.

Satisfaction of Conditions:

The Borrower shall be obligated to draw down the Loan and shall use all reasonable best efforts to satisfy the conditions of advance thereof.

Documentation:

The Note, the documentation of the Collateral and such other documents as the Lender may require shall be in form satisfactory to the Lender and supported by such legal opinions as the Lender may require.

All of Lender's reasonable costs of preparing, reviewing and recording such documents shall be to the Borrower's account.

**[SIGNATURE PAGE FOLLOWS]**

LENDER:  Greystone EB-5 LLLP
By South Atlantic Regional Center, Its General Partner

By: _____          Dated: _____ August  9th _____, 2014

Joseph Walsh                                     Managing Partner
Printed Name _____          Title _____

ACCEPTED
BORROWER:  Greystone Hotel Miami, LLC

By: _____          Dated: _____ August 8th _____, 2014

James Vosotas                                    Member
Printed Name _____          Title _____


STATE OF   :  Florida

COUNTY OF :  Broward

On this, the __8__ day of __Augst__, 20 14 before me, the undersigned Notary
Public, personally appeared the person listed above, who acknowledged himself to be an officer
of Greystone Hotel Miami, LLC, and that he as authorized representative, executed the foregoing
instrument for the purposes therein contained by signing the name of the company by himself as
officer. IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.


Notary Public
My Commission Expires:

_____

MITCHELL  GARRETT
MY COMMISSION # EE880893
EXPIRES December 26, 2016

# LOAN AND SECURITY AGREEMENT

**LOAN AND SECURITY AGREEMENT** dated as of the date executed below between **Greystone EB-5 LLLP** (the "Lender") a Florida limited liability limited partnership of 197 S. Federal Hwy, Suite 200, Boca Raton, FL 33432, and **Greystone Hotel Miami, LLC** (the "Borrower") a Florida limited liability company of 4901 NW 17th Way, Suite 503, Fort Lauderdale, FL 33309. In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

**1. Definitions.** For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

*Advances* means the Borrower's Advances with the Lender referred to in Section 2.1 infra.

*Affiliate* means any person and/or entity, which directly or indirectly controls, or is controlled by, or is under common control, with the Borrower.

*Agreement* means this Loan and Security Agreement.

*Bank* means any other financial institution and/or third party providing credit or account services to Borrower in connection with the property.

*Collateral* means the Collateral described in Section 3, infra.

*Collateral Account* means the account of Borrower with the Lender established under Section 8.2 (c) infra.

*Control* shall be deemed to exist if any person, entity or corporation, or combination thereof, shall have possession, directly and/or indirectly, of the power to direct the management and/or policies of the Borrower.

*Deposit* means any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Bank, or any other holder for the purpose of securing Inventory financing of Borrower, and the proceeds thereof.

*Deposit Accounts* means all deposit accounts maintained by the Borrower with the Bank for the purpose of financing renovation, expansion, furniture and fixtures of Borrower, and the proceeds thereof.

*Events of Default* shall have the meaning given such term in Section 8 of this Agreement infra.

*Indebtedness* means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

*Inventory* means all inventory, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, and completed and unshipped merchandise, and all products and proceeds (including insurance and condemnation proceeds) of the foregoing, as defined by the Uniform Commercial Code of the State of Florida, whether presently owned or hereafter acquired.

*Legal Requirements* means all applicable present and future statutes, laws, ordinances, rules and/or regulations of any governmental authority, all orders, writs, injunctions, decrees and judicial decisions and all covenants which bind or materially affect the Borrower or any part of its assets.

*Loan Account* means the accounting as to the Loans issued by the Lender pursuant to Section 2.2 infra.

*Loan Documents* means the following documents collectively: (i) This Agreement; (ii) Each Promissory Note of the Borrower to the Lender, including the Note (collectively the "Notes") evidencing the indebtedness for the Loan; (iii) All other documents and instruments heretofore or hereafter executed by the Borrower in favor of the Lender relating to the Loans, including any guaranty, pledge, security and/or subordination agreement and related Uniform Commercial Code financing statements; and (iv) In each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents, whenever executed.

