

# LIMITED PARTNERSHIP AGREEMENT

**LIMITED PARTNERSHIP AGREEMENT**
OF
**GREYSTONE EB-5 LLLP**

*A Florida Limited Liability Limited Partnership*

Greystone EB-5 LLLP
197 S. Federal Hwy, Suite 200
Boca Raton, FL 33432
Telephone: (561) 282-6102

**GREYSTONE EB-5 LLLP**
**LIMITED PARTNERSHIP AGREEMENT**

This Limited Partnership Agreement ("Agreement") is entered into and effective on the date signed below by and between the undersigned (hereafter, the "General Partner," "Limited Partners," or collectively, the "Partners"), as amended from time to time; WHEREAS, the Partners have caused a Certificate of Limited Partnership to be filed with the Florida Secretary of State forming a limited partnership under the name "Greystone EB-5 LLLP" (the "Partnership"); WHEREAS, the Partnership is formed for the purpose of investing in Qualifying Investments under the EB-5 Program; and WHEREAS, the parties hereto desire to set forth certain understandings and agreements among them with respect to the affairs of the Partnership and the conduct of its business; NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, the parties hereby agree as follows:

**DEFINITIONS**

Capitalized terms used in this Agreement shall have the meaning set forth below. Other terms defined throughout this Agreement shall have the meanings respectively ascribed to them.

***"Offering"*** means that certain private offering of Units of limited partnership interest in the Partnership described in the Partnership's Private Placement Memorandum.

***"Project"*** means development and operation by Greystone Hotel Miami, LLC, a Florida limited liability company, of the Greystone Hotel Project described in the accompanying Business Plan, which seeks to redevelop two adjacent historic properties on a premier corner of Miami Beach into the Greystone Hotel with restaurant and accessory spaces.

***"Adjusted Capital Contribution"*** means, with respect to each Partner, the aggregate capital contributed to the Partnership by such Partner reduced, from time to time, (i) by any return of a Capital Contribution made pursuant to this Agreement, and (ii) by the aggregate distributions of Net Proceeds from a Capital Event made to such Partner pursuant to this Agreement.

***"Affiliate"*** means, with respect to any Partner, any Person: (i) which owns more than 50% of the voting interests of such Partner; or (ii) in which the Partner owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interests are owned by a Person who has a relationship with the Partner described in clause (i) or (ii) above, or (iv) who otherwise controls, is controlled by, or under common control with, another Person.

***"Agent"*** means any officer, director, employee, trustee, partner, agent or representative of a Partner acting for or on behalf of such Partner or the Partnership.

***"Available Cash Flow"*** means funds provided from operation of the Partnership, without deductions for depreciation, but after deducting funds used to pay all expenses and debts of the Partnership, including administrative operational expenses, debt payments, capital improvements, and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

"***Bankruptcy***" means, with respect to any Partner: (i) an assignment for the benefit of creditors; (ii) a voluntary petition in bankruptcy; (iii) adjudication as bankrupt or insolvent; (iv) the filing of a petition or answer seeking any reorganization, arrangement, composition, readjustment,

liquidation or similar relief under any statute, regulation or law; (v) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Partner in any proceeding of this nature; (vi) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of such Partner's properties or of all or any substantial part of the Partner's properties; or (vii) any proceeding against the Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, that continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Partner or all or any substantial part of the Partner's properties without the Partner's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

*"Capital Contribution"* means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Partnership by a Partner, net of liabilities assumed or to which the assets are subject.

*"Capital Event"* means the refinance, sale, exchange or other disposition of Partnership Property or any portion thereof.

*"Code"* means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law or any corresponding provision, and all applicable Treasury Regulations.

*"Deficit Capital Account"* means the situation whereby the Partnership has made distributions to a Partner in excess of such Partner's Capital Account.

*"EB-5 Limited Partners"* means Limited Partners admitted to the Partnership as a result of Capital Contributions made into a Qualifying Investment, including the Offering (defined herein), under the EB-5 Program.

*"EB-5 Minimum Capital Requirement"* means the minimum capital investment required of EB-5 investors by USCIS to be at-risk under the EB-5 Program. The EB-5 Minimum Capital Requirement for the Project is USD $500,000.

*"EB-5 Program"* means the program adopted by the U.S. Congress creating the EB-5 Regional Center Program.

*"Economic Interest"* means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Partnership.

*"General Partner"* means South Atlantic Regional Center and United EB5, LLC (collectively, "General Partners").

*"Incapacity"* means (i) the entry of a judgment by a court of competent jurisdiction to the effect that a Partner who is an individual is incompetent to manage such Partner's affairs, or the appointment of a guardian ad litem by a court of competent jurisdiction to manage such Partner's affairs; or (ii) the incapacity of a Partner who is an individual to perform his or her duties as a Partner as determined by (a) the vote of at least a majority of the Units not held by such Partner, and if such Partner is not in agreement with such determination, the certification of a physician selected by mutual agreement between such Partner and the holders of at least a majority of the Units not held by such Partner, or (b) the certification of a physician selected by the Partner and, if the holders of at least a majority of the Units not held by the Partner are not in agreement with

such certification, the certification of a physician selected by mutual agreement between the Partner and the holders of at least a majority of the Units not held by such Partner.

***"Interest Holder"*** means any Person who holds an Economic Interest, whether as a Partner or an un-admitted assignee of a Partner.

***"Involuntary Withdrawal"*** means, with respect to any Partner, the occurrence of any of the following events: (i) the Bankruptcy of a Partner; (ii) if the Partner is an individual, the Partner's death or Incapacity; (iii) if the Partner is acting as a Partner by virtue of being a trustee of a trust, the termination of the trust; (iv) if the Partner is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company; (v) if the Partner is a corporation, the dissolution of the corporation or the revocation of its charter; or (vi) if the Partner is an estate, the distribution by the fiduciary of the estate's entire interest in the Partnership.

***"Limited Partner"*** means each Person who is admitted as a Limited Partner of the Partnership.

***"Majority-In-Interest"*** means Partners holding a majority of all Partners' or Interest Holders', as the case may be, Economic Interests in the Partnership.

***"Net Proceeds from a Capital Event"*** means the net proceeds derived by the Partnership from a Capital Event after payment or allowance for the expenses incurred in connection with such Capital Event and after payment or allowance for existing indebtedness (but not including any outstanding Secured Debt), the discharge of any other expenses or liabilities of the Partnership and the establishment of appropriate reserves, all as determined by the Managing General Partner, in its sole discretion.

***"Partner"*** or ***"Partners"*** means each Person who has signed this Agreement and any Person who subsequently is admitted as a Partner of the Partnership.

***"Partnership Interest"*** means all of the rights of a Partner in the Partnership, including a Partner's: (i) Economic Interest; and (ii) right to participate in the management of the Partnership as provided in this Agreement.

***"Percentage"*** or ***"Percentage Interest"*** means, as to a Partner, a percentage equal to 100% divided by the total number of Units.

***"Person"*** means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

***"Preferred Return"*** means the cumulative annual preferred distribution of Profits to EB-5 Limited Partners in an amount equal to 0.25% of each EB-5 Limited Partner's initial Capital Contribution; five years after the date an EB-5 Limited Partner is admitted to the Partnership, this rate shall increase to 5%. If Available Cash Flow is insufficient to pay all amounts due as Preferred Return hereunder at the end of any year, the unpaid balance thereof shall continue to accrue uncompounded until the end of the next year, and from year to year until there is Available Cash Flow sufficient for payment in full of the Preferred Return. The ability of the Partnership to pay the Preferred Return is reliant upon the performance of the Partnership's investments and is therefore not guaranteed.