*Loans* means: (i) Advances evidenced by the Note; and (ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

*Note* means the Borrower's Promissory Note evidencing indebtedness for Advances.

*Obligations* means all liabilities, duties and/or obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect to the letters of credit or Lender's acceptances issued by the Lender for the account of, or guaranteed by, the Borrower, including, without limitation all obligations of any partnership or joint venture as to which the Borrower is or may become, liable, which term shall include all accrued interest and/or all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

*Required Permits* means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from, or made by, any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

*Termination Date* shall have the meaning set forth in Section 2.1 infra.

## 2. Loans.

### 2.1 Advances.

(a)   Pursuant to this Agreement, and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the Maturity Date of the last Loan Advance (comprised of an Initial Term of five years plus up to three, one-year extensions at the option of the Borrower), the Lender may make advances and the Borrower may borrow under this Agreement.

(b)   All Advances under this Agreement shall be evidenced by the Note, shall bear interest and shall be due and payable in full on the Maturity Date (including any potential extensions).

### 2.2   Loan Account.

(a)   The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations. All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time. Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower, and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b)   The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations. Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within thirty (30) days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement. In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

**3.   Grant of Security Interest; Obligations Secured.** The Borrower hereby grants to the Lender a subordinated security interest in all of the Borrower's present and future right, title and interest in real property, furniture and fixtures, inventory, deposit accounts and reserve bank accounts, lease reserve accounts wherever located and whether now existing or hereafter created or arising, collectively called the "Collateral." Lender's security interest in the Collateral shall be subordinated only to the security interest therein of the Bank. The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations. Lender is hereby authorized by Borrower to file any and all documents with the appropriate authorities as necessary to authenticate and/or perfect the security interests granted herein.

**4.   Representations and Warranties.** The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a)   (i) The Borrower is, and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of incorporation thereof; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits, without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b)   The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its Board of Directors. The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party. To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

(c)   Subject to any limitations stated therein or in connection therewith, all information furnished, or to be furnished, by the Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d)   The Borrower is in material compliance with all Legal Requirements applicable to it, its property or the conduct of its business, including, without limitation, those pertaining to or

concerning the employment of labor, employee benefits, public health, safety and the environment.

(e)   No proceedings by or before any private, public or governmental body, agency or authority and no litigation is pending, or, so far as is known to the Borrower, its officers or directors, or threatened against the Borrower, except such as are disclosed in any addendums attached hereto.

(f)   No Event of Default has occurred and no event has occurred, or is continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice specified therein, would constitute such an Event of Default.

(g)   The Borrower shall use the proceeds of each Advance hereunder for purposes set forth in its business plan, including general commercial purposes related to job creation, purchase of the building, and furniture, fixtures, and equipment, provided that no part of such proceeds will be used, in whole or in part, for the purpose of purchasing or carrying any "margin stock" as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System.

(h)   This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower as the case may be, in accordance with the terms of each; provided, however, that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally, and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(i)   The Borrower has good and marketable title to its properties and assets, including all of the Collateral, subject to no mortgage, pledge, lien, security interest, encumbrance or other charge which is not set forth herein. Specifically, the Borrower represents that it has or shall obtain a Bank mortgage and/or construction loan on the underlying Properties, and may secure mezzanine financing as a bridge loan while awaiting EB-5 funding.

(j) The Borrower has filed all tax returns and reports required to be filed by it with all federal, state or local authorities and has paid in full, or made adequate provision for the payment of, all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

(k) The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of, or through, any other entity of any kind, other than as disclosed on any addendums attached hereto. All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations where its assets are located.

(l) The Borrower and any of the Borrower's tenants have not given, nor have they received, any notice that: (i) there has been a release, or there is a threat of release, of toxic substances, oil or hazardous wastes on or from any real property owned or operated by the Borrower; (ii) the

Borrower or any tenants may be, or is, liable for the costs of cleaning up or responding to a release of any toxic substances, oil or hazardous wastes; or (iii) any of such real property is subject to a lien for any liability arising from costs incurred in response to a release of toxic substances, oil or hazardous wastes.