***"Profits"*** and ***"Losses"*** mean, for each fiscal year, an amount equal to the Partnership's taxable income or loss for such year, determined in accordance with Code Section 703(a) (including all items required to be stated separately) with the following adjustments: (a) Any income exempt

from federal income tax shall be included; and (b) Any expenditures of the Partnership described in Code Section 705(a)(2)(B) (including expenditures treated as such pursuant to Treas. Reg. Section 1.704-1(b)(2)(iv)(i)) shall be subtracted.

*"Property"* or the *"Partnership Property"* means all real and personal property of the Partnership.

*"Qualifying Investment"* means an investment that will generate full-time employment positions, either directly or indirectly, for not fewer than ten U.S. workers per EB-5 Limited Partner whose Capital Contributions have been so applied.

*"Regional Center"* means South Atlantic Regional Center, a Florida limited liability company of 197 S. Federal Hwy, Suite 200, Boca Raton, FL 33432. The Regional Center is an entity approved by USCIS as a regional center under the EB-5 Program, and is the sponsor of the Project.

*"Regulations"* or *"Treas. Reg."* means the income tax regulations promulgated under the Code as amended from time to time (including corresponding provisions of succeeding regulations).

*"Transfer"* means — when used as a noun — any sale, hypothecation, pledge, assignment, gift, bequest, attachment, or other transfer, including transfers by operation of law, and — when used as a verb — means to sell, hypothecate, pledge, assign, give, bequeath, or otherwise transfer.

*"Units"* means limited partnership units representing each Partner's undivided interest in the capital of the Partnership.

*"USCIS"* means the United States Citizenship and Immigration Services.

*"Voluntary Withdrawal"* means a Partner's disassociation with the Partnership by means other than a Transfer or an Involuntary Withdrawal.

## ARTICLE 1
## FORMATION OF THE PARTNERSHIP

1.1     **Formation of Limited Partnership.** The Partners have organized the Partnership pursuant to the provisions of the Florida Limited Partnership Act, as amended from time to time (the "Act"), under the name "Greystone EB-5 LLLP", intending the Partnership to be a limited partnership under the Act. Except as otherwise provided herein, all rights, liabilities and obligations of the Partners shall be as provided in the Act.

1.2     **Principal Place of Business and Agent for Service.** The principal place of business of the Partnership shall be 197 S. Federal Hwy, Suite 200, Boca Raton, FL 33432, or at such other place in the State of Florida as may be designated by the General Partner. The Agent for Service of Process of the Partnership in the State of Florida is Joseph Walsh, Sr. until otherwise determined by the General Partner.

1.3     **Purposes.** The purposes of the Partnership shall be to engage in any lawful acts or activities for which limited liability companies may be formed under the Act. Without limiting the foregoing, the Partnership was formed for the purpose of investing in Qualifying Investments under the EB-5 Program.

1.4     **Duration of the Partnership.** The Partnership shall commence on the date on which its Certificate of Limited Partnership was accepted and filed by the Florida Secretary of State, and shall continue in perpetuity until dissolved in accordance with this Agreement.

## ARTICLE 2
## CAPITALIZATION

2.1     **Units; Initial Capital Contributions.**

2.1.1   Each Partner's undivided interest in the capital of the Partnership shall be represented by Units. Each Limited Partnership Unit shall represent an interest in the capital of the Partnership and shall be identical in all respects to every other Limited Partnership Unit. Notwithstanding the foregoing, only EB-5 Limited Partners shall be entitled to Preferred Returns. Each General Partnership Unit shall represent an interest in the capital of the Partnership and shall be identical in all respects to every other General Partnership Unit, except as specified herein. General Partnership Units and Limited Partnership Units shall have the relative rights and preferences accorded General Partners and Limited Partners set forth in this Agreement and the Act.

2.1.2   The Partnership shall be capitalized by each Limited Partner contributing a Capital Contribution, with such Limited Partner receiving, in exchange therefor, one Unit per USD $500,000 invested. The Capital Contribution of EB-5 Limited Partners may be placed in escrow in accordance with an Escrow Agreement signed by EB-5 Limited Partners simultaneously herewith.

2.1.3   Together with his/her Capital Contribution, each EB-5 Limited Partner shall also concurrently make a USD $45,000 payment to the Partnership as an administrative fee (the "Administrative Fee") to pay the costs and expenses incurred in connection with the organization of the Partnership, negotiation of the Loan, and placement of the Units. The Administrative Fee shall not be considered a Capital Contribution to the Partnership.

2.1.4   An EB-5 Limited Partner shall be conditionally accepted to the Partnership upon receipt by the Partnership of his/her Capital Contribution and the Administrative Fee. The Capital Contribution shall be released from escrow and delivered to the Partnership upon or before the USCIS approval of the Form I-526 petition for such conditionally accepted EB-5 Limited Partner, in accordance with the Escrow Agreement. Upon release of the Capital Contribution to the Partnership, an EB-5 Limited Partner shall be admitted to the Partnership.

2.1.5   A Partner shall not have the right to demand or receive the return of such Partner's Capital Contribution except as otherwise expressly provided herein. The Partners shall have no obligation to make additional Capital Contributions. The Partners may make an additional Capital Contribution to the Partnership upon consent of the General Partner. No interest shall be paid on Capital Contributions.

2.1.6   Interest will be charged by the Partnership to a Partner on the sum of any deemed distributions charged to such Partner's Capital Account from obligations to the Partnership arising under Section 4.8 concerning federal income tax withholding. The interest charged will

be computed on a calendar year compounded basis at a rate equal to two percent above the prime rate of interest from time to time announced by Bank of America, or its successors, to be its "prime rate," such interest to be collected by reduction of any distributions payable to the Partner immediately following the calculation of the year's interest by the General Partner. To the extent that there are no distributions against which the interest can be applied, then the interest will be charged to the Partner's Capital Account. This Section will survive the termination of a Partner's status as a Partner.

2.1.7   No Partner shall have any right to withdraw or make a demand for the withdrawal of any of such Partner's Capital Contribution (or the capital interest reflected in such Partner's Capital Account) until the full and complete winding up and liquidation of the Partnership. No Partner shall have the right to demand Partnership Property.

2.1.8   Loans or advances by any Partner to the Partnership can only be made after and in addition to a Partner's initial Capital Contribution. Loans or advances by any Partner to the Partnership shall not be considered additional Capital Contributions and shall not increase the Capital Account of the lending or advancing Partner. No Partner shall be required to lend any cash or property to the Partnership.

## 2.2   Capital Accounts.

2.2.1   The Partnership shall establish and maintain Capital Accounts ("Capital Accounts") for each Partner in accordance with the Code, applicable Regulations, and the provisions hereof. Except as required by the Code, the Capital Account of each Partner shall consist of his Capital Contribution, as increased by any contribution of capital subsequent to his original Capital Contribution, and by such Partner's share of Partnership income and gain allocated after the date hereof to such Partner, and as decreased by the amount of all cash and the fair market value of all property and assets distributed to such Partner, the amount of all losses allocated after the date hereof to such Partner, and any amounts charged under Section 4.8 to such Partner.

2.2.2   The provisions of this Article 2 as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit to have substantial economic effect under the Regulations promulgated under the Code, in light of the distributions and the Capital Contributions made pursuant hereto. All allocations of items that cannot have economic effect (including credits and nonrecourse deductions) shall be allocated to the Partners in accordance with their respective Percentage Interests. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation.

2.2.3   The Capital Account of a transferring Partner shall become the Capital Account of the transferee to the extent it relates to the Units transferred.

## ARTICLE 3
## ALLOCATIONS AND DISTRIBUTIONS

3.1    **Allocation of Profits and Losses.** Profits and Losses for each fiscal year shall be allocated among Partners in the following order and priority: (a) First, to Partners in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) The balance, to Partners in accordance with their respective Percentage Interests.