**5.   Conditions Precedent.**

**5.1   Conditions to Initial Advance.** In addition to any other conditions contained in this Agreement, the initial advance shall be subject to the following conditions precedent:

(a) *Proof of Action.* The Lender shall have received such documents evidencing the Borrower's power to execute and deliver this Agreement and the other Loan Documents as the Lender or its counsel shall request.

(b) *The Notes and Loan Documents.* The Borrower shall have delivered to the Lender the Notes, this Agreement, the other Loan Documents and such other documents as the Lender may request.

(c) *Liens to be Discharged.* The Lender shall be satisfied with arrangements made to pay, discharge and terminate debt owed, and security interests granted by, the Borrower to non-permitted debt and security interest holders.

**5.2   Conditions to Every Advance.** In addition to all other conditions contained in this Agreement, every advance shall be subject to the following conditions precedent that:

(a) *No Event of Default.* No Event of Default has occurred and no event shall have occurred, or be continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b) *No Material Adverse Change.* There shall have been no material adverse change that threatens the ability of the Lender to repay the loan or create the required jobs (as determined by the Lender) in the assets, liabilities, financial condition or business of the Borrower since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

(c) *Representations and Warranties.* That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects. Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 infra and in each other Loan Document as of the date of such request.

**6.   Affirmative Covenants.** The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder, and under all other Loan Documents, is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

(a)   Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b)   The Borrower shall deliver to the Lender: (i) within 30 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of each fiscal year and statements of income and retained earnings for that portion of the fiscal year-to-date then ended, prepared in conformity with industry-standard accounting practices; (ii) (1) within 90 days after the close of each fiscal year of the Borrower, and (2) within 30 days of completion, in final, unaudited accountant reviewed form, financial statements ("Financial Statements"), including, a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, prepared in conformity with industry-standard accounting practices, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or results of operations of any change in the application of accounting principles during the year; (iii) the other financial reports, if any, delivered to the owners of the Borrower, and upon request, such other information about the financial condition, business and operations of the Borrower, as the Lender may from time to time, reasonably request; and (iv) promptly upon becoming aware of any Event of Default, or any event which with the giving of notice or the passage of time would constitute an Event of Default, notice thereof, in writing. The Lender may waive the performance of this section (b) in its sole discretion.

(c)   (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as additional insured as its interest may appear, (ii) maintain general liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law. Such All Risk property insurance coverage shall provide for a minimum of 30 days' written notice to the Lender of cancellation or modification. The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender. In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(d)   Comply with all material Legal Requirements, including without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment. The Borrower shall pay all taxes, assessments, governmental charges or levies, or claims for labor, supplies, rent and other obligations made against the Borrower or any of its properties which, if unpaid, might become a lien or charge against it or any of its properties, except liabilities being contested in good faith with the prior written consent of the Lender and against which, if requested by the Lender, the Borrower shall maintain reserves in amount and in form (book, cash, bond or otherwise) reasonably satisfactory to the Lender.

(e)   Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement. The Borrower shall promptly give the Lender written notice of any change in any of such addresses. All business records of the Borrower, including those pertaining to all Collateral, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

(f)   Allow the Lender, by or through any of its officers, agents, attorneys, or accountants designated by it, for the purpose of ascertaining whether or not each and every provision hereof and of any other Loan Document is being performed and for the purpose of examining and appraising the assets of the Borrower and the records relating thereto, to enter the offices of the Borrower to examine or inspect any of the properties, books and records or extracts therefrom and to make copies thereof and to discuss the affairs, finances and accounts thereof with the Borrower and its accountants, at such reasonable times with advance notice to Borrower and as often as the Lender may reasonably determine. The Borrower will reimburse the Lender for all costs associated with its examination, appraisals and audits if an Event of Default has occurred or if it uncovers material discrepancies. Such audits may be subject to Lender signing a confidentiality agreement.

(g)   Promptly advise the Lender of the commencement of litigation, including arbitration proceedings and any proceedings before any governmental agency, which might have a material adverse effect upon the assets, liabilities, financial condition or business of the Borrower.