To the extent the allocations of profits and losses otherwise provided under this Agreement are not made in accordance with a Partner's Interest in the Company within the meaning of Code Section 704, the allocations shall be made to the appropriate Partners in the necessary and required amounts in order to comply with Code Section 704(b). The General Partner shall be authorized to make appropriate amendments to the allocations of items pursuant to this Section 3.1 if necessary, in the discretion of the General Partner, in order to comply with Code Section 704 or applicable Regulations thereunder; provided that no such change shall have a material adverse effect upon the amount distributable to any Partner hereunder.

In the event Partners are admitted to the Company pursuant to this Agreement on different dates, the Company Profits (or Company Losses) allocated to the Partners for each Fiscal Year during which Partners are so admitted shall be allocated among the Partners in proportion to their Percentage Interests during such Fiscal Year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Manager.

3.2    **Limitation on Allocation of Losses.** Notwithstanding the foregoing, the Losses allocated pursuant hereto shall not exceed the maximum amount of Losses that can be so allocated without causing any Partner to have a Deficit Capital Account at the end of any fiscal year. In the event some but not all of the Partners would have a Deficit Capital Account as a consequence of an allocation of Losses pursuant hereto, the limitation set forth in this Section 3.2 shall be applied on a Partner by Partner basis so as to allocate the maximum permissible Losses to each Partner under Regulation Section 1.704- 1(b)(2)(ii)(d).

3.3.    **Deficit Capital Accounts at Liquidation.** Partners shall have no liability to the Partnership, to the Partners, or to the creditors of the Partnership on account of any deficit balance in their Capital Accounts upon liquidation of the Partnership, provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligations described in Section 4.8 is required to pay to the Partnership the amount of any negative balance in his Capital Account, but such payment shall not exceed the obligations under Section 4.8. This Section 3.3 will survive the termination of a Partner's status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Partnership or the General Partner in collecting amounts under this provision from any Partner.

3.4    **Distributions.** The General Partner shall determine the timing, amount, if any, and form (cash or property) of all distributions to Partners in its sole discretion and notwithstanding any other provision of this Agreement.

3.4.1   **Available Cash Flow.** Subject to the limitations set forth in Section 3.5, Available Cash Flow shall be distributed on an annual basis, as follows:

(a)      to Partners in amounts required by Section 3.6, Mandatory Distributions;

(b)      then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's accrued unpaid Preferred Return, less any amounts then due and owing by such EB-5 Limited Partner to the Partnership, including his/her Additional Administrative Fees;

(c)      then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's Adjusted Capital Contribution;

(d)      then to Partners other than EB-5 Limited Partners pro rata in accordance with such Partners' Adjusted Capital Contribution in an amount up to each such Partner's Adjusted Capital Contribution; and

(e)      then to the General Partners.

3.4.2   **Net Proceeds from a Capital Event or from Dissolution.** The Net Proceeds from a Capital Event and/or a distribution resulting from the dissolution of the Partnership shall be distributed in the same manner as Available Cash Flow, as set forth in 3.4.1 above. Net Proceeds from a Capital Event and/or a distribution from the dissolution of the Partnership shall be distributed to Partners within 120 days of such Capital Event or dissolution of the Partnership.

3.5      **Limitation on Distributions.** Notwithstanding any other provision of this Article 3, the Partnership shall not make a distribution:

3.5.1   To the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Partnership, other than liabilities to Partners on account of their Partnership Interests, exceed the fair value of the assets of the Partnership.

3.5.2   To EB-5 Limited Partners to the extent that such distributions result in their Capital Accounts being less than the EB-5 Minimum Capital Requirement. After the fifth anniversary date of an EB-5 Limited Partner's admission as a Limited Partner of the Partnership and the approval of that investor's I-829 application with USCIS, the foregoing restriction shall no longer apply.

3.5.3   To the extent that such distribution is prohibited under the Act.

3.6      **Mandatory Distributions.** The Partnership shall make distributions from Available Cash Flow to Partners for the payment of taxes incurred by such Partner as a result of allocation of Profits to such Partner by the Partnership. The amount distributable with respect to any year shall be equal to the aggregate amount of U.S. Federal, state and local income taxes payable by the Partners with respect to the taxable income of the Partnership, assuming, for purposes of

determining the amount of such distribution, that each Partner will be taxed on the net amount set forth in the Partner's respective K-1 at the highest marginal individual Federal income tax rate for such year, and at the highest marginal individual state and local income tax rates applicable to any Partner for each such taxable year. Such distributions shall be made within 90 days of the end of the Partnership's fiscal year or such other time or times as may be determined by the General Partner.

3.7     **Record Date.** All items of Partnership income, gain, loss and deduction shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Partnership to have been Partners as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, if any Units in the Partnership shall be transferred during a taxable year, items of Partnership income, gain, loss and deduction for such period shall be allocated among the original Partners and the successor on the basis of the number of days each was a Partner during such period; provided, however, that if the Partnership has any extraordinary non-recurring items for the taxable year in which the transfer of Units occurs, such period shall be segregated into two or more segments in order to account for income, gain, loss, deductions or proceeds attributable to such extraordinary non-recurring items of the Partnership.

## ARTICLE 4
## MANAGEMENT

**4.1     The General Partner.** The business and the affairs and all powers of the Partnership shall be exercised exclusively by the General Partner. The General Partner may resign at any time. In the event of resignation of the General Partner, the remaining Partners may elect one or more new General Partners by the vote of a Majority-In-Interest of the remaining Partners. If the General Partner is an individual, upon the death or incapacity of the General Partner, the personal representative of the General Partner shall appoint a new General Partner. If the General Partner is a legal entity, upon the liquidation or termination of the General Partner the remaining Partners shall elect one or more new General Partners by the vote of a Majority-In-Interest of the remaining Partners.

**4.2     Authority and Powers of the General Partner.** The General Partner shall have the exclusive right and power to manage, operate and control the Partnership and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Partnership. In the case of more than one General Partner, each General Partner shall vote, and a simple majority of votes shall prevail. In the case of a tie, South Atlantic Regional Center shall cast the tie-breaking vote. In addition to the specific rights and powers herein granted to the General Partner, the General Partner shall possess and enjoy and may exercise all the rights and powers of a General Partner under the Act, including the full and exclusive power and authority to act for and to bind the Partnership. The scope of the General Partner's power and authority shall encompass all matters connected with or incident to the business of the Partnership, including but not limited to the power and authority:

4.2.1   To spend and or invest the capital and revenue of the Partnership to maximize return to the Partnership, including the acquisition of the Partnership Property;

4.2.2    To manage, sell, develop, purchase, mortgage, improve, operate and dispose of Partnership Property;

4.2.3    To employ persons, firms and/or corporations for the sale, operation, management, syndication and development of Partnership Property, including but not limited to sales agents, broker-dealers, attorneys and accountants;

4.2.4    To employ agents, attorneys, accountants, engineers and other consultants or contractors who may be Affiliates of a Partner or the General Partner; however, any employment of such persons must be on terms not less favorable to the Partnership than those offered by unaffiliated persons for comparable services in the same area;

4.2.5    To acquire and or sell Partnership Property or property in which the Partnership has an interest, lease real property, borrow on a secured or unsecured basis in the name of the Partnership, grant Partnership Property as security for a loan to the Partnership;

4.2.6    To hire and fire employees, and appoint agents/representatives to manage the day-to-day operations of the Partnership;

4.2.7    To execute, acknowledge and deliver any and all instruments to effectuate any of the foregoing powers and any other powers granted to the General Partner under the laws of the State of Florida or other provisions of this Agreement, and to take all other acts necessary, appropriate, or helpful for the operation of the Partnership business;

4.2.8    To enter into such agreements and contracts with parties and to give such receipts, releases and discharges, with respect to the business of the Partnership, which the General Partner, in its sole discretion, deems necessary or appropriate to own, sell, improve, operate and dispose of Partnership Property or to effectively and properly perform its duties or exercise its powers hereunder;

4.2.9    To purchase, at the expense of the Partnership, such liability and other insurance as the General Partner, in its sole discretion, deems advisable to protect the Partnership's assets and business; however, the General Partner shall not be liable to the Partnership or the other Partners for failure to purchase any insurance, including earthquake insurance, unless such act or omission constitutes gross negligence or willful misconduct;

4.2.10  To sue and be sued, complain, defend, settle, and/or compromise, with respect to any claim in favor of or against the Partnership, in the name and on behalf of the Partnership; and

4.2.11  To grant Partnership Property as security for a loan to the Partnership, and sign all documents required to grant such security interests in Partnership property, without the signatures or consents of the Partners provided that such borrowing is in furtherance of the purpose of the Partnership.