(h)   Promptly notify the Lender in writing of (i) any enforcement, cleanup, removal or other action instituted against the Borrower by any federal, state, county or municipal authority or agency pursuant to any public health, safety or environmental laws, rules, ordinances and regulations, (ii) any and all claims made by any third party against the Borrower or any real property owned or operated by any of them relating to the existence of, or damage, loss or injury from any toxic substances, oil or hazardous wastes or any other conditions constituting actual or potential violations of such laws, rules, ordinances or regulations and (iii) any enforcement or compliance action, instituted or threatened or claim made by any federal or state authority relating to the employment of labor or employee benefits.

(i) Continue to conduct the business of the Borrower as presently conducted, maintain its existence and maintain its properties in good repair, working order and operating condition. The Borrower shall promptly notify the Lender of any event causing material loss or unusual depreciation in the value of the business assets of the Borrower and the amount of same.

(j) The Borrower will notify the Lender promptly upon Borrower's entry into any transaction with any federal, state or local governmental entity which would give rise to an account receivable which would be subject to the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement (herein a "Government Account") and the Borrower will execute all such instruments and take all such action as may be reasonably requested by the Lender so that all moneys due, or to become due, thereunder will be effectively assigned to the Lender and notice thereof given to such account debtor in accordance with the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement.

(k) (i) The Borrower will keep the Collateral in good order and repair, will not waste or destroy the Collateral or any part thereof and will not knowingly use the Collateral in violation of any applicable Legal Requirement or any policy of insurance thereon. The Borrower will notify the Lender in writing promptly upon its learning of any event, condition, loss, damage, litigation, administrative proceeding or other circumstance which may materially and adversely affect the assets, liabilities, financial condition or business of the Borrower or the Lender's security interest

in the Collateral. (ii) Without limiting the generality of the foregoing, the Borrower shall notify the Lender promptly of any claim or dispute that may materially affect the value of the Borrower's Accounts.

(l) The Borrower will, at such intervals as the Lender may request, notify the Lender, in a form satisfactory to the Lender, of all Collateral which has come into existence since the date hereof or the date of the last such notification, whichever is later.

(m) At its option, but without obligation to do so, the Lender may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; may place and pay for insurance on the Collateral; may order and pay for the repair, maintenance and preservation of the Collateral; and may pay any fees for filing or recording such instruments or documents as may be necessary or desirable to perfect the security interest granted herein, in all cases after notice to Borrower and Borrower's failure to comply with same. The Borrower agrees to reimburse the Lender on demand for any payment made, or any expense incurred, by the Lender pursuant to the foregoing authorization, and all such payments and expenses shall constitute part of the principal amount of Obligations hereby secured and shall bear interest at the highest rate payable on the Obligations of the Borrower to the Lender.

(n) Deliver to Lender, and or its nominee(s), all information requested by it, or them, in connection with their reporting obligations to the U.S. Citizenship and Immigration Services and reasonably related to compliance with the EB-5 Immigrant Investor Program.

**7. Negative Covenants.** The Borrower covenants and agrees that until payment is made in full on all Loans, the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete, and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall not directly or indirectly:

(a) Incur or permit to exist any lien, mortgage, security interest, pledge, charge or other encumbrance against any of the Collateral, whether now owned or hereafter acquired, except: (i) liens in favor of the Lender required by this Agreement and/or any other Loan Document; (ii) tax liens which are being contested in good faith; (iii) liens, mortgages, security interests, pledges, charges or other encumbrances in favor of the Lender or specifically permitted, in writing, by the Lender; and (iv) liens and mortgages already disclosed in Section 4(i) herein. Specifically, the Borrower may refinance the Bank financing disclosed herein during the initial term of the Loan with Lender's consent, which shall not be unreasonably withheld.

(b) Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted, or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(c) Make or consent to a material change in the ownership or capital structure of the Borrower that would constitute a change in Control, or make a material change in the management of the Borrower or in the manner in which the business of the Borrower is conducted.