4.3 **Liability of the General Partner.** A General Partner shall not have any liability to the Partnership or to any Partner for any mistakes or errors in judgment, or for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement. A General Partner shall be liable only for acts and/or omissions involving intentional wrongdoing. Actions or omissions taken in reliance upon the advice of legal counsel that they are within the scope of a General Partner's authority hereunder shall be conclusive evidence of good faith; provided, however, a General Partner shall not be required to procure such advice to be entitled to the benefit of this subparagraph.

4.4 **Time Devoted to Partnership; Other Ventures.** The General Partner shall devote so much of their time to the business of the Partnership as in its judgment the conduct of the Partnership's business reasonably requires. The General Partner may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Partnership, and neither the Partnership nor any of the other Partners shall have any rights in and to such independent ventures and activities or the income or profits derived therefrom by reason of the acquisition of Units.

4.5 **Books and Records.**

(a) The General Partner shall maintain or cause to be maintained complete and accurate books of account (containing such information as shall be necessary to record allocations and distributions), and make such records and books of account available for inspection by any Partner, or any Partner's duly authorized representative, during regular business hours and at the principal office of the Partnership, upon reasonable notice and for any purpose related to his or her ownership of Units.

(b) Within sixty (60) days after the end of each calendar year, there shall be prepared and distributed to all Partners reasonable tax-reporting information, in sufficient detail to enable such Partner to prepare such Partner's federal, state and local income tax returns.

(c) Within ninety (90) days after the end of each calendar year, there shall be prepared and distributed to each Partner, a balance sheet, and a report of the receipts, disbursements, net profits and losses, and cash flow of the Partnership, and the share of the net profits and losses and cash flow of each Partner for such calendar year. Such balance sheet and report shall be prepared by the Partnership's accountant in accordance with the method of accounting used by the Partnership for tax purposes.

4.6 **Tax Returns.** The taxable year of the Partnership shall be the calendar year. The General Partner shall, at Partnership expense, cause the Partnership to prepare and file all tax returns required to be filed by the law for each fiscal year of the Partnership.

4.7 **Tax Elections and Adjustments.** The General Partner is authorized to cause the Partnership to make, forego or revoke such elections or adjustments for federal income tax purposes as it deems necessary or advisable in its sole discretion, provided such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Units of any Partner, an election pursuant to

Section 754 of the Code to adjust the basis of the assets of the Partnership or any similar provision enacted in lieu thereof. The Partners will, upon request, supply any information necessary to properly give effect to any such election or adjustment.

4.8     **Federal Income Tax Withholding.** The General Partner is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners. In the event that the General Partner learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the General Partner will issue an invoice to the Partner. If the invoice is not paid within sixty (60) days, the General Partner will charge the amount against the Partner's Capital Account. This Section will survive the termination of a Partner's status as a Partner.

**ARTICLE 5**
**INDEMNIFICATION**

5.1     **Third Party Actions.** The Partnership may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, including all appeals (other than an action, suit or proceeding by or in the right of the Partnership) by reason of the fact that he is or was a partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a partner, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Partnership and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interest of the Partnership and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

5.2     **Derivative Actions.** The Partnership may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit, including all appeals, by or in the right of the Partnership to procure a judgment in its favor by reason of the fact that he is or was a limited partner or general partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a member, General Partner, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Partnership, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been finally adjudged to be liable for negligence or misconduct in the performance of his duty to the Partnership unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of

liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

5.3     **Rights After Successful Defense.** To the extent that a Partner, General Partner, officer or employee has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 5.1 or 5.2, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

5.4     **Other Determination of Rights.** Except in a situation governed by Section 5.3, any indemnification under Section 5.1 or 5.2 (unless ordered by a court) shall be made by the Partnership only as authorized in the specific case upon a determination that indemnification of the Partner, General Partner, officer or employee is proper in the circumstances because he has met the applicable standard of conduct set forth in Section 5.1 or 5.2. Such determination shall be made by the General Partner.

5.5     **Advances of Expenses.** Expenses of each person indemnified hereunder incurred in defending a civil, criminal, administrative or invesigative action, suit or proceeding (including all appeals), or threat thereof, may be paid by the Partnership in advance of the final disposition of such action, suit or proceeding as authorized by the General Partner upon receipt of an undertaking by or on behalf of the Partner, General Partner, officer or employee, to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Partnership.

5.6     **Nonexclusiveness; Heirs.** The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law or under the Certificate of Limited Partnership, or any agreement, any insurance purchased by the Partnership, or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Partner, General Partner, officer or employee and shall inure to the benefit of the heirs, executors and administrators of such a person.

5.7     **Purchase of Insurance.** The Partnership may purchase and maintain insurance on behalf of any person who is or was a Partner, General Partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a General Partner, officer or employee of another company, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Partnership would have the power to indemnify him against such liability under the provisions of this Article or of the Act.

## ARTICLE 6
## EXPENSES

6.1     **Partnership Expenses.** The Partnership shall pay all costs and expenses related to the conduct of its business, including those relating to investing in Qualifying Investments, which may include, but are not limited to: (1) All costs of personnel employed by the Partnership or

performing services for the Partnership; (2) All costs of borrowed money including repayment of advances to the Partnership made by a Partner; (3) All administrative costs, including fees charged by the Regional Center in connection with administration of the Project, legal, audit, accounting, brokerage and other fees; (4) Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of Units of the Partnership or in connection with the business of the Partnership; (5) Fees and expenses paid to contractors, mortgage bankers, brokers and services, leasing agents, consultants, on-site General Partners, real estate brokers, insurance brokers and other agents, including Affiliates of the Partnership, the General Partner or any Partner; (6) Expenses in connection with the acquisition, preparation, operation, improvement, development, disposition, replacement, alteration, repair, remodeling, refurbishment, leasing, and financing and refinancing of Partnership property; (7) The cost of insurance obtained in connection with the business of the Partnership; (8) Expenses of organizing, revising, amending, converting, modifying or terminating the Partnership; (9) Expenses in connection with distributions made by the Partnership to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Partners; (10) Expenses in connection with preparing and mailing reports required to be furnished to Partners for required tax reporting, or other purposes which the General Partner deems appropriate; (11) Costs incurred in connection with any litigation, including any examination or audits by regulatory agencies; and (12) Costs of preparation and dissemination of informational material and documentation relating to potential sale, refinancing or other disposition of Partnership property.