## 8. Events of Default; Remedies.

**8.1 Events of Default.** The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a)  (i) Failure to make due payment of principal and/or interest on any Loan provided such failure continues for a period of ten (10) business days or (ii) failure by the Borrower, or any Affiliate, to make due payment of any other liability or obligation owing by the Borrower, or any Affiliate, to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"), provided such failure continues for a period of ten (10) business days; or

(b)  Failure by the Borrower to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of thirty (30) days (which time may be extended by Lender if Borrower is making good faith efforts to cure the Default); or

(c)  Any representation or warranty made by the Borrower to the Lender in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d)  A judgment or judgments for the payment of money shall be rendered against the Borrower, which shall remain unsatisfied and in effect for a period of sixty (60) days without a stay of execution; or

(e)  Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's property, which process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

(f)  The Borrower shall (i) apply for or consent to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its assets; (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) file or permit the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, or the adjudication of it as Bankrupt, or the making of an assignment for the benefit of creditors or the consenting to any form of arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its properties; or (iv) take any action for the purpose of effecting any of the foregoing; or

(g)  An order, judgment, or decree shall be entered against the Borrower, without the application, approval, or consent of the Borrower by, or in, any court of competent jurisdiction, approving a petition seeking reorganization or liquidation of the Borrower or appointing a receiver, trustee, conservator or liquidator of the Borrower, or of all or a substantial part of its assets and the Borrower, by any act, indicates its approval thereof, consent thereto, or acquiescence therein, or, in any event, such order, judgment, decree or case shall continue unstayed, or undismissed, and in effect for any period of ninety (90) consecutive days; or

(h)   The Borrower shall dissolve or liquidate, or be dissolved or liquidated, or cease to exist legally, or merge or consolidate with, or be merged or consolidated with or into any other entity; or

(i)   Failure by the Borrower to pay or perform any other Obligation, whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation, in all cases that could have a material adverse effect on the business or assets of the Borrower; or

(j)   The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(k)  If the Borrower fails to create the required number of direct or indirect jobs (as specified in the Economic Analysis of the Project) to cover any Advance. In such an event, only those Advances for which the Borrower has not created the required number of jobs shall be in Default.

## 8.2 Remedies.

(a)   Upon the occurrence of any Event of Default, and at any time thereafter, the availability of advances hereunder shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more, or all, of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges and all other liabilities and obligations of the Borrower to the Lender, to be forthwith due and payable, whereupon the same shall become forthwith due and payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower.

(b)   The Lender shall have the following additional rights and remedies:

(i)   All of the rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law or at equity, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, any other Loan Document or in any document, instrument or agreement evidencing, governing or securing the Obligations.

(ii)   The right to (1) take possession of the Collateral, without resort to legal process and without prior notice to Borrower, and for that purpose Borrower hereby irrevocably appoints the Lender its attorney-in-fact to enter upon any premises on which the Collateral or any part thereof may be situated and remove the Collateral therefrom, or (2) require the Borrower to assemble the Collateral and make it available to the Lender in a place to be designated by the Lender, in its sole discretion, or (3) instruct the Bank, without further consent of Borrower, to transfer the balance of all deposit accounts of Borrower to Lender and to thereafter treat Lender as the owner of such deposit accounts and the Bank's customer with respect to such deposit account. The Borrower shall make available to the Lender all premises, locations and

facilities necessary for the Lender's taking possession of the Collateral or for removing or putting the Collateral in saleable form.

(iii) The right to sell or otherwise dispose of all or any part of the Collateral by one or more public or private sales. The Lender will give the Borrower at least ten (10) business days' prior written notice of the time and place of any public sale thereof, or of the time after which any private sale or any other intended disposition (which may include, without limitation, a public sale or lease of all or part of the Collateral) is to be made. The Borrower agrees that ten (10) business days is a reasonable time for any such notice. The Lender, its employees, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is subject to widely distributed standard price quotations. Any public or private sale shall be free from any right of redemption, which the Borrower hereby waives and releases. If there is a deficiency after such sale and the application of the net proceeds from such sale, the Borrower shall be responsible for the same, with interest.