## ARTICLE 7
## PARTNERS

7.1     **Partners.** The General Partner shall maintain a current list setting forth the full name, last known mailing address, and the number and class of Units of each current and former Partner of the Partnership. This information is reflected on Schedule A of this Agreement and is hereby made a part hereof. With each change in the Partnership's Partners (or any information on Schedule A), the Partnership shall revise such list to reflect such changes. Partners shall have only the rights and powers set forth in this Agreement unless otherwise provided by the Act.

7.2     **General Partners.** The Partnership shall at all times have at least one General Partner, as defined by the Act, that is subject to the liabilities of a partner in a partnership without limited partners to persons other than the partnership and other partners. The initial General Partners shall be listed in Schedule A as amended from time to time.

7.3     **Limited Partners.** The Partnership shall at all times have at least one limited partner as defined by the Act. The Limited Partners of the Partnership shall be listed in Schedule A, as amended from time to time. The Partnership shall have two classes of limited partners unless and until one or more additional classes are authorized by the General Partner. EB-5 Limited Partners (EB5LP) shall constitute a class of Limited Partners that shall have all of the rights of a Limited Partner set forth herein in addition to the right to Preferred Returns.

7.4     **Meetings.** Meetings of the Partners may be called only by the General Partner. Not less than seven or more than sixty days before the date fixed for a meeting of Partners, written notice

stating the time and place of the meeting, and in the case of a special meeting the purposes of such meeting, shall be given by or at the direction of the General Partner. The notice shall be given by personal delivery or by mail to each Partner entitled to notice of the meeting who is of record as of the day next preceding the day on which notice is given or, if a record date therefor is duly fixed, of record as of said date; if mailed, the notice shall be addressed to the Partners at their respective addresses as they appear on the records of the Partnership. Notice of the time, place and purposes of any meeting of Partners may be waived in writing, either before or after the holding of such meeting, by any Partners, which writing shall be filed with or entered upon the records of the meeting. The attendance of any Partners at any such meeting without protesting the lack of proper notice, prior to or at the commencement of the meeting, shall be deemed to have waived notice of such meeting.

7.5    **Quorum; Adjournment.** At any meeting of Partners, whether present in person or by proxy, a Majority-In-Interest of Partners shall constitute a quorum for such meeting; provided, however, that no action required by law or by the Certificate of Limited Partnership to be authorized or taken by a designated proportion of the Percentage Interests of the Partnership, or a particular class thereof, may be authorized or taken by a lesser proportion; and provided, further, that the holders of a majority of the Percentage Interests represented thereat, whether or not a quorum is present, may adjourn such meeting from time to time; if any meeting is adjourned, notice of such adjournment need not be given if the time and place to which such meeting is adjourned are fixed and announced at such meeting. If permitted by the General Partner, Partners may participate in any meeting through telephonic or similar communications equipment by means of which all persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

7.6    **Voting of Limited Partners.** On any matter presented by the General Partner, in its sole discretion, to the Limited Partners or any class thereof for their vote, each Limited Partner shall have one vote for each Unit owned by him. Limited Partners entitled to vote or to act with respect to Units in the Partnership may vote or act in person or by proxy. The person appointed as proxy need not be a Limited Partner. Unless the writing appointing a proxy otherwise provides, the presence at a meeting of the person having appointed a proxy shall not operate to revoke the appointment. Notice to the Partnership, in writing or in open meeting, of the revocation of the appointment of a proxy shall not affect any vote or act previously taken or authorized. The following actions shall require the approval of Limited Partners holding a majority of the then outstanding Units held by Limited Partners: (i) any modification to this Agreement materially changing the rights of the Limited Partners; and (ii) dissolution of the Company prior to the end of the fifth year after admission of the last EB-5 Limited Partner.

7.7    **Action Without a Meeting.** Any action which may be authorized or taken at a meeting of Partners may be authorized or taken without a meeting in a writing or writings signed by all of the Partners entitled to vote on such matter, which writing or writings shall be filed with or entered upon the records of the Partnership. A facsimile, photographic, photostatic or similar transmission or reproduction of a writing signed by a Partner, shall be regarded as signed by the Partner for purposes of this Section.

## ARTICLE 8
## RESTRICTIONS ON TRANSFER

8.1     **Transfers.** No EB-5 Limited Partner may voluntarily Transfer all, or any portion of, or any interest or rights in, his/her Partnership Interest. Each EB-5 Limited Partner acknowledges the reasonableness of this prohibition in view of the purposes of the Partnership and the relationship of the Partners. The voluntary Transfer of any Partnership Interests, including Economic Interests, in violation of the prohibition contained in this Section 8.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Partnership Interests are attempted to be transferred in violation of this Section 8.1 shall not be entitled to vote, receive distributions from the Partnership, or have any other rights in or with respect to the Partnership Interests. All Partners other than EB-5 Limited Partners may freely transfer his/her Units with consent of the General Partner.

8.2     **Voluntary Withdrawal.** No Limited Partner shall have the right or power to Voluntarily Withdraw from the Partnership. Any Voluntary Withdrawal in violation of this Agreement shall entitle the Partnership to damages for breach, which may be offset against the amounts otherwise distributable to such Limited Partner.

8.3     **Involuntary Withdrawal.** Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawing Partner shall thereupon become an Interest Holder, but shall not become a Partner. The successor Interest Holder shall have all the rights of an Interest Holder, but shall not be entitled by reason of the withdrawal to receive in liquidation of the Partnership Interest, the fair market value of the withdrawing Partner's Economic Interest.

8.4     **Right of First Refusal.**

8.4.1   **Voluntary Transfer.** If any EB-5 Limited Partner intends to transfer his or her Units or any part thereof to any person or entity, after obtaining approval required hereunder, such Partner shall give written notice to the Partnership of his intention so to transfer. The notice, in addition to stating the fact of the intention to transfer a Partnership Interest, shall describe (i) the Partnership Interest to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the transfer is for valuable consideration, and (iv) if so, the amount of the consideration and the other terms of the sale. The Partnership shall promptly send a copy of such notice to all other Partners.

8.4.2   **Partnership Option.** Within thirty (30) days after the receipt by the Partnership of the notice of intention to transfer Units, the Partnership may exercise an option, which is hereby granted by the Partner intending to Transfer his or her Units, to purchase the Units proposed to be transferred, for the price and upon the other terms hereinafter provided. The Partnership may, at its election, terminate its option period by giving a notice to the selling Partner and all other Partners that the Partnership has elected not to exercise its option granted in this Section 8.4.2.

8.4.3   **General Partner Option.** In the event that the option granted to the Partnership in Section 8.4.2 is not exercised in its entirety, then the remaining General Partner(s) of the Partnership may, within the earlier of (i) sixty (60) days from receipt of notice of intention to

transfer from the transferring General Partner, or (ii) thirty (30) days from receipt of notice that the Partnership has elected not to exercise its option, exercise an option which is hereby granted, to purchase all of the Units for the price and upon the other terms hereinafter provided. If more than one General Partner exercises the option hereunder, such General Partners (hereinafter, the **"Participating General Partners"**) shall be entitled to purchase a proportion of the Units proposed to be transferred determined by a fraction, the numerator of which shall be equal to the Units owned by each such Participating General Partner and the denominator of which shall be equal to the aggregate Units owned by all Participating General Partners, or such other proportion of such Units as shall be agreed upon in writing by all Participating General Partners. The option granted to the General Partners in this Section 8.4.3 shall expire at the end of the option period herein granted if options for all of the Units are not exercised by the last date of such option period.