(iv) The right, after an Event of Default shall have occurred (and Borrower irrevocably appoints the Lender as attorney-in-fact for the Borrower for this purpose, such appointment being coupled with an interest), upon notice to Borrower and without resort to legal process, to notify the persons liable for payment of all accounts (as defined in the Uniform Commercial Code) at any time and direct such persons to make payments directly to the Lender, and to perform all acts the Borrower could take to collect on such accounts, including, without limitation, the right to notify postal authorities to change the address for delivery, open mail, endorse checks, bring collection suits, and realize upon Collateral securing such accounts. At the Lender's request, all bills and statements sent by the Borrower to the persons liable for payments of such accounts shall state that they have been assigned to, and are solely payable to, the Lender, and Borrower shall direct persons liable for the payment of such accounts to pay directly to the Lender any sums due or to become due on account thereof.

(v) The right from and after an Event of Default, from time to time without demand or notice, and without being required to look first to any other Collateral to apply and set off any or all of the Deposits against any and all Obligations even though such Obligations are unmatured.

(c) Collateral Account. Upon an Event of Default:

(i) The Borrower shall direct each of its creditors and/or customers that all payments or other distributions of whatever kind made to the Borrower shall be made to a post office box designated by the Lender (the "Lock Box"). The Lender shall have sole access to the Lock Box, and is hereby authorized by the Borrower to open all mail addressed to the Lock Box, and to apply all proceeds received therein, as herein provided. If Borrower should receive itself any such payments, the Borrower shall hold all such collections in trust for the Lender without commingling the same with other funds of the Borrower and will promptly, on the day of receipt thereof, transmit such collections to the Lender in the identical form in which they were received by the Borrower, with such endorsements as may be appropriate,

accompanied by a report, in a form approved by the Lender, showing the amount of such collections and such other information as the Lender may require.

(ii)  All collections in the form of cash, checks or other demand remittances so received by, or transmitted to, the Lender shall upon receipt by the Lender be credited to the Collateral Account established hereunder, subject to subsection (c) below. Each such credit shall be conditional upon final payment to the Lender of all items giving rise to such credit, and, if any item is not so paid, the credit for such item shall be reversed whether or not the item has been returned and the amount thereof, in the Lender's discretion may be charged to any operating account of Borrower with the Lender. All collections in the form of notes, drafts, acceptances or other instruments not payable on demand shall be delivered by the Borrower to the Lender. When such items are collected, the amount thereof shall be credited by the Lender to the Collateral Account, with appropriate notice to the Borrower. Until such items are collected, the Borrower will not, without the consent of the Lender, make any entry on its books or records indicating that the same were received in payment of the receivable giving rise thereto.

(iii)  At such intervals as the Lender may deem appropriate, the Lender shall charge and apply the full amount then on deposit in the Collateral Account in reduction or payment of Borrower's Loan Account, such application to be subject to the final payment in cash of all items theretofore credited to such Collateral Account.

**9.   Lien and Set Off.** The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations to the Lender upon and against all Collateral now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it.

**10.  Miscellaneous.**

**10.1  Certain Waivers.** Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and hereby agrees to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral, all without notice and without any effect on their liabilities. Any delay on the part of the Lender in exercising any right hereunder, or under any other Loan Document which may secure any Loan, shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default. The Lender may revoke any permission or waiver previously granted to Borrower, such revocation to be effective prospectively when given, whether given orally or in writing. The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

LENDER AND BORROWER IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR BORROWER IN RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

BORROWER (i) ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE

EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES ANY RIGHT TO PRIOR NOTICE OF, AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THE NOTES, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF THEIR PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

**10.2  Notices.** All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mail, postage prepaid, return receipt requested, addressed to the addressee at the address set forth herein as the Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto.

**10.3  Expenses; Additional Documents.** The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien, granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees). The Borrower will, from time to time, at its sole expense, execute and deliver to the Lender all such other and further instruments and documents, and take or cause to be taken all such other and further action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

**10.4  Addendums.** Any Addendums that are attached hereto are and shall constitute a part of this Agreement.

**10.5   Governing Law; Consent to Jurisdiction.** This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder, and thereunder, shall be construed and interpreted in accordance with the laws of the State of Florida, USA. The Borrower agrees that the execution of this Agreement and the other Loan Documents, and the performance of the Borrower's obligations hereunder, and thereunder, shall be deemed to have a Florida situs and the Borrower shall be subject to the personal jurisdiction of the courts of Florida with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower hereby specifically and irrevocably consents to the jurisdiction of the courts of Florida with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

**10.6   Survival of Representations.** All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

**10.7  Integration; Severability; Successors.** This Agreement is the final, complete and exclusive statement of the terms governing this Agreement. If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected. The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

**10.8  Determinations as to Compliance.** All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

**10.9  Termination of this Agreement.** This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances and/or full and final payment of all amounts with respect to all Loans or amounts otherwise due hereunder and under the other Loan Documents.