8.4.4   **Limited Partner Option.** In the event that the option granted to the Partnership in Section 8.4.2 is not exercised in its entirety, and the option granted to the General Partner in Section 8.4.3 is not exercised in its entirety, then the remaining Limited Partners of the Partnership may, within the earlier of:

> (i)      seventy five (75) days from receipt of notice of intention to transfer from the transferring Partner, or

> (ii)     thirty (30) days from receipt of notice that the General Partners have elected not to exercise their option, exercise an option which is hereby granted, to purchase all of the Units for the price and upon the other terms hereinafter provided. If more than one Limited Partner exercises the option hereunder, such Limited Partners (hereinafter, the **"Participating Limited Partners"**) shall be entitled to purchase a proportion of the Units proposed to be transferred determined by a fraction, the numerator of which shall be equal to the Units owned by each such Participating Limited Partner and the denominator of which shall be equal to the aggregate Units owned by all Participating Limited Partners, or such other proportion of such Units as shall be agreed upon in writing by all Participating Limited Partners. The option granted to the Limited Partners in this Section 8.4.4 shall expire at the end of the option period herein granted if options for all of the Units are not exercised by the last date of such option period.

8.4.5   **Involuntary Transfer.** If a Partner's Units are transferred by operation of law to any person (such as, but not limited to, a deceased Partner's estate, a Partner's trustee in bankruptcy, a purchaser at any creditor's or court sale or the guardian or conservator of an incompetent Partner), the Partnership within forty-five (45) days of the receipt by it of actual notice of the transfer may exercise its option, which is hereby granted, and, if not exercised by the Partnership, the General Partners within sixty (60) days of the receipt of actual notice of the transfer may exercise their respective options, which are hereby granted, and if not exercised by the General Partner, the Limited Partners within seventy-five (75) days of receipt of actual notice of the transfer may exercise their respective options, which are hereby granted to purchase the Units so transferred for the price determined pursuant to Section 8.4.9 below and in the same manner as provided in Sections 8.4.2, 8.4.3 and 8.4.4 with respect to Units proposed to be transferred.

8.4.6   **Exercise of Options.** The purchase options granted in this Section 8.4 shall be exercised by delivery of written notice of exercise within the time periods provided in said section to the transferring Partner and/or the proposed transferee in the case of a transfer pursuant to Section 8.4.2, 8.4.3 or 8.4.4, as the case may be.

8.4.7   **Failure to Exercise Option.** If the purchase options are not exercised in compliance with this Section 8.4, then the Units may be transferred to the proposed transferee named in the notice required by Section 8.4.1, and upon the terms therein stated, or to the transferee in the case of an Involuntary Withdrawal, within thirty (30) days after the expiration of the option period granted in Section 8.4.4. In the case of a Transfer as the result of an Involuntary Withdrawal, unless otherwise prohibited therein, the Units, after the expiration of the option periods set forth therein shall, in the hands of the transferee, be subject to the provisions of this Agreement. A subsequent transferee under Section 8.4 shall thereafter be subject to the terms of this Agreement as if such transferee had originally executed it. Unless and until admitted as a Partner, any transferee of any Partnership Interest or portion thereof, shall be merely an Interest Holder and subject to the terms of this Agreement.

8.4.8   **Transfers Not in Compliance with this Section.** If a Transfer is not upon the terms or is not to the transferee stated in the notice required of the transferring Partner by Section 8.4.1, or is not within the time periods provided, or the transferor, after the transfer, reacquires the transferred Partnership Interest, the Partnership Interest transferred shall remain subject to this Partnership Agreement as if no transfer had been made.

8.4.9   **Fair Market Value.**

8.4.9.1   The value of each Unit to be purchased and sold upon exercise of the option granted in Section 8.4.5 shall be its Fair Market Value determined pursuant to an independent appraisal performed by an independent appraisal firm qualified in valuing interests in comparable companies in the same industry to determine the Fair Market Value and to prepare a written appraisal of any Units to be repurchased upon exercise of the option granted in Section 8.4.5. Without limiting the appraiser's consideration of any particular relevant fact in preparing its appraisal, the appraiser shall take into account (i) the criteria discussed in the previous sentence in determining the Fair Market Value of any Units (or portion thereof), (ii) the fact that only the Economic Interest is being transferred, if applicable, and (iii) in such a case, the transferring Partner's death. The Fair Market Value of the Units shall be determined as of the last day of the month preceding the month in which the transfer of the Partnership Interest occurred, unless the transfer shall have occurred within three (3) months prior to or within three (3) months after the end of a fiscal year of the Partnership, in which case Fair Market Value shall be determined as of the last day of such fiscal year.

8.4.9.2   In the event the transferee disagrees with the Fair Market Value determined by the independent appraiser pursuant to Section 8.4.9.1, such transferee shall notify the remaining Partners in writing within thirty (30) days after such transferee receives the notice from remaining Partners of the determination of Fair Market Value prescribed in Section 8.4.8.1 above. If the remaining Partners and such transferee cannot agree on such Fair Market Value

within thirty (30) days after the receipt by the remaining Partners of the transferee's notice disagreeing with such determination, then the issue shall be referred to two (2) appraisers, one of which shall be the remaining Partner's existing appraiser and one of which shall be selected by the transferee. If such appraisers cannot agree upon a Fair Market Value within thirty (30) days after they are appointed as provided for above, then the issue shall be referred to an appraiser selected by the appraisers selected by the remaining Partners and the transferee. The parties to the dispute shall cause such additional appraiser to render within thirty (30) days after its appointment a decision regarding the Fair Market Value, such decision shall be binding on the parties to the dispute for the purpose of this Section 8.4.9.

8.4.9.3 The Partnership shall bear the fees and expenses of the appraiser selected by the remaining Partner under Section 8.4.9.1. The Partnership shall also bear the fees and expenses of the appraiser selected by the transferee and the additional appraiser selected under Section 8.4.9.2 in the event the Fair Market Value finally determined pursuant to Section 8.4.9.2 is more than 10% greater than the Fair Market Value initially proposed by the remaining Partners (or an appraiser chosen by the General Partner under Section 8.4.9.2); and, provided, further, however, that if the Fair Market Value of the Units of more than one transferring Partner is the subject of any appraiser's determination under this Section 8.4.9, then each transferee shall pay his or her pro rata share (based upon the Fair Market Value of all such transferees' interests) of the fees and expenses, if any, required to be borne by such transferees under this Section 8.4.9.

8.4.9.4  Notwithstanding anything to the contrary herein, no payment of the purchase price under this Article 8 may be made to any selling Partner or his or her legal representatives to the extent the remaining Partners determine that (a) such payment would cause an event of default or potential event of default to occur under the terms of any credit agreement to which the Partnership is a party, (b) the Partnership is unable to fund such payment out of available cash or secure reasonable financing to make such payment, or (c) such payment would otherwise have a materially negative impact on the Partnership or its business. In such circumstance, the Partnership agrees that it shall use its good- faith efforts to (a) have such default or potential event of default waived with respect to such payment, (b) secure such reasonable financing, or (c) pay that portion of such payment that does not cause a materially negative impact on the Partnership or its business and pay the remainder of any such payment as soon as practicable without causing such a materially negative impact. In addition, each selling Partner hereby agrees and acknowledges that the right to receive any payment of purchase price shall be forfeited by such selling Partner if prior to the making of such payment the remaining Partners determine that the selling Partner has breached the terms of this Partnership Agreement (which breach remains uncured).

8.4.10  **Purchase Price.** The price of each Unit to be purchased and sold under this Agreement shall be as follows:

8.4.10.1  A purchase of Units pursuant to the options granted under Sections 8.4.2, 8.4.3 or 8.4. shall be the consideration set forth in the notice required of a selling Partner by Section 8.4.1.

8.4.10.2  Subject to 8.4.10.3, a purchase of Units pursuant to the option granted under Section 8.4.5 shall be for a price equal to one hundred (100%) percent of the Fair Market Value of Units established under Section 8.4.9.