**10.10 Attorney's Fees.** Lender shall be entitled to recover all reasonable attorney's fees and expenses incurred by it in connection with enforcement of this Loan Agreement, including costs of collection.

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

BORROWER: **Greystone Hotel Miami, LLC**

By: _____     Date: ____8/8/14_____

James Vosotas                                              Member
Printed Name                                               Title

LENDER:      **Greystone EB-5 LLLP**
             By: South Atlantic Regional Center, Its General Partner

By: _____     Date: ____08.09.2014_____

Joseph Walsh                                             Managing Partner
Printed Name                                             Title

## PROMISSORY NOTE

For value received, **Greystone Hotel Miami, LLC**, a Florida limited liability company of 4901 NW 17th Way, Suite 503, Fort Lauderdale, FL 33309 (the "Borrower"), hereby promises to pay to the order of **Greystone EB-5 LLLP,** a Florida limited liability limited partnership of 197 S. Federal Hwy, Suite 200, Boca Raton, FL 33432 (the "Lender"), or at such other address as the holder hereof may designate, the principal amount of all advances made by the Lender to the Borrower hereunder, in lawful money of the United States. This Note evidences the Borrower's indebtedness under a Loan and Security Agreement with Lender (the "Loan Agreement"), as may be amended from time to time. During the period from the date hereof until the fifth anniversary ("Maturity Date") of the date of the first Advance hereunder ("First Advance"), the Lender may make advances ("Advances") from time to time thereunder and the Borrower may borrow; and provided, further, that the Lender's obligation to make advances and the Borrower's right to borrow are subject to the terms, conditions and limitations contained in this Note and the Loan Agreement.

The outstanding principal of all Advances hereunder will bear interest at the rate per annum of 6.00%. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable.

The balance of each Advance and all accrued unpaid interest thereon shall be repaid as follows. Borrower shall make interest only payments monthly on the balance of each Advance until the Maturity Date of each Advance. Upon Maturity of each Advance, Borrower shall pay the then outstanding balance of that Advance and all accrued unpaid interest thereon.

Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of each Advance and all accrued unpaid interest thereon upon Maturity (the "Initial Term"). If Borrower cannot refinance such amounts on commercially reasonable terms, or at all, within 30 days of the expiration of the Initial Term, or any Extension Period (as defined below), Borrower may, upon written notice to Lender, and in its sole discretion, extend the Maturity date for up to three additional one-year periods (each an "Extension Period"). During each Extension Period, Borrower shall make interest payments on the outstanding principal balance of each Advance and all accrued unpaid interest thereon then outstanding. Upon the commencement of the first Extension Period, the Interest Rate shall increase to 8%; upon the commencement of the second Extension Period, the Interest rate shall increase to 10%; upon the commencement of the third Extension Period, the Interest rate shall increase to 12%.

All payments hereunder shall be applied first to the payment of interest on the unpaid principal of all Advances outstanding under this Note, and then to the balance on account of the principal of all Advances due under this Note.

Borrower shall pay Lender a late charge of five (5%) percent of any amount due to the Lender which is not paid or reimbursed by the Borrower within 10 business days of the due date thereof

to defray the extra cost and expense involved in handling such delinquent payment and the increased risk of non-collection. The minimum late charge shall be $100.00.

If at any time, the rate of interest, together with all amounts which constitute interest and which are reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating or collection of any advance evidenced hereby, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Lender to the Borrower, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal.

The Borrower may not, without Lender's prior express written consent, prepay this Note prior to the expiration of the Initial Term. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of Lender.