8.4.10.3  Notwithstanding the foregoing, or any other terms of this Agreement, a purchase of Units of an EB-5 Limited Partner pursuant to the option granted under Section 8.4.5 shall be for a price equal to the sum of such EB-5 Limited Partner's Adjusted Capital Contribution and accrued unpaid Preferred Returns less any amounts due to the Partnership by the EB-5 Limited Partner.

8.4.11  **Closing; Payment of the Purchase Price.** The purchase price for Units shall be paid in cash. Unless otherwise agreed by the parties, the closing of the sale and purchase of Units shall take place on the later of thirty (30) days after the delivery to the selling Partner or the transferee of the written notice by the Partnership of its exercise of the option to purchase the selling Partner's Units or thirty (30) days after the date on which Fair Market Value is determined pursuant to Section 8.4.9 above.

8.5  **Effect of Assignment.** A Partner shall cease to be a Partner of the Partnership and to have the power to exercise any rights or powers of a Partner upon transfer of all of the Partner's Units in the Partnership.

8.6  **Rights of Interest Holders.** Interest Holders have no voting rights in the Partnership and are only entitled to the Economic Interest attributable to the Units transferred, subject to the terms and conditions of this Agreement.

8.7  **Admission of Additional Partners.** A Person may be admitted as a Partner and, upon such admission, shall be admitted to all the rights of a Partner upon approval of the General Partner. The General Partner may grant or withhold the approval of such admission in their sole and absolute discretion. If so admitted, such newly admitted Partner shall have all the rights and powers and be subject to all the restrictions and liabilities of the Partnership Interest assigned. The admission of an Interest Holder to Partnership, without more, shall not release the Partner originally assigning the Partnership Interest from any liability to the Partnership that may have existed prior to the admission of the Interest Holder as a Partner of the Partnership. No Partners admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Partnership. The General Partner may, at the time a Partner is admitted, close the books and records of the Partnership (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to such Partner for that portion of the Fiscal Year in which such Partner was admitted in accordance with the Code.

## ARTICLE 9
## TERMINATION

9.1 **Termination of Interest.** The Partnership Interest of each EB-5 Limited Partner shall be terminated by (a) dissolution of the Partnership as provided in this Agreement and distribution of the proceeds of liquidation in accordance herewith; (b) the Agreement of an EB-5 Limited

Partner, or his/her personal representative, and the General Partners; or (c) the return of the Capital Contributions and payment of all accrued unpaid Preferred Returns to such EB-5 Limited Partner.

## ARTICLE 10
## DISSOLUTION AND WINDING UP

10.1   **Termination of the Partnership.** The Partnership shall be terminated and dissolved upon the first to occur of the following: If the Partnership then has any EB-5 Partners (a) upon vote of a Majority-In-Interest of the Partners; or (b) upon the sale of all or substantially all the assets of the Partnership; and if there are then no EB-5 Partners of the Partnership (a) upon vote of the General Partner, or (b) upon sale of all or substantially all of the assets of the Partnership.

10.2   **Winding Up.** Upon the termination of the Partnership pursuant to Section 10.1 above, a full and general accounting shall be taken of the Partnership's business, and the affairs of the Partnership shall be wound up. Any profits earned or losses incurred since the last previous accounting shall be allocated among, or borne by, the Partners in accordance with the provisions of Section 3.1 above. The General Partner shall, with reasonable time allotted for constraints of liquidating property that may be illiquid in nature, wind up and liquidate the Partnership by selling the Partnership's assets, or by distributing such assets in kind, subject to the Partnership's liabilities, or by a combination thereof, as determined by the General Partner. The proceeds of such liquidation shall be applied and distributed in the following order of priority, by the end of the taxable year during which the liquidation occurs (or, if later, within ninety (90) days after the date of the liquidation): (a) to the payment of any debts and liabilities of the Partnership; (b) to the setting up of any reserve which the General Partner shall reasonably deem necessary to provide for any contingent or unforeseen liabilities or obligations of the Partnership, with any excess in such reserve remaining after such liabilities are satisfied to be distributed as soon as practicable in the manner hereinafter set forth; and (c) thereafter, the balance of the proceeds, if any, shall be distributed in the same manner as Available Cash Flow, after taking into account all capital account adjustments for the Partnership's taxable year during which such liquidation occurs. For purposes of this subsection, a liquidation of the Partnership shall mean a liquidation as defined in Section 1.704-1(b)(2)(ii)(g) of the Regulations.

10.3   **Statement.** The Partners shall be furnished with a statement prepared by the Partnership's accountants, which shall set forth the assets and liabilities of the Partnership as of the date of complete liquidation.

10.4   **Return of Capital Contributions.** Notwithstanding anything in this Agreement to the contrary, neither the General Partner nor any other Partner shall be personally liable for the return of the Capital Contributions of any Partner, or any portion thereof, it being expressly understood that any such return of the Capital Contributions of the Partners shall be made solely from Partnership assets.

## ARTICLE 11
## DISCLOSURES AND REPRESENTATIONS

11.1     **Disclosure by Partnership.** In connection with the offer and sale of Units to Limited Partners hereunder, the Partnership hereby discloses that the Units have not been registered under the Federal Securities Act of 1933, as amended (the **"Securities Act"),** and are being offered and sold by the Partnership pursuant to one or more exemptions from registration under the Securities Act, including the exemption provided by Section 4(2) of the Securities Act, Regulation D promulgated thereunder, and exemptions available under applicable state securities laws and regulations.

11.2     **Representations and Warranties of the Limited Partners.** In connection with a Limited Partner's purchase of Units in the Partnership, each Limited Partner represents and warrants, which representations and warranties shall survive the consummation of the Limited Partner's purchase of such Units, as follows: (a) the Limited Partner's principal residence is located within the country, state/province and at the address listed in Schedule A hereto; (b) the Limited Partner is aware that no market exists for the resale of Units; (c) the Limited Partner is purchasing the Units for investment and not for the distribution; (d) the Limited Partner is aware of all restrictions imposed by the Partnership on the sale or transfer of the Units, including, but not limited to, any restrictive legends appearing on the certificate(s) and/or other document(s) evidencing the Units; (e) the Limited Partner acknowledges and understands that the Partnership has been organized with the intention that it qualify for taxation as a partnership for U.S. federal income tax purposes. The Limited Partner acknowledges that the provisions of Subchapter K of the Code, and the Regulations promulgated thereunder will apply to the Partnership, and intend that the allocations of taxable income and loss, distributions to the Limited Partners and maintenance of Capital Accounts all conform to the requirements of the Code and the applicable Regulations; (f) the Limited Partner has full legal capacity to execute and agree to this Agreement and to perform his obligations hereunder; (g) the Limited Partner has duly executed and delivered this Agreement; (h) the Limited Partner's authorization, execution, delivery and performance of this Agreement do not conflict with any other material agreement or arrangement to which that Limited Partner is a party or by which he is bound or with any law or regulation to which that Limited Partner is subject; and (i) this Agreement constitutes the valid, binding and enforceable agreement of that Limited Partner, except to the extent such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect relating to the rights and remedies of creditors, as well as general principles of equity (regardless of whether considered in a proceeding in equity or in law).

## ARTICLE 12
## MISCELLANEOUS

12.1     **Endorsement.** Upon the execution of this Agreement, any certificate or certificates evidencing the Units in the Partnership shall be endorsed, as follows:

> "*The Units represented by this certificate are subject to the terms and conditions of a Limited Partnership Agreement, among the original owner of record and the other partners of the Partnership. Any purchaser or transferee of these Units is*

> *bound by the agreement and shall be considered a party to the agreement. The Partnership will mail to the holder of this certificate, without charge, a copy of such agreement within five (5) days after receiving a written request therefor."*

The foregoing endorsement shall also include such other legends and notices as the General Partner deems necessary and appropriate.