Each Advance is issued to Borrower as part of an offering of investment Units to EB-5 Investors, and may be advanced before those investors' I-526 applications with USCIS are approved. In such a case, if an individual investor's I-526 application is denied without possibility of cure, Borrower shall, within 60 days, refund the full amount of the Advance attributable to that investor to Lender, unless Lender is able to replace those investment funds with a new EB-5 investor.

Upon the happening of any Event of Default (as defined in the Loan Agreement), all Advances outstanding hereunder, together with accrued interest thereon, shall, at the option of the Lender, accelerate and become immediately due and payable and any privilege of the Borrower to take or request advances hereunder shall terminate without demand or notice of any kind. Failure to exercise such option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. This Note has been executed and delivered in accordance with the Loan Agreement of even date herewith between the Borrower and the Lender, incorporated herein by reference, which sets forth further terms and conditions upon which the entire unpaid principal hereof and all interest hereon may become due and payable prior to the Termination Date, and generally as to further rights of the Lender and duties of the Borrower. All advances made by the Lender to the Borrower shall be evidenced by the books and records of the Lender which shall be conclusive, absent manifest error.

The Borrower agrees to pay all taxes levied or assessed upon the outstanding principal against any holder of this Note and to pay all reasonable costs, including attorneys' fees, costs relating to the appraisal and/or valuation of assets and all other costs for expenses incurred in the collection, protection, defense, preservation, and/or enforcement of this Note or any endorsement of this Note or in any litigation arising out of the transactions of which this Note or any endorsement of this Note is a part.

The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations subject to any priority liens of record upon and against all the deposits, credits, collateral and property of the Borrower, now or hereafter in the possession, custody, safekeeping

or control of the Lender or in transit to it. At any time, without demand or notice, and without being required to look first to any other security, the Lender may set off the same, or any part thereof, and apply the same to any obligation of the Borrower even though unmatured.

THE LENDER AND THE BORROWER IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR THE BORROWER IN RESPECT TO THIS NOTE OR ARISING OUT OF ANY DOCUMENT, INSTRUMENT OR AGREEMENT EVIDENCING, GOVERNING OR SECURING THIS NOTE, INCLUDING THE AFORESAID AGREEMENT.

THE BORROWER (1) ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS NOTE IS PART OF A COMMERCIAL TRANSACTION AND (2) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES THE RIGHT BORROWER MAY HAVE TO PRIOR NOTICE, OF AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THIS NOTE TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF BORROWER'S PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS NOTE.

The Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this Note, and all rights under any statute of limitations, and agrees that the time for payment of this Note may be changed and extended at the Lender's sole discretion, without impairing the Borrower's liability hereon, and further consents to the release of all, or any part, of the security for the payment hereof at the discretion of the Lender. Any delay on the part of the Lender in exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default.

The making of an advance at any time shall not be deemed a waiver of, or consent, agreement or commitment to or by the Lender to the making of any future advance to the Borrower.

If any provision of this Note shall, to any extent, be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Note shall not be affected.

This Note shall bind the heirs, executors, administrators, successors and assigns of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

This Note is secured in accordance with the terms of the Loan Agreement of even date herewith between the Lender and the Borrower, and by other security.

This Note is executed as a sealed instrument and shall be governed by, and construed in accordance with, the laws of the State of Florida, USA.

**[SIGNATURE PAGE FOLLOWS]**

**LENDER:  Greystone EB-5 LLLP**

By South Atlantic Regional Center, Its General Partner

By: _____     Dated: August 9th _____, 2014

Joseph Walsh     Managing Partner
Printed Name     Title


ACCEPTED

**BORROWER:  Greystone Hotel Miami, LLC**

By: _____     Dated: August 8 ____, 2014

James Vor.tni     Member
Printed Name     Title


STATE OF : FLORIDA

COUNTY OF : BROWARD

On this, the __8__ day of __August__, 2014 before me, the undersigned Notary Public, personally appeared the person listed above, who acknowledged himself to be an officer of Greystone Hotel Miami, LLC, and that he as authorized representative, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself as officer. IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.

_____ Notary Public
My Commission Expires

MITCHELL GARRETT
MY COMMISSION # EE860685
EXPIRES December 26, 2016

MITCHELL GARRETT
MY COMMISSION # EE860685
EXPIRES December 26, 2016