After endorsement, the certificate or certificates shall be delivered to the Partners who shall, subject to the terms of this Agreement, be entitled to exercise all rights of ownership of such Partnership Units. The Partnership agrees that it will cause a similar endorsement to be placed on all certificates hereafter issued by it and which are subject to the provisions of this Agreement.

12.2   **Tax Matters.** The General Partner shall direct Tax Matters of the Partnership, as provided in Regulations issued pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Partnership shall indemnify and reimburse the General Partner for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Partners. The payment of all such expenses shall be made before any distributions to Partners are made by the Partnership. The taking of any action and the incurring of any expense by the General Partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the General Partner.

12.3   **Amendments.** Except as provided herein, this Agreement may be amended only with the written approval of all of the Partners.

12.4   **Notices.** All notices, consents or other instruments hereunder shall be in writing and mailed by United States mail, postage prepaid, and shall be directed to the parties hereto at the last addresses of the parties furnished by them in writing to the Partnership, and to the Partnership at its principal office. The Partnership and/or any Partner shall have the right to designate a new address for receipt of notices by notice addressed to the Partners and the Partnership and mailed as aforesaid. Such notices shall be made a permanent part of the Partnership records.

12.5   **Obligations and Rights of Transferees.** Any person who acquires in any manner whatsoever any interest in the Partnership, irrespective of whether such person has accepted and assumed in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to, and to be bound by, all the obligations of this Agreement with the same force and effect as any predecessor in interest of such person.

12.6   **Benefit and Binding Effect.** This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next of kin, legatees, administrators, executors, legal representatives, nominees, successors and permitted assigns.

12.7    **Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.

12.8    **Governing Law.** This Agreement and the rights of all parties hereunder shall be governed by, and construed in accordance with, the laws of the State of Florida, without regard to the conflicts of laws principles thereof.

12.9    **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be considered an original when executed by one or more of the Partners.

12.10   **Reports to Limited Partners.** As soon as reasonably practicable after the date when an Limited Partner has made his/her Capital Contribution to the Partnership in full and has otherwise complied with its obligations under this Agreement, the Partnership shall provide such Limited Partner or its designated immigration counsel with the copies of the following information: (a) A copy of the USCIS letter of designation of South Atlantic Regional Center as a regional center under the EB-5 Program; (b) A copy of the approved regional center narrative proposal and business plan submitted to USCIS by the Regional Center; (c) A copy of approved econometric reports which, taken together, conclude that the investments to be made by the Partnership from the Capital Contributions of the Limited Partners are Qualified Investments - they will generate full-time employment positions, either directly or indirectly, for not fewer than ten U.S. workers per EB-5 Limited Partner whose Capital Contributions have been so applied; (d) Documented evidence that the location of the Partnership's investment of an EB-5 Limited Partner's Capital Contribution is within a "targeted employment area" as defined by the USCIS; and (e) A copy of the Partnership's Limited Partnership Agreement, including the Schedules thereto, evidencing that the EB-5 Limited Partner has invested at least the EB-5 Minimum Capital Requirement and that such investment is "at risk."

12.11   **Severability.** If any provision of this Agreement is declared by any court of competent jurisdiction to be invalid or unenforceable such invalidity or unenforceability shall not affect the remaining provisions of this Agreement. If such invalidity or unenforceability is due to the court's determination that the provision's scope is excessively broad or restrictive under applicable law then in effect, the parties hereby jointly request that such provision be construed by modifying its scope so as to be enforceable to the fullest extent of applicable law then in effect. If any provision is held to be invalid or unenforceable with respect to a particular circumstance, such provision shall nevertheless remain in full force and effect in all other circumstances.

12.12   **No Waiver.** The waiver by any party hereto of any breach of any provision of this Agreement shall not be deemed a continuing waiver, and shall not affect any subsequent breach of the same or different provisions of this Agreement.

12.13   **Further Assurances.** Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate

and make effective as promptly as practicable the transactions contemplated by this Agreement, including using all commercially reasonable efforts to remove any legal impediment to the consummation or effectiveness of such transactions and to obtain any consents and approvals required under this Agreement.

12.14  **Neutral Construction.** The construction and interpretation of any clause or provision of this Agreement shall be construed without regard to the identity of the party that prepared this Agreement, and no presumption shall arise as a result that this Agreement was prepared by one party or the other.

12.15  **Attorneys' Fees.** In the event a dispute arises regarding this Agreement, the prevailing party shall be entitled to recover all attorneys' fees and expenses incurred.

12.16  **Injunctive Relief.** Without intending to limit the remedies available to either party, each party hereby acknowledges that a breach of any of the restrictive covenants contained in this Agreement may result in material and irreparable injury to the other party for which there is no adequate remedy at law, and that it may not be possible to measure damages for such injuries with reasonable certainty. In the event of such a breach or threat thereof, a party shall be entitled to obtain a temporary restraining order and/or a preliminary injunction restraining any other party from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants in this Agreement. The parties expressly agree that it shall not be a defense in such an injunction action that a party had previously breached this Agreement.

12.17  **Representation of Counsel.** All parties acknowledge that prior to executing this Agreement, they have been advised to seek independent legal counsel. In executing this Agreement, all parties represent and warrant that they relied exclusively upon the advice of their respective independent legal counsel and are not entering into this Agreement based upon any representation of any other party or any other party's counsel.

12.18  **Jurisdiction.** Any and all legal proceedings to enforce this Agreement, or to enforce or vacate any judgment or award rendered therein, whether in contract, tort, equity or otherwise, shall be brought in the state or federal courts sitting in the district encompassing Palm Beach County, Florida, the parties hereto hereby waiving any claim or defense that such forum is not convenient or proper. Each party hereby agrees that any such court shall have in personam jurisdiction over it, and agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner specified by law.

12.19  **Force Majeure.** Neither party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) to the extent said failures or delays are proximately caused by causes beyond that party's reasonable control and occurring without its fault or negligence, including, without limitation, failure of suppliers, subcontractors, and carriers, or party to substantially meet its performance obligations under this Agreement, provided that, as a condition to the claim of nonliability, the party experiencing the difficulty shall give the other prompt written notice, with full details

following the occurrence of the cause relied upon. Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused.

**12.20  Notice.** All notices, requests, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service, if personally served; (b) on the day of facsimile over telephone lines with same day first class mailing of both the original of the documents and a proof of transmission; (c) on the day after mailing if sent by express overnight air courier guaranteeing next day delivery with written evidence of delivery; or (d) five (5) days after the date of mailing if mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed to the parties at the addresses listed above. Each party is required to notify the other party in the above manner of any change in address.

IN WITNESS WHEREOF, each party has executed this Limited Partnership Agreement on the date below.

**GENERAL PARTNER (South Atlantic Regional Center)**

_____          08.09.2014
Signature                                 _____
                                          Date

_____
Joseph Walsh
Printed Name

**GENERAL PARTNER (United EB5, LLC)**

_____          8.8.2014
Signature                                 _____
                                          Date

_____
Printed Name

**LIMITED PARTNER**

_____          07. 11 2016
Signature                                 _____
                                          Date

FENG YUAN XIAO
_____
Printed Name

Scanned by CamScanner

**SCHEDULE A**

| Name | Address | Units / Type | |
|---|---|---|---|
| 1.  South Atlantic Regional Center | 197 S. Federal Hwy, Suite 200<br>Boca Raton, FL  33432 | 1 | GP |
| 2.  United EB5, LLC | 4901 NW 17th Way, Suite 503<br>Fort Lauderdale, FL  33309 | 1 | GP |
| 3. | | | EB5LP |