# Attachment 4

**EXECUTION COPY**

# LOAN AGREEMENT

dated as of December 22, 2017

by and between

**SANTA BARBARA 230, LLC**, a Delaware limited liability company,

and

**GREYSTONE TENANT, LLC**, a Delaware limited liability company,

collectively, as Borrower,

and

**1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company,

as Lender

**Property:**

Fee simple interest in
230 20th Street
Miami Beach, Florida

Leasehold Interest in
1920 Collins Avenue
Miami Beach, Florida

Loan Amount: $36,800,000.00

TABLE OF CONTENTS

Page

I    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...................................................1

1.1    Definitions...........................................................................................................1
1.2    Index of Defined Terms.....................................................................................35
1.3    Principles of Construction..................................................................................45

II    GENERAL TERMS...................................................................................................45

2.1    Loan Amount and Disbursement to Borrower....................................................45
2.2    Commitment to Lend .........................................................................................46
2.3    Method of Borrowing and Conversion ...............................................................46
2.4    Notice to Lender and Funding of Loan...............................................................46
2.5    Term and Extension Periods...............................................................................46
2.6    Interest on the Loan Prior to Maturity ...............................................................51
2.7    Administrative Fee .............................................................................................51
2.8    General Provisions as to Payments ....................................................................51
2.9    Breakage Costs...................................................................................................52
2.10   Calculation of Interest and Fees ........................................................................52
2.11   Default Interest; Late Payment Charge and Usury Savings................................52
2.12   Voluntary Prepayments......................................................................................53
2.13   LIBOR Unascertainable .....................................................................................55
2.14   Illegality .............................................................................................................55
2.15   Increased Cost and Reduced Return ..................................................................56
2.16   Taxes...................................................................................................................57
2.17   Release or Assignment on Payment in Full .......................................................60

III   CONDITIONS TO CLOSING ..................................................................................60

3.1    Loan Documents.................................................................................................61
3.2    Mortgage and Recordable Documents................................................................61
3.3    UCC Financing Statements.................................................................................61
3.4    Guarantees; Indemnities.....................................................................................61
3.5    Required Equity Investment ...............................................................................61
3.6    Representations, Warranties and Compliance.....................................................61
3.7    Title Insurance ...................................................................................................61
3.8    Survey .................................................................................................................62
3.9    Zoning; Governmental Approvals; Building Permits .........................................62
3.10   Interest Rate Cap Agreement..............................................................................62
3.11   Encumbrances .....................................................................................................62
3.12   Related Documents .............................................................................................62
3.13   Delivery of Organizational Documents ..............................................................62
3.14   Legal Opinions ...................................................................................................62
3.15   Appraisal.............................................................................................................63

3.16 Completion of Proceedings.................................................................63
3.17 Independent Director Certificate..........................................................63
3.18 Transaction Costs...............................................................................63
3.19 Other Payments and Fees; Origination Fee ........................................63
3.20 Material Adverse Change ....................................................................63
3.21 Reports ...............................................................................................63
3.22 Financial Statements; Tax Statements; Operating Statements.............63
3.23 Tax Lot; Subdivision...........................................................................64
3.24 Construction Matters...........................................................................64
3.25 Insurance ............................................................................................65
3.26 Other Agreements ...............................................................................65
3.27 Evidence of Utility Service..................................................................65
3.28 Reciprocal Easement Agreements .......................................................65
3.29 Compliance with Legal Requirements.................................................65
3.30 Credit Reports and Searches................................................................66
3.31 Net Worth and Liquidity......................................................................66
3.32 Ground Lessor Estoppel.......................................................................66
3.33 UCC Insurance Policy..........................................................................66
3.34 Flood Zone Compliance.......................................................................66
3.35 Marketing Agreement...........................................................................66
3.36 Subordination and Standstill Agreements............................................66
3.37 Miscellaneous .....................................................................................66

IV     CONDITIONS TO ALL SUBSEQUENT ADVANCES ................................66

4.1 Conditions Precedent to Loan Advances ..............................................66
4.2 Costs and Advances .............................................................................70
4.3 Use of Advances; Florida Disbursement Notice Waiver.......................71
4.4 Loan Borrowing Procedures .................................................................72
4.5 Advances for Stored Material ...............................................................76
4.6 Loan Balancing and Budget Reallocations...........................................78
4.7 Loan Balancing and Deficiency; Protective Advances.........................80
4.8 Direct Advances ...................................................................................82
4.9 Partial Advances ..................................................................................82
4.10 Retainage.............................................................................................82
4.11 Intentionally Omitted ..........................................................................83
4.12 Conditions Precedent to Completion ..................................................83

V      CASH MANAGEMENT .............................................................................83

5.1 Cash Management .................................................................................83

VI     REPRESENTATIONS AND WARRANTIES..............................................92

6.1 Borrower General Representations .......................................................92
6.2 Construction and Project Representations ............................................104
6.3 Survival of Representations .................................................................106

ii

VII      BORROWER COVENANTS ........................................................................107

      7.1     Affirmative Covenants ............................................................107
      7.2     Construction Related Covenants ...........................................117
      7.3     Ground Lease Covenants .......................................................125
      7.4     Negative Covenants ...............................................................126
      7.5     Marketing Agreement ............................................................128
      7.6     Option Agreement ..................................................................129
      7.7     CDE, EB-5 and Octagon ........................................................131
      7.8     Master Lease Covenants ........................................................132
      7.9     Development Agreement ........................................................132

VIII    INSURANCE; CASUALTY; CONDEMNATION; RESTORATION.........................133

      8.1     Insurance Requirements .........................................................133
      8.2     Condemnation and Insurance Proceeds .................................138
      8.3     Requirements of Ground Lease ..............................................142

IX       IMPOSITIONS, OTHER CHARGES, LIENS AND OTHER ITEMS .........................142

      9.1     Borrower to Pay Impositions and Other Charges .................142
      9.2     No Liens .................................................................................143
      9.3     Contest ...................................................................................143

X        TRANSFERS .......................................................................................144

      10.1    Reliance by Lender ................................................................144
      10.2    No Transfers...........................................................................144
      10.3    Permitted Transfers ...............................................................145

XI       INTEREST RATE CAP AGREEMENT .......................................................146

      11.1    Interest Rate Cap Agreement .................................................146
      11.2    Pledge ....................................................................................147
      11.3    Covenants...............................................................................147

XII     MAINTENANCE OF PROPERTY.............................................................149

      12.1    Maintenance of Property........................................................149
      12.2    Conditions to Alterations ......................................................149

XIII    BOOKS AND RECORDS, FINANCIAL STATEMENTS, REPORTS AND
      OTHER INFORMATION ........................................................................150

      13.1    Books and Records ................................................................150
      13.2    Reporting................................................................................150
      13.3    Management Agreement ........................................................152
      13.4    Intentionally Omitted ............................................................152

WEIL:\96218278\17\63946.0005

| | 13.5 | Copies of Documents Relating to Property | .................................................. | 152 |
|---|---|---|---|---|
| | 13.6 | Other Information | .................................................. | 152 |
| | 13.7 | Annual Operating Budget | .................................................. | 152 |
| **XIV** | | **ENVIRONMENTAL MATTERS** | .................................................. | 153 |
| | 14.1 | Representations | .................................................. | 153 |
| | 14.2 | Covenants | .................................................. | 154 |
| | 14.3 | Environmental Indemnification | .................................................. | 155 |
| | 14.4 | Recourse Nature of Certain Indemnifications | .................................................. | 156 |
| **XV** | | **SECONDARY MARKET TRANSACTIONS** | .................................................. | 156 |
| | 15.1 | Secondary Market Transactions | .................................................. | 156 |
| | 15.2 | Borrower Cooperation | .................................................. | 157 |
| | 15.3 | Securitization Indemnification | .................................................. | 160 |
| | 15.4 | Rating Agency Confirmation | .................................................. | 162 |
| | 15.5 | Servicer | .................................................. | 162 |
| **XVI** | | **ASSIGNMENTS AND PARTICIPATIONS** | .................................................. | 163 |
| | 16.1 | Assignment and Acceptance | .................................................. | 163 |
| | 16.2 | Effect of Assignment and Acceptance | .................................................. | 164 |
| | 16.3 | Content | .................................................. | 164 |
| | 16.4 | Registered Obligation | .................................................. | 164 |
| **XVII** | | **RESERVE ACCOUNTS** | .................................................. | 165 |
| | 17.1 | Tax Reserve Account | .................................................. | 165 |
| | 17.2 | Insurance Reserve Account | .................................................. | 166 |
| | 17.3 | Ground Rent Reserve Account | .................................................. | 167 |
| | 17.4 | Security Deposits | .................................................. | 167 |
| | 17.5 | FF&E | .................................................. | 169 |
| **XVIII** | | **DEFAULTS** | .................................................. | 170 |
| | 18.1 | Event of Default | .................................................. | 170 |
| | 18.2 | Remedies | .................................................. | 174 |
| | 18.3 | Remedies Cumulative; Waivers | .................................................. | 176 |
| | 18.4 | Costs of Collection | .................................................. | 176 |
| | 18.5 | Construction Related Remedies | .................................................. | 176 |
| **XIX** | | **EXCULPATION** | .................................................. | 178 |
| | 19.1 | Exculpation | .................................................. | 178 |

XX    MISCELLANEOUS .................................................................................183

      20.1   Survival..............................................................................................183
      20.2   Lender's Discretion............................................................................183
      20.3   GOVERNING LAW..........................................................................183
      20.4   Modification, Waiver in Writing .......................................................184
      20.5   Delay Not a Waiver ..........................................................................184
      20.6   Notices ..............................................................................................185
      20.7   TRIAL BY JURY ..............................................................................186
      20.8   Headings ...........................................................................................187
      20.9   Severability ......................................................................................187
      20.10  Preferences .......................................................................................187
      20.11  Waiver of Notice...............................................................................187
      20.12  Expenses; Indemnity ........................................................................187
      20.13  Exhibits and Schedules Incorporated................................................190
      20.14  Offsets, Counterclaims and Defenses ...............................................190
      20.15  Liability of Assignees of Lender.......................................................190
      20.16  No Joint Venture or Partnership; No Third Party Beneficiaries.........190
      20.17  Publicity ...........................................................................................191
      20.18  Waiver of Marshaling of Assets .......................................................191
      20.19  Waiver of Counterclaim and other Actions .......................................191
      20.20  Conflict; Construction of Documents; Reliance ................................191
      20.21  Brokers and Financial Advisors ........................................................192
      20.22  Prior Agreements ..............................................................................192
      20.23  Counterparts......................................................................................192
      20.24  Limitation of Liability.......................................................................192
      20.25  Joint and Several Liability; Right of Contribution ............................192
      20.26  Compliance; Investigation ...............................................................196
      20.27  Exculpation of Lender.......................................................................196
      20.28  Time is of the Essence ......................................................................197
      20.29  Successor Laws.................................................................................197
      20.30  No Fiduciary Duty ............................................................................197
      20.31  Representation by Lender ..................................................................198
      20.32  CCG Fee Reserve Account and Loan Disbursement Account ............198

EXHIBITS:

EXHIBIT A-1        FEE LAND LEGAL DESCRIPTION

EXHIBIT A-2        LEASEHOLD LAND LEGAL DESCRIPTION

EXHIBIT B          FORM OF ASSIGNMENT AND ACCEPTANCE

EXHIBIT C-1        DRAW REQUEST/REQUISITION LETTER

EXHIBIT C-2        FORM OF BORROWER REQUISITION SPREADSHEET

v

EXHIBIT C-3          FORM OF AIA APPLICATION FOR PAYMENT

EXHIBIT C-4          FORM OF BORROWING CERTIFICATE

EXHIBIT C-5          FORM OF PAYMENT RECEIPT

EXHIBIT C-6          FORM OF ANTICIPATED COST REPORT

EXHIBIT C-7          FORM OF CONDITIONAL LIEN WAIVER AND CONSENT

EXHIBIT C-8          FORM OF FINAL UNCONDITIONAL LIEN WAIVER AND
                     CONSENT

EXHIBIT D            FORM OF TENANT DIRECTION LETTER

EXHIBIT E            FORM OF CREDIT CARD COMPANIES/BANKS DIRECTION
                     LETTER

EXHIBIT F            FORM OF ARCHITECT CONSENT

EXHIBIT G            FORM OF ASSIGNMENT OF ARCHITECT AGREEMENT

EXHIBIT H            FORM OF MAJOR TRADE CONTRACTOR CONSENT

EXHIBIT I            FORM OF LOCKBOX AGREEMENT


SCHEDULES:

SCHEDULE I           BORROWER ORGANIZATIONAL STRUCTURE

SCHEDULE II          LIST OF PLANS AND SPECIFICATIONS

SCHEDULE III         INITIAL LOAN ADVANCE PURPOSE

SCHEDULE IV          EXISTING TRADE CONTRACTS

SCHEDULE V           LITIGATION DISCLOSURE

SCHEDULE VI          LIST OF MATERIAL AGREEMENTS

SCHEDULE VII         DEFINITION OF SINGLE PURPOSE ENTITY

SCHEDULE VIII        CONSTRUCTION SCHEDULE

SCHEDULE IX          INTENTIONALLY OMITTED

SCHEDULE X           DESCRIPTION OF GROUND LEASE

WEIL:\96218278\17\63946.0005

SCHEDULE XI          DESCRIPTION OF OPTION AGREEMENT

SCHEDULE XII         LIST OF QUALIFIED MARKETING AGENTS

SCHEDULE XIII        LIST OF QUALIFIED MANAGERS

SCHEDULE XIV         DESCRIPTION OF MASTER LEASE

SCHEDULE XV          LIST OF CDE LOAN DOCUMENTS

SCHEDULE XVI         LIST OF EB-5 LOAN DOCUMENTS

SCHEDULE XVII        LIST OF OCTAGON LOAN DOCUMENTS

SCHEDULE XVIII       DESCRIPTION OF MASTER TENANT JV AGREEMENT

WEIL:\96218278\17\63946.0005

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** dated as of December 22, 2017 (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is made by and between **SANTA BARBARA 230, LLC**, a Delaware limited liability company ("**Fee Borrower**"), and **GREYSTONE TENANT, LLC**, a Delaware limited liability company ("**Leasehold Borrower**"), each having its principal place of business at 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139, as borrower, and **1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company, having an address at 3 Columbus Circle, 23rd Floor, New York, New York 10019, as lender.

## RECITALS:

**WHEREAS**, Borrower (as defined herein) has requested that Lender (as defined herein) make a loan to Borrower in the maximum aggregate principal amount up to $36,800,000.00 (the "**Loan**") to fund the costs of constructing the Project (as defined herein) on the Property (as defined herein);

**WHEREAS**, the Loan shall be evidenced by the Note (as defined herein) and secured by, among other things, the Mortgage (as defined herein) constituting a first priority mortgage lien on the Property; and

**WHEREAS**, Lender is agreeing to fund the Loan in installments pursuant to Loan Advances (as defined herein) in accordance with the terms and subject to conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the making of the Loan by Lender, and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

I        **DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

> 1.1        **Definitions**.        For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Account Banks**" means, collectively, the Lockbox Bank and the Cash Management Bank.

"**Account Control Agreement**" means that certain Cash Management Agreement (Hard) dated as of the date hereof, by and among Cash Management Bank, Borrower and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Acknowledgment**" means an acknowledgment of the Assignment of Rate Cap by the Counterparty, or as applicable, an Approved Counterparty in form and substance reasonably satisfactory to Lender.

"**ADA**" means the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, as from time to time amended, together with any and all comparable Legal Requirements of any Governmental Authority

"**Administrative Fee**" means five (5) basis points per annum multiplied by the Loan Amount.

"**Advance Conditions**" means, collectively, all of the conditions for the disbursement of any Loan Advance as set forth in Article IV of this Agreement.

"**Advance Date**" means, with respect to each Loan Advance, the date on which such Loan Advance is disbursed to Borrower pursuant to this Agreement.

"**Affiliate**" means, as to any Person, any other Person that, (i) directly or indirectly owns ten percent (10%) or more of all Equity Interests in such Person, and/or (ii) is in Control of, is Controlled by or is under common Control with such Person, and/or (iii) is a director, partner, member, officer or employee of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue, parent or officer of such Person or an Affiliate of such Person.

"**Affiliated Manager**" means any Manager that is an Affiliate of Borrower or Guarantor.

"**ALTA**" means American Land Title Association, or any successor thereto.

"**Alternative Rate**" means, for any Interest Period in respect of an Alternative Rate Loan, the sum of the Alternative Rate Index plus the Alternative Rate Spread, for such Interest Period.

"**Alternative Rate Index**" means the greater of (i) the Federal Funds Rate plus 1.00% per annum, and (ii) the annual rate of interest publicly announced by Citibank, N.A. in New York, New York, as its base rate, as such rate shall change from time to time.  If Citibank, N.A. ceases to announce a base rate, the Alternative Rate Index shall mean the rate of interest published in *The Wall Street Journal* from time to time as the "Prime Rate."  If more than one "Prime Rate" is published in *The Wall Street Journal* for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest one-thousandth of one percent (0.001%).  If *The Wall Street Journal* ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index.  Lender's determination of the Alternative Rate Index shall be binding and conclusive on Borrower absent manifest error.  The Alternative Rate Index may or may not be the lowest rate at which Lender prices loans on the date which the Alternative Rate Index is determined by Lender as set forth above.

"**Alternative Rate Loan**" means the Loan or any portion thereof at any time during which the Interest Rate for the Loan or such portion thereof is calculated with reference to the Alternative Rate in accordance with the provisions of Article II.

WEIL:\96218278\17\63946.0005

"**Alternative Rate Spread**" means the greater of (i) zero basis points and (ii) the difference (expressed as the number of basis points) between (a) the LIBOR Rate plus the Spread on the date the LIBOR Rate was last applicable to the Loan and (b) the Alternative Rate Index on the date that the LIBOR Rate was last applicable to the Loan.

"**Annual Operating Budget**" means an operating budget for the Property to be prepared by or on behalf of Borrower for each Fiscal Year (or portion thereof) following Substantial Completion, and setting forth, in reasonable detail, Borrower's good faith estimates, on a month by month basis, of all anticipated Operating Income, Operating Expenses, and Capital Expenditures for the Property for such Fiscal Year (or portion thereof).

"**Anti-Corruption Laws**" means any law of any jurisdiction in which Borrower performs business, or of the United States.

"**Appraisal**" means a FIRREA appraisal of the Property conducted by an Independent MAI appraiser selected by Lender, which Appraisal shall conform to all regulatory requirements and be reasonably satisfactory in form and substance to Lender. Borrower and Lender acknowledge and agree that HVS International is an acceptable Independent MAI appraiser.

"**Approved Bank**" means Wells Fargo Bank, National Association, or another bank or other financial institution that has a minimum long term unsecured debt rating of at least "A" by S&P or "A2" by Moody's.

"**Approved Counterparty**" means a bank or other financial institution which has a long-term unsecured debt rating of at least "A-" from S&P (and if Fitch rates the entity, from Fitch) and a long-term unsecured debt rating of not less than "A3" by Moody's, which rating shall not include a "t" or otherwise reflect a termination risk.

"**Architect**" means (i) Schulman + Associates and (ii) Norberto Rosenstein Architect, Inc., the architects engaged by (or on behalf of) Borrower with respect to the design and construction of the Project (or a portion thereof), together with any successor or additional Architect engaged by (or on behalf of) Borrower with the prior written approval of Lender pursuant to Section 7.2.12 and for which Lender has received an Architect Consent.

"**Architect Agreement**" means, individually and/or collectively, as the context may require, (i) that certain Contract Consultant Services between Fee Borrower and Norberto Rosenstein Architect, Inc. dated as of October 10, 2014 and (ii) that certain Agreement between Shulman + Associates and Trans Inn Management dated as of May 24, 2012 as assigned to Leasehold Borrower pursuant to that Assignment and Assumption of Contract for Construction dated as of October 23, 2017, together with any replacement agreements entered into in accordance with Section 7.2.12 and any other agreements for architectural services which Borrower may enter into with any successor Architect subject to any applicable requirements of the Loan Documents, and as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Architect Consent**" means an Architect Consent executed and delivered by Architect in favor of Lender, in connection with the Loan, in the form annexed hereto as **Exhibit F**, as the

same may be amended, replaced, restated, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"**<u>Assignment and Acceptance</u>**" means an Assignment and Acceptance entered into by Lender and an assignee, accepted by Lender, and in substantially the form of **<u>Exhibit B</u>** or such other form customarily used by Lender in connection with the participation or syndication of mortgage loans at the time of such assignment**.**

"**<u>Assignment of Architect Agreement</u>**" means an Assignment of Architectural Agreements and Plans and Specifications, to be entered into by Borrower and Lender contemporaneously with Borrower's entering into an Architect Agreement in accordance with the terms of this Agreement, in the form annexed hereto as **<u>Exhibit G</u>**, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**<u>Assignment of Development Agreement</u>**" means that certain Assignment and Subordination of Development Agreement dated as of the date hereof, made by Leasehold Borrower to Lender, as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**<u>Assignment of Leases</u>**" means that certain Assignment of Leases, Rents and Hotel Transactions Income dated as of the date hereof, made by Borrower to Lender, as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**<u>Assignment of Management Agreement</u>**" means (i) with respect to the Leasehold Hotel Management Agreement, that certain Assignment and Subordination of Management Agreement to be entered into by Leasehold Borrower and Lender, and/or (ii) with respect to the Fee Hotel Management Agreement, that certain Assignment and Subordination of Management Agreement to be entered into by Fee Borrower and Lender, and/or (iii) with respect to any other Management Agreement, an Assignment and Subordination of Management Agreement to be entered into by Borrower and/or Master Tenant, a Qualified Manager and Lender contemporaneously with Borrower's and/or Master Tenant entering into a Management Agreement in accordance with the terms of this Agreement, in the form and substance reasonably acceptable to Lender (with such revisions as are reasonably satisfactory to Lender, Borrower and Qualified Manager), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**<u>Assignment of Option Agreement</u>**" means an Assignment of Option Agreement dated as of the date hereof, by Option Holder in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**<u>Assignment of Permits</u>**" means that certain Assignment of Permits, Licenses, Approvals, Agreements and Documents dated as of the date hereof, by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Rate Cap**" means an Assignment of Interest Rate Protection Agreement dated as of the date hereof, by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Authorized Representative**" means any Person(s) designated in writing by Borrower to Lender on the date hereof as authorized to sign and deliver requisition letters pursuant to Section 4.4(b)(ii), as the list of such Persons may be updated and revised by Borrower by written notice to Lender from time to time.  As of the date hereof, Branden Muhl and James Vosotas are each an Authorized Representative.

"**Bankruptcy Code**" means Title 11, U.S.C.A., as amended from time to time and any successor statute thereto.

"**Borrower**" means individually or collectively, as the context may require, jointly and severally, Fee Borrower and Leasehold Borrower.

"**Borrower Holdco**" means, individually or collectively, as the context may require, jointly and severally, Greystone Holdco and Greystone Hotel Miami.

"**Borrower Party**" and "**Borrower Parties**" means, collectively, Borrower, Guarantor, Borrower Holdco and any of Borrower's, Guarantor's or Borrower Holdco's respective members.

"**Borrower's Disbursement Account**" means the account of Borrower into which the proceeds of the Loan are to be disbursed as referred to in Section 4.2(b), or such other account as Borrower and Lender shall reasonably agree to be the account into which such proceeds are to be disbursed.

"**Borrowing Date**" means the date set forth in the applicable Draw Request for the funding by Lender of the related Loan Advance.

"**Broker**" means Mission Capital Advisors.

"**Budget**" means the Project construction and development budget prepared by, or on behalf of, Borrower for the construction and development of the Project, as the same is adjusted due to changes or reallocations made in accordance with Section 4.6, Section 7.2.3 or Section 7.2.7 of this Agreement and which (i) sets forth Borrower's estimates for budgeted construction categories of all items of direct and indirect Costs to be incurred or payable with respect to the foregoing (including monthly interest on the Loan), the Hard Cost Contingency, the Soft Cost Contingency and reserves and (ii) specifies whether each such item constitutes a Project Cost, a Hard Cost or a Soft Cost. The Budget shall include the fees of the Construction Consultant.

"**Business Day**" means any day other than a Saturday, Sunday or any other day on which state or national banks in New York, New York are not open for business.  When used with respect to an Interest Determination Date, Business Day means any day on which dealings in deposits in U.S. Dollars are transacted in the London interbank market.

"**Cafe**" means an outdoor restaurant and coffee shop with approximately 500 square feet of indoor space located on the Fee Land.

"**Capital Expenditures**" means, for any period, the amount expended for any items capitalized under GAAP and the Uniform System of Accounts (including Costs, expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Carry Guaranty**" means that certain Interest and Carry Guaranty dated as of the date hereof, made by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash**" means the legal tender of the United States.

"**Cash and Cash Equivalents**" means any one or a combination of the following: (i) Cash, and (ii) U.S. Government Obligations.

"**Cash Management Bank**" means Wells Fargo Bank, National Association, or any successor Approved Bank acting as Cash Management Bank under the Account Control Agreement pursuant to the terms of this Agreement selected by Lender from time to time to maintain the Cash Management Account under the terms of a replacement cash management agreement acceptable to Lender in its sole discretion.

"**Cash Management Commencement Date**" means the date that is ninety (90) days prior to the anticipated date of receipt of a temporary certificate of occupancy with respect to any portion of the Project pursuant to the Construction Schedule.

"**Casualty**" means the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Casualty Amount**" means One Million and 00/100 Dollars ($1,000,000).

"**Cause**" means, with respect to an Independent Director or Independent Manager, (i) acts or omissions by such Person that constitute willful disregard of such Person's duties under the applicable agreements; (ii) that such Person has engaged in or has been charged with, or has been convicted of, fraud or other acts constituting a crime under any law applicable to such Person; (iii) that such Person dies or is incapacitated or otherwise unable to perform its duties as an Independent Director or Independent Manager; or (iv) any material increase in the fees charged by such Person for service as an Independent Director or Independent Manager which Borrower or the applicable SPE Entity in its reasonable discretion determines to be commercially unreasonable.

"**CDE**" means CCG Sub-CDE 43, LLC, a Delaware limited liability company.

"**CDE Loan**" means those certain loans made by CDE to Leasehold Borrower in the aggregate amount of $3,430,000.

"**CDE Loan Documents**" means the documents evidencing, securing or otherwise governing the CDE Loan.

6

"**Change Order**" means any amendment, supplement or other modification in any respect to (i) the Plans and Specifications, (ii) the Budget, (iii) the Construction Schedule, (iv) any Construction Contract, (v) any Major Trade Contract, or (vi) any Construction Permits, in each case which, without regard to any other such amendment and/or modification, would increase or decrease the Costs or any category thereof.

"**Closing Date**" means the date hereof.

"**Code**" means the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral Accounts**" means, collectively, the Collection Account, the Cash Management Account, the Tax Reserve Account, the Insurance Reserve Account, the Proceeds Reserve Account, the FF&E Reserve Account, the Ground Rent Reserve Account, the Security Deposit Reserve Account, the Interest Reserve Account and any other accounts now or hereafter pledged to Lender pursuant to this Agreement, the Mortgage and/or the other Loan Documents (including, without limitation, pursuant to any documents hereafter executed and delivered by Borrower in connection with the Loan).

"**Completion**" means, with respect to the Project, the stage at which the development, construction and equipping of the Project shall be one hundred percent (100%) complete substantially in accordance with the Plans and Specifications and all Legal Requirements, including all Punchlist Items with respect thereto and temporary (or permanent) certificates of occupancy have been issued for the entire Project.  The terms "**Completed**" or "**Complete**" shall have correlative meanings.

"**Completion Guaranty**" means that certain Completion Guaranty dated as of the date hereof, made by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Construction Consultant**" means Partner Engineering, or such other Person (other than an Affiliate of Lender) as may be designated and engaged by Lender in its sole discretion from time to time as construction consultant to advise, consult and render reports to Lender concerning the status of the development and construction of the Project.

"**Construction Contract**" means any contract between Borrower, an Affiliate of Borrower, or any Contractor and any other Person for the design, development, construction and equipping of the Project or any part thereof, and including, as the context shall require, the Architect Agreement, the Construction Management Agreement, each agreement with any other Design Professional, and each Trade Contract.

"**Construction Documents**" means, collectively, each Construction Contract, the Plans and Specifications, the Budget, the Construction Permits, all Change Orders and all other

agreements, certificates or other documents to which Borrower or any Affiliate of Borrower is a party, or otherwise subject to, or is a beneficiary, in each case relating to the construction of the Project, as the same may be amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"**Construction Management Agreement**" means, individually or collectively, as the context may require, (i) that certain Document A133-2009 Standard Form of Agreement Between Owner and Construction Manager as Contractor between Fee Borrower, as Owner, and Construction Manager dated December 12, 2017, as modified by AIA  Document A133-2009 SP Exhibit A Guarantees Maximum Price Amendment dated December 12, 2017, requiring the construction of the portion of the Project located on the Fee Land in accordance with the Plans and Specifications and in accordance with the Construction Schedule for a guaranteed maximum price of $8,247,168, as the same may be amended, replaced, supplemented or otherwise modified form time to time in accordance with the terms and conditions of this Agreement and (ii) that certain Document A133-2009 Standard Form of Agreement Between Owner and Construction Manager as Contractor between Ground Lessor and Construction Manager dated December 23, 2014, as modified by the Phase 1.5 Guaranteed Maximum Price Amendment dated March 7, 2017 and the Guaranteed Maximum Price Amendment (not dated), which among other things, changed the "Owner" to Leasehold Borrower, requiring the construction of the portion of the Project located on the Leasehold Land in accordance with the Plans and Specifications and in accordance with the Construction Schedule for a guaranteed maximum price of $19,172,235, as the same may be amended, replaced, supplemented or otherwise modified form time to time in accordance with the terms and conditions of this Agreement.

"**Construction Manager**" means (i) Turner Construction Company with respect to the Leasehold Land, (ii) A.V.I. Contractors Inc. with respect to the Fee Land, and/or (iii) a bondable general contractor or any construction manager, as applicable, licensed in the State, engaged by Borrower with respect to the construction of the Project (or a portion thereof) with the prior written approval of Lender pursuant to Section 7.2.12 and for which Lender has received a Construction Manager Consent.

"**Construction Manager Consent**" means a Construction Manager Consent executed and delivered by a Construction Manager in favor of Lender, in connection with the Loan, in form and substance reasonably acceptable to Lender, as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"**Construction Permits**" means, collectively, all authorizations, consents and approvals, licenses and permits given or issued by Governmental Authorities which are required for the construction of the Project in accordance with all Legal Requirements and the Plans and Specifications, as the same may be amended, modified, supplemented and/or assigned from time to time in compliance with this Agreement and applicable Legal Requirements.

"**Construction Phase**" means the period commencing on the Closing Date and continuing until the earlier to occur of (i) Completion, and (ii) the Outside Construction Completion Date.

"**Construction Schedule**" means a schedule (substantially in the form attached hereto as **Schedule VIII** with such changes to such form or additional information as may be reasonably requested by Lender from time to time) for the projected progress of the development and construction of the Project, setting forth the monthly projected Loan Advances throughout the Construction Phase and a construction progress schedule, as the same may be updated and amended from time to time in accordance with the terms of this Agreement or otherwise with the approval of Lender, which approval shall not be unreasonably withheld. The initial Construction Schedule approved by Lender and Construction Consultant is attached as **Schedule VIII** hereto.

"**Contingency**" means, individually or collectively, as the context may require, the Hard Cost Contingency and the Soft Cost Contingency.

"**Contractor**" means any contractor, subcontractor, sub-subcontractor or Design Professional party to a Construction Contract.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the day-to-day management and policies of a Person, whether through ownership of voting securities, by contract or otherwise; provided, that Control shall not be deemed absent solely because another member, manager, partner or Person shall have veto rights with respect to certain major decisions and shall not be deemed granted solely because such other member, partner or other Person has been granted such veto right. The terms "**Controlled**," "**Controlling**" and "**Common Control**" shall have correlative meanings.

"**Costs**" means, collectively, all costs and expenses of constructing the Project (including all Project Costs, Hard Costs and Soft Costs) through Completion.

"**Counterparty**" means, with respect to the Interest Rate Cap Agreement, SMBC Capital Markets, Inc., and with respect to any Replacement Interest Rate Cap Agreement, any Approved Counterparty thereunder.

"**Debt**" means the outstanding principal balance of the Loan, together with all interest accrued and unpaid thereon and all other sums (including, without limitation, the Minimum Multiple Payment (if applicable in accordance with Section 2.12(c)), the Exit Fee, the Administrative Fee and any Breakage Costs) due to Lender or the Indemnified Parties in respect of the Loan under the Note, this Agreement, and the other Loan Documents.

"**Debt Service**" means, with respect to any particular period of time, scheduled payments of interest and principal (if any) under the Note during such period.

"**Default**" means the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" means a rate per annum equal to the lesser of (i) the Maximum Legal Rate and (ii) five percent (5%) plus the Interest Rate in effect from time to time as set forth herein.

9

"**Deficiency**" means, at any given time, the amount (if any) by which the balance of the sum of (i) the portion of the Loan yet to be advanced by Lender pursuant to this Agreement, (ii) any unused Deficiency Collateral, plus (iii) funds in the Collateral Accounts (other than funds in the Security Deposit Reserve Account), are less than the sum of (a) the actual sum, as estimated by Lender or Construction Consultant in its reasonable judgment, which will be required to Complete the Project substantially in accordance with the Plans and Specifications, the then current Construction Schedule, all Legal Requirements and this Agreement, and to pay all unpaid Costs in connection therewith (including Impositions and Insurance Premiums) and (b) all operating deficits of the Property as and when due and payable (inclusive of Debt Service on the Loan, along with any Breakage Costs, the Exit Fee and any Minimum Multiple Payment (if applicable in accordance with Section 2.12(c))) through the Maturity Date, or, if the term has been extended in accordance with the terms of this Agreement, through the First Extended Maturity Date, the Second Extended Maturity Date or the Third Extended Maturity Date, as applicable.  Such estimate shall be binding and conclusive provided it is made in good faith and absent manifest error.

"**Design Professionals**" means, collectively, all architects, engineers and similar professionals retained by or on behalf of Borrower in connection with the design of the Project (including, without limitation, the Architect), all of which shall be licensed professionals in the State and, if such Design Professional is retained after the Closing Date, such Design Professional shall be subject to the reasonable approval by Lender prior to engagement in connection with the Project.

"**Development Agreement**" means that certain Development Services Agreement dated as of November 2, 2016 by and between Leasehold Borrower, as owner, and Greystone Hotel Developer, LLC, a Florida limited liability company ("**Developer**"), as developer, as the same may be amended, replaced, supplemented or otherwise modified form time to time in accordance with the terms and conditions of this Agreement.

"**DST**" means Greystone Delaware Statutory Trust, a Delaware statutory trust.

"**EB-5 Lender**" means Greystone EB-5 LLLP, a Florida limited liability limited partnership.

"**EB-5 Loan**" means that certain loan made by EB-5 Lender to Greystone Hotel Miami, LLC in the aggregate amount of $500,000.

"**EB-5 Loan Documents**" means the documents evidencing, securing or otherwise governing the EB-5 Loan.

"**Eligible Account**" means a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus

of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Assignee**" means (i) a commercial bank, trust company, savings and loan association, savings bank, insurance company, investment bank or pension fund organized under the laws of the United States of America, any state thereof or the District of Columbia, and having total assets in excess of $250,000,000 and liquidity in excess of $50,000,000, or (ii) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development, or a political subdivision of any such country, and having total assets in excess of $250,000,000 and liquidity in excess of $50,000,000, provided that such bank is acting through a branch or agency located in the United States of American, and which, in each case, is regularly engaged in the business of making or owning commercial real estate loans and is not identified on the OFAC List or otherwise qualifies as a Prohibited Person.

"**Eligible Institution**" means (i) a depository institution or trust company insured by the Federal Deposit Insurance Corporation (A) the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for thirty (30) days or less) and (B) the long term unsecured debt obligations of which are rated at least "A+" (or its equivalent) from each of the Rating Agencies (in the case of accounts in which funds are held for more than thirty (30) days) or (ii) such other depository institution otherwise approved by Lender from time to time in its sole discretion.

"**Environmental Claim**" means any claim, action, cause of action, investigation or written notice by any Person alleging potential liability (including potential liability for investigatory costs, cleanup costs, natural resource damages, property damages, personal injuries or penalties) arising out of, based upon or resulting from (i) the presence, threatened presence, release or threatened release into the environment of any Hazardous Materials from or at the Property, or (ii) the violation, or alleged violation, of any Environmental Law relating to the Property.

"**Environmental Consultant**" means an environmental consulting firm having experience (i) conducting environmental assessments for properties similar to the Property, and (ii) preparing and supervising remediation plans for properties similar to the Property, which firm is selected by Lender.

"**Environmental Indemnity**" means that certain Environmental Indemnity dated as of the date hereof, made by Borrower and Guarantor, collectively as indemnitor, in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Law**" shall have the meaning set forth in the Environmental Indemnity.

"**Equipment**" has the meaning set forth in the Mortgage.

11

"**Equity Interests**" mean (i) partnership interests (general or limited) in a partnership; (ii) membership interests in a limited liability company; (iii) shares or stock interests in a corporation; and (iv) the beneficial ownership interests in a trust.

"**Equity Payment**" means a payment by Borrower with respect to Costs from sources other than (i) Advances or (ii) the Required Equity Investment.

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the rulings issued thereunder.

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Excluded Hotel Taxes**" means federal, state and municipal excise, sales and use taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent taxes.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lender or any other recipient (each, a "**Recipient**") or required to be withheld or deducted from a payment to a Recipient, (i) any Taxes imposed on (or measured by) its net income (however denominated) and franchise or similar taxes imposed on it by the United States (or any political subdivision thereof), or by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of a Lender, in which its applicable Lending Office is located (and, if different from the jurisdiction of Lender's Lending Office, the jurisdiction of the domicile of its Loan Advances determined by the applicable taxing authorities) or that are Other Connection Taxes, (ii) any branch profits taxes imposed by the United States (or any political subdivision thereof) or any similar tax imposed under the laws of any other jurisdiction in which Borrower (or any political subdivision thereof) is located, (iii) in the case of a Lender, U.S. withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Debt, the Loan or any commitment pursuant to a law in effect on the date on which (x) such Lender acquires such interest in the Debt, the Loan or any commitment or (y) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iv) Taxes attributable to such Recipient's failure to comply with Section 2.16(d), and (v) any U.S. withholding Taxes imposed under FATCA.

"**Excusable Delay**" means any delay or number of delays, not exceeding ninety (90) days in the aggregate, due to (a) conditions beyond the reasonable control of Borrower, including, without limitation, strikes, stays, judgments, orders, decrees, labor disputes, governmental restrictions, earthquakes, hurricanes, tidal waves, inclement weather or any act of God or operation of forces of nature, enemy action, an act of terrorism, civil commotion, fire, casualty, accidents, shortages of, inability to obtain, labor, utilities or material or any delay by Lender in approving the Plans and Specifications, the Construction Schedule, Architect's Agreement, Construction Management Agreement, Major Trade Contracts, the Budget (or any modification

of any of the foregoing) or in funding any Advance hereunder, in each case only if this Agreement expressly provides Lender with a time frame for such approval; and (b) Borrower's termination of a Construction Manager if such Construction Manager has been terminated by Borrower with Lender's consent or as may be required by Lender in accordance with the terms of this Agreement and Borrower is using commercially reasonable efforts to replace such Construction Manager in accordance with the terms of this Agreement; provided, however, that any lack of funds in and of itself shall not be deemed to be a condition beyond the reasonable control of Borrower (other than any failure of Lender to fund any Loan Advance hereunder required to be funded by Lender in accordance with the terms hereof); and provided, further, (i) Borrower shall have given written notice of such delay to Lender within twenty (20) days after the date Borrower should have reasonably become aware of the occurrence of the event resulting in such delay, and (ii) Borrower shall have obtained Lender's written acknowledgement that the delay is due to one of the foregoing causes and therefore constitutes an Excusable Delay (it being agreed by Lender that Lender shall respond to Borrower's notice given under clause (i) above within ten (10) Business Days after Lender's receipt thereof (such response either to agree that the occurrence constitutes an Excusable Delay, to disagree with Borrower's assertion that the occurrence constitutes an Excusable Delay, or to request additional information from Borrower), and if Lender fails to respond by the end of such ten (10) Business Day period, then Borrower shall send a follow-up written notice to Lender, and if Lender fails to respond to the second notice within five (5) Business Days after Lender's receipt thereof, then Lender shall be deemed to have agreed that the occurrence constitutes an Excusable Delay).

"**Existing Construction Documents**" means, collectively, the Construction Documents in effect on the Closing Date.

"**Existing Trade Contracts**" means the Trade Contracts in effect on the Closing Date, as more particularly described on **Schedule IV**.

"**Exit Fee**" means an amount, in the aggregate, equal to one percent (1.0%) of the Loan Amount, which Exit Fee shall be payable pro rata together with any repayment of any portion of the Loan, whether by prepayment or on the Maturity Date.

"**Extension Fee**" means, (i) with respect to the First Extension Period, one-half of one percent (0.50%) of the Outstanding Principal Balance, (ii) with respect to the Second Extension Period, one-half of one percent (0.50%) of the Loan Amount and (iii) with respect to the Third Extension Period, one-half of one percent (0.50%) of the Loan Amount.

"**Extension Period**" means the First Extension Period, the Second Extension Period or the Third Extension Period, as applicable.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement entered into to implement such Sections of the Code and any laws, rules and practices adopted by a non-U.S. jurisdiction to effect any such intergovernmental agreement.

WEIL:\96218278\17\63946.0005

"**Federal Funds Rate**" means, for any day, the rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Lender on such day on such transactions as determined by Lender.

"**Fee Hotel Management Agreement**" means that certain Hotel and Premises Management Agreement dated November 7, 20107, between Fee Borrower and Hotel Manager.

"**FF&E**" means all furniture, furnishings, fixtures and equipment required for the construction and operation of the Property or of the type customarily used in hotel properties such as the Property, including, without limitation, lobby furniture, carpeting, draperies, paintings, bedspreads, television sets, office furniture and equipment such as safes, cash registers, and accounting, duplicating and communication equipment, telephone systems, back and front of the house computerized systems, guest room furniture, specialized hotel equipment such as equipment required for the operation of kitchens, laundries, the front desk, dry cleaning facilities, bar and cocktail lounges, restaurants, recreational facilities as they may exist from time to time, and decorative lighting, material handling equipment and cleaning and engineering equipment and all other fixtures, equipment, apparatus and personal property needed for such purposes; but excluding operating equipment and supplies.

"**First Extended Maturity Date**" means December 22, 2020.

"**First Extension Period**" means a period of twelve (12) consecutive months following the Initial Maturity Date.

"**Fiscal Year**" means each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan or the portion of any such twelve (12) month period falling within the term of the Loan in the event that such a 12-month period occurs partially before or after, and partially during, the term of the Loan.

"**Fitch**" means Fitch, Inc.

"**Funding Date Cutoff**" means the Initial Maturity Date.

"**Future Construction Documents**" means, collectively, the Construction Documents entered into after the Closing Date in accordance with the terms hereof.

"**GAAP**" means the generally accepted accounting principles as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession, to the extent such principles are

WEIL:\96218278\17\63946.0005

applicable to the facts and circumstances on the date of determination, as of the date of the applicable financial report.

"**Global Trade Laws**" means the U.S. Export Administration Regulations; the U.S. International Traffic in Arms Regulations; the economic sanctions rules and regulations implemented under statutory authority or President's Executive Orders and administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"); and other relevant economic sanctions imposed by a relevant Governmental Authority.

"**Government Official**" means (i) an officer, agent or employee of a government, government-owned enterprise (or any agency, department or instrumentality thereof), political party or public international organization, (ii) a candidate for government or political office; or (iii) an agent, officer, or employee of any entity owned by a government.

"**Governmental Authority**" means any court, board (including any historic preservation board), agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, foreign or otherwise) whether now or hereafter in existence.

"**Greystone Holdco**" means Greystone Holdco, LLC, a Delaware limited liability company.

"**Greystone Hotel Miami**" means Greystone Hotel Miami, LLC, a Delaware limited liability company.

"**Greystone Managing Member**" means Greystone Managing Member, LLC, a Florida limited liability company.

"**Ground Lease**" means the lease described on **Schedule X**, as the same may be amended, replaced, restated, supplemented or otherwise modified from to time to time in accordance with the terms and conditions of this Agreement.

"**Ground Lessor**" means the ground lessor under the Ground Lease, which ground lessor is, as of the Closing Date, Greystone Terra Firma, LLC, a Florida limited liability company.

"**Ground Rent**" means all rents, additional rent, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties, income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, together with each other amount or charge due to Ground Lessor under the Ground Lease or in connection therewith, subject in each case to any reimbursements applicable thereto (as and to the extent provided in the Ground Lease).

"**Guarantees**" means, collectively, the Carry Guaranty, the Completion Guaranty and the Recourse Guaranty.

"**Guarantor**" means individually and/or collectively, as the context may require, James Vosotas and Branden Muhl.

15

"**Hard Cost Contingency**" means 5% of the contingency line item set forth in the Budget for permitted overruns of Hard Costs and available for Hard Costs in accordance with the Agreement and subject to compliance at all times with the Lien Law.

"**Hard Costs**" means, collectively, all costs and expenses set forth in the Budget which are denominated in the Budget as "Hard Costs".

"**Hazardous Materials**" or "**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Hotel Manager**" means Vos Hospitality, LLC, a Florida limited liability company.

"**Hotel Transactions**" means, collectively, (i) occupancy arrangements for customary hotel transactions in the ordinary course of Borrower's business conducted at the hotel located at the Property, including nightly rentals (or licensing) of hotel rooms or suites, banquet room use and food and beverage services and (ii) informational or guest services which are terminable on one month's notice or less without cause and without penalty or premium, including co-marketing, promotional services and outsourced services.

"**Hotel Transactions Income**" means income from Hotel Transactions, including, without limitation, all income, receivables, receipts, revenues, deposits, accounts, cash, issues, profits, charges for services rendered and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to operations on the Property, and proceeds, if any, from business interruption or other losses of income or insurance, including, without limitation, hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance.

"**Immediate Family**" **or** "**Immediate Family Member**" with respect to a natural person, means the parent, sibling, child, grandchild, niece, nephew, spouse, domestic partner or lineal descendant of such natural person.

"**Impositions**" means all taxes or payments-in-lieu of taxes (including all ad valorem, sales (including those imposed on lease rentals), use, single business, gross receipts, value added, intangible transaction, privilege or license or similar taxes), governmental assessments (including all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not commenced or completed within the term of this Agreement), business improvement district charges and assessments, water, sewer or other rents

16

and charges, excises, levies, fees (including license, permit, inspection, authorization and similar fees), and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Property and/or any Operating Income (including all interest and penalties thereon), which at any time prior to, during or in respect of the term hereof may be assessed or imposed on or in respect of or be a Lien upon (i) Borrower (including all income, franchise, single business or other taxes imposed on Borrower for the privilege of doing business in the jurisdiction in which the Property is located), (ii) the Property, or any other collateral delivered or pledged to Lender in connection with the Loan, or any part thereof, or any Operating Income therefrom or any estate, right, title or interest therein, or (iii) any occupancy, operation, use or possession of, or sales from, or activity conducted on, or in connection with the Property or the leasing or use of all or any part thereof, but excluding Excluded Taxes.

"**Improvements**" has the meaning set forth in the Mortgage.

"**Indebtedness**" has the meaning set forth in **Schedule VII**.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Independent**" means, when used with respect to any Person, a Person who (i) does not have any direct financial interest or any material indirect financial interest in Borrower or in any Affiliate of Borrower, (ii) is not connected with Borrower or any Affiliate of Borrower, as an officer, employee, promoter, underwriter, trustee, partner, member, manager, creditor, director, supplier, customer or person performing similar functions, and (iii) is not a member of the immediate family of a Person defined in clauses (i) or (ii) above.

"**Independent Architect**" means an architect, engineer or construction consultant selected by Borrower which is Independent, licensed to practice in the State and has at least five (5) years of architectural experience and which is reasonably acceptable to Lender.

"**Independent Director**" or "**Independent Manager**" means an individual who has prior experience as an independent director, independent manager or independent member with at least three years of employment experience and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc. (or its affiliate NRAI Entity Services, LLC), Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional Independent Directors or Independent Managers, another nationally-recognized company reasonably approved by Lender, in each case that is not an Affiliate of Borrower and that provides professional Independent Directors and Independent Managers and other corporate services in the ordinary course of its business, and which individual is duly appointed as an Independent Director or Independent Manager of such corporation or limited liability company and for the five-year period prior to his or her appointment as an Independent Director has not been and during the continuation of his or her serving as an Independent Director will not be, any of the following:  (i) a member, manager, director, trustee, officer, employee, attorney, or counsel of any of Borrower, Guarantor or their Affiliates (other than as an Independent Director of Borrower or an Affiliate of Borrower that is

17

not in the direct chain of ownership of Borrower and that is required by a creditor to be a single purpose bankruptcy remote entity, provided that such Independent Director is employed by a company that routinely provides professional Independent Directors or managers in the ordinary course of its business); (ii) a creditor, customer, supplier, service provider (including provider of professional services) or other Person who derives any of its purchases or revenues from its activities with Borrower, Guarantor or any Affiliate of Borrower or Guarantor (other than a nationally-recognized company that routinely provides professional Independent Directors or Independent Managers and other corporate services to Borrower, Guarantor or any Affiliate of Borrower or Guarantor in the ordinary course of business); (iii) a direct or indirect legal or beneficial owner in Borrower, Guarantor or any Affiliate of Borrower or Guarantor; (iv) a member of the immediate family of any member, manager, employee, attorney, supplier or other Person referred to above; and (v) a Person Controlling or under the common Control of anyone listed in clauses (i) through (iv) above.  A natural person who otherwise satisfies the foregoing definition and satisfies the requirements of clause (i) by reason of being the Independent Director or Independent Manager of a "single purpose entity" affiliated with Borrower shall be qualified to serve as an Independent Director or Independent Manager hereunder provided that the fees that such individual earns from serving as an Independent Director or Independent Manager of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.  For purposes of this paragraph, a "single purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to the Single Purpose Entity definition in **Schedule VII** of this Agreement.

"**Initial Maturity Date**" means December 22, 2019.

"**Insurance Requirements**" means the requirements of Section 8.1 together with all material terms of any of the Policies required thereunder.

"**Intangibles**" has the meaning set forth in the Mortgage.

"**Interest Determination Date**" means, with respect to each Interest Period, the date that is two (2) London Business Days prior to the eleventh (11th) day of the calendar month in which such Interest Period commences; provided, however, that with respect to the initial Interest Period, the Interest Determination Date shall be the Closing Date.

"**Interest Period**" means, with respect to any Payment Date, the period commencing on and including the eleventh (11th) day of the calendar month prior to the calendar month in which such Payment Date occurs and ending on and including the tenth (10th) day of the calendar month in which such Payment Date occurs (or in the case of the Maturity Date, the Maturity Date); provided, however, that  no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate).  The first Interest Period hereunder shall begin on and include the Closing Date and shall end on and include the tenth (10th) day of either (a) the calendar month in which the Closing Date occurs, if the Closing Date occurs on or after the first day of such month, but prior to the eleventh (11th) day of such calendar month, or (b) the calendar month following the calendar month in which the Closing Date occurs, if the Closing Date occurs after the eleventh (11th) day of such calendar month).

"**Interest Rate**" means, with respect to each Interest Period, an interest rate per annum equal to the LIBOR Rate plus the Spread, except with respect to any portion of the Loan which is an Alternative Rate Loan, in which case, the interest rate for such Alternative Rate Loan for each Interest Period during which such Alternative Rate Loan is outstanding shall be the Alternative Rate.

"**Interest Rate Cap Agreement**" means a Confirmation and Agreement (together with the confirmation and schedules relating thereto) between a Counterparty and Borrower, obtained by Borrower and collaterally assigned to Lender pursuant to an Assignment of Rate Cap in accordance with the terms of this Agreement.  After delivery of any Replacement Interest Rate Cap Agreement to Lender, the term Interest Rate Cap Agreement shall be deemed to mean such Replacement Interest Rate Cap Agreement.  Any Interest Rate Cap Agreement shall contain or comply with each of the following terms and conditions, as applicable:

   (i)   Notional Amount.  The notional amount of the Interest Rate Cap Agreement shall equal the maximum principal amount of the Loan;

   (ii)   Term.  The remaining term of the Interest Rate Cap Agreement shall at all times extend through the end of the Interest Period in which the Maturity Date occurs;

   (iii)   Parties.  The Interest Rate Cap Agreement shall be issued by the Counterparty to Borrower and shall be pledged to Lender by Borrower in accordance with this Agreement;

   (iv)   Payment Stream.  The Counterparty under the Interest Rate Cap Agreement shall be obligated to make a stream of payments, directly to the Cash Management Account (whether or not an Event of Default has occurred) from time to time equal to the product of (a) the notional amount of such Interest Rate Cap Agreement multiplied by (b) the excess, if any, of LIBOR (including any rounding under the definition of LIBOR) over the Strike Price, and shall provide that such payments shall be made on a monthly basis, in each case, not later than (after giving effect to and assuming the passage of any cure period afforded to such Counterparty under the Interest Rate Cap Agreement, which cure period shall not in any event be more than three (3) Business Days) each Payment Date;

   (v)   Acknowledgment.  The Counterparty under the Interest Rate Cap Agreement shall execute and deliver the Acknowledgment; and

   (vi)   Other.  The Interest Rate Cap Agreement shall impose no material obligation on the beneficiary thereof (after payment of the acquisition cost) and shall be in all material respects reasonably satisfactory in form and substance to Lender and shall satisfy applicable Rating Agency standards and requirements, including, without limitation, provisions satisfying Rating Agencies standards, requirements and criteria (a) that incorporate representations by the Counterparty that no withholding taxes shall apply to payments by the Counterparty, and provide for "gross up" payments by the Counterparty for any withholding tax, (b) whereby the Counterparty agrees not to file or join in the filing of any petition against Borrower under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, and (c) that incorporate, if the Interest Rate Cap Agreement contemplates collateral posting by

19

the Counterparty, a credit support annex setting forth the mechanics for collateral to be calculated and posted that are consistent with Rating Agency standards, requirements and criteria.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**", when used in relation to Borrower, means the actual knowledge of Branden Muhl and James Vosotas or, to the extent that any such individual(s) are no longer associated with Borrower and future representations, warranties and certifications required to be made by Borrower under the Loan Documents are at issue, then any individual having the title of President, Executive Vice President or Treasurer (or similar variants thereof) of Borrower will be the Persons whose actual knowledge is referred to.

"**Land**" means, collectively, (i) that certain real property located at 230 20th Street, Miami Beach, Florida (the "**Fee Land**"), as more particularly described on **Exhibit A-1** attached hereto and made a part hereof, and (ii) that certain real property located at 1920 Collins Avenue, Miami Beach, Florida (the "**Leasehold Land**"), as more particularly described on **Exhibit A-2** attached hereto and made a part hereof, leased to Leasehold Borrower pursuant to the Ground Lease.

"**Lease**" means any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect), pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, sub-sublease, or other agreement entered into in connection with such lease, sublease, sub-sublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto. "**Lease**" shall not include Ordinary Course Rentals or the Ground Lease.

"**Lease Letter of Credit**" means a letter of credit issued for the benefit of Borrower as security for the payment and performance of a Tenant's obligation under its Lease.

"**Leasehold Hotel Management Agreement**" means that certain Hotel and Premises Management Agreement dated October 12, 2016, between Master Tenant and Hotel Manager.

"**Legal Requirements**" means, collectively, all present and future laws, statutes, codes, ordinances, consents, approvals, certifications, orders, judgments, decrees, injunctions, rules, regulations and requirements, and irrespective of the nature of the work to be done, of every Governmental Authority (including, without limitation, Environmental Laws and all covenants, restrictions and conditions now or hereafter of record, including, without limitation, the ADA) which may be, and to the extent the same are applicable to Borrower, the Property or the Project.

"**Lender**" means 1920 Collins Ave ML Funding LLC, a Delaware limited liability company, its respective successors and assigns.

"**Lender Affiliate**" means any Person that Lender (i) Controls and (ii) owns, directly or indirectly, not less than fifty and one tenth percent (50.1%) of the Equity Interests in such Person.

20

"**Lending Office**" means the office Lender may designate as its lending office by notice to Borrower.

"**Letter of Credit**" means an irrevocable, unconditional, freely transferable (without cost to Lender), clean sight draft letter of credit, as the same may be replaced, split, substituted, modified, amended, supplemented, assigned or otherwise restated from time to time (either an evergreen letter of credit or a letter of credit which does not expire until one (1) year after the issuance date thereof), in form and substance acceptable to Lender (which approval shall not be unreasonably withheld, delayed or conditioned) and issued by a domestic Approved Bank or the U.S. agency or branch of a foreign Approved Bank, or if there are no domestic Approved Banks or U.S. agencies or branches of a foreign Approved Bank then issuing letters of credit, then such letter of credit may be issued by a domestic bank, the long term unsecured debt rating of which is "A+/A-1" or better by S&P and Moody's, in any event, having an office in the City of New York, New York where presentation may be made by Lender.  If at any time the bank issuing any such Letter of Credit shall cease to be an Approved Bank or the U.S. agency or branch of a foreign Approved Bank, Lender shall have the right immediately to draw down the same in full and hold the proceeds of such draw in accordance with the applicable provisions hereof if (i) Lender has previously delivered written notice to Borrower that the bank issuing the Letter of Credit has ceased to be an Eligible Institution and (ii) Borrower has not delivered a replacement Letter of Credit within thirty (30) days after Borrower's receipt of such notice.  In addition, if at any time a Letter of Credit is scheduled to expire in ten (10) days or less, then Lender shall have the right immediately to draw down the same in full and hold the proceeds of such draw in a Sub-Account of the Cash Management Account as additional collateral for the Loan**.**

"**LIBOR**" means, with respect to each Interest Determination Date and each Interest Period in respect of any LIBOR Loan, the rate (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest 1/1,000 of 1%) for deposits in U.S. dollars, for a one-month period, which appears on the Bloomberg Terminal LIBOR Page as of 11:00 a.m., London time, on the related Interest Determination Date.  If such rate does not appear on the Bloomberg Terminal LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date, LIBOR shall be the arithmetic mean of the offered rates (expressed as a percentage per annum) for deposits in U.S. dollars for a one-month period that appear on the Reuters Screen LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date, if at least two such offered rates so appear.  If fewer than two such offered rates appear on the Reuters Screen LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date, Lender shall request any three major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Interest Determination Date for the amounts for a comparable loan at the time of such calculation.  If at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates.  LIBOR may or may not be the lowest rate based upon the market for U.S. Dollar deposits in the London Interbank Eurodollar Market at which Lender prices loans on the date which LIBOR is determined by Lender as set forth above.

"**LIBOR Floor**" means 153.488 basis points (1.53488%).

"**LIBOR Loan**" means the Loan or any portion thereof at any time during which the Interest Rate for the Loan or such portion thereof is calculated with reference to the LIBOR Rate in accordance with the provisions of Article II.

"**LIBOR Rate**" means, with respect to each Interest Period, an interest rate per annum equal to the greater of (i) LIBOR, determined as of the Interest Determination Date applicable to such Interest Period, and (ii) the LIBOR Floor.

"**Lien**" means any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance or charge on or affecting the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and construction, mechanic's, materialmen's and other similar liens and encumbrances against the Property or any portion thereof or Borrower or any direct interest in Borrower or Borrower Holdco.

"**Lien Law**" means the Chapter 713, Florida Statutes as in effect from time to time.

"**Line Item**" means a line item of cost or expense set forth in the Budget, as the same may be adjusted in compliance with Section 4.6.

"**Loan Advance**" or "**Advance**" means an advance of any portion of the Loan Amount made pursuant to the provisions of this Agreement, which shall be used by Borrower solely for application to the Costs.

"**Loan Amount**" means $36,800,000.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Assignment of Option Agreement, the Assignment of Permits, the Recourse Guaranty, the Carry Guaranty, the Completion Guaranty, the Environmental Indemnity, any Uniform Commercial Code financing statements required to be filed hereunder and under the Pledge Agreements, the Pledge Agreements, the Recycled Entity Certificate, the Post-Closing Agreement, the Assignment of Rate Cap, the Lockbox Agreement, the Account Control Agreement, and, upon execution and delivery of the same in accordance with the requirements of this Agreement, the Assignment of Management Agreement, the Assignment of Development Agreement, the Assignment of Architect Agreement, together with all other agreements or other documents now or hereafter evidencing, guaranteeing, securing or otherwise executed in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan-to-Value Ratio**" means the ratio, as of the date of calculation, in which the numerator is equal to the aggregate Outstanding Principal Balance of the Loan and the denominator is equal to the fair market value of the Property (as determined by an Appraisal).

"**Lockbox Agreement**" means the Deposit Account Control Agreement (Hard Lockbox), a form of which is attached hereto as **Exhibit I** to be entered into among Lender, Borrower and Lockbox Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

WEIL:\96218278\17\63946.0005

"**Lockbox Bank**" means the Approved Bank selected by Borrower, and reasonably approved by Lender, to act as the depositary bank under the Lockbox Agreement.

"**London Business Day**" means any day other than a Saturday, Sunday or any other day on which commercial banks in London, England are closed for interbank or foreign exchange transactions.

"**Major Trade Contract**" means any Trade Contract, having a contract or purchase price, as the case may be, whether initially or thereafter by virtue of any Change Order or Change Orders, equal to or in excess of Two Hundred Fifty Thousand Dollars ($250,000.00); provided that, for purposes of this definition, multiple Trade Contracts with a single contractor or supplier, or an Affiliate thereof, as the case may be, shall be deemed to be one Trade Contract.

"**Major Trade Contractor**" means any contractor, supplier or vendor, as the case may be, under a Major Trade Contract.

"**Major Trade Contractor Consent**" means a Major Trade Contractor Consent executed and delivered by a Major Trade Contractor in favor of Lender, in connection with the Loan, in the form annexed hereto as **Exhibit H**.

"**Management Agreement**" means, individually or collectively, (i) the Leasehold Hotel Management Agreement, (ii) the Fee Hotel Management Agreement, and/or (iii) one (1) or more hotel property management agreements between Borrower or Master Tenant, as owner, and Manager, as manager, to be entered into in accordance with Section 7.1.20(b) hereof, in form and substance acceptable to Lender in Lender's reasonable discretion, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Management Fee**" means all compensation paid or payable to the applicable Manager pursuant to the terms of the applicable Management Agreement, including, without limitation, any of the following paid or payable to Manager or its Affiliates:  marketing fees, system expense reimbursements, payments for use of names, marks and systems in which Manager or any Affiliate has any interest, and other royalties.  "**Management Fee**" does not include reimbursement to Manager for expenses incurred at the Property for the Property, but does include reimbursements for Manager's overhead, for employees of Manager who have duties that are not exclusive to the Property, and for other items which are allocated among more than one property which is owned or managed by Manager or its affiliates.

"**Manager**" means (i) Hotel Manager or (ii) any Qualified Manager engaged by Borrower with respect to all or any portion of the Property.

"**Marketing Agent**" means (i) Preferred Hotels and Resorts or (ii) any Qualified Marketing Agent engaged by Borrower with respect to all or any portion of the Property.

"**Marketing Agreement**" means any marketing agreement to be entered into between Borrower and Marketing Agent in form and substance acceptable to Lender in Lender's reasonable discretion, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

WEIL:\96218278\17\63946.0005

"**Master Lease**" means the lease described on **Schedule XIV**, as the same may be amended, replaced, restated, supplemented or otherwise modified from to time to time in accordance with the terms and conditions of this Agreement.

"**Master Tenant**" means Greystone Master Tenant, LLC, a Florida limited liability company.

"**Master Tenant and Tenant Side Letter**" means the Master Tenant and Tenant Side Letter dated as of the date hereof, made by Leasehold Borrower to Master Tenant, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Master Tenant JV Agreement**" means the operating agreement of Master Tenant dated as of November 3, 2016, as the same may be amended, replaced, restated, supplemented or otherwise modified from to time to time in accordance with the terms and conditions of this Agreement.

"**Master Tenant Cash Management Agreements**" means, collectively, that certain (i) Deposit Account Control Agreement (Hard Lockbox), a form of which is attached to the Master Tenant and Tenant Side Letter or shall be approved by Lender in its reasonable discretion prior to execution by Leasehold Borrower, to be entered into among Master Tenant, Leasehold Borrower and Wells Fargo Bank, National Association ("**Master Tenant Cash Management Bank**") and (ii) Cash Management Agreement (Hard), a form of which is attached to the Master Tenant and Tenant Side Letter or shall be approved by Lender in its reasonable discretion prior to execution by Leasehold Borrower, to be entered into among Master Tenant, Leasehold Borrower and Master Tenant Cash Management Bank (the "**Master Tenant CMA**").

"**Material Adverse Change**" means any event, development, or circumstance after the date hereof that causes a material adverse change (as determined by Lender in Lender's commercially reasonable discretion) in (i) the financial condition of Borrower, Guarantor, or the Project, or (ii) on the validity or enforceability of any of the Loan Documents. Borrower acknowledges that a fact, event or circumstance which exists as of the date hereof which does not currently constitute a Material Adverse Change may, in the future, constitute a Material Adverse Change upon the occurrence of further adverse facts or circumstances (e.g., a pending litigation action pertaining to the Property may, following future adverse procedural or substantive trial developments, become a Material Adverse Change).

"**Material Agreement**" means any agreement to which Borrower is a party relating to the ownership, management, use, operating, leasing, maintenance or repair of the Property or any portion thereof (other than Trade Contracts, the Management Agreements and Leases) which (i) is between Borrower and any Affiliate of Borrower or Guarantor that relates to the Property, (ii) has a term greater than one (1) year, unless such agreement may be terminated by Borrower upon thirty (30) days' notice or less, (iii) requires the payment of a material termination fee by Borrower or (iv) provides for annual payments thereunder by Borrower in excess of $250,000.

"**Material Alteration**" means any Alteration following the Completion of the Project which, when aggregated with all related Alterations (other than decorative work such as painting, wall papering and carpeting and the replacement of fixtures, furnishings and equipment to the

WEIL:\96218278\17\63946.0005

extent being of a routine and recurring nature and performed in the ordinary course of business) constituting a single project, involves an estimated cost exceeding $350,000 with respect to such Alteration or related Alterations (including the Alteration in question) then being undertaken at the Property.

"**Maturity Date**" means the Initial Maturity Date or such earlier date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether by acceleration, or otherwise; provided, however, that if Borrower exercises its right to extend the Term of the Loan for the First Extension Period, the Second Extension Period or the Third Extension Period and, in accordance with the terms of this Agreement, the Term of the Loan is so extended, from and after such extension of the Term of the Loan, the term "**Maturity Date**" shall mean the First Extended Maturity Date, the Second Extended Maturity Date or the Third Extended Maturity Date, as the case may be, or in each case such earlier date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether by acceleration or otherwise.

"**Maximum Legal Rate**" means the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Minor Change Order**" means a Change Order that:  (i) will not change the gross square feet or leasable area of the Improvements by more than one-half of one percent (0.5%), individual hotel rooms in the Improvements as reflected in the Plans and Specifications or the general layout of the Improvements (or any component thereof); (ii) does not materially adversely affect the structural integrity, quality of building materials, or overall efficiency of operating systems of the Project; (iii) does not change the basic layout of the Project as contemplated by the Plans and Specifications; and (iv) will not result in an increase in the cost of the Project by more than $100,000 (not to exceed $500,000 in the aggregate, together with all related Minor Change Orders made pursuant to this clause (iv) and all other Minor Change Orders not previously approved by Lender and Construction Consultant).

"**Money Laundering Laws**" means any applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, the U.S. Money Laundering Control Act of 1986, as amended, and all money laundering-related laws of other jurisdictions where Borrower, Guarantor, or Manager conducts business or owns assets, and any related or similar Law issued, administered or enforced by any Governmental Authority.

"**Moody's**" means Moody's Investors Service, Inc.

"**Morningstar**" means Morningstar Credit Ratings, LLC.

"**Mortgage**" means that certain Fee and Leasehold Mortgage, Assignment of Leases, Rents, Hotel Transactions Income and Security Deposits and Security Agreement dated as of the date hereof, made by Borrower to Lender, as security for the Loan, to be recorded in the

25

Register's Office, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Net Cash Flow**" means, for any period, the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Operating Income for such period.

"**Net Operating Income**" means, with respect to any period of determination, Operating Income less Operating Expenses.

"**Note**" means that certain Promissory Note dated the date hereof, made by Borrower to Lender, in the maximum principal amount of the Loan Amount, as the same may be hereinafter amended, restated, replaced (whether by one or more replacement notes), supplemented, extended or otherwise modified from time to time.

"**Obligations**" means, collectively, the "Obligations" as defined and described in the Mortgage, and shall include all of such Obligations in the aggregate.

"**Octagon**" means Octagon Credit Partners LP, a Delaware limited partnership.

"**Octagon Loan**" means those certain loans made by CDE to Greystone Managing Member in the aggregate amount of $3,400,000.

"**Octagon Loan Documents**" means the documents evidencing, securing or otherwise governing the Octagon Loan.

"**OFAC List**" means the specially designated nationals and blocked persons list, the foreign sanctions evaders list, and the sectoral sanctions identification list maintained by OFAC within the U.S. Treasury Department.

"**Officer's Certificate**" means a certificate executed by an authorized signatory of Borrower that is familiar with the financial condition of Borrower and the operation of the Property.

"**Operating Expenses**" means, for any period, and without duplication, the total of all expenditures of whatever kind during such period relating to the operation, maintenance and/or management of the Property that are incurred by Borrower on a regular monthly or other periodic basis, including without limitation (and without duplication), utilities, ordinary repairs and maintenance, insurance, license fees, the costs associated with any Leases and/or Hotel Transactions, Impositions, Other Charges, advertising expenses, Management Fees, payroll and related Taxes, computer processing charges, operational equipment or other lease payments (including payments owing under the Ground Lease), and other similar costs, but excluding depreciation, amortization and other non-cash items, Debt Service, Capital Expenditures and contributions to the Collateral Accounts, income Taxes or other Taxes in the nature of income Taxes on sales, or use Taxes required to be paid to any Governmental Authority, equity distributions, Tax Distributions and other extraordinary and non-recurring items.

"**Operating Income**" means, for any period, and without duplication, all income and proceeds (whether in cash or on credit) derived from the ownership and/or operator of the

Property, including, without limitation: (a) all income and proceeds, including Hotel Transactions Income and Rent, received from rental of rooms, Leases and commercial space, meeting, conference and/or banquet space within the Property including net parking revenue; (b) all income and proceeds received from food and beverage operations and from catering services conducted from the Property even though rendered outside of the Property; (c) all income and proceeds from business interruption, rental interruption and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); (d) all Proceeds for temporary use (after deducting therefrom all costs incurred in the adjustment or collection thereof and in Restoration of the Property); (e) all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this definition of "Operating Income" if received in the ordinary course of the Property operation (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof and any amounts payable to Manager in connection therewith pursuant to the Management Agreement); and (f) interest on credit accounts, rent concessions or credits, and other required pass-throughs and interest on Collateral Accounts; but excluding, (1) gross receipts received by lessees, licensees or concessionaires of the Property; (2) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Borrower or Manager; (3) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (4) Excluded Taxes; (5) Proceeds (except to the extent provided in clauses (c) and (d) above); (6) refunds of amounts not included in Operating Expenses and uncollectible accounts; (7) gratuities collected by the Property or on behalf of employees; (8) the proceeds of any financing; (9) security deposits received from Tenants until forfeited or applied; (10) payments made to Borrower under any Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement; and (11) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues.

"**Operating Permits**" means, collectively, all authorizations, consents and approvals given by and licenses and permits issued by Governmental Authorities which are required for the ownership, use and occupancy of the Property in accordance with all Legal Requirements, and for the performance and observance of all obligations and agreements of Borrower contained herein or in the other documents that relate to the ownership, use and occupancy of the Property, including (without limitation) the ownership, use and occupancy of the Project following Substantial Completion of the same.

"**Opinion of Counsel**" means an opinion of counsel of a law firm selected by Borrower and reasonably acceptable to Lender.

"**Option**" means the option granted to Option Holder to purchase the Leasehold Land or to purchase all of the membership interests of DST in Ground Lessor as further described in the Option Agreement.

"**Option Agreement**" means that means the agreement described on **Schedule XI**.

"**Option Holder**" means Greystone Option Holder, LLC, a Delaware limited liability company.

27

WEIL:\96218278\17\63946.0005

"**Ordinary Course Rentals**" means any short-term rental of guest rooms, meeting rooms and other facilities at the Property and, in connection with such short-term rental, use rights associated with the business center, health club, spa, pool, facilities, restaurants and other hotel related amenities, in each case consistent with the business of operating a hotel and which in no event exceeds thirty (30) consecutive days.

"**Other Charges**" means maintenance charges, impositions other than Impositions, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, in each case now or hereafter levied or assessed or imposed against the Property or any part thereof by any Governmental Authority, other than those required to be paid directly to a Governmental Authority by a Tenant under its Lease.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction, imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Debt or any Loan Document).

"**Outside Construction Completion Date**" means the Initial Maturity Date.

"**Outstanding Principal Balance**" means, as of any date, the outstanding principal balance of the Loan.

"**Payment and Performance Surety Bonds**" mean dual-obligee payment and performance bonds relating to any Major Trade Contractors, issued by a surety company or companies authorized to do business in the state in which the Property is located and acceptable to Lender in its reasonable discretion, and in each case in compliance with applicable Legal Requirements and in an amount not less than the full contract price and otherwise in form and substance acceptable to Lender in its reasonable discretion.

"**Payment Date**" means the eleventh (11th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately succeeding Business Day.

"**Permitted Debt**" means collectively, (i) the Note and the other obligations, indebtedness and liabilities specifically provided for in any Loan Document and secured by this Agreement, the Mortgage and/or the other Loan Documents, (ii) the Octagon Loan, (iii) the CDE Loan, (iv) the EB-5 Loan and (v) unsecured trade payables incurred in the ordinary course of Borrower's business, not to exceed $1,472,000 in the aggregate.

"**Permitted Encumbrances**" means collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Policy, (iii) Liens, if any, for Impositions or Other Charges not yet delinquent, (iv) reserved, (v) any Liens which have been fully bonded to the reasonable satisfaction of Lender and discharged of record or which are being contested by appropriate proceedings in accordance with the terms of with Section 9.3, (vi) statutory Liens of carriers, warehousemen, mechanics, materialmen and other similar Liens arising by operation of law after the expiration of the

Construction Phase, which are incurred in the ordinary course of business and do not relate to the construction of the Project, for sums which are being contested in good faith in accordance with Section 9.3, (vii) financing leases for equipment in the ordinary course, provided the aggregate rental payments under all such leases do not exceed $50,000 per annum, (viii) Leases and rights of Tenants, as Tenants only, under such Leases, if and only if Lender has approved such Lease as provided herein, (ix) such governmental, public utility and private easements, covenants, conditions and restrictions which are customary and reasonably necessary for the provision of utilities to the Property, (x) the Notice of Commencement and (xi) such other title and survey exceptions as Lender has approved or may approve in writing in its reasonable discretion.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" has the meaning set forth in the Mortgage.

"**Plans and Specifications**" means (i) the preliminary plans and specifications for the construction of the Project as identified on **Schedule II** attached hereto and (ii) the updated and revised plans and specifications to be delivered pursuant to Section 4.1(h) and Section 7.2.6 and any other plans and specifications prepared or to be prepared by (or on behalf of) Borrower after the date hereof, in each case, as approved in writing by Lender and Construction Consultant in accordance with the terms hereof, and (iii) all Change Orders applicable thereto, provided that such Change Orders have been approved by Lender to the extent required in accordance with Section 7.2.7; the Plans and Specifications shall include, without limitation, a description of the materials, equipment and fixtures necessary for the construction of the Project, in each case as reasonably approved by Lender, together with any other architectural, structural, foundation and elevator plans and specifications prepared by Architect, any mechanical, electrical, plumbing and fire protection plans and specifications prepared by any Person retained or to be retained by Borrower, Architect or Construction Manager.

"**Pledge Agreement – Borrower Holdco**" means that certain Pledge and Security Agreement dated as of the date hereof, between Borrower Holdco, as pledgor, and Lender, as secured party, pursuant to which (i) Greystone Holdco has pledged 100% of the Equity Interests in Leasehold Borrower, Greystone Hotel Miami and Option Holder to Lender and (ii) Greystone Hotel Miami has pledged 100% of the Equity Interests in Fee Borrower to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Pledge Agreement – Greystone Managing Member/Master Tenant**" means that certain Pledge and Security Agreement dated as of the date hereof, between Greystone Managing Member, as pledgor, and Lender, as secured party, pursuant to which Greystone Managing Member has pledged 100% of the Equity Interests in Master Tenant to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Pledge Agreements**" means the Pledge Agreement – Borrower Holdco and the Pledge Agreement – Greystone Managing Member/Master Tenant.

"**Post-Closing Agreement**" means any post-closing agreement dated as of the date hereof, made by Borrower to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Presumed Tax Rate**" means the highest effective marginal combined U.S. federal, state and local income Tax rate for the fiscal year prescribed for an individual resident of New York City (taking into account (i) the deductibility of state and local income Taxes for U.S. federal income Tax purposes and (ii) the character (e.g., long-term or short-term capital gain or ordinary or exempt) of the applicable income).

"**Prohibited Person**" means any Person identified on the OFAC List or any other Person with whom a U.S. Person (as defined by the Office of Foreign Assets Control, as used in this instance only) may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States, or any Person on one or more of the lists of sanctioned entities maintained by the E.U. or the United Nations.

"**Project**" means an approximately 55,000 square foot, 92 key full-service boutique hotel project to be built on the Property in accordance with the Plans and Specifications, all Legal Requirements and all other applicable requirements of the Loan Documents, and to be named The Greystone South Beach Hotel.

"**Project Cost**" means each of those costs and expenses not constituting Hard Costs or Soft Costs set forth in the Budget which are designated in the Budget as "Project Items" or which otherwise are not to be funded from Loan Advances.

"**Property**" means, collectively, Borrower's fee simple and leasehold interests in the Land, the Improvements now or hereafter erected thereon, together with all other property, interests, rights and estates pertaining to such Land and Improvements and described as the "Property" in the Mortgage.

"**Punchlist Items**" means, collectively, minor details of construction, decoration, mechanical adjustment or installation the non-completion of which does not hinder or impede the use, operation and occupancy of the Project for their intended purposes or the ability to obtain a temporary certificate of occupancy for the Property (or any portion thereof).

"**Qualified Manager**" means (a) any entity listed on **Schedule XIII** or (b) in the reasonable judgment of Lender, a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties, hotels, food and beverage operations, parking, as applicable, similar in size, scope, use and value as the Property and who at the time of engagement manages no less than fifteen (15) of such hotels with no less than 3,000 rooms.

"**Qualified Marketing Agent**" means (a) any entity listed on **Schedule XII** or (b) in the reasonable judgment of Lender, a reputable and experienced hotel management or marketing organization (which may be an Affiliate of Borrower) possessing experience in managing or

30

marketing properties similar in size, scope, use and value as the Property and who at the time of engagement manages or provides marketing services for no less than fifteen (15) of such hotels with no less than 3,000 rooms.

"**Rating Agencies**" means each of S&P, Moody's, Fitch, or Morningstar or any other nationally-recognized statistical rating agency rating (or anticipated to rate) any portion of the Loan or any participation interest therein.

"**Recourse Guaranty**" means that certain Guaranty of Recourse Obligations dated as of the date hereof, made by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Recycled Entity Certificate**" means that certain Recycled Entity Certificate dated of the date hereof, made by Borrower in favor of Lender.

"**Register's Office**" means the Clerk of Courts for Miami-Dade County, Florida.

"**Rents**" means all rents, percentage rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, all other amounts payable as rent under any Lease (including the Master Lease) or other occupancy agreement relating to the Property (including, without limitation, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, other required pass-throughs or reimbursements paid by Tenants under Leases of any nature, and interest on reserve funds, if any), business interruption or other loss of income or rental insurance proceeds, and other items constituting Rents under the Assignment of Leases, and other income or consideration of whatever form or nature, in each case received by or paid to or for the account of or benefit of Borrower from any and all sources arising from or attributable to the Property, but excluding Hotel Transactions Income.

"**Replacement Interest Rate Cap Agreement**" means an interest rate cap agreement from an Approved Counterparty with substantially the same terms as the Interest Rate Cap Agreement and otherwise in form and substance reasonably satisfactory to Lender, except that the same shall be effective (i) in connection with a replacement following the expiration thereof, as of the date required in Section 11.1 or (ii) in connection with a replacement following a downgrade, withdrawal or qualification of the long-term unsecured debt rating of the Counterparty below "A-" by S&P or Fitch (if Fitch rates such Counterparty) and "A3" by Moody's, as of the date required in Section 11.3(c); provided that to the extent any such interest rate cap agreement does not meet the foregoing requirements, a Replacement Interest Rate Cap Agreement shall be such interest rate cap agreement reasonably approved in writing by Lender, and if the Loan or any portion thereof is included in a Securitization, each of the Rating Agencies with respect thereto.

"**Required Equity Investment**" means $24,157,847 in cash.

WEIL:\96218278\17\63946.0005

"**Restricted Party**" means, collectively Borrower, Guarantor, Sponsor and any Affiliated Manager.

"**Retainage**" means, with respect to each Trade Contract, until the work to be provided under such Trade Contract shall have reached fifty percent (50%) completion, as reasonably determined by the Construction Consultant, ten percent (10%) of the aggregate amounts payable under such Trade Contract, and after such time, five percent (5%) of the aggregate amounts payable under such Trade Contract until completion, unless, in either case, Lender determines in Lender's sole discretion, for a particular Trade Contract, to accept a lower Retainage or to the early release of Retainage for certain Trade Contracts; provided, however, no Retainage shall be required for any (i) Trade Contracts relating only to labor, (ii) direct material purchase Trade Contracts or (iii) amounts due under a Trade Contract relating to subcontractor default insurance, payment and performance bonds, Construction Manager insurance, Construction Manager fee and/or any general conditions.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"**Sanctioned Country**" or "**Sanctioned Countries**" means any country or geographic region subject to comprehensive economic sanctions administered by OFAC or the E.U., which currently includes: Cuba, Iran, North Korea, Sudan, Syria, and the Crimea region of Ukraine.

"**Second Extended Maturity Date**" means December 22, 2021.

"**Second Extension Period**" means a period of twelve (12) consecutive months following the First Extended Maturity Date.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Single Purpose Entity**" has the meaning set forth in **Schedule VII**.

"**Soft Cost Contingency**" means 5% of the contingency line item set forth in the Budget for permitted overruns of Soft Costs and available for Soft Costs in accordance with this Agreement, and subject to compliance at all times with the Lien Law.

"**Soft Costs**" means, collectively, all costs and expenses set forth in the Budget which are denominated in the Budget as "Soft Costs".

"**SPE Entity**" means Borrower, Borrower Holdco and any other entity which is required by this Agreement to be, as long as any portion of the Loan is outstanding, a Single Purpose Entity.

"**Speakeasy**" means an indoor, approximately 1200 square foot bar and restaurant located on the Leasehold Land.

"**Sponsor**" means individually or collectively, as the context may require, Greystone Hospitality, LLC, a Florida limited liability company, BBM3 LLC, a Delaware limited liability company and BBM3 II LLC, a Delaware limited liability company.

32

"**Spread**" means ten percent (10%) per annum.

"**State**" means the State of Florida.

"**Stored Materials**" means materials purchased by Borrower at or prior to the date of a Draw Request for use in the Project, but either (i) stored at the Property or a bonded warehouse, and not yet installed or incorporated into the Project ("**Unincorporated Materials**") or (ii) not yet delivered to the Property ("**Off-Site Materials**").  Stored Materials shall cease to be Stored Materials only when the same are installed or incorporated into the Project.  Notwithstanding anything to the contrary contained in the definition of "Stored Materials", no materials, machinery or Personal Property shall be deemed "Stored Materials" until the same shall have been stored at the Property or a bonded warehouse and unused for thirty (30) days, provided at all times such materials, machinery and/or Personal Property shall be insured for an amount equal to their replacement cost in accordance with Section 8.1 of this Agreement.

"**Substantial Completion**" means the lien-free (except for any such lien that has been bonded in accordance with the terms of this Agreement or being contested in accordance with the provisions of Section 9.3, the Liens and security interests created by the Loan Documents and other Permitted Encumbrances) substantial completion (i.e., completion of the Improvements other than Punchlist Items) of the construction of the Project, other than the portion of Project representing the Café or Speakeasy substantially in accordance with all Plans and Specifications, all Legal Requirements, all Permitted Encumbrances, and this Agreement, and that all utilities reasonably necessary to service the Property have been connected and are in operation, such completion to be evidenced to the reasonable satisfaction of Lender and the Construction Consultant; together with the delivery to Lender of temporary certificates of occupancy for all of the Improvements and evidence that all other Governmental Approvals and Operating Permits (other than de minimis Governmental Approvals and Operating Permits) have been issued and all other Legal Requirements (other than de minimis Legal Requirements) have been satisfied so as to allow the Improvements to be used and operated in accordance with the Loan Documents.

"**Survey**" means a survey of the Property prepared by a surveyor licensed in the State and reasonably satisfactory to Lender and Title Company, and containing a certification of such surveyor reasonably satisfactory to Lender.

"**Taking**" means a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Tax Distributions**" means distributions made by Borrower with respect to the taxable net income from the Property (or the business operated by Borrower on the Property or the business attributable to the Property) to Borrower allocable to direct or indirect members or owners assuming that each of such direct or indirect owner is a natural Person and applying the Presumed Tax Rate to such deemed natural member or owner.

"**Taxes**" means all present or future taxes, duties, levies, imposts, deductions, charges, assessments, fees, withholdings (including backup withholding) or other changes imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable or with respect thereto.

"**Tenant**" means any Person leasing, subleasing or otherwise occupying any portion of the Property pursuant to a Lease in accordance with this Agreement.

"**Third Extended Maturity Date**" means December 22, 2022.

"**Third Extension Period**" means a period of twelve (12) consecutive months following the Second Extended Maturity Date.

"**Title Company**" means Royal Abstract, as agent for First American Title Insurance Company, or any successor title insurance company acceptable to Lender and licensed to issue title insurance in the State.

"**Title Continuation**" means an endorsement to the Title Policy indicating that, since the Closing Date or the date of the last preceding Loan Advance, as the case may be, the Lien of the Mortgage continues to be a valid lien on the Property, subject only to the Permitted Encumbrances and any other exceptions previously approved by Lender as provided herein, which endorsement shall contain no exception for inchoate construction or mechanic's liens and shall have the effect of continuing the Title Policy to the date of such Loan Advance or, in the case of a Title Continuation delivered in connection with an extension of the Loan in accordance with Section 2.5 to the Maturity Date, as applicable, and increasing the coverage of the Title Policy by an amount equal to the Loan Advance then being made (if any) if the Title Policy does not by its terms provide for such an increase and which such Title Continuation shall contain the endorsements and affirmative coverages as Lender may reasonably require to the extent the same are available in the State.

"**Title Policy**" means an ALTA mortgagee title insurance policy in a form reasonably acceptable to Lender issued by Title Company with respect to the Property and insuring the lien of the Mortgage.

"**Trade Contract**" means any agreement, contract or purchase order (excluding the Architect Agreement, the Construction Management Agreement and any other agreements pertaining solely to professional services from other Design Professionals) entered into by Construction Manager or Borrower with any Trade Contractor, pursuant to which such Trade Contractor agrees to provide labor, materials, equipment and/or services in connection with the construction of the Project.

"**Trade Contractor**" means any Person that is a contractor, sub-contractor, supplier or provider of labor, materials, equipment and/or services in connection with the construction of the Project, as the case may be, under a Trade Contract.

"**Transfer**" means any sale, conveyance, transfer, lease, assignment, grant, mortgage, option, encumbrance, hypothecation, pledge, in each case, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and with respect to an entity shall include the

WEIL:\96218278\17\63946.0005

merger of such entity with or into any other entity, of (i) all or any part of the Property or any estate or interest therein, or (ii) any Equity Interests in any Restricted Party.

"**U.S. Bank**" means U.S. Bancorp Community Development Corporation, a Minnesota corporation.

"**U.S. Government Obligations**" means any direct obligations of, or obligations guaranteed as to principal and interest by, the United States Government or any agency or instrumentality thereof, provided that such obligations are backed by the full faith and credit of the United States. Any such obligation must be limited to instruments that have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change. If any such obligation is rated by S&P, it shall not have an "r" highlighter affixed to its rating. Interest must be fixed or tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with said index. In no event shall any such obligation have a maturity in excess of 365 days.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**UCC**" or "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect in the State, the State of New York or the State of Delaware, as applicable.

"**UCC Insurance Policy**" means a UCCPlus policy or a comparable form of lender's UCC insurance policy, in form and substance reasonably satisfactory to Lender.

"**Uniform System of Accounts**" means the most recent edition of the Uniform System of Accounts for Hotels, as adopted by the American Hotel and Motel Association.

"**United States**" means the United States of America, including the States and the District of Columbia, but excluding its territories and possessions.

      1.2     **Index of Defined Terms**. The following is a list of each capitalized term used in this Agreement and the page in which each such term is defined:

Account Banks ........................................................................................................................ 1
Account Collateral ................................................................................................................. 85
Account Control Agreement ................................................................................................... 1
Acknowledgment ..................................................................................................................... 1
ADA ......................................................................................................................................... 2
Administrative Fee .................................................................................................................. 2
Advance ................................................................................................................................. 22
Advance Conditions ................................................................................................................ 2
Advance Date .......................................................................................................................... 2
Affiliate ................................................................................................................................... 2
Affiliate Agreement ............................................................................................................. 128
Affiliated Manager ................................................................................................................. 2
Aggregate Per Location ...................................................................................................... 134

WEIL:\96218278\17\63946.0005

Agreement ........................................................................................................... 1
ALTA ................................................................................................................... 2
Alteration ........................................................................................................ 149
Alternative Rate ................................................................................................. 2
Alternative Rate Index ....................................................................................... 2
Alternative Rate Loan ......................................................................................... 2
Alternative Rate Spread ...................................................................................... 3
Annual Operating Budget .................................................................................... 3
Anti-Corruption Laws .......................................................................................... 3
Appraisal ............................................................................................................. 3
Approved Annual Operating Budget ............................................................... 152
Approved Bank .................................................................................................... 3
Approved Counterparty ....................................................................................... 3
Architect ............................................................................................................. 3
Architect Agreement ........................................................................................... 3
Architect Consent ............................................................................................... 3
Assignment and Acceptance ............................................................................... 4
Assignment of Architect Agreement ................................................................... 4
Assignment of Development Agreement .............................................................. 4
Assignment of Leases ......................................................................................... 4
Assignment of Management Agreement .............................................................. 4
Assignment of Option Agreement ....................................................................... 4
Assignment of Permits ........................................................................................ 4
Assignment of Rate Cap ...................................................................................... 5
Authorized Representative ................................................................................... 5
Bankruptcy Action ........................................................................................... 171
Bankruptcy Code ................................................................................................ 5
Book Entry Registry ........................................................................................ 165
Borrower ............................................................................................................. 5
Borrower Holdco ................................................................................................. 5
Borrower Parties ................................................................................................. 5
Borrower Party .................................................................................................... 5
Borrower Recourse Liabilities ......................................................................... 178
Borrower's Disbursement Account ...................................................................... 5
Borrowing Date ................................................................................................... 5
Breakage Costs ................................................................................................. 52
Broker .................................................................................................................. 5
Budget ................................................................................................................. 5
Business Day ........................................................................................................ 5
Cafe ..................................................................................................................... 6
Capital Expenditures ........................................................................................... 6
Carry Guaranty .................................................................................................... 6
Cash ..................................................................................................................... 6
Cash and Cash Equivalents ................................................................................. 6
Cash Management Account ................................................................................ 83
Cash Management Bank ....................................................................................... 6

36

Cash Management Commencement Date ............................................................... 6
Casualty .............................................................................................................. 6
Casualty Amount ................................................................................................. 6
Cause ................................................................................................................... 6
CDE ..................................................................................................................... 6
CDE Loan ............................................................................................................ 6
CDE Loan Documents .......................................................................................... 6
Change Order ....................................................................................................... 7
Closing Date ........................................................................................................ 7
Code .................................................................................................................... 7
Collateral Accounts ............................................................................................. 7
Collection Account .............................................................................................. 84
Common Control .................................................................................................. 9
Completion ........................................................................................................... 7
Completion Guaranty ........................................................................................... 7
Connection Income Taxes .................................................................................... 7
Construction Consultant ....................................................................................... 7
Construction Contract .......................................................................................... 7
Construction Documents ...................................................................................... 7
Construction Management Agreement .................................................................. 8
Construction Manager .......................................................................................... 8
Construction Manager Consent ............................................................................. 8
Construction Permits ............................................................................................ 8
Construction Phase ............................................................................................... 8
Construction Schedule .......................................................................................... 9
Contingency ......................................................................................................... 9
Contractor ............................................................................................................ 9
Control ................................................................................................................. 9
Controlled ............................................................................................................ 9
Controlling ........................................................................................................... 9
Cost Saving .......................................................................................................... 79
Costs .................................................................................................................... 9
Counterparty ........................................................................................................ 9
Counterparty Opinion .......................................................................................... 148
Credit Card Companies/Banks .............................................................................. 85
Credit Card Companies/Banks Direction Letter .................................................... 85
Debt ..................................................................................................................... 9
Debt Service ........................................................................................................ 9
Default ................................................................................................................. 9
Default Rate ......................................................................................................... 9
Deficiency ............................................................................................................ 10
Deficiency Account .............................................................................................. 81
Deficiency Collateral ........................................................................................... 81
Design Professionals ............................................................................................ 10
Developer ............................................................................................................. 10
Development Agreement ....................................................................................... 10

WEIL:\96218278\17\63946.0005

Disclosure Document ........................................................................................... 160
Draw Request ..................................................................................................... 72
DST ................................................................................................................... 10
EB-5 Lender ....................................................................................................... 10
EB-5 Loan .......................................................................................................... 10
EB-5 Loan Documents ....................................................................................... 10
EB-5 Standstill ................................................................................................... 66
Eligible Account ................................................................................................ 10
Eligible Assignee ............................................................................................... 11
Eligible Institution ............................................................................................ 11
Environmental Claim ......................................................................................... 11
Environmental Consultant ................................................................................ 11
Environmental Event ......................................................................................... 154
Environmental Indemnity .................................................................................. 11
Environmental Law ............................................................................................ 11
Environmental Reports ...................................................................................... 153
Equipment ......................................................................................................... 11
Equity Interests ................................................................................................. 12
Equity Payment .................................................................................................. 12
ERISA ................................................................................................................ 12
Event of Default ................................................................................................. 170
Exchange Act ..................................................................................................... 12
Excluded Hotel Taxes ........................................................................................ 12
Excluded Taxes .................................................................................................. 12
Excusable Delay ................................................................................................. 12
Existing Construction Documents ..................................................................... 13
Existing Trade Contracts ................................................................................... 13
Exit Fee .............................................................................................................. 13
Extension Fee ..................................................................................................... 13
Extension Period ............................................................................................... 13
FATCA ................................................................................................................ 13
Federal Funds Rate ............................................................................................ 14
Fee Borrower ...................................................................................................... 1
Fee Hotel Management Agreement .................................................................... 14
Fee Land ............................................................................................................. 20
FF&E ................................................................................................................... 14
FF&E Reserve Account ...................................................................................... 84
FF&E Reserve Amount ....................................................................................... 169
Financial Information ......................................................................................... 159
First Extended Maturity Date ............................................................................ 14
First Extension Notice ....................................................................................... 46
First Extension Option ....................................................................................... 46
First Extension Period ....................................................................................... 14
Fiscal Year ......................................................................................................... 14
Fitch ................................................................................................................... 14
Full Replacement Cost ....................................................................................... 133

WEIL:\96218278\17\63946.0005

Funding Borrower ................................................................................................ 196
Funding Date Cutoff ............................................................................................ 14
Future Construction Documents ......................................................................... 14
GAAP .................................................................................................................. 14
Global Trade Laws .............................................................................................. 15
Government Official ............................................................................................ 15
Governmental Authority ...................................................................................... 15
Greystone Holdco ............................................................................................... 15
Greystone Hotel Miami ....................................................................................... 15
Greystone Managing Member ............................................................................. 15
Ground Lease ...................................................................................................... 15
Ground Lessor ..................................................................................................... 15
Ground Lessor Estoppel ...................................................................................... 66
Ground Rent ........................................................................................................ 15
Ground Rent Reserve Account ............................................................................ 84
Guarantees .......................................................................................................... 15
Guarantor ............................................................................................................ 15
Hard Cost Contingency ....................................................................................... 16
Hard Costs .......................................................................................................... 16
Hazardous Materials ........................................................................................... 16
Hazardous Substances ........................................................................................ 16
Hotel Manager .................................................................................................... 16
Hotel Transactions .............................................................................................. 16
Hotel Transactions Income ................................................................................. 16
Immediate Family ............................................................................................... 16
Immediate Family Member ................................................................................. 16
Impositions ......................................................................................................... 16
Improvements ..................................................................................................... 17
In Balance ........................................................................................................... 78
Indebtedness ....................................................................................................... 17
Indemnification Date ........................................................................................... 189
Indemnified Liabilities ....................................................................................... 189
Indemnified Parties ............................................................................................ 188
Indemnified Taxes .............................................................................................. 17
Indemnitee Group ............................................................................................... 161
Independent ........................................................................................................ 17
Independent Architect ......................................................................................... 17
Independent Director ........................................................................................... 17
Independent Manager .......................................................................................... 17
Initial Loan Advance ........................................................................................... 46
Initial Maturity Date ........................................................................................... 18
Initial Option Closing Date ................................................................................. 129
Initial Option Notice Deadline ........................................................................... 129
Insurance Premiums ............................................................................................ 136
Insurance Requirements ...................................................................................... 18
Insurance Reserve Account ................................................................................. 84

WEIL:\96218278\17\63946.0005

Insurance Reserve Amount ........................................................................................ 167
Intangibles ...................................................................................................................... 18
Interest Determination Date ........................................................................................ 18
Interest Period ............................................................................................................... 18
Interest Rate ................................................................................................................... 19
Interest Rate Cap Agreement ...................................................................................... 19
Interest Reserve Account ............................................................................................. 76
Interest Shortfall ........................................................................................................... 76
IRS ................................................................................................................................... 20
Knowledge ..................................................................................................................... 20
Land ................................................................................................................................ 20
Late Payment Charge ................................................................................................... 53
Lease ............................................................................................................................... 20
Lease Letter of Credit .................................................................................................. 20
Leasehold Borrower ....................................................................................................... 1
Leasehold Hotel Management Agreement ................................................................. 20
Leasehold Land ............................................................................................................. 20
Legal Requirements ...................................................................................................... 20
Lender ............................................................................................................................ 20
Lender Affiliate ............................................................................................................ 20
Lender Option Closing Deadline .............................................................................. 130
Lender's Reallocated Disbursement .......................................................................... 71
Lending Office ............................................................................................................... 21
Lending Parties ........................................................................................................... 197
Letter of Credit ............................................................................................................. 21
Liabilities ..................................................................................................................... 161
LIBOR ............................................................................................................................. 21
LIBOR Floor ................................................................................................................. 21
LIBOR Loan .................................................................................................................. 22
LIBOR Rate ................................................................................................................... 22
Licenses .......................................................................................................................... 97
Lien ................................................................................................................................. 22
Lien Law ........................................................................................................................ 22
Line Item ....................................................................................................................... 22
Litigation Disclosure Email ........................................................................................ 94
Loan .................................................................................................................................. 1
Loan Advance ............................................................................................................... 22
Loan Amount ................................................................................................................ 22
Loan Documents ........................................................................................................... 22
Loan-to-Value Ratio ..................................................................................................... 22
Lockbox Agreement ..................................................................................................... 22
Lockbox Bank ............................................................................................................... 23
London Business Day ................................................................................................... 23
Major Trade Contract .................................................................................................. 23
Major Trade Contractor ............................................................................................... 23
Major Trade Contractor Consent ............................................................................... 23

WEIL:\96218278\17\63946.0005

Management Agreement ................................................................................................ 23
Management Fee .......................................................................................................... 23
Manager ...................................................................................................................... 23
Manager Replacement Event ..................................................................................... 114
Marketing Agent .......................................................................................................... 23
Marketing Agreement .................................................................................................. 23
Master Lease ............................................................................................................... 24
Master Lease SNDA .................................................................................................... 66
Master Tenant ............................................................................................................. 24
Master Tenant and Tenant Side Letter ........................................................................ 24
Master Tenant Cash Management Agreements ........................................................... 24
Master Tenant Cash Management Bank ...................................................................... 24
Master Tenant CMA .................................................................................................... 24
Master Tenant Collection Account .............................................................................. 92
Master Tenant JV Agreement ...................................................................................... 24
Master Tenant Rent ..................................................................................................... 92
Material Adverse Change ............................................................................................ 24
Material Agreement ..................................................................................................... 24
Material Alteration ....................................................................................................... 24
Maturity Date ............................................................................................................... 25
Maximum Legal Rate ................................................................................................... 25
Maximum Net Worth .................................................................................................. 196
Minimum Multiple Payment ......................................................................................... 54
Minor Change Order .................................................................................................... 25
Money Laundering Laws .............................................................................................. 25
Monthly FF&E Reserve Amount ................................................................................ 169
Monthly Insurance Reserve Amount .......................................................................... 167
Monthly Tax Reserve Amount .................................................................................... 166
Moody's ....................................................................................................................... 25
Morningstar .................................................................................................................. 25
Mortgage ..................................................................................................................... 25
Net Cash Flow ............................................................................................................. 26
Net Cash Flow Schedule ........................................................................................... 151
Net Operating Income ................................................................................................. 26
Net Worth .................................................................................................................. 196
New Lending Office ...................................................................................................... 58
New Mezzanine Borrower .......................................................................................... 158
New Mezzanine Loan ................................................................................................. 158
New Mortgage Loan ................................................................................................... 158
Non-U.S. Lender .......................................................................................................... 58
Note ............................................................................................................................. 26
Notice of Borrowing ..................................................................................................... 46
Notice of Commencement ........................................................................................... 64
Obligations .................................................................................................................. 26
Octagon ....................................................................................................................... 26
Octagon Loan .............................................................................................................. 26

WEIL:\96218278\17\63946.0005

Octagon Loan Documents .................................................................................................. 26
Octagon Standstill ............................................................................................................... 66
OFAC ................................................................................................................................... 15
OFAC List ............................................................................................................................ 26
Officer's Certificate ............................................................................................................ 26
Off-Site Materials ............................................................................................................... 33
Operating Expenses ............................................................................................................ 26
Operating Income ............................................................................................................... 26
Operating Permits ............................................................................................................... 27
Opinion of Counsel ............................................................................................................ 27
Option .................................................................................................................................. 27
Option Agreement .............................................................................................................. 27
Option Closing Deliverables ............................................................................................. 130
Option Holder ..................................................................................................................... 27
Option Mortgage ............................................................................................................... 130
Option Notice ..................................................................................................................... 129
Ordinance or Law Coverage ............................................................................................. 133
Ordinary Course Rentals .................................................................................................... 28
Origination Fee .................................................................................................................... 63
Other Charges ...................................................................................................................... 28
Other Connection Taxes ...................................................................................................... 28
Other Taxes .......................................................................................................................... 58
Outside Construction Completion Date ............................................................................. 28
Outstanding Principal Balance ........................................................................................... 28
Payment and Performance Surety Bonds .......................................................................... 28
Payment Date ....................................................................................................................... 28
Percentage of Completion .................................................................................................. 67
Permitted Debt .................................................................................................................... 28
Permitted Encumbrances .................................................................................................... 28
Permitted Transfer ............................................................................................................. 145
Permitted Transfers ........................................................................................................... 145
Person .................................................................................................................................. 29
Personal Property ............................................................................................................... 29
Plan .................................................................................................................................... 127
Plans and Specifications ..................................................................................................... 29
Pledge Agreement – Borrower Holdco .............................................................................. 29
Pledge Agreement – Greystone Managing Member/Master Tenant ................................ 29
Pledge Agreements ............................................................................................................. 30
Policies ............................................................................................................................... 136
Policy ................................................................................................................................. 136
Post-Closing Agreement ..................................................................................................... 30
Prepayment Date ................................................................................................................. 54
Prepayment Notice .............................................................................................................. 54
Presumed Tax Rate .............................................................................................................. 30
Proceeds ............................................................................................................................. 138
Proceeds Reserve Account .................................................................................................. 84

WEIL:\96218278\17\63946.0005

Prohibited Person .................................................................................................................. 30
Project ...................................................................................................................................... 30
Project Commencement Date ............................................................................................ 169
Project Cost ............................................................................................................................ 30
Project Website ...................................................................................................................... 68
Property .................................................................................................................................. 30
Protective Advances .............................................................................................................. 82
Punchlist Items ...................................................................................................................... 30
Purchasing Covenant ........................................................................................................... 131
Qualified Manager ................................................................................................................ 30
Qualified Marketing Agent .................................................................................................. 30
Rate Cap Collateral ............................................................................................................. 147
Rating Agencies ..................................................................................................................... 31
Recipient ................................................................................................................................ 12
Recourse Guaranty ................................................................................................................ 31
Recycled Entity Certificate .................................................................................................. 31
Register's Office .................................................................................................................... 31
Registrar ............................................................................................................................... 165
Regulatory Change ................................................................................................................ 55
Remaining Borrower ........................................................................................................... 196
Rents ....................................................................................................................................... 31
Replacement Interest Rate Cap Agreement ....................................................................... 31
Required Equity Investment ................................................................................................ 31
Restoration ........................................................................................................................... 140
Restricted Party ..................................................................................................................... 32
Retainage ................................................................................................................................ 32
S&P ......................................................................................................................................... 32
Sanctioned Countries ........................................................................................................... 32
Sanctioned Country .............................................................................................................. 32
Second Extended Maturity Date .......................................................................................... 32
Second Extension Notice ...................................................................................................... 48
Second Extension Option ..................................................................................................... 48
Second Extension Period ...................................................................................................... 32
Secondary Market Transaction .......................................................................................... 156
Securities .............................................................................................................................. 156
Securities Act ......................................................................................................................... 32
Securitization ....................................................................................................................... 156
Security Deposit Reserve Account ...................................................................................... 84
Security Deposits ................................................................................................................. 114
Servicer ................................................................................................................................. 162
Servicing Agreement ........................................................................................................... 162
Single Purpose Entity ........................................................................................................... 32
Soft Cost Contingency .......................................................................................................... 32
Soft Costs ............................................................................................................................... 32
SPE Entity .............................................................................................................................. 32
Speakeasy ............................................................................................................................... 32

43

Sponsor ........................................................................................................................... 32
Spread ............................................................................................................................. 33
Springing Recourse Event .............................................................................................. 182
Standstills ....................................................................................................................... 131
State ................................................................................................................................ 33
Stored Materials ............................................................................................................. 33
Strike Price ..................................................................................................................... 146
Sub-Account ................................................................................................................... 83
Sub-Accounts ................................................................................................................. 83
Substantial Completion ................................................................................................... 33
Survey ............................................................................................................................. 33
Taking ............................................................................................................................. 33
Tax Distributions ............................................................................................................. 33
Tax Reserve Account ...................................................................................................... 84
Tax Reserve Amount ...................................................................................................... 166
Taxes .............................................................................................................................. 34
Tenant ............................................................................................................................. 34
Tenant Direction Letter ................................................................................................... 85
Term ................................................................................................................................ 46
Third Extended Maturity Date .......................................................................................... 34
Third Extension Notice .................................................................................................... 49
Third Extension Option .................................................................................................... 49
Third Extension Period .................................................................................................... 34
Title Company ................................................................................................................. 34
Title Continuation ............................................................................................................ 34
Title Policy ...................................................................................................................... 34
Trade Contract ................................................................................................................ 34
Trade Contractor ............................................................................................................. 34
Tranches ......................................................................................................................... 158
Transaction ..................................................................................................................... 197
Transfer .......................................................................................................................... 34
U.S. Bank ........................................................................................................................ 35
U.S. Government Obligations .......................................................................................... 35
U.S. Lender ..................................................................................................................... 58
U.S. Person ..................................................................................................................... 35
UCC ................................................................................................................................ 35
UCC Insurance Policy ..................................................................................................... 35
Underwriter Group .......................................................................................................... 161
Uniform Commercial Code .............................................................................................. 35
Uniform System of Accounts ........................................................................................... 35
Unincorporated Materials ................................................................................................ 33
United States .................................................................................................................. 35
Updated Information ........................................................................................................ 159
Zoning Memo .................................................................................................................. 106

WEIL:\96218278\17\63946.0005

1.3         **Principles of Construction**.  All references to sections, exhibits and schedules are to sections, exhibits and schedules in or to this Agreement unless otherwise specified.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP, as modified by the Uniform System of Accounts.  All terms defined in this Agreement shall have the definitions given them in this Agreement when used in any other Loan Document or in any certificate or other document made or delivered pursuant this Agreement or any other Loan Document, unless otherwise specified herein or therein.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

II       **GENERAL TERMS**

2.1         **Loan Amount and Disbursement to Borrower**.

2.1.1       **Loan Amount**.

(a)       <u>Loan</u>.  Subject to the conditions and upon the terms herein provided, and subject specifically to the restrictions set forth in the remainder of this <u>Section 2.1.1</u>, Lender hereby agrees to lend to Borrower, and Borrower agrees to borrow from Lender, in installments, the Loan.  The Loan shall be repaid with interest, costs and charges as more particularly set forth in this Agreement, the Note, the Mortgage and the other Loan Documents.  Principal amounts of the Loan which are repaid for any reason may not be reborrowed.

2.1.2       **Loan Advances**.

(a)       If Borrower shall have satisfied the applicable Advance Conditions pursuant to and in accordance with the terms and conditions set forth in this Agreement, Lender shall make Loan Advances in an aggregate principal amount not to exceed the Loan Amount.

(b)       Upon the disbursement of any Loan Advance, Borrower agrees to borrow such Loan Advance from Lender upon the terms of the Note, this Agreement, and the other Loan Documents.  Other than any other Loan Advances made on the Advance Dates pursuant to this Agreement, Lender shall have no obligation to loan any additional funds in respect of the Loan in connection with the Project.

2.1.3       **The Note, Mortgage and Loan Documents**. The Loan shall be evidenced by the Note and secured by the Mortgage, the Assignment of Leases and the other Loan Documents and shall in no event exceed the Loan Amount.

2.1.4       **Use of Proceeds**.  Borrower shall use the proceeds of the Loan only for the purposes and in the manner set forth in this Agreement.  The Budget sets forth, by category and line items, the purposes and amounts for which Loan Advances made by Lender under this Agreement are to be used.  Borrower will receive the Loan Advances to be made hereunder, and

45

will hold the right to receive the same, as a trust fund for the purpose of paying the Costs and Borrower will apply the same first to such payment before using any part thereof for any other purpose.

2.1.5    **Initial Loan Advance**.    On the Closing Date, Lender advanced $7,808,852.00, which amount shall be used by Borrower for the purposes set forth on **Schedule III** (the "**Initial Loan Advance**").

2.2    **Commitment to Lend**.    Lender agrees, on the terms and conditions set forth in this Agreement, to make the Loan Advances to Borrower pursuant to this Agreement.    Lender shall not have any further commitment to advance any additional funds after the Funding Date Cutoff.    Notwithstanding the Funding Date Cutoff, Lender may, in its sole discretion and for Borrower's account, continue to make Loan Advances for the payment of interest on the Loan, Impositions and Insurance Premiums until the repayment in full of the Loan.

2.3    **Method of Borrowing and Conversion**.    With respect to each Loan Advance (other than the Initial Loan Advance), Borrower shall submit a notice to Lender (a "**Notice of Borrowing**") which Notice of Borrowing shall be irrevocable once delivered to Lender and specify the Borrowing Date of such Loan Advance and the amount of such Loan Advance, provided that such Notice of Borrowing shall be received by Lender prior to 2:00 P.M., New York time, ten (10) Business Days prior to the Borrowing Date.    Each Notice of Borrowing shall include a Draw Request and the documentation required by Section 4.4 of this Agreement.

2.4    **Notice to Lender and Funding of Loan**.    Upon receipt of a Notice of Borrowing, Lender shall make such requested Loan Advance on the Borrowing Date as long as the conditions to such Loan Advance set forth in this Agreement are satisfied.

2.5    **Term and Extension Periods**.

(a)    The term (the "**Term**") of the Loan shall terminate and expire on the Maturity Date.    Subject to Section 2.16, the entire outstanding principal amount of the Loan, together with accrued and unpaid interest thereon and all other amounts due to Lender hereunder and under the other Loan Documents, shall be payable by Borrower in full on the Maturity Date.

(b)    Borrower shall have the option (the "**First Extension Option**") by written notice delivered to Lender (the "**First Extension Notice**") no later than thirty (30) days prior to the Initial Maturity Date nor any earlier than sixty (60) days prior to the Initial Maturity Date to extend the Term of the Loan for an additional twelve (12) month period to the First Extended Maturity Date subject to satisfaction of each of the following conditions precedent:

(i)    Borrower shall have paid or caused to be paid to Lender the non-refundable Extension Fee for the First Extension Period on or before the Business Day immediately preceding the Initial Maturity Date;

WEIL:\96218278\17\63946.0005

(ii)     no Event of Default shall have occurred which remains uncured at the time of the delivery of the First Extension Notice or the Initial Maturity Date;

(iii)     Borrower shall have delivered to Lender, together with the First Extension Notice, a certificate which shall be deemed remade as of the Initial Maturity Date executed by an authorized officer of Borrower having actual Knowledge sufficient to make such certification, representing and warranting to Lender that (A) the Loan Documents are in full force and effect, (B) the Loan Documents constitute the valid and binding obligations of Borrower and Guarantor enforceable in accordance with their terms, (C) Borrower and Guarantor do not have any offsets, counterclaims or defenses with respect to the payment of the Loan or to the Loan Documents or Borrower's or Guarantor's obligations and liabilities under the Loan Documents, and (D) all of the representations and warranties contained in the Loan Documents, or otherwise made with respect to the Loan, remain true and correct in all material respects as of the date of such officer's certificate (and on the Initial Maturity Date) except for (a) any matters which by their nature are no longer true and correct as a result of the passage of time, and (b) updates to the representations and warranties which are necessitated by the actions and/or omissions of Borrower provided, that any such action and/or omission, as applicable, did not require the consent of Lender pursuant to the Loan Documents and did not result in an Event of Default under the Loan Documents;

(iv)     Lender shall have received a Title Continuation to the Title Policy which shall show that the Property has no Liens or encumbrances other than Permitted Encumbrances and the amount of coverage under the Title Policy is not less than the Outstanding Principal Balance of the Loan;

(v)     Borrower shall obtain and deliver to Lender not later than the Initial Maturity Date, one or more Replacement Interest Rate Cap Agreements from an Approved Counterparty, which Replacement Interest Rate Cap Agreement(s) shall be effective commencing on the Initial Maturity Date and shall have a maturity date no earlier than the First Extended Maturity Date and shall have a Strike Price of three percent (3%) (based on one month LIBOR), and Borrower shall deliver to Lender on or prior to the Initial Maturity Date a collateral assignment of such Replacement Interest Rate Cap Agreement(s) substantially in the form of the Assignment of Rate Cap delivered to Lender on the Closing Date;

(vi)     Substantial Completion of the Project shall have occurred to the reasonable satisfaction of Lender and the Construction Consultant;

(vii)     the Loan-to-Value Ratio as of the date of the giving of the First Extension Notice shall not be higher than 62.5%;

(viii)     Borrower shall have deposited into (i) the Tax Reserve Account an amount equal to one-twelfth of the annual Impositions and Other Charges in accordance with Section 17.1 of this Agreement, (ii) the Insurance Reserve

47

Account an amount equal to one-twelfth of the annual Insurance Premiums in accordance with <u>Section 17.2</u> of this Agreement, and (iii) the FF&E Reserve Account an amount equal to the Monthly FF&E Reserve Amount in accordance with <u>Section 17.5</u>;

        (ix)    No Material Adverse Change has occurred (provided that, with respect to Guarantor, a Material Adverse Change shall only be deemed to occur if Guarantor fails to continue to satisfy the liquidity and net worth requirements set forth in the Guarantees);

        (x)    Borrower shall have paid all reasonable third party costs and expenses incurred by Lender (including reasonable attorneys' fees) in connection with the exercise by Borrower of such extension.

        (c)    Provided that Borrower shall have effectively exercised the First Extension Option in accordance with <u>Section 2.5(b)</u> to extend the Term to the First Extended Maturity Date, Borrower shall have the option (the "**Second Extension Option**") by written notice delivered to Lender (the "**Second Extension Notice**") no later than thirty (30) days prior to the First Extended Maturity Date nor any earlier than sixty (60) days prior to the First Extended Maturity Date to further extend the Term of the Loan for an additional twelve (12) month period to the Second Extended Maturity Date subject to satisfaction of each of the following conditions precedent:

        (i)    Borrower shall have paid or caused to be paid to Lender the non-refundable Extension Fee for the Second Extension Period on or before the Business Day immediately preceding the First Extended Maturity Date;

        (ii)    no Event of Default shall have occurred which remains uncured at the time of the delivery of the Second Extension Notice or on the First Extended Maturity Date;

        (iii)    Borrower shall have delivered to Lender, together with the Second Extension Notice, an officer's certificate which shall be deemed remade as of the First Extended Maturity Date executed by an authorized officer of Borrower having actual Knowledge sufficient to make such certification, representing and warranting to Lender that (A) the Loan Documents are in full force and effect, (B) the Loan Documents constitute the valid and binding obligations of Borrower and Guarantor enforceable in accordance with their terms, (C) Borrower and Guarantor do not have any offsets, counterclaims or defenses with respect to the payment of the Loan or to the Loan Documents or Borrower's or Guarantor's obligations and liabilities under the Loan Documents, and (D) all of the representations and warranties contained in the Loan Documents, or otherwise made with respect to the Loan, remain true and correct in all material respects as of the date of such officer's certificate (and on the First Extended Maturity Date) except for (a) any matters which by their nature are no longer true and correct as a result of the passage of time, and (b) updates to the representations and warranties which are necessitated by the actions and/or omissions of Borrower provided, that any such action and/or omission, as

applicable, did not require the consent of Lender pursuant to the Loan Documents and did not result in an Event of Default under the Loan Documents;

(iv)     Lender shall have received a Title Continuation to the Title Policy which shall show that the Property has no Liens or encumbrances other than Permitted Encumbrances and the amount of coverage under the Title Policy is not less than the Outstanding Principal Balance of the Loan;

(v)     Borrower shall obtain and deliver to Lender not later than the First Extended Maturity Date, one or more Replacement Interest Rate Cap Agreements from an Approved Counterparty, which Replacement Interest Rate Cap Agreement(s) shall be effective commencing on the First Extended Maturity Date and shall have a maturity date no earlier than the Second Extended Maturity Date and shall have a Strike Price of three percent (3%) (based on one month LIBOR), and Borrower shall deliver to Lender on or prior to the First Extended Maturity Date a collateral assignment of such Replacement Interest Rate Cap Agreement(s) substantially in the form of the Assignment of Rate Cap delivered to Lender on the Closing Date;

(vi)     Completion of the Project shall have occurred to the reasonable satisfaction of Lender and the Construction Consultant;

(vii)     the Loan-to-Value Ratio as of the date of the giving of the Second Extension Notice shall not be higher than 62.5%;

(viii)     Borrower shall have deposited into (i) the Tax Reserve Account an amount equal to one-twelfth of the annual Impositions and Other Charges in accordance with Section 17.1 of this Agreement, (ii) the Insurance Reserve Account an amount equal to one-twelfth of the annual Insurance Premiums in accordance with Section 17.2 of this Agreement, and (iii) the FF&E Reserve Account an amount equal to the Monthly FF&E Reserve Amount in accordance with Section 17.5;

(ix)     No Material Adverse Change has occurred (provided that, with respect to Guarantor, a Material Adverse Change shall only be deemed to occur if Guarantor fails to continue to satisfy the liquidity and net worth requirements set forth in the Guarantees); and

(x)     Borrower shall have paid all reasonable third party costs and expenses incurred by Lender (including reasonable attorneys' fees) in connection with the exercise by Borrower of such extension.

(d)     Provided that Borrower shall have effectively exercised the First Extension Option in accordance with Section 2.5(b) to extend the Term to the First Extended Maturity Date and the Second Extension Option in accordance with Section 2.5(c) to extend the Term to the Second Extended Maturity Date, Borrower shall have the option (the "**Third Extension Option**") by written notice delivered to Lender (the "**Third Extension Notice**") no later than thirty (30) days prior to the Second Extended Maturity nor any earlier than sixty (60)

days prior to the Second Extended Maturity Date to further extend the Term of the Loan for an additional twelve (12) month period to the Third Extended Maturity Date subject to satisfaction of each of the following conditions precedent:

(i)     Borrower shall have paid or caused to be paid to Lender the non-refundable Extension Fee for the Third Extension Period on or before the Business Day immediately preceding the Second Extended Maturity Date;

(ii)    no Event of Default shall have occurred which remains uncured at the time of the delivery of the Third Extension Notice or on the Second Extended Maturity Date;

(iii)   Borrower shall have delivered to Lender, together with the Third Extension Notice, an officer's certificate which shall be deemed remade as of the Second Extended Maturity Date executed by an authorized officer of Borrower having actual Knowledge sufficient to make such certification, representing and warranting to Lender that (A) the Loan Documents are in full force and effect, (B) the Loan Documents constitute the valid and binding obligations of Borrower and Guarantor enforceable in accordance with their terms, (C) Borrower and Guarantor do not have any offsets, counterclaims or defenses with respect to the payment of the Loan or to the Loan Documents or Borrower's or Guarantor's obligations and liabilities under the Loan Documents, and (D) all of the representations and warranties contained in the Loan Documents, or otherwise made with respect to the Loan, remain true and correct in all material respects as of the date of such officer's certificate (and on the Second Extended Maturity Date) except for (a) any matters which by their nature are no longer true and correct as a result of the passage of time, and (b) updates to the representations and warranties which are necessitated by the actions and/or omissions of Borrower provided, that any such action and/or omission, as applicable, did not require the consent of Lender pursuant to the Loan Documents and did not result in an Event of Default under the Loan Documents;

(iv)    Lender shall have received a Title Continuation to the Title Policy which shall show that the Property has no Liens or encumbrances other than Permitted Encumbrances and the amount of coverage under the Title Policy is not less than the Outstanding Principal Balance of the Loan;

(v)     Borrower shall obtain and deliver to Lender not later than the Second Extended Maturity Date, one or more Replacement Interest Rate Cap Agreements from an Approved Counterparty, which Replacement Interest Rate Cap Agreement(s) shall be effective commencing on the Second Extended Maturity Date and shall have a maturity date no earlier than the Third Extended Maturity Date and shall have a Strike Price of three percent (3%) (based on one month LIBOR), and Borrower shall deliver to Lender on or prior to the Second Extended Maturity Date a collateral assignment of such Replacement Interest Rate Cap Agreement(s) substantially in the form of the Assignment of Rate Cap delivered to Lender on the Closing Date;

WEIL:\96218278\17\63946.0005

(vi)     the Loan-to-Value Ratio as of the date of the giving of the Third Extension Notice shall not be higher than 62.5%

(vii)     Borrower shall have deposited into (i) the Tax Reserve Account an amount equal to one-twelfth of the annual Impositions and Other Charges in accordance with Section 17.1 of this Agreement, (ii) the Insurance Reserve Account an amount equal to one-twelfth of the annual Insurance Premiums in accordance with Section 17.2 of this Agreement, and (iii) the FF&E Reserve Account an amount equal to the Monthly FF&E Reserve Amount in accordance with Section 17.5;

(viii)     No Material Adverse Change has occurred (provided that, with respect to Guarantor, a Material Adverse Change shall only be deemed to occur if Guarantor fails to continue to satisfy the liquidity and net worth requirements set forth in the Guarantees); and

(ix)     Borrower shall have paid all reasonable third party costs and expenses incurred by Lender (including reasonable attorneys' fees) in connection with the exercise by Borrower of such extension.

2.6     **Interest on the Loan Prior to Maturity**.   The Outstanding Principal Balance of the Loan shall accrue interest prior to but excluding the Maturity Date at a rate per annum equal to the Interest Rate for the applicable Interest Period.

2.7     **Administrative Fee**.   On each Payment Date, Borrower shall pay Lender the Administrative Fee, which Administrative Fee shall be paid in arrears and shall be calculated on the number of days elapsed based on a 360 day year.

2.8     **General Provisions as to Payments**.

(a)     On each Payment Date to but not including the Maturity Date, Borrower shall pay to Lender, accrued and unpaid interest at the Interest Rate on the Outstanding Principal Balance of the Loan.

(b)     Borrower shall make each payment of principal of, and interest on, the Loan and of fees hereunder, not later than 4:00 p.m. (New York time) on the date when due, in immediately funds available in lawful money of the United States, delivered to Lender by wire transfer to such accounts at such banks as Lender may designate from time to time in writing at least five (5) Business Days prior to the next Payment Date.

(c)     Subject to Section 2.16, all amounts due hereunder shall be payable, without any counterclaim, setoff or deduction whatsoever.

(d)     The entire outstanding principal amount of the Note, all accrued and unpaid interest thereon and all other fees and sums then payable hereunder or under the Loan Documents, including, without limitation, any payment in respect of the Minimum Multiple

Payment (if applicable in accordance with <u>Section 2.12(c)</u>) and Exit Fee, shall be due and payable in full on the Maturity Date.

        2.9      **Breakage Costs**.  Borrower agrees to indemnify Lender and to hold Lender harmless from any actual loss or out-of-pocket expense (other than with respect to Excluded Taxes) which Lender sustains or incurs (including, without limitation, any such actual loss or out-of-pocket expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder and any such loss or expense arising from obtaining, liquidating or employing deposits from third parties, but excluding loss of margin for the period after any such payment or conversion or failure to borrow or prepay) as a consequence of (i) any default by Borrower in payment of the principal of or interest on the Loan as and when due and payable, (ii) any prepayment (whether voluntary or mandatory) of the Loan on a day that (A) is not a Payment Date (provided, that if Lender receives all accrued and unpaid interest payable with respect to such principal being prepaid through the end of the Interest Period in which such prepayment occurs, such prepayment is otherwise made in accordance with <u>Section 2.12</u>, no Breakage Costs related to this clause (A) shall be payable with respect to such prepayment) or (B) is a Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, (iii) Borrower fails to (A) borrow any Loan Advance after the delivery by Borrower of a Draw Request (other than as a result of Lender's failure to fund such Loan Advance in contravention of the terms of this Agreement) or (B) prepay any portion of the Loan after irrevocable notice thereof has been given to Lender in accordance with the terms of this Agreement without the prior written approval of Lender and (iv) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Loan to a non-LIBOR Loan (the amounts referred to in clauses (i), (ii), (iii) and (iv) are herein referred to collectively as the "**Breakage Costs**"); provided, however, Borrower shall not indemnify Lender from any loss or expense to the extent arising from Lender's willful misconduct or gross negligence.

        2.10      **Calculation of Interest and Fees**.  All interest and fees shall be calculated on the basis of a year of 360 days and paid for the actual number of days elapsed in the Interest Period or other period for which the calculation is being made.

        2.11      **Default Interest; Late Payment Charge and Usury Savings**.

        2.11.1   **Default Interest**.  Upon the occurrence and during the continuance of an Event of Default, interest on the Outstanding Principal Balance of the Loan and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan shall accrue at the Default Rate calculated from the date of the occurrence of such Event of Default.  Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt or that portion thereof that is then due in connection with the Loan.  This <u>Section 2.11</u> shall not be construed as an agreement or privilege to extend the date of the payment of the Loan, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default, and Lender retains its rights hereunder to

accelerate and to continue to demand payment of the Loan upon the occurrence and during the continuance of any Event of Default.

2.11.2 **Application of Payments**. Borrower shall repay the entire Outstanding Principal Balance in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. All proceeds of any repayment, including any permitted prepayments of the Loan, shall be applied by Lender as follows in the following order of priority: first, to accrued and unpaid interest at the Interest Rate; second, to the Outstanding Principal Balance; and third, to the Exit Fee and any other amounts then due and owing under the Loan Documents, including any applicable Minimum Multiple Payment.

2.11.3 **Late Payment Charge**. If any principal (other than principal due on the Maturity Date), interest or other sums due under the Loan Documents is not paid by Borrower when due, Borrower shall pay upon demand to Lender, an amount equal to the lesser of (a) five percent (5%) of such unpaid sum and (b) the Maximum Legal Rate (the "**Late Payment Charge**") in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by this Agreement, the Mortgage and the other Loan Documents to the extent permitted by applicable law.

2.11.4 **Usury Savings**. This Agreement and the Note are subject to the express condition that at no time shall interest be charged or Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due under the Note at a rate in excess of the Maximum Legal Rate, then the Interest Rate or the Default Rate for the Note, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due under the Note. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.12 **Voluntary Prepayments**.

(a) Voluntary Prepayments.

(i) The outstanding principal balance of the Loan may be prepaid, in whole only (but not in part), at any time during the Term upon compliance with the terms set forth in clause (ii) below; provided, however, that Borrower shall contemporaneously with such prepayment pay to Lender the Minimum Multiple Payment (if applicable in accordance with Section 2.12(c)), the Exit Fee and any Breakage Costs (if any).

(ii)     In connection with any proposed prepayment of the Loan, Borrower shall give Lender not less than ten (10) Business Day's prior written irrevocable notice of such election to prepay the Loan, which notice (the "**Prepayment Notice**") shall specify the Business Day upon which such prepayment shall be made (the "**Prepayment Date**").  Together with any principal prepayment, Borrower shall pay to Lender:  (A) all accrued and unpaid interest on the Loan to and including the date of prepayment, (B) all other sums then due and payable under the Loan Documents, (C) if the prepayment occurs on any date other than a Payment Date, all interest which would have accrued on the Loan for the remainder of the then applicable Interest Period, (D) the Exit Fee, (E) the Minimum Multiple Payment (if applicable in accordance with Section 2.12(c)) and (F) any Breakage Costs (if any).

(b)     Prepayments after Event of Default.  If, following the occurrence and during the continuance of an Event of Default, Borrower, a purchaser at foreclosure or any other Person tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after and during the continuance of such Event of Default, Borrower, such purchaser at foreclosure or other Person shall pay (i) all accrued and unpaid interest at the Default Rate on the outstanding principal amount of the Loan through the last day of the Interest Period within which such tender or recovery occurs, (ii) the Minimum Multiple Payment (if applicable in accordance with Section 2.12(c)), and (iii) all other sums then due and payable under the Loan Documents (including, without limitation, any Breakage Costs, the Exit Fee, the Administrative Fee and Late Payment Charges).  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any prepayment of the Debt made concurrently with the occurrence of an Event of Default or while an Event of Default is continuing shall be applied to the Debt in such order and priority as may be determined by Lender in its sole discretion.

(c)     Minimum Multiple Payment.  In connection with the repayment of the Loan, whether by prepayment, on the Maturity Date or as a result of acceleration of the Loan (other than as a result of a Casualty or Taking), in addition to all other amounts payable by Borrower in accordance with the Loan Agreement, Borrower shall pay to Lender an amount equal to the positive excess, if any, of: (a) an amount calculated by multiplying (i) 1.14 by (ii) (A) the Loan Amount or (B) if Lender is in breach of its obligation to fund any Loan Advance after Borrower has fully complied with the requirements set forth herein with respect to such Loan Advance, the aggregate Loan Advances; minus (b) the aggregate interest and principal payments received by Lender from the Closing Date to the date of final prepayment or repayment of the Loan plus the Origination Fee and the Exit Fee, but expressly excluding from clause (b) the non-refundable processing fee deposited with Lender prior to the Closing Date in the amount of $10,000, the Administrative Fee and any servicing fees paid by Borrower to Lender (the "**Minimum Multiple Payment**").  Borrower acknowledges that (w) a prepayment, except as permitted hereunder, will cause damage to Lender; (x) the Minimum Multiple Payment is intended to compensate Lender for the loss of its investment and the expense incurred and time and effort associated with making the Loan, which will not be fully repaid if the Loan is prepaid; (y) it will be extremely difficult and impractical to ascertain the extent of Lender's damages caused by a prepayment not permitted by the Loan Documents; and (z) the Minimum Multiple Payment represents Lender's and Borrower's reasonable estimate of Lender's damages from the prepayment and is not a penalty.

(d)     Exit Fee.   In connection with any prepayment of the Loan or any repayment of the Loan on (or after) the Maturity Date, regardless of whether such prepayment or repayment is voluntary, involuntary, on account of the acceleration of the Loan (whether or not due to an Event of Default), or otherwise, in addition to all other amounts due and owing to Lender in accordance with the terms of the Loan Documents, Borrower shall pay to Lender the Exit Fee.

(e)     No Right to Reborrow.   Any amount borrowed and repaid hereunder may not be reborrowed.

2.13     **LIBOR Unascertainable**.   If Lender notifies Borrower, after reasonably determining in good faith, that adequate and reasonable means do not exist for ascertaining LIBOR or that a contingency has occurred which materially and adversely affects the London Interbank Eurodollar Market at which Lender prices loans (which good faith determination by Lender shall be conclusive and binding on Borrower in the absence of manifest error), then Lender shall give notice thereof to Borrower at least one (1) Business Day prior to the last day of the related Interest Period.   If such notice is given, Lender's obligation to maintain interest based on LIBOR shall be suspended and the Note shall bear interest at the Alternative Rate beginning on the first day of the next succeeding Interest Period.   If, pursuant to the terms of this Section 2.13, the Note is bearing interest at the Alternative Rate and Lender shall reasonably determine that the event(s) or circumstance(s) which resulted in such conversion are no longer applicable, Lender shall give written notice of such determination to Borrower and Lender not later than one (1) Business Day prior to the last day of the then current Interest Period.   If such notice is given, the Note shall bear interest at the LIBOR Rate beginning on the first day of the next succeeding Interest Period.   Lender shall promptly notify Borrower in writing of each such determination made pursuant to the terms of this Section 2.13.

2.14     **Illegality**.   If, after the date of this Agreement, any applicable law, rule or regulation is adopted, or any change is made in any existing applicable law, rule or regulation or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender (or its Lending Office) with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency issued after the date of this Agreement (a "**Regulatory Change**") shall make it unlawful for Lender (or its Lending Office) to make, maintain or fund its LIBOR Loans at the LIBOR Rate, Lender shall forthwith give written notice thereof to Borrower, whereupon (a) the obligation of Lender to make LIBOR Loans shall be suspended, and (b) any outstanding LIBOR Loan made by Lender shall be converted into an Alternative Rate Loan on the first day of the immediately succeeding Interest Period or within such earlier period as required by applicable law.   If, pursuant to the terms of this Section 2.14, the Note is bearing interest at the Alternative Rate and the Regulatory Change which resulted in the Note bearing interest at the Alternative Rate shall no longer exist or be effective or applicable to Lender, Lender shall give written notice

WEIL:\96218278\17\63946.0005

thereof to Borrower, and the Note shall bear interest at the LIBOR Rate commencing on the first day of the next succeeding Interest Period. Notwithstanding the foregoing, before giving any notice pursuant to this <u>Section 2.14</u>, Lender shall designate a different Lending Office if such designation will avoid the need for giving such notice and will not, in the judgment of Lender, be otherwise disadvantageous in any material respect to Lender. Lender shall promptly notify Borrower in writing of such determination made pursuant to the terms of this <u>Section 2.14</u>.

<p style="text-align:center">2.15 <strong><u>Increased Cost and Reduced Return</u></strong>.</p>

(a) Except with respect to Excluded Taxes, if any Regulatory Change shall hereafter (i) impose, modify or deem applicable any reserve (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System (but excluding with respect to any LIBOR Loan any such requirement reflected in an applicable LIBOR reserve percentage)), special deposit, insurance assessment or similar requirement against assets of, deposits with or for the account of, or credit extended by, Lender (or its Lending Office) or (ii) shall impose on Lender (or its Lending Office) or on the London interbank market any other condition affecting its LIBOR Loans, the Note, or its obligation to make LIBOR Loans, and the result of any of the foregoing is to materially increase the cost to Lender (or its Lending Office) of making or maintaining any LIBOR Loan, or to materially reduce the amount of any sum received or receivable by Lender (or its Lending Office) under this Agreement or under the Note with respect thereto, by an amount reasonably determined by Lender to be material, then, within thirty (30) days after written demand by Lender, which demand shall be accompanied by a certificate showing, in reasonable detail, the calculation of such amount or amounts (based upon a reasonable allocation thereof by Lender to LIBOR rate loans made by Lender), and provided Lender is generally exercising rights similar to those set forth in this subsection against other borrowers similarly situated to Borrower, Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such increased actual out-of-pocket cost or reduction to the extent reasonably allocable to its LIBOR Loans.

(b) If Lender shall have reasonably determined in good faith that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change in any such law, rule or regulation, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on capital of Lender (or its parent) as a consequence of Lender's obligations hereunder to a level below that which Lender (or its parent) could have achieved but for such adoption, change, request or directive (taking into consideration its policies with respect to capital adequacy) by an amount deemed by Lender to be material (other than with respect to any (A) Indemnified Taxes, (B) Taxes described in clauses (iii) through (v) of the definition of Excluded Taxes and (C) Connection Income Taxes), then from time to time, within thirty (30) days after written demand by Lender, which demand shall be accompanied by a certificate showing, in reasonable detail, the calculation of such amount or amounts, and provided Lender is generally exercising rights similar to those set forth in this subsection against other borrowers similarly situated to

<p style="text-align:center">56</p>

Borrower, Borrower shall pay to Lender such additional amount or amounts as will compensate Lender (or its parent) for such reduction.

(c)     Lender shall promptly notify Borrower in writing of any event of which it has knowledge, occurring after the date hereof, which will entitle Lender to compensation pursuant to this Section 2.15 and will designate a different Lending Office if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the good faith judgment of Lender, be otherwise disadvantageous in any material respect to Lender.  A certificate of Lender claiming compensation under this Section 2.15 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error.  In determining such amount, Lender may use any reasonable averaging and attribution methods.  Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, Borrower shall not be required to pay compensation of additional amounts pursuant to this Section 2.15 that arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender or any of Lender's owners, officers, employees or agents.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Regulatory Change or other applicable change in law reflected in this Section 2.15 giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Regulatory Change or other applicable change in law reflected in this Section 2.15 giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.16     **Taxes**.

(a)     Any and all payments by Borrower to or on account of any obligation of Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required under applicable law.  If any applicable law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any Tax from any such payment by a Borrower then (i) Borrower shall make such deductions or withholdings, (ii) Borrower shall pay the full amount deducted or withheld to the relevant Governmental Authority or other authority in accordance with applicable law, (iii) if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 2.16) the sum payable shall be increased so that each Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, and (iv) Borrower shall furnish to Lender, at its address referred to in Section 20.6, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment as shall be reasonably satisfactory to Lender.

(b)     In addition, Borrower agrees to pay any present or future stamp court, or documentary Taxes, intangible, recording, filing or similar Taxes which arise from any payment

made hereunder or under the Note or from the execution or delivery of or performance of, or the exercise of remedies under, or otherwise with respect to, this Agreement, the Note or any other Loan Document (hereinafter referred to as "**Other Taxes**") except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16(h)).

(c)     Borrower agrees to indemnify Lender for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.16) paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto.  Payment under this indemnification shall be made within ten (10) days from the date Lender makes written demand therefor to Borrower, specifying in reasonable detail the nature and amount of such Indemnified Taxes.

(d)     Lender or any participant that is not a U.S. Person (each, a "**Non-U.S. Lender**"), (i) on or prior to the date of its execution and delivery of this Agreement in the case of any Non-U.S. Lender listed on the signature page hereof, (ii) on or prior to the date on which it becomes a Lender in the case of each other Non-U.S. Lender, (iii) in the case where a Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "**New Lending Office**"), on the date upon which such Non-U.S. Lender designates the New Lending Office, (iv) upon the obsolescence or invalidity of any form previously delivered and (v) from time to time thereafter if requested in writing by Borrower, shall provide Borrower with IRS Form W-8EXP, W-8IMY (with applicable attachments), W-8BEN-E, W-8BEN or W-8ECI, as appropriate, or any successor form prescribed by the IRS, certifying that such Non-U.S. Lender is entitled to receive payments hereunder free from, or subject to a reduced rate of withholding of U.S. federal income Tax.  In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code, such Non-U.S. Lender shall also provide a duly executed certificate reasonably satisfactory to Borrower to the effect that such Non-U.S. Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of Borrower and is not a controlled foreign corporation related to Borrower (within the meaning of Section 864(d)(4) of the Code), and such Non-U.S. Lender agrees that it shall promptly notify Borrower in the event any such representation is no longer accurate.  Lender and any participant that is a U.S. Person (each, a "**U.S. Lender**"), other than a U.S. Lender that may be treated as an exempt recipient based on the indicators described in Treasury Regulation Section 1.6049-4(c)(1)(ii), hereby agrees that it shall, (i) on or prior to the date of its execution and delivery of this Agreement in the case of each U.S. Lender listed on the signature pages hereof, (ii) on or prior to the date on which it becomes a U.S. Lender, in the case of each other U.S. Lender, (iii) in the case where a U.S. Lender changes its applicable lending office by designating a New Lending Office, on the date upon which such U.S. Lender designates the New Lending Office, (iv) upon the obsolescence or invalidity of any form previously delivered, and (vi) from time to time thereafter if requested in writing by Borrower, deliver to Borrower an accurate, complete and signed copy of IRS Form W-9 or successor form, certifying that such U.S. Lender is on the date of delivery thereof entitled to an exemption from United States backup withholding Tax.  Unless Borrower has received such forms or other documents required by this Section 2.16(d), Borrower shall withhold amounts as required by applicable requirements of law from such payments at the applicable statutory rate.  Each Lender agrees that if any form or certification it previously

WEIL:\96218278\17\63946.0005

delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(e)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Lender such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. For purposes of this Section 2.16, the term "applicable law" includes FATCA.

(f)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.16 (including by the payment of additional amounts pursuant to this Section 2.16), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.16(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.16(f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.16(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person or to file a refund claim.

(g)     Lender shall promptly notify Borrower in writing of any event of which it has knowledge, occurring after the date hereof, which will entitle Lender to compensation pursuant to this Section 2.16 and will designate a different Lending Office if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the good faith judgment of Lender, be otherwise disadvantageous in any material respect to Lender. A certificate of Lender claiming compensation under this Section 2.16 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error. In determining such amount, Lender may use any reasonable averaging and attribution methods.

     2.17      **Release or Assignment on Payment in Full**. If Borrower shall pay or cause to be paid, the principal of and interest on the Note in full at maturity or as otherwise permitted in accordance with the terms of the Loan Documents and all other Debt payable to Lender or secured by the Mortgage or by the other Loan Documents, then (a) Lender shall release the Lien of this Agreement upon the Account Collateral and the Rate Cap Collateral, and (b) satisfy and release of record the Mortgage and all the other Loan Documents shall be discharged (unless such Loan Document by its terms is expressly intended to survive repayment of the Loan). At the written request of Borrower, in connection with repayment of the Debt, Lender shall assign the Note and the Mortgage to Borrower or to any other Person at Borrower's direction and without representation or warranty by, or recourse to, Lender (except that Lender shall represent that the assignment of the Note has been duly authorized and that it has not otherwise assigned or encumbered all or any portion of the Note and Lender shall represent that such release and termination or assignment has been duly authorized and that it has not assigned or encumbered all or any portion of the Mortgage or the other Loan Documents and Lender shall deliver a pay-off letter in customary form), all of the foregoing being at the sole cost, preparation and expense of Borrower. Concurrently with or promptly after such release and satisfaction or assignment of the Mortgage and all the other Loan Documents, Lender will return to Borrower any amounts held in escrow pursuant to this Agreement or any of the other Loan Documents, or otherwise, any original certificated interests evidencing the pledged interests to Lender in its possession and any part of the Property or other Account Collateral that may be in its possession and, on the written request and at the expense of Borrower, will execute and deliver such instruments of conveyance, assignment and release (including appropriate UCC-3 termination statements) in recordable form prepared by Borrower and as may reasonably be requested by Borrower to evidence such release and satisfaction, or assignment and/or severance, and any such instrument, when duly executed by Lender and, if appropriate, duly recorded by Borrower in the places where the Mortgage and each of the other Loan Documents are recorded, shall conclusively evidence the release and satisfaction or assignment of the Mortgage and the other Loan Documents.

III      **CONDITIONS TO CLOSING**

     The obligation of Lender to make the Loan pursuant to the Loan Documents is subject to the fulfillment by, or on behalf of, Borrower or waiver by Lender in its sole and absolute discretion of the following conditions precedent; provided, however, the following conditions precedent shall be deemed satisfied by the Lender by the making of the Loan on the Closing Date. Notwithstanding the foregoing, this Article III shall not impose an obligation to redeliver items previously delivered to Lender in connection with the closing of the Loan on the Closing Date unless such previously delivered item was amended, modified, supplemented or the subject matter underlying such delivered item, or the conditions upon which such delivered items was initially prepared, have changed, in each case, following the date such item was last received by Lender:

3.1     **Loan Documents**.   Lender shall have received an original counterpart of this Agreement, and an original of the Note and all of the other Loan Documents required to be delivered as of the Closing Date, in each case, duly executed (and to the extent required, acknowledged) and delivered on behalf of Borrower and each of the other parties thereto and, in the case of any Loan Documents being recorded in the Register's Office, in proper form for filing by the Title Company in the Register's Office, with a written instruction to the Title Company to file the same and the order of recording of such documents.

3.2     **Mortgage and Recordable Documents**.   Lender shall have received evidence that original counterparts of the Mortgage and Assignment of Leases, in proper form for recordation, have been delivered to the Title Company for recording, so as to create, in the reasonable judgment of Lender, upon such recording valid and enforceable first priority Liens upon the Property, in favor of Lender, subject only to the Permitted Encumbrances, which Liens shall be first priority Liens.

3.3     **UCC Financing Statements**.   Lender shall have received evidence that such UCC financing statements relating to the Mortgage and other applicable Loan Documents that Lender shall deem reasonably necessary or desirable have been delivered to the Title Company for filing in the applicable jurisdictions, so as to create, in the reasonable judgment of Lender, upon filing a valid and enforceable first priority Lien in all of Borrower's Equipment, FF&E, Personal Property and Intangibles (which may also be incorporated within the Mortgage).

3.4     **Guarantees; Indemnities**.   Guarantor shall have executed and delivered to Lender the Completion Guaranty, the Carry Guaranty, the Recourse Guaranty and the Environmental Indemnity.

3.5     **Required Equity Investment**.   Borrower shall have provided to Lender evidence reasonably acceptable to Lender that the Required Equity Investment shall have been invested in the Project in a manner approved by Lender.

3.6     **Representations, Warranties and Compliance**.   The representations and warranties of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date, no Default or Event of Default shall have occurred and be continuing, and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed as of the Closing Date.

3.7     **Title Insurance**.   Lender shall have received the Title Policy issued by the Title Company and dated as of the Closing Date.  The Title Policy shall (a) provide coverage in the amount of the Loan, (b) insure Lender that the Mortgage creates a valid first priority Lien on the Property, in each case free and clear of all exceptions from coverage other than the Permitted Encumbrances, (c) contain the endorsements and affirmative coverages as Lender may require to the

61

extent the same are available in the State (including a mezzanine endorsement, if applicable), (d) contain a "pending disbursements" clause in customary form and as otherwise reasonably acceptable to Lender, and (e) name Lender, its successors and assigns, as the insured.  Lender also shall have received evidence that all premiums in respect of such Title Policy have been paid.

   3.8  **Survey**.  Lender shall have received, as of the Closing Date, a current Survey for the Land, containing the survey certification and satisfying the other reasonable requirements of Lender.

   3.9  **Zoning; Governmental Approvals; Building Permits**.  Lender shall have received the Zoning Memo.

   3.10  **Interest Rate Cap Agreement**.  Lender shall have received the Interest Rate Cap Agreement (in the notional amount required under the definition of Interest Rate Cap Agreement) in compliance with the provisions hereof, including Article XI.

   3.11  **Encumbrances**.  Borrower shall have caused the fee mortgage encumbering the Leasehold Land prior to the Closing Date and the fee mortgages encumbering the Fee Land prior to the Closing Date to be released and shall have taken or caused to be taken such other actions in such a manner so that Lender has a valid and perfected first priority Lien on the Property as of the Closing Date, subject only to Permitted Encumbrances, and Lender shall have received satisfactory evidence thereof.

   3.12  **Related Documents**.  Each additional document required to be executed and/or delivered by Borrower to Lender pursuant to the terms of this Agreement or the other Loan Documents or otherwise in connection with the execution and delivery of the Loan Documents on the Closing Date shall have been duly authorized, executed and delivered by all parties thereto, and Lender shall have received and approved certified copies thereof.

   3.13  **Delivery of Organizational Documents**.  On or before the Closing Date, Borrower shall deliver, or cause to be delivered, to Lender copies certified by an Officer's Certificate, of all organizational documentation related to Borrower and certain of its Affiliates as have been requested by Lender and/or the formation, structure, existence, good standing and/or qualification to do business of Borrower and such Affiliates, as Lender may request in its sole discretion, including, without limitation, good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender.  Each of the organizational documents of each SPE Entity shall contain the language required by Lender.

   3.14  **Legal Opinions**.  Lender shall have received Opinions of Counsel with respect to Borrower, Guarantor and Borrower Holdco relating to the due authorization, execution and enforceability of the Loan Documents and such other

WEIL:\96218278\17\63946.0005

matters required by Lender with respect to Borrower, Guarantor, Borrower Holdco, and such other entities as Lender may request, and such other legal opinions as Lender may request.

3.15     **Appraisal**.   Lender shall have received an Appraisal of the Property in form and substance reasonably satisfactory to Lender.

3.16     **Completion of Proceedings**.  All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Lender, and Lender shall have received all such counterpart originals or certified copies of such documents as Lender may reasonably request.

3.17     **Independent Director Certificate**.  Lender shall have received an executed certificate in form and substance satisfactory to Lender from each Independent Director of an SPE Entity.

3.18     **Transaction Costs**.   Borrower shall have paid or reimbursed Lender for all title insurance premiums, recording and filing fees, costs of environmental reports, appraisals and other reports, reasonable fees and costs of Lender's counsel and all other reasonable third party out-of-pocket costs and expenses incurred in connection with the origination of the Loan, including, but not limited to, the out-of-pocket fees and expenses of the Construction Consultant relating to the Loan, and all other reasonable out-of-pocket fees, costs and expenses (including, without limitation, fees, costs and expenses of outside legal counsel) of Lender relating to the Loan to the extent then due and payable.

3.19     **Other Payments and Fees; Origination Fee**.   All payments, deposits or escrows required to be made or established by Borrower under this Agreement and the other Loan Documents on or before the Closing Date shall have been paid, and the non-refundable origination fee payable on the Closing Date in an amount equal to one and one half percent (1.50%) of the Loan Amount (the "**Origination Fee**") shall have been paid to Lender in connection with the Loan.

3.20     **Material Adverse Change**.  As of the Closing Date, (a) no event or condition which results in a Material Adverse Change shall have occurred, and (b) neither Borrower nor Guarantor shall be the subject of any bankruptcy, reorganization or insolvency proceeding.

3.21     **Reports**.  Lender shall have received the Environmental Report, a report from Lender's insurance consultant and a report from the Construction Consultant, each of which report shall be satisfactory in form and substance to Lender.

3.22     **Financial Statements; Tax Statements; Operating Statements**. On or before the Closing Date, Lender shall have received, as applicable: (a) certified copies of financial statements with respect to the Property, Borrower

and Guarantor as requested by Lender, each in form and substance reasonably satisfactory to Lender, and (b) certified copies of the operating statements, balance sheets, Tax returns (if any) and supporting documentation for Borrower and tax returns for Guarantor (related to the Property or the business related thereto or operated thereon) for the most recent reporting year, as requested by Lender, each in form and substance satisfactory to Lender; provided, however, that no financial statement shall be required from Branden Muhl (other than a certified letter from Branden Muhl and his accountant attesting that Branden Muhl's Net Worth (as defined in the Recourse Guaranty) is in excess of the Net Worth and Liquidity Threshold described in the Recourse Guaranty).

   3.23 **Tax Lot; Subdivision**.  Lender shall have received evidence that the Land has been duly subdivided, and that the Land constitutes one (1) or more separate tax lots, which evidence shall be in form and substance reasonably satisfactory to Lender.

   3.24 **Construction Matters**.

   (a) Budget.  Lender shall have received the final Budget, in form and substance reasonably satisfactory to Lender and Construction Consultant.

   (b) Plans and Specifications.  Lender shall have received originals of complete Plans and Specifications as of the Closing Date, in form and substance reasonably satisfactory to Lender in its sole discretion, together with such other plans, specifications, contracts, subcontracts, schedules, test and reports reasonably required by Construction Consultant.

   (c) Construction Schedule.  Lender shall have received the Construction Schedule as in effect on the Closing Date, in form and substance reasonably satisfactory to Lender and Construction Consultant.

   (d) Existing Construction Documents.  Borrower shall have submitted for Lender's and Construction Consultant's review all Existing Construction Documents, including, without limitation, the Architect Agreement, all Trade Contracts in effect as of the Closing Date, the building permit and any other permits, licenses, any Leases or other agreements encumbering the Property or relating to Borrower, the Property and/or the Project, which said agreements (but not licenses and/or permits) encumbering the Property must contain customary lender protection rights, including assignability and termination rights for the benefit of Lender, and must otherwise be approved by Lender in its reasonable discretion.

   (e) Notice of Commencement.  Lender shall have received and approved a notice of commencement, in the form compliant with the Lien Law and otherwise reasonably acceptable to Lender (the "**Notice of Commencement**"), to be recorded in the Register's Office promptly after the execution of this Agreement, but in no event prior to the recording of the Mortgage and Assignment of Leases.

(f)     <u>Construction Management Agreement</u>.     Lender and Construction Consultant shall have received, reviewed and approved, in their reasonable discretion, the Construction Management Agreement and the Construction Manager Consent.

(g)     <u>Standard Form of Trade Contracts</u>.  Lender shall have received copies of each standard form of Trade Contract to be used by the Construction Manager, which standard form shall be approved by Lender in its reasonable discretion.

(h)     <u>Trade Contracts</u>.  Lender and Construction Consultant shall have received, reviewed and approved evidence satisfactory, in their reasonable discretion, that the Construction Manager has engaged Trade Contractors under Trade Contracts representing at least fifty-four percent (54%) of all Trade Contracts amounts under the Budget for the Leasehold Land (which shall include all of the following Major Trade Contracts: superstructure, curtainwall, HVAC, electrical, and plumbing), and the related Trade Contractors under such Major Trade Contracts and the Major Trade Contracts shall be reasonably acceptable to Lender.  Borrower shall obtain or cause Construction Manager to obtain surety bonds in form and substance satisfactory to Lender or "Subguard" insurance with respect to any subcontractor under a Major Trade Contract, and any such surety bond, shall be issued by insurers having long-term unsecured debt ratings of not less than A- from A.M. Best Company, Inc.

3.25     **Insurance**.  Lender shall have received certified copies of policies, valid certificates of insurance or other reasonably acceptable evidence with respect to the policies of insurance required hereunder, reasonably satisfactory to Lender, and evidence of the payment of all Insurance Premiums for the existing policy period.

3.26     **Other Agreements**.  Lender shall have received, reviewed and approved, in its reasonable discretion, all agreements affecting the Property then in effect, each in form and substance acceptable to Lender, including the Ground Lease, the Master Lease, the EB-5 Loan Documents, the CDE Loan Documents, the Octagon Loan Documents and the Option Agreement.

3.27     **Evidence of Utility Service**.  Lender shall have received evidence that all utility services and facilities necessary for the construction of the Project and, upon Completion, the operation, use and occupancy of the Project for their intended purposes are available at or proximate to the boundaries of the Land, including, without limitation, water supply, storm and sanitary sewer facilities, gas and electric and telephone facilities and means of access between the Land and public ways.

3.28     **Reciprocal Easement Agreements**.  Lender shall have received, reviewed and approved, in its sole discretion, any reciprocal easement agreements with respect to the Property.

3.29     **Compliance with Legal Requirements**.  Lender shall have received evidence that the Property complies in all material respects with all applicable Legal Requirements as of the Closing Date.

WEIL:\96218278\17\63946.0005

3.30     **Credit Reports and Searches**.  Lender shall have received credit reports and UCC, lien, litigation bankruptcy and judgment searches concerning Borrower, Guarantor, Sponsor and such other Persons as may be required by Lender, in its sole discretion.

3.31     **Net Worth and Liquidity**.  Guarantor shall be in compliance with any net worth or liquidity requirements or other financial covenants set forth in the Guarantees and shall have provided Lender with evidence of such compliance.

3.32     **Ground Lessor Estoppel**.  Lender shall have received a consent and estoppel executed by Ground Lessor in respect of the Ground Lease, in form and substance reasonably acceptable to Lender (the "**Ground Lessor Estoppel**").

3.33     **UCC Insurance Policy**.  Lender shall have received a UCC Insurance Policy.

3.34     **Flood Zone Compliance**.  Lender shall have received a special hazard flood determination form from Borrower for any portion of the Property located in a special flood hazard area.

3.35     **Marketing Agreement**.  If executed prior to the date hereof, Lender shall have received, in form and substance reasonably acceptable to Lender, (a) a certified copy of the Marketing Agreement; and (b) an executed "comfort letter" from Marketing Agent.

3.36     **Subordination and Standstill Agreements**.  Lender shall have received (a) a standstill agreement with Octagon (the "**Octagon Standstill**"), (b) a standstill agreement with EB-5 Lender (the "**EB-5 Standstill**"), (c) a subordination and standstill agreement with CDE, and (d) a subordination, non-disturbance and attornment agreement in connection with the Master Lease (the "**Master Lease SNDA**"), in each case in form and substance acceptable to Lender.

3.37     **Miscellaneous**.  Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested, including the Loan Documents in form and substance satisfactory to Lender and its counsel, together with all reports, certificates, affidavits and other information, in form and substance reasonably satisfactory to Lender or Construction Consultant, as each reasonably may require to evidence compliance by Borrower with all of the provisions of this Agreement.

IV     **CONDITIONS TO ALL SUBSEQUENT ADVANCES**

4.1     **Conditions Precedent to Loan Advances**.  Lender shall not be obligated to make any Loan Advance of the Loan after the Closing Date, unless the following conditions are satisfied in the reasonable discretion of Lender as of the Advance Date, except to the extent that Lender may elect in its sole discretion to waive any such conditions:

WEIL:\96218278\17\63946.0005

(a)  <u>Satisfaction of Conditions for Closing</u>.   All conditions set forth in <u>Article III</u> shall continue to be satisfied as of such Advance Date (in the same manner in which they were satisfied on the Closing Date) or waived in writing by Lender; provided, however, that this paragraph (a) shall not reimpose an obligation to redeliver items previously delivered to Lender in connection with the satisfaction of the conditions precedent stated in <u>Article III</u> unless such previously delivered item was amended, modified, supplemented or the subject matter underlying such delivered item, or the conditions upon which such delivered item was initially prepared, have changed, in each case, following the date such item was last received by Lender and as permitted in accordance with the terms of this Agreement.

(b)  <u>Representations and Warranties</u>.   On each Advance Date, the representations and warranties made by Borrower and/or Guarantor in <u>Article VI</u>, the Guarantees, and in any other Loan Documents, as applicable, shall be true and correct in all material respects on the Advance Date with the same effect as if made on such date, except for (a) any matters which by their nature are no longer true and correct as a result of the passage of time, and (b) updates to the representations and warranties which are necessitated by the actions and/or omissions of Borrower and/or Guarantor provided, that any such action and/or omission, as applicable, did not require the consent of Lender pursuant to the Loan Documents and did not result in an Event of Default under the Loan Documents.

(c)  <u>Intentionally Omitted</u>.

(d)  <u>No Events of Default</u>.  On the date of each Advance, no Default or Event of Default hereunder shall have occurred and be continuing.

(e)  <u>Draw Request</u>.  Lender shall have received (i) a complete executed Notice of Borrowing and Draw Request in accordance with the requirements of <u>Section 4.4</u>, together with all required attachments and deliveries relating thereto, and (ii) evidence reasonably satisfactory to Lender that U.S. Bank has approved the Draw Request.

(f)  <u>Construction Consultant Certificate</u>.  Lender shall have received with each Draw Request relating to Hard Costs, a certificate or report of Construction Consultant based upon a site observation of the Property made by Construction Consultant not more than fifteen (15) days prior to the date of such Advance, in which Construction Consultant shall in substance (i) verify that the portion of the Project completed as of the date of such site observation has been completed substantially in accordance with the Plans and Specifications; and (ii) state its estimate of (1) the percentages of the construction of the Project completed as of the date of such site observation on the basis of work in place as part of the Project and the Budget (the "**Percentage of Completion**"), (2) the Hard Costs actually incurred for work in place as part of the Project as of the date of such site observation, (3) the sum necessary to complete construction of the Project substantially in accordance with the Plans and Specifications, and (4) the amount of time from the date of such site inspection that will be required to achieve Substantial Completion  and Completion of the Project; provided, however, that if the Construction Consultant delivers a certificate or report that states that the portion of the Project completed as of the date of such site observation has not been completed substantially in accordance with the Plans and Specifications, then, Lender shall provide Borrower the opportunity to object to such Construction Consultant's certificate or report and for Borrower to deliver to Lender and

WEIL:\96218278\17\63946.0005

Construction Consultant evidence of such compliance, and if such evidence is acceptable to Lender, then the condition precedent set forth in this <u>Section 4.1(f)</u> shall be deemed to have been satisfied; provided, further, however, that if the Construction Consultant fails to deliver a certificate or report as provided herein within the earlier of (x) five (5) Business Days after written notice from Lender to Construction Consultant or (y) ten (10) days after all of the other Advance Conditions shall have been satisfied for such Loan Advance, then the condition precedent set forth in this <u>Section 4.1(f)</u> shall be deemed to have been satisfied.

(g)    <u>Construction Documents</u>.

(i)    Lender shall have received a list of all Construction Documents in effect as of the Advance Date, and copies of any new Construction Documents and any amendments, supplements, replacements or other modifications of any Construction Documents (other than Plans and Specifications), which may be posted on a secure website (the "**Project Website**") to be established and maintained by Borrower in connection with the construction and development of the Project, including, without limitation, the Architect Agreement, the Construction Management Agreement, Major Trade Contracts, together with original Payment and Performance Surety Bonds in respect of each such contract and executed Major Trade Contractor Consents for each new Major Trade Contractor who is to receive proceeds of the applicable Advance, executed after the Closing Date or the date of the last Draw Request, as the case may be, and not previously furnished to Lender, which Construction Documents and such amendments, supplements, replacements or other modifications shall have been reasonably approved by Lender, to the extent Lender's approval is required.

(ii)    The Major Trade Contracts and the related Trade Contractors under such Major Trade Contracts shall be reasonably acceptable to Lender.

(h)    <u>Plans and Specifications</u>.  Borrower shall have made available for Lender and Construction Consultant on the Project Website, if applicable, a complete set of any and all amendments, supplements, replacements or other modifications made to the Plans and Specifications, and Lender shall have approved (such approval not to be unreasonably withheld), to the extent Lender's approval is required, any amendments, supplements, replacements or other modifications to the Plans and Specifications.

(i)    <u>Title Continuation</u>.  Lender shall have received a Title Continuation, dated the date of the requested Advance, issued to Lender in connection with the Loan Advance, which Title Continuation shall state that since the last disbursement of the Loan there have been no changes in the state of title to the Property other than Permitted Encumbrances and that there are no additional survey exceptions not previously approved by Lender.

(j)    <u>Intentionally Omitted</u>.

(k)    <u>Updated Budget and Anticipated Cost Report</u>.  Lender shall have received (i) an updated Budget for the Project, in form and substance (including, without limitation, as with specificity as to Line Items and other levels of detail as Lender may reasonably require) reasonably approved by Lender, in each case which indicates the Costs anticipated to complete the design and construction of the Project, after giving effect to Costs incurred during the period

since the Closing Date, or the date of the last preceding Draw Request, as applicable, and (ii) an anticipated cost report in the form attached hereto as **Exhibit C-6** in form and substance reasonably approved by Lender, which indicates the Costs anticipated to complete the design and construction of the Project, after giving effect to Costs incurred during the previous month and projected.  No Line Item in the Budget shall be eligible for funding from the proceeds of an Advance until Lender and the Construction Consultant have received the related sub-contract(s) and, if applicable, Major Trade Contractor Consent(s) (provided the foregoing shall not be deemed to expand any approval rights of Lender with respect to Trade Contracts that are not Major Trade Contracts).  Subject to all other terms and conditions set forth herein, Loan Advances shall be made for deposits required by the Construction Manager or the Trade Contractors.  In no event shall any Loan Advance be made to fund over a construction or mechanic's lien.

(l)    Budget Reconciliation.  Lender shall have received a reconciliation by Borrower of the progress and cost of the construction of the Project through the date of the Draw Request with the Construction Schedule and the Budget, together with a projection of such progress and cost through to Completion of the Project.

(m)    Payment of Fees.  Lender shall have received (or the same will be paid with the proceeds of the applicable Advance) payment for any and all reasonable out-of-pocket fees payable with respect to the Loan Advance pursuant to the Loan Documents, including, but not limited to, the reasonable out-of-pocket fees and expenses of the Construction Consultant relating to the Loan, and all other reasonable out-of-pocket fees, costs and expenses of (including, without limitation, reasonable fees and expenses of outside legal counsel) Lender relating to the Loan to the extent then due and payable.

(n)    No Other Mortgage.  All materials and fixtures incorporated in the construction of the Project shall have been purchased so that their absolute ownership shall have vested in Borrower immediately upon delivery to the Property and Borrower shall have produced and furnished, if required by Lender, the contracts, bills of sale, if applicable to such type of materials, or other agreements under which title to such materials and fixtures is claimed.

(o)    Additional Bids.

(i)    Borrower shall obtain or cause Construction Manager to obtain, prior to Borrower's right to request a Loan Advance, for itself and each Major Trade Contract, Payment and Performance Surety Bonds in form and substance reasonably satisfactory to Lender or "Subguard" insurance with respect to any subcontractor under each Major Trade Contracts. Each surety bond delivered in accordance with Section 3.24(h) or this Section 4.1(o) shall be issued by an insurer having a rating of not less than "A-" from A.M. Best Company, Inc.

(ii)    Other than in connection with FF&E and costs relating to the opening and marketing of the Project, if in the reasonable judgment of Lender and Construction Consultant all Trade Contracts, Major Trade Contracts and the Construction Management Agreement do not cover all the work necessary for Completion of the Project, Borrower shall cause to be furnished firm bids from responsible parties, or estimates and other information reasonably satisfactory to Lender, for the work not so covered, to enable Lender and

69

Construction Consultant to ascertain the total estimated Cost of all work done and to be done for Completion of the Project.

(iii)     Borrower shall obtain or cause Construction Manager to obtain Payment and Performance Surety Bonds reasonably satisfactory to Lender or "Subguard" insurance with respect to any subcontractor under a Major Trade Contract entered into after the Closing Date.

(p)     <u>Loan Balancing</u>.  The Loan is In Balance as provided in <u>Section 4.6</u>.

(q)     <u>Material Adverse Change</u>.  No Material Adverse Change has occurred.

(r)     <u>Miscellaneous</u>.  Lender shall have received all documents, reports, certificates, affidavits and other information, in form and substance reasonably satisfactory to Lender or Construction Consultant, as each reasonably may require to evidence compliance by Borrower with all of the provisions of this Agreement.

4.2     **Costs and Advances**.

(a)     Subject to the provisions of this Agreement, Loan Advances made by Lender pursuant to this Agreement shall only be used to pay Costs.

(b)     Subject to the other provisions of this Agreement, any Loan Advances shall be made in accordance with Draw Requests submitted by Borrower and approved by Lender in accordance with the provisions of <u>Section 4.4</u> of this Agreement.  The proceeds of the Loan shall be advanced from time to time on each Advance Date by transfer of such funds to Borrower's Disbursement Account, funding into an escrow account held by the Title Company, funding to the Construction Manager or other parties set forth in <u>Section 4.8</u> or in such other manner as Lender shall reasonably require.  Borrower shall not deposit any other funds into Borrower's Disbursement Account other than sums sufficient to pay the administrative costs of such account.

(c)     Subject to the other provisions of this Agreement, Loan Advances shall be made on the basis of (i) the Line Items for Costs specified in the Budget, or for items not detailed in the Budget but which are funded by the Hard Cost Contingency or Soft Cost Contingency, subject to the provisions of <u>Section 4.6</u> and <u>Section 4.7</u>, and (ii) the documented cost of work in place and performed and services provided (without reduction for any retainage permitted under any applicable Trade Contract, but subject to Retainage required hereunder), or to the extent provided in <u>Section 4.5(a)</u>, Stored Materials or Off-Site Materials properly inventoried or deposits made; provided, that Lender shall at no time be obligated to disburse any proceeds of the Loan for work performed, materials furnished or services provided under Construction Documents that are not fully executed and delivered.  The calculation of any Loan Advance shall account for Retainage as provided for in <u>Section 4.10</u>.

(d)     All conditions precedent to the obligation of Lender to make Loan Advances are imposed solely for the benefit of Lender and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to

make the Loan or any Loan Advance in the absence of strict compliance with such conditions precedent.

4.3       **Use of Advances; Florida Disbursement Notice Waiver**.

4.3.1      Each Loan Advance made to Borrower shall be subject to the provisions of the Lien Law and received, held and used by Borrower to pay for (or reimburse Borrower for the payment of) Hard Costs and Soft Costs, as the case may be, which were specified on the Draw Request for such Advance and in accordance with the Budget.

4.3.2      Pursuant to Florida Statutes, Section 713.3471(1), Lender hereby notifies Borrower as follows:

WARNING!

**YOUR LENDER IS MAKING A LOAN DISBURSEMENT DIRECTLY TO YOU AS THE BORROWER, OR JOINTLY TO YOU AND ANOTHER PARTY.  TO PROTECT YOURSELF FROM HAVING TO PAY TWICE FOR THE SAME LABOR, SERVICES, OR MATERIALS USED IN MAKING THE IMPROVEMENTS TO YOUR PROPERTY, BE SURE THAT YOU REQUIRE YOUR CONTRACTOR TO GIVE YOU LIEN RELEASES FROM EACH LIENOR WHO HAS SENT A NOTICE TO OWNER EACH TIME YOU MAKE A PAYMENT TO YOUR CONTRACTOR.**

4.3.3      To the fullest extent permitted by applicable law, Borrower hereby waives the right to receive any further notices under Section 713.3471(1), and hereby acknowledges that the notice provided in Section 4.3.2 above is adequate notice for all loan disbursements hereafter make pursuant to this Agreement.

4.3.4      Borrower and Lender stipulate and agree that for purposes of Section 713.3471(3) of the Florida Statutes, none of the Loan proceeds have been designated as "designated construction loan proceeds" as defined by such statute.  In the event that the stipulation contained in this paragraph is deemed invalid or unenforceable, in whole or in part, then to the extent of such invalidity or unenforceability, Borrower shall be deemed to have not requested the disbursement of any reallocated proceeds, except where Lender, prior to any disbursement not in accordance with the original allocation of proceeds, affirmatively notifies Borrower in writing that it will avail itself of a provision in the Mortgage or this Agreement permitting such reallocated disbursement ("**Lender's Reallocated Disbursement**").  In the event that Lender reasonably determines to make a Lender's Reallocated Disbursement, Borrower shall within five (5) Business Days of a request by Lender authorize Lender to provide certificates on behalf of Borrower and provide to Lender a written list, certified by Borrower, containing the name and address of all contractors (including all parties who may be deemed a contractor as a multiple prime contractor, or by virtue of the relationship between Borrower and any other party or entity furnishing labor, material or services to the Project), subcontractors and all other actual and potential lienors, including, without limitation, those who have served a statutory notice to owner upon Borrower or who are actually known to Borrower.

4.3.5      In the event that Borrower requests or makes a reallocation of any portion of the Loan proceeds in accordance with the provisions of this Agreement which would

WEIL:\96218278\17\63946.0005

require compliance with the provisions of Section 713.3471 of the Florida Statutes, Borrower shall fully and timely comply with all of Borrower's obligations under Section 713.3471(3)(a) of the Florida Statutes, including, without limitation, providing all notices required thereby, and if and to the extent requested by Lender, Borrower shall provide to Lender a written sworn statement executed by each contractor, subcontractor and other actual or potential lienor confirming that such Person has received the written notice requirements of Section 713.3471 of the Florida Statutes.  Lender shall not approve a reallocation requested by Borrower or disburse funds pursuant to an approved reallocation request made by Borrower unless and until Borrower has complied with all of its obligations relating to such disbursement under the terms and provisions of this Agreement and Section 713.3471 of the Florida Statutes.  Nothing contained herein shall be deemed to constitute a waiver by Lender of any of its rights relating to the approval of disbursement requests or construction budget or allocations provided elsewhere in this Agreement.

4.3.6    Without limiting the provisions of this Section 4.3, in consideration of the making of the Loan by Lender, Borrower agrees to indemnify and hold Lender harmless from any and all losses, claims, and damages, including interest, and reasonable attorneys' fees, which Lender may suffer by virtue of Borrower having failed to comply with any of the provisions of Section 713.3471 of the Florida Statutes or any other applicable provisions of Section 713 of the Florida Statutes.

4.3.7    Borrower and Lender stipulate and agree that for purposes of Section 713.3471(2)(a) of the Florida Statutes, Lender shall not be deemed to have made a "final determination that Lender will cease further Advances pursuant to this Agreement," unless and until Lender notifies Borrower in writing that any cessation, delay or withholding of any Advance is a "final determination" under the statute.  The parties specifically acknowledge and agree that a denial or delay of a request for an Advance which is denied or delayed pursuant to the terms of this Agreement or any of the Loan Documents shall not constitute a "final determination" under the statute unless and until Lender provides the written notice described herein.

4.4      **Loan Borrowing Procedures**.

(a)    Draw Requests.   Borrower shall submit to Lender and Construction Consultant draw requests (each, a "**Draw Request**") substantially in the form attached as **Exhibit C-1** and as otherwise required pursuant to Section 4.4(b) not less than ten (10) Business Days prior to the Borrowing Date and no more frequently than once in each calendar month. Each Draw Request shall specify the Hard Costs (which shall not exceed the value of work in place and Stored Materials as supported by invoices and other supporting documentation, as reasonably approved by Construction Consultant, less any Retainage), including deposits paid to any Contractor, and Soft Costs (including deposits required to be paid pursuant to any agreement covering Soft Costs) to be paid from the proceeds of the requested Advance.  The minimum amount requested under each Draw Request shall be Fifty Thousand Dollars ($50,000.00).  Such Draw Request shall specify the amount of any Retainage previously withheld and which has then become payable by Borrower and shall also include a request for any disbursements from the Deficiency Account that Borrower may desire, with supporting documentation describing in reasonable detail the basis for any such disbursements.  All Draw Requests shall be approved by

72

Lender and, with respect to Hard Costs, reasonably approved for payment by Construction Consultant.

(b)    Required Documentation.  Each Draw Request submitted hereunder shall include the following:

(i)    a Notice of Borrowing, which shall not be deemed submitted to Lender pursuant to Section 2.3 until the Draw Request has reasonably been determined to be complete by the Construction Consultant pursuant to this Section 4.4;

(ii)    a requisition letter in the form set forth in **Exhibit C-1**, which shall be executed by an Authorized Representative of Borrower;

(iii)    a requisition spreadsheet in the form set forth in **Exhibit C-2**;

(iv)    an executed borrowing certificate in the form set forth in **Exhibit C-4**;

(v)    payment receipts in the form set forth in **Exhibit C-5** from the Construction Manager and all contractors, subcontractors, suppliers and materialmen, as applicable, evidencing that they have been paid in full for all work performed and/or materials supplied to the date of the preceding Advance, except for Retainage provided for in this Agreement and any disputed amounts being contested by Borrower pursuant to Section 9.3;

(vi)    intentionally omitted;

(vii)    with respect to any Draw Request for payment of Hard Costs, the following:

(A)    a completed Application and Certificate for Payment (AIA Document G702) in the form attached hereto as **Exhibit C-3** that is executed by the Construction Manager, the Major Trade Contractor or Trade Contractor to whom such payment is made, as applicable, each of which shall be certified as true by Borrower;

(B)    subject to Borrower's right to contest pursuant to Section 9.3, an absolute, unconditional waiver of lien and contractor's affidavit in compliance with Lien Law with respect to the then last preceding Loan Advance from Construction Manager and each Trade Contractor, subcontractor and any other Person who were paid from the proceeds of such Advance, dated on or about the date of such Draw Request, covering all work done and all sums received by such Persons through the date of the then last

preceding Loan Advance and noting that the only amounts then due and owing (other than any Retainage) are the amounts to be paid to such Persons out of the Loan Advance being requested, each of which shall be certified as true and complete by Borrower;

(C)     intentionally omitted;

(D)     a list of all Trade Contracts executed since the date of the then last preceding Loan Advance, together with a certification by Borrower that copies of such Trade Contracts and all other contracts with any contractor or subcontractor involved with the construction of the Project executed by Borrower since the date of the then last preceding Loan Advance have been submitted to Construction Consultant not fewer than ten (10) Business Days prior to the date of such Draw Request;

(E)     copies of all Change Orders that have not been previously submitted to Lender on the date of such Draw Request;

(F)     evidence reasonably satisfactory to Lender that the full amount of the portion of the proceeds of the then last preceding Loan Advance have been paid out by Borrower or Construction Manager to the Persons with respect to whom such Loan Advance was disbursed and otherwise in accordance with this Agreement;

(G)     a comprehensive list of all pending Change Orders and any Cost issues that have arisen, have not yet been resolved and have not as of such time resulted in a Change Order, as well as the current listing of all requests for information (RFIs) that remain unresolved and with respect to which the potential costs is not yet known;

(H)     such other information and documents as may be reasonably requested or required by Lender or Construction Consultant with respect to the Hard Costs covered by such Draw Request; and

(viii)   with respect to any Draw Request of payment for Soft Costs, the following:

(A)     intentionally omitted;

(B)     evidence reasonably satisfactory to Lender that the full amount of the portion of the proceeds of the then last preceding Loan Advance have been paid out by Borrower

WEIL:\96218278\17\63946.0005

or Construction Manager to the Persons with respect to whom such Loan Advance was disbursed and otherwise in accordance with this Agreement; and

(C)     invoices, statements or such other information and documentation as Lender shall reasonably request or require with respect to such Soft Costs covered by such Draw Request.

(c)     <u>Conditions Precedent</u>.  Lender shall not be obligated to make any Loan Advance unless the applicable conditions precedent to the making of such Loan Advance, as set forth in this <u>Article IV</u>, have been satisfied by Borrower (or waived in writing by Lender in its sole discretion) not less than three (3) Business Days prior to the applicable Borrowing Date.

(d)     <u>One Advance Per Month</u>.  Lender shall have no obligation to make Loan Advances more often than once in each calendar month except that Lender, in its sole discretion, shall have the right but not the obligation, to make advances more than once per month for Lender's third party expenses (including, without limitation, fees and expenses of the Construction Consultant and attorneys' fees and disbursements), interest, Impositions and Insurance Premiums when due under the Loan Documents as more particularly described in <u>Section 4.4(e)</u> or for the purpose of making payments of the nature referred to in <u>Section 4.4(e)</u>, and any such advances made by Lender under this <u>clause (d)</u> or <u>clause (e)</u> of this <u>Section 4.4</u> in any calendar month shall not preclude Borrower from requesting and receiving during such calendar month any Loan Advance to which Borrower is otherwise entitled under this Agreement.

(e)     <u>Advances to Pay Interest, the Administrative Fee, Other Fees and Expenses</u>.

(i)     Proceeds of the Loan may be used to pay interest hereunder and any other sums due and payable with respect to the Loan or pursuant to any Loan Documents, subject to the terms and conditions of this Agreement, including, without limitation, the availability in the Budget of Loan proceeds for such purpose. Borrower hereby irrevocably requests that Lender make a Loan Advance, without requisition, on each (A) Payment Date to pay (1) interest due hereunder on such Payment Date and (2) the Administrative Fee due hereunder on such Payment Date, and (B) Advance Date to pay expenses, reimbursables and other amounts that are then due and payable under the Loan Documents (including, without limitation, Impositions and Insurance Premiums).  Lender will give Borrower notice of any such Advance promptly following the date of such Advance and any Advance so made shall be deemed to be a Loan Advance made to and received by Borrower and shall be added to the unpaid principal balance of the Note, and in no event shall such Advance prevent Borrower from requesting and receiving an additional Advance in the same calendar month, provided Borrower otherwise satisfies the conditions set forth in <u>Section 4.1</u>.  Notwithstanding anything to the contrary contained in this Agreement, Lender shall have no obligation to make any Loan Advances with respect to such interest, fees and expenses (including, without limitation, Impositions and

75

Insurance Premiums) if an Event of Default has occurred and is continuing. The authorization hereby granted shall be irrevocable, and no further direction or authorization from Borrower shall be necessary for Lender to make any such Advances. However, the provisions of this Section 4.4(e) shall not prevent Borrower from paying interest, fees and expenses (including, without limitation, Impositions and Insurance Premiums) from its own funds; provided, however, if Borrower intends to make any such payment using Borrower's own funds, Borrower will give Lender not less than three (3) Business Days' advance written notice of such intention.

(ii)  If, at any time and from time to time, Lender in its reasonable discretion determines that the amount remaining as an interest line item in the Budget for interest on the Loan, would be insufficient to fund interest projected to be payable on the Loan (calculated at the Interest Rate) through the Maturity Date (an "**Interest Shortfall**"), Lender may require that Borrower deposit, into an interest reserve account (the "**Interest Reserve Account**") maintained by Lender (or Servicer) as a Sub-Account of the Cash Management Account, cash in an amount reasonably determined by Lender to be sufficient to cover such Interest Shortfall. Prior to the Cash Management Commencement Date, in the event the Project, in any month, generates Net Cash Flow, any amounts of Net Cash Flow remaining following the application of such amounts required hereunder shall be deposited into the Interest Reserve Account. Upon any amounts being deposited into the Interest Reserve Account, monthly interest payable on the Loan shall be funded first from the Interest Reserve Account until the funds on deposit therein are reduced to zero and thereafter from funds advanced pursuant to Section 4.4(e)(i).

(iii)  On the Closing Date, Lender shall deposit, as part of the initial Advance on the Closing Date, the amount of $4,652,706 to be used to pay Debt Service during the term of the Loan, and Lender shall deposit such funds into the Interest Reserve Account. Lender shall use any amounts on deposit from time to time in the Interest Reserve Account on each Payment Date (to the extent funds are available for such purpose) to pay the applicable Debt Service then due on such Payment Date for the Loan.

(iv)  Borrower grants Lender a first priority Lien and security interest in the Interest Reserve Account and the funds therein from time to time. Upon the occurrence of an Event of Default, all funds on deposit in the Interest Reserve Account may be applied by Lender in such order and priority as Lender shall determine.

4.5  **Advances for Stored Material**.

(a)  Lender will make disbursements for Stored Materials to be utilized in connection with the Project, in amounts such that the Advance of the Loan on account of all such Stored Materials (other than fixtures, furniture and equipment) shall not be in excess of $500,000.00 in the aggregate at any one time, or such greater amount as may be approved by Lender and the Construction Consultant. The aggregate amount of disbursements of the Loan for such materials shall in no event at any time exceed the actual Hard Costs incurred by

Borrower for such materials as verified by Construction Consultant pursuant to the provisions of this Agreement.  In addition to the foregoing limitations, Loan Advances on account of Stored Materials shall be subject to the other provisions of this Agreement and, prior to any Advance for Stored Materials being made, Lender must have received the following, in form and substance reasonably satisfactory to Lender:

(i)     evidence that the Stored Materials are appropriate for purchase during the then current stage of construction; provided that Borrower may not request Loan Advances to buy Stored Materials more than two (2) months in advance of the estimated date that such Stored Materials will be used in the construction of the Project; provided, further, however, that Lender will not unreasonably withhold Lender's consent with respect to Loan Advances for Stored Materials to be used more than two (2) months in advance, if Borrower demonstrates to Lender's satisfaction that it will take more than two (2) months to fabricate the materials in question.

(ii)    evidence that the Stored Materials are or will be securely stored (A) on site at the Property, or (B) in a warehouse off-site reasonably approved by Lender or such other location as Lender may reasonably approve, properly inventoried, and clearly segregated and stenciled or otherwise marked to indicate that they are the property of Borrower and with respect to Unincorporated Materials, evidence that same are not in excess of such building equipment and materials as would be kept at the Property in accordance with good construction practice for current installation or incorporation;

(iii)   evidence that the Stored Materials have been paid for and are owned by (or upon payment of the amounts to be disbursed in such Draw Request shall be paid for and owned by) Borrower free of all lien rights or claims of the vendor or any third party; provided, however, that Borrower shall be permitted to submit Draw Requests, in the reasonable discretion of Lender, with respect to deposits and down payments for Stored Materials to the extent approved by Lender and Construction Consultant);

(iv)    Lender has obtained a perfected, first-priority security interest in such Stored Materials, unless waived by Lender in its sole discretion, and the warehouse or other location has been notified that Lender has a security interest in the Stored Materials and Lender shall have received from Borrower a copy of the warehouse receipt, if applicable;

(v)     intentionally omitted;

(vi)    Lender has been provided with a certificate or binder of insurance from Borrower or the supplier, fabricator or other subcontractor, reasonably satisfactory to it and covering it as a named insured and loss payee against casualty, loss and theft with respect to the Off-Site Materials and the Unincorporated Materials, for an amount equal to their replacement costs in accordance with the terms of this Agreement;

77

(vii)    Lender has received a copy of the agreement with the supplier or fabricator of any Off-Site Materials, or other evidence reasonably satisfactory to Lender, that Lender may be an assignee of such agreement without the consent of the supplier or fabricator;

(viii)   intentionally omitted;

(ix)    as to Off-Site Materials stored in a warehouse, (A) evidence satisfactory to Lender that the Off-Site Materials are stored in a warehouse reasonably approved by Lender or such other location as Lender may reasonably approve, and the warehouse or other location has been notified that Lender has a security interest in the subject Off-Site Materials, and (B) Lender shall have received from Borrower a copy of the warehouse receipt, if applicable; and

(x)    if requested by Lender, Lender and/or Construction Consultant shall have the right, upon reasonable advance notice, to inspect all Off-Site Materials.

(b)    Any Draw Request made for a deposit or down payment for Stored Materials, which requires some degree of manufacturing process prior to incorporation into the Project and which is not by itself a completed component ready for installation into the Project, shall be reviewed on a case by case basis, provided that Draw Requests for a deposit or down payment for such Stored Materials in the amount of (i) $250,000 or less (in the aggregate) for Stored Materials to be used in connection with the development of the Fee Land and (ii) $250,000 or less (in the aggregate) for Stored Materials to be used in connection with the development of the Leasehold Land shall not be subject to Lender's approval.  Approval for such requests which are reasonable based on the Construction Schedule and security of funds in such investment shall not be unreasonably withheld.  Borrower shall provide a separate log of such deposits and the status of the manufacture of those items as part of the monthly Draw Request. Such tracking shall be continued until such time as they are incorporated into the Project or moved to a Stored Materials status in accordance with Section 4.5(a) above. No Draw Request shall be made for any item of Off-Site Materials which is not a completed component (other than steel, wood flooring or similar structural materials) ready for installation into the Project and any Draw Request shall constitute Borrower's certificate to such effect, whether or not expressly so stated in such Draw Request.

4.6    **Loan Balancing and Budget Reallocations**.

(a)    Loan Balancing.    At all times that any portion of the Debt remains outstanding, in Lender's reasonable determination, no Deficiency, after taking into account Cost Savings, the Hard Cost Contingency and the Soft Cost Contingency, to the extent permitted hereunder, shall exist (the absence of any Deficiency shall be referred to herein as the Loan being "**In Balance**").  After taking into account Cost Savings, the Hard Cost Contingency and the Soft Cost Contingency, to the extent permitted hereunder, such Loan balancing shall be required on both a Line Item-by-Line Item basis and in the aggregate.

78

(b)    Contingency Line Items.  Provided no Event of Default has occurred and is continuing, but subject to the requirements of the Lien Law and the last sentence of this Section 4.6(b), Borrower may revise the Budget from time to time to move (i) amounts available under the Hard Cost Contingency for Costs to other Line Items for Hard Costs in the Budget, and/or (ii) amounts available under the Soft Cost Contingency for Costs to other Line Items for Soft Costs in the Budget. Prior written approval of Lender (which approval shall not be unreasonably withheld, conditioned or delayed) shall be required as a condition to increasing any line item by more than the greater of (i) $50,000.00 and (ii) ten percent (10%) of its original amount. For the purposes of determining whether Lender's approval is required in connection with a particular allocation of Hard Cost Contingency or Soft Cost Contingency, as the case may be, in accordance with this Section 4.6(b), multiple allocations by Borrower of the Hard Cost Contingency or Soft Cost Contingency, as the case may be, with respect to the same (or related) work or costs shall be aggregated.

(c)    Cost Savings.  If there is a Cost Saving in a particular Line Item of the Budget, as determined in Section 4.6(d), and if such Cost Saving is substantiated by evidence reasonably satisfactory to Lender (including that Borrower has fully bought out a Line Item at less than the approved Budget amount) and verified by Construction Consultant, then Borrower shall have the right, upon prior approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed, to reallocate such Cost Saving to other Line Items or to the applicable Contingency; provided, however, that Borrower shall in no event or under any circumstances have the right to:

(i)    reallocate any portion of the Line Items for interest, fees and other expenses payable hereunder prior to Completion of the Project;

(ii)    reallocate any savings in any Line Item for Hard Costs, or Soft Costs to a Line Item other than another Hard Costs Line Item or another Soft Costs Line Item, respectively; or

(iii)    cause a reallocation to occur that, in the opinion of Lender, its counsel or the Title Company, will be in contravention of applicable Legal Requirements with respect to Liens, or that in the opinion of Lender, its counsel or the Title Company will adversely affect or impair in any manner whatsoever the Lien or the priority of Lien of the Mortgage.

(d)    Determination of Cost Savings.  For the purposes hereof, "**Cost Saving**" shall be defined and determined as follows:

(i)    if the component of the construction of the Project (other than interest on any portion of the Loan) which is the subject of a Line Item shall be reasonably determined by Lender and verified by Construction Consultant (in its reasonable discretion) to have been completed without the expenditure of the entire amount allocated in the Budget to such Line Item, and all Trade Contractors, subcontractors and other Persons have been paid in full (including the delivery of final lien waivers) or have an agreed upon final settlement amount for work performed and materials provided with respect to the component of the construction

79

of the Project which is the subject of such Line Item have been paid in full, the difference between the amount of such Line Item in the Budget and the amount so expended for such Line Item shall be deemed to be a Cost Saving; and

(ii)     if prior to the completion of the component of the construction of the Project which is the subject of a Line Item (other than the Line Item for interest payable under the Loan or any Line Item designated as "Contingency") and the subcontracts for such Line Item have been fully bought out, Borrower shall demonstrate to Lender and Construction Consultant's reasonable satisfaction that upon completion of such component, a Cost Saving will be realized pursuant to clause (i) above with respect to such component, the amount of such Cost Saving which is demonstrated to Lender's reasonable satisfaction shall be deemed to be a Cost Saving; and

(iii)     notwithstanding the foregoing, Cost Savings may be established prior to a particular Line Item being 100% purchased or contracted for by Borrower or the Construction Manager as a result of changes to the scope of the Project, if such Cost Savings is established to the reasonable satisfaction of Lender and Construction Consultant.

(e)     New Line Items.  Borrower shall not be permitted to create any new Line Items in an amount greater than $50,000.00 without Lender's prior written consent, in Lender's reasonable discretion, and, if created with Lender's consent, the Line Item designated "Contingency" may not be reallocated to any such new Line Item, without Lender's prior written consent, in Lender's reasonable discretion.  To the extent not paid for by reallocating the Line Item designated as "Contingency" or Cost Savings, any new Line Items shall either constitute a Change Order subject to Section 7.2.7 and be paid for out of the Hard Cost Contingency or Soft Cost Contingency (subject to the requirements of the last sentence of Section 4.6(b)) or shall be paid for from Equity Payments.

(f)     Reallocations.    In no event shall Lender be required to consent to reallocation of Line Items unless Lender is reasonably satisfied that any necessary amendment to this Agreement has been executed and the Lien of the Mortgage will not be adversely affected by any such reallocation.

4.7     **Loan Balancing and Deficiency; Protective Advances**.

(a)     Lender will not be required to make Loan Advances pursuant to the provisions of this Agreement or any of the other Loan Documents for more than the aggregate amount of the Line Items in the Budget or if the Loan is otherwise not In Balance, unless Cost Savings from other Line Items have previously been reallocated in accordance with Section 4.6(c) hereof or all or a portion of the Hard Cost Contingency or Soft Cost Contingency has been reallocated to such Line Item in accordance with Section 4.6(b) hereof or any of the actions set forth in Section 4.7(b) below are taken.

(b)     If Lender shall reasonably determine that a Deficiency exists, Lender shall deliver written notice of such determination (and with Lender providing to Borrower written

documentation in reasonably sufficient detail demonstrating any such Deficiency) to Borrower. If, at the time of such determination the Loan is not fully funded, Lender will not be obligated to make any Advances under this Agreement or any of the other Loan Documents until the Loan is In Balance as hereinafter set forth and, if at the time of such determination the Loan is fully funded, Borrower's failure to deposit Deficiency Collateral pursuant to the terms of and in the time allotted in this Section 4.7 shall constitute an Event of Default hereunder. Within ten (10) Business Days of receipt of such notice of determination, whether such determination occurs before or after the Loan has been fully funded, Borrower shall take the following actions, individually or in combination:

>          (i)      subject to Section 4.6(b) and Section 4.6(c), reallocate Cost Savings and/or any of the Hard Cost Contingency or Soft Cost Contingency pursuant to Section 4.6 hereof such that the aggregate sum of the Deficiency is reduced to zero; or

>          (ii)      deposit Cash with Lender as provided in Section 4.7(c) into an account under the sole dominion and control of Lender (the "**Deficiency Account**") or deliver a Letter of Credit to Lender in the aggregate amount of the Deficiency (Cash or such Letter of Credit, "**Deficiency Collateral**").

     (c)      If Borrower deposits Deficiency Collateral in the form of Cash with Lender, such deposit shall be held in the Deficiency Account, or at such other account and financial institution as Lender shall designate, and all interest earned thereon shall become part of the Deficiency Collateral. Borrower grants a first priority Lien and security interest in the Deficiency Collateral. Any Deficiency Collateral deposited in the form of Cash shall first be exhausted before Lender shall draw on any Deficiency Collateral deposited in the form of a Letter of Credit. Any Deficiency Collateral deposited in the form of a Letter of Credit may be drawn upon by Lender for so long as any amount remains available and undrawn under such Letter of Credit. The Deficiency Account (whether in the form of Cash, Letter of Credit, or any combination thereof) shall first be exhausted before any further Loan Advances shall be made and Lender shall have no obligation to make Loan Advances when the Loan is not In Balance. If Borrower shall fail to deliver Deficiency Collateral when required under Section 4.7(b)(ii), Lender shall have the right to make demand upon the Guarantor to deposit such Deficiency Collateral amount pursuant to, and in accordance with the terms of, the Completion Guaranty.

     (d)      Borrower shall have no right to any Deficiency Collateral on deposit in the Deficiency Account or, in the case of a Letter of Credit, held by Lender, except for the purpose for which such funds were deposited; provided that, as long as an Event of Default exists, Borrower shall have no right to any such Deficiency Collateral for any purpose and Lender may draw, use and apply such Deficiency Collateral in its sole discretion in accordance with the terms hereof. Until expended or applied as provided herein, such Deficiency Collateral shall constitute additional security for the Debt. Any amounts held as Deficiency Collateral shall be drawn and advanced to pay costs for Line Items in the same manner as if such amounts were proceeds of the Loan.

     (e)      If after the deposit of any Deficiency Collateral but prior to disbursement thereof, Borrower shall establish to Lender's reasonable satisfaction that due to a change in

WEIL:\96218278\17\63946.0005

circumstances, the amount of the Deficiency Collateral exceeds the Deficiency, then, promptly following the request of Borrower and provided no Event of Default shall then exist, the excess amount of the Deficiency Collateral shall be disbursed to Borrower if held in the form of Cash or, if held in the form of a Letter of Credit, Borrower shall be entitled to deliver an amendment to such Letter of Credit to reduce the amount thereof by the amount required to be reimbursed to Borrower.

(f)     If Lender shall determine, in accordance herewith, that there exists any Deficiency and Borrower shall fail to bring the Loan In Balance by reallocating Costs Savings or Contingency or by depositing Deficiency Collateral in accordance with Section 4.7(b), Lender will not be obligated to make any further Advances under this Agreement or any of the other Loan Documents until the Loan is In Balance as hereinafter set forth.   Notwithstanding the foregoing, in such event, Lender may (but shall not be obligated to) make protective advances ("**Protective Advances**") in the amount of the Deficiency.  Protective Advances shall be payable prior to any other Advances hereunder, shall bear interest at the Interest Rate and shall remain secured by the Mortgage.

4.8     **Direct Advances**.    Lender shall have the right (but not the obligation) to make any or all Loan Advances upon five (5) days prior notice to Borrower directly to Construction Manager, any Trade Contractor or, following the occurrence and continuation of an Event of Default, any other Person to whom payment is due and for which Borrower has failed to make payment and to the extent funds are allocated thereto in the Budget, provided that no direct Loan Advance shall be made for any costs being disputed by Borrower pursuant to Section 9.3 hereof. Loan Advances may be made by deposit in a bank account to be designated by Lender which may be controlled by Construction Manager, a Trade Contractor or by such other Person, in each case individually or jointly with Lender, as Lender may elect.  Such direct Loan Advances also may be made by check payable to the Person to whom a Loan Advance is to be made.  The execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable direction and authorization to so disburse the Loan Advances.    No further direction or authorization from Borrower shall be necessary or required for such direct Loan Advances and all such Loan Advances shall satisfy pro tanto the obligations of Lender hereunder and shall be secured by the Loan Documents as fully as if made directly to Borrower, regardless of the disposition thereof by Construction Manager, any Trade Contractor or any other Person.

4.9     **Partial Advances**.  If any or all conditions precedent to making a Loan Advance have not been satisfied on the date requested for such Advance, Lender may, at its option, waive, in writing, so many of such conditions precedent as Lender may elect.   Lender may, however, without waiving any of its rights or remedies, disburse that portion, if any, of the requested Advance for which all of the conditions precedent have been satisfied.

4.10     **Retainage**.  The amount of Loan proceeds disbursed on account of any Loan Advance or portion thereof allocable to any Hard Costs shall be reduced by the Retainage applicable to such Hard Costs.  The Retainage balance shall not be

released with respect to a particular Trade Contract prior to the date of final completion of all of the work of the Trade Contractor under such Trade Contract (*i.e.*, all Punchlist Items completed to reasonable satisfaction of Lender and the Construction Consultant) and the expiration of the lien period for an individual subcontract (unless Borrower provides an unconditional lien waiver conforming with the Lien Law from the applicable Trade Contractor reasonably satisfactory to Lender, in which event such final Retainage shall be funded in connection with the Draw Request therefor).  In no event will Lender be required to disburse any funds on account of Retainage prior to the time such sums are payable pursuant to the applicable Trade Contract.

    4.11    **Intentionally Omitted**.

    4.12    **Conditions Precedent to Completion**.  The Project shall not be deemed Completed unless and until the conditions set forth in <u>Section 7.2.22</u> have been satisfied, except to the extent that Lender may elect (which election may be made without written or express notice of such election) to waive any such conditions in its sole and absolute discretion.

## V    CASH MANAGEMENT

    5.1    **Cash Management**.

    5.1.1    **Cash Management Account**.   Lender shall, on Borrower's behalf pursuant to the Account Control Agreement, establish and maintain with Cash Management Bank as of the Closing Date, in the name of Borrower for the benefit of Lender, as secured party, an account (the "**Cash Management Account**"), which will be established as a "deposit account" pursuant to Section 9-102(a) of the UCC.  The Cash Management Account and each sub-account thereof and the funds deposited therein and securities and other assets credited thereto shall serve as additional security for the Loan.  In recognition of Lender's security interest in the funds deposited into the Cash Management Account, Borrower shall identify the Cash Management Account with the name of Lender, as secured party.  The Cash Management Account shall be under the sole dominion and control of Lender and be named as follows: "Greystone Tenant, LLC for the benefit of 1920 Collins Ave ML Funding LLC, and its successors and assigns, as secured party - Cash Management Account."  Borrower agrees that, prior to the payment in full of the Debt, the terms and conditions of the Account Control Agreement shall not be amended or modified without the prior written consent of Lender (which consent Lender may grant or withhold in its sole discretion).  Borrower agrees that it will establish with Cash Management Bank the following sub-accounts of the Cash Management Account (each, a "**Sub-Account**" and, collectively, the "**Sub-Accounts**") and provide Lender with the account numbers therefor, which (a) may be ledger or book entry sub-accounts and need not be actual sub-accounts, (b) shall each be linked to the Cash Management Account, (c) shall each be a "deposit account" pursuant to Section 9-102(a) of the UCC and (d) shall each be an Eligible Account to which certain funds shall be allocated and from which disbursements shall be made pursuant to the terms of this Agreement:

WEIL:\96218278\17\63946.0005

(i)      a sub-account for the retention of Account Collateral in respect of Impositions and Other Charges (the "**Tax Reserve Account**");

(ii)      a sub-account for the retention of Account Collateral in respect of Insurance Premiums (the "**Insurance Reserve Account**");

(iii)      a sub-account for the retention of Account Collateral in respect of Proceeds as more fully set forth in Section 8.2 (the "**Proceeds Reserve Account**");

(iv)      the Interest Reserve Account for the retention of Interest Shortfalls funded by Borrower in accordance with Section 4.4(e)(ii);

(v)      the Deficiency Account for the retention of Deficiency Collateral delivered in the form of Cash in accordance with Section 4.7;

(vi)      a sub-account for retention of Ground Rent in accordance with Section 17.3 hereof (the "**Ground Rent Reserve Account**");

(vii)      a sub-account for retention of Security Deposits in accordance with Section 17.4 hereof (the "**Security Deposit Reserve Account**"); and

(viii)      a sub-account for the retention of Account Collateral in respect of FF&E as more fully set forth in Section 17.5 (the "**FF&E Reserve Account**").

5.1.2      **Collection Account**.

(a)      On or prior to the Cash Management Commencement Date, Borrower shall cause the Lockbox Agreement to be effective and shall establish and maintain with Lockbox Bank, in the name of Borrower for the benefit of Lender, as secured party, the collection account (the "**Collection Account**"), which account will be established and maintained as an interest-bearing deposit account pursuant to Section 9-102(a) of the UCC. The Collection Account and the funds deposited therein shall serve as additional security for the Loan. In recognition of Lender's security interest in the funds deposited into the Collection Account, Borrower shall identify the Collection Account with the name of Lender, as secured party. The Collection Account shall be under the sole dominion and control and be named as follows: "Greystone Tenant, LLC for the benefit of 1920 Collins Ave ML Funding LLC, and its successors and assigns, as secured party – Collection Account." Borrower agrees that, prior to the payment in full of the Debt, the terms and conditions of the Lockbox Agreement shall not be amended or modified without the prior written consent of Lender (which consent Lender may grant or withhold in its sole discretion). Pursuant to the Lockbox Agreement, all amounts on deposit in the Collection Account shall be transferred on a daily basis by the Lockbox Bank to the Cash Management Account. Borrower has obtained from the Lockbox Bank its agreement, pursuant to the Lockbox Agreement, to transfer the full amount of the available balance on deposit in the Collection Account by federal wire transfer once every Business Day throughout the term of the Loan to the Cash Management Account.

(b)     Borrower shall, or shall cause Manager to, (i) deliver irrevocable written instructions to all Tenants under Leases to deliver all Rents payable thereunder directly to the Collection Account in the form of the instruction letter attached hereto as **Exhibit D** (a "**Tenant Direction Letter**"), (ii) deliver irrevocable written instructions (a "**Credit Card Companies/Banks Direction Letter**") in the form of **Exhibit E** attached hereto to each of the credit card companies or credit card clearing banks with which Borrower or Manager has entered into merchant's agreements (collectively, the "**Credit Card Companies/Banks**") to deliver all receipts payable with respect to the Property directly to the Collection Account, and (iii) deposit all amounts received by Borrower or Manager constituting Operating Income into the Collection Account within three (3) Business Days after receipt.  Borrower shall send a copy of each Tenant Direction Letter and each Credit Card Companies/Banks Direction Letter sent as provided above, together with evidence that the same has been sent, to Lender within five (5) Business Days after the Cash Management Commencement Date.  Without limitation of the foregoing, on or before the Cash Management Commencement Date and continuing thereafter in connection with the execution of any new Leases or credit card arrangements which are entered into after the Cash Management Commencement Date, Borrower shall, or shall cause Manager to, notify and advise each Tenant under each Lease to send directly to the Collection Account all payments of Rents pursuant to the Tenant Direction Letter and notify and advise each Credit Card Company/Bank that all credit card receipts (including Excluded Hotel Taxes) with respect to the Property (net of any expenses charged for such processing) cleared by such Credit Card Company/Bank shall be transferred by such Credit Card Company/Bank by wire transfer or the ACH System to the Collection Account pursuant to a Credit Card Company/Bank Direction Letter.  Without the consent of Lender neither Borrower nor Manager shall terminate, amend, revoke or modify any Tenant Direction Letter relating to any Lease or any Credit Card Companies/Banks Direction Letter, or direct or cause any Tenant or Credit Card Companies/Banks to pay any amount in any manner other than as provided in the related Tenant Direction Letter and Credit Card Companies/Banks Direction Letter, respectively.  To the extent that Borrower, Manager or any Person on Borrower's behalf holds any Operating Income, whether in accordance with this Agreement or otherwise, (A) such amounts shall be deemed to be collateral for the Debt and shall be held in trust for the benefit of Lender, (B) such amounts shall not be commingled with any other funds or property of Borrower or Manager, and (C) Borrower or Manager shall deposit such amounts in the Collection Account within three (3) Business Day of receipt.

5.1.3     **Pledge of Account Collateral.**

(a)     To secure the full and punctual payment and performance of the Obligations in connection with the Loan, upon creation of the aforementioned accounts, Borrower hereby collaterally assigns, grants a security interest in and pledges to Lender, to the extent not prohibited by applicable law, a first priority continuing security interest in and to the following property of Borrower, whether now owned or existing or hereafter acquired or arising and regardless of where located (all of the same, collectively, the "**Account Collateral**"):

(i)     the Collateral Accounts and all cash, checks, drafts, securities entitlements, certificates, instruments and other property, including, without limitation, all deposits and/or wire transfers from time to time deposited or held in, credited to or made to Collateral Accounts;

85

(ii)    all interest, dividends, cash, instruments, securities entitlements and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing or purchased with funds from the Collateral Accounts; and

(iii)    to the extent not covered by clauses (i), (ii) or (iii) above, all proceeds (as defined under the UCC) of any or all of the foregoing.

(b)    In addition to the rights and remedies herein set forth, Lender shall have all of the rights and remedies with respect to the Account Collateral available to a secured party at law or in equity, including, without limitation, the rights of a secured party under the UCC, as if such rights and remedies were fully set forth herein.

(c)    This Agreement shall constitute a security agreement for purposes of the Uniform Commercial Code and other applicable law.  Borrower agrees to confirm the provisions hereof and enter into any other agreements, financing statements and documents reasonably requested by Lender to further evidence, secure and perfect its interests in the Account Collateral, the Mortgage and all other assets of Borrower.

### 5.1.4    **Maintenance of Collateral Accounts**.

(a)    Borrower agrees that the Collection Account will be and will be maintained (i) as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over the Collection Account and (iii) such that neither Borrower nor Manager shall have any right of withdrawal from the Collection Account and, except as provided herein, no Account Collateral shall be released to Borrower or Manager from the Collection Account.  Without limiting Borrower's obligations under the immediately preceding sentence, Borrower shall only establish and maintain the Collection Account with a financial institution that has executed an agreement substantially in the form of the Lockbox Agreement or in such other form acceptable to Lender in its sole discretion.

(b)    Borrower agrees that each of the Cash Management Account and the Sub-Accounts will be and will be maintained (i) as a "deposit account" (as such term is defined in Section 9-102(a) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over the Cash Management Account and any Sub-Account, (iii) such that neither Borrower nor Manager shall have any right of withdrawal from the Cash Management Account or the Sub-Accounts and, except as provided herein, no Account Collateral shall be released to Borrower from the Cash Management Account or the Sub-Accounts, (iv) in such a manner that the Cash Management Bank shall agree to treat all property credited to the Cash Management Account or the Sub-Accounts as "financial assets" and (v) such that all securities or other property underlying any financial assets credited to the accounts shall be registered in the name of Cash Management Bank, endorsed to Cash Management Bank or in blank or credited to another securities account maintained in the name of Cash Management Bank and in no case will any financial asset credited to any of the Collateral Accounts be registered in the name of Borrower, payable to the order of Borrower or specially endorsed to Borrower except to the extent the foregoing have been specially endorsed

to Cash Management Bank or in blank.  Without limiting Borrower's obligations under the immediately preceding sentence, Borrower shall only establish and maintain the Cash Management Account with a financial institution that has executed an agreement substantially in the form of the Account Control Agreement or in such other form acceptable to Lender in its sole discretion.

        5.1.5      **Eligible Accounts**.  The Collateral Accounts shall be Eligible Accounts. The Collateral Accounts shall be subject to such applicable laws, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other banking or governmental authority, as may now or hereafter be in effect.  Income and interest accruing on the Collateral Accounts or any investments held in such accounts shall be periodically added to the principal amount of such account and shall be held, disbursed and applied in accordance with the provisions of this Agreement, the Lockbox Agreement and the Account Control Agreement. Borrower shall be the beneficial owner of the Collateral Accounts for federal income Tax purposes and shall report all income on the Collateral Accounts.

        5.1.6      **Application of Funds into Accounts**.

        (a)      Following the establishment of the Collection Account pursuant to <u>Section 5.1.2</u> above, so long as no Event of Default shall have occurred and be continuing, Lender shall direct the Cash Management Bank to apply funds on deposit in the Cash Management Account (other than funds which pursuant to the terms hereof are deposited into a Sub-Account) on each Payment Date as follows (except as otherwise provided herein):

        (i)      First, to the Tax Reserve Account, funds in an amount equal to the Monthly Tax Reserve Amount and any other amounts required pursuant to <u>Section 17.1</u>;

        (ii)      Second, to the Insurance Reserve Account, funds in an amount equal to the Monthly Insurance Reserve Amount and any other amounts required pursuant to <u>Section 17.2</u>;

        (iii)      Third, if the Ground Lease remains in effect, to the Ground Rent Reserve Account, funds in an amount equal to pay monthly Ground Rent and any other amounts required pursuant to <u>Section 17.3</u>;

        (iv)      Fourth, to Lender, funds in an amount equal to pay monthly Debt Service; provided, however, that Debt Service shall be funded first, from funds (if any) in the Interest Reserve Account;

        (v)      Fifth, to Borrower's Disbursement Account an amount equal to the aggregate of (A) Operating Expenses due and payable by Borrower during the current calendar month as set forth in the Approved Annual Operating Budget and (B) expenses, if any, approved by Lender, less (C) any amounts that were previously disbursed to Borrower pursuant to this <u>Section 5.1.6(a)(v)</u> and which were not used by Borrower to pay Operating Expenses or other expenses approved by Lender; provided, however, Lender shall have no obligation to disburse any funds to Borrower under this <u>Section 5.1.6(a)(v)</u> unless Borrower has delivered to Lender, not

less than five (5) Business Days prior to the disbursement date an Officer's Certificate in form and substance reasonably acceptable to Lender certifying to Lender (x) a list in reasonable detail of the Operating Expenses that are due and payable by Borrower during the succeeding month as set forth in the Approved Annual Operating Budget and (y) a reconciliation showing all Operating Expenses (and other expenses approved by Lender) actually paid by Borrower for the prior quarter and all amounts distributed to Borrower under this Section 5.1.6(a)(v);

(vi)    Sixth, to Lender, funds to pay the Administrative Fee;

(vii)   Seventh, to Lender, funds to pay any other amounts, if any, then due to Lender under the Loan Documents;

(viii)  Eighth, to the FF&E Reserve Account, funds in an amount equal to the Monthly FF&E Reserve Amount and any other amounts required pursuant to Section 17.5;

(ix)    Ninth, to the Borrower's Disbursement Account.

(b)     The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(c)     Notwithstanding anything to the contrary contained herein or in the Mortgage, to the extent that Borrower shall fail to pay any documentary stamp Taxes, intangibles Taxes, mortgage recording Taxes, or payments-in-lieu thereof, costs, expenses or other amounts pursuant to Section 20.12 of this Agreement within the time period set forth therein, Lender shall have the right, at any time, with written notice to Borrower, to withdraw from the Collection Account or the Cash Management Account, as applicable, an amount equal to such unpaid Taxes, costs, expenses and/or other amounts and pay such amounts to the Person(s) entitled thereto.

5.1.7    **Payments from Sub-Accounts**.    Borrower irrevocably authorizes Lender to make and, provided no Event of Default shall have occurred and be continuing, Lender hereby agrees to instruct Cash Management Bank to make, the following payments from the Sub-Accounts to the extent of the monies on deposit therefor:

(i)     funds from the Tax Reserve Account to Lender sufficient to permit Lender to pay (A) Impositions and (B) Other Charges, on or prior to the respective due dates therefor, and Lender shall so pay such funds to the Governmental Authority or other Person having the right to receive such funds;

(ii)    funds from the Insurance Reserve Account to Lender sufficient to permit Lender to pay Insurance Premiums for the insurance required to be maintained pursuant to the terms of this Agreement and the Mortgage, on or prior to the respective due dates therefor, and Lender shall so pay such funds to the insurance company having the right to receive such funds;

WEIL:\96218278\17\63946.0005

(iii)     funds from the Interest Reserve Account to Lender, to be applied to pay monthly interest on the Loan; provided, however, that any funds in the Interest Reserve Account will be applied to payments of monthly interest on the Loan ahead of any funding from any other source;

(iv)     funds from the Deficiency Account to be applied in accordance with Section 4.7 hereof;

(v)     funds from the Security Deposit Account to be applied in accordance with Section 17.4 hereof;

(vi)     funds from the FF&E Reserve Account to Lender, to be applied in accordance with Section 17.5 hereof;

(vii)     funds from the Ground Rent Reserve Account to Lender sufficient to permit Lender to pay the Ground Rent on or prior to the due dates therefor, and Lender shall so pay such funds to the Ground Lessor or other Person having the right to receive such funds; and

(viii)     as and to the extent provided in Section 8.2.5, funds from the Proceeds Reserve Account to Lender sufficient to permit Lender to pay the amounts required pursuant to Section 8.2.5, and any balance thereof shall be distributed and applied in accordance with Section 8.2.5.

5.1.8     **Event of Default**.  Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, all funds on deposit in the Collection Account and the Cash Management Account may, in Lender's sole discretion, be disbursed to or as directed by Lender.  Without in any way limiting the foregoing or Lender's rights and remedies upon an Event of Default, and subject to Lender's direction otherwise from time to time, in whole or in part, in Lender's sole and absolute discretion, after the occurrence and during the continuance of an Event of Default which remains uncured, Lender may direct the Account Banks to allocate all available funds on deposit in the Collection Account, the Cash Management Account, or any of them, to:  (a) the Debt and other Obligations; (b) as a reserve for Operating Expenses, Impositions, Insurance Premiums, capital expenses, costs and expenses of maintenance, repairs and restoration, and other expenditures relating to the use, management, operation or leasing of the Property; and/or (c) any actual out-of-pocket costs and expenses incurred by Lender in connection with such Event of Default, or expended by Lender to protect or preserve the value of the Property.

5.1.9     **Cash Management Bank; Lockbox Bank**.

(a)     Lender shall have the right at Borrower's sole cost and expense to replace the Cash Management Bank and/or the Lockbox Bank, as the case may be, with a financial institution reasonably satisfactory to Borrower in the event that (i) the Cash Management Bank and/or the Lockbox Bank, as the case may be, fails, in any material respect, to comply with the Account Control Agreement, and/or the Lockbox Agreement, as applicable, (ii) the Cash Management Bank and/or the Lockbox Bank, as the case may be, named herein is no longer the Cash Management Bank and/or the Lockbox Bank, as the case may be, or (iii) the Cash

89

Management Bank and/or the Lockbox Bank, as the case may be, is no longer an Approved Bank. Borrower shall reasonably cooperate with Lender in connection with the appointment of any replacement Cash Management Bank and/or the Lockbox Bank, as the case may be, and the execution by the Cash Management Bank and Borrower of an Account Control Agreement and/or the Lockbox Bank and Borrower of a Lockbox Agreement substantially similar to the Account Control Agreement or the Lockbox Agreement previously executed by Borrower or in each case, otherwise reasonably acceptable to Lender and, in each case, delivery of same to Lender.

(b)     Lender shall have the right at any time, at its sole cost and expense, to replace the Lockbox Bank with a financial institution selected by Lender that is an Approved Bank and is reasonably acceptable to Borrower and, in such event, such financial institution and Borrower shall execute and deliver to Lender a Lockbox Agreement substantially similar to the Lockbox Agreement executed as of the Closing Date.

5.1.10   **Account Collateral and Remedies Upon Event of Default**.

(a)     Upon the occurrence and during the continuance of an Event of Default, without additional notice from Lender to Borrower, Lender may, in addition to and not in limitation of Lender's other rights, make any and all withdrawals from, and transfers between and among, the Collateral Accounts as Lender shall determine in its sole and absolute discretion to pay the Note, Operating Expenses and/or Capital Expenditures for the Property.

(b)     Upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Account Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower could or might do and which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein and to accomplish the purposes of this Agreement. The foregoing powers of attorney are irrevocable for the term of the Loan and coupled with an interest. Upon the occurrence and during the continuance of an Event of Default, Lender may exercise any of the rights granted to Lender pursuant to this Section 5.1.10, and any reasonable expenses of Lender incurred in connection therewith shall be paid by Borrower.

(c)     Except as otherwise provided herein or in any of the other Loan Documents, Borrower hereby expressly waives, to the fullest extent permitted by law, presentment, demand, protest or any notice of any kind in connection with the Account Collateral. Borrower acknowledges and agrees that ten (10) days' prior written notice of the time and place of any public sale of the Account Collateral or any other intended disposition thereof shall be reasonable and sufficient notice to Borrower within the meaning of the UCC.

5.1.11   **Transfers and Other Liens**. Borrower agrees that it will not (i) sell or otherwise dispose of any of the Account Collateral or (ii) create or permit to exist any Lien upon

WEIL:\96218278\17\63946.0005

or with respect to all or any of the Account Collateral, other than the Liens and security interests created by the Loan Documents and other Permitted Encumbrances.

5.1.12  **Reasonable Care**.   Beyond the exercise of reasonable care in the custody thereof, Lender shall have no duty as to any Account Collateral in its possession or control as agent therefor or bailee thereof or any income thereon or the preservation of rights against any person or otherwise with respect thereto.   Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Account Collateral in its possession if the Account Collateral is accorded treatment substantially equal to that which Lender accords its own property, it being understood that Lender shall not be liable or responsible for any loss or damage to any of the Account Collateral, or for any diminution in value thereof, by reason of the act or omission of Lender, its Affiliates, agents, employees or bailees, except to the extent that such loss or damage results from Lender's gross negligence or willful misconduct.   In no event shall Lender be liable either directly or indirectly for losses or delays resulting from any event which may be the basis of an Excusable Delay, computer malfunctions, interruption of communication facilities, labor difficulties or other causes beyond Lender's reasonable control or for indirect, special or consequential damages except to the extent of Lender's gross negligence or willful misconduct.

5.1.13  **Lender's Liability**.

(a)     Lender shall be responsible for the performance only of such duties with respect to the Account Collateral as are specifically set forth in this Section 5.1 or elsewhere in the Loan Documents, and no other duty shall be implied from any provision hereof.  Lender shall not be under any obligation or duty to perform any act with respect to the Account Collateral which would cause it to incur any expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own monies.  Borrower shall indemnify and hold Lender, its employees and officers harmless from and against any actual loss, actual out-of-pocket cost or damage (including, without limitation, reasonable attorneys' fees and disbursements, but excluding consequential, punitive and special damages) incurred by Lender in connection with the Account Collateral except as such may be caused by the gross negligence or willful misconduct of Lender, its employees, officers or agents.

(b)     In connection with the cash management of the Property as provided in this Article V and the other Loan Documents, Lender shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper, document or signature believed by it in good faith to be genuine, and, in so acting, it may be assumed that any person purporting to give any of the foregoing in connection with the cash management provisions hereof and in the other Loan Documents has been duly authorized to do so.  In connection with the foregoing, Lender may consult with counsel, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder and under the other Loan Documents and in good faith in accordance therewith.

5.1.14  **Continuing Security Interest**.   This Agreement shall create a continuing security interest in the Account Collateral and all other assets of Borrower and shall remain in full force and effect until payment in full of the Obligations.  Upon payment in full of

WEIL:\96218278\17\63946.0005

the Obligations, this security interest shall automatically terminate without further notice from any party and Borrower shall be entitled to the return, upon its request, of such of the Account Collateral as shall not have been applied pursuant to the terms hereof and Lender shall execute such instruments and documents as may be reasonably requested by Borrower to evidence such termination and the release of the Account Collateral.

      5.1.15 **Master Tenant Cash Management Agreements**.  Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, if (a) the Master Tenant Cash Management Agreements are fully executed and copies are delivered to Lender and (b) all Rent (as defined in the Master Tenant CMA) ("**Master Tenant Rent**") is delivered into the Collection Account (as defined in the Master Tenant CMA) (the "**Master Tenant Collection Account**") and applied as provided in the Master Tenant CMA, then, with respect to the Leasehold Land only, (i) all Rents and other amounts required under the Loan Documents to be deposited into the Collection Account will not be required to be deposited into the Collection Action (because such amounts are being deposited into the Master Tenant Collection Account) and (ii) Leasehold Borrower will not be required to comply with any requirements under this Agreement to fund the Sub-Accounts established pursuant to Section 5.1.1(a) (because such accounts are being funded pursuant to the Master Tenant Cash Management Agreements), provided that Borrower shall, within three (3) Business Days of any Subaccount (as defined in the Master Tenant CMA) being funded, cause such funds in any such Subaccount to be transferred to the corresponding Subaccount described herein and/or the other Loan Documents.  For the avoidance of doubt, if Master Tenant Rent is collected, deposited into the Master Tenant Collection Account and run through the waterfall as provided in Section 3 of the Master Tenant CMA, then as each bucket under the Master Tenant CMA is filled that has a corresponding bucket in this Agreement or the other Loan Documents (i.e., buckets for Taxes, Insurance, Ground Rent, Operating Expenses and FF&E), within three (3) Business Days of such bucket(s) being filled, Borrower shall cause the transfer of funds from such bucket(s) described in the Master Tenant Cash Management Agreements to the corresponding bucket(s) described hereunder or the other Loan Documents.  Borrower shall also, within three (3) Business Days of any amounts being deposited into the Rent Reserve Account (as defined in the Master Tenant CMA) (which such Rent Reserve Account does not have a corresponding bucket under this Agreement or the other Loan Documents), cause such amounts in such Rent Reserve Account to be transferred to the Cash Management Account to be applied in accordance with Section 5.1.6(a) hereof. Borrower shall deliver a copy of every Allocation Letter (as defined in the Master Tenant CMA) simultaneously with delivery to Master Tenant Cash Management Bank. Notwithstanding the foregoing, for the first two (2) times that any Subaccount (as defined in the Master Tenant CMA) is funded, Borrower shall have an additional three (3) Business Days to cause such funds to be deposited in the event that there is an inadvertent clerical or accounting error that resulted in the wrong amount being deposited.

## VI    **REPRESENTATIONS AND WARRANTIES**

    6.1    **Borrower General Representations**.  Borrower represents and warrants as of the Closing Date that:

    6.1.1   **Organization**.  Borrower is a limited liability company formed (pursuant to a conversion) under the laws of the State of Delaware, has been duly organized and

is validly existing and in good standing pursuant to the laws of the State of Delaware, as applicable with requisite power and authority to own its properties and to transact the businesses in which it is now engaged.  Borrower has duly qualified to do business and is in good standing in the State.  Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its property and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership, leasing, use, management, renovation, financing, development, construction, operation and maintenance of the Property and activities related thereto.  As of the Closing Date, the organizational and ownership structure of Borrower is accurately depicted by the schematic diagram attached hereto as **Schedule I**.  Borrower shall not change its name, identity, corporate structure or jurisdiction of organization unless it shall have given Lender thirty (30) days prior written notice of any such change and shall have taken all steps reasonably requested by Lender to grant, perfect, protect and/or preserve the security interest granted hereunder to Lender.

6.1.2    **Proceedings**.  Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party.  This Agreement and the other Loan Documents to which Borrower is a party have been duly executed and delivered by, or on behalf of, Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws generally affecting rights of creditors and the enforcement of debtors' obligations, and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

6.1.3    **No Conflicts**.  The execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party will not result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than Permitted Debt, Permitted Encumbrances or pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject (unless consents from all applicable parties thereto have been obtained), nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such regulatory authority or other governmental agency or body required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect (or will be obtained when required).

6.1.4    **Litigation**.

(a)    Except as set forth on **Schedule V** attached hereto, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's Knowledge, threatened in writing against or affecting Borrower or the Property.  The actions, suits or proceedings identified on **Schedule V**, if determined adversely to Borrower or the Property, would not be reasonably likely to materially adversely

affect the condition (financial or otherwise) or business of Borrower or the condition or ownership of the Project or Property or any portion thereof.

(b)    Except for the two lawsuits affecting Muhl Guarantor previously disclosed to Lender (the "**Litigation Disclosure Email**") and as set forth on **Schedule V** attached hereto, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's Knowledge, threatened in writing against or affecting Guarantor which, if determined adversely to Guarantor, would be reasonably likely to materially adversely affect Guarantor's ability to perform under the Guarantees.

6.1.5    **Agreements**.  Borrower is not a party to any agreement or instrument or subject to any restriction (other than Permitted Debt, Permitted Encumbrances and agreements disclosed in writing to Lender) which is reasonably likely to materially and adversely affect Borrower or Borrower's business, properties or assets, operations or financial condition.  With respect to Material Agreements, Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any such agreements to which it is a party or by which Borrower or the Property is bound and with respect to all other agreements or instruments, Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any such agreement or instrument to which it is a party or by which Borrower or the Property is bound which default is reasonably likely to materially and adversely affect Borrower or Borrower's business, properties or assets, operations or financial condition.  Borrower has no financial obligation (contingent or otherwise) under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of owning, leasing, developing, constructing, managing, maintaining, marketing, designing, selling and operating the Property and (b) obligations under the Loan Documents, the Permitted Encumbrances and the Permitted Debt.  **Schedule VI** contains a true, complete and accurate list of all Material Agreements.  True, complete and correct copies of all Material Agreements listed on **Schedule VI** have been delivered to Lender. The Material Agreements are in full force and effect and, to Borrower's knowledge, there are no material defaults by any party other than Borrower thereunder.

6.1.6    **Property**. Borrower has good, marketable and insurable (a) fee simple absolute title to the Fee Land and (b) leasehold title to the Leasehold Land as demised under the Ground Lease, and Borrower has good title to the balance of the Property owned by it, free and clear of all Liens whatsoever other than the Liens and security interests created by the Loan Documents, the Permitted Debt and other Permitted Encumbrances.  The Mortgage and the Assignment of Leases when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected lien on that portion of the Property constituting real property, subject only to the Permitted Encumbrances, and (b) perfected security interests in and to, and perfected collateral assignments of, all Hotel Transactions Income, Rents and Leases and all personalty which are capable of perfection by such recordation of the Mortgage, the Assignment of Leases and/or the filing of Uniform Commercial Code financing statements, all in accordance with the terms thereof, in each case, subject only to any Permitted Encumbrances.  Except for the Permitted Encumbrances, to Borrower's Knowledge  there are no claims (other than inchoate

claims) for payment for work, labor or materials affecting the Property or any portion thereof which are or may become a lien prior to, or of equal priority with, the Liens created by the Loan Documents.  Borrower represents and warrants that none of the Permitted Encumbrances are reasonably likely to materially and adversely affect the use or operation of the Property as of the Closing Date and thereafter (including after Completion of the Project).  Borrower will preserve its right, title and interest in and to the Property for as long as the Note remains outstanding and will warrant and defend same and the validity and priority of the Lien hereof from and against any and all claims whatsoever, other than the Permitted Debt and Permitted Encumbrances.

6.1.7   **No Bankruptcy Filing**.   Neither Borrower nor, to Borrower's Knowledge, any other Borrower Party, Greystone Managing Member, Master Tenant, Ground Lessor or Option Holder is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of such entity's assets or property, and Borrower has no Knowledge of any Person contemplating the filing of any such petition against Borrower or any other Borrower Party, Greystone Managing Member, Master Tenant, Ground Lessor or Option Holder.

6.1.8   **Full and Accurate Disclosure**.  No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Borrower substantially relating to the Property or any Borrower Party (excluding general market conditions) which has not been disclosed to Lender which could reasonably be expected to have a material adverse effect on Borrower, the Project or the Property.  As of the date hereof, Branden Muhl and James Vosotas are the individuals associated with Borrower and its constituent equity holders with the most knowledge about the management, development and day-to-day operations of the Project, the construction thereof and the other matters pertaining to the development of the Project and are the Persons who would have knowledge of the subject matter in question.   All other written information, reports, certificates and other documents submitted by Borrower to Lender in connection with the Loan are accurate, complete and correct in all material respects.  There has been no material adverse change known to Borrower in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the Property or the business operations or the financial condition of Borrower.

6.1.9   **All Property**.  The Property constitutes all of the real property, personal property, licenses, permits, equipment and fixtures currently owned or leased by Borrower.

6.1.10   **No Plan Assets**.

(a)      Borrower does not maintain a Plan which is subject to Title IV of ERISA; and

(b)      Borrower is not a Plan that is subject to Title I of ERISA, none of the assets of Borrower constitutes or will constitute Plan assets of one or more such Plans within the meaning of 29 C.F.R. Section 2510.3 101 and Borrower is not a governmental plan within the meaning of Section 3(32) of ERISA and transactions by or with Borrower are not subject to state

statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

6.1.11    **Compliance**.   Borrower and, to Borrower's Knowledge, the Property and, upon its completion, the use of the Project shall comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes.   To Borrower's Knowledge, Borrower is not in default or in violation of any order, writ, injunction, decree or demand of any Governmental Authority.    There has not been committed by Borrower any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

6.1.12    **Financial Information**.    All financial information that has been delivered by Borrower to Lender in respect of Borrower and/or the Property is true, complete and correct in all material respects, except as disclosed therein.   Except for the Permitted Debt and the Permitted Encumbrances, Borrower does not have any contingent liabilities, any material liabilities for Taxes, unusual forward or long term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Borrower, Project or Property or any portion thereof.   Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

6.1.13    **Condemnation**.   No Taking has been commenced or, to Borrower's Knowledge, is threatened in writing with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

6.1.14    **Federal Reserve Regulations**.   None of the proceeds of the Loan will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U, Regulation X or Regulation T or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry "margin stock" or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of Regulation U or Regulation X.   As of the Closing Date, Borrower does not own any "margin stock."

6.1.15    **Not a Foreign Person**.   Borrower is a disregarded entity for U.S. federal income tax purposes and the sole member or owner of Borrower is not a foreign person within the meaning of § 1445(f)(3) of the Code.

6.1.16    **Separate Lots**.    The Property is comprised of one (1) or more contiguous parcels which constitute a separate tax lot or lots and does not constitute or include a portion of any other tax lot not a part of the Property.

6.1.17    **Assessments**.   Except as disclosed in the Title Policy, there are no pending or, to Borrower's Knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

6.1.18   **Enforceability**.  The Loan Documents are not subject to any existing right of rescission, set off, counterclaim or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and Borrower has not asserted any right of rescission, set off, counterclaim or defense with respect thereto.

6.1.19   **No Prior Assignment**.   There are no prior sales, transfers or assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding following the funding of the Loan, other than those being terminated or assigned to Lender concurrently herewith.

6.1.20   **Insurance**.  Borrower has obtained and has delivered to Lender full and accurate copies of all Policies (or certificates thereof) reflecting the insurance coverages, amounts and other requirements required to be maintained pursuant to this Agreement.  Neither Borrower nor any other Person has, done by act or omission anything which would impair the coverage of any such Policy.

6.1.21   **Permits; Licenses**.  All Construction Permits required in connection with the Property as of the Closing Date have been obtained (or are ready to be pulled) and are (or shall be) in full force and effect and true, correct and complete copies of same have been (or shall be) delivered to Lender.  All permits, licenses and approvals required for the legal use, occupancy and operation of the Property (collectively, the "**Licenses**"), shall have been obtained and shall be in full force and effect, and true, correct and complete copies of same shall have been delivered to Lender prior to the occupancy of the Property after Substantial Completion of the Project.

6.1.22   **Flood Zone**.  The Improvements on the Property are located in a flood zone identified by the Federal Emergency Management Agency as "AE".

6.1.23   **Boundaries**.  Except for Permitted Encumbrances and as disclosed in the Title Policy and/or Survey, all of the Improvements lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, which would be reasonably likely to have a material and adverse effect on the Property or the value or marketability thereof except those which are insured against by the Title Policy.

6.1.24   **No Leases**.  As of the date hereof, the Property is not subject to any Leases. No Person (other than Borrower and Ground Lessor) has any possessory interest in the Property or right to occupy the same.

6.1.25   **Filing and Recording Taxes**.   All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the Land and the granting and recording of the Mortgage and the UCC financing statements have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or other similar tax (including payments in lieu thereof) required to be paid by any Person under

applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid (or delivered to the Title Company for payment on the date hereof), and, under current Legal Requirements, the Mortgage is enforceable against Borrower in accordance with its terms by Lender (or any subsequent holder thereof).

6.1.26   **Single Purpose Entity/Separateness**.  Until the Loan has been paid in full, Borrower hereby represents, warrants and covenants that each of Borrower and Borrower Holdco is, shall be, and shall continue to be, a Single Purpose Entity, provided that Greystone Holdco does not have (and shall not be required to have) any Independent Directors or Independent Managers and Greystone Holdco has (and shall be permitted to have) Greystone Hospitality, LLC, a Florida limited liability company, BBM3 LLC, a Delaware limited liability company and BBM3 II LLC, a Delaware limited liability company, as it members.

6.1.27   **Management Agreement**.  The Management Agreement is in force or effect with respect to the Property and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  Neither the execution and delivery of the Loan Documents nor Borrower's performance thereunder will adversely affect Borrower's rights under the Management Agreement.

6.1.28   **Illegal Activity**.   No portion of the Property has been or will be purchased with proceeds of any illegal activity.

6.1.29   **Development Agreement**.  The Development Agreement is in force or effect with respect to the Property and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  Neither the execution and delivery of the Loan Documents nor Borrower's performance thereunder will adversely affect Borrower's rights under the Development Agreement.

6.1.30   **Tax Filings**.  Borrower has filed (or has obtained effective extensions for filing) all federal and all material state and local Tax returns required to be filed by Borrower and has paid or made adequate provision for the payment of all federal and material state and local Taxes, charges and assessments payable by Borrower, other than Taxes contested in good faith through appropriate means.

6.1.31   **Solvency/Fraudulent Conveyance**.  Borrower (a) has not entered into the transaction contemplated by this Agreement or any Loan Document with the intent to hinder, delay, or defraud any creditor, and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  After Completion of construction of the Project and giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and the maximum amount of its contingent liabilities on its Debts as such Debts become absolute and matured.  Borrower's assets do not and, immediately following the making of the Loan will not, constitute an

WEIL:\96218278\17\63946.0005

insufficient amount of capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

6.1.32 **Investment Company Act**. Borrower is not (a) an investment company or a company Controlled by an investment company, within the meaning of the Investment Company Act of 1940, as amended; (b) a holding company or a subsidiary company of a holding company or an affiliate of either a holding company or a subsidiary company within the mean of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

6.1.33 **Labor**. No organized work stoppage or labor strike is pending or, to Borrower's Knowledge, threatened in writing by employees and other laborers at the Property. Borrower (a) is not involved in and has not been threatened in writing with any labor dispute, grievance or litigation relating to labor matters involving any employees and other laborers at the Property, including, without limitation, violation of any federal, state or local labor, safety or employment laws (domestic or foreign) and/or charges of unfair labor practices or discrimination complaints; (b) has not engaged in any unfair labor practices within the meaning of the National Labor Relations Act or the Railway Labor Act; or (c) is not a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and other laborers at the Property and no such agreement or contract is currently being negotiated by Borrower or any of its Affiliates with respect to the Property.

6.1.34 **Brokers**. No financial advisors, brokers, underwriters, placement agents, agents or finders have been dealt with by Borrower in connection with the Loan, except for Broker.

6.1.35 **No Other Debt**. Borrower has not borrowed or received debt financing that has not been heretofore repaid in full, other than the Permitted Debt.

6.1.36 **Taxpayer Identification Number**. Fee Borrower's Federal taxpayer identification number is 46-4317649. Leasehold Borrower's Federal taxpayer identification number is 81-3370077.

6.1.37 **Principal Place of Business**. Borrower's principal place of business and chief executive office is 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139.

6.1.38 **Compliance with Anti-Terrorism, Embargo and Anti-Money Laundering Laws**. Borrower hereby represents, warrants, covenants and agrees as follows:

(a) Borrower, Guarantor, any Affiliate of the foregoing and any Person who Controls any of the foregoing (i) are and have been in compliance with all Anti-Corruption Laws; and (ii) have not promised to make, will not promise to make, and will not cause to be made, in connection with this Agreement, any payments (a) to or for the use or benefit of any Government Official, (b) to any other Person either for an advance or reimbursement, if it knows

or has reason to know that any part of such payment will be directly or indirectly given or paid by such other Person, or will reimburse such other Person for payments previously made, to any Government Official, or (c) to any other Person, to obtain or keep business or to secure some other improper advantage, the payment of which would violate applicable Anti-Corruption Laws;

(b)     Borrower, Guarantor, any Affiliate of the foregoing and any Person who Controls any of the foregoing have effective controls that are sufficient to provide reasonable assurances that violations of applicable Anti-Corruption Laws and Global Trade Laws will be prevented, detected, and deterred;

(c)     Borrower and Guarantor will not request any Loan to be made, and Borrower and Guarantor shall not use, and shall procure that any of their respective Affiliates and any Person who Controls any of the foregoing shall not use the proceeds of any Loan: (i) in furtherance of any offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws; or (ii) directly or indirectly for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Prohibited Person, or in any Sanctioned Country, to the extent such activities, business or transaction would be prohibited by sanctions if conducted by a Person in the United States or in a E.U. member state;

(d)     Borrower, Guarantor, any Affiliate of the foregoing and any Person who Controls any of the foregoing (i) are and have been in compliance with all Global Trade Laws, and (ii) are not, and have not, directly or indirectly, engaged in any business with, or used, directly or indirectly, any corporate funds to contribute to or finance, the activities of any Prohibited Person or activities in any Sanctioned Country;

(e)     none of Borrower, Guarantor, any Affiliate of the foregoing, any Person who Controls any of the foregoing currently, or to Borrower's Knowledge, Manager, is identified on the OFAC List or otherwise qualifies as a Prohibited Person, and Borrower has implemented procedures to ensure that no Person who now or hereafter owns any equity interest in Borrower is a Prohibited Person or Controlled by a Prohibited Person;

(f)     none of Borrower, Guarantor, any Affiliate of the foregoing or any Person who Controls any of the foregoing is in violation of any Legal Requirements relating to Money Laundering Laws or anti-terrorism, including, without limitation, Legal Requirements related to transacting business with Prohibited Persons or the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107 56, and the related regulations issued thereunder, including temporary regulations, all as amended from time to time; and

(g)     if Borrower enters into any Lease at the Property in accordance with the terms of this Agreement, Borrower (or Manager on Borrower's behalf) will implement reasonable procedures to ensure that no Tenant at the Property is a Prohibited Person or owned or Controlled by a Prohibited Person.

6.1.39   **Interest Rate Cap Agreement**.  The Interest Rate Cap Agreement is in full force and effect and enforceable against Borrower in accordance with its terms, subject to

applicable bankruptcy, insolvency or similar laws generally affecting the enforcement of creditors' rights and subject as to enforceability to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law.

6.1.40   **Marketing Agreement**.  As of the Closing Date, there is no Marketing Agreement in force or effect with respect to the Property.  Any Marketing Agreement will be subject to the reasonable prior approval of Lender in accordance with Section 7.5.

6.1.41   **Ground Lease**.

(a)   Recording; Modification.  The Ground Lease (or a memorandum thereof) has been duly recorded in the Register's Office.  The Ground Lease permits the interest of Leasehold Borrower to be encumbered by a mortgage and Ground Lessor has delivered the Ground Lessor Estoppel.  All amendments or modifications to the Ground Lease are identified on **Schedule X**, and there are no other amendments, modifications or understandings (oral or written) in respect thereof.  Borrower has delivered to Lender a true, accurate and complete copy of the Ground Lease.

(b)   No Liens.  Except for the Permitted Debt and Permitted Encumbrances, Leasehold Borrower's interest in the Ground Lease is not subject to any Liens or encumbrances superior to, of equal priority with, or subordinate to the Mortgage, other than the Ground Lessor's related fee interest.

(c)   Ground Lease Assignable.  Leasehold Borrower's interest in the Ground Lease is collaterally assignable to Lender pursuant to, and in accordance with Section 11.1 of the Ground Lease, and Leasehold Borrower may assign to Lender pursuant to, and in accordance with, Section 11.2.5 of the Ground Lease.  The Ground Lease is further assignable by Lender without the consent of Ground Lessor as provided in Section 11.2.5 of the Ground Lease.

(d)   Default.  The Ground Lease is in full force and effect and no default of any material obligation on the part of Leasehold Borrower exists and, to Leasehold Borrower's Knowledge, (i) no default on the part of Ground Lessor exists and (ii) there is no existing condition which, but for the passage of time or the giving of notice, would be reasonably likely to result in a default of a material obligation under the terms of the Ground Lease.  Neither Leasehold Borrower nor Ground Lessor has commenced any action or given or received any written notice for the purpose of terminating the Ground Lease.

(e)   Notice.  The Ground Lease (i) requires the Ground Lessor to give notice of any default by Leasehold Borrower to Lender provided that Lender complies with the terms of Section 11.2.1 of the Ground Lease and (ii) provides that any surrender, cancellation, amendment or modification of the Ground Lease made without obtaining Lender's prior written consent shall not be binding on Lender, subject to the terms of Sections 11.2.3 and 11.2.6 of the Ground Lease.

(f)   Cure.  As provided in the Ground Lease, Lender is permitted the opportunity (including, where necessary, time to gain possession of the interest of Leasehold Borrower under the Ground Lease ) to cure any default under the Ground Lease, which is curable after the receipt of notice of any default before Ground Lessor may terminate the Ground Lease,

subject to the terms of Sections 11.2.1, 11.2.2 and 11.2.3 of the Ground Lease and provided Lender complies with all of the terms, conditions, and requirements set forth therein.

(g)     Term.  The Ground Lease terminates on December 31, 2035, subject to any early termination or extension rights contained therein.

(h)     New Lease.  The Ground Lease requires Ground Lessor to enter into a new lease with Lender upon a termination of the Ground Lease as a result of Leasehold Borrower's default under the Ground Lease, or if Leasehold Borrower as debtor in possession, or any trustee for Leasehold Borrower's bankruptcy estate in any bankruptcy proceedings, shall reject the Ground Lease, subject to the terms of Section 11.2.4 of the Ground Lease and provided Lender complies with all of the terms, conditions, and requirements set forth therein.

(i)     Insurance Proceeds.  Under the terms of the Ground Lease, Leasehold Borrower shall retain the right to receive all insurance proceeds relating to a casualty under insurance policies carried by Leasehold Borrower.

(j)     Subleasing.  Subleasing is permitted under the Ground Lease subject to the terms and conditions set forth in Article 10 thereof.

(k)     Ground Rent.  No Ground Rent is or will be due and payable to Ground Lessor until January 1, 2018.

6.1.42   **Master Lease**.

(a)     Recording; Modification.  The Master Lease (or a memorandum thereof) has been duly recorded in the Register's Office.  The Master Lease permits the interest of Leasehold Borrower to be encumbered by a mortgage and Master Tenant has delivered the Master Lease SNDA.  All amendments or modifications to the Master Lease are identified on **Schedule XIV**, and there are no other amendments, modifications or understandings (oral or written) in respect thereof.  Borrower has delivered to Lender a true, accurate and complete copy of the Master Lease.

(b)     No Liens.  Except for the Permitted Debt and Permitted Encumbrances, Leasehold Borrower's interest in the Master Lease is not subject to any Liens or encumbrances superior to, of equal priority with, or subordinate to the Mortgage, other than the Ground Lessor's related fee interest.  To Borrower's Knowledge, there is no mortgage or Lien encumbering Master Tenant's leasehold interest.

(c)     Master Lease Assignable.  Leasehold Borrower's interest in the Master Lease is assignable to Lender in accordance with the Master Lease.  The Master Lease is further assignable by Lender without the consent of Master Tenant.

(d)     Default.  The Master Lease is in full force and effect and no default of any material obligation on the part of Leasehold Borrower exists and, to Leasehold Borrower's Knowledge, (i) no default on the part of Master Tenant exists and (ii) there is no existing condition which, but for the passage of time or the giving of notice, would be reasonably likely to result in a default of a material obligation (i.e., a default that may no longer be cured) under

WEIL:\96218278\17\63946.0005

the terms of the Master Lease.  Neither Leasehold Borrower nor Master Tenant has commenced any action or given or received any written notice for the purpose of terminating the Master Lease.

(e)     Notice.  The Master Lease or the Master Lease SNDA (i) requires the Master Tenant to give notice of any default by Leasehold Borrower to Lender and (ii) provides that any surrender, cancellation, amendment or modification of the Master Lease made without obtaining Lender's prior written consent shall not be binding on Lender.

(f)     Cure.  As provided in the Master Lease or Master Lease SNDA, Lender is permitted the opportunity (including, where necessary, time to gain possession of the interest of Leasehold Borrower under the Master Lease) to cure any default under the Master Lease, which is curable after the receipt of notice of any default before Master Tenant may terminate the Master Lease.

(g)     Term.  The Master Lease terminates in accordance with the terms of the Master Lease, including any early termination or extension rights contained therein.

(h)     Insurance Proceeds.  Under the terms of the Master Lease, the Master Lease SNDA and the Loan Documents, insurance and condemnation proceeds with be applied to the repair or restoration of all or part of the Property subject to the Master Lease, with Lender having the right to hold and disburse the proceeds as the repair or restoration progresses in the Master Lease.

(i)     Rent.  No rent is or will be due and payable to Leasehold Borrower until the commencement date of the Master Lease as provided in the Master Lease. Rent under the Master Lease is comprised of base rent and supplemental rent as provided in the Master Lease.

6.1.43     **Option Agreement**.  All assignments, amendments or modifications to the Option Agreement are identified on **Schedule XI**, and there are no other assignments, amendments, modifications or understandings (oral or written) in respect thereof.  Borrower has delivered to Lender a true, accurate and complete copy of the Option Agreement.  Option Holder's interest in the Option Agreement is assignable to Lender.  The Option Agreement is further assignable by Lender without the consent of DST or any other party to the Option Agreement.  Lender may exercise the Option in accordance with the terms of this Agreement or as set forth in the Assignment of Option Agreement and no other Person has the ability to exercise the Option or otherwise acquire the interest in the Ground Lease other than Option Holder.  The Option Agreement is in full force and effect and no default of any material obligation on the part of Option Holder exists and, to Leasehold Borrower's Knowledge, (i) no default on the part of any other party thereto exists and (ii) there is no existing condition which, but for the passage of time or the giving of notice, would be reasonably likely to result in a default of a material obligation (i.e., a default that may no longer be cured) under the terms of the Option Agreement.  No party to the Option Agreement has commenced any action or given or received any written notice for the purpose of terminating the Option Agreement.

6.1.44     **CDE, Octagon and EB-5**.

103

(a)	There are no CDE Loan Documents, EB-5 Loan Documents or Octagon Loan Documents other than those set forth on the attached **Schedule XV**, **Schedule XVI** and **Schedule XVI**, respectively.  Borrower has or has caused to be delivered to Lender true, complete and correct copies of all CDE Loan Documents, EB-5 Loan Documents and Octagon Loan Documents and none of the CDE Loan Documents, EB-5 Loan Documents and Octagon Loan Documents have been amended or modified as of the date hereof, except as set forth on **Schedule XV**, **Schedule XVI** and **Schedule XVI**, respectively. The CDE Loan Documents, the EB-5 Loan Documents and the Octagon Loan Documents are in full force and effect and there are no monetary or other material defaults by Borrower or any Affiliate of Borrower (including Master Tenant) or to Borrower's Knowledge any other party under such documents.  There is no existing condition which, but for the passage of time or the giving of notice, would be reasonably likely to result in a default of a material obligation (i.e., a default that may no longer be cured) under the terms of the CDE Loan Documents, the EB-5 Loan Documents or the Octagon Loan Documents. The CDE Loan, the Octagon Loan and the EB-5 Loan shall in no way delay, hinder, impede, subordinate or otherwise affect the repayment of the Loan by Borrower.

(b)	The outstanding principal balance of the EB-5 Loan is $500,000.  There is no ability to make any further advances in connection with the CDE Loan, the Octagon Loan or the EB-5 Loan.

(c)	**Master Tenant JV Agreement**.  All amendments or modifications to the Master Tenant JV Agreement are identified on **Schedule XVIII**, and there are no other amendments, modifications or understandings (oral or written) in respect thereof.  Borrower has delivered to Lender a true, accurate and complete copy of the Master Tenant JV Agreement. The Master Tenant JV Agreement is in full force and effect and there are no monetary or other material defaults by any Affiliate of Borrower or to Borrower's Knowledge any other party under the Master Tenant JV Agreement.  There is no existing condition which, but for the passage of time or the giving of notice, would be reasonably likely to result in a default of a material obligation (i.e., a default that may no longer be cured) under the terms of the Master Tenant JV Agreement.  No party to the Master Tenant JV Agreement has commenced any action or given or received any written notice for the purpose of terminating the Master Tenant JV Agreement.  All of the representations and warranties made by Greystone Managing Member in the Master Tenant JV Agreement are true and correct as of the date hereof and are deemed remade and restated herein by Borrower. As of the Effective Date, Branden Muhl and James Vosotas own 100% of the issued and outstanding limited liability company interests in and Control Greystone Managing Member.

6.2	**Construction and Project Representations**.

6.2.1	**Construction Documents**.

(a)	Borrower has all necessary power and authority to enter into and perform its respective obligations under the Construction Documents to which Borrower is a party, and all other agreements and instruments to be executed by Borrower in connection with the construction and the development of the Project.

(b)     The Existing Construction Documents to which Borrower is a party have been, and the Future Construction Documents to which Borrower will be a party will be, duly executed and delivered by Borrower.

(c)     The Existing Construction Documents to which Borrower is a party constitute, and the Future Construction Documents to which Borrower is a party, when executed and delivered, each will constitute a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

6.2.2     **No Violation**.   The construction of the Project and the execution, delivery and performance by Borrower of its obligations under, and the consummation of the transactions contemplated by, each of the Construction Documents to which Borrower is, or will be, a party, and all other agreements and instruments to be executed by Borrower in connection therewith do not and will not (a) violate any Legal Requirement applicable to Borrower, (b) result in a breach of any of the terms, conditions or provisions of, or constitute a default under the organizational documents of Borrower, or any mortgage, indenture, agreement, permit, franchise, license, note or instrument to which Borrower is a party or by which it or any of its properties is bound which would result in a Material Adverse Change, or (c) result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Borrower (except as contemplated by this Agreement and by the other Loan Documents and the Permitted Encumbrances).

6.2.3     **Litigation and Proceedings**.   Except as set forth on **Schedule V** attached hereto, there are no actions, suits or proceedings at law or in equity or before or instituted by any Governmental Authority pending or, to Borrower's Knowledge, threatened in writing against or affecting Borrower or the Property, or any part thereof which affect or may reasonably be expected to affect the validity or enforceability of any of the Construction Documents or which may reasonably be expected to have a material adverse effect on the parties ability to consummate the transactions contemplated thereby.

6.2.4     **Consents**.   All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, or other actions in respect of or by, any Governmental Authorities that are required in connection with the execution, delivery and performance by Borrower of the Construction Documents and all other agreements and instruments to be executed by Borrower in connection therewith and the construction and operation of the Project have been obtained or will be obtained when required for the then applicable stage of construction of the Project and are or will be in full force and effect.

6.2.5     **Plans and Specifications**.   The Plans and Specifications have been approved or shall be approved, to the extent required by applicable Legal Requirements, by all Governmental Authorities.   The anticipated use of the Project complies with all restrictive covenants affecting the Property and all Legal Requirements, including, without limitation, all applicable zoning ordinances and regulations and Environmental Laws.

6.2.6   **Availability of Utilities and Access**.  All utility services and facilities necessary for the construction of the Project and, upon completion of construction, the operation, use and occupancy of the Project for its intended purposes are or will be available at the boundaries of the Land, including, without limitation, water supply, storm and sanitary sewer facilities, gas and electric and telephone facilities and means of access between the Land and public ways.

6.2.7   **No Liens**.  Except for the Existing Trade Contracts and the Permitted Encumbrances, as of the date hereof, Borrower has not made, assumed or been assigned any contract or arrangement of any kind, the performance of which by the other party thereto would give rise to a Lien against all or any portion of the Property.

6.2.8   **Compliance with Building Codes and Zoning Laws**.  Except as otherwise expressly provided in the zoning opinion letter provided by Bercow Radell & Fernandez, PLLC dated as of the date hereof (the "**Zoning Memo**"), the current land use, zoning law, regulations and declarations covering the Property permit on an as-of-right basis, the construction of the Project to be completed substantially in accordance with the Plans and Specifications, the current zoning law and declarations covering the Property permit the Project to be operated and used as contemplated by this Agreement and the other Loan Documents, and no additional variance, conditional use permit, special use permit or other similar approval is required for such construction, use and occupancy of the Project that has not been or will not, if and when required, be obtained.  The Property currently and, upon completion of construction of the Project substantially in accordance with the Plans and Specifications, the use thereof will be in all material respects in compliance with all Construction Permits then required and Operating Permits then required, as applicable, and all other Legal Requirements, and such compliance is not dependent on any land, improvements or facilities that are not a part of the Property.  There are no pending, or to Borrower's Knowledge, threatened actions, suits or proceedings to revoke, attach, invalidate, rescind or modify the zoning applicable to the Property or any part thereof or any of the Construction Permits, as currently existing.

6.2.9   **Certain Agreements**.  The Existing Trade Contracts and the other Existing Construction Documents heretofore executed by, or assigned to and assumed by, Borrower are in full force and effect, have not been amended, modified, terminated, assigned or otherwise changed, or the provisions thereof waived, except as permitted hereunder.

6.2.10   **Budget**.  The Budget accurately reflects all anticipated Costs to achieve Completion of the Project based upon current information and reasonable estimates in accordance with construction industry practices.

6.2.11   **Intentionally Omitted**.

6.3   **Survival of Representations**.  Borrower agrees that all of the representations and warranties of Borrower set forth in Section 6.1 and Section 6.2 and elsewhere in this Agreement and in the other Loan Documents shall be deemed given and made as of the date hereof and, unless Borrower specifically notifies Lender in writing of any material change therein prior to the funding of each Loan Advance (or any portion thereof) (or, if specifically made as of a prior date, continue

106

to be true and correct as of such prior date), subject only to changes resulting from any changed facts or circumstances, provided that such changed facts or circumstances do not constitute an Event of Default or were otherwise approved in writing by Lender), shall constitute an affirmation that the same remain true and correct in all material respects on the Advance Date (or, if specifically made as of a prior date, continue to be true and correct as of such prior date), subject only to changes resulting from any changed facts or circumstances, provided that such changed facts or circumstances do not constitute an Event of Default or were otherwise approved in writing by Lender), and shall survive for so long as any amount remains owing by Borrower to Lender under this Agreement or any of the other Loan Documents.  All representations and warranties made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

VII     **BORROWER COVENANTS**

7.1     **Affirmative Covenants**.  From the Closing Date and until payment and performance in full of all of Borrower's obligations under the Loan Documents, Borrower hereby covenants and agrees with Lender as follows:

7.1.1     **Performance by Borrower**.  Borrower shall in a timely manner observe, perform and fulfill in all material respects each and every covenant, term and provision of each Loan Document executed and delivered by Borrower in accordance with the applicable terms thereof.

7.1.2     **Existence; Compliance with Legal Requirements**.  Subject to Borrower's right of contest pursuant to Section 9.3, Borrower shall at all times comply and cause the Property to be in compliance in all material respects with all Legal Requirements applicable to Borrower and the Property and the uses permitted upon the Property.  Borrower shall do or cause to be done all things reasonable and necessary to preserve, renew and keep in full force and effect its existence, and all rights, Licenses, permits and franchises to the extent necessary to comply in all material respects with all Legal Requirements applicable to it and the Property.  Borrower shall not commit, and shall not knowingly permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, knowingly permit or suffer to exist any act or omission affording such right of forfeiture.

7.1.3     **Litigation**.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower which if adversely determined against Borrower would reasonably be expected to have a material adverse effect with respect to Borrower, the Project or the Property.

7.1.4     **Single Purpose Entity**.  Each of Borrower and Borrower Holdco has been, since the date of its formation a special purpose bankruptcy remote entity, and shall at all

times remain a Single Purpose Entity.  Borrower shall not remove or replace any Independent Director or Independent Manager except for Cause, and in any event not without providing at least five (5) Business Days' advance written notice thereof to Lender (and if a Securitization has occurred, the applicable Rating Agencies) (unless such removal or replacement occurs as a result of the death or incapacity of such Independent Director or Independent Manager, in which case Borrower shall provide written notice of the removal and replacement of such Independent Director or Independent Manager promptly following such removal and replacement).

       7.1.5    **Intentionally Omitted**.

       7.1.6    **Access to Property**.  Borrower shall permit agents, representatives and employees of Lender and Construction Consultant to inspect the Property or any part thereof during normal business hours on Business Days upon reasonable advance notice, subject to the rights of Tenants and/or hotel guests (if any) and provided that such inspections do not unreasonably interfere with the construction of the Project or the operation of the Property and such agents, representatives and employees of Lender and Construction Manager comply with all safety and other reasonable rules and requirements instituted by Borrower or Construction Manager with respect to the Project and the Property or the then existing tenants at the Property.

       7.1.7    **Notices of Default**.  In addition to all other notices required to be given by Borrower hereunder, Borrower shall give notice to Lender promptly upon Borrower obtaining actual knowledge of (a) any event or condition that has had or is reasonably likely to have a material adverse effect on Borrower, the Project or the Property, (b) the occurrence of any Event of Default, or (c) any written notice of default given or received under the Option Agreement, the Ground Lease, the Master Lease, the CDE Loan Documents, the Octagon Loan Documents or the EB-5 Loan Documents.  Borrower shall promptly provide Lender with a true and complete copy of any notice of default given or received under the Option Agreement, the Ground Lease, the Master Lease, the CDE Loan Documents, the Octagon Loan Documents or the EB-5 Loan Documents. Lender may conclusively rely upon any notice received from any other party to the Option Agreement, the Ground Lease, the Master Lease, the CDE Loan Documents, the Octagon Loan Documents or the EB-5 Loan Documents with respect to the occurrence, continuance or termination of any default under the Option Agreement, the Ground Lease, the Master Lease, the CDE Loan Documents, the Octagon Loan Documents or the EB-5 Loan Document.  Lender shall be under no duty to inquire or investigate the validity, accuracy or content of any such notice. In connection with the exercise of its rights set forth in the Loan Documents, Lender shall have the right at any time to discuss the Property, the Option Agreement, the Ground Lease, the Master Lease, the CDE Loan Documents, the EB-5 Loan Documents or the Octagon Loan Documents directly with the other parties thereto, as applicable, without notice to or permission from Borrower, Master Tenant or any other Borrower Party, nor shall Lender have any obligation to disclose such discussions or the contents thereof to Borrower, Master Tenant or any other Borrower Party, provided that, other than with respect to communications that pertain to the Octagon Standstill, the EB-5 Standstill, the Master Lease SNDA or the Ground Lease Estoppel, as applicable, and provided no Event of Default has occurred, Lender shall use reasonable efforts to provide Borrower with reasonable notice of and the opportunity to participate in any such discussions and provided further that Lender shall have no liability in connection with any failure to do so.

7.1.8    **Cooperate in Legal Proceedings**.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may affect the rights of Lender hereunder or under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings which could reasonably be expected to have a Material Adverse Change.

7.1.9    **Perform Loan Obligations**.  Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses (including, without limitation, all reasonable legal fees and disbursements) to the extent required, under and in accordance with the Loan Documents executed and delivered by, or applicable to, Borrower.

7.1.10    **Insurance**.

(a)    Borrower shall reasonably cooperate with Lender in obtaining for Lender the benefits of any Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any actual out-of-pocket expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements) out of such Proceeds.

(b)    Borrower shall comply in all material respects with all Insurance Requirements and shall not bring or keep or permit to be brought or kept any article upon any of the Property or cause or permit any condition to exist thereon which would be prohibited by any Insurance Requirement, or would invalidate insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to Section 8.1.

7.1.11    **Further Assurances; Substitute Notes**.

(a)    Borrower shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all documents, and take all actions, reasonably required by Lender from time to time to confirm the rights created or now or hereafter intended to be created under this Agreement and the other Loan Documents and any security interest created or purported to be created thereunder, to protect and further the validity, priority and enforceability of this Agreement and the other Loan Documents, to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents, or otherwise carry out the purposes of the Loan Documents and the transactions contemplated thereunder, provided same does not increase the obligations or decrease the rights of Borrower under the Loan Documents.  Borrower agrees that it shall, promptly after written notice from Lender, and at Lender's sole cost and expense, reasonably cooperate with Lender in connection with any request by Lender to sever the Note into two (2) or more separate substitute notes in an aggregate principal amount up to the Loan Amount and to reapportion the Loan among such separate substitute notes, and Borrower hereby agrees to execute and deliver to Lender, promptly after written demand therefor from Lender, new substitute notes substantially in the same form as the existing Note to replace the Note and amendments to or replacements of existing Loan Documents substantially in the same form as such existing Loan Documents to reflect such severance (including, without limitation, if required by Lender, an amendment to the Mortgage to cause same to be two (2) or more separate substitute Mortgages in the aggregate principal amount of up to the Loan Amount and to

109

reapportion the lien of the Mortgage among such separate substitute Mortgages, *pari passu* or otherwise), provided same shall not increase the obligations or decrease the rights of Borrower under the Loan, all in accordance with Section 16.4 (as applicable).  Upon receipt of such substitute notes, Lender shall mark the replaced Note with a legend indicating they have been substituted and replaced by such substitute notes and, upon release of the Lien of the applicable Mortgage or Mortgages, shall return (or cause Lender to return, as applicable) the same to Borrower or assign to a *bona fide* lender providing a refinancing in full of the Loan to Borrower such notes and Mortgages as more particularly set forth in this Agreement.  Borrower hereby further agrees, promptly after written demand therefor from Lender, to cause Opinions of Counsel with respect to such substitute notes, Mortgages, amendments and/or replacements to be delivered to Lender, and Lender shall be responsible for all reasonable out-of-pocket fees and expenses incurred in connection therewith.   Any such substitute notes may have varying principal amounts, maturity dates and economic terms; provided, however, that (i) the maturity date of any such substitute note shall be the same as the scheduled Maturity Date of the Note immediately prior to the issuance of such substitute notes, (ii) there shall be no other changes in the economic terms of the Loan in a manner which is adverse to Borrower, (iii) such substitute notes shall not increase Borrower's obligations or decrease its rights under the Loan Documents other than to a de minimis extent, (iv) the total principal amount of the Loan (including any separate notes) contained in such substituted notes shall equal the total principal amount of the Loan immediately prior to the execution of the substituted notes, (v) the weighted average interest rate of the Loan (as set forth in the substituted notes), shall, in the aggregate, equal the Interest Rate and (vi) the aggregate debt service payments on the Loan shall equal the aggregate debt service payments which would have been payable under the Loan had the severing not occurred.

> (b)  In addition, Borrower shall, at Borrower's sole cost and expense:

>> (i)  execute and deliver, from time to time, such further instruments (including, without limitation, any financing statements under the UCC) as may be reasonably requested by Lender to confirm the lien of the Mortgages on Borrower's interest in any Equipment, FF&E, Personal Property or Intangibles;

>> (ii)  execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts reasonably necessary to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, in each case as Lender may reasonably require; and

>> (iii)  do and execute all and such further lawful and reasonable acts, conveyances and assurances for the carrying out of the terms and conditions of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time, provided same shall not increase the obligations or decrease the rights of Borrower under the Loan other than to a de minimis extent.

> (c)  If the Note is mutilated, destroyed, lost or stolen, upon Lender's furnishing to Borrower a lost note affidavit to such effect reasonably satisfactory to Borrower, Borrower shall deliver to Lender, in replacement therefor, a new promissory note containing the same

terms and conditions as the mutilated, destroyed, lost or stolen Note with a notation thereon (i) of the unpaid principal and accrued and unpaid interest, and (ii) stating that such promissory note is a duplicate original of the mutilated, destroyed, lost or stolen Note, intended to replace the mutilated, destroyed, lost or stolen Note.

7.1.12  **Mortgage Taxes**.  Without duplication, Borrower shall pay all Taxes (including documentary stamp Taxes and intangible Taxes), if any, payments in lieu of Taxes, if any, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Liens created or secured by the Loan Documents as the same shall become due and payable, other Excluded Taxes imposed on any Lender.

7.1.13  **Business and Operations**.

(a)    Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership, development, construction, maintenance, management, sale and operation of the Property and the Project.

(b)    Borrower shall: (i) perform and/or observe (and/or cause Master Tenant to perform and/or observe), in all material respects, all of the covenants and agreements required to be performed and observed by Borrower and/or Master Tenant under the Management Agreement and do all things reasonably necessary to preserve and to keep unimpaired Borrower's and Master Tenant's material rights thereunder; (ii) notify Lender (and/or cause Master Tenant to notify Lender) of any "event of default" or material default by any party under any Management Agreement of which it (or Master Tenant) is aware; (iii) promptly deliver to Lender a copy of each financial statement, capital expenditures plan, property improvement plan and any other notice, report and estimate received by Borrower or Master Tenant under each Management Agreement; and (iv) enforce (or cause Master Tenant to enforce) the performance and observance of all of the covenants and agreements required to be performed and/or observed by the Manager under the Management Agreement in a commercially reasonable manner.

(c)    Borrower shall: (i) perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Marketing Agreement and do all things reasonably necessary to preserve and to keep unimpaired its material rights thereunder; (ii) notify Lender of any "event of default" or material default by any party under the Marketing Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, capital expenditures plan, property improvement plan and any other notice, report and estimate received by it under the Marketing Agreement; and (iv) enforce, in its reasonable discretion, the performance and observance of all of the covenants and agreements required to be performed and/or observed by Marketing Agent under the Marketing Agreement.

(d)    Borrower shall: (i) perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Development Agreement and do all things reasonably necessary to preserve and to keep unimpaired its material rights thereunder; (ii) notify Lender of any "event of default" or material default by any party under the Development Agreement of which it is aware; (iii) promptly

111

deliver to Lender a copy of each financial statement, capital expenditures plan, property improvement plan and any other notice, report and estimate received by it under the Development Agreement; and (iv) enforce, in its reasonable discretion, the performance and observance of all of the covenants and agreements required to be performed and/or observed by Developer under the Development Agreement.

7.1.14    **Title to the Property**.  Borrower will warrant and defend (a) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances and Permitted Debt), and (b) the validity and priority of the Lien of the Mortgage and the Assignment of Leases on the Property, subject only to Liens permitted hereunder (including Permitted Encumbrances and Permitted Debt), in each case against the claims of all Persons whomsoever.  Borrower shall reimburse Lender for any actual losses, actual out-of-pocket costs, actual damages (but excluding special, consequential and punitive damages) or expenses (including reasonable attorneys' fees and court costs) incurred by Lender (and not paid by the Title Company under the Title Policy within ten (10) days after demand by Lender) if an interest in the Property, other than as permitted hereunder, is claimed by any Person other than pursuant to a Permitted Encumbrance and unless and to the extent any such claim arises or results from any act or omission by or on behalf of Lender.

7.1.15    **Costs of Enforcement**.   If (a) this Agreement or the Mortgage is foreclosed upon in whole or in part or this Agreement or any Loan Document is put into the hands of an attorney for collection, suit, action or foreclosure, (b) a foreclosure occurs with respect to any security agreement prior to or subsequent to this Agreement in which proceeding Lender is made a party, or a mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, or (c) the bankruptcy, insolvency, rehabilitation or other similar proceeding occurs with respect to Borrower or an assignment by Borrower for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all of Lender's out-of-pocket costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein.

7.1.16    **Estoppel Statement**.

(a)    Borrower shall, from time to time, upon thirty (30) days' prior written request from Lender (but not more than two (2) times in any calendar year provided there is no Event of Default), execute, acknowledge and deliver to Lender, an Officer's Certificate, stating that this Agreement and the other Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that this Agreement and the other Loan Documents are in full force and effect as modified and setting forth such modifications), stating, to Borrower's knowledge, the principal amount outstanding under the Loan, accrued and unpaid interest thereon and containing such other information with respect to Borrower, the Property, and the Loan, as Lender shall reasonably request.  The estoppel certificate shall also state either that no Event of Default exists hereunder or, if any Event of Default shall exist hereunder, specifying such Event of Default and the steps being taken to cure such Event of Default.

(b)    After written request by Lender, Borrower shall request and use commercially reasonable efforts to obtain and deliver to Lender tenant estoppel certificates from

each Tenant leasing space at the Property (including Master Tenant) in form and substance reasonably acceptable to Lender, provided that Borrower shall not be required to request such certificates more frequently than two (2) times in any calendar year provided there is no Event of Default.

(c)   After written request by Lender, Borrower shall request and use commercially reasonable efforts to obtain and deliver to Lender estoppel certificates from each party to a Material Agreement affecting the Property, the Construction Management Agreement and the Architect Agreement in form and substance reasonably satisfactory to Lender, provided, however, that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year provided there is no Event of Default.

(d)   After written request by Lender, Borrower shall request and use commercially reasonable efforts to obtain and deliver to Lender estoppel certificates from Manager, Marketing Agent, Developer, Ground Lessor, Octagon, CDE, EB-5 Lender and Option Holder in form and substance reasonably satisfactory to Lender; provided, however, that Borrower shall not be required to deliver such certificates from each such Person more frequently than two (2) times in any calendar year provided there is no Event of Default (except in connection with a replacement of a Manager or Marketing Agent as provided herein).

7.1.17   **No Joint Assessment**.  Borrower shall not suffer, permit, consent to or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any Taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

7.1.18   **No Further Encumbrances**.  Subject to Borrower's rights to bond over and/or contest the same pursuant to the terms of this Agreement, Borrower shall do, or cause to be done, all things necessary to keep and protect the Property and all portions thereof unencumbered from any Liens, easements or agreements granting rights in or restricting the use or development of the Property, except for Permitted Encumbrances.

7.1.19   **Leases**.

(a)   Without the prior written consent of Lender, which consent may not be unreasonably withheld, conditioned or delayed, Borrower shall not (i) enter into any Lease; (ii) cancel or terminate (including, without limitation, by exercise of any landlord recapture rights) any Lease; (iii) approve any assignment of any Lease that releases the original Tenant from its obligations under such Lease; (iv) amend, modify or waive the provisions of any Lease in any material respect (including, without limitation, any amendment, modification or waiver reducing the fixed initial term of any Lease, reducing the rent payable under any Lease, changing any renewal provisions of any Lease or materially increasing the obligations of the landlord or materially decreasing the obligations of the Tenant under any Lease or pursuant to which any premises covered by such Lease is surrendered); or (v) cancel or modify any guaranty, or release any security deposit, letter of credit, or other item constituting security pertaining to any Lease. In addition to the foregoing restrictions, without the prior written consent of Lender, such

113

consent not to be unreasonably withheld, conditioned or delayed, Borrower shall not enter into any Lease for any space on the roof of the Project, the mechanical floors of the Project or the exterior of the Project.

(b)     Borrower shall promptly send Lender copies of any written notices of default received from the Tenant under any Lease, and will enforce (short of terminating a Lease, unless Lender consents thereto, which consent shall not be unreasonably withheld or unduly delayed) the performance by each Tenant of its obligations under its Lease.

(c)     Except for security deposits received from Tenants ("**Security Deposits**"), Borrower shall not collect rent more than one month in advance.  Borrower, at Lender's request, shall furnish Lender with executed copies of all Leases hereafter made (to the extent not theretofore provided to Lender).

(d)     All Leases executed after the date hereof shall provide that they are subordinate to the Mortgage and that the Tenant agrees to attorn to Lender or any purchaser at a sale by foreclosure or power of sale.

(e)     All Leases executed after the date hereof (including any renewal or expansion options) shall provide that in the event of a foreclosure under the Mortgage or any assignment-in-lieu thereof, the Lease shall not terminate or be terminable by the tenant by reason foreclosure or assignment-in-lieu of the Mortgage unless the tenant is specifically named and joined in any such action and unless a judgment is obtained therein against the tenant.

7.1.20   **Manager**.

(a)     From and after the opening and operation of the Property in accordance with this Agreement, Borrower shall provide management for the Property by a Qualified Manager pursuant to a written Management Agreement, in each case satisfying the criteria set forth herein.  Unless waived by Lender in writing, which waiver may be withheld in Lender's sole discretion, the Manager shall be a Qualified Manager.  Without Lender's prior written consent (including as to the form of the Management Agreement and the identity of Manager), which consent shall not be unreasonably withheld, conditioned or delayed, Borrower shall not (and shall cause Master Tenant not to) enter into, modify or amend any Management Agreement, or permit any change in control or identity of any Manager, or otherwise retain the services of any property management company, or surrender, terminate or cancel the Management Agreement, or pursue any remedies against Manager.  Without limitation of the foregoing, any Management Agreement (or the Assignment of Management Agreement executed and delivered by the Manager to Lender) shall provide (i) for a Management Fee that shall not exceed the prevailing amount for compensation for management of comparable properties in the market where the Property is located, (ii) that the Management Agreement shall be terminable if Lender, or any other person, takes possession of the Property or any portion thereof through foreclosure, conveyance in lieu of foreclosure or other similar transaction and (iii) that the Management Agreement shall be terminable at Borrower's (or Master Tenant's) option without penalty or premium upon the occurrence of any of the following (collectively, a "**Manager Replacement Event**"):  (A) if the Manager is an Affiliate of Borrower and an Event of Default shall occur and is continuing under the Loan Documents, (B) if a change in control of Manager occurs, (C) if

114

Manager shall become bankrupt or insolvent or if Manager files or is the subject of a petition in bankruptcy or similar proceeding or a trustee or receiver is appointed for Manager's assets or if Manager makes an assignment for the benefit of creditors, (D) if Manager breaches any of its obligations under the Management Agreement in any material respect, after the expiration of any applicable notice and cure periods contained in the Management Agreement, or (E) upon the gross negligence, fraud, malfeasance or willful misconduct of Manager.  Borrower shall cause each Manager to execute and deliver a subordination agreement reasonably satisfactory to Lender at the time of execution and delivery of any Management Agreement.  Further, if Manager is an Affiliate of Borrower, then the Management Agreement shall satisfy the requirements set forth in this Agreement applicable to transactions between Borrower and its Affiliates.  Any action or inaction of Manager within the scope of the rights and obligations of Borrower that are delegated to Manager under the Management Agreement shall be deemed attributed to Borrower for purposes of determining compliance with or default under this Agreement and the other Loan Documents. Borrower shall not agree to any assignment or subcontract of Manager's rights, duties or responsibilities under the Management Agreement to any other Person without the express written consent of Lender.

(b)     If a Manager Replacement Event has occurred and is continuing or if a circumstance occurs that would otherwise permit Borrower to terminate the Management Agreement, Borrower shall (and/or shall cause Master Tenant to), at the request of Lender, terminate the Management Agreement and replace the Manager with a Qualified Manager in accordance with this Agreement.  Lender shall have the right to approve (which approval shall not be unreasonably withheld or delayed) any new management agreement with such Qualified Manager.

(c)     Following the occurrence and during the continuance of an Event of Default, Borrower shall not (and shall cause Master Tenant not to) exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

7.1.21   **Termination Fees**.  In the event Lender has the right hereunder to terminate or cause Borrower (and cause Borrower to cause Master Tenant) to terminate any Management Agreement, the Development Agreement, the Marketing Agreement, the Construction Management Agreement or any other Construction Contract, and a termination fee or other fees or sums is required to be paid by Borrower or Master Tenant in connection therewith, Borrower shall (or shall cause Master Tenant to) pay such fees or sums when due and payable.

7.1.22   **Approval of Material Agreements**.  Borrower shall be required to obtain Lender's prior written approval of any and all Material Agreements (other than the Existing Construction Documents (but including any amendments thereto)) affecting the Property or the Project, which approval shall not be unreasonably withheld, conditioned, or delayed.  Notwithstanding anything to the contrary contained in this Section 7.1.22, provided that no Event of Default is continuing, whenever Lender's approval or consent is required pursuant to the provisions of this Section 7.1.22 for a Material Agreement, Lender's consent shall be deemed given if:

WEIL:\96218278\17\63946.0005

(a)      the first correspondence from Borrower to Lender requesting such approval or consent is in an envelope marked "Priority" and contains a bold-faced, conspicuous legend at the top of the first page thereof stating that "**FIRST NOTICE:  THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT – [PROPERTY ADDRESS]. FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) BUSINESS DAYS MAY RESULT IN THE REQUEST BEING DEEMED GRANTED**", and is accompanied by the information and documents required above, and any other information reasonably requested by Lender in writing prior to the expiration of such ten (10) Business Day period after the effectiveness of such notice in order to adequately review the same has been delivered; and

(b)      if Lender fails to respond or to deny such request for approval in writing within such ten (10) Business Day period, a second notice requesting approval is delivered to Lender from Borrower in an envelope marked "**PRIORITY**" containing a bold-faced, conspicuous legend at the top of the first page thereof stating that "**SECOND AND FINAL NOTICE:  THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT – [PROPERTY ADDRESS].  IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN FIVE (5) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GIVEN**" and Lender fails to provide a substantive response to such request for approval within such second five (5) Business Day period after the effectiveness of such notice.

7.1.23    **Liquor License**.  From and after Substantial Completion, Borrower shall obtain and maintain a liquor license, which such liquor license shall, to the extent permitted by applicable law rules and regulations, be issued in Borrower's name, an Affiliate of Borrower's name or Hotel Manager's name. Borrower will, or will cause Hotel Manager or the applicable Affiliate of Borrower to, execute such additional documents as Lender shall reasonably request, and otherwise cooperate with Lender, to make certain that any liquor licenses are effectively assigned (to the extent permitted by applicable law) for security for the Loan to Lender.

7.1.24    **Impositions and Other Charges**.  Without duplication, Borrower shall (a) timely file or cause to be timely filed all tax returns (federal, state and local) required to be filed and (b) pay or make adequate provision for the payment of, or cause to be paid or adequate provision to be made for the payment of, all Impositions, Taxes, Other Taxes and Other Charges; provided, however, prior to the occurrence and continuance of an Event of Default, Borrower's obligation to directly pay Impositions and Other Charges shall be suspended for so long as Borrower complies with the terms and provisions of Section 17.1 hereof.

7.1.25    **Master Lease**.  Borrower shall cause Master Tenant to comply with all requirements under this Agreement with respect to the Property applicable to Borrower to the same extent as if the Master Lease was not in effect. Borrower shall ensure that at all times Branden Muhl and James Vosotas own 50.1% of the issued and outstanding limited liability company interests in and Control Greystone Managing Member and that Greystone Managing Member is the managing member of Master Tenant.

116

7.2 **Construction Related Covenants**.

7.2.1 **Generally**.

(a)     Borrower shall cause the Project to be constructed on the Land (i) in a diligent, good and workmanlike manner, substantially in accordance with the Plans and Specifications approved by Lender, (ii) free and clear of Liens and claims for materials supplied or for labor or services performed in connection with the construction of the Project or otherwise, subject to Borrower's right to contest any such Liens or claims in accordance with Section 9.3 hereof, and (iii) in accordance with this Agreement so as to cause Substantial Completion in accordance with the Construction Schedule, subject only to Excusable Delay.

(b)     Intentionally Omitted.

(c)     Intentionally Omitted.

(d)     Borrower shall: (i) perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by it under the Construction Management Agreement and do all things reasonably necessary to preserve and to keep unimpaired its material rights thereunder; (ii) notify Lender of any "event of default" or material default by either party under the Construction Management Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each notice, report and estimate received by it under the Construction Management Agreement; and (iv) enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by Construction Manager under the Construction Management Agreement using sound business judgment.

(e)     Lender shall have the right to require Borrower to replace the Construction Manager with a Person that, prior to an Event of Default, is selected by Borrower and approved by Lender upon the occurrence of any one of the following events: (i) at any time following an Event of Default and/or (ii) if Construction Manager shall be in material default under the Construction Management Agreement beyond applicable notice and cure periods.

7.2.2 **Construction Schedule**.  Each month during the Construction Phase, Borrower shall deliver to Lender and Construction Consultant a copy of an updated Construction Schedule reflecting, among other things, the anticipated dates of completion of and the timing of disbursements of incremental amount of various subcategories of the Budget, all in such form and containing such details as Lender may require in its reasonable discretion. Lender's consent and approval shall be required in connection with any modification to the Construction Schedule that changes the projected date(s) of Substantial Completion or Completion of any portion of the Property.

7.2.3 **Budget Adjustments**.  No adjustments in the Budget shall be deemed to be approved without the prior written consent of Lender except to the extent expressly permitted hereunder; provided, however, Budget adjustments to reflect Change Orders approved by Lender under Section 4.6 and Section 7.2.7 shall be permitted upon Borrower's request unless otherwise specified at the time such Change Order is approved by Lender.

117

7.2.4      **Inspection of Property and Books and Records**.

(a)      Borrower agrees to permit Lender and Construction Consultant, or designated representatives of any of them, to enter upon the Property, at any reasonable times during business hours on reasonable notice, with free access to inspect or examine or, to the extent not located on the Property, to otherwise make available in Miami, Florida or on the Project Website to Lender and Construction Consultant the following:

(i)      all materials and shop drawings pertaining to the construction of the Project;

(ii)      any contracts, bills of sale, statements, receipts or vouchers pertaining to the construction of the Project;

(iii)      all work done, labor performed or materials furnished in and about the Project, including, without limitation, in connection with the construction of the Project;

(iv)      all books, contracts and records of Borrower or Construction Manager pertaining to the construction of the Project; and

(v)      any other documents which are related to the construction of the Project.

(b)      Borrower will make its representatives available at reasonable times during business hours in reasonable notice to discuss Borrower's affairs, finances and accounts relating to the construction of the Project, and Borrower will reasonably cooperate, and take all reasonable steps to cause the Construction Manager, the Architect and the Trade Contractors (including Major Trade Contractors) to cooperate with Lender and Construction Consultant, or any of their designated representatives, to enable such Person to perform its functions under this Agreement.  The Construction Consultant shall be permitted, upon request, to attend Borrower's draw meetings and shall be provided with reasonable notice of the scheduling of all such meetings.

7.2.5      **Construction      Consultant**.      Borrower acknowledges that (a) Construction Consultant has been retained by Lender to act as a consultant to review Plans and Specifications, Construction Contracts and Draw Requests and only as a consultant to Lender in connection with the construction of the Project and has no duty to Borrower; (b) Construction Consultant shall in no event or under any circumstance have any power or authority to make any decision or to give any approval or consent or to do any other act or thing which is binding upon Lender and any such purported decision, approval, consent, act or thing by Construction Consultant on behalf of Lender shall be void and of no force or effect; (c) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender, and to accept or not accept any matter or thing required to be accepted by Lender, under and in accordance with the terms of this Agreement, and without being bound or limited in any manner or under any circumstances whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not

provided, by Construction Consultant to Lender with respect thereto; (d) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender; (e) Lender reserves the right in its sole and absolute discretion to replace Construction Consultant with another construction consultant at any time and without approval by or prior (but with subsequent) notice to Borrower; and (f) Borrower shall reimburse Lender for the cost of Construction Consultant, in the amount not to exceed $10,000 per month.

7.2.6     **Changes to Plans and Specifications**.  Borrower shall make available to Lender and Construction Consultant, concurrently with each Draw Request or at such other times as Lender or Construction Consultant may request, copies of all orders, documents or revisions to Plans and Specifications reflecting Change Orders, regardless of whether the prior approval by Lender and/or Construction Consultant of any such order, document or revision or Change Order is required pursuant to the terms of this Agreement or the other Loan Documents.

7.2.7     **Change Orders**.  Borrower shall not agree to, accept, cause or suffer directly or indirectly any Change Order without Lender's prior written consent, which consent shall be in Lender's sole and absolute discretion, subject to verification and approval by Construction Consultant, provided that such consent shall not be required with respect to Minor Change Orders.  Any Minor Change Order or the approval by Lender of any Change Order shall not obligate Lender to increase the amount of the Loan.  Borrower shall submit to Lender and Construction Consultant copies of each proposed Change Order prior to entering into it, together with documentation reasonably satisfactory to Lender and Construction Consultant, setting forth all additions and subtractions theretofore made to or from the scope of the Improvements. Lender shall promptly review all Change Orders so submitted.  If any Change Order shall require the consent or approval of any third party, Borrower shall provide Lender with written evidence of such consent or approval prior to entering into the related Change Order(s).  Borrower shall submit to Lender and Construction Consultant copies of all Change Orders entered into with respect to the Improvements within fifteen (15) days after the same are entered into.  Nothing herein shall be deemed to restrict Borrower's right to (a) revise the Budget in accordance with Section 7.2.3, Section 4.6(b) or Section 4.6(c) or (b) fund Line Item increases with Equity Payments, as provided under Section 4.6(e).

7.2.8     **Correction of Work**.  Borrower will, promptly after written notice from Lender, correct any defect in the Project or the Property or any material departure made without Lender's prior written approval from the Plans and Specifications.  Borrower agrees that the making of any Advance shall not constitute a waiver of Lender's right to require compliance with this Section 7.2.8 with respect to any such defects or material departures from the Plans and Specifications.  Borrower agrees that Lender's failure to deliver such a written notice shall not constitute a waiver by Lender of any of the Debt in connection with the Loan.

7.2.9     **Required Notices**.

(a)     Without limiting any other notice requirement set forth in this Agreement, Borrower shall give notice to Lender promptly upon the occurrence of:

119

(i)      any cessation of construction of the Project for a period in excess of seven (7) consecutive calendar days, regardless of whether or not such cessation is due to an Excusable Delay;

(ii)      Borrower obtaining knowledge of any actual or threatened in writing litigation, investigation or legal proceeding (including without limitation, a motion where injunctive or similar relief is sought, but excluding minor violations which can be cured by payment of an amount not exceeding $100,000) commenced by any third party affecting Borrower, Guarantor, the Project or the Property;

(iii)      any actual litigation or action of, or any litigation or action threatened in writing by, a Governmental Authority of which Borrower has knowledge concerning the actual or alleged presence, release, threat of release, placement on or in, or the generation, transportation, storage, treatment or disposal at, the Property and/or Project of any Hazardous Material in violation of applicable Environmental Law;

(iv)      any written notice given pursuant to any Construction Document alleging that there has occurred a default by Borrower or Construction Manager in the performance of its obligations thereunder;

(v)      any condition which results in any delay, including, without limitation, any Excusable Delay, which could result in Substantial Completion occurring after the date set forth in the Construction Schedule, or in any further delay beyond any delays of which Lender has been previously notified; and

(vi)      any Event of Default or any other notice required to be given under Section 7.1.7.

(b)      Each notice pursuant to this Section 7.2.9 shall be accompanied by a statement of Borrower setting forth details of the occurrence referred to therein and stating what action Borrower proposes to take with respect thereto, in each case in such detail as Lender may reasonably require.

7.2.10      **No Encroachments**.  Borrower shall cause the Project to be constructed entirely within the perimeter of the Land and so as not to encroach upon or overhang any easement or right-of-way or any land of others, and when erected shall be wholly within any applicable building restriction lines, however established.

7.2.11      **Compliance with Construction Documents**.  Borrower shall abide by, perform and comply with all of Borrower's material obligations under the Architect Agreement, the Construction Management Agreement, the Trade Contracts, and the other Construction Documents; and Borrower, at its sole cost and expense, shall use all commercially reasonable efforts to secure or enforce the performance of each and every material obligation, covenant, condition and agreement to be performed by the other parties thereunder. Borrower agrees that the payment and performance bonds (including all riders thereto) to be delivered from time to time in accordance with Section 4.1(o) hereof (or otherwise pursuant to the terms of the Construction Management Agreement) shall be issued in the form and substance acceptable to

120

Lender in Lender's reasonable discretion.  Not later than five (5) Business Days after the issuance of any payment and performance bond in accordance with the terms of the Construction Management Agreement, Borrower shall deliver a copy of same to Lender.

       7.2.12    **Changes in Agreements**.  Except to the extent otherwise permitted herein, Borrower will not surrender, terminate, cancel, modify, amend, enter into any such agreement or any agreement in substitution for, or consent to the assignment of the Architect Agreement, the Construction Management Agreement or any Major Trade Contract, without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  If and to the extent any amendment, supplement replacement or other modification is made to any of the foregoing, upon reasonable request by Lender, Borrower shall promptly cause the Architect, Construction Manager or Major Trade Contractor, as applicable, to deliver a certificate or other written statement which confirms, on and as of the date thereof, that the Architect Consent, the  Construction Manager Consent or the Major Trade Contractor Consent, as applicable, previously delivered in connection with the Loan remains valid, true, correct and complete in all material respects as of the date so amended, supplemented, replaced or otherwise modified.  Borrower promptly will give notice to Lender of the surrender, termination, cancellation, modification, amendment, substitution or assignment of the other Construction Documents, whether or not Lender consented thereto pursuant to the immediately preceding sentence.

       7.2.13    **Trade Contracts**.  Borrower will not, without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, enter into any Major Trade Contract except the Major Trade Contracts existing on the date hereof.  Borrower certifies that, on or prior to the date hereof, Lender has been provided with a true, correct and complete copy of each Existing Trade Contract.  In connection with the foregoing consent, Borrower may from time to time deliver to Lender and Construction Consultant a list of the names of prospective Major Trade Contractors with whom the Construction Manager or Borrower may contract for the construction of the Project, which may be pre-approved by Lender.  Each Trade Contract will provide that it will be fully assignable to Borrower (or Borrower's designee), upon Borrower's election, upon the occurrence of a default by Construction Manager under the Construction Management Agreement.  Borrower will deliver to Lender an executed copy of any Trade Contract which Borrower enters into and will promptly give notice to Lender of the surrender, termination, cancellation, modification, amendment, substitution or assignment of any Trade Contract, whether or not Lender's consent to such action is required pursuant to this Section 7.2.13.  Borrower shall deliver to Lender a copy of each subcontract entered into by the Construction Manager within fifteen (15) days after Borrower receives a copy of such subcontract.

       7.2.14    **Final "As-Built" Survey**.  Within ninety (90) days after Substantial Completion has occurred, Borrower shall deliver to Lender a full and complete "as-built" Survey for the Property, dated no earlier than the Substantial Completion date, showing all Improvements constructed on the Property and certified as Lender may then require.

       7.2.15    **Cessation of Business**.  Borrower shall not for any reason (a) cease (for any period in excess of seven (7) days) the construction of the Project or, after the opening of the

Project, cease operating the Project in the normal course, unless such cessation shall have been caused by Excusable Delay, or (b) enter into or engage in any other business.

    7.2.16 **Construction Permits**. Promptly after obtaining any additional Construction Permits for the construction of the Project after the date hereof, Borrower shall deliver a copy thereof to Lender.

    7.2.17 **Certificate of Occupancy**. Borrower shall obtain temporary (or permanent) certificates of occupancy with respect to the entire Project in accordance with this Agreement and, thereafter, shall continuously maintain in full force and effect valid certificates of occupancy for the Project.

    7.2.18 **Protection Against Liens**. Subject to its right of contest set forth in Section 9.3, Borrower shall pay, discharge or bond all claims for labor, materials and services furnished in connection with construction of the Project and take all actions reasonably required to prevent the assertion of claims of Liens against the Property. Borrower irrevocably appoints, designates and authorizes Lender as its agent (such agency being coupled with an interest) with the authority (but no obligation) to file any notice relating to claims of Liens that Lender deems advisable to protect its interests under the Loan Documents. In the event that any stop notice or claim is asserted against Lender by any Person furnishing labor, services, equipment or materials to the Project, upon demand by Lender, Borrower shall take such action as Lender may reasonably require to release Lender from any obligation or liability with respect to such stop notice or claim, including (a) if the claim is being contested in accordance with Section 9.3 hereof, obtaining a bond or other security, in form, substance and amount satisfactory to Lender, or (b) payment of such claim. If Borrower fails to take such action, Lender may, in its sole discretion, file an interpleader action requiring all claimants to interplead and litigate their respective claims, and in any such action Lender shall be released and discharged from all obligations with respect to any funds deposited in court.

    7.2.19 **Lender's Review**. Observation, inspection and approvals by Lender of the Plans and Specifications, any other Construction Documents, the construction of the Project and the workmanship and materials used therein shall impose no responsibility or liability of any nature whatsoever on Lender or Construction Consultant, and no Person shall, under any circumstances, be entitled to rely upon such inspections and approvals by Lender or Construction Consultant for any reason. Approvals granted by Lender for any matters covered under this Agreement shall be narrowly construed to cover only the parties and facts identified in any such approval. Construction Consultant has been or will be retained by Lender solely as a consultant and has no authority to bind or otherwise act for or on behalf of Lender.

    7.2.20 **Submission of Evidence**. Any condition of this Agreement which requires the submission of evidence of the existence or non-existence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts and Lender shall, at all times, be free to independently establish to its reasonable satisfaction such existence or non-existence.

    7.2.21 **Contractors**. Except as provided by law, no Trade Contractors or any other Person dealing with Borrower, including, without limitation, the Architect and the

Construction Manager, shall be, nor shall any of them be deemed to be, third party beneficiaries of this Agreement, but each shall be deemed to have agreed, and each Trade Contract shall state, (a) that the Trade Contractor(s) or other Person in question shall look to Construction Manager as their sole source of recovery if not paid and (b) except as otherwise agreed to in writing between Lender and the Trade Contractor(s) or other Person in question, that they may not claim against Lender under any circumstances.  Each Trade Contract (other than the Existing Trade Contracts) shall state that the Trade Contractor waives all right to seek redress from Lender whatsoever and, except as provided by law, or as otherwise agreed in writing between Lender and the Trade Contractor or other Person in question, each such Trade Contractor or other Person shall be deemed to have waived in writing all right to seek redress from Lender under any circumstances whatsoever.

        7.2.22   **Completion of the Project**.  Borrower covenants and agrees that within sixty (60) days after Completion of the Project, it shall cause the following to occur:

        (a)     The development, construction and equipping of the Project will have been 100% Completed to the reasonable satisfaction of Lender and Construction Consultant substantially in accordance with the Plans and Specifications, including, without limitation, the Punchlist Items;

        (b)     With respect to the Punchlist Items, Borrower will have furnished Lender with final lien waivers and subordination of liens from the Contractors and the Architect, and the Construction Manager and the other Contractors shall have furnished to Borrower and Lender final lien waivers from all of such Contractor's subcontractors and material suppliers who have provided materials, labor or both with respect to the development and construction of the Improvements and/or the Project;

        (c)     Borrower shall have delivered to Lender the final "as-built" Plans and Specifications, field sketches and all of the changes, revisions and modifications thereto issued or approved by the Architect or Construction Manager;

        (d)     Borrower shall have furnished to Lender an AIA Form G704 (Certificate of Substantial Completion) from the Architect;

        (e)     Borrower shall have furnished Lender with: (i) temporary (or permanent) certificates of occupancy for the Project from the applicable Governmental Authority having jurisdiction thereof (provided that if a temporary certificate of occupancy is obtained, Borrower shall have a continuing obligation hereunder to diligently pursue the issuance of the related final certificate of occupancy thereafter and shall renew, if applicable, the temporary certificate until the permanent certificate of occupancy is obtained); (ii) a so-called "municipals search" of applicable local municipal authorities showing no violations filed against the Project or the Property (provided, however, that the Property shall be deemed "Complete" notwithstanding any such violations if such violations do not (x) prevent the issuance of a temporary or permanent certificate of occupancy for all or any portion of the Project, or (y) affect the title and safety of the Project or Persons anticipated to use the Project; and (iii) such other certificates, approvals, Licenses and permits of each Governmental Authority required (or customarily procured)

concerning the then existing development, construction, use, occupancy and operation of the Project;

(f)     Borrower shall promptly close any and all open permits at the Property, regardless of whether such open permits are in connection with the construction of the Project or previously opened;

(g)     Borrower shall have furnished to Lender a certificate from Borrower, currently dated, certifying that: (i) no notices from any Governmental Authority of any claimed violations of applicable Legal Requirements arising from the development or operation of the Project which have not been cured or are not being contested in accordance with the Loan Documents were served upon Borrower or, to Borrower's Knowledge, any contractor or subcontractor or their respective agents or representatives and (ii) Borrower is not aware of any circumstances which could give rise to the issuance of any such notice of claimed violation;

(h)     Lender shall have received a certificate from the Construction Consultant, in form and substance reasonably satisfactory to Lender, that the Project has been Completed substantially in accordance with the Plans and Specifications;

(i)     Borrower shall have furnished to Lender a Title Continuation in the full aggregate amount of the Loan and such Title Policy shall otherwise conform with the requirements of this Agreement;

(j)     Borrower shall have furnished Lender with current searches of all Uniform Commercial Code financing statements filed with the Secretary of State of Delaware, and the Register's Office, against Borrower as debtor, showing that no Uniform Commercial Code financing statements are filed or recorded against Borrower in which the collateral is described as any of the collateral given by Borrower to Lender in the Loan Documents as security for the Loan, including any fixtures, furnishings and equipment or other personal property located on the Property or used in connection with the Property, other than filings pursuant to the Loan Documents;

(k)     Subject to Borrower's right to contest pursuant to Section 9.3, Lender shall have received from Borrower (i) final unconditional Lien waivers and release/payment receipts from the Construction Manager and all Trade Contractors and subcontractors substantially in the form attached as **Exhibit C-8** evidencing that the same have been paid in full for all work performed and/or materials supplied, or (ii) final conditional Lien waivers substantially in the form attached as **Exhibit C-7** and within thirty (30) days thereafter, final unconditional Lien waivers and release/payment receipts substantially in the form attached as **Exhibit C-8** evidencing that the same have been paid in full for all work performed and/or materials supplied; and

(l)     Lender shall have received payment for any and all reasonable out-of-pocket fees payable with respect to the Loan Documents, including, but not limited to the reasonable out-of-pocket fees and expenses of the Construction Consultant relating to the Loan, and all other reasonable out-of-pocket fees, costs and expenses (including, without limitation, fees, costs and expenses of outside legal counsel) of Lender relating to the Loan to the extent

124

then due and payable (and to the extent of Lender's estimates thereof, if the amounts thereof have not been finally determined).

7.3        **Ground Lease Covenants**.

7.3.1        **General Covenants**.  Leasehold Borrower shall: (i) pay (or cause to be paid) prior to delinquency any installment of fixed rent payable under the Ground Lease; (ii) pay (or cause to be paid) additional rent or other charges payable under the Ground Lease prior to the expiration of the applicable grace period; (iii) observe and perform all other terms, covenants and conditions of the Ground Lease on the part of Leasehold Borrower, as tenant, prior to the expiration of any applicable grace period provided therein; (iv) promptly notify Lender of the giving of any written notice by Ground Lessor to Leasehold Borrower of any default by Leasehold Borrower and deliver to Lender a true copy of each such notice; (v) enforce all material obligations of Ground Lessor under the Ground Lease in a commercially reasonable manner; (vi) provide a copy of the Mortgage to Ground Lessor and provide Ground Lessor with Lender's contact information; and (vii) promptly notify Lender in writing of any material default by Ground Lessor in the performance or observance of any of the terms, covenants and conditions on the part of Ground Lessor to be performed or observed under the Ground Lease. Leasehold Borrower shall not, without the prior written consent of Lender (except to the extent expressly permitted pursuant to this Agreement): (i) terminate or cancel the Ground Lease; (ii) surrender the leasehold estate created by the Ground Lease; (iii) reserved; or (iv) cause or permit any term of the Ground Lease to be modified or supplemented without Lender's consent.

7.3.2        **Lender Rights**.

(a)        If Leasehold Borrower shall default in the performance or observance of any term, covenant or condition of the Ground Lease on the part of Leasehold Borrower and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, then, without waiving or releasing Leasehold Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sum and to take any reasonable action (including entry upon such Property) to cause such performance or observance on behalf of Leasehold Borrower, so that the rights of Leasehold Borrower under the Ground Lease are unimpaired and free from default.  Leasehold Borrower shall pay to Lender upon demand, all such sums so paid or expended by Lender, together with interest thereon from the date of notice to Leasehold Borrower of such payment at the Default Rate.  If Ground Lessor gives Lender notice of a default, such notice shall constitute full protection to Lender for any action taken or omitted by Lender in reliance thereon.  Leasehold Borrower will not subordinate or consent to the subordination of the Ground Lease to any mortgage, security deed, lease or other interest on or in Ground Lessor's interest in the Property.

(b)        No release or forbearance of any of Leasehold Borrower's obligations with respect to the Ground Lease, pursuant to the Ground Lease or otherwise, shall release Leasehold Borrower from any of its obligations under the Loan Documents, including its obligation with respect to the payment of rent as provided for in the Ground Lease and the performance of all of the terms, provisions, covenants, conditions and agreements contained in the Ground Lease to be kept, performed and complied with by Leasehold Borrower, unless such release or forbearance is evidenced in writing and a copy thereof is provided to Lender. If any

125

action or proceeding shall be instituted to evict Leasehold Borrower or to recover possession of all or any portion of the Property or for any other purpose affecting the Ground Lease or the Mortgage, Leasehold Borrower will, promptly upon service thereof, deliver to Lender a true copy of each petition, summons, complaint and of all other documents served or otherwise provided in any such action or proceeding.

7.3.3    **Rejection or Termination of the Ground Lease**.

(a)    If the Ground Lease is terminated upon the rejection thereof pursuant to the Bankruptcy Code or any comparable federal or State statute or law, then any property not removed by Leasehold Borrower as permitted or required by the Ground Lease shall, at the option of Lender, be deemed abandoned by Leasehold Borrower; provided that Lender may remove any such property required to be removed by Leasehold Borrower pursuant to the Ground Lease, and all costs of such removal shall be paid by Leasehold Borrower within five (5) days of receipt by Leasehold Borrower of an invoice therefor.

(b)    If the Ground Lease is terminated prior to the scheduled expiration of its term, and Lender or its designee acquires another lease of such Property, Leasehold Borrower shall have no right, title or interest in or to such other lease or the leasehold estate created thereby.

7.4    **Negative Covenants**.  From the Closing Date until payment in full of the Loan, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, or suffer or permit, any of the following:

(a)    Incur Debt.  Incur, create,  assume or permit any debt other than Permitted Debt;

(b)    Encumbrances.  Incur, create or assume or permit the incurrence, creation or assumption of any Debt secured by the Property or any direct or indirect interest in Borrower, except in connection with the Loan, and shall not Transfer or lease all or any portion of the Property or any interest therein or permit the Transfer of any direct or indirect interest in Borrower, except as permitted pursuant to the terms hereof;

(c)    Engage in Different Business.  Engage, directly or indirectly, in any business other than the use, ownership, management, renovation, financing, development, construction, sale, operation and maintenance of the Property and activities related thereto;

(d)    Make Advances.  Make advances (other than payments permitted under this Agreement, including to Contractors, subcontractors or other service providers) or make loans to any Person, or hold any investments, except as expressly permitted pursuant to the terms of this Agreement or any other Loan Document;

(e)    Partition.  Partition the Property;

(f)    Guarantee Obligations.  Guarantee any obligations of any Person;

126

(g)     Transfer Assets.  Transfer any material asset other than in the ordinary course of business, or Transfer or lease all or any portion of the Property or any interest therein or permit the Transfer of any direct or indirect interest in Borrower, except in each case as permitted pursuant to the terms of this Agreement or any of the other Loan Documents;

(h)     Amend Organizational Documents.  Amend or modify any organizational documents of Borrower, Borrower Holdco, Option Holder or Master Tenant without Lender's prior written consent;

(i)     Single Purpose Entity.  Fail to be a Single Purpose Entity or take or suffer any action or inaction the result of which would be to cause Borrower or Borrower Holdco to cease to be a Single Purpose Entity;

(j)     Dissolve.  Cause, permit or suffer Borrower or Borrower Holdco to, to the fullest extent permitted by law, dissolve, wind-up, terminate, liquidate, merge with or consolidate into another Person;

(k)     Bankruptcy.  (i) File a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to Borrower, (ii) dissolve, liquidate, consolidate, merge or sell all or substantially all of Borrower's assets other than in connection with the repayment of the Loan, (iii) Reserved; or (iv) solicit the filing of an involuntary bankruptcy petition against Borrower, without in each instance obtaining the prior consent of all of the members, directors and managers of Borrower, including, without limitation, the Independent Directors or Independent Managers;

(l)     ERISA.  Engage in any activity that would subject it to regulation under ERISA or qualify as an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) subject to ERISA (each, a "**Plan**") and Borrower's assets do not and will not constitute Plan assets;

(m)     Distributions.  Make any distributions to or for the benefit of any of its partners or members or its or their respective Affiliates except with respect to amounts received by Borrower pursuant to Section 5.1.6(a)(ix);

(n)     Modify Account Control Agreement or Lockbox Agreement.  Without the prior consent of Lender, execute any modification to the Account Control Agreement or the Lockbox Agreement;

(o)     Zoning Reclassification.  Without the prior written consent of Lender, (i) initiate or consent to any zoning reclassification of any portion of the Property, (ii) seek any variance under any existing zoning ordinance that is reasonably likely to result in the use of the Property becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, or (iii) allow any portion of the Property to be used in any manner that is reasonably likely to result in the use of the Property becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation;

(p)     Change of State of Formation.  Change the state in which it is formed;

WEIL:\96218278\17\63946.0005

(q)     Name Change.  Change its name or otherwise do anything which would make the information set forth in the financing statements covering any of the Property materially misleading without immediately notifying Lender of the same;

(r)     Debt Cancellation.  Cancel or otherwise forgive or release any material claim or debt owed to it by any Person, except for adequate consideration or in the ordinary course of its business or for other valid business reasons that do not affect the Loan, the Property or the financial condition of Borrower or Guarantor;

(s)     Misapplication of Funds.  Distribute any revenue from the Property or any Proceeds in violation of the provisions of this Agreement, fail to remit amounts to the Collection Account or Cash Management Account, as applicable, as required by Section 5.1, misappropriate any security deposit or portion thereof, or misapply or misappropriate the proceeds of the Loan or any Loan Advances;

(t)     Affiliate Agreements.  Without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed, (i) enter into or be a party to any agreement between Borrower and an Affiliate of Borrower (an "**Affiliate Agreement**"), except for the Management Agreement and contracts for the providing of goods and services in the ordinary course of Borrower's business and pursuant to the reasonable requirements of Borrower's business and, in each case, upon fair and reasonable terms which are fully disclosed to Lender and are no more onerous to it than it would obtain in a comparable arm's length transaction with a Person not its Affiliate, or (ii) materially modify, change, supplement, alter or amend any Affiliate Agreement, provided that all Affiliate Agreements shall be fully subordinate to the Obligations;

(u)     CDE Loan Documents, EB-5 Loan Documents and Octagon Loan Documents. Amend, modify or terminate the CDE Loan Documents, the EB-5 Loan Documents or the Octagon Loan Documents, without Lender's prior written consent.

(v)     Option Agreement.  Except as otherwise provided herein, amend, modify or terminate the Option Agreement, without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; and

(w)     Master Lease.  Without the consent of Lender, permit or cause Master Tenant to take any action under the Master Lease that would require the consent of Lender hereunder if such action were taken by Borrower if the Master Lease was not in effect. For the avoidance of doubt, Borrower shall ensure that Master Tenant does not take any action under the Master Lease without the consent of Lender if such action, had it been taken by Borrower, would require the consent of Lender hereunder.

(x)     Master Tenant Cash Management Agreements and Master Tenant and Tenant Side Letter. Amend, modify or terminate any of the Master Tenant Cash Management Agreements or the Master Tenant and Tenant Side Letter, without Lender's prior written consent.

7.5     **Marketing Agreement**.

(a)     Borrower shall not, without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed:  (i) enter into, modify, change, supplement, alter or amend the Marketing Agreement or waive or release any of its right and remedies under the Marketing Agreement or (ii) replace the Marketing Agent with other than a Qualified Marketing Agent.

(b)     Borrower shall notify Lender in writing (and shall deliver a copy of the proposed management) of any entity proposed to be designated as a Qualified Marketing Agent of the Property not less than thirty (30) days prior to the effective date of such Marketing Agreement.

(c)     It is acknowledged and agreed that a Qualified Marketing Agent may be retained at Lender's direction at any time following the occurrence and during the continuance of an Event of Default.

(d)     Upon the retention of a Qualified Marketing Agent, Lender shall have the right to approve any new Marketing Agreement with such Qualified Marketing Agent (which approval by Lender shall not be unreasonably withheld or delayed) and Lender shall receive an executed "comfort letter" from Marketing Agent, in form and substance reasonably acceptable to Lender.

7.6        **Option Agreement**.

7.6.1     Borrower shall cause Option Holder to abide by, perform and comply with all of Option Holder's material obligations under the Option Agreement; and Borrower, at its sole cost and expense, shall use all commercially reasonable efforts to secure and enforce (or to cause Option Holder to secure and enforce) the performance of each and every material obligation, covenant, condition and agreement to be performed by the other parties thereunder.

7.6.2     Borrower shall have the right, but not the obligation, to cause Option Holder to deliver the notice required in accordance with the terms of the Option Agreement to exercise the Option (the "**Option Notice**") at any time on or prior to November 1, 2018 (the "**Initial Option Notice Deadline**").  The Option Notice shall specify that closing shall occur on December 31, 2018 (the "**Initial Option Closing Date**").  In the event that Borrower causes Option Holder to deliver the Option Notice on or prior to the Initial Option Notice Deadline, Lender shall make an additional advance in the amount of $1,800,000 to Borrower as an increase in the Loan Amount to be applied to the Purchase Price (as defined in the Option Agreement) on the Initial Option Closing Date provided Borrower delivers the Option Closing Deliverables and satisfies the Advance Conditions other than those that specifically relate to construction (e.g., Sections 4.1(f), (g), (k), (l) and (o)) and except to the extent duplicative of the Option Closing Deliverables.  Lender shall have no obligation to provide any other amount in connection with the closing on the Initial Option Closing Date.   Simultaneously with the closing on the Initial Option Closing Date, Borrower, at its sole cost and expense, shall take (or cause to be taken) all steps necessary to cause Leasehold Borrower to become the fee owner of the Leasehold Land, terminate the Ground Lease and take all actions required under the Option Agreement to effectuate same and grant Lender a first priority fee mortgage Lien and security interest in the Leasehold Land.   In connection with the foregoing, on the Initial Option Closing Date, Lender

WEIL:\96218278\17\63946.0005

or its counsel shall receive (a) an executed amendment to and/or an amendment and restatement of the Mortgage to reflect Leasehold Borrower's fee simple ownership of the Leasehold Land in form reasonably satisfactory to Lender to be recorded in the Register's Office (the "**Option Mortgage**"), (b) such other amendments to and/or amendments and restatements of the Loan Documents, the Master Lease, the Master Lease SNDA and the Standstills as are reasonably necessary or required to reflect Leasehold Borrower's fee simple ownership of the Leasehold Land and the other transaction steps described herein, (c) a Title Continuation or Title Policy and such Title Continuation or Title Policy shall be in form reasonably satisfactory to Lender and otherwise conform with the requirements of this Agreement, including increasing the coverage by an amount equal to the increase in the Loan Amount, (d) an Opinion of Counsel substantially in the form of the Opinion of Counsel delivered to Lender on the Effective Date and otherwise reasonably satisfactory to Lender with respect to the documentation delivered to Lender in connection with the Option closing, and (e) such other and further approvals, opinions, documents, endorsements, reports, searches, certificates, affidavits and information as Lender or its counsel may reasonably request in form and substance reasonably satisfactory to Lender and its counsel (collectively, the "**Option Closing Deliverables**").

7.6.3   In the event Borrower does not cause Option Holder to deliver the Option Notice or to close on the Initial Option Closing Date, Lender shall have the right, but not the obligation, to cause Borrower to cause Option Holder to deliver the Option Notice and exercise the Option at any time following the Initial Option Closing Date through, and including, December 31, 2019 (the "**Lender Option Closing Deadline**").   In connection with the foregoing, Lender shall provide $7,500,000 to fund the Purchase Price (as defined in the Option Agreement) as follows: (a) Lender shall make an additional advance in the amount of $1,800,000 to Borrower as an increase in the Loan Amount and (b) Lender shall provide $5,700,000 in the form of equity in exchange for a 23.59% (based on market value) equity interest in Greystone Holdco. Lender's equity shares in Greystone Holdco shall be passive in nature and Lender shall have no voting rights other than in connection with a change of the construction plans, a sale or refinance of the property, a change in the nature of the company, the filing of a voluntary bankruptcy, any recapitalization of the company and such other voting rights and protections (including, without limitation, restrictions on amendments to the joint venture agreement without Lender's consent, anti-dilution provisions and tag along provisions in the event any Sponsor tries to sell its interest) as are customary for partners of a similar percentage in joint venture agreements.   Any amounts owed in connection with the Option closing in excess of the $7,500,000 shall be the responsibility of Borrower. Following payment in full of the Debt, Borrower shall have the ability to repurchase Lender's equity interest at any time at a 17.5% internal rate of return on equity. The foregoing terms shall be further detailed in a joint venture agreement (i.e., an amended and restated limited liability company agreement of Greystone Holdco) in form and substance reasonably satisfactory to Lender and Sponsor.   Borrower represents and warrants to Lender that none of CDE, EB-5 Lender and Octagon have any consent or other rights in connection with the Option, any debt or equity provided by Lender in connection with the Option as provided herein or any other of the transactions steps described in this Section 7.6.

7.6.4   In the event Borrower does not cause Option Holder to deliver the Option Notice or to close on the Initial Option Closing Date and Lender does not cause Borrower to cause Option Holder to deliver the Option Notice or to close on or prior to the Lender Option

Closing Deadline as provided herein, Borrower shall have the right, but not the obligation, to cause Option Holder to deliver the Option Notice at any time following the Lender Option Closing Deadline and Lender shall not be required to provide any debt or other amount in connection with such exercise of the Option.

      7.6.5     In connection with any closing under the Option Agreement pursuant to Section 7.6.3, Section 7.6.4 or Section 7.6.6, Borrower shall be required to satisfy the Advance Conditions as provided in Section 7.6.2 above and provide the Option Closing Deliverables to Lender at such closing.  Prior to any closing under the Option Agreement in connection with this Section 7.6, Borrower shall provide drafts of all documents being executed or delivered to effectuate the closing under the Option Agreement, including the Option Closing Deliverables, for Lender's review, comment and approval. In addition, Borrower shall be responsible for all costs and expenses (including Lender's reasonable attorneys' fees) in connection with this Section 7.6, including, without limitation, in connection with the exercise and closing of the Option, the termination of the Ground Lease, any transfer or assignment of the Leasehold Land or any transfer or assignment of membership interests and any amendments to the Loan Documents.

      7.6.6     Borrower shall ensure that (a) it is the purchaser pursuant to any sale or assignment of the Membership Interests (as defined in the Option Agreement) or the Real Property (as defined in the Option Agreement) that is not otherwise consummated pursuant to the provisions of this Section 7.6 (e.g., Borrower shall be the transferee pursuant to any ROFR Transfer described in the Option Agreement) and (b) in connection with Ground Lessor's right to refinance the Terra Firma Note (as defined in the Option Agreement), no mortgage or loan or interest therein shall be provided by Borrower, Guarantor or any of their Affiliates (collectively, the "**Purchasing Covenant**").

     7.7     **CDE, EB-5 and Octagon**.

      7.7.1     If any action, proposed action or other decision is consented to or approved by CDE, EB-5 Lender or Octagon, such consent or approval shall not be binding or controlling on Lender.  Further, the denial by Lender of a requested consent or approval shall not create any liability or other obligation of Lender if the denial of such consent or approval results directly or indirectly in a default under the CDE Loan Documents, the EB-5 Loan Documents or the Octagon Loan Documents, and Borrower hereby waives (and agrees to cause Master Tenant and the other Borrower Parties to waive) any claim of liability against Lender arising from any such denial.

      7.7.2     Borrower acknowledges that the Octagon Standstill and the EB-5 Standstill (the "**Standstills**") are being entered into solely for the benefit of Lender and neither Borrower nor any of its Affiliates shall be intended third-party beneficiaries of any of the provisions therein, shall have any rights thereunder or shall be entitled to rely on any of the provisions therein.  Lender, Octagon and EB-5 Lender shall have no obligation to disclose to Borrower or any of its Affiliates the contents of the Standstills.  Borrower's obligations hereunder are and will be independent of such Standstills and shall remain unmodified by the terms and provisions thereof.

WEIL:\96218278\17\63946.0005

7.8        **Master Lease Covenants**.

7.8.1        **General Covenants**.   Leasehold Borrower shall: (i) observe and perform all terms, covenants and conditions of the Master Lease on the part of Leasehold Borrower, as landlord, prior to the expiration of any applicable grace period provided therein; (ii) promptly notify Lender of the giving of any written notice by Master Tenant to Leasehold Borrower of any default by Leasehold Borrower and deliver to Lender a true copy of each such notice; (iii) enforce all material obligations of Master Tenant under the Master Lease in a commercially reasonable manner; (iv) provide a copy of the Mortgage to Master Tenant and provide Master Tenant with Lender's contact information; and (v) promptly notify Lender in writing of any material default by Master Tenant in the performance or observance of any of the terms, covenants and conditions on the part of Master Tenant to be performed or observed under the Master Lease.   Leasehold Borrower shall not, without the prior written consent of Lender (except to the extent expressly permitted pursuant to this Agreement): (i) terminate or cancel the Master Lease; or (ii) cause or permit any term of the Master Lease to be modified or supplemented without Lender's consent.

7.8.2        **Lender Rights**.

(a)        If Leasehold Borrower shall default in the performance or observance of any term, covenant or condition of the Master Lease on the part of Leasehold Borrower and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, then, without waiving or releasing Leasehold Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to take any reasonable action (including entry upon such Property) to cause such performance or observance on behalf of Leasehold Borrower, so that the rights of Leasehold Borrower under the Master Lease are unimpaired and free from default.   Leasehold Borrower shall pay to Lender upon demand, all such sums so paid or expended by Lender, together with interest thereon from the date of notice to Leasehold Borrower of such payment at the Default Rate.   If Master Tenant gives Lender notice of a default, such notice shall constitute full protection to Lender for any action taken or omitted by Lender in reliance thereon.   Leasehold Borrower will not subordinate or consent to the subordination of the Master Lease to any mortgage, security deed, lease or other interest on or in Master Tenant's interest in the Property.

(b)        No release or forbearance of any of Leasehold Borrower's obligations with respect to the Master Lease, pursuant to the Master Lease or otherwise, shall release Leasehold Borrower from any of its obligations under the Loan Documents, including the performance of all of the terms, provisions, covenants, conditions and agreements contained in the Master Lease to be kept, performed and complied with by Leasehold Borrower, unless such release or forbearance is evidenced in writing and a copy thereof is provided to Lender. If any action or proceeding shall be instituted to evict Master Tenant or to recover possession of all or any portion of the Property or for any other purpose affecting the Master Lease or the Mortgage, Leasehold Borrower will, promptly upon service thereof, deliver to Lender a true copy of each petition, summons, complaint and of all other documents served or otherwise provided in any such action or proceeding.

7.9        **Development Agreement**.

(a)     Borrower shall not, without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed:  (i) modify, change, supplement, alter or amend the Development Agreement or waive or release any of its right and remedies under the Development Agreement or (ii) replace the Developer.  Borrower shall not agree to any assignment or subcontract of Developer's rights, duties or responsibilities under the Development Agreement to any other Person without the express written consent of Lender.

(b)     Following the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Development Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

VIII     **INSURANCE; CASUALTY; CONDEMNATION; RESTORATION**

8.1     **Insurance Requirements**.

(a)     Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property (including the Improvements thereon) providing at least the following coverages:

(i)     comprehensive all risk or Special Form Perils insurance, including wind/hail/named storm, on the Improvements and, if applicable, the Personal Property, in each case (A) in an amount equal to one hundred percent (100%) of the "**Full Replacement Cost,**" which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings); (B) written on a no coinsurance form or containing an agreed amount endorsement with respect to the Improvements and, if applicable, Personal Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Twenty-Five Thousand Dollars ($25,000) for all such insurance coverage, except for wind/hail/named storm or earthquake which may provide for a maximum deductible of five percent (5%) of the total insurable values; (D) containing "**Ordinance or Law Coverage,**" including coverage for loss to the undamaged portion of the building, demolition costs and increased costs of construction in amounts acceptable to Lender, if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, and including the following additional coverages:   (1) if any portion of the Improvements is currently (or at any time in the future is) located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Program as governed by the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, or the National Flood Insurance Reform Act of 1994, as each may be amended, with a deductible not greater than Fifty Thousand Dollars ($50,000) (but not greater than an amount equal to the maximum available under the foregoing laws if less), and with such excess limits as Lender may reasonably require; (2) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity; and  (3) if excluded from the comprehensive all risk policy, named windstorm

133

insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in any coastal region, provided, that the insurance pursuant to the preceding clauses (1), (2) and (3) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this Section 8.1(a)(i);

(ii)     commercial general liability insurance, including coverage against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than Two Million Dollars ($2,000,000) in the aggregate and One Million Dollars ($1,000,000) per occurrence (and, if on a blanket policy, containing an "**Aggregate Per Location**" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards:  (1) premises and operations; and (2) products and completed operations;

(iii)     rental loss and/or business income interruption insurance (A) with loss payable to Lender as its interest shall appear; (B) covering all risks and limits required to be covered by the insurance provided for in Section 8.1(a)(i); (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of at least six (6) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected Operating Income for a period of at least eighteen (18) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the Operating Income for the succeeding eighteen (18) month period;

(iv)     at all times during which construction work is being performed at the Property and prior to Substantial Completion of the Project, (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made at the Property which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policies required herein; and (B) the insurance provided for in Section 8.1(a)(i), unless such insurance is provided by the Policy required in Section 8.1(a)(i), written in a so-called builder's risk completed value form in such amount as Lender shall reasonably require (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 8.1(a)(i) and Section 8.1(a)(iii) and including terrorism (it being understood and agreed that, should any portion of the Improvements be located in a federally designated "special flood hazard area," flood coverage through the National Flood Insurance Program shall not be required prior to Substantial Completion of the Project for as long as Borrower maintains flood

134

coverage through a private policy in form and substance, amounts and with deductibles acceptable to Lender), (3) including permission to occupy the Property, (4) with an agreed amount endorsement waiving co-insurance provisions, (5) including coverage for loss suffered with respect to signage, materials, equipment, machinery and supplies, in each case owned by Borrower or required to be insured by Borrower, whether on site, in transit or stored offsite, and with respect to temporary structures, hoists, sidewalks, retaining walls and underground property, in each case owned by Borrower or required to by insured by Borrower, and (6) including Soft Costs that are recurring costs as agreed to by Lender in its reasonable discretion, which may include real estate property taxes, legal and accounting fees, advertising and promotion expenses, interest on money borrowed and costs to reproduce plans, specifications, blueprints and models in connection with any Restoration following a Casualty. Borrower shall cause Design Professionals engaged during the term of this Agreement, including any architects and engineers, to obtain and maintain professional liability insurance during the period commencing on the date of the architect's or engineer's contract and maintained through Substantial Completion of the Project.  Such insurance shall be in an amount reasonably acceptable to Lender and consistent with market standards.  Borrower shall further cause the Construction Manager to obtain and maintain commercial general liability coverage, including, without limitation, products and completed operations to the extent available in the market expiring no earlier than the expiration of the applicable statute of repose (to the extent available in the market) after completion of services or Substantial Completion of the Project.  Such policy maintained by the Construction Manager shall name Borrower and Lender as additional insureds by endorsement reasonably satisfactory to Lender and have limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate for the Project.  The Construction Manager shall provide umbrella liability over the required policies with limits acceptable to Lender.  The Construction Manager shall maintain statutory Workers Compensation, Disability and Employers Liability insurance in force for all workers on the job as well as commercial auto liability for all owned, hired and non-owned vehicles with a combined single limit no less than $1,000,000.  Certificates of insurance and endorsements reasonably acceptable to Lender must be provided prior to any work being performed on the Property;

(v)     if applicable, worker's compensation insurance with respect to any employees of Borrower, as required by any Governmental Authority or Legal Requirement and employer's liability in amounts acceptable to Lender;

(vi)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under Section 8.1(a)(i);

(vii)     umbrella liability insurance in an amount not less than Twenty Five Million Dollars ($25,000,000) per occurrence on terms consistent with the commercial general liability insurance policy required under Section 8.1(a)(ii) above;

135

(viii)   if applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of no less than Twenty-Five Million Dollars ($25,000,000);

(ix)   the commercial property, construction-related coverages, business income, commercial general liability and umbrella liability insurance required under Section 8.1(a)(i), Section 8.1(a)(ii), Section 8.1(a)(iii), Section 8.1(a)(iv) and Section 8.1(a)(vii) above shall cover perils of terrorism and acts of terrorism (whether caused by a foreign or domestic source) and Borrower shall maintain commercial property, construction related coverages and business income, commercial general liability and umbrella liability insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Sections 8.1(a)(i), Section 8.1(a)(ii), Section 8.1(a)(iii), Section 8.1(a)(iv) and Section 8.1(a)(vii) above at all times during the term of the Loan; provided, however, that in the event the insurance required under Sections 8.1(a)(i) and (iii) above shall contain an exclusion for loss resulting from perils and acts of terrorism, Borrower shall maintain a separate, stand-alone terrorism insurance policy satisfactory to Lender;

(x)   such other coverages as are required to be maintained by Leasehold Borrower, in its capacity as tenant under the Ground Lease; and

(xi)   upon not less than sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)   All insurance provided for in Section 8.1(a) shall be obtained under valid and enforceable policies under the laws of the State (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by S&P, or "A2" or better by Moody's, or "A/X" or better by A.M. Best (but in such case only to the extent that such Rating Agency rates the applicable insurer or such other insurance company as may be reasonably acceptable to Lender). The Policies described in Section 8.1(a) hereof (other than those strictly limited to liability protection) shall designate Lender as mortgagee and loss payee. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender. Complete copies of the Policies shall be submitted to Lender upon request; provided that if such Policies have not been issued by the insurers, Borrower shall request and diligently pursue such Policies and submit to Lender the Policies upon issuance.

(c)      Except with respect to the insurance coverage required in <u>Section 8.1(a)(iv)</u>, Borrower shall be permitted to obtain the Policies required under <u>Section 8.1(a)</u> hereof under a "<u>blanket</u>" insurance Policy so long as such policy specifically allocates to the Property the amount of coverage from time to time required hereunder and otherwise provides the same protection as would a separate policy insuring only the Property in compliance with the provisions of <u>Section 8.1(a)</u> hereof.

(d)      All Policies provided for or contemplated by <u>Section 8.1(a)</u> hereof shall name Borrower as a named insured and, in the case of liability coverages (except for the Policies referenced in <u>Section 8.1(a)(v)</u> and <u>(viii)</u> hereof), shall name Lender as the additional insured, as its interests may appear, and in the case of property coverages, including but not limited to all risk, builder's risk, boiler and machinery, terrorism and flood insurance, shall contain a standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)      The Policies provided for in <u>Section 8.1(a)(iii)</u>, <u>Section 8.1(a)(iv)(B)</u>, <u>Section 8.1(a)(vi)</u> and, as applicable, <u>Section 8.1(a)(xi)</u> hereof shall:  (i) provide that no act or negligence of Borrower,  or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned; (ii) provide that the Policies shall not be canceled without at least thirty (30) days' notice to Lender, except ten (10) days' notice for non-payment of premium; (iii) provide that the issuers thereof shall give notice to Lender if the issuers of such Policies elects not to renew ten (10) days prior to its expiration; and (iv) not contain provisions that would make Lender liable for any Insurance Premiums thereon or subject to any assessments thereunder except to the extent provided by the standard non-contributory mortgage clause.

(f)      If at any time Lender is not in receipt of written evidence that all Policies are in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate.  All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the Default Rate.  Borrower shall promptly forward to Lender a copy of each written notice received by Borrower of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(g)      In the event of a foreclosure of the Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force that are not umbrella or blanket Policies concerning the Properties and all proceeds payable under the Policies (regardless of whether or not an umbrella or blanket Policy, but in such case with respect to the Property only) shall thereupon vest exclusively in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

8.2    **Condemnation and Insurance Proceeds**.

8.2.1    **Notification**.  Borrower shall promptly notify Lender in writing upon obtaining actual knowledge of (a) the institution of any proceedings relating to any Taking (whether material or immaterial) of, or (b) the occurrence of any Casualty to the Property or any portion thereof.  In addition, each such notice shall set forth such good faith estimate of the cost of repairing or restoring such Casualty or Taking in reasonable detail if the same is then available and, if not, as soon thereafter as it can reasonably be provided.

8.2.2    **Proceeds**.  Subject to compliance with the requirements of Section 8.3, in the event of any Casualty or any Taking, Borrower's right, title and interest in and to all compensation, awards, proceeds, damages, claims, insurance recoveries, causes and rights of action (whether accrued prior to or after the date hereof) and payments which Borrower may receive or to which Borrower may become entitled with respect to the Property or any part thereof other than payments received in connection with any liability or loss of rental value or business interruption insurance (collectively, "**Proceeds**"), in connection with any such Taking of, or Casualty to, the Property or any part thereof are hereby assigned by Borrower to Lender and, except as otherwise herein provided and subject to the terms and conditions of Section 8.3, shall be paid to Lender.  Borrower shall, in good faith and in a commercially reasonable manner, file and prosecute the adjustment, compromise or settlement of any claim for Proceeds and, subject to Borrower's right to receive the direct payment of any Proceeds as herein provided, shall cause the same to be paid directly to Lender to be held and applied in accordance with the provisions of this Agreement.  Except upon the occurrence and during the continuance of an Event of Default, Borrower may settle any insurance claim with respect to Proceeds which does not exceed the Casualty Amount.  Whether or not a Default or an Event of Default shall have occurred and be continuing, Lender shall have the right to approve, such approval not to be unreasonably withheld, any settlement which might result in any Proceeds in excess of the Casualty Amount and Borrower shall deliver or cause to be delivered to Lender all instruments reasonably requested by Lender to permit such approval.  Borrower shall pay all reasonable out-of-pocket costs, fees and expenses reasonably incurred by Lender (including all reasonable attorneys' fees and expenses, the reasonable fees of insurance experts and adjusters and reasonable costs incurred in any litigation or arbitration), and interest thereon at the Default Rate to the extent not paid within ten (10) days after delivery of a request for reimbursement by Lender, in connection with the settlement of any claim for Proceeds and seeking and obtaining of any payment on account thereof in accordance with the foregoing provisions.  If any Proceeds are received by Borrower and may be retained by Borrower pursuant to this Section 8.2, such Proceeds shall, until the completion of the related Restoration, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of the Restoration in accordance with the terms hereof, and in the event such Proceeds exceed the Casualty Amount, such Proceeds shall be forthwith paid directly to and held by Lender in the Proceeds Reserve Account in trust for Borrower, in each case to be applied or disbursed in accordance with this Section 8.2.  If an Event of Default shall have occurred and be continuing, or if Borrower fails to file and/or prosecute any insurance claim for a period of fifteen (15) days following Borrower's receipt of written notice from Lender, Borrower hereby irrevocably empowers Lender, in the name of Borrower as its true and lawful attorney-in-fact, to file and prosecute such claim (including settlement thereof) with counsel satisfactory to Lender and to collect and to make receipt for any such payment.  Notwithstanding anything to the contrary set

WEIL:\96218278\17\63946.0005

forth in this Agreement, and excluding situations requiring prepayment of the Note, but in all events and at all times subject to compliance with the requirements of <u>Section 8.3</u>, to the extent any Proceeds (either singly or when aggregated with all other than unapplied Proceeds with respect to the Property) do not exceed the Casualty Amount, such Proceeds are to be paid directly to Borrower to be applied to restoration of the Property in accordance with the terms of this Agreement.

      8.2.3     **<u>Lender to Take Proceeds</u>**.  So long as all of the following conditions have been satisfied in Lender's reasonable discretion and subject to compliance with the requirements of <u>Section 8.3</u>, Lender agrees to make Proceeds actually received by Lender available to Borrower for purposes of paying for the cost of Restoration in accordance with the provisions of <u>Section 8.2.4</u> and <u>Section 8.2.5</u> below; provided, however, if the Proceeds are less than the Casualty Amount, then such Proceeds (other than the proceeds of any business interruption insurance) will be disbursed to Borrower in one payment for purposes of paying for the costs of Restoration (or, if no Restoration is feasible or necessary, for such purposes as Borrower shall determine subject to compliance with the requirements of <u>Section 8.3</u>):

      (a)     no Event of Default shall have occurred and be continuing;

      (b)     in the event the Proceeds are insurance proceeds, less than forty percent (40%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty;

      (c)     in the event the Proceeds are condemnation proceeds, less than ten percent (10%) of the land constituting the Property is taken, such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land or is being taken;

      (d)     Lender shall have determined that the proceeds of any applicable business interruption insurance, to the extent required to be maintained hereunder (together with any projected revenues and any additional funds to be deposited with Lender for such purposes), are sufficient to pay all Debt Service coming due under the Loan Documents through the end of the Restoration;

      (e)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (i) three (3) months prior to the Maturity Date, (ii) such time as may be required under applicable Legal Requirements and the Ground Lease, and (iii) Completion, the expiration of any business interruption insurance coverage required hereunder;

      (f)     the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements and the Ground Lease;

      (g)     such Casualty or Taking, as applicable, does not result in the long-term loss of access to the Property or the related Improvements;

      (h)     if Substantial Completion has occurred, the Loan-to-Value Ratio, after giving effect to the Restoration, shall not be higher than 62.5%;

WEIL:\96218278\17\63946.0005

(i)      Borrower shall deliver to Lender for Lender's reasonable approval a detailed budget that describes the entire cost of completing the Restoration; and

(j)      the Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender, are sufficient in Lender's reasonable discretion to cover the cost of Restoration.

Subject to compliance with the requirements of Section 8.3, any Proceeds not made available to Borrower for Restoration shall be paid over to Lender (if not paid directly to Lender) and any Proceeds remaining after reimbursement of Lender's reasonable out-of-pocket costs and expenses actually incurred in connection with recovery of any such Proceeds (including, without limitation, reasonable out-of-pocket administrative costs and inspection fees) shall be applied by Lender to prepay the Note in accordance with the provisions hereof, and the balance, if any, shall be paid to Borrower.

### 8.2.4      **Borrower to Restore**.

(a)      Subject to compliance with the requirements of Section 8.3, promptly after the occurrence of any damage or destruction to all or any portion of the Property or a Taking of a portion of the Property, Borrower shall commence and diligently prosecute, or cause to be commenced and diligently prosecuted, to completion, subject to Excusable Delays, the repair, restoration and rebuilding of the Property (in the case of a partial Taking, to the extent it is capable of being restored) so damaged, destroyed or remaining after such Taking in full compliance with all material Legal Requirements and free and clear of any and all Liens except Permitted Encumbrances (such repair, restoration and rebuilding are sometimes hereinafter collectively referred to as the "**Restoration**").  During the Construction Phase, the Restoration shall be conducted in accordance with the Plans and Specifications, as the same may be modified from time to time in compliance with the terms and conditions of this Agreement.  If the Restoration is commenced following the expiration of the Construction Phase, the plans and specifications for the Restoration shall require that the Restoration be done, and Borrower shall cause the work to be done, in a first-class workmanlike manner at least equivalent to the quality and character prior to the damage or destruction (provided, however, that in the case of a partial Taking, the Restoration shall be done to the extent reasonably practicable after taking into account the consequences of such partial Taking), so that upon completion thereof, the Property shall be at least equal in value and substantially the same character to the Property prior to the damage or destruction; it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to any partial Taking of, or Casualty to, the Property.  Subject to Borrower's right to prepay the Loan in full and pursuant to Section 2.12 to cause the Property to be released from the Lien of the Mortgage, in the event of a Casualty or a partial Taking affecting the Property, Borrower shall be obligated to restore the Property in accordance with the provisions of this Section 8.2 whether or not the Proceeds shall be sufficient, provided that the Proceeds shall be made available to Borrower by Lender in accordance with this Agreement.

(b)      Subject to compliance with the requirements of Section 8.3, if Proceeds are not required to be applied toward payment of the Debt pursuant to the terms hereof, then Lender shall make the Proceeds which it is holding pursuant to the terms hereof (after payment

of any reasonable out-of-pocket expenses actually incurred by Lender in connection with the collection thereof in accordance with Section 8.2.2) available to Borrower for payment of or reimbursement of Borrower's expenses incurred with respect to the Restoration, upon the terms and subject to the conditions set forth in paragraphs (i), (ii) and (iii) below and in Section 8.2.5:

> (i)     at the time of loss or damage or at any time thereafter while Borrower is holding any portion of the Proceeds, there shall be no continuing Event of Default;

> (ii)    Lender shall have reasonably approved any modifications to the Plans and Specifications (during the Construction Phase) or the plans and specifications for the Restoration (following the expiration of the Construction Phase) and any change orders in connection with such plans and specifications; and

> (iii)   Lender shall, within a reasonable period of time prior to request for initial disbursement, be furnished with the Plans and Specifications, including any modifications thereto, or appropriate plans and specifications for the Restoration.   Upon Lender's approval of any modifications to the Plans and Specifications or such plans and specifications, Borrower shall restore all Improvements such that when they are fully restored and/or repaired, such Improvements and their contemplated use fully comply with all applicable Legal Requirements, including zoning, environmental and building laws, codes, ordinances and regulations.

> 8.2.5    **Disbursement of Proceeds**.

> (a)     Disbursements of the Proceeds to Borrower hereunder shall be made from time to time (but not more frequently than once in any month) by Lender but only for so long as no Event of Default shall have occurred and be continuing, as the Restoration progresses upon receipt by Lender of (i) an Officer's Certificate dated not more than ten (10) days prior to the application for such payment, requesting such payment or reimbursement and describing the Restoration performed that is the subject of such request, the parties that performed such Restoration and the actual cost thereof, and also certifying that such Restoration and materials are or, upon disbursement of the payment requested to the parties entitled thereto, will be free and clear of Liens other than Permitted Encumbrances, (ii) evidence reasonably satisfactory to Lender that (A) all materials installed and work and labor performed in connection with such Restoration that was the subject of the prior disbursement of Proceeds have been paid for in full or will be paid upon receipt of such disbursement, and (B) there exists no notices of pendency, stop orders, construction or mechanic's liens or notices of intention to file same (unless the same is required by State law as a condition to the payment of a contractor) or any Liens, other than Permitted Encumbrances, on the Property arising out of the Restoration which, subject to its right of contest set forth in Section 9.3, have not been either fully bonded to the reasonable satisfaction of Lender and discharged of record or, in the alternative if Lender shall in its sole discretion consent in advance thereto, fully insured to the reasonable satisfaction of Lender by the Title Company which issued the Title Policy, and (iii) an Independent Architect's certificate certifying performance of the Restoration together with an estimate of the cost to complete the Restoration. No payment made prior to the final completion of the Restoration, except for payment made to

contractors whose Restoration shall have been fully completed and from which final lien waivers have been received, shall exceed ninety percent (90%) of the value of the Restoration performed and materials furnished and incorporated into the Improvements from time to time, and at all times the undisbursed balance of such Proceeds together with all amounts deposited, bonded, guaranteed or otherwise provided for pursuant to Section 8.2.4(b) above, shall be at least sufficient to pay for the estimated cost of completion of the Restoration; final payment of all Proceeds remaining with Lender shall be made upon receipt by Lender of a certification by the Construction Consultant or Independent Architect (as applicable), as to the completion of the Restoration substantially in accordance with the plans and specifications approved by Lender, final lien releases, and the filing of a notice of termination or the expiration of the period provided under the law of the State for the filing of construction, mechanics' and materialmens' liens, as certified pursuant to an Officer's Certificate, and delivery of a temporary certificate of occupancy or completion, as applicable, with respect to the Restoration, or, if not applicable, an Officer's Certificate to the effect that a certificate of occupancy or completion is not required.

(b)     Subject to compliance with the requirements of Section 8.3, if, after the Restoration is completed and all costs of completion have been paid, there are excess Proceeds, Lender shall apply such excess Proceeds with respect to the Taking of or Casualty to the Property to the payment or prepayment of all or any portion of the Debt in accordance with the last paragraph of Section 8.2.3, Section 2.11.2 and Section 2.12 without penalty or premium (including the Minimum Multiple Payment) and any balance thereof shall be disbursed to Borrower.

8.3     **Requirements of Ground Lease**.   Notwithstanding anything to the contrary set for in this Agreement or in the other Loan Documents, so long as the Ground Lease shall be in full force and effect, the terms and provisions of the Ground Lease (as amended by the Ground Lessor Estoppel) relating to the restoration of the Property subject to the Ground Lease and the disbursement of Proceeds shall supersede and govern over any contrary or conflicting provision of this Agreement or any of the other Loan Documents with respect to such Property. Without limiting the generality of the foregoing, if the Ground Lease requires that Proceeds be disbursed for Restoration, all Proceeds relating to the Leasehold Land shall be deposited with and held by the insurance depository designated or appointed under the Ground Lease and shall be disbursed pursuant to the Ground Lease; provided, however, that if Borrower has the right or ability to vote for or designate such insurance depository, then Borrower shall vote for or designate Lender as such insurance depository to the extent permitted under the Ground Lease.

## IX     IMPOSITIONS, OTHER CHARGES, LIENS AND OTHER ITEMS

9.1     **Borrower to Pay Impositions and Other Charges**.

(a)     Borrower shall pay all Impositions and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable.   If at any time Lender reasonably determines, based on applicable Legal Requirements, that any applicable documentary stamp Taxes, intangible Taxes, or other mortgage recording Taxes (or payments in lieu thereof) have not been paid with respect to the

Property, Borrower agrees that Borrower shall, on demand, pay any such additional mortgage recording Taxes.  Borrower will deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Impositions and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Impositions and/or Other Charges would otherwise be delinquent if not paid.  Notwithstanding the foregoing, Borrower's obligation to directly pay Impositions and Other Charges for which Lender is reserving funds pursuant to Section 17.1 (and to provide evidence of the same) shall be suspended for so long as Borrower complies with the terms and provisions of Section 17.1.  Nothing contained in this Agreement or the Mortgage shall be construed to require Lender to pay any Tax, assessment, levy or charge imposed on Borrower in the nature of a franchise, capital levy, estate, inheritance, succession, income or net revenue Tax.

(b)     Nothing contained in this Agreement shall be deemed to require Borrower to pay any amount, so long as Borrower is in good faith, and by proper legal proceedings, diligently contesting the validity, amount or application thereof in accordance with Section 9.3.  Notwithstanding anything set forth herein, in no event shall Borrower be permitted under this provision to enter into a note or other instrument for borrowed money.

9.2     **No Liens**.  Subject to its right of contest set forth in Section 9.3, Borrower shall at all times keep, or cause to be kept, the Property free from all Liens (other than Permitted Encumbrances and Permitted Debt) and shall pay when due and payable (or bond over) all claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in or permit the creation of a Lien on the Property or any portion thereof and shall in any event cause the prompt, full and unconditional discharge of all Liens imposed on or against the Property or any portion thereof within thirty (30) days after receiving written notice of the filing (whether from Lender, the lienor or any other Person) thereof.  Borrower shall do or cause to be done, at the sole cost of Borrower, everything reasonably necessary to fully preserve the priority of the Lien of the Mortgage against the Property, subject to the Permitted Encumbrances and Permitted Debt.  Upon the occurrence of an Event of Default, Lender may (but shall not be obligated to) make such payment or discharge such Lien, and Borrower shall reimburse Lender on demand for all such advances pursuant to Section 20.12 (together with interest thereon at the Default Rate).

9.3     **Contest**.  Borrower, at its own expense, may contest (after prior written notice to Lender) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Impositions or Other Charges, any Liens imposed on the Property, and the application of any Legal Requirement, provided that (a) no Event of Default shall exist and be continuing hereunder; (b) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument and any applicable Legal Requirements to which Borrower or the Property is subject; (c) neither the Property nor any part thereof or interest therein will be in danger of being imminently sold, forfeited, terminated, cancelled or lost; (d) Borrower shall keep Lender reasonably informed of the status of such contest at reasonable intervals; (e) if Borrower is not providing security as provided in

clause (g) below, adequate reserves with respect thereto are maintained on Borrower's books (as determined by an Independent Accountant); (f) either such contest operates to suspend collection or enforcement as the case may be, of the contested Imposition, Lien or Legal Requirement and such contest is maintained and prosecuted continuously and with diligence or the Imposition or Lien is bonded; provided, however, that with respect to any Lien filed by a Contractor, supplier, vendor, materialmen or other similar Person in respect of work or services performed or materials supplied to the Property, the same shall be required to be discharged of record (whether by bonding, payment or otherwise) regardless of amount; and (g) in the case of Impositions and Liens which are not bonded (other than those required to be discharged of record pursuant to subclause (f) hereof) in excess of $100,000 individually, or in the aggregate, during such contest, Borrower, shall deposit with or deliver to Lender either Cash and Cash Equivalents or Letter(s) of Credit in an amount equal to 125% of (i) the amount of Borrower's obligations being contested plus (ii) any additional interest, charge, or penalty arising from such contest.  Notwithstanding the foregoing, the creation of any such reserves or the furnishing of any bond or other security, Borrower promptly shall comply with any contested Legal Requirement or shall pay any contested Imposition or Lien, and compliance therewith or payment thereof shall not be deferred, if, at any time the Property or any portion thereof shall be, in Lender's reasonable judgment, in imminent danger of being forfeited or lost or Lender is likely to be subject to civil or criminal damages as a result thereof (and Lender shall make any deposit held by it in connection therewith available for such compliance by Borrower).  Borrower shall promptly upon final determination thereof pay the amount of any such Impositions, Other Charges, or Lien, together with all costs, interest and penalties which may be payable in connection therewith, and comply with any such contested Legal Requirement and following such payment, as confirmed by evidence reasonably satisfactory to Lender, the Cash and Cash Equivalents or Letter(s) of Credit shall be returned to Borrower.

X    **TRANSFERS**

10.1    **Reliance by Lender**.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its members and principals in owning, developing, constructing and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's owning, development and construction of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Obligations under the Loan Documents.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Obligations, Lender can recover the Debt by a sale of the Property.

10.2    **No Transfers**.  Except to the extent otherwise provided in Section 10.3, without the prior written consent of Lender, Borrower shall not, and shall not permit to occur, any (a) Transfer of (i) the Property, any part thereof, or any legal or beneficial interest therein, or (ii) any direct or indirect Equity Interest in any

Restricted Party, or (b) change of Control of a Restricted Party.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer without Lender's consent in violation of this Article X.  The provisions of this Section 10.2 shall apply to every such Transfer (other than a Permitted Transfer) regardless of whether voluntary or not, or whether or not Lender has consented to any previous such Transfer.  In determining whether or not to grant consent to any Transfer (other than a Permitted Transfer), Lender may require, among other things, the delivery by Borrower of an Opinion of Counsel (or, if applicable, an updated Opinion of Counsel) regarding substantive consolidation.

       10.3     **Permitted Transfers**.  Notwithstanding the provisions of this Agreement, including Section 10.2, the following Transfers shall be permitted without Lender's prior written consent thereto (each, a "**Permitted Transfer**" and, collectively, "**Permitted Transfers**"):

       (a)     Leases entered into in accordance with the prior written consent of Lender and the other terms and conditions of the Loan Documents;

       (b)     The pledges pursuant to the Pledge Agreements;

       (c)     a Transfer of any indirect interest in Borrower that occurs by devise or bequest or by operation of law upon the death of a natural person;

       (d)     Ordinary Course Rentals;

       (e)     the removal or sale of FF&E, equipment and inventory in the ordinary course of business so long as the removed item is consumed or sold in the usual and customary course of business, removed temporarily for maintenance and repair or, if removed permanently, and necessary for the operation of the Project, replaced by an article of equivalent suitability and not materially less value, owned by Borrower free and clear of any Lien (other than Permitted Encumbrances);

       (f)     Transfers (but not pledges, collateral assignments, hypothecations, or encumbrances) of Equity Interests in Borrower or in other Restricted Parties by any natural person to one or more of such natural person's Immediate Family Members or trusts or other entities established for the benefit of such natural person or one or more of such natural person's Immediate Family Members for *bona fide* estate planning purposes;

       (g)     one or a series of Transfers (but not pledges, collateral assignments, hypothecations, or encumbrances) of direct or indirect ownership interests in Borrower or any direct or indirect owner of Borrower of not more than forty-nine percent (49%), in the aggregate, of the direct or indirect stock, general partnership interests, limited partnership interests, managing member interests or non-managing membership interests (as the case may be) in Borrower; and

145

(h)     Transfers (but not pledges, collateral assignments, hypothecations, or encumbrances) of indirect Equity Interests in Borrower to (i) BBM3 LLC, (ii) BBM3 II LLC or (iii) Brad Muhl and Holly Muhl;

provided, however, in each case with respect to any such Permitted Transfer described in clauses (a) through (h) above, the following conditions are satisfied:  (i) other than with respect to the Transfers described in clauses (b) and (c) above, no Event of Default then exists; (ii) Borrower shall give Lender written notice of such Transfer together with copies of all instruments effecting such Transfer, together with an Officer's Certificate certifying that the requirements of this Section 10.3 have been satisfied, not less than ten (10) Business Days prior to the date of such Transfer, and with respect to a Transfer described in clause (c) or a Transfer of less than ten percent (10%) of the direct or indirect ownership interests in Borrower, no later than thirty (30) days after the date Borrower or Guarantor obtains knowledge of such Transfer; (iii) in each case, such Transfer does not and will not result in the termination or dissolution of Borrower or Borrower Holdco, by operation of law or otherwise; (iv) the Transfer shall not constitute a default under the CDE Loan Documents, the EB-5 Loan Documents or the Octagon Loan Documents; (v) Guarantor continues to satisfy the liquidity and net worth requirements set forth in the Guarantees; (vi) Branden Muhl and/or James Vosotas continue to Control Borrower and any Affiliated Manager, Borrower representing and warranting that, as of the date hereof, Branden Muhl and/or James Vosotas Control Borrower; (vii) Branden Muhl and/or James Vosotas continue to own, directly or indirectly, an aggregate of at least fifteen percent (15%) ownership interest in Borrower and any Affiliated Manager, Borrower representing and warranting that, as of the date hereof, Branden Muhl and/or James Vosotas own, directly or indirectly, an aggregate of thirty percent (30%) ownership interest in Borrower and Affiliated Manager; (viii)  other than with respect to Persons that as of the Closing Date own twenty percent (20%) or more of the direct or indirect ownership interest in Borrower or Borrower Holdco, for any proposed transferee that after such Transfer would own twenty percent (20%) or more of the direct or indirect ownership interest in Borrower or Borrower Holdco, such Transfers shall be conditioned upon Lender's receipt of "Know Your Customer," credit history check, litigation, bankruptcy, judgment and other customary searches, which searches shall be satisfactory to Lender in its reasonable discretion; (ix) in each case, Borrower and Borrower Holdco shall continue to be Single Purpose Entities after such Transfer; (x) Borrower shall have reimbursed Lender for all expenses (including, without limitation, reasonable attorney's fees and expenses) incurred by Lender in connection with such Transfer; and (xi) upon request from Lender, Borrower shall promptly provide Lender a revised version of the organizational chart delivered to Lender in connection with the Loan reflecting any Transfers consummated in accordance with this Section 10.3.

## XI     **INTEREST RATE CAP AGREEMENT**

11.1     **Interest Rate Cap Agreement**.  Lender acknowledges that Borrower has obtained an Interest Rate Cap Agreement for a forward cap with a term commencing on the Closing Date and continuing for the remaining Term until the Initial Maturity Date, with an Approved Counterparty and having a strike rate (the "**Strike Price**") equal to three percent (3%).

11.2     **Pledge**.   As security for the full and punctual payment and performance of the Debt when due (whether upon stated maturity, by acceleration, early termination or otherwise), Borrower, as pledgor, hereby pledges, assigns, hypothecates, transfers and delivers to Lender and hereby grants to Lender a continuing first priority lien on and security interest in, to and under all of the following whether now owned or hereafter acquired and whether now existing or hereafter arising (the "**Rate Cap Collateral**"):  all of the right, title and interest of Borrower in and to (a) any Interest Rate Cap Agreement; (b) all payments, distributions, disbursements or proceeds due or to become due to Borrower in respect of any Interest Rate Cap Agreement or arising out of any Interest Rate Cap Agreement, whether as contractual obligations, damages or otherwise; and (c) all of Borrower's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of any Interest Rate Cap Agreement, in each case including all accessions and additions to, substitutions for and replacements, products and proceeds of any of the foregoing.

11.3     **Covenants**.

(a)     Borrower shall comply with all of its material obligations under the terms and provisions of any Interest Rate Cap Agreement.  All amounts paid by the Counterparty under any Interest Rate Cap Agreement to Borrower or Lender shall be deposited immediately into an account designated by Lender in a written notice to the Counterparty and shall constitute collateral for the Debt which Borrower hereby irrevocably authorizes Lender to be applied by Lender to pay interest under the Loan.  Subject to terms hereof, provided no Event of Default has occurred and is continuing, Borrower shall be entitled to exercise all rights, powers and privileges of Borrower under, and to control the prosecution of all claims with respect to, any Interest Rate Cap Agreement and the other Rate Cap Collateral.  Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under any Interest Rate Cap Agreement in the event of a default by the Counterparty thereunder and shall not waive, amend or otherwise modify any of its rights thereunder.

(b)     Borrower shall defend Lender's right, title and interest in and to the Rate Cap Collateral pledged by Borrower pursuant hereto or in which it has granted a security interest pursuant hereto against the claims and demands of all other Persons.

(c)     In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "A-" by S&P or Fitch (if Fitch rates such counterparty) or "A3" by Moody's, or in the event of any default by the Approved Counterparty under an Interest Rate Cap Agreement, Borrower shall, within thirty (30) days after such downgrade, withdrawal or qualification or receipt of notice of such default from Lender, (i) replace the applicable Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement or (ii) if provided for in the Interest Rate Cap Agreement, cause the Counterparty to post cash collateral equal to 100% of the market to market value of the rate protection transaction to secure Borrower's exposure under the Interest Rate Cap Agreement in such amount and pursuant to such terms as are reasonably acceptable to Lender, S&P, Moody's and Fitch (if rated by Fitch).

(d)     If Borrower fails to purchase, maintain and deliver to Lender an Interest Rate Cap Agreement as and when required hereunder, Lender may purchase the Interest Rate Cap Agreement and the cost incurred by Lender in purchasing the Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(e)     Borrower shall not sell, assign, or otherwise dispose of, or encumber, pledge or grant a security interest in, any of the Rate Cap Collateral or any interest therein other than in favor of Lender, and any sale, assignment, encumbrance, pledge or security interest whatsoever made in violation of this covenant shall be a nullity and of no force and effect, and upon demand of Lender, shall forthwith be cancelled or satisfied by an appropriate instrument in writing.

(f)     Borrower shall not (i) without the prior written consent of Lender, modify, amend or supplement the terms of any Interest Rate Cap Agreement, (ii) without the prior written consent of Lender, except in accordance with the terms of the applicable Interest Rate Cap Agreement, terminate the Interest Rate Cap Agreement prior to its stated maturity date, (iii) without the prior written consent of Lender, except as aforesaid, waive or release any material obligation of the Counterparty (or any successor or substitute party to an Interest Rate Cap Agreement) under any Interest Rate Cap Agreement, (iv) without the prior written consent of Lender, consent or agree to any material act or omission to act on the part of the Counterparty (or any successor or substitute party to an Interest Rate Cap Agreement), which, without such consent or agreement, would constitute a default under the applicable Interest Rate Cap Agreement, (v) fail to exercise promptly and diligently each and every material right which it may have under any Interest Rate Cap Agreement, (vi) take or intentionally omit to take any material action or intentionally suffer or permit any material action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under any Interest Rate Cap Agreement or any defense by the Counterparty (or any successor or substitute party to an Interest Rate Cap Agreement), to payment, and (vii) fail to give prompt notice to Lender of any written notice of default given by or to Borrower under or with respect to any Interest Rate Cap Agreement, together with a complete copy of such notice.

(g)     In connection with any Interest Rate Cap Agreement, Borrower shall obtain and deliver to Lender, within ten (10) Business Days after the issuance date of the Interest Rate Cap Agreement, a legal opinion from counsel (which counsel may be in-house counsel for the Counterparty) for the Counterparty upon which Lender and its successors and assigns may rely (the "**Counterparty Opinion**") which shall provide, in relevant part (subject to customary and reasonable assumptions and qualifications), that:

(i)     the Counterparty and, if applicable, any guarantor of the Counterparty's obligations, are each duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement, the Acknowledgment and any guaranty of the Interest Rate Cap Agreement;

148

(ii)     the execution and delivery of the Interest Rate Cap Agreement and the Acknowledgment by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)     all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, the Acknowledgment and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)     the Interest Rate Cap Agreement, the Acknowledgment and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

## XII     **MAINTENANCE OF PROPERTY**

12.1     **Maintenance of Property**.  Following Completion of the Project, Borrower shall keep and maintain, or cause to be kept and maintained, the Property and every part thereof in good condition and repair, subject to ordinary wear and tear, and, subject to Excusable Delays and the provisions of this Agreement with respect to damage or destruction caused by Casualty or Takings, shall not permit or commit any intentional physical waste, impairment, or deterioration of any portion of the Property in any material respect.  Borrower shall not remove or demolish any Improvement on the Property except as the same may be necessary in connection with the Project or an Alteration or a Restoration in connection with a Taking or Casualty, or as otherwise permitted herein, in each case in accordance with the terms and conditions hereof.

12.2     **Conditions to Alterations**.  Other than as provided herein with respect to the Improvements, and provided that no Event of Default shall have occurred and be continuing hereunder, following the Completion of the Project, Borrower shall have the right to undertake any alteration, improvement, demolition or removal of the Property or any portion thereof (any such alteration, improvement, demolition or removal, an "**Alteration**") so long as (a) Borrower provides Lender with prior written notice of any Material Alteration, (b) such Alteration is

WEIL:\96218278\17\63946.0005

undertaken in compliance with all applicable Legal Requirements and otherwise in accordance with the applicable provisions of the Loan Documents and the Ground Lease, (c) any Material Alteration shall be conducted under the supervision of an Independent Architect and, in connection with any Material Alteration, Borrower shall deliver to Lender detailed Plans and Specifications and cost estimates therefor, prepared by such Independent Architect, and (d) in the case of any Material Alteration, Lender shall have given its written consent thereto prior to the commencement thereof (which consent shall be in Lender's sole and absolute discretion and shall be subject to Lender's customary conditions with respect to Alterations (including for example, evidence of required insurance coverage, reimbursement of Lender's out-of-pocket review costs and compliance with applicable law). Such Plans and Specifications may be revised at any time and from time to time by such Independent Architect provided that, in the case of any Material Alteration, material revisions of such Plans and Specifications are approved by Lender. All work done in connection with any Alteration shall be performed with due diligence in a good and workmanlike manner. All materials used in connection with any Alteration shall not be less than the standard of quality of the materials used at the Property for Completion of the Improvements and all materials used shall be in accordance with all applicable material Legal Requirements and Insurance Requirements.

XIII   **BOOKS AND RECORDS, FINANCIAL STATEMENTS, REPORTS AND OTHER INFORMATION**

13.1   **Books and Records**.  Borrower shall keep and maintain books and records separate from any other Person in which accurate and complete entries shall be made of all dealings or transactions of or in relation to the Note, the Property, and the business and affairs of Borrower relating to the Property, which such books and records shall reflect, on a Fiscal Year basis, all items of income and expense in connection with the operation on an individual basis of the Property and in connection with any services, equipment or furnishings provided in connection with the operation of the Property, in accordance with GAAP (as modified by the Uniform System of Accounts). Lender and its authorized representatives shall have the right at reasonable times and upon reasonable notice to examine the books and records of Borrower relating to the operation of the Property and to make such copies or extracts thereof as Lender may reasonably require. During the continuance of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be reasonably necessary or appropriate in the protection of Lender's interest. Upon Lender's reasonable request, Borrower shall provide such other information reasonably necessary and sufficient to fairly represent the financial condition of Borrower and the Property.

13.2   **Reporting**.

13.2.1   **Annual Financial Reporting**.  Within ninety (90) days following the end of each calendar year, Borrower shall provide or cause to be provided to Lender the

WEIL:\96218278\17\63946.0005

following:  (a) a complete copy of Borrower's annual financial statements setting forth the financial condition for Borrower, which, shall be compiled with respect to Borrower; provided, however, that if Lender notifies Borrower that Lender reasonably suspects that an Event of Default shall be then continuing, same shall be audited by a "big four" accounting firm or other independent certified public accountant reasonably acceptable to Lender (including an unqualified opinion) in accordance with GAAP (as modified by the Uniform System of Accounts), and (b) an Officer's Certificate from Borrower (i) certifying that such annual financial statements are true and correct and fairly present the financial condition for Borrower, and (ii) representing whether any Defaults or Events of Default then exist (and if so, the nature thereof, the period of time it has existed, and the action then being taken to remedy the same). Such statements shall set forth the financial condition and the results of operations for the Property for such calendar year, and shall include, but not be limited to, amounts representing annual Net Cash Flow, Operating Income and Operating Expenses.  Borrower's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses pursuant to the Annual Operating Budget and the actual income and expenses for the prior calendar year, (ii) an unqualified opinion of a "big four" accounting firm or other independent certified public accountant reasonably acceptable to Lender, (iii) occupancy statistics for the Property, (iv) a schedule audited by such independent certified public accountant reconciling Net Operating Income to Net Cash Flow (the "**Net Cash Flow Schedule**"), which shall itemize all adjustments made to Net Operating Income to arrive at Net Cash Flow deemed material by such independent certified public accountant and (v) an Officer's Certificate certifying that each annual financial statement fairly presents the financial condition and the results of operations of Borrower and the Property being reported upon and that such financial statements have been prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP.  Borrower shall deliver to Lender copies of all federal income Tax returns filed by Borrower and Sponsor (if any) within thirty (30) days after each filing thereof.  In addition, on before the first day of each calendar year, Borrower shall provide or cause to be provided to Lender evidence that Guarantor is in compliance with any net worth or liquidity requirements set forth in the Guaranties.  Borrower shall deliver to Lender, no later than October 30 of each calendar year, compiled financial statements with respect to each Sponsor substantially in the format of the financial statements delivered to Lender as of the Effective Date, together with, for each Sponsor, an officer's certificate executed by an authorized signatory of such Sponsor that is familiar with the financial condition of such Sponsor, certifying that such financial statements are true and correct and fairly present the financial condition for such Sponsor.

13.2.2    **Monthly Financial Reporting**.

(a)    **Monthly Financial Statements**.  Borrower shall furnish to Lender, within twenty (20) days following the end of each calendar month, a certified statement, in form reasonably acceptable to Lender, showing:  (i) during the Construction Phase, development/operating progress reports, (ii) following the Construction Phase, Borrower's operating statements and reconciliation statements, each report including an analysis contrasting the figures on such financial reports to then most recently approved Budget and Annual Operating Budget and (iii) a Net Cash Flow Schedule.

(b)    **Monthly Rent Rolls**.  Within twenty (20) days following the end of each calendar month following the Construction Phase and if there are any Leases at the Property,

Borrower shall deliver to Lender the rent roll for the Property (in form and substance reasonably satisfactory to Lender).

        (c)       <u>Intentionally Omitted</u>.

        13.2.3    **<u>Quarterly Financial Reporting</u>**.  Borrower shall furnish to Lender, within forty-five (45) days following the end of each calendar quarter, (i) following the Construction Phase, a certified statement, in form reasonably acceptable to Lender, showing Borrower's and Sponsor's financial statements and operating statements and reconciliation statements, (ii) during the Construction Phase, development/operating progress reports, in each case, each such report with respect to Borrower or the Property shall include an analysis contrasting the figures on such financial reports to then most recently approved Budget and (iii) following the Construction Phase and if there are any Leases at the Property the rent roll for the Property (in form and substance reasonably satisfactory to Lender).

        13.3      **<u>Management Agreement</u>**.  Borrower shall deliver to Lender, within ten (10) Business Days of the receipt thereof by Borrower or any Affiliate of Borrower, including Master Tenant, a copy of all material reports prepared by Manager pursuant to the Management Agreement, including, without limitation, the Annual Operating Budget and any inspection reports.

        13.4      **<u>Intentionally Omitted</u>**.

        13.5      **<u>Copies of Documents Relating to Property</u>**.  Borrower shall deliver to Lender, within ten (10) days of the receipt thereof by Borrower, copies of all material filings, material correspondence, approvals, proposals and similar materials relating or delivered to applicable Governmental Authorities which relate to the Property.

        13.6      **<u>Other Information</u>**.  Borrower shall furnish to Lender, within thirty (30) days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, any Affiliated Manager and Guarantor as may be reasonably requested by Lender.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower or Guarantor which would reasonably be expected to have a material adverse effect on Borrower, Guarantor, the Property or the Project.

        13.7      **<u>Annual Operating Budget</u>**.  For the partial year period commencing on the date of Substantial Completion, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Operating Budget not later than fifteen (15) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender.  The Annual Operating Budget submitted shall be subject to Lender's written approval on a line-item basis (each such Annual Operating Budget, an "**<u>Approved Annual Operating Budget</u>**"), which approval shall not be unreasonably withheld or delayed.  In the event that Lender reasonably objects to a proposed Annual Operating Budget submitted by Borrower, Lender shall

WEIL:\96218278\17\63946.0005

advise Borrower of such reasonable objections within ten (10) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such reasonable objections), and Borrower shall promptly revise such Annual Operating Budget and resubmit the same to Lender.  Lender shall advise Borrower of any objections to such revised Annual Operating Budget within ten (10) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Operating Budget.  If Lender transmits in writing any request by Lender for such additional information as may be reasonable under the circumstances within said ten (10) Business Day Period, then Lender shall be deemed to have responded on a timely basis.  Until such time that Lender approves a proposed Annual Operating Budget, the most recently Approved Annual Operating Budget shall apply; provided, however, that such Approved Annual Operating Budget shall be adjusted to reflect actual increases in Impositions, Insurance Premiums, utilities expenses and other similar expenses. Without limiting the foregoing, provided that no Event of Default is continuing, whenever Lender's approval or consent is required pursuant to the provisions of this Section 13.7, Lender's consent shall be deemed given if:

(a)     the first correspondence from Borrower to Lender requesting such approval or consent is in an envelope marked "Priority" and contains a bold-faced, conspicuous legend at the top of the first page thereof stating that "FIRST NOTICE:  THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT – [PROPERTY ADDRESS]. FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) BUSINESS DAYS MAY RESULT IN THE REQUEST BEING DEEMED GRANTED", and is accompanied by the information and documents required above, and any other information reasonably requested by Lender in writing prior to the expiration of such ten (10) Business Day period after the effectiveness of such notice in order to adequately review the same has been delivered; and

(b)     if Lender fails to respond or to deny such request for approval in writing within such ten (10) Business Day period, a second notice requesting approval is delivered to Lender from Borrower in an envelope marked "PRIORITY" containing a bold-faced, conspicuous legend at the top of the first page thereof stating that "SECOND AND FINAL NOTICE:  THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT – [PROPERTY ADDRESS].  IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN TEN (10) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GIVEN" and Lender fails to provide a substantive response to such request for approval within such second ten (10) Business Day period after the effectiveness of such notice.

XIV     **ENVIRONMENTAL MATTERS**

14.1     **Representations**.  Borrower hereby represents and warrants, as of the date hereof, that except as set forth in the environmental reports and studies delivered to Lender (the "**Environmental Reports**") prior to the date hereof, (i) neither Borrower nor any of its Tenants, occupants or users of the Property has

engaged in or permitted any operations or activities upon, or any use or occupancy of the Property, or any portion thereof, for the purpose of or in any way involving the handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of any Hazardous Materials on, under, in or about the Property, or transported or disposed of any Hazardous Materials to, from or across the Property, except in all cases in material compliance with Environmental Laws and only in the course of legitimate business operations at the Property; (ii) to Borrower's knowledge, prior to Borrower's ownership of the Property, no owner, Tenant, occupant or user of the Property, nor any other person, had engaged in or permitted any operations or activities upon, or any use or occupancy of the Property, or any portion thereof, for the purpose of or in any material way involving the handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of any Hazardous Materials on, in or about the Property, or transported any Hazardous Materials to, from or across the Property, except in all cases in material compliance with Environmental Laws and only in the course of legitimate business operations at the Property; (iii) to Borrower's knowledge, no Hazardous Materials are presently constructed, deposited, stored, or otherwise located on, under, in or about the Property except in material compliance with Environmental Laws; and (iv) to Borrower's knowledge, no Hazardous Materials have migrated from the Property upon or beneath other properties which would reasonably be expected to result in material liability for Borrower.

14.2     **Covenants**.

14.2.1     **Compliance with Environmental Laws**.  Borrower covenants and agrees with Lender that it shall comply in all material respects with all Environmental Laws.  If at any time during the continuance of the Lien of the Mortgage, a Governmental Authority having jurisdiction over the Property requires remedial action to correct the presence of Hazardous Materials in, around, or under the Property (an "**Environmental Event**"), Borrower shall deliver prompt notice of the occurrence of such Environmental Event to Lender.  Within thirty (30) days after Borrower has knowledge of the occurrence of an Environmental Event, Borrower shall deliver to Lender an Officer's Certificate explaining the Environmental Event in reasonable detail based on Borrower's knowledge and setting forth the proposed remedial action, if any.  Borrower shall promptly provide Lender with copies of all notices which allege or identify any actual or potential violation or noncompliance received by Borrower in connection with any Environmental Law.  For purposes of this paragraph, the term "notice" shall mean any written summons, citation, directive, order, claim, pleading, letter, application, filing, report, findings, declarations or other materials pertinent to compliance of the Property and Borrower with such Environmental Laws.

14.2.2     **Environmental Reports**.  Upon the occurrence of an Environmental Event with respect to the Property or during the continuance of any Event of Default, Lender shall have the right to have its consultants perform a comprehensive environmental audit of the Property.  Such audit shall be conducted by an Environmental Consultant chosen by Lender and may include a visual survey, a record review, an area reconnaissance assessing the presence of hazardous or toxic waste or substances, PCBs or storage tanks at the Property, and such further site assessments as Lender may reasonably require due to the results obtained from the

154

foregoing.  Borrower grants Lender, its consultants and contractors the right to enter the Property as reasonable or appropriate for the circumstances for the purposes of performing such studies and the reasonable cost of such studies shall be due and payable by Borrower to Lender upon demand and shall be secured by the Lien of the Mortgage.  Lender shall not unreasonably interfere with, and Lender shall direct the Environmental Consultant to use its commercially reasonable efforts not to hinder, Borrower's or any Tenant's, other occupant's or Manager's operations upon the Property when conducting such audit, sampling or inspections.  By undertaking any of the measures identified in and pursuant to this Section 14.2.2, Lender shall not be deemed to be exercising any control over the operations of Borrower or the handling of any environmental matter or hazardous wastes or substances of Borrower for purposes of incurring or being subject to liability therefore.

14.3    **Environmental Indemnification**.    Borrower shall protect, indemnify, save, defend, and hold harmless the Indemnified Parties from and against any and all liability, actual loss, damage (excluding consequential damages other than consequential damages payable by an Indemnified Party to a third party), actions, causes of action, actual out-of-pocket costs or expenses whatsoever (including reasonable out-of-pocket attorneys' fees and expenses) and any and all claims, suits and judgments which any Indemnified Party (but shall not include any Person (other than Lender's nominee or designee or any person affiliated with Lender) who purchases the Property at any time following a foreclosure or acceptance of a deed in lieu of foreclosure) may suffer, as a result of or with respect to:  (a) any Environmental Claim relating to or arising from the Property; (b) the violation of any Environmental Law in connection with the Property; (c) any release, spill, or the presence of any Hazardous Materials affecting the Property; and (d) the presence at, in, on or under, or the release, escape, seepage, leakage, discharge or migration at or from, the Property of any Hazardous Materials, whether or not such condition was known or unknown to Borrower.   If any such action or other proceeding shall be brought against Lender, upon written notice from Borrower to Lender (given reasonably promptly following Lender's notice to Borrower of such action or proceeding), Borrower shall be entitled to assume the defense thereof, at Borrower's expense, with counsel reasonably acceptable to Lender;  provided, however, that if (i) an Event of Default exists; (ii) any Indemnified Party notifies Borrower in writing that under applicable ethics rules an actual conflict of interest exists which precludes the counsel chosen by Borrower from undertaking the defense of such Indemnified Party or Parties; or (iii) if the defendants in any such action include both Indemnified Parties and Borrower and Indemnified Parties shall have reasonably concluded that there are any legal defenses available to them that are different from or in addition to those available to Borrower, then Indemnified Parties shall have the right, at the expense of Borrower, to employ separate counsel in any such action and to participate in the defense thereof and the reasonable out-of-pocket fees and disbursements of counsel for Indemnified Parties in connection therewith shall be paid by Borrower.   Borrower shall have no obligation to indemnify an Indemnified Party for damage or loss (x) resulting from such Indemnified Party's gross negligence or willful misconduct or (y) relating to Hazardous Materials which are initially introduced on, in or under the Property which first occurred on or after the date on which Lender or its nominee acquires

title to and possession of, the Property at a foreclosure sale or accepts tender of a deed in lieu of foreclosure by Borrower.

14.4 **Recourse Nature of Certain Indemnifications**. The indemnification provided in Section 14.3 shall be fully recourse to Borrower and shall be independent of, and shall survive, the discharge of the Debt, the release of the Lien created by the Mortgage, and/or, except as provided herein, the conveyance of title to the Property to Lender or any purchaser or designee in connection with a foreclosure of the Mortgage or conveyance in lieu of foreclosure.

## XV   SECONDARY MARKET TRANSACTIONS

15.1 **Secondary Market Transactions**.

(a) Borrower acknowledges and agrees that Lender may, subject to the provisions of Section 15.1(b), Section 15.1(c) and Article XVI, (i) sell, transfer or assign all or any portion of its interest in the Loan and the Loan Documents, (ii) pledge all or any portion of its interest in the Loan and the Loan Documents, (iii) grant or issue one or more participations therein, (iv) create within the Loan one or more senior and subordinate notes or multiple components of such note or notes, and thereafter sell, assign, participate, syndicate or securitize all or any part of any variant of the Note, and/or (v) consummate one or more private or public securitizations of rated single- or multi-class securities (the "**Securities**") secured by or evidencing ownership interests in all or any portion of its interest in the Loan and the Loan Documents or a pool of assets that include the Loan and the Loan Documents (a "**Securitization**"; and together with any other such sales, transfers and/or participations, collectively, a "**Secondary Market Transaction**"); provided, however, that:

(A) after giving effect to such Secondary Market Transaction, the total maximum principal amount for the Loan and/or any Tranches therein created by a Secondary Market Transaction shall not exceed the sum of the Loan Amount;

(B) the Secondary Market Transaction shall not increase Borrower's or Guarantor's obligations or decrease their rights under the Loan Documents (other than to a de minimis extent), nor shall it have an adverse effect on Borrower or Guarantor;

(C) Lender shall not transfer the Note to a Person that is not an Eligible Assignee or an Affiliate of Lender at the time of such Transfer;

(D) such Secondary Market Transaction shall not result in the making of any representation or warranty beyond the scope of the representations or warranties set forth in this Agreement;

(E)   such Secondary Market Transaction shall not result in Borrower being obligated to pay any additional Taxes, including without limitation any mortgage recording Taxes or Other Taxes (unless otherwise provided for hereunder); and

(F)   such Secondary Market Transaction shall not result in any modification of any other term of the Loan (including, without limitation, any financial obligations, personal recourse, representations and warranties and reporting requirements).

(b)   If Lender determines at any time to participate in a Secondary Market Transaction, Lender may forward to each actual or potential purchaser, transferee, assignee (or proposed assignee), servicer, participant or investor (or proposed investor) in the Loan or such Securities, any Rating Agency, any regulator or other Governmental Authority and their representatives, any organization maintaining databases on the underwriting and performance of commercial loans, trustees, counsel, and accountants, and any representatives or agents of any of the foregoing, all documents and information which Lender now has or may hereafter acquire relating to the Loan, Borrower, Manager, Guarantor, and any direct or indirect equity owner of Borrower, which shall have been furnished to Lender in connection with the Loan, as Lender in its reasonable discretion determines necessary or desirable to complete the Secondary Market Transaction, including without limitation, financial statements relating to Borrower, Guarantor, the Property and any Tenant at the Property provided that such Person agrees to maintain the confidentiality of Guarantor's financial statements and related documentation pursuant to a confidentiality agreement in customary and reasonable form and provided such disclosure does not result in a breach of any agreement with a third party (other than any agreement made to circumvent this provision).  Borrower irrevocably waives any and all rights it may have under law or in equity to prohibit such disclosure, including but not limited to any right of privacy.

(c)   Notwithstanding anything to the contrary contained herein, until the date that is one year following the opening of the Project, provided no Event of Default has occurred and is continuing, without Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed), the interest(s) in the Loan retained by Lender or one or more Lender Affiliates shall equal not less than fifteen percent (15%) of the Outstanding Principal Balance.

15.2   **Borrower Cooperation**.

(a)   In connection with any Secondary Market Transaction, Borrower shall execute and deliver to Lender such documents, instruments, certificates, financial statements and assignments and use commercially reasonable efforts to do such other acts and provide such information, and participate in such meetings and discussions, in each case that are necessary to facilitate the consummation of each Secondary Market Transaction, including, without limitation, executing and delivering such documents and agreements (and deliver such opinions of counsel with respect thereto as to Lender may reasonably require, including, without limitation, a non-consolidation opinion), reasonably necessary to (i) restructure the Loan into multiple notes (which may include component notes and/or senior and junior notes) and/or

157

reduce the number of notes, and/or (ii) establish different interest rates for any such notes, component notes, senior and/or junior notes and to require the payment of the indebtedness evidenced by such notes Loan in such order of priority as may be designated by Lender (collectively, "**Tranches**") may be paid in such order of priority as may be designated by Lender, bear such interest rates and principal balances, and include an allocation of monthly debt service payments as Lender may determine, and/or (iii) modify any operative dates (including the Payment Dates, the Interest Determination Date, and the Interest Period) under the Loan Documents; provided, however, that (A) the aggregate principal amount of such Tranches as of their date of creation shall comply with the conditions in clauses (A)-(C) of Section 15.1(a), (B) the debt service payments on all such Tranches shall on the date they are created equal the debt service payment that was due under the Loan immediately prior to the creation of such Tranches, and (C) the weighted average interest rate of the Loan (and all Tranches) shall, in the aggregate, equal the Interest Rate.  Lender, without in any way limiting Lender's other rights hereunder, in Lender's sole and absolute discretion, shall have the right, at any time (whether prior to or after any Secondary Market Transaction), to create one or more mezzanine loans (each, a "**New Mezzanine Loan**"), to establish different interest rates and to reallocate the outstanding principal balance of the Loan and monthly debt service payments for the Loan to the Loan and such New Mezzanine Loan(s) and to require the payment of the Loan and any New Mezzanine Loan(s) in such order of priority as may be designated by Lender; provided, that the outstanding principal balance of the Loan and such New Mezzanine Loan(s) immediately after the effective date of the creation of such New Mezzanine Loan(s) equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for the Loan and such New Mezzanine Loan(s) immediately after the effective date of the creation of such New Mezzanine Loan(s) equals the interest rate of the Note immediately prior to such modification.  Borrower shall cause the formation of one or more special purpose, bankruptcy remote entities as required by Lender in order to serve as the borrower under any New Mezzanine Loan (each, a "**New Mezzanine Borrower**") and the applicable organizational documents of Borrower shall be amended and modified as necessary or required in the formation of any New Mezzanine Borrower.  Further, Lender, without in any way limiting Lender's other rights hereunder, in Lender's sole and absolute discretion, shall have the right, at any time (whether prior to or after any Secondary Market Transaction), to create one or more mortgage loans (each, a "**New Mortgage Loan**"), to establish different interest rates and to reallocate the outstanding principal balance of the Loan and monthly debt service payments for the Loan to the Loan and such New Mortgage Loan(s) and to require the payment of the Loan and any New Mortgage Loan(s) in such order of priority as may be designated by Lender; provided, that the outstanding principal balance of the Loan and such New Mortgage Loan(s) immediately after the effective date of the creation of such New Mortgage Loan(s) equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for the Loan and such New Mortgage Loan(s) immediately after the effective date of the creation of such New Mortgage Loan(s) equals the interest rate of the Note immediately prior to such modification; and provided further that Borrower shall not be obligated to incur any cost and expense (other than to a de minimis extent), including recording fees, in connection with the creation of any New Mortgage Loan and any such New Mortgage Loan shall not increase Borrower's obligations or liabilities or decrease Borrower's rights other than to a de minimis extent.

(b)     At the request of Lender, Borrower shall provide information regarding Borrower, Guarantor or the Property which is not in the possession of Lender or which may be reasonably required by Lender in order to satisfy the market standards to which Lender customarily adheres or which may be reasonably required by prospective investors and/or the Rating Agencies or required by applicable Legal Requirements in connection with any such Secondary Market Transaction, including, without limitation, to use commercially efforts to: (i) provide (and cooperate with Lender's procurement of, including permission to perform any necessary site inspections, updated appraisals, market studies, environmental reviews and reports, property condition reports and other due diligence investigations of the Property) additional and/or updated information concerning Borrower, Guarantor, any Manager, or the Property, together with appropriate verification and/or consents related to such information through letters of auditors or opinions of counsel of independent attorneys reasonably acceptable to Lender and the Rating Agencies (the "**Updated Information**"); (ii) assist in preparing descriptive materials for presentations to any or all of the Rating Agencies, and work with, and if requested, supervise, third-party service providers engaged by Borrower and its Affiliates to obtain, collect, and deliver information requested or required by Lender or the Rating Agencies; (iii) deliver (1) new or updated Opinions of Counsel as to due execution and enforceability with respect to the Property, Borrower, Guarantor and their respective Affiliates, and the Loan Documents (including, without limitation, a so-called "10b-5" opinion), in substantially the same form and substance as the Opinions of Counsel with respect to such matters provided to Lender at Closing, (2) a non-consolidation opinion in form and substance acceptable to the Rating Agencies and Lender, and (3) revised organizational documents for Borrower and certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower as of the date of the Secondary Market Transaction, which counsel opinions and revisions to organizational documents shall be reasonably satisfactory to Lender and the Rating Agencies; (iv) use commercially reasonable efforts to deliver such additional tenant estoppel letters and subordination, non-disturbance and attornment agreements or, if applicable, estoppels from parties to agreements that affect the Property, which estoppel letters and subordination non-disturbance and attornment agreements shall be reasonably satisfactory to Lender and the Rating Agencies; (v) make such representations and warranties as of the closing date of the Secondary Market Transaction with respect to the Property, Borrower, Guarantor and the Loan Documents as may be reasonably requested by Lender or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents; (vi) if requested by Lender, review any information regarding the Property, Borrower, Guarantor, any Manager and the Loan which is contained in a preliminary or final private placement memorandum, prospectus, prospectus supplement (including any amendment or supplement to either thereof), or other disclosure document to be used by Lender; and (vii) supply to Lender updates to such documentation, financial statements and reports which were delivered at or prior to Closing in form and substance required in order to comply with any applicable securities laws (the "**Financial Information**"); provided, however, (1) with respect to any information requested to be provided or prepared by Borrower (other than updates of information previously provided or prepared by Borrower), Borrower shall not be required to prepare any materials, reports or other information which is not customarily utilized in the ordinary course of its business (provided that to the extent such materials, reports or other information or the related format thereof may be incorporated by Borrower without unreasonable hindrance, Borrower

shall use commercially reasonable efforts to produce the same), (2) with respect to any certificate, updated opinion or other document requesting that Borrower certify as to the accuracy of any representation or warranty, or that any opinion giver provide an updated opinion, Borrower shall not be required to provide any representation or warranty beyond those expressly set forth in the Loan Documents and Borrower or opinion giver, as applicable, shall be permitted to adjust any such certification, representation or update to reflect the facts as they then may exist, (3) with respect to any meetings, appraisals, preparation of updated reports, inspections or on-site inspections, the same shall be conducted promptly upon prior written notice, no more frequently than once in connection with any Securitization, in a manner designed to minimize interruption to Borrower's ordinary course of business, and (4) Guarantor shall not be required to provide any financial information beyond the financial information provided to Lender in connection with the closing of the Loan (or any update of such information provided) and as provided in the Guaranty.

(c)     Borrower shall not be obligated to incur any cost and expense (other than to a de minimis extent) in connection with complying with the requests made under <u>Section 15.1</u> and this <u>Section 15.2</u>.  All reasonable third party costs and expenses incurred by Borrower, Sponsor, Guarantor or Lender in connection with Borrower's complying with requests made under <u>Section 15.1</u> and this <u>Section 15.2</u> shall be paid by Lender.

15.3     **<u>Securitization Indemnification</u>**.

(a)     Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in disclosure documents in connection with the Securitization, including, without limitation, an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "**<u>Disclosure Document</u>**") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act or Exchange Act, and may be made available to investors or prospective investors in the Securities, rating agencies, investment banking firms, any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act (without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization), accounting firms, law firms and other third party advisory and service providers relating to the Securitization.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by Lender, the issuer of any Securitization or any Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.  Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Borrower Affiliates, the Property, Manager, Guarantor and all other aspects of the Loan, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying (1) Lender and its Affiliates (including, for purposes of this <u>Section 15.3</u>, the Person that has filed the registration statement relating to the Securitization, each of its directors and officers, and

each Person that controls such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) (collectively, the "**Indemnitee Group**"), and (2) such Person that has filed the registration statement relating to the Securitization and any other placement agent or underwriter with respect to the Securitization, each of their respective directors and officer, and each Person who controls the foregoing within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "**Underwriter Group**") for any actual third party losses, claims, damages (specifically excluding punitive, special and exemplary damages) or liabilities (collectively, the "**Liabilities**") to which Lender, the Indemnitee Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Updated Information and the Financial Information and (C) agreeing to reimburse Lender, the Indemnitee Group and/or the Underwriter Group for any legal or other expenses actually and reasonably incurred by Lender, the Indemnitee Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission of a material fact made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Property. The indemnification provided for in clauses (B) and (C) above shall be effective whether or not the indemnification agreement described above is provided. The aforesaid indemnity will be in addition to any liability which Borrower may otherwise have. In connection with Exchange Act filings, Borrower shall (i) indemnify, defend and hold Lender, the Indemnitee Group and the Underwriter Group harmless from and against all Liabilities to which Lender, the Indemnitee Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the failure of Borrower to state in the Disclosure Document a material fact known to Borrower and required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the Indemnitee Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Indemnitee Group or the Underwriter Group in connection with defending or investigating the Liabilities. This Section 15.3 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)     Promptly after receipt by an indemnified party under this Section 15.3 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 15.3, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel reasonably satisfactory to such indemnified party. After

WEIL:\96218278\17\63946.0005

notice from the indemnifying party to such indemnified party under this <u>Section 15.3</u>, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and there is an actual conflict of interest between the indemnified party, on the one hand, and the indemnifying party, on the other hand, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.  Without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Lender reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings, and such settlement requires no statement as to, or an admission of, fault, culpability or a failure to act, by or on behalf of the indemnified party.

(c)     The liabilities and obligations of Borrower and Lender under this <u>Section 15.3</u> shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

15.4     **<u>Rating Agency Confirmation</u>**.  Borrower acknowledges and agrees that if the Loan is part of a Securitization, Lender may be required to obtain confirmation from one or more Rating Agencies that the granting of certain consents, approvals, or waivers (and certain other actions of Lender) will not cause a downgrade, withdrawal or qualification of any ratings of the Securities or any class thereof, and that any such consent or approval by Lender may be conditioned upon receipt of such confirmation and the satisfaction of any conditions precedent thereto required by such Rating Agencies.  The circumstances under which this might arise include, but are not limited to, request to approve the replacement of a Manager, and requests for approvals of Transfers.  Lender shall be responsible for any and all fees and costs incurred in order to obtain any such Rating Agency confirmation (and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation).

15.5     **<u>Servicer</u>**.  At the option of Lender and upon notice to Borrower, the Loan may be serviced by a servicer (any such servicer, together with its agents, nominees or designees, are collectively referred to as "**<u>Servicer</u>**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a servicing agreement (the "**<u>Servicing Agreement</u>**") between Lender and Servicer.  Lender shall be responsible for any reasonable set up fees and any other initial costs relating to or arising under the Servicing Agreement.  Borrower shall be responsible for (a) the

payment of servicing fees or trustee fees due to Servicer under the Servicing Agreement, (b) the payment of any out-of-pocket costs and expenses and/or "special servicing," "workout," and "liquidation" fees incurred pursuant to the Servicing Agreement in connection with any default or workout of the Loan and (c) all costs and expenses relating to or arising from any special requests made by Borrower or Guarantor during the term of the Loan, including, without limitation, in connection with any prepayment, assumption or modification of the Loan; provided, however, prior to an Event of Default, Borrower shall not be responsible for any standard monthly servicing fees in excess of $2,500 per month (which such cap, for the avoidance of doubt, does not apply to any "special servicing," "workout," or "liquidation" fees).

## XVI   **ASSIGNMENTS AND PARTICIPATIONS**

16.1      **Assignment and Acceptance**.  The parties to each Secondary Market Transaction assignment shall execute and deliver to Lender an Assignment and Acceptance, with (and subject to) the subscribed consent of Lender.  Upon the consummation of any assignment pursuant to this Section 16.1, the transferor Lender and Borrower shall make appropriate arrangements in accordance with Section 7.1.11 so that, if required, a new Note or notes are issued to the assignee.  If the assignee, participant or other transferee in the Secondary Market Transaction is not incorporated under the laws of the United States or a state thereof, it shall deliver to Borrower and Lender certification (reasonably satisfactory to Borrower in its good faith discretion) setting forth that such assignee, participant or other transferee is entitled to an exemption from the deduction or withholding of any United States federal income Taxes in accordance with Section 2.16.  No assignee, participant or other transferee of Lender's rights with respect to a Secondary Market Transaction shall be entitled to receive any greater payment under Section 2.15 or Section 2.16 than Lender would have been entitled to receive with respect to the rights transferred, unless such transfer is made with Borrower's prior written consent or by reason of the provisions of Section 2.15 or Section 2.16 requiring Lender to designate a different Lending Office under certain circumstances or at a time when the circumstances giving rise to such greater payment did not exist.  Subject to the provisions of Section 2.15 or Section 2.16, Lender may transfer and carry the Debt or its Loans at, to or for the account of any domestic or foreign branch office, subsidiary or affiliate of Lender.  In the event that any Lender participates all or any portion of its interest in this Agreement, the Debt, the Loan or any of the Loan Documents (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (c) Borrower and any other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, (d) such Lender shall use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16(h) with respect to any participant, (e) any agreement or instrument pursuant to which a Lender sells such a participation shall provide that (i) such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement and (ii) the

applicable participant agrees to be subject to the provisions of Section 2.15(c) and Section 2.16(g) as if it were an assignee or other transferee, and (f) the documentation required under Section 2.16(d) shall be delivered to the participating Lender to the same extent as if it were a Lender and had acquired its interest by assignment or other transfer.

16.2    **Effect of Assignment and Acceptance**.  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (a) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of the assigning Lender, as the case may be, hereunder and such assignee shall be deemed to have assumed such rights and obligations, and (b) the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement and the other Loan Documents (and, in the case of an Assignment and Acceptance covering all or the remaining portion of Lender's rights and obligations under this Agreement and the other Loan Documents, the assigning Lender shall cease to be a party hereto) accruing from and after the effective date of the Assignment and Acceptance.

16.3    **Content**.    By executing and delivering an Assignment and Acceptance, Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (a) other than as provided in such Assignment and Acceptance, Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, this Agreement or any other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (b) Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or the performance or observance by Borrower of any of its obligations under any Loan Documents or any other instrument or document furnished pursuant thereto; (c) such assignee confirms that it has received a copy of this Agreement, together with copies of such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (d) such assignee will, independently and without reliance upon Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; and (e) such assignee agrees that it will perform, in accordance with their terms, all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by Lender.

16.4    **Registered Obligation**.    Notwithstanding anything in this Agreement or any Loan Document to the contrary, this Agreement, the Debt,  the

Loan and the Note are registered as to both principal and any stated interest with Borrower and any Secondary Market Transaction of all or any portion of the Debt, the Loan or the Note or the Secondary Market Transaction of the right to any portion of the principal of or interest on, the Debt, the Loan or the Note may be effectuated only by way of the following methods: (A) through a book entry system maintained by Borrower (or a registrar appointed by Borrower as its non-fiduciary agent ("**Registrar**")), located in an office in the U.S., and only upon delivery of written notification to Borrower (or the Registrar as its agent) that a Secondary Market Transaction has been duly executed by Lender or (B) the surrender of the relevant Note, and either the re-issuance by Borrower of the Note to the new lender, assignee, participant or other transferee or the issuance by Borrower of a new promissory note to the new lender, assignee, participant or other transferee; all in accordance with the rules concerning obligations in registered form set forth under Sections 1.871-14(c) and 5f.103-1(c) of the U.S. federal income tax regulations promulgated under the Code.  Borrower hereby agrees that ownership of an interest in the Debt, the Loan or any Note will, at all times, be reflected in a book entry system located in the U.S. (the "**Book Entry Registry**") maintained by the Borrower (or the Registrar as its non-fiduciary agent), whether or not physical securities are issued, that satisfies the requirements for registration of a book entry obligation under Section 5f.103- 1(c)(2) of the U.S. federal income tax regulations promulgated under the Code. Under such regulations, a "book entry" is a record of ownership that identifies the owner of an interest in an obligation.  The Book Entry Registry shall include the name and address of each Lender and the name and address of each purchaser, participant, transferee or assignee of a Lender in respect of all or any portion of the Debt, the Loan or any Note, and the principal amount of the Loan owing to each Lender pursuant to the terms hereof and under each and any participation or assignment agreement.  For the avoidance of doubt, and notwithstanding any term or provision to the contrary contained in this Agreement, any Note or any other Loan Document, none of the Debt, the Loan on any Note is a negotiable instrument under any applicable commercial or negotiable instruments law.  Any purported Secondary Market Transaction of all or any portion of the Debt, the Loan or the Note by any way other than as described in this Section 16.4 shall have no force or effect, and Borrower shall be entitled to make payments hereunder to the last recorded Lender (identified in the Book Entry Registry maintained by Borrower or the Registrar as Borrower's non-fiduciary agent, for such purpose) despite any such Secondary Market Transaction.

## XVII   **RESERVE ACCOUNTS**

17.1   **Tax Reserve Account**.  On the Closing Date, Lender shall deposit, as part of the initial Advance on the Closing Date, the amount of $164,726.00 representing Lender's estimate of the amount of Impositions that will be payable during the first twelve (12) months after the Closing Date, and Lender shall deposit such funds into the Tax Reserve Account. From and after the first anniversary of the Closing Date, Borrower shall request Advances to pay for Impositions not later than the Payment Date immediately preceding each date on which an installment of Impositions shall be due and payable; provided, however, that from and after the

Payment Date first occurring after the expiration of the Construction Phase, and on each Payment Date thereafter, Borrower shall deposit an amount equal to the sum of (a) one-twelfth of the annual Impositions that Lender reasonably estimates (based on the most recent tax bill for the Property or other information reasonably available to Lender) will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Impositions at least thirty (30) days prior to the imposition of any interest, charges or expenses for the non-payment thereof and (b) one-twelfth of the annual Other Charges that Lender reasonably estimates will be payable during the next ensuing twelve (12) months (hereinafter called the "**Monthly Tax Reserve Amount**," and the aggregate amount of funds held in the Tax Reserve Account being the "**Tax Reserve Amount**"). Lender will apply the Monthly Tax Reserve Amount to payments of Impositions and Other Charges required to be made by Borrower pursuant to this Agreement and under the Mortgage, subject to Borrower's right to contest Impositions in accordance with Section 9.3.  In making any payment relating to the Tax Reserve Account, Lender may do so according to any bill, statement or estimate procured from the appropriate public office, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof until such time as Borrower shall notify Lender of a potential inaccuracy in any bill, statement or estimate or challenge the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of funds in the Tax Reserve Account shall exceed the amounts due for Impositions and Other Charges pursuant to this Agreement, Lender shall credit such excess against future payments to be made to the Tax Reserve Account.  Upon payment of the Impositions and Other Charges, Lender shall reassess the amount necessary to be deposited in the Tax Reserve Account for the succeeding period, which calculation shall take into account any excess amounts remaining in the Tax Reserve Account.  Any Tax Reserve Amount remaining on deposit in the Tax Reserve Account upon the payment in full of the Debt shall be disbursed to Borrower.

      17.2    **Insurance Reserve Account**.  On the Closing Date, Lender shall deposit, as part of the initial Advance on the Closing Date, the amount of $126,069.00 representing Lender's estimate of the amount of Insurance Premiums that will be payable during the first twelve (12) months after the Closing Date, and Lender shall deposit such funds into the Insurance Reserve Account.  From and after the first anniversary of the Closing Date, Borrower shall request Advances to pay for Insurance Premiums not later than the Payment Date immediately preceding each date on which the Insurance Premiums will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof; provided, however, that from and after the Payment Date first occurring after the expiration of the Construction Phase, and on each Payment Date thereafter, Borrower shall deposit an amount equal to one-twelfth of the Insurance Premiums that Lender reasonably estimates, based on the most recent bill, will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies required to be maintained by Borrower pursuant to the terms hereof (said monthly amounts hereinafter called the

"**Monthly Insurance Reserve Amount**," and the aggregate amount of funds held in the Insurance Reserve Account being the "**Insurance Reserve Amount**").  Lender will apply the Monthly Insurance Reserve Amount to payments of Insurance Premiums required to be made by Borrower pursuant to this Agreement and under the Mortgage.  In making any payment relating to the Insurance Reserve Account, Lender may do so according to any bill, statement or estimate procured from the insurer or agent, without inquiry into the accuracy of such bill, statement or estimate or into the validity thereof until such time as Borrower shall notify Lender of a potential inaccuracy in any bill, statement or estimate or challenge the validity of such bill, statement or estimate.  If the amount of funds in the Insurance Reserve Account shall exceed the amounts due for Insurance Premiums pursuant to this Agreement, Lender shall credit such excess against future payments to be made to the Insurance Reserve Account.  If at any time Lender reasonably determines that the Insurance Reserve Amount is not or will not be sufficient to pay Insurance Premiums by the dates set forth above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the applicable Policies.  Upon payment of such Insurance Premiums, Lender shall reassess the amount necessary to be deposited in the Insurance Reserve Account for the succeeding period, which calculation shall take into account any excess amounts remaining in the Insurance Reserve Account.  Any Insurance Reserve Amount remaining on deposit in the Insurance Reserve Account upon the payment in full of the Debt shall be disbursed to Borrower.

17.3     **Ground Rent Reserve Account**.  Borrower shall deposit with Lender on the Closing Date, an amount equal to $0.00 to fund the Ground Rent that Lender reasonably estimates will be payable by Leasehold Borrower, as ground lessee, under the Ground Lease during the term of the Ground Lease, which such amount will be deposited into the Ground Rent Reserve Account.  Such deposit may be increased by Lender in the amount Lender deems is necessary in its reasonable discretion based on any increases in the Ground Rent by notice to Borrower.  Lender will apply amounts held in the Ground Rent Reserve to payments of Ground Rent required to be made by Leasehold Borrower pursuant to the Ground Lease.  In making any payment relating to the Ground Rent Reserve Account, Lender may do so according to any bill, statement or estimate procured by Ground Lessor, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any rent, additional rent or other charge thereof.  Any Ground Rent Reserve Amount remaining on deposit in the Ground Rent Reserve Account upon the earlier of (i) Leasehold Borrower acquiring the fee interest in the Leasehold Land and otherwise complying with the provisions of Section 7.6 and (ii) payment in full of the Debt shall be disbursed to Borrower.

17.4     **Security Deposits**.

17.4.1     **Deposits into Security Deposit Reserve Account**.  Borrower shall comply with all Legal Requirements and the requirements of any applicable Lease with respect

to any security given under such Lease.  Subject to the foregoing, Borrower shall deposit or cause to be deposited all Security Deposits (other than Lease Letters of Credit) under the Leases into the Security Deposit Reserve Account within one (1) Business Day after receipt.

17.4.2   **Disbursements from Security Deposit Reserve Account**.  Borrower may direct Lender to cause the Cash Management Bank to disburse funds from the Security Deposit Reserve Account in an amount equal to the applicable Security Deposit (or applicable portion thereof) (i) at such time as no Event of Default has occurred and is continuing provided the proceeds are applied in the ordinary course of business to sums due under the applicable Lease when the terms of such Lease or applicable Legal Requirements permit the application thereof or (ii) returned to the applicable Tenant pursuant to Legal Requirements or the terms of the applicable Lease which require Borrower to return such Security Deposit (or portion thereof). In the event an Event of Default has occurred and is continuing and Borrower is required pursuant to the terms of the applicable Lease or applicable Legal Requirements to return any Security Deposit (or portion thereof) to a Tenant, Borrower shall deliver a notice to Lender certifying same and stating the reason therefor.  Lender shall, at Lender's option, instruct the Cash Management Bank to deliver the Security Deposit (or portion thereof) (1) to Borrower for delivery to the applicable Tenant or, (2) at Lender's election, directly to the applicable Tenant.

17.4.3   **Delivery of Lease Letter of Credit**.  Borrower covenants and agrees to deliver to Lender upon Borrower's or Manager's receipt thereof each Lease Letter of Credit executed in connection with any Lease, with the effect that Lender shall be the beneficiary thereunder.  All Lease Letters of Credit shall provide that any drawing thereunder shall be by presentation of a clean sight draft, without any representations or warranties of the beneficiary and be irrevocable, transferable and otherwise reasonably acceptable to Lender in form, content and as to issuer.

17.4.4   **Draws Upon Lease Letters of Credit**.  Borrower shall have the right to (i) make drawings under a Lease Letter of Credit at such time as no Event of Default has occurred and is continuing provided the proceeds are applied in the ordinary course of business to sums due under the applicable Lease when the terms of such Lease or applicable Legal Requirements permit the application thereof or (ii) return such Lease Letter of Credit to the applicable Tenant pursuant to Legal Requirements or the terms of the applicable Lease which require Borrower to return such Lease Letter of Credit, and Lender agrees to return such Lease Letter of Credit to Borrower in such circumstance.  After the occurrence and during the continuation of an Event of Default, Borrower shall have no right to make a drawing under, or return (unless required by the Lease or applicable law), a Lease Letter of Credit, except as may be approved by Lender.  In the event an Event of Default has occurred and is continuing and Borrower is required pursuant to the terms of the applicable Lease or applicable Legal Requirements to return any Lease Letter of Credit to the applicable Tenant, Borrower shall deliver a notice to Lender certifying same and stating the reason therefor and, if Lender shall be holding such Lease Letter of Credit pursuant to this Section 17.4, Lender shall, at Lender's option and at Borrower's sole cost and expense, either deliver the Lease Letter of Credit to Borrower, or deliver the applicable Lease Letter of Credit to directly to the applicable Tenant.

17.4.5   **Expiring Lease Letters of Credit.**  In the event that at any time any Lease Letter of Credit delivered to Lender by or on behalf of Borrower pursuant to this Section

<u>17.4</u> by its terms (including pursuant to a notice given pursuant thereto) shall be due to expire within thirty (30) days, on or before the day which is thirty (30) days prior to such expiration, Borrower shall give notice thereof to Lender and Lender shall (or if Lender shall not receive such notice from Borrower, if Lender shall elect), to the extent permitted by the terms of the Lease Letter of Credit, the applicable Lease and applicable Legal Requirements, make a drawing on the Lease Letter of Credit in accordance with the applicable Lease and shall deposit such sums into the Security Deposit Reserve Account.

17.4.6   **Indemnity**.  Borrower shall indemnify and hold Lender and each of the other Indemnified Parties harmless from and against all liability, loss, damage, cost, or expense (including reasonable attorneys' fees and disbursements incurred in the enforcement of this indemnity) in connection with any claim by any Tenant or any Person claiming by or through Borrower or any Tenant in connection with any drawing by Lender on the Lease Letter of Credit or the application of any proceeds thereof or the transfer of the Lease Letter of Credit unless arising from the gross negligence or willful misconduct of Lender.  This indemnity shall survive the payment and performance of all Debt.  This Section 17.4.6 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

17.5   **FF&E**.

17.5.1   Commencing on the first Payment Date that occurs immediately following Completion of the Project (the "**Project Commencement Date**") and on each Payment Date thereafter, Borrower shall deposit with Lender, to be deposited into the FF&E Reserve Account, an amount equal to the Monthly FF&E Reserve Amount.  As used herein, the "**Monthly FF&E Reserve Amount**" means (a) for the period commencing on the Project Commencement Date through and including the day immediately preceding the first anniversary of the Project Commencement Date, two percent (2%) of Operating Income received during the preceding calendar month, (b) for the period commencing on the first anniversary of the Project Commencement Date through and including the day immediately preceding the second anniversary of the Project Commencement Date, three percent (3%) of Operating Income received during the preceding calendar month and (c) for the period from and after the second anniversary of the Project Commencement Date, four percent (4%) of Operating Income received during the preceding calendar month. The "**FF&E Reserve Amount**" means the aggregate amount of funds held in the FF&E Reserve Account.

17.5.2   Within ninety (90) days after the end of the Fiscal Year, amounts deposited into the FF&E Reserve Account during such Fiscal Year shall be adjusted to ensure that the aggregate amount of all deposits made into the FF&E Reserve Account during such Fiscal Year is equal to the amount required to have been deposited therein in accordance with the Management Agreement and this Agreement.  Any shortfall in an FF&E Reserve Account on the date such adjustment is computed, to the extent not otherwise funded by Borrower, shall be funded into the FF&E Reserve Account from amounts that otherwise would be distributed to Borrower from the Borrower's Disbursement Account on the Payment Date immediately following the end of the month in which such adjustment is computed.  Any FF&E Reserve Amount remaining on deposit in the FF&E Reserve Account upon the payment in full of the Debt shall be disbursed to Borrower.

WEIL:\96218278\17\63946.0005

XVIII  **DEFAULTS**

     18.1       **Event of Default**.

     (a)       Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

           (i)       if (A) the Debt is not paid in full on the Maturity Date; (B) any regularly scheduled monthly payment of interest hereunder is not paid in full on the applicable Payment Date; (C) any prepayment of principal due under this Agreement or the Note is not paid when due; (D) any deposit to the Collection Account is not made on the required deposit date therefor; or (E) except as to any amount included in subclause (A), (B), (C) and/or (D) of this clause (i), any other amount payable pursuant to this Agreement, the Note or any other Loan Document is not paid in full when due and payable in accordance with the provisions of the applicable Loan Document;

           (ii)       subject to Borrower's right to contest as set forth in Section 9.3, if any of the Impositions or Other Charges are not paid prior to the imposition of any interest, penalty, charge or expense for the non-payment thereof; provided, however, that no Event of Default under this clause (ii) shall be deemed to have occurred if the funds reserved hereunder for the payment of Impositions and Other Charges are sufficient to pay the same and Lender fails to pay the same when due in accordance with the terms, provisions and conditions of this Agreement;

           (iii)      subject to Borrower's right to contest as set forth in Section 9.3, if Borrower shall breach any of the covenants set forth in Section 9.2.

           (iv)      if (A) the Policies required by Section 8.1 are not kept in full force and effect, or (B) certified copies of any of such Policies are not delivered to Lender within thirty (30) days of the effective date of such insurance policies; provided, however, that no Event of Default under the foregoing subclause (A) shall be deemed to have occurred if the funds reserved hereunder for the payment of Insurance Premiums are sufficient to pay the same and Lender fails to pay the same when due in accordance with the terms, provisions and conditions of this Agreement;

           (v)      if, except as permitted pursuant to Article X or as otherwise permitted hereunder, any of the following shall occur or exist: (A) any Transfer of any direct or indirect legal, beneficial or equitable interest in all or any portion of the Property, (B) any Transfer of any direct or indirect interest in Borrower, (C) subject to Borrower's right to contest set forth in Section 9.3 and any cure period provided in Section 9.2, if the Property or any portion thereof becomes subject to any Lien or encumbrance on all or any portion of the Property, other than Permitted Encumbrances, or (D) any pledge, hypothecation, creation of a security interest in or other encumbrance of any direct or indirect interests in Borrower other than Permitted Debt;

(vi)     if any, representation or warranty made by Borrower herein or by Borrower, Guarantor or any Affiliate of Borrower in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or any other Borrower Party to Lender at the time of closing of the Loan or during the term of the Loan shall have been false or misleading in any material respect as of the date the representation or warranty was made or is deemed to have been remade;

(vii)    if Borrower, Guarantor or Borrower Holdco shall make an assignment for the benefit of creditors;

(viii)   (a) if a receiver, liquidator or trustee shall be appointed for Borrower, Guarantor or Borrower Holdco, (b) if Borrower shall dissolve, liquidate, consolidate, merge or sell all or substantially all of Borrower's assets other than in connection with the repayment of the Loan, (c) reserved, (d) if Borrower, Guarantor or Borrower Holdco shall solicit the filing of an involuntary bankruptcy petition against Borrower, without in each instance obtaining the prior consent of all of the members, directors and managers of Borrower, including, without limitation, the Independent Directors or Independent Managers, (e) if Borrower, Guarantor or Borrower Holdco shall be adjudicated a bankrupt or insolvent, (f) if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Guarantor or Borrower Holdco or (g) if any proceeding for the dissolution or liquidation of Borrower, Guarantor or Borrower Holdco shall be instituted (each, a "**Bankruptcy Action**"); provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to or acquiesced in by Borrower, Guarantor or Borrower Holdco upon the same not being discharged, stayed or dismissed within ninety (90) days;

(ix)     if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(x)      if after hotel operations have commenced at the Property, Borrower ceases to do business at the Property as a hotel (other than temporary cessation in connection with an Excusable Delay or any continuous and diligent renovation or restoration of the Property following a Casualty or Taking);

(xi)     with respect to any term, covenant or provision set forth herein (other than the other subsections of this Section 18.1(a) which specifically contains a notice requirement or grace period), if Borrower or Guarantor shall be in default under such term, covenant or condition after the giving of such notice and the expiration of such grace period;

(xii)    If Borrower breaches in any material respect any covenant contained in Section 7.1.4, Section 7.1.19 or Section 7.4; provided, however, if such breach is curable, Borrower shall promptly cure such breach within ten (10) Business

Days after the earlier to occur of (x) Borrowers' actual knowledge thereof and (y) notice from Lender;

(xiii)   except as provided in <u>clauses (iii)</u> and <u>(xii)</u> above, if Borrower shall fail to comply with any covenants set forth in <u>Article VII</u> or <u>Article XII</u> with such failure continuing for ten (10) Business Days after Lender delivers written notice thereof to Borrower; provided, however, that if such cure cannot be accomplished with reasonable diligence within ten (10) Business Days, then so long as Borrower has commenced the cure thereof during such ten (10) Business Day period and, thereafter, continuously and diligently prosecutes the curing thereof to completion, such period of time shall be extended for such additional period of time as may be reasonably necessary for Borrower in the exercise of due diligence to cure same, which additional period shall not exceed ninety (90) days;

(xiv)   intentionally omitted;

(xv)   if this Agreement or any other Loan Document or any Lien granted hereunder or thereunder, in whole or in part, shall terminate or shall cease to be effective or shall cease to be a legally valid, binding and enforceable obligation of Borrower or Guarantor, or any Lien securing the Debt shall, in whole or in part, cease to be a perfected first or second, as the case may be, priority Lien, subject to the Permitted Encumbrances (except in any of the foregoing cases in accordance with the terms hereof or under any other Loan Document or by reason of any affirmative act of Lender);

(xvi)   if any Management Agreement is terminated (or required by Lender to be terminated in accordance with the terms hereof) and a Qualified Manager is not appointed as a replacement manager pursuant to the provisions of this Agreement within thirty (30) days after such termination (unless Lender has not approved such replacement manager as and when Lender has such approval right in accordance with the terms, provisions and conditions of this Agreement);

(xvii)   intentionally omitted;

(xviii)  except as expressly permitted pursuant to the Loan Documents, if Borrower grants any easement, covenant or restriction (other than the Permitted Encumbrances) over the Property;

(xix)   if Borrower shall default beyond the expiration of any applicable cure period under any existing easement, covenant or restriction which affects the Property, which default has a material adverse effect on Borrower, the Property or the Project;

(xx)   if there shall occur any Event of Default under and as defined in any of the other Loan Documents;

WEIL:\96218278\17\63946.0005

(xxi)    if there shall be entered against Borrower or the Property a judgment in an amount in excess of $360,000 which is not covered by insurance, paid, bonded or appealed within thirty (30) days of entry;

(xxii)   if Borrower fails to timely and properly exercise the Option under the Option Agreement;

(xxiii) if, without the prior written consent of Lender, Borrower modifies, amends or terminates any of the terms or provisions of the Ground Lease, Master Lease, Option Agreement, CDE Loan Documents, EB-5 Loan Documents, Octagon Loan Documents in violation of the terms of this Agreement;

(xxiv) if the Ground Lease shall be terminated or cancelled for any reason or under any circumstance whatsoever, in violation of the terms of this Agreement;

(xxv)  if Borrower (or any Affiliate of Borrower) shall be in default beyond the expiration of any applicable cure period of any of its monetary or non-monetary obligations under the Ground Lease, the Master Lease or the Option Agreement;

(xxvi)  intentionally omitted;

(xxvii) if Guarantor shall be in default under any of the Guarantees or the Environmental Indemnity, including, without limitation, the breach of any of the net worth or liquidity requirements or other financial covenants under the Guarantees beyond any applicable notice or cure periods;

(xxviii)  intentionally omitted;

(xxix) if Borrower shall not have caused Substantial Completion of the Project to occur on or prior to the Outside Construction Completion Date (subject to extension by reason of Excusable Delay); and

(xxx)    intentionally omitted;

(xxxi) if Borrower shall have failed to deposit the Deficiency Collateral pursuant to the terms of and in the time allotted in Section 4.7;

(xxxii) intentionally omitted; and

(xxxiii)if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or of any Loan Document not specified in subsections (i) to (xxxiii) above, for thirty (30) days after notice from Lender; provided, however, that if such Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period then so long as Borrower shall have commenced to cure such Default within such thirty (30) day period and, thereafter, diligently prosecutes the curing of such default to completion, such thirty

(30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, which additional period shall not exceed sixty (60) days.

(b)      Unless waived in writing by Lender, upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in clauses (a)(vii), (a)(viii) or (a)(ix) above), Lender may, without notice or demand, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, (i) declaring immediately due and payable the entire principal amount of the Loan together with interest thereon and all other sums due by Borrower under the Loan Documents, (ii) collecting interest on the principal amount of the Loan at the Default Rate whether or not Lender elects to accelerate the Note and (iii) enforcing or availing itself of any or all rights or remedies set forth in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in subsections (a)(vii), (a)(viii) or (a)(ix) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.  The foregoing provisions shall not be construed as a waiver by Lender of its right to pursue any other remedies available to it under this Agreement, the Mortgage, or the other Loan Documents.  Any payment due hereunder may be enforced and recovered in whole or in part at such time by one or more of the remedies provided to Lender in the Loan Documents.

18.2      **Remedies**.

(a)      Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) to the extent permitted by law, Lender shall not be subject to any one action or election of remedies law or rule; (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full; and (iii) Lender may, in its sole discretion, without impairing or otherwise affecting any other rights and remedies of Lender hereunder, at law or in equity, apply, ex parte, for the appointment of a custodian, trustee,

receiver, keeper, liquidator or conservator of the Property or any part thereof, irrespective of the adequacy of the security for the Debt and without regard to the solvency of Borrower or of any Person liable for the payment of the Debt, to which appointment Borrower does hereby consent and such receiver or other official shall have all rights and powers permitted by applicable law and such other rights and powers as the court making such appointment may confer, but the appointment of such receiver or other official shall not impair or in any manner prejudice the rights of Lender to receive all Rents pursuant to this Agreement or any other Loan Document.

(b)     Upon the occurrence and during the continuance of an Event of Default, with respect to the Account Collateral, Lender may:

(i)     without notice to Borrower, except as required by law, and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Account Collateral against the Debt, Operating Expenses and/or Capital Expenditures for the Property or any part thereof;

(ii)     in Lender's sole discretion, at any time and from time to time, exercise any and all rights and remedies available to it under this Agreement, and/or as a secured party under the UCC;

(iii)     demand, collect, take possession of or receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Account Collateral (or any portion thereof) as Lender may determine in its sole discretion; and

(iv)     take all other actions provided in, or contemplated by, this Agreement.

(c)     With respect to Borrower, the Account Collateral, the Rate Cap Collateral and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt, and Lender may seek satisfaction out of the Property or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to partially foreclose this Agreement and the Mortgage in any manner and for any amounts secured by this Agreement or the Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal or interest, Lender may foreclose this Agreement and the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose this Agreement and the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by this Agreement or the Mortgage as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to this Agreement and the Mortgage to secure payment of sums secured by this Agreement and the Mortgage and not previously recovered.

(d)     Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest

and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender determines.

18.3 **Remedies Cumulative; Waivers**. The rights, powers and remedies of Lender under this Agreement and the Mortgage shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or Guarantor or to impair any remedy, right or power consequent thereon.

18.4 **Costs of Collection**. In the event that after an Event of Default: (a) the Note or any of the Loan Documents is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding; (b) an attorney is retained to represent Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under the Note or any of the Loan Documents; or (c) an attorney is retained to protect or enforce the lien or any of the terms of this Agreement, the Mortgage or any of the Loan Documents; then Borrower shall pay to Lender all reasonable attorney's fees, costs and expenses actually incurred in connection therewith, including court costs, expert witness fees, costs of appeal, together with interest on any judgment obtained by Lender at the Default Rate.

18.5 **Construction Related Remedies**.

(a) Right to Stop Disbursing Funds. In addition to any other rights and remedies which Lender may have pursuant to this Agreement and the other Loan Documents or pursuant to law or equity, and without limitation thereof, (i) so long as an Event of Default shall exist, Lender may elect to decline to make all or any portion of such further Advances as Lender may elect and/or (ii) so long as an Event of Default shall exist, any or all obligations of Lender under this Agreement, at the option of Lender, shall cease and terminate; provided, however, Lender may make all or any portion of any Loan Advance so long as any such Event of Default shall exist without thereby becoming obligated to make all or a portion of any other or further Loan Advance or waiving the rights to exercise any of Lender's rights and remedies pursuant to any one or more of the Loan Documents or as may be available at law or equity.

(b) Right to Complete. In addition to any other rights and remedies which Lender may have under this Agreement and the other Loan Documents or pursuant to law or equity, and without limitation thereof, after the occurrence of any Event of Default and upon acceleration of the Loan, Lender may enter upon the Property and into possession of the Property

and any other Property (and exclude Borrower and any other persons therefrom) and cause Completion of the construction of the Project substantially in accordance with the Plans and Specifications, with such changes therein as Lender may from time to time deem reasonably appropriate, all at the sole risk, cost and expense of Borrower. Lender shall have the right, at any and all times, in its sole discretion to discontinue any work commenced by Lender with respect to the construction of the Project or to change any course of action undertaken by it and shall not be bound by any limitations or requirements of time whether set forth herein or otherwise. Upon acceleration of the Loan, Lender shall have the right and power (but shall not be obligated) to assume all or any portion of the obligations of Borrower under any or all Construction Documents as Lender may elect and to take over and use all or any part or parts of the labor, materials, supplies and equipment contracted for by or on behalf of Borrower, whether or not previously incorporated into the Property. In connection with any portion of the construction of the Project undertaken by Lender pursuant to the provisions of this <u>Section 18.5</u>, Lender may do any or all of the following as Lender, in its sole discretion, may elect:

> (i)     engage builders, construction managers, general and trade contractors, suppliers, architects, engineers, inspectors and others for the purpose of furnishing labor, materials, equipment and fixtures in connection with the construction of the Improvements;

> (ii)     amend, modify or terminate any then existing contracts between Borrower and any of the Persons described in the preceding <u>clause (i)</u>;

> (iii)     pay, settle or compromise all bills or claims which may become Liens against the Property, or which have been or may be incurred in any manner in connection with the construction of the Project or for the discharge of liens, encumbrances or defects in the title of the Property; and

> (iv)     take such other action (including the employment of watchmen and the taking of other measures to protect the Property) or refrain from acting under this Agreement as Lender may in its sole and absolute discretion from time to time determine without any limitation whatsoever.

(c)     <u>Sums Advanced</u>.  Borrower shall be liable to Lender for all sums paid or incurred for the construction of the Project whether the same shall be paid or incurred pursuant to the provisions of this Section or otherwise, and all other payments made or liabilities incurred by Lender under this Agreement of any kind whatsoever (except to the extent it is determined by a court of competent jurisdiction, beyond right of appeal, that such liabilities arose solely and directly out of the gross negligence or willful misconduct of Lender), all of which shall be paid by Borrower to Lender upon demand with interest at the Default Rate to the date of payment to Lender, and all of the foregoing sums, including such interest at the Default Rate, shall be deemed and shall constitute advances under this Agreement and be evidenced by the Note and secured by the Mortgage given in connection with the Loan.

## XIX    **EXCULPATION**

19.1    **Exculpation**.

(a)    Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Operating Income, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, notwithstanding anything to the contrary contained in this Agreement or in any of the other Loan Documents, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, the Hotel Transactions Income, the Rents and in any other collateral given by Borrower to Lender in the Loan Documents as security for the Loan, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees for itself and its successors and assigns that it and its successors and assigns shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under, or by reason of, or in connection with, the Note, this Agreement, the Mortgage or the other Loan Documents.  The provisions of this Section 19.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of the Guarantees or any other guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender seeking a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or commencing any other appropriate action or proceeding in accordance with the terms of this Agreement in order for Lender to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower under the terms of this Agreement, by money judgment or otherwise, to the extent of any actual out-of-pocket loss, damage, cost, expense, liability, claim or other obligation suffered or incurred by Lender (including attorneys' fees and costs and any breakage or other termination fees (including any Breakage Fees, as such term is defined in the Master Lease SNDA)) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "**Borrower Recourse Liabilities**"):

(A)    fraud, willful misconduct or illegal acts by any of the Borrower Parties in connection with the Loan or the Loan Documents;

(B)    any intentional misrepresentation with respect to any representations or certifications by any of the Borrower Parties in the Loan Documents;

178

(C)    the breach of any representation, warranty, covenant or indemnification provision in the Loan Documents concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender and other applicable indemnified parties with respect thereto in any such Loan Document;

(D)    intentional physical waste to the Property caused by the intentional acts or omissions of any of the Borrower Parties to the extent there is sufficient cash flow from the operation of the Property to avoid such waste from occurring and the same is not applied to prevent such waste from occurring;

(E)    Any Borrower Parties' removal or disposal of any Personal Property from the Property in violation of the Loan Documents, unless such Personal Property is promptly replaced by other Property of substantially the same quality and utility and of equal or greater value or the failure to so replace such Personal Property does not reduce (other than to a de minimis extent) the value of Lender's collateral for the Loan;

(F)    the misappropriation or conversion by any of the Borrower Parties in a manner expressly prohibited by the Loan Documents of (1) any Proceeds and (2) Security Deposits, Operating Income, Hotel Transactions Income, Rents or any other monetary collateral for the Loan;

(G)    failure to pay charges for labor or materials or other charges incurred by Borrower that create Liens on any portion of the Property after any applicable notice and cure period under this Agreement, except to the extent Borrower is contesting such Liens in accordance with the provisions of Section 9.3 hereof (provided that there shall be no liability under this subsection (G) to the extent that (i) sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms hereof and Borrower has not made a claim against such escrowed amounts or otherwise taken action to restrict Lender from applying such sums for the purpose of paying such items and/or (ii) there is insufficient cash flow from the operation of the Property to pay such items);

(H)    any security deposits, advance deposits, earnest money deposits or any other deposits with respect to Leases collected by Borrower that are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof,

179

except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(I)     failure of Borrower to purchase and maintain any Interest Rate Cap Agreement in accordance with <u>Article XI</u> (it being agreed that Lender shall have no obligation to purchase an Interest Rate Cap Agreement on behalf of Borrower, and that Lender's losses on account of Borrower's failure to purchase an Interest Rate Cap Agreement are not limited to the cost of such Interest Rate Cap Agreement at the time the same was required to be purchased);

(J)     Borrower's failure to obtain and maintain the fully paid for Policies in accordance with <u>Section 8.1</u> (provided that there shall be no liability under this subsection (J) to the extent that (i) sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms hereof and Borrower has not made a claim against such escrowed amounts or otherwise taken action to restrict Lender from applying such sums for the purpose of paying such items and/or (ii) there is insufficient cash flow from the operation of the Property to pay such items);

(K)     Borrower's failure to pay all Impositions prior to the same becoming delinquent (provided that there shall be no liability under this subsection (K) to the extent that (i) sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms hereof and Borrower has not made a claim against such escrowed amounts or otherwise taken action to restrict Lender from applying such sums for the purpose of paying such items and/or (ii) there is insufficient cash flow from the operation of the Property to pay such items);

(L)     if any Borrower Party shall make a counterclaim against Lender, Servicer or any of their respective Affiliates in violation of <u>Section 20.19</u> hereof;

(M)     Borrower entering into, modifying or cancelling Leases in violation of this Agreement or any of the other Loan Documents;

(N)     if Lender terminates the Master Lease pursuant to the terms of the Master Lease SNDA and subject to the terms of

Section 6(b) of the Master Lease SNDA, U.S. Bank and/or Master Tenant are in default beyond any applicable notice and/or cure period in the performance of any of the terms, covenants or conditions of the Master Lease SNDA;

(O)     any Borrower Party modifying or cancelling the Ground Lease, the Master Lease, any of the Octagon Loan Documents, any of the CDE Loan Documents or any of the EB-5 Loan Documents in violation of this Agreement or any of the other Loan Documents or taking any action (or failing to take any action) under such documents in contravention of this Agreement or any of the other Loan Documents;

(P)     If any Borrower Party (i) contests or hinders, intentionally delays or obstructs the pursuit of Lender to cause the appointment of a receiver at the Property following the occurrence of an Event of Default or (ii) contests or hinders, intentionally delays or obstructs the pursuit of any rights or remedies by Lender after the occurrence of an Event of Default, other than a good faith challenge that an Event of Default has not occurred, a good faith challenge as to the amount claimed to be owed to Lender, or a good faith challenge to any other action taken by Lender in enforcing its rights under the Loan Documents;

(Q)     breach of the Purchasing Covenant;

(R)     if Borrower fails to maintain its status as a Single Purpose Entity, as required by, and in accordance with the terms of this Agreement;

(S)     breach of any Legal Requirement that results in the forfeiture of the Property (or any portion thereof) because of the conduct or purported conduct of criminal activity by any of the Borrower Parties;

(T)     if Lender terminates the Master Lease pursuant to the terms of the Master Lease SNDA and subject to the cure rights set forth in Section 6 of the Master Lease SNDA, an Event of Default exists under the Loan Documents which was either (x) caused by Master Tenant, if Master Tenant was owned and/or Controlled by Greystone Managing Member at the time Master Tenant caused such Event of Default or (y) caused solely by U.S. Bank affirmatively causing or directing Master Tenant (whether directly or through any property manager or other manager taking such action)

before U.S. Bank is the managing member of Master Tenant to take an action which results in such Event of Default.; and

(U)     failure of Borrower to pay (i) any amounts in connection with the exercise of the Option under Section 7.6 or (ii) the full amount of the Purchase Price (as defined in the Option Agreement) after an Event of Default.

(b)     Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (ii) the Debt shall be fully recourse to Borrower in the event of any of the following (each, a "**Springing Recourse Event**"):   (A) Borrower, Borrower Holdco, Master Tenant or Guarantor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (B) the filing of an involuntary petition against Borrower, Master Tenant or Borrower Holdco under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law by any other Person in which any of the Borrower Parties or Master Tenant colludes with or otherwise assists such Person, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against Borrower from any Person; (C) any of the Borrower Parties or Master Tenant filing an answer consenting to, acquiescing in or joining in any involuntary petition filed against Master Tenant, Borrower or Guarantor, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (D) any of the Borrower Parties or Master Tenant consenting to, acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, Guarantor, Master Tenant or all or any portion of the Property (other than an application by Lender in connection with the enforcement of Lender's remedies under the Loan Documents); (E) Master Tenant, Borrower or Borrower Holdco making an assignment for the benefit of creditors, or admitting, in writing, in any legal proceeding or otherwise (except if directed to do so in writing by Lender), its insolvency or inability to pay its debts as they become due; (F) if Borrower fails to provide the Option Mortgage following exercise of the Option in accordance with the terms hereof; (G) if any SPE Entity fails to maintain its status as a Single Purpose Entity as required by, and in accordance with the terms of this Agreement, and which breach is cited in a final non-appealable decision by a court of competent jurisdiction as the basis for ordering the substantive consolidation of the assets and liabilities of Borrower with any other Person; (H) reserved; (I) if Borrower fails to obtain Lender's prior written consent to any Transfer requiring Lender's consent other than as expressly permitted by this Agreement, provided, however, failure to deliver timely notice of a Permitted Transfer or performance of any other ministerial or administrative obligation as required pursuant to this Agreement shall not be a full recourse event, but shall be deemed part of the Borrower Recourse Liabilities; (J) if any Borrower Party (i) contests (or any Borrower Party colludes with or otherwise assists any other Person, or solicits or causes to be solicited any other Person to contest) the validity or enforceability of the Loan Documents, (ii) contests or hinders, intentionally delays or obstructs the pursuit of Lender to cause the appointment of a receiver at the Property following the occurrence of an Event of Default or (iii) contests or hinders, intentionally delays or obstructs the pursuit of any rights or

WEIL:\96218278\17\63946.0005

remedies by Lender after the occurrence of an Event of Default, and in the case of clauses (ii) and (iii), if such defense is determined by a court of competent jurisdiction to have been brought in bad faith; or (K) the incurrence by Borrower or Borrower Holdco of any Indebtedness that is secured by a voluntary Lien filed directly against the Property or any portion thereof, other than as permitted pursuant to this Agreement.

XX     **MISCELLANEOUS**

20.1     **Survival**.  This Agreement and all covenants, indemnifications, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt in connection with the Loan is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

20.2     **Lender's Discretion**.  Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.  All consents or approvals of Lender given by Lender pursuant to the Loan Documents shall not be deemed to have given by Lender unless such consent or approval is in writing. Whenever pursuant to this Agreement or any other Loan Document, Lender are required to be reasonable in making any determination or granting any consent or approval, such qualification of reasonability shall be disregarded at any time that an Event of Default has occurred and is continuing.

20.3     **GOVERNING LAW**.

(a)     THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES.  EXCEPT THAT AT ALL TIMES (I) THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY AND

ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS WITH RESPECT TO THE PROPERTY (OTHER THAN THAT DESCRIBED IN SUBPARAGRAPH II BELOW) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY AND FIXTURES ARE LOCATED AND (II) WITH RESPECT TO THE PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED BY THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS), THE LAW OF THE JURISDICTION APPLICABLE IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK SHALL GOVERN. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND EACH OF BORROWER AND LENDER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON-CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH OF BORROWER AND LENDER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

20.4    **Modification, Waiver in Writing**.  Any provision of this Agreement, the Note or other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Borrower and Lender.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

20.5    **Delay Not a Waiver**.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other

184

amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

20.6    **Notices**.  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if sent by (a) hand delivery against receipt, or (b) certified or registered United States mail, postage prepaid, return receipt requested, (c) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (d) facsimile (with confirmation), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section 20.6):



[redacted]

Any party may change the address to which any notice is to be delivered, by furnishing ten (10) days' prior written notice of such change to the other parties in accordance with the provision of this Section 20.6. All notices, elections, requests and demands under this Agreement shall be effective and deemed received upon the earliest of (i) the actual receipt of the same by personal delivery or otherwise, (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service as required above, (iii) three (3) Business Days after being deposited in the United States mail as required above or (iv) on the day sent if sent by facsimile with confirmation on or before 5:00 p.m. New York time on any Business Day or on the next Business Day if so delivered after 5:00 p.m. New York time or on any day other than a Business Day. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, election, request, or demand sent. Notices may be sent by a party hereto or on its behalf by its attorney.

20.7 **TRIAL BY JURY**. EACH OF BORROWER AND LENDER AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER ANY OF THEM, HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, THE MORTGAGE, THE NOTE OR ANY OTHER LOAN DOCUMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, THE MORTGAGE, THE NOTE OR ANY OTHER LOAN DOCUMENT (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND BORROWER HEREBY AGREES AND CONSENTS THAT AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION MAY BE FILED WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT HERETO TO THE WAIVER OF ANY RIGHT TO TRIAL BY JURY. BORROWER ACKNOWLEDGES THAT IT HAS CONSULTED WITH LEGAL COUNSEL REGARDING THE MEANING OF THIS WAIVER AND ACKNOWLEDGES THAT THIS WAIVER IS AN ESSENTIAL INDUCEMENT FOR THE MAKING OF THE LOAN. THIS WAIVER SHALL SURVIVE THE REPAYMENT OF THE LOAN.

20.8     **Headings**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

20.9     **Severability**.     Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

20.10    **Preferences**.    To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

20.11    **Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

20.12    **Expenses; Indemnity**.

(a)      Except as otherwise provided herein, including in connection with any Securitization, Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of written notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender (or any Affiliate of Lender) in connection with (i) originating and making the Loan, including for preparation of audits, environmental and engineering reports, credit reports, appraisals, preparing, negotiating, executing and delivering this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender pursuant to this Agreement), and other document filing fees and other expenses relating to credit and collateral evaluations; (ii) each of Lender's and Borrower's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents,

187

amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters as required herein or under the other Loan Documents; (iv) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (v) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Lien in favor of Lender pursuant to this Agreement and the other Loan Documents; (vi) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan or the Property; (vii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property (including any fees and expenses incurred by or payable to Servicer or a trustee in connection with the transfer of the Loan to a special servicer upon Servicer's anticipation of a Default or Event of Default, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees and interest payable on advances made by Servicer with respect to delinquent debt service payments or expenses of curing any of Borrower's defaults under the Loan Documents), or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a work out or of any insolvency or bankruptcy proceedings; and (viii) procuring Policies pursuant to Section 8.1.  Any cost and expenses due and payable to Lender may be paid from any amounts in the Collection Account or the Cash Management Account.  This Section 20.12 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)    Borrower will protect, indemnify and save harmless Lender and all of its officers, directors, stockholders, members, partners, employees, agents, successors and assigns (collectively, the "**Indemnified Parties**") from and against all actual liabilities, obligations, claims, damages (but excluding consequential, punitive and special damages other than those payable to third parties), penalties, causes of action, actual out-of-pocket costs and expenses (including all reasonable attorneys' fees and expenses actually incurred) imposed upon or incurred by or asserted against the Indemnified Parties or the Property or any part of its interest therein, by reason of the occurrence or existence of any of the following (to the extent Proceeds payable on account of the following shall be inadequate):  (A) ownership of Borrower's interest in the Property, or any interest therein, or receipt of any Rents, Operating Income or other sum therefrom, (B) any accident, injury to or death of any persons or loss of or damage to property occurring on or about the Property, (C) any design, construction, operation, repair, maintenance, use, non-use or condition of the Property, including claims or penalties arising from violation of any Legal Requirement or Insurance Requirement, as well as any claim based on any patent or latent defect, whether or not discoverable by Lender, any claim the insurance as to which is inadequate, and any Environmental Claim, (D) any Default or Event of Default under this Agreement or any of the other Loan Documents, including any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, this Agreement or the other Loan Documents,  (E) any failure on the part of Borrower to perform or comply with any of the terms of any Lease within the applicable notice or grace periods, (F) any performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof, (G) any negligence or tortious act or omission on the part of Borrower or any of its agents, contractors, servants, employees, sublessees, licensees or invitees,

(H) any contest referred to in <u>Section 9.3</u> hereof, (I) any obligation or undertaking relating to the performance or discharge of any of the terms, covenants and conditions of the landlord contained in the Leases, (J) the use or intended use of the proceeds of the Loan, (K) the presence at, in or under the Property or the Improvements of any Hazardous Materials in violation of any Environmental Law or (L) any amounts due to the Ground Lessor, Master Tenant, U.S. Bank, CDE, the EB-5 Lender or Octagon and/or any claims, proceedings or actions brought by any such Person (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to an Indemnified Party hereunder to the extent that such Indemnified Liabilities (i) arise from the willful misconduct or gross negligence of the Indemnified Parties, (ii) arise from failure by Lender to lend any Advance when required to in accordance with the terms hereof or (iii) arise after transfer of title to the Property through foreclosure or deed in lieu of foreclosure.  Any amounts the Indemnified Parties are legally entitled to receive under this <u>Section 20.12</u> which are not paid within fifteen (15) Business Days after written demand therefor (the "**Indemnification Date**") by the Indemnified Parties or Lender, setting forth in reasonable detail the amount of such demand and the basis therefor, shall bear interest at the Default Rate if not paid within such fifteen (15) Business Day period, and shall, together with such interest, be part of the Debt secured by the Mortgage.  In case any action, suit or proceeding is brought against the Indemnified Parties by reason of any such occurrence, Borrower shall at Borrower's expense resist and defend such action, suit or proceeding or will cause the same to be resisted and defended by counsel at Borrower's reasonable expense for the insurer of the liability or by counsel designated by Borrower (unless reasonably disapproved by Lender promptly after Lender has been notified of such counsel); provided, however, that nothing herein shall compromise the right of Lender (or any Indemnified Party) to appoint its own counsel at Borrower's expense for its defense with respect to any action which in its reasonable opinion presents a conflict or potential conflict between Lender and Borrower that would make such separate representation advisable; provided, further, that if Lender shall have appointed separate counsel pursuant to the foregoing, Borrower shall not be responsible for the expense of additional separate counsel of any Indemnified Party unless there is an actual conflict of interest between such Indemnified Party, on the one hand, and Lender, on the other hand.  As long as Borrower is resisting and defending such action, suit or proceeding as provided above in a prudent and commercially reasonable manner, Lender and the Indemnified Parties shall not be entitled to settle such action, suit or proceeding without Borrower's consent which shall not be unreasonably withheld, conditioned or delayed, and claim the benefit of this Section with respect to such action, suit or proceeding; provided, however, that if Borrower is not diligently defending such action, suit or proceeding in a prudent and commercially reasonable manner as provided above, and Lender (or such Indemnified Party) has provided Borrower with thirty (30) days' prior written notice, or shorter period if mandated by the requirements of applicable law, and opportunity to correct such determination, Lender or such Indemnified Party may settle such action, suit or proceeding and claim the benefit of this <u>Section 20.12</u> with respect to settlement of such action, suit or proceeding without Borrower's consent. Any Indemnified Party will give Borrower prompt notice after such Indemnified Party obtains actual knowledge of any potential claim by such Indemnified Party for indemnification hereunder.  No Indemnified Party shall settle or compromise any action, proceeding or claim as to which it is indemnified hereunder without notice to Borrower.

20.13    **Exhibits and Schedules Incorporated**.    The exhibits and schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

20.14    **Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

20.15    **Liability of Assignees of Lender**.  No assignee of Lender shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any other Loan Document or any amendment or amendments hereto made at any time or times, heretofore or hereafter, any different than the liability of Lender hereunder.  In addition, no permitted assignee shall have at any time or times hereafter any personal liability, directly or indirectly, under or in connection with or secured by any agreement, lease, instrument, encumbrance, claim or right affecting or relating to the Property or to which the Property is now or hereafter subject any different than the liability of Lender hereunder.  The limitation of liability provided in this Section 20.15 is (a) in addition to, and not in limitation of, any limitation of liability applicable to the permitted assignee provided by law or by any other contract, agreement or instrument, and (b) shall not apply to any assignee's gross negligence or willful misconduct.

20.16    **No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)    Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property, other than that of mortgagee, beneficiary or lender.

(b)    This Agreement and the other Loan Documents are solely for the benefit of Borrower and Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender or Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such

conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

20.17     **Publicity**.  All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced all or in part by the Loan Documents, to Lender, or any of its Affiliates shall be subject to the prior written approval of Lender, such approval not to be unreasonably withheld, conditioned or delayed.

20.18     **Waiver of Marshaling of Assets**.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshaling of the assets of Borrower, Borrower's members and others with interests in Borrower and of the Property, and agrees not to assert any right under any laws pertaining to the marshaling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of all or any portion of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

20.19     **Waiver of Counterclaim and other Actions**.  Borrower hereby expressly and unconditionally waives, in connection with any suit, action or proceeding brought by Lender on this Agreement, the Note, the Mortgage or any other Loan Document, any and every right it may have to (i) interpose any counterclaim therein (other than a counterclaim which can only be asserted in the suit, action or proceeding brought by Lender on this Agreement, the Note, the Mortgage or any other Loan Document and cannot be maintained in a separate action) and (ii) have any such suit, action or proceeding consolidated with any other or separate suit, action or proceeding.

20.20     **Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or

WEIL:\96218278\17\63946.0005

take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or their Affiliates.

20.21    **Brokers and Financial Advisors**.  Borrower and Lender each hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement, other than Broker.  Borrower agrees to pay Broker on the date hereof all fees, commissions and expenses due Broker pursuant to a separate agreement between Borrower and Broker.  Borrower and Lender hereby agree to indemnify each other, defend and hold each other harmless from and against any and all claims, liabilities, costs and expenses of any kind (including each other's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of such party in connection with the transactions contemplated herein.  The provisions of this <u>Section 20.21</u> shall survive the expiration and termination of this Agreement and the payment of the Debt.

20.22    **Prior Agreements**.   This Agreement and the other Loan Documents contain the entire agreement of the parties hereto with respect to the Loan and the transactions contemplated hereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents and unless specifically set forth in a writing contemporaneous herewith the terms, conditions and provisions of any and all such prior agreements do not survive execution of this Agreement.

20.23    **Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.

20.24    **Limitation of Liability**.  No claim may be made by Borrower or any other Person against Lender or its affiliates, directors, officers, employees, attorneys or agents for any consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or by the other Loan Documents, or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

20.25    **Joint and Several Liability; Right of Contribution**.  If more than one Person has executed this Agreement as a "Borrower" the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.  Each entity that constitutes a Borrower (for purposes of this <u>Section 20.25</u> only, each a "**Borrower**" and collectively, "**Borrowers**") acknowledges and agrees that it shall be jointly and severally liable for the Loan and all other

WEIL:\96218278\17\63946.0005

Obligations arising under this Agreement and/or any of the other Loan Documents. In addition, each Borrower acknowledge and agrees that each Borrower has certain obligations arising under this Agreement and/or the other Loan Documents and in furtherance thereof, each Borrower acknowledges and agrees as follows:

(a)     For the purpose of implementing the joint borrower provisions of the Loan Documents, each Borrower hereby irrevocably appoints each other Borrower as its agent and attorney-in-fact for all purposes of the Loan Documents, including the giving and receiving of notices and other communications.

(b)     To induce Lender to make the Loan, and in consideration thereof, each Borrower hereby agrees to indemnify Lender pursuant to the terms of <u>Section 20.12</u> hereof.

(c)     Each Borrower acknowledges that the liens and security interests created or granted herein and by the other Loan Documents will secure the Obligations of all Borrowers under the Loan Documents and, in full recognition of that fact, each Borrower consents and agrees that Lender may, at any time and from time to time, without notice or demand, and without affecting the enforceability or security hereof or of any other Loan Document:

(i)     agree with any Borrower to supplement, modify, amend, extend, renew, accelerate, or otherwise change the time for payment or the terms of the Obligations or any part thereof, including any increase or decrease of the rate(s) of interest thereon;

(ii)     agree with any Borrower to supplement, modify, amend or waive, or enter into or give any agreement, approval or consent with respect to, the Obligations or any part thereof or any of the Loan Documents or any additional security or guaranties, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder;

(iii)     accept new or additional instruments, documents or agreements in exchange for or relative to any of the Loan Documents or the Obligations or any part thereof;

(iv)     accept partial payments on the Obligations;

(v)     receive and hold additional security or guaranties for the Obligations or any part thereof;

(vi)     release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer and enforce any security for or guaranties of the Obligations, and apply any security and direct the order or manner of sale thereof as Lender, in its sole and absolute discretion, may determine;

(vii)     release any Person or any guarantor from any personal liability with respect to the Obligations or any part thereof; or

WEIL:\96218278\17\63946.0005

(viii)   settle, release on terms satisfactory to Lender or by operation of applicable laws or otherwise liquidate or enforce any Obligations and any security therefor or guaranty thereof in any manner, consent to the transfer of any such security and bid and purchase at any sale; and consent to the merger, change or any other restructuring or termination of the corporate existence of any Borrower, or any other Person, and correspondingly restructure the obligations of such Borrower, or other Person, and any such merger, change, restructuring or termination shall not affect the liability of any Borrower or the continuing existence of any lien or security interest hereunder, or under any other Loan Document to which any Borrower is a party, or the enforceability hereof or thereof with respect to all or any part of the Obligations.

(d)   Upon the occurrence of and during the continuance of any Event of Default, Lender may enforce this Agreement and the other Loan Documents independently as to each Borrower and independently of any other remedy or security Lender at any time may have or hold in connection with the Obligations, and in collecting on the Loan it shall not be necessary for Lender to marshal assets in favor of any Borrower, or any other Person or to proceed upon or against and/or exhaust any other security or remedy before proceeding to enforce this Agreement and the other Loan Documents.  Each Borrower expressly waives any right to require Lender, in connection with Lender's efforts to obtain repayment of the Loan and other Obligations, to marshal assets in favor of any Borrower or any other Person or to proceed against any other Person or any collateral provided by any other Person, and agrees that Lender may proceed against any Persons and/or collateral in such order as it shall determine in its sole and absolute discretion in connection with Lender's efforts to obtain repayment of the Loan and other Obligations.  Lender may file a separate action or actions against each Borrower to enforce the Obligations, whether action is brought or prosecuted with respect to any other security or against any other Person, or whether any other Person is joined in any such action or actions.  Each Borrower agrees that Lender, each Borrower and/or any other Person may deal with each other in connection with the Obligations or otherwise, or alter any contracts or agreements now or hereafter existing among any of them, in any manner whatsoever, all without in any way altering or affecting the security of this Agreement or the other Loan Documents.  The rights of Lender hereunder and under the other Loan Documents shall be reinstated and revived, and the enforceability of this Agreement and the other Loan Documents shall continue, with respect to any amount at any time paid on account of the Obligations, which thereafter shall be required to be restored or returned by Lender as a result of the bankruptcy, insolvency or reorganization of any Borrower or any other Person, or otherwise, all as though such amount had not been paid.  The enforceability of this Agreement and the other Loan Documents at all times shall remain effective even though any or all Obligations, or any other security or guaranty therefor, may be or hereafter may become invalid or otherwise unenforceable as against any Borrower or any other Person and whether or not any Borrower or any other Person shall have any personal liability with respect thereto.  Each Borrower expressly waives any and all defenses to the enforcement of its Obligations under the Loan Documents now or hereafter arising or asserted by reason of (i) any disability or other defense of any Borrower or any other Person with respect to the Obligations, (ii) the unenforceability or invalidity of any security or guaranty for the Obligations or the lack of perfection or continuing perfection or failure of priority of any security for the Obligations, (iii) the cessation for any cause whatsoever of the liability of any Borrower or any other Person (other than by reason of the full and final payment and performance of all

194

Obligations), (iv) any failure of Lender to marshal assets in favor of any of the Borrowers or any other Person, (v) any failure of Lender to give notice of sale or other disposition of any collateral for the Obligations to any Borrower or to any other Person or any defect in any notice that may be given in connection with any such sale or disposition, (vi) any failure of Lender to comply in any non-material respect with applicable laws in connection with the sale or other disposition of any collateral or other security for any Obligation, (vii) any act or omission of Lender or others that directly or indirectly results in or aids the discharge or release of any Borrower or of any other Person or of any of the Obligations or any other security or guaranty therefor by operation of law or otherwise, (viii) any law that provides that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or guarantor's obligation in proportion to the principal obligation, (ix) any failure of Lender to file or enforce a claim in any bankruptcy or similar proceeding with respect to any Person, (x) the election by Lender, in any bankruptcy or similar proceeding of any Person, of the application or non-application of Section 1111(b)(2) of the Bankruptcy Code, (xi) any extension of credit or the grant of any lien under Section 364 of the Bankruptcy Code except to the extent otherwise provided in this Agreement, (xii) any use of cash collateral under Section 363 of the Bankruptcy Code, (xiii) any agreement or stipulation with respect to the provision of adequate protection in any bankruptcy or similar proceeding of any Person, (xiv) the avoidance of any lien or security interest in favor of Lender securing the Obligations for any reason, or (xv) any bankruptcy or similar proceeding commenced by or against any Person, including any discharge of, or bar or stay against collecting, all or any of the Obligations (or any interest thereon) in or as a result of any such proceeding.

(e)     Borrowers represent and warrant to Lender that they have established adequate means of obtaining from each other, on a continuing basis, financial and other information pertaining to their respective businesses, operations and condition (financial and otherwise) and their respective properties, and each now is and hereafter will be completely familiar with the businesses, operations and condition (financial and otherwise) of the other and their respective properties.  Each Borrower hereby expressly waives and relinquishes any duty on the part of Lender to disclose to such Borrower any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of the other Borrowers or the other Borrowers' properties, whether now known or hereafter known by Lender during the life of this Agreement. With respect to any of the Obligations, Lender need not inquire into the powers of any Borrower or the officers, employees or other Persons acting or purporting to act on such Borrower's behalf.

(f)     EACH BORROWER WARRANTS AND AGREES THAT EACH OF THE WAIVERS AND CONSENTS SET FORTH HEREIN IS MADE WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE AND CONSEQUENCES, WITH THE UNDERSTANDING THAT EVENTS GIVING RISE TO ANY DEFENSE WAIVED MAY DIMINISH, DESTROY OR OTHERWISE ADVERSELY AFFECT RIGHTS THAT EACH OTHERWISE MAY HAVE AGAINST THE OTHER, AGAINST LENDER OR OTHERS, OR AGAINST ANY COLLATERAL.  IF ANY OF THE WAIVERS OR CONSENTS HEREIN IS DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS AND CONSENTS SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW.

WEIL:\96218278\17\63946.0005

(g)     Right of Contribution.   In order to provide for just and equitable contribution among Borrowers, in connection with the execution of the Loan Documents, the Borrowers have agreed that if any Borrower satisfies some or all of the Obligations (a "**Funding Borrower**"), the Funding Borrower shall be entitled to contribution from the other Borrower(s) that have positive Maximum Net Worth for all payments made by the Funding Borrower in satisfying the Obligations, so that each Borrower that remains obligated under the Loan Documents at the time that a Funding Borrower makes such payment (a "**Remaining Borrower**") and has a positive Maximum Net Worth shall bear a portion of such payment equal to the percentage that such Remaining Borrower's Maximum Net Worth bears to the aggregate Maximum Net Worth of all Remaining Borrowers that have positive Maximum Net Worth.  As used herein, "**Net Worth**" means, with respect to any Borrower, the amount, as of the respective date of calculation, by which the sum of such Person's assets (including subrogation, indemnity, contribution, reimbursement and similar rights that such Borrower may have), determined on the basis of a "fair valuation" or their "fair saleable value" (whichever is the applicable test under Section 548 and other relevant provisions of the Bankruptcy Code and the relevant state fraudulent conveyance or transfer laws), is greater than the amount that will be required to pay all of such Borrower's debts, in each case matured or unmatured, contingent or otherwise, as of the date of calculation, but excluding liabilities arising under the Loan Documents and excluding, to the maximum extent permitted by applicable Legal Requirements with the objective of avoiding rendering such Borrower insolvent, liabilities subordinated to the Obligations arising out of loans or advances made to such Borrower by any other Person. "**Maximum Net Worth**" means, with respect to any Borrower, the greatest of the Net Worth of such Borrower calculated as of the following dates:  (A) the date on which such Person becomes a Borrower, and (B) the date on which such Borrower expressly reaffirms its obligations under the Loan Documents.  The meaning of the terms "fair valuation" and "fair saleable value" and the calculation of assets and liabilities shall be determined and made in accordance with the relevant provisions of the Bankruptcy Code and applicable state fraudulent conveyance or transfer laws.

20.26     **Compliance; Investigation**.   If Lender becomes aware of any allegations, suspicions, or evidence of conduct that would raise questions concerning Borrower's or Guarantor's compliance with this Agreement or any of the Anti-Corruption Laws or Global Trade Laws, then Lender is entitled to investigate such allegations, in which event Borrower and Guarantor shall fully cooperate in a timely manner, and cause its Affiliates to cooperate fully in a timely manner, with such investigation by Lender or any third party appointed by Lender to perform such investigation.

20.27     **Exculpation of Lender**.   Lender neither undertakes nor assumes any responsibility or duty to Borrower or any other party to select, review, inspect, examine, supervise, pass judgment upon or inform Borrower or any third party of (a) the existence, quality, adequacy or suitability of appraisals of any Property or any other collateral, (b) any environmental report, or (c) any other matters or items, including, but not limited to, engineering, soils and seismic reports which are contemplated in the Loan Documents. Any such selection, review, inspection, examination and the like, and any other due diligence conducted by Lender, is solely for the purpose of protecting Lender's rights under the Loan Documents, and shall

196

not render Lender liable to Borrower or any third party for the existence, sufficiency, accuracy, completeness or legality thereof.

      20.28    **Time is of the Essence**.  Time is of the essence of each provision of this Agreement and the other Loan Documents.

      20.29    **Successor Laws**.  Any reference in this Agreement to any statute or regulation shall be deemed to include any successor statute or regulation.

      20.30    **No Fiduciary Duty**.

      (i)    Borrower acknowledges that, in connection with this Agreement, the other Loan Documents and the transactions contemplated and/or financed by the Loan Documents (the "**Transaction**"), Lender has relied upon and assumed the accuracy and completeness of all of the financial, legal, regulatory, accounting, tax and other information provided to, discussed with or reviewed by Lender for such purposes, and Lender does not assume any liability therefor or responsibility for the accuracy, completeness or independent verification thereof. Lender, its affiliates and their respective equity holders and employees (for purposes of this Section, the "**Lending Parties**") have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets and liabilities) of Guarantor, Borrower or any other Person or any of their respective affiliates or to advise or opine on any related solvency or viability issues.

      (ii)    It is understood and agreed that (i) the Lending Parties shall act under this Agreement and the other Loan Documents as an independent contractor, (ii) the Transaction is an arms'-length commercial transactions between the Lending Parties, on the one hand, and Borrower, on the other, (iii) each Lending Party is acting solely as principal and not as the agent or fiduciary of Borrower, Guarantor or their respective affiliates, stockholders, employees or creditors or any other Person and (iv) nothing in this Agreement, the other Loan Documents, the Transaction or otherwise shall be deemed to create (A) a fiduciary duty (or other implied duty) on the part of any Lending Party to Guarantor, Borrower, any of their respective affiliates, stockholders, employees or creditors, or any other Person or (B) a fiduciary or agency relationship between Guarantor, Borrower or any of their respective affiliates, stockholders, employees or creditors, on the one hand, and the Lending Parties, on the other. Borrower agrees that neither it nor Guarantor nor any of their respective affiliates shall make, and hereby waives, any claim against the Lending Parties based on an assertion that any Lending Party has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Borrower, Guarantor or their respective affiliates, stockholders, employees or creditors. Nothing in this Agreement or the other Loan Documents is intended to confer upon any other Person (including affiliates, stockholders, employees or creditors of Borrower and Guarantor) any rights or remedies by reason of any fiduciary or similar duty.

WEIL:\96218278\17\63946.0005

(iii)    Borrower acknowledges that it has been advised that the Lending Parties are engaged, either directly or through affiliates in various activities, including securities trading, investment banking and financial advisory, investment management, principal investment, hedging, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. In the ordinary course of these activities, the Lending Parties may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and/or instruments. Such investment and other activities may involve securities and instruments of affiliates of Borrower, including Guarantor, as well as of other Persons that may (i) be involved in transactions arising from or relating to the Transaction, (ii) be customers or competitors of Borrower, Guarantor and/or their respective affiliates, or (iii) have other relationships with Borrower, Guarantor and/or their respective affiliates. In addition, the Lending Parties may provide investment banking, underwriting and financial advisory services to such other Persons. The Lending Parties may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of affiliates of Borrower, including Guarantor, or such other Persons. The Transaction may have a direct or indirect impact on the investments, securities or instruments referred to in this paragraph. Although the Lending Parties in the course of such other activities and relationships may acquire information about the Transaction or other Persons that may be the subject of the Transaction, the Lending Parties shall have no obligation to disclose such information, or the fact that the Lending Parties are in possession of such information, to Borrower, Guarantor or any of their respective affiliates or to use such information on behalf of Borrower, Guarantor or any of their respective affiliates.

(iv)    Borrower acknowledges and agrees that Borrower has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to this Agreement, the other Loan Documents, the Transaction and the process leading thereto.

20.31    **Representation by Lender**.    Lender represents and warrants that Lender has and will have sufficient available capital in order to make each Loan Advance hereunder to the extent Borrower fully complies with the requirements herein for each such Loan Advance.

20.32    **CCG Fee Reserve Account and Loan Disbursement Account**. Notwithstanding anything to the contrary contained herein or any of the other Loan Documents, Lender acknowledges that funds of Borrower exist in the CCG Fee Reserve Account and the Loan Disbursement (as such terms are defined in the CDE Loan Documents) and that the existence of such accounts shall not result in a violation of this Agreement or any of the other Loan Documents.

WEIL:\96218278\17\63946.0005

**[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGES FOLLOW]**

WEIL:\96218278\17\63946.0005

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**SANTA BARBARA 230, LLC**, a Delaware limited liability company

By: _____
Name: _____JAmes Vosotas_____
Title: _____MANAGER_____

**GREYSTONE    TENANT,    LLC,** a Delaware limited liability company

By: _____
Name: _____JAmes Vosotas_____
Title: _____MANAGER_____

[Signatures Continue on Following Page]

[Signature Page to Loan Agreement (#96218278)]

**LENDER:**

**1920 COLLINS AVE ML FUNDING LLC,** a
Delaware limited liability company

By:_____
Name:    Joseph Moinian
Title:    Authorized Signatory

## **EXHIBIT A-1**

## **FEE LAND LEGAL DESCRIPTION**

LOT 4 AND THE EAST 35 FEET OF LOT 5 (A/K/A LOT 5, LESS NW 15'), IN BLOCK "D", OF AMENDED PLAT OF OCEAN FRONT PROPERTY OF THE MIAMI BEACH IMPROVEMENT COMPANY, AS RECORDED IN PLAT BOOK 5, PAGE 7, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

WEIL:\96218278\17\63946.0005

# **EXHIBIT A-2**

## **LEASEHOLD LAND LEGAL DESCRIPTION**

THE NORTH ½ OF LOTS 1, 2 AND 3, BLOCK "D" OF "AMENDED PLAT OF THE OCEAN FRONT PROPERTY OF THE MIAMI BEACH IMPROVEMENT COMPANY" ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 5, PAGE 7 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

WEIL:\96218278\17\63946.0005

## EXHIBIT B

## FORM OF ASSIGNMENT AND ACCEPTANCE

Reference is made to that certain Loan Agreement (as the same may be amended, restated, extended, renewed, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), by and among **Santa Barbara 230, LLC**, a Delaware limited liability company and **Greystone Tenant, LLC**, a Delaware limited liability company (each individually or collectively, as the context may require, jointly and severally, "**Borrower**"), and **1920 Collins Ave ML Funding LLC**, a Delaware limited liability company (together with its successors and assigns, "**Lender**"). Capitalized terms used herein that are not specifically defined herein shall have the meanings ascribed thereto in the Loan Agreement.

Each "Assignor" referred to on <u>Schedule 1</u> hereto (each, an "**Assignor**") and each "**Assignee**" referred to on <u>Schedule 1</u> hereto (each, an "**Assignee**") agrees severally with respect to all information relating to it and its assignment hereunder and on <u>Schedule 1</u> hereto as follows:

1. Such Assignor hereby sells and assigns, without recourse except as to the representations and warranties made by it herein, to such Assignee, and such Assignee hereby purchases and assumes from such Assignor, an interest in and to such Assignor's rights and obligations under the Loan Agreement as of the date hereof equal to the percentage interest specified on <u>Schedule 1</u> hereto of all outstanding rights and obligations under the Loan. After giving effect to such sale and assignment, such Assignee's Commitments and the amount of the Advances owing to such Assignee will be as set forth on <u>Schedule 1</u> hereto.

2. Such Assignor: (A) represents and warrants that its name set forth on <u>Schedule 1</u> hereto is its legal name, that it is the legal and beneficial owner of the interest or interests being assigned by it hereunder and that such interest or interests are free and clear of any adverse claim; (B) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any of the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any of the Loan Documents or any other instrument or document furnished pursuant thereto; (C) makes no representation or warranty and assumes no responsibility with respect to the financial condition of either Borrower or any Guarantor or the performance or observance by either Borrower or any Guarantor of any of their respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto; and (D) attaches the Note or notes held by such Assignor and requests that Lender exchange such Note or notes for a new Note or notes payable to the order of such Assignee in an amount equal to the Commitments assumed by such Assignee pursuant hereto or new notes payable to the order of such Assignee in an amount equal to the Commitments assumed by such Assignee pursuant hereto and such Assignor in an amount equal to the Commitments retained by such Assignor under the Loan Agreement, respectively, as specified on <u>Schedule 1</u> hereto.

WEIL:\96218278\17\63946.0005

3.      Such Assignee: (A) confirms that it has received a copy of the Loan Documents and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (B) agrees that it will, independently and without reliance upon Lender, any Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (C) represents and warrants that its name set forth on Schedule 1 hereto is its legal name; (D) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Loan Agreement are required to be performed by it as a Lender; and (E) attaches any U.S. Internal Revenue Service forms required under the Loan Agreement.

4.      Following the execution of this Assignment and Acceptance, it will be delivered to Lender for acceptance and recording by Lender.  The effective date for this Assignment and Acceptance (the "**Effective Date**") shall be the date of acceptance hereof by Lender, unless otherwise specified on Schedule 1 hereto.

5.      Upon such acceptance and recording by Lender, from and after the Effective Date, (A) such Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of Assignor thereunder first occurring from and after the Effective Date and be deemed to have assumed such rights and obligations, and (B) such Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Loan Agreement first occurring from and after the Effective Date (other than its rights and obligations under the Loan Documents that are specified under the terms of such Loan Documents to survive the payment in full of the Obligations under the Loan Documents to the extent any claim thereunder relates to an event arising prior to the Effective Date of this Assignment and Acceptance), and if this Assignment and Acceptance covers all of the remaining portion of the rights and obligations of such Assignor under the Loan Agreement, such Assignor shall cease to be a party thereto.

6.      Upon such acceptance and recording by Lender, from and after the Effective Date, Lender shall make all payments under the Loan Agreement and the Note or notes in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees with respect thereto) to such Assignee.  Such Assignor and such Assignee shall make all appropriate adjustments in payments under the Loan Agreement and the Note or notes for periods prior to the Effective Date directly between themselves.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.      This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of Schedule 1 to this Assignment and

Exhibit B-2

Acceptance by telecopier or by e-mail in "pdf" format shall be effective as delivery of an original executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, each Assignor and each Assignee have caused this Assignment and Acceptance and <u>Schedule 1</u> to this Assignment and Acceptance to be executed by their officers thereunto duly authorized as of the date specified thereon.


[_____], as Assignor

By: _____
Name:
Title:

Dated: _____ __, _____


[_____], as Assignee

By: _____
Name:
Title:

Dated: _____ __, _____

WEIL:\96218278\17\63946.0005

**SCHEDULE 1**
**TO**
**ASSIGNMENT AND ACCEPTANCE**

As to the Loan in respect of which an interest is being assigned:

| | |
|---|---|
| Percentage interest assigned: | _____% |
| Assignee's commitment ("**Commitment**") | $ _____ |
| Aggregate outstanding principal amount of the Loan assigned: | $ _____ |
| Principal amount of Note payable to Assignee: | $ _____ |
| Principal amount of Note payable to Assignor: | $ _____ |

Effective Date (if other than date of acceptance by Lender):
*_____ __, 201[_]

Effective Date (if other than date of acceptance by Lender):

_____ __, ____(Note: This date should be no earlier than five (5) Business Days after the delivery of this Assignment and Acceptance to Lender.)

_____, as Assignor

[*Type or print legal name of Assignor*]

By      _____
Title:

Dated: _____ __, ____

_____, as Assignee

[*Type or print legal name of Assignee*]

By      _____
Title:

Dated: _____ __, ____

Exhibit B - Sch. 1-1

## EXHIBIT C-1

### FORM OF DRAW REQUEST

BORROWER'S REQUISITION LETTER
Requisition No. ___

| | |
|---|---|
| LENDER: | 1920 COLLINS AVE ML FUNDING LLC |
| BORROWER(S): | SANTA BARBARA 230, LLC and GREYSTONE TENANT, LLC |
| DATE: | _____ |
| PERIOD COVERED: | _____    to _____ |

Pursuant to the Loan Agreement (the "Loan Agreement") by and among **Santa Barbara 230, LLC**, a Delaware limited liability company and **Greystone Tenant, LLC**, a Delaware limited liability company (each individually or collectively, as the context may require, jointly and severally, "Borrower"), and **1920 Collins Ave ML Funding LLC**, a Delaware limited liability company (together with its successors and assigns, "Lender"), dated as of [_____], 2017, Borrower hereby authorizes and requests an advance, which is calculated as follows (below amounts obtained from Borrower's Requisition Spreadsheet):

| | | | |
|---|---|---|---|
| 1. | Amount Requisitioned for the Period Covered: | | $_____ |
| 2. | Less interest/fees already funded for the Period Covered: | | (_____) |
| 3. | Amount of new loan proceeds (1) - (2): | | $_____ |
| 4. | Less Lender holdbacks for Reimbursements: | | (_____) |
| 5. | Net Amount of Wire (3) - (4) | | $_____ |

Borrower requests that the funds be wired on **[DATE]** in accordance with the following wire instructions:

Amount:

Bank:

ABA #:

Account Name:

Account #:

Exhibit C-1-1

Attention:

In connection with and in order to induce Lender to advance the amounts requested on the previous page, Borrower hereby represents, warrants and stipulates as follows:

A. The amounts and percentages set forth on Borrower's Requisition Spreadsheet attached hereto are true and correct to Borrower's Knowledge;

B. All sums previously requisitioned have been applied to the payment of the Hard Costs and Soft Costs heretofore incurred;

C. Names, addresses, contract dates and amounts for the contractors responsible for performing each item of Hard Costs listed on Borrower's Requisition Spreadsheet have been heretofore or are herewith submitted to Lender and the Construction Consultant and copies of any contracts not previously delivered to Lender or the Construction Consultant are enclosed herewith;

D. All change orders have been submitted to Lender and the Construction Consultant and all change orders for which an advance is requested hereby have been approved by Lender for funding to the extent required by the Loan Agreement;

E. All payment receipts due as of the end of the Period Covered have been submitted to the Construction Consultant;

F.  All conditions precedent to the requested Loan Advance have been satisfied; and

G. The loan proceeds from the requested Loan Advance will be applied in accordance with the terms of the Loan Documents.

Capitalized terms used but not defined in this Borrower's Requisition Letter shall have the respective meanings given to such terms in the Loan Agreement.


[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Exhibit C-1-2

Subscribed and sworn to
before me on _____, 201[_].

                                      Very truly yours,


_____

Notary Public

[Stamp and Seal]

                              SANTA BARBARA 230, LLC,
                              a Delaware limited liability company


                              By: _____
                              Name: _____
                              Title: _____


                              GREYSTONE TENANT, LLC,
                              a Delaware limited liability company


                              By: _____
                              Name: _____
                              Title: _____

Exhibit C-1-3

**<u>EXHIBIT C-2</u>**

**FORM OF BORROWER REQUISITION SPREADSHEET**

See attached.

Exhibit C-2-1

WEIL:\96218278\17\63946.0005

AIA Document A·B·C+D/PLICATION AND CERTIFICATION FOR PAYMENT, containing

Contractor's signed certification is attached

In tabulations below, amounts are stated to the nearest dollar.

Use Column I on Contracts where variable retainage for line items may apply.

_____ 201
__/1 /20__ __/31/20__

| 0 | Schedule Value - All Values Exclude Retainage | A Original Budget | B Previous Adjustments | C Current Adjustments | A+B+C=D Current Budget | E Pending CO's | F Other costs/ savings | D+E+F=H Forecasted Adjusted Budget | I Previously Drawn | J Net Amount to be drawn this period | H-I-J=K Remaining to be drawn |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Purchased Trades In Green | | | | 0 | | | 0 | | | 0 |
| 1 | LAND PURCHASE & MISC | | | | 0 | | | 0 | | | 0 |
| 2 | FOUNDATION | | | | 0 | | | 0 | | | 0 |
| 3 | HAZARDOUS MATERIALS / DEWATERING | | | | 0 | | | 0 | | | 0 |
| 4 | HOISTING AND SIDEWALK BRIDGE | | | | 0 | | | 0 | | | 0 |
| 5 | CONCRETE - SUPERSTRUCTURE | | | | 0 | | | 0 | | | 0 |
| 6 | CONCRETE- OTHER | | | | 0 | | | 0 | | | 0 |
| 7 | MASONRY AND PLASTER | | | | 0 | | | 0 | | | 0 |
| 8 | STRUCTURAL STEEL | | | | 0 | | | 0 | | | 0 |
| 9 | DRYWALL, CEILINGS AND CARPENTRY | | | | 0 | | | 0 | | | 0 |
| 10 | MILLWORK | | | | 0 | | | 0 | | | 0 |
| 11 | WOOD STAIRS | | | | 0 | | | 0 | | | 0 |
| 12 | ROOFING | | | | 0 | | | 0 | | | 0 |
| 13 | DOORS, FRAMES AND HARDWARE( SUPPLY ALLOWANCE) | | | | 0 | | | 0 | | | 0 |
| 14 | ARCHITECTURAL METAL AND GLASS | | | | 0 | | | 0 | | | 0 |
| 15 | ARCHITECTURAL METAL AND GLASS (ALLOWANCE) | | | | 0 | | | 0 | | | 0 |
| 16 | FIREPROOFING | | | | 0 | | | 0 | | | 0 |
| 17 | WOOD FLOORS - MATERIAL ALLOWANCE - VE SELECTION | | | | 0 | | | 0 | | | 0 |
| 18 | WOOD FLOORS - INSTALLATION | | | | 0 | | | 0 | | | 0 |
| 19 | STONE AND TILE- MATERIAL ALLOWANCE | | | | 0 | | | 0 | | | 0 |
| 20 | STONE AND TILE- INSTALLATION | | | | 0 | | | 0 | | | 0 |
| 21 | FLOORING AND BASE (ALLOWANCE) | | | | 0 | | | 0 | | | 0 |
| 22 | PAINTING AND WALL COVERING | | | | 0 | | | 0 | | | 0 |
| 23 | TOILET ACCESSORIES( ALLOWANCE) | | | | 0 | | | 0 | | | 0 |
| 24 | KITCHEN-SUPPLY | | | | 0 | | | 0 | | | 0 |
| 25 | KITCHEN-INSTALLATION | | | | 0 | | | 0 | | | 0 |
| 26 | VANITIES AND MEDICINE CABINETS- SUPPLY | | | | 0 | | | 0 | | | 0 |
| 27 | VANITIES AND MEDICINE CABINETS- INSTALLATION | | | | 0 | | | 0 | | | 0 |
| 28 | WARDROBES- SUPPLY | | | | 0 | | | 0 | | | 0 |
| 29 | WARDROBES- INSTALLATION | | | | 0 | | | 0 | | | 0 |
| 30 | KITCHEN-APPLIANCES | | | | 0 | | | 0 | | | 0 |
| 31 | SPECIALTY ITEMS | | | | 0 | | | 0 | | | 0 |
| 32 | POOLS | | | | 0 | | | 0 | | | 0 |
| 33 | SIGNAGE ( ALLOWANCE) | | | | 0 | | | 0 | | | 0 |
| 34 | ELEVATORS | | | | 0 | | | 0 | | | 0 |
| 35 | H.V.A.C | | | | 0 | | | 0 | | | 0 |
| 36 | PLUMBING | | | | 0 | | | 0 | | | 0 |
| 37 | PLUMBING (ALLOWANCE) - HOT WATER HEATERS | | | | 0 | | | 0 | | | 0 |
| 38 | PLUMBING FIXTURES ( BASED ON NEWFORM AND OTHER EUROPEAN MFG | | | | 0 | | | 0 | | | 0 |
| 39 | SPRINKLERS | | | | 0 | | | 0 | | | 0 |
| 40 | COMPACTOR | | | | 0 | | | 0 | | | 0 |
| 41 | ELECTRICAL | | | | 0 | | | 0 | | | 0 |
| 42 | FIRE ALARM | | | | 0 | | | 0 | | | 0 |
| 43 | LIGHTING FIXTURES ( SUPPLY ALLOWANCE) | | | | 0 | | | 0 | | | 0 |
| 44 | TV/ DATA/ TELEPHONE | | | | 0 | | | 0 | | | 0 |
| 45 | LANDSCAPING- ALLOWANCE | | | | 0 | | | 0 | | | 0 |
| 46 | FIREPLACE-ALLOWANCE | | | | 0 | | | 0 | | | 0 |
| 47 | SALES OFFICE ALLOWANCE | | | | 0 | | | 0 | | | 0 |
| 48 | DEMOLITION | | | | 0 | | | 0 | | | 0 |
| 49 | SUB TOTAL | | | | 0 | | | 0 | | | 0 |
| 50 | GENERAL CONDITIONS / GENERAL REQUIREMENTS | | | | 0 | | | 0 | | | 0 |
| 51 | SUB TOTAL | | | | 0 | | | 0 | | | 0 |
| 52 | CONSTRUCTION MANAGEMENT FEE | | | | 0 | | | 0 | | | 0 |
| 53 | SUB TOTAL | | | | 0 | | | 0 | | | 0 |
| 54 | BONDS | | | | 0 | | | 0 | | | 0 |
| 55 | SUB TOTAL | | | | 0 | | | 0 | | | 0 |
| 56 | CONSTRUCTION MANAGERS CONTINGENCY | | | | 0 | | | 0 | | | 0 |
| 57 | SUB TOTAL | | | | 0 | | | 0 | | | 0 |
| 58 | SAVINGS ALLOWANCE | | | | 0 | | | 0 | | | 0 |
| 59 | SUB TOTAL -GMP and Owner Anticipated Costs | | | | 0 | | | 0 | | | 0 |
| 60 | Owner's Hard Cost Contingency | | | | 0 | | | 0 | | | 0 |
| 61 | Size Utilises | | | | 0 | | | 0 | | | 0 |
| 62 | SUB TOTAL - Direct Cost Budget | | | | 0 | | | 0 | | | 0 |
| 63 | Site Maintenance | | | | 0 | | | 0 | | | 0 |
| 64 | Project Architecture | | | | 0 | | | 0 | | | 0 |
| 65 | Mechanical Engineering | | | | 0 | | | 0 | | | 0 |
| 66 | Structural Engineering | | | | 0 | | | 0 | | | 0 |
| 67 | Site/Civ Engineering | | | | 0 | | | 0 | | | 0 |
| 68 | Adjacent Site, GeoTech & Misc Engineering | | | | 0 | | | 0 | | | 0 |
| 69 | Miscellaneous Consultants | | | | 0 | | | 0 | | | 0 |
| 70 | Architecture & Engineering Incidentals & Disbursements | | | | 0 | | | 0 | | | 0 |

Exhibit C-2-2

| # | Description | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 71 | Expediting | | | | | 0 | | | 0 | | | | 0 |
| 72 | Environmental | | | | | 0 | | | 0 | | | | 0 |
| 73 | Appraisal | | | | | 0 | | | 0 | | | | 0 |
| 74 | Surveys | | | | | 0 | | | 0 | | | | 0 |
| 75 | Borings | | | | | 0 | | | 0 | | | | 0 |
| 76 | Building Department Exam & Permit Fees | | | | | 0 | | | 0 | | | | 0 |
| 77 | Controlled Inspections | | | | | 0 | | | 0 | | | | 0 |
| 78 | Interim Real Estate Taxes (24 Months) | | | | | 0 | | | 0 | | | | 0 |
| 79 | Omitted | | | | | 0 | | | 0 | | | | 0 |
| 80 | Omitted | | | | | 0 | | | 0 | | | | 0 |
| 81 | Construction Comprehensive General Liability (CGL) & Umbrella Insurance | | | | | 0 | | | 0 | | | | 0 |
| 82 | Builder's Risk Insurance | | | | | 0 | | | 0 | | | | 0 |
| 83 | Accounting (including Cost Certification) | | | | | 0 | | | 0 | | | | 0 |
| 84 | Brand Positioning (re allocated from Marketing - Condo) | | | | | 0 | | | 0 | | | | 0 |
| 85 | Marketing - Condo (Sales Office & Models) 400k year plus rent | | | | | 0 | | | 0 | | | | 0 |
| 86 | Marketing - Sales Office Staffing 85K yr | | | | | 0 | | | 0 | | | | 0 |
| 87 | Advance Against Commissions | | | | | 0 | | | 0 | | | | 0 |
| 88 | Return of Advance Commissions | | | | | 0 | | | 0 | | | | 0 |
| 89 | Lender Title Policy | | | | | 0 | | | 0 | | | | 0 |
| 90 | Interest Rate Cap & Recording Charges | | | | | 0 | | | 0 | | | | 0 |
| 91 | Legal-Acquisition | | | | | 0 | | | 0 | | | | 0 |
| 92 | Legal-Zoning | | | | | 0 | | | 0 | | | | 0 |
| 93 | Legal-Organizational | | | | | 0 | | | 0 | | | | 0 |
| 94 | Legal-Financing | | | | | 0 | | | 0 | | | | 0 |
| 95 | Legal - Construction Management Agreement | | | | | 0 | | | 0 | | | | 0 |
| 96 | Legal - Offering Plan | | | | | 0 | | | 0 | | | | 0 |
| 97 | Legal - Commercial Leasing | | | | | 0 | | | 0 | | | | 0 |
| 98 | Furniture, Fixtures, & Equipment (FF&E) | | | | | 0 | | | 0 | | | | 0 |
| 99 | Sponsor's Operating Deficit | | | | | 0 | | | 0 | | | | 0 |
| 100 | Management Start-Up Expenses | | | | | 0 | | | 0 | | | | 0 |
| 101 | Developer Overhead Reimbursements | | | | | 0 | | | 0 | | | | 0 |
| 102 | Developer Overhead Office Rent | | | | | 0 | | | 0 | | | | 0 |
| 103 | Soft Cost Contingency | | | | | 0 | | | 0 | | | | 0 |
| 104 | Construction Loan Commitment Fee | | | | | 0 | | | 0 | | | | 0 |
| 105 | Construction Loan Service Fee | | | | | 0 | | | 0 | | | | 0 |
| 106 | Construction Loan Mortgage Broker Fee | | | | | 0 | | | 0 | | | | 0 |
| 107 | Legal-Construction Lender | | | | | 0 | | | 0 | | | | 0 |
| 108 | Mortgage Recording Tax | | | | | 0 | | | 0 | | | | 0 |
| 109 | Mortgage Recording Tax Savings | | | | | 0 | | | 0 | | | | 0 |
| 110 | Bank Construction Consultant & Site Inspections | | | | | 0 | | | 0 | | | | 0 |
| 111 | Construction Loan Interest - Building Loan | | | | | 0 | | | 0 | | | | 0 |
| 112 | Construction Loan Interest - Project Loan | | | | | 0 | | | 0 | | | | 0 |
| 113 | Interest Paid from Cash Flow | | | | | 0 | | | 0 | | | | 0 |
| 114 | SubTotal All Costs (Soft & Hard) | | | | | 0 | | | 0 | | | | 0 |
| 115 | Developer Fee | | | | | 0 | | | 0 | | | | 0 |
| 116 | Total of All Costs (Soft & Hard) | | | | | 0 | | | 0 | | | | 0 |
| 117 | FOUNDATION ANTICIPATED CHANGE ORDERS (Out of GMP) | | | | | 0 | | | 0 | | | | 0 |
| 118 | FOUNDATION - REMOVAL OF CONTAMINATED SOIL (Out of GMP) | | | | | 0 | | | 0 | | | | 0 |
| 119 | Grand Total (All Soft & Hard Costs) | | | | | 0 | | | 0 | | | | 0 |
| 120 | Equity Funded | | | | | | | | | | | | |
| 121 | Funding Amount | | | | | 0 | | | 0 | | | | 0 |

Exhibit C-2-3

## **EXHIBIT C-3**

## **FORM OF AIA APPLICATION FOR PAYMENT**

See attached.

Exhibit C-3-1

WEIL:\96218278\17\63946.0005

Form of A1A Application for Payment

# APPLICATION AND CERTIFICATE FOR PAYMENT AIA DOCUMENT G702 (instructions on reverse side) PAGE ONE OF PAGES

| TO OWNER: | PROJECT: | APPLICATION NO.: | Distribution to: |
|---|---|---|---|
| | | PERIOD TO: | ☐ OWNER |
| | | PROJECT NOS.: | ☐ ARCHITECT |
| FROM CONTRACTOR: | VIA ARCHITECT: | CONTRACT DATE: | ☐ CONTRACTOR |
| CONTRACT FOR: | | | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract. Continuation Sheet, AIA Document G703 is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM ................. | $ | |
| 2. Net change by Change Orders ................. | $ | |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) ......... | $ | |
| 4. TOTAL COMPLETED & STORED TO DATE ...... | $ | |
| (Column G on G703) | | |
| 5. RETAINAGE: | | |
| a. ____% of Completed Work | $ | |
| (Columns D + E on G703) | | |
| b. ____% of Stored Material | $ | |
| (Column F on G703) | | |
| Total Retainage (Line 5a + 5b or | | |
| Total in Column I of G703) .................... | $ | |
| 6. TOTAL EARNED LESS RETAINAGE ............ | $ | |
| (Line 4 less Line 5 total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT | | |
| (Line 6 from prior Certificate) .................. | $ | |
| 8. CURRENT PAYMENT DUE .................. | $ | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Plans and Specifications, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____ Date: _____

State of:
County of:
Subscribed and sworn to before
me this _____ day of _____

Notary Public
My Commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Plans and Specifications, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Plans and Specifications, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | |
|---|---|
| (Line 3 less Line 6) | $ |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

AMOUNT CERTIFIED ............................... $ _____

(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)

ARCHITECT:

By: _____ Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**G702-1992**

Exhibit C-3-2

## <u>EXHIBIT C-4</u>

## **FORM OF BORROWING CERTIFICATE**

Pursuant to Section 4.4(b)(iv) of that certain Loan Agreement (the "<u>Loan Agreement</u>") dated as of [_____] __, 2017, among **1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company (together with its successors and assigns, "<u>Lender</u>"), and **SANTA BARBARA 230, LLC**, a Delaware limited liability company and **GREYSTONE TENANT, LLC**, a Delaware limited liability company (each individually or collectively, as the context pay require, jointly and severally, "<u>Borrower</u>") the undersigned, [_____] of Borrower hereby certifies as follows:

1.  The representations and warranties of Borrower, Borrower Holdco and/or Guarantor (collectively, the "<u>Borrower Parties</u>") set forth in the Loan Agreement, or in any of the Loan Documents, any certificate, document or financial or any other statement furnished pursuant to or in connection with the Loan Agreement are true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof;

2.  Immediately prior to and immediately after the making of the Loan Advance requested to be made on the current Advance Date, no Event of Default shall have occurred and be continuing under the Loan Agreement or any other Loan Document;

3.  No part of the Project has been materially damaged by any Casualty or Taking or is threatened (in writing) with a Taking;

4.  No event has occurred which is likely to adversely and materially affect the ability of Borrower to construct or to cause the construction of the Project in accordance with the terms and conditions of the Loan Agreement, the Plans and Specifications and the Construction Documents;

5.  [_____], as [_____] is the authorized signatory of each Borrower, and the signature set forth on the signature line above such Person's name below is such Person's true and genuine signature;

6.  There are no liquidation or dissolution proceedings pending or to the Knowledge of the undersigned threatened against Borrower or any other Borrower Party, nor has any other event occurred affecting or threatening the existence of Borrower or any other Borrower Party;

7.  Each Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; and

8.  The Loan Documents have been duly executed and delivered by, or on behalf of, Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws generally affecting rights of creditors and the enforcement of debtors' obligations, and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Exhibit C-4-1

WEIL:\96218278\17\63946.0005

All capitalized terms used in this Borrowing Certificate that are not defined herein shall have the meanings given to such terms in the Loan Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit C-4-2

Date: _____, 201[_]

**SANTA BARBARA 230, LLC**,
a Delaware limited liability company

By:_____
Name:
Title:

**GREYSTONE TENANT, LLC**,
a Delaware limited liability company

By:_____
Name:
Title:

Exhibit C-4-3

<u>**EXHIBIT C-5**</u>

**FORM OF PAYMENT RECEIPT**

TO:    Santa Barbara 230, LLC, Greystone Tenant, LLC, the General Contractor named below and 1920 Collins Ave ML Funding LLC, as Lender

Period Ending ("Date") _____, 201[_]

Re:    
| | | |
|---|---|---|
| Borrower(s): | Santa Barbara 230, LLC and Greystone Tenant, LLC |
| Lender: | 1920 Collins Ave ML Funding LLC |
| Premises: | 1920 Collins Ave., Miami Beach, FL and 230 20th St., Miami Beach, FL |
| Project: | Construction of an approximately 55,000 square foot, 92 key full-service boutique hotel project to be built on the Premises. |

General Contractor:
Contract Work:
Contract Date:

| | |
|---|---|
| Original Contract Amount: | $ |
| Change Order Amounts: | $ |
| Adjusted Contract Amount: | $ |
| Amount of Work Done to Date: | $ |
| Retainage Amount Not Yet Due: | $ |
| Net Amount Due to Date: | $ |
| Total Payments Received to Date: | $ |

The undersigned contractor, subcontractor or supplier hereby acknowledges receipt of $_____ (in cash only and not in equivalents or other agreements) and aggregate payments equal to the Total Payments Received to Date stated above. These amounts represent payment in full for all amounts due for the Contract Work as of the Date of this Payment Receipt under our contract with the General Contractor or the Borrower(s) identified above as increased or decreased by the Change Order Amounts also specified above excluding Retainage.

The undersigned hereby certifies that the amounts set forth are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material on the above described Project other than those included in the Original Contract Amount and any Change Order Amounts set forth above.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit C-5-1

Duly authorized, executed and delivered by the undersigned this _____day of _____, _____ 201[_].

[Contractor, Subcontractor or Supplier]

By:   _____
Name:
Title:

Exhibit C-5-2

## EXHIBIT C-6

## PROJECT NAME: 1920 COLLINS AVE., MIAMI BEACH, FL AND 230 20TH ST., MIAMI BEACH, FL ANTICIPATED COST REPORT

| Description of Work | Contract Amount | | | | | Project Costs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Original Budget A | Approved Scope Change & Revs B | Approved Budget Realloca tions C | Current Budget (A+B+C=D) D | Pending Scope Changes & Revisions E | Anticipated Budget (D+E=F) F | Costs Incurred to Date G | Projected Costs to Complete H | Pending Change Event I | Estimated Add'l & Future Commit- ment J | Total Projected Costs (G+H+ I+J= K | Percentage of Comple- tion K/D=L L | Variance (K-D=M M | Variance Explana- tion |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| SUBTOTAL DIRECT HARD COSTS | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |
| Contractor Contingency | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |
| CONTRACT SUBTOTAL | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |
| Contractor Fee | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |
| TOTAL CONTRACT AMOUNT | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| SUBTOTAL- OTHER HARD COSTS | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| | | | | | | | | | | | | #DIV/0! | | |
| SUBTOTAL – SOFT COSTS | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |
| | | | | | | | | | | | | #DIV/0! | | |
| CON- STRUC- TION MANAGE- MENT FEE | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - | |
| | | | | | | | | | | | | #DIV/0! | | |
| TOTAL PROJECT COSTS | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | #DIV/0! | $ - | |

7

Exhibit C-6-1

## **EXHIBIT C-7**

### **FORM OF CONDITIONAL LIEN WAIVER AND CONSENT**

TO:      Santa Barbara 230, LLC, Greystone Tenant, LLC, the General Contractor named below and 1920 Collins Ave ML Funding LLC, as Lender

            Period Ending ("Date") _____, 201[_]

Re:      Borrower(s): Santa Barbara 230, LLC and Greystone Tenant, LLC
            Lender: 1920 Colling Ave ML Funding LLC
            Premises: 1920 Collins Ave., Miami Beach, FL and 230 20th St., Miami Beach, FL
            Project: Construction of an approximately 55,000 square foot, 92 key full-service boutique hotel project to be built on the Premises.

            General Contractor:
            Contract Work:
            Contract Date:
            Original Contract Amount: $
            Change Order Amounts: $
            Adjusted Contract Amount: $
            Total Payments Received to Date: $
            Final Payment Due: $

      The undersigned contractor, subcontractor or supplier hereby acknowledges that upon receipt of the Final Payment Due (in cash only and not equivalents or other agreements), which will be added to the Total Payments Received to Date stated above, the total due under the contract and any and all change orders and/or claims will be paid in full. These amounts represent payment in full for all amounts due for the Contract Work under our contract for the Borrower(s) and/or General Contractor identified above as increased or decreased by the Change Order Amounts also specified above. An Unconditional Final Waiver of Lien and Release of Payment Receipt will be given upon delivery of the Final Payment Due stated above.

      The undersigned hereby certifies that to Date the amounts set forth are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material on the above described Project other than those included in the Original Contract Amount and any Change Order Amounts set forth above.

      The undersigned, upon receipt of the Final Payment Due, has been paid in full for all labor, services, supplies, equipment and materials furnished under the Contract Work performed or supplied to Date. The undersigned, for itself, its successors and assigns and anyone else acting or claiming by or through it, hereby releases and waives entirely any mechanic's lien or other lien, stop notice, or any right against any labor or material bond, or claim to mechanic's lien or other lien, which the undersigned may now or hereafter have for all labor, materials, equipment, services and supplies furnished for use in or performed upon the above described Premises for Contract Work supplied or performed to Date.

Exhibit C-7-1

Duly authorized, executed and delivered by the undersigned this _____ day of _____, 201[_].

WITNESSED OR NOTARIZED BY:                    [Contractor, Subcontractor or Supplier]

_____
Notary Public or signature of officer taking
acknowledgment              [Stamp and Seal]        By: _____
                                                    Name:
this ____ day of _____, 201[_].                  Title:

Exhibit C-7-2

## <u>EXHIBIT C-8</u>

### FORM OF FINAL UNCONDITIONAL LIEN WAIVER AND CONSENT

TO:          1920 Collins Ave ML Funding LLC, as Lender

Period Ending ("Date") _____, 201[_]

| Re: | Borrower(s): | Santa Barbara 230, LLC and Greystone Tenant, LLC |
| | Lender: | 1920 Colling Ave ML Funding LLC |
| | Premises: | 1920 Collins Ave., Miami Beach, FL and 230 20th St., Miami Beach, FL |
| | Project: | Construction of an approximately 55,000 square foot, 92 key full-service boutique hotel project to be built on the Premises. |

Contract Date:
Original Contract Amount: $
Change Order Amounts: $
Adjusted Contract Amount: $
Total Payments Received to Date: $
**Final Payment Due: $**

The undersigned lienor, **[_____]** ("General Contractor"), hereby acknowledges receipt equal to the Total Payments Received to Date and the Final Payment Due (in cash only and not in equivalents or other agreements) stated above and that this amount represents payment in full for all amounts due for the work under the General Contractor's contract with the Borrower(s) identified above as increased or decreased by the Change Order Amounts also above.

The General Contractor hereby certifies that the amounts set forth are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material on the above described Project.

The General Contractor has been paid the Final Payment Due and, therefore, has been paid in full for all labor, services, supplies, equipment and materials furnished under the General Contractor's contract. In exchange for the Final Payment Due, the General Contractor, for itself, its successors and assigns and anyone else acting or claiming by or through it, hereby releases and waives entirely any mechanic's lien or other lien, stop notice, or any right against any labor or material bond, or claim to mechanic's lien or other lien, which the General Contractor may now or hereafter have for all labor, materials, equipment, services and supplies furnished for use in or performed upon the above described Premises.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Duly authorized, executed and delivered by the General Contractor this _____day of _____, 201[_].

WITNESSED OR NOTARIZED BY:             [General Contractor]

_____

Notary Public or signature of officer taking
acknowledgment              [Stamp and Seal]      By: _____

                                                  Name:

this _____ day of _____, 201[_].             Title:

Exhibit C-8-2

## <u>EXHIBIT D</u>

## FORM OF TENANT DIRECTION LETTER

### SANTA BARBARA 230, LLC and GREYSTONE TENANT, LLC
1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139
Attention: [_____]

_____ __, 20__

[Tenant Address]

     Re:    <u>Payment Direction Letter for 1920 Collins Ave., Miami Beach, Florida and 230 20th St., Miami Beach, FL  (collectively, the "Property")</u>

To whom it may concern:

Santa Barbara 230, LLC, a Delaware limited liability company and Greystone Tenant, LLC, a Delaware limited liability company (jointly and severally, the "<u>Owners</u>"), the Owners of the Property, have assigned by that certain mortgage (the "<u>Mortgage</u>") and that certain assignment of leases and rents (the "<u>Assignment</u>") their interests in the Lease (as hereinafter defined) at the Property to 1920 Collins Ave ML Funding LLC, a Delaware limited liability company, (together with its successors and assigns, "<u>Lender</u>") and has obtained that certain loan pursuant to that certain loan agreement among the Owners and Lender (collectively, the "<u>Loan Agreement</u>").

The Owners and Lender have agreed that rents due for the Property will be paid directly to a bank selected by the Owners and approved by Lender.  Therefore, from and after the date hereof, all rent to be paid by you to the Owners under that certain [Lease], dated as of [_____ __, ____], by and between the Owners and [Tenant] (the "<u>Lease</u>"), should be paid as follows:

    By wire transfer to:

    Bank:
    ABA No.:
    Account No.:
    Account Name:

These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent (the "<u>Servicer</u>"), or pursuant to a joint written instruction from the Borrower and the Lender or Servicer.

If you have any questions concerning this letter, please contact Santa Barbara 230, LLC and Greystone Tenant, LLC, 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139, Attention: [_____].  We appreciate your cooperation in this matter.

Very truly yours,

Exhibit D-1

**SANTA BARBARA 230, LLC**,
a Delaware limited liability company

By:    _____
Name:
Title:

**GREYSTONE TENANT, LLC**,
a Delaware limited liability company

By:    _____
Name:
Title:

Exhibit D-2

**<u>EXHIBIT E</u>**

**FORM OF CREDIT CARD COMPANIES/BANKS DIRECTION LETTER**

**SANTA BARBARA 230, LLC and GREYSTONE TENANT, LLC**
1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139
Attention: [_____]

_____ __, 20__

[ADDRESSEE]

      Re:    <u>Payment Direction Letter for 1920 Collins Ave., Miami Beach, FL and 230 20th St., Miami Beach, FL</u>

To Whom It May Concern:

    Santa Barbara 230, LLC and Greystone Tenant, LLC, the owners of the 1920 Collins Ave., Miami Beach, FL and 230 20th St., Miami Beach, FL (the "**Property**") have mortgaged the Property to 1920 Collins Ave ML Funding LLC (together with its successors and assigns, the "**Lender**") and have agreed that all receipts received with respect to the Property will be paid directly to a bank selected by the Lender.  Therefore, from and after [DATE], please remit all [payments/credit card receipts] under that certain [REFERENCE AGREEMENT], dated [_____], [____] (the "**Agreement**") between [_____] and you, as follows:

    Bank Name

    ABA#_____

    Atm:_____

    Fax:_____

    Account of Restricted Account

    Account #_____

    These payment instructions cannot be withdrawn or modified without the prior written consent of the Lender or its agent (the "**Servicer**"), or pursuant to a joint written instruction from the Borrower and the Lender or Servicer.  Until you receive written instructions from the Lender or Servicer, continue to send all payments due under the Agreement to [LOCKBOX BANK]. All payments due under the Agreement shall be remitted to [LOCKBOX BANK] no later than the day on which such amounts are due.

    If you have any questions concerning this letter, please contact Santa Barbara 230, LLC and Greystone Tenant, LLC, 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139, Attention: _____. We appreciate your cooperation in this matter.

Exhibit E-1

**SANTA BARBARA 230, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**GREYSTONE TENANT, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

Exhibit E-2

# EXHIBIT F

# FORM OF ARCHITECT CONSENT

Date: [_____]

The undersigned ("**Architect**") hereby consents to the assignment of that certain **[Architectural Agreement]**, dated as of **[_____]**, 201**[__]**, by and between **[SANTA BARBARA 230, LLC, a Delaware limited liability company and GREYSTONE TENANT, LLC, a Delaware limited liability company]**, having an address at 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139 ("**Assignor**") and Architect (together with all other attachments thereto, collectively, the "**Architectural Agreement**"), made pursuant to that certain Assignment of Architectural Agreements and Plans and Specifications dated as of [_____] (the "**Assignment**"), made by Assignor in favor of **1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company, having an address at 3 Columbus Circle, 23rd Floor, New York, New York 10019 (together with its successors and assigns, "**Assignee**"), of which this Architect's Consent (this "**Consent**") is a part, and acknowledges that there presently exists no unpaid claims due to the Architect except as set forth on **Schedule 1** attached hereto, arising out of the preparation and delivery of the Plans and Specifications by Architect to Assignor and/or the performance of the Architect's obligations under the Architectural Agreement.  Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Assignment.

1. Architect agrees that if, at any time, Assignee (or its designee) shall become the owner of the Property (or any part thereof), or, pursuant to Assignee's rights under the Loan Documents, shall elect to undertake or cause the Completion (as defined in the Loan Agreement) of construction of all or any portion of the Project and gives Architect written notice of such election; THEN, so long as Architect has received, receives or continues to receive the compensation called for under the Architectural Agreement, Assignee (or its designee) may, at its option, use and rely on the Plans and Specifications for the purposes for which they were prepared, and Architect shall continue to perform its obligations under the Architectural Agreement in accordance with the terms thereof for the benefit and account of Assignee (or its designee) in the same manner as if performed for the benefit or account of Assignor in the absence of the Assignment, provided that nothing contained herein or in the Assignment shall relieve Assignor of its obligations under the Architectural Agreement.

2. Architect warrants and represents to Assignee that, upon completion in accordance with the Plans and Specifications, the Improvements and their contemplated use will comply with all applicable environmental laws, building codes and zoning laws and resolutions.

3. Architect further agrees that, in the event of a breach by Assignor of the Architectural Agreement, or any agreement entered into with Architect in connection with the Plans and Specifications prepared by Architect, so long as the Assignment remains in effect, Architect will give written notice to Assignee of such breach at the following address:

WEIL:\96218278\17\63946.0005



Assignee shall have thirty (30) days from the receipt of such written notice of default to remedy or cure said default, provided, that if such default is of a nature that it cannot be cured within thirty (30) days, Assignee shall have thirty (30) days within which to commence the cure and shall thereafter have such reasonable period of time to complete such cure as is necessary. Nothing herein shall require Assignee to cure said default or to undertake Completion of construction of the Project or any portion thereof.

4.      The undersigned Architect warrants and represents that such Architect has no knowledge of any prior assignment(s) of any interest in the Plans and Specifications prepared by it or the Architectural Agreement.

[SIGNATURE PAGE FOLLOWS]

Exhibit F-2

IN WITNESS WHEREOF, this Consent is executed and delivered as of the date first above written.

**ARCHITECT:**

By:_____

Name: _____

Title: _____


Architect's Address:

_____

_____

_____

Exhibit F-3

SCHEDULE 1 TO ARCHITECT'S CONSENT

**SCHEDULE OF UNPAID CLAIMS**

| **Description** | **Amount** |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| **Total Unpaid Claims Due [_____]** | $_____ |

WEIL:\96218278\17\63946.0005

## EXHIBIT G

## FORM OF ASSIGNMENT OF ARCHITECT AGREEMENT

### ASSIGNMENT OF ARCHITECTURAL AGREEMENTS AND PLANS AND SPECIFICATIONS

THIS ASSIGNMENT OF ARCHITECTURAL AGREEMENTS AND PLANS AND SPECIFICATIONS (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, this "**Assignment**") is made as of the [__] day of [_____], 2017, by **SANTA BARBARA 230, LLC**, a Delaware limited liability company, and **GREYSTONE TENANT, LLC**, a Delaware limited liability company, each having its principal place of business at 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139 (each individually or collectively, as the context may require, jointly and severally, "**Assignor**"), to **1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company, having an address at 3 Columbus Circle, 23rd Floor, New York, New York 10019 (together with its successors and assigns, "**Assignee**").

### R E C I T A L S

WHEREAS, Assignor (i) owns and holds the fee simple interest in and to those certain lots or parcels of land more particularly described on **Exhibit A-1** attached hereto and made a part hereof and (ii) owns and holds the leasehold interest in and to those certain lots or parcels of land demised to it under that certain Ground Lease dated December 23, 2015 between Leasehold Borrower and Greystone Terra Firma, LLC, a Florida limited liability company, as amended by the First Amendment to Ground Lease dated as of November 3, 2016 and the First Amendment to Option Agreement, Amendment to Ground Lease and Amendment to Trust Agreement dated as of the date hereof (as may hereafter be further amended, assigned, modified, restated, extended or supplemented from time to time), which lots or parcels of land are more particularly described on **Exhibit A-2** attached hereto and made a part hereof, together, in each case, with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon or relating thereto (collectively, the "**Property**");

WHEREAS, Assignor desires to obtain a loan from Assignee in the principal amount of $36,800,000 (the "**Loan**") pursuant to that certain Loan Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), by and between Assignor and Assignee, and the other documents referenced as "**Loan Documents**" therein;

WHEREAS, the Loan is evidenced by that certain Promissory Note, dated the date hereof, in the stated maximum principal amount of $36,800,000 (as the same may be amended, restated, replaced (whether by one or more replacement notes), supplemented, extended or otherwise modified from time to time, the "**Note**"), and secured by, among other things, that certain Fee and Leasehold Mortgage, Assignment of Leases, Rents, Hotel Transactions Income and Security Deposits and Security Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, or otherwise modified from

WEIL:\96218278\17\63946.0005

time to time, the "**Security Instrument**"), given by Assignor to Assignee, which grants to Assignee a first priority lien on the Property;

    **WHEREAS**, concurrently herewith, Assignor has granted to Assignee a security interest in the Agreements and the Plans and Specifications (each as hereinafter defined) pursuant to the Security Instrument; and

    **WHEREAS**, all capitalized terms not defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement.  In the event any of the terms hereof shall conflict with the terms of the Loan Agreement, the terms of the Loan Agreement shall control.

    **NOW, THEREFORE**, with reference to the above recitals, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Assignor agrees as follows:

    1. <u>Assignment</u>.  Assignor hereby assigns, conveys and transfers to Assignee, as security for the Loan and to the fullest extent allowed by law, all of Assignor's right, title and interest in, to and under: (a) that certain (i) Architectural Basic Services letter agreement dated as of May 23, 2012, by and between Trans Inn Management ("**Trans**") and Schulman + Associates ("**Schulman**"), as assigned by Trans to Leasehold Borrower pursuant to that certain Assignment and Assumption of Contract for Construction dated as of October 23, 2017 and (ii) Contract Consultant Services, dated as of October 10, 2014, by and between Fee Borrower and  Norberto Rosenstein Architect, Inc. ("**Norberto**", together with Schulman, each individually an "**Architect**" and collectively, the "**Architects**") (each an "**Agreement**" and collectively, the "**Agreements**"); and (b) all plans and specifications, shop drawings, working drawings, and amendments, modifications, changes, supplements, and addenda thereto (as the same may be amended, restated, replaced, supplemented or modified from time to time, collectively, the "**Plans and Specifications**") heretofore or hereafter prepared by each Architect in connection with the construction of the Project on the Property.

    2. <u>Architect's Consent</u>.  Assignor covenants and agrees to cause each Architect to deliver to Assignee an Architect's Consent, substantially in the form attached hereto as **<u>Exhibit B</u>**.

    3. <u>Exercise of Rights</u>.  Upon the occurrence and during the continuance of an Event of Default, Assignee may, but shall not be obligated to, exercise any rights of Assignor under any of the Agreements and to the Plans and Specifications or exercise any rights of Assignee under this Assignment.  Assignee's exercise of any such rights shall not cure or waive any Event of Default, waive, modify or affect any notice of an Event of Default under any of the Loan Documents, or invalidate any act done pursuant to any such notice, and Assignee may continue to exercise such rights even after any Event of Default has been cured.  Assignee may exercise its rights as often as any such Event of Default may occur and continue.  The exercise of such rights shall not constitute a waiver of any of the remedies of Assignee under any of the Loan Documents. Assignor acknowledges that by accepting this Assignment, Assignee does not assume any of Assignor's obligations under the Agreements or with respect to the Plans and Specifications.

<div align="center">Exhibit G-2</div>

4.     <u>Assignor Covenants</u>.     Assignor hereby covenants with Assignee that during the term of this Assignment: (a) Assignor shall perform and/or observe in all material respects each and every term, covenant and provision of the Agreements and the Plans and Specifications to be fulfilled or performed by Assignor thereunder, if any; (b) Assignor shall, in the manner provided for in this Assignment, give prompt notice to Assignee of any written notice received by Assignor under any of the Agreements, together with a complete copy of any such notice; (c) Assignor shall use all commercially reasonable efforts to secure or enforce the performance of each and every material obligation, covenant, condition and agreement of the Agreements to be performed by the other parties thereunder; (d) Assignor shall not terminate any Agreements or amend any of the terms or provisions of any Agreements and/or the Plans and Specifications without the prior written consent of Assignee, which consent shall not be unreasonably withheld, conditioned or delayed; and (e) Assignor shall not assign, pledge, grant a security interest in or otherwise encumber any of the Agreements or the Plans and Specifications.

5.     <u>Indemnity</u>.     Assignor shall indemnify, defend, protect and hold Assignee harmless from and against any and all liability, loss or damage which it may or might incur by reason of this Assignment or from Assignor's failure to perform hereunder or under any requirement in any of the Agreements or the Plans and Specifications and from any and all claims and demands whatsoever which may be asserted against it under or by reason of this Assignment or any of the Agreements and the Plans and Specifications; provided, however, Assignor shall not be obligated to indemnify, hold harmless or defend Assignee with respect to any liabilities to the extent arising out of the gross negligence or willful misconduct of Assignee. In no event shall Assignee be liable hereunder until Assignee shall have exercised its rights under this Assignment, it being agreed that the exercise of any rights by Assignee under this Assignment shall not accrue until the occurrence and during the continuance of an Event of Default.  Should Assignee incur any liability, loss or damage by reason of this Assignment, or in the defense of any such claim or demand, the amount thereof including third party out-of-pocket costs, reasonable attorneys' fees, and expenses, together with interest thereon at the Default Rate shall be secured hereby, and Assignor shall reimburse Assignee therefor within ten (10) Business Days.

6.     <u>Satisfaction of Obligations</u>.     Upon the payment in full of the Loan, this Assignment shall become and be void and of no effect; provided, the provisions of this Assignment shall continue to be effective or be reinstated, as the case may be, if at any time payment of any portion of the Loan is rescinded or must otherwise be returned by Assignee upon the insolvency, bankruptcy or reorganization of Assignor.

7.     <u>Further Assurances</u>.     Assignor shall, upon written request of Assignee, execute or cause to be executed such further instruments or documents as Assignee may reasonably require to further effect the purposes hereof.

8.     <u>Notices</u>.  All notices or other written communications hereunder shall be delivered in accordance with Section 20.6 of the Loan Agreement.

9.     <u>Assignor Representations and Warranties</u>.

WEIL:\96218278\17\63946.0005

(a) Subject to the Permitted Encumbrances, Assignor hereby represents and warrants to Assignee that all previous assignments of Assignor's interest in and to the Agreements or with respect to the Plans and Specifications, if any, are, as of the date hereof, terminated, and Assignor agrees not to assign, sell, pledge, transfer, or otherwise encumber Assignor's interest in the Agreements or with respect to the Plans and Specifications, without the express written consent of Assignee, so long as this Assignment shall remain in effect. Subject to the Permitted Encumbrances, there exist no instruments, agreements, contracts or documents that restrict, adversely affect, or require the consent of any Person for the assignment of Assignor's interest in any of the Agreements or with respect to the Plans and Specifications in accordance with the terms of this Assignment.

(b) Assignor hereby represents and warrants to Assignee that: (i) the Agreements are in full force and effect and there are no monetary or other material defaults by Assignor or to Assignor's Knowledge any other party thereunder; and (ii) all copies of the Agreements and the Plans and Specifications delivered to Assignee are complete and correct as of the date hereof.

10.    Amendments.  This Assignment, the Note, and the other Loan Documents and any provisions hereof or thereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Assignor or Assignee, but only by an agreement in writing signed by Assignor and Assignee.

11.    Successors and Assigns.  If Assignor consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns forever.

12.    Assignee's Discretion; Consents.  Whenever pursuant to this Assignment, Assignee exercises any right given to it to consent or refrain from consenting, or to approve or disapprove, or any arrangement or term is to be satisfactory to Assignee, the decision of Assignee to consent or refrain from consenting, or to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Assignee.  Notwithstanding anything to the contrary in this Assignment, no consent or approval of Assignee shall be effective unless it is given or made in writing.

13.    Attorneys Fees.  Wherever in the Loan Documents Assignor is obligated to pay Assignee's attorneys' fees, such obligation shall include the reasonable third party out-of-pocket fees and expenses charged by those attorneys selected by Assignee.

14.    Governing Law.  The provisions of Section 20.3 of the Loan Agreement are hereby incorporated by reference into this Assignment to the same extent and with the same force as if fully set forth herein.

15.    Severability.  Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid as to any party or in any jurisdiction shall, as to that party or jurisdiction, be inoperative, unenforceable or invalid without affecting the remaining

provisions or the operation, enforceability or validity of that provision as to any other party or in any other jurisdiction, and to this end the provisions of all the Loan Documents are declared to be severable.

      16.   <u>No Mortgagee in Possession</u>.  Nothing herein contained, and no action taken pursuant to this Assignment, shall be construed as constituting Assignee as a mortgagee in possession.

      17.   <u>No Waiver</u>.  This Assignment shall be separate from and not in substitution of or in derogation of any assignment of Rents, Hotel Transactions Income or Leases in the Security Instrument or any of the other Loan Documents.  Assignee shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Assignee and then, only to the extent specifically set forth in the writing.  A waiver with reference to one event shall not be construed as continuing or as a bar to or waiver of any right or remedy as to a subsequent event.  No collection or receipt by Assignee of any Rents or Hotel Transactions Income or any action taken by Assignee under this Assignment shall cause or constitute a waiver of or cure by Assignor of any Event of Default hereunder, under the Note, the Security Instrument or any of the other Loan Documents.

      18.   <u>Paragraph Headings</u>.  The headings in this Assignment and the other Loan Documents are included for convenience of reference only and are not part of this Assignment or the other Loan Documents for any other purpose and shall not in any way limit, amplify or be used in interpreting the terms of this Assignment.

      19.   <u>Waiver of Statute of Limitations</u>.  Assignor hereby waives all rights to plead or assert at any time any statute of limitations as a defense or bar to any action or proceeding brought to enforce this Assignment or any of the other Loan Documents or any Obligations hereunder or thereunder.

      20.   <u>JURY WAIVER</u>.  ASSIGNOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS ASSIGNMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF ASSIGNEE AND ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

      21.   <u>Duplicate Originals, Counterparts</u>.  This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

WEIL:\96218278\17\63946.0005

22.    <u>Exculpation</u>.    The terms and provisions of Section 19.1 of the Loan Agreement are hereby incorporated by reference in this Assignment to the same extent and with the same force as if fully set forth herein.

[Signatures on Following Page]

Exhibit G-6

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed as of the day and year first above written.

<div style="margin-left:40%">

**SANTA BARBARA 230, LLC**, a Delaware limited liability company

By:_____
Name:_____
Title:_____

**GREYSTONE    TENANT,    LLC**,    a Delaware limited liability company

By:_____
Name:_____
Title:_____

</div>

Exhibit G-7

## EXHIBIT A-1

## LEGAL DESCRIPTION (FEE)

LOT 4 AND THE EAST 35 FEET OF LOT 5 (A/K/A LOT 5, LESS NW 15'), IN BLOCK "D", OF AMENDED PLAT OF OCEAN FRONT PROPERTY OF THE MIAMI BEACH IMPROVEMENT COMPANY, AS RECORDED IN PLAT BOOK 5, PAGE 7, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

WEIL:\96218278\17\63946.0005

## EXHIBIT A-2

## LEGAL DESCRIPTION (LEASEHOLD)

THE NORTH ½ OF LOTS 1, 2 AND 3, BLOCK "D" OF "AMENDED PLAT OF THE OCEAN FRONT PROPERTY OF THE MIAMI BEACH IMPROVEMENT COMPANY" ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 5, PAGE 7 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

WEIL:\96218278\17\63946.0005

EXHIBIT B

ARCHITECT'S CONSENT

Date: [_____]

The undersigned ("**Architect**") hereby consents to the assignment of that certain **[Architectural Agreement]**, dated as of **[_____]**, 201**[__]**, by and between **[SANTA BARBARA 230, LLC, a Delaware limited liability company and GREYSTONE TENANT, LLC, a Delaware limited liability company]**, having an address at 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139 ("**Assignor**") and Architect (together with all other attachments thereto, collectively, the "**Architectural Agreement**"), made pursuant to that certain Assignment of Architectural Agreements and Plans and Specifications dated as of [_____] (the "**Assignment**"), made by Assignor in favor of **1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company, having an address at 3 Columbus Circle, 23rd Floor, New York, New York 10019 (together with its successors and assigns, "**Assignee**"), of which this Architect's Consent (this "**Consent**") is a part, and acknowledges that there presently exists no unpaid claims due to the Architect except as set forth on **<u>Schedule 1</u>** attached hereto, arising out of the preparation and delivery of the Plans and Specifications by Architect to Assignor and/or the performance of the Architect's obligations under the Architectural Agreement. Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Assignment.

23.     Architect agrees that if, at any time, Assignee (or its designee) shall become the owner of the Property (or any part thereof), or, pursuant to Assignee's rights under the Loan Documents, shall elect to undertake or cause the Completion (as defined in the Loan Agreement) of construction of all or any portion of the Project and gives Architect written notice of such election; THEN, so long as Architect has received, receives or continues to receive the compensation called for under the Architectural Agreement, Assignee (or its designee) may, at its option, use and rely on the Plans and Specifications for the purposes for which they were prepared, and Architect shall continue to perform its obligations under the Architectural Agreement in accordance with the terms thereof for the benefit and account of Assignee (or its designee) in the same manner as if performed for the benefit or account of Assignor in the absence of the Assignment, provided that nothing contained herein or in the Assignment shall relieve Assignor of its obligations under the Architectural Agreement.

24.     Architect warrants and represents to Assignee that, upon completion in accordance with the Plans and Specifications, the Improvements and their contemplated use will comply with all applicable environmental laws, building codes and zoning laws and resolutions.

25.     Architect further agrees that, in the event of a breach by Assignor of the Architectural Agreement, or any agreement entered into with Architect in connection with the Plans and Specifications prepared by Architect, so long as the Assignment remains in effect, Architect will give written notice to Assignee of such breach at the following address:

Exhibit G-10



Assignee shall have thirty (30) days from the receipt of such written notice of default to remedy or cure said default, provided, that if such default is of a nature that it cannot be cured within thirty (30) days, Assignee shall have thirty (30) days within which to commence the cure and shall thereafter have such reasonable period of time to complete such cure as is necessary. Nothing herein shall require Assignee to cure said default or to undertake Completion of construction of the Project or any portion thereof.

26. The undersigned Architect warrants and represents that such Architect has no knowledge of any prior assignment(s) of any interest in the Plans and Specifications prepared by it or the Architectural Agreement.

[SIGNATURE PAGE FOLLOWS]

Exhibit G-11

IN WITNESS WHEREOF, this Consent is executed and delivered as of the date first above written.

**ARCHITECT:**


By:_____
Name: _____
Title: _____


Architect's Address:

_____

_____

_____

Exhibit G -12

SCHEDULE 1 TO ARCHITECT'S CONSENT

**SCHEDULE OF UNPAID CLAIMS**

| Description | Amount |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| **Total Unpaid Claims Due [_____]** | $_____ |

WEIL:\96218278\17\63946.0005

## EXHIBIT H

## FORM OF MAJOR TRADE CONTRACTOR CONSENT

Date: [_____]

The undersigned ("**Major Trade Contractor**") hereby consents to the assignment of that certain [**Trade Subcontract Agreement**], dated as of [_____], 201[_], by and between [_____] (the "**Construction Manager**") and Major Trade Contractor (the "**Assigned Contract**"), made pursuant to (i) that certain Assignment of Permits, Licenses, Approvals, Agreements and Documents (the "**Assignment**"), dated as of [_____], 2017, made by [**SANTA BARBARA 230, LLC, a Delaware limited liability company and GREYSTONE TENANT, LLC, a Delaware limited liability company**], having an address at 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139 ("**Borrower**") and Greystone Master Tenant, LLC, a Delaware limited liability company, having an address at 1941 Liberty Avenue, 2nd floor, Miami Beach, Florida 33139, Attention: James Vosotas, in favor of **1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company, having an address at 3 Columbus Circle, 23rd Floor, New York, New York 10019 (together with its successors and assigns, "**Lender**"), of which this Major Trade Contractor Consent (this "**Consent**") is a part and (ii) that certain Construction Manager Consent, dated as of [_____], 2017, made by Construction Manager in favor of Lender.  Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Assignment.

       1.     Major Trade Contractor agrees that if, at any time, Lender (or its designee) shall become the owner of the Property or, pursuant to Lender's rights under the Loan Documents (as defined in the Loan Agreement) shall take possession or control of the Property or elect to undertake or cause the completion of construction of the Project (as defined in the Loan Agreement) and gives Major Trade Contractor written notice of such election (the date of such election, the "**Election Date**") and provided that (A) Lender (or its designee) has accepted assignment of Borrower's interest in that certain [_____], dated as of [_____], 201[_], between Borrower and the Construction Manager (the "**Construction Management Agreement**") and (B) the Construction Management Agreement is thereafter terminated in accordance with the terms thereof; THEN, so long as Major Trade Contractor has received, receives or continues to receive the compensation called for under the Assigned Contract and Lender agrees to assume the obligations of Construction Manager under the Assigned Contract which arise from and after the Election Date, Major Trade Contractor shall continue to perform its obligations under the Assigned Contract in accordance with the terms thereof for the benefit and account of Lender (or its designee) in the same manner as if performed for the benefit or account of the Construction Manager in the absence of the Assignment, provided that nothing contained herein or in the Assignment shall relieve the Construction Manager of its obligations under the Assigned Contract.

       2.     Major Trade Contractor further agrees that, in the event of a breach by the Construction Manager of the Assigned Contract, so long as the Construction Manager's interest in the Assigned Contract is assigned to Lender, Major Trade Contractor will give written notice of such breach to Lender at the following addresses:

WEIL:\96218278\17\63946.0005



Lender shall have thirty (30) days from the receipt of such written notice of default to remedy or cure said default, provided, if such default is of a nature that it cannot be cured within thirty (30) days, Lender shall have thirty (30) days within which to commence the cure and shall thereafter have such reasonable period of time to complete such cure as is necessary.  Nothing herein shall require Lender to cure said default or to undertake completion of construction of the Project.

Exhibit H-2

3.      Major Trade Contractor shall hold in trust all money disbursed to or otherwise received by Major Trade Contractor from or on account of the Construction Manager in connection with the construction of the Project and shall use such money solely for the payment of costs incurred in the construction of the Project, including Major Trade Contractor's fees, and for no other purpose, until all bills, claims and demands for such costs have been paid in full.

4.      Major Trade Contractor represents and warrants that it has no knowledge of any prior assignment(s) of any interest in the Assigned Contract.

5.      All notices, demands or requests which are required or permitted to be given or served upon the Major Trade Contractor shall be delivered to the following address:

[_____]
[_____]
[_____]
[_____]


[SIGNATURE PAGE FOLLOWS]

Exhibit H-3

IN WITNESS WHEREOF, this Consent is executed and delivered as of the date first above written.

**MAJOR TRADE CONTRACTOR**

[MAJOR TRADE CONTRACTOR SIGNATURE BLOCK]

By:_____

Name: _____

Title: _____

Exhibit H-4

## EXHIBIT I

## FORM OF LOCKBOX AGREEMENT



### DEPOSIT ACCOUNT CONTROL AGREEMENT

### (Hard Lockbox)

This **Deposit Account Control Agreement** (the "Agreement") is made as of [_____] 201_, by and among **SANTA BARBARA 230, LLC,** a Delaware limited liability company, and **GREYSTONE TENANT, LLC,** a Delaware limited liability company (collectively, and jointly and severally, "Borrower"), **1920 COLLINS AVE ML FUNDING LLC**, a Delaware limited liability company ("Lender") and **Wells Fargo Bank, National Association** ("Bank") and sets forth the rights and obligations of the parties with respect to the Collection Account (defined below).

1. **Establishment of Account.**

    a. Borrower and Bank acknowledge and confirm that Borrower has established with Bank an account with account number [_____](the "Collection Account"), and that the Collection Account is subject to lockbox services provided by Bank in accordance with Section 7 of this Agreement and Bank's standard lockbox policies and procedures.

    b. The Collection Account shall be in the name of Greystone Tenant, LLC for the benefit of Lender.

    c. Each account designated as a Collection Account includes, for purposes of this Agreement, and without the necessity of separately listing subaccount numbers, all subaccounts presently existing or hereafter established for deposit reporting purposes and integrated with the Collection Account by an arrangement in which deposits made through subaccounts are posted only to the Collection Account.

    d. The Collection Account shall at all times have a minimum balance of $5,000 (the "Minimum Balance").

    e. The Collection Account is an Eligible Account. As used herein, (i) "Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument and (ii) "Eligible Institution" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by Standard & Poor's Ratings Group ("S&P"), "P-1" by Moody's Investors Service,

Inc. ("Moody's"), and "F-1" by Fitch, Inc. ("Fitch") in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A" by Fitch and S&P and "A2" by Moody's, or such other depository institution otherwise approved by Lender from time to time in its sole discretion.

2. **Lender's Interest in Collection Account.**  Borrower represents that it has granted, or intends to grant, a security interest in the Collection Account to Lender.  Borrower hereby confirms the security interest granted, or to be granted, by Borrower to Lender in all of Borrower's right, title and interest in and to the Collection Account and all sums now or hereafter on deposit in or payable or withdrawable from the Collection Account (the "Collection Account Funds", which includes, if applicable, all financial assets, security entitlements, investment property, and other property and the proceeds thereof now or at any time hereafter held in the Collection Account).  Lender hereby appoints Bank as agent for Lender solely for the purpose of perfecting the security interest of Lender in the Collection Account and the Collection Account Funds.

3. **Lender Control.**  Except as otherwise provided in this Agreement, Borrower agrees that the Collection Account and the Collection Account Funds are subject to the sole dominion, control and discretion of Lender.  Bank, Lender and Borrower each agrees that Bank will comply with written instructions given to Bank by Lender directing disposition of funds in the Collection Account (collectively "Disposition Instructions") without further consent by Borrower or any other person.  Except as otherwise required by law, Bank will not agree with any third party to comply with instructions for disposition of funds in the Collection Account.

4. **No Access to Collection Account.**  Borrower acknowledges and agrees that (a) subject to the terms hereof, neither Borrower nor any other person claiming on behalf of, or through, Borrower shall have any right, title or interest, whether express or implied, in the Collection Account or to withdraw or make use of any amounts from the Collection Account, and (b) unless required by applicable law, Borrower shall not be entitled to any interest on amounts held in the Collection Account.

5. **Disbursements from Collection Account.**

   a.  Unless otherwise instructed by Lender in writing in accordance with Section 3 above, Bank will transfer the full amount of the collected and available balance in the Collection Account (after deduction of the Minimum Balance and other amounts permitted under Section 6 hereof), on each Business Day by wire transfer (or other means in Bank's sole discretion) of immediately available funds to the following account of Lender or such other account specified by Lender in writing:

   > Bank Name: Wells Fargo
   > Bank Address:
   > ABA Number:
   > Account Number:
   > Account Name:  Greystone Tenant, LLC for the benefit of 1920 Collins Ave ML Funding LLC

   "Business Day" means any day on which Bank is open to conduct its regular banking business, other than a Saturday, Sunday or public holiday.

   b.  Unless Bank separately agrees in writing to the contrary, Bank will have no obligation to disburse funds or assets under this Agreement other than by automatic standing wire.  Any disposition of funds or assets which Bank makes pursuant to this Agreement is subject to Bank's standard policies, procedures and documentation governing the type of disposition made; provided, however, that in no circumstances will any such disposition require Borrower's

consent.  Furthermore, Bank will have a reasonable opportunity to act upon any instructions (including Disposition Instructions) provided pursuant to this Agreement.

c.  Funds available for disbursement from the Collection Account in accordance with this <u>Section 5</u> should not include any rents or additional rents which are paid for more than one month in advance, and such funds should be retained in the Collection Account and not released without Lender's written consent until payment thereof is due under the applicable lease or agreement. Lender and Borrower agree to notify Bank in writing as to the amount of any such rents and/or additional rents that should be retained in the Collection Account and the date such funds may be disbursed from the Collection Account in such manner as to afford Bank a reasonable opportunity to act upon such notice.  Bank shall have no responsibility or liability for disbursement of any such rents and/or additional rents that should be retained in the Collection Account in the event that Lender and Borrower fail to provide Bank such notice or a reasonable opportunity to act upon it.

6.  **Partial Subordination of Bank's Rights.**  Bank hereby subordinates to the security interest of Lender in the Collection Account (i) any security interest which Bank may have or acquire in the Collection Account, and (ii) any right which Bank may have or acquire to set off or otherwise apply any Collection Account Funds against the payment of any indebtedness from time to time owing from Borrower; provided, however, that, Bank retains the right to set off against and to charge the Collection Account for (A) any Bank Fees (as defined in Section 9), (B) all items deposited in and credited to such account and subsequently returned unpaid or with respect to which Bank fails to receive final settlement and (C) all items deposited in and credited to such account in error.  If amounts in the Collection Account are insufficient to fully reimburse Bank for such amounts, Borrower agrees to pay such deficiency to Bank, without setoff or counterclaim, within ten (10) calendar days after written demand of Bank.

7.  **Bank Obligations with respect to Collection Account.**

a.  To the extent items deposited to a Collection Account have been received in one or more post office lockboxes maintained for Borrower by Bank (each a "<u>Lockbox</u>") and processed by Bank for deposit, Borrower acknowledges that Borrower has granted Lender a security interest in all such items (the "<u>Remittances</u>").  Lender alone will have the right and ability to so instruct Bank regarding the receipt, processing or deposit of Remittances.  Borrower and Lender acknowledge and agree that Bank's operation of each Lockbox, and the receipt, retrieval, processing and deposit of Remittances, will at all times be governed by Bank's Master Agreement for Treasury Management Services and the relevant lockbox service description.

b.  The parties agree that items deposited in the Collection Account shall be deemed to bear the valid and legally binding endorsement of the payee and to comply with all of Bank's requirements for the supplying of missing endorsements, now or hereafter in effect.  As between Borrower and Lender, any deposit made by or on behalf of Borrower into the Collection Account shall be deemed deposited into the Collection Account when such funds are deposited.

c.  Any item deposited by or on behalf of Borrower in the Collection Account which is returned for insufficient or uncollected funds will be re-deposited by Bank one time.

8.  **Balance Reports and Bank Statements.**  Borrower agrees that it shall make available to Lender information directly related to the Collection Account, including granting Lender online access to Borrower's treasury reporting with Bank (if any).  Bank will, at written request of Lender, provide Lender such information by a transmission method determined by Bank, in Bank's sole discretion, which may include granting Lender online access to Borrower's treasury reporting (if any), and Borrower consents to the provision of such information to Lender.

9. **Bank Fees.**  Borrower agrees to pay all Bank's fees and charges for the maintenance and administration of the Collection Account and for the treasury management and other account services provided with respect to the Collection Account and any Lockboxes (collectively, the "Bank Fees"), including, but not limited to, the fees for (a) treasury reporting (including online access thereto) provided on the Collection Account, (b) funds transfer services received with respect to the Collection Account, (c) lockbox processing services, (d) funds advanced to cover overdrafts in the Collection Account (but without Bank being in any way obligated to make any such advances), (e) duplicate bank statements, (f) any treasury management service(s) that may be required to block the Collection Account as contemplated hereunder, and (g) the Acceptance Fee and other fees and expenses described in Exhibit A attached hereto, in each case, to the extent applicable.  The Bank Fees will be paid by Bank debiting the Collection Account on the Business Day that the Bank Fees are due, without notice to Lender or Borrower.  If there are not sufficient funds in the Collection Account to cover fully the Bank Fees on the Business Day Bank attempts to debit them from the Collection Account, such shortfall or the amount of such Bank Fees will be paid by Borrower to Bank, without setoff or counterclaim, within ten (10) calendar days after demand from Bank.

10. **Account Documentation.**  Except as specifically provided in this Agreement, Lender and Borrower agree that the Collection Account will be subject to, and Bank's operation of the Collection Account will be in accordance with, the terms of Bank's applicable deposit account agreement and other related service documentation governing the Collection Account (the "Account Documentation").  Borrower agrees, upon Bank's request, to promptly execute and deliver the Account Documentation to Bank.  For the avoidance of doubt, the parties hereto acknowledge and agree that pursuant to the Account Documentation, the Collection Account may be subject to Bank's sweep product services.  The parties agree that, in the event of a conflict between this Agreement and the Account Documentation with respect to the Collection Account, this Agreement shall control.

11. **Legal Compliance.**

   a. If Bank at any time receives notice of the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Borrower, Bank will continue to comply with its obligations under this Agreement, except to the extent that any action required of Bank under this Agreement is prohibited under applicable bankruptcy laws or regulations or is stayed pursuant to the automatic stay imposed under the United States Bankruptcy Code or by order of any court or agency.

   b. Bank will comply with any legal process, legal notice or court order it receives in relation to the Collection Account if Bank determines in its sole discretion that the legal process, legal notice or court order is legally binding on it.

   c. If at any time Bank, in good faith, is in doubt as to the action it should take under this Agreement, Bank shall have the right (i) to commence an interpleader in the United States District Court in the State of New York, and/or (ii) to take no further action, except, in each case, in accordance with joint instructions from Lender and Borrower or in accordance with the final order of the court in such action.

12. **Indemnification.**  Borrower will indemnify, defend and hold harmless Bank and its officers, directors, employees, and agents (collectively, the "Indemnified Parties") from and against any and all claims, demands, losses, liabilities, damages, third party out-of-pocket costs and expenses (including reasonable attorneys' fees) (collectively "Losses and Liabilities") Bank incurs as a result of or in connection with (a) Bank complying with any binding legal process, legal notice or court order referred to in the immediately preceding Section of this Agreement, (b) Bank following any instruction or request of Lender, including but not limited to any Disposition Instructions, or (c) Bank complying with its obligations under this Agreement, except, in each case, to the extent such Losses and Liabilities are directly caused by Bank's gross negligence or willful misconduct.

*DACA - Hard Lockbox – For CMS Group only.*

Exhibit I-4

13. **Termination.**  This Agreement may be terminated by Lender or Bank at any time by either of them giving thirty (30) calendar days prior written notice of such termination to the other parties to this Agreement at their contact addresses specified after their signatures to this Agreement; provided, however, that this Agreement may be terminated (i) immediately upon prior written notice from Bank to Borrower and Lender (x) should Borrower or Lender fail to make any payment when due to Bank from Borrower or Lender under the terms of this Agreement or (y) should Bank close the Collection Account pursuant to applicable law, regulation or policy, or (ii) immediately upon prior written notice from Lender to Bank on termination or release of Lender's security interest in the Collection Account; provided that any notice from Lender under clause (ii) of this sentence must contain Lender's acknowledgement of the termination or release of its security interest in the Collection Account. Borrower's payment obligations hereunder, as well as the indemnifications made, and the limitations on the liability of Bank accepted by Borrower and Lender under this Agreement will continue after the termination of this Agreement with respect to all the circumstances to which they are applicable, existing or occurring before such termination, and any liability of any party to this Agreement, as determined under the provisions of this Agreement, with respect to acts or omissions of such party prior to such termination will also survive such termination.  Upon any termination of this Agreement, Bank will transfer all collected and available balances (less any deductions permitted under Section 6 hereof) in the Collection Account on the date of such termination in accordance with Lender's written instructions.

14. **Modifications, Amendments, and Waivers.**  This Agreement may not be modified or amended, or any provision thereof waived, except in a writing signed by all the parties to this Agreement.

15. **Notices.**  All notices from one party to another must be in writing, must be delivered to Borrower, Lender and/or Bank at their contact addresses specified after their signatures to this Agreement, or any other address of any party communicated to the other parties in writing, and will be effective on receipt. Any notice sent by a party to this Agreement to another party must also be sent to all other parties to this Agreement.  Bank is authorized by Borrower and Lender to act on any instructions or notices received by Bank if (a) such instructions or notices purport to be made in the name of Lender, (b) Bank reasonably believes that they are so made, and (c) they do not conflict with the terms of this Agreement as such terms may be amended from time to time, unless such conflicting instructions or notices are supported by a court order.

16. **Successors and Assigns.**  Borrower may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Bank and Lender.  Lender may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Bank; provided, however, that no such consent will be required if Lender transfers its rights and obligations under this Agreement to (i) a transferee to which, by contract or operation of law, Lender transfers substantially all of its rights and duties under the financing or other arrangements between Lender and Borrower, or (ii) if Lender is acting as a representative in whose favor a security interest is created or provided for, a transferee that is a successor representative.  In the event of a permitted assignment or transfer by Lender of its rights or obligations under this Agreement, Lender will not be released from its obligations under this Agreement unless and until Bank receives transferee's binding written agreement to assume all of Lender's obligations hereunder.  Bank may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Lender, which consent will not be unreasonably withheld or delayed; provided, however, that no such consent will be required if such assignment or transfer takes place as part of a merger, acquisition or corporate reorganization affecting Bank.

17. **Governing Law.**  This Agreement will be governed by and be construed in accordance with the laws of the State of New York, without regard to conflict of laws principles.  This state will also be deemed to be Bank's jurisdiction for purposes of Article 9 of the Uniform Commercial Code as it applies to this Agreement.

18. **Severability.**  To the extent that the terms of this Agreement are inconsistent with, or prohibited or unenforceable under, any applicable law or regulation, they will be deemed ineffective only to the extent of such prohibition or unenforceability, and will be deemed modified and applied in a manner consistent with such law or regulation.  Any provision of this Agreement which is deemed unenforceable or invalid in any jurisdiction will not affect the enforceability or validity of the remaining provisions of this Agreement or the same provision in any other jurisdiction.

19. **Counterparts.**  This Agreement may be executed in any number of counterparts each of which will be an original with the same effect as if the signatures were on the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by telecopier or electronic image scan transmission (such as a "pdf" file) will be effective as delivery of a manually executed counterpart of the Agreement.

20. **Entire Agreement.**  This Agreement, together with the Account Documentation, contains the entire and only agreement among all the parties to this Agreement and between Bank and Borrower, on the one hand, and Bank and Lender, on the other hand, with respect to (a) the interest of Lender in the Collection Account and Collection Account Funds, and (b) Bank's obligations to Lender in connection with the Collection Account and Collection Account Funds.

21. **Waiver of Jury Trial.**   To the extent permitted by law, the parties hereto hereby waive all rights to a trial by jury in any action or proceeding relating to the Collection Account or this Agreement.

22. **Certain Matters Affecting Bank**.

    a.  Bank may rely and shall be protected in acting or refraining from acting upon any notice, request, consent, order, certificate, report, opinion or document (including, but not limited to, electronically confirmed facsimiles thereof) believed by it to be genuine and to have been signed or presented by the proper party or parties.  Bank shall have no obligation to review or confirm that actions taken pursuant to the foregoing in accordance with this Agreement comply with any other agreement or document to which it is not a party.

    b.  The duties and obligations of Bank set forth in this Agreement shall be determined solely by the express provisions of this Agreement.  Bank shall not be liable except for the performance for its duties and obligations as are specifically set forth herein.  No implied covenants or obligations shall be read into this Agreement against Bank.   Bank makes no express or implied representations or warranties with respect to its obligations under this Agreement, except for those expressly set forth herein.

    c.  Bank will not be liable to Borrower, Lender or any other person for any Losses and Liabilities caused by (i) circumstances beyond Bank's reasonable control (including, without limitation, computer malfunctions, interruptions of communication facilities, labor difficulties, acts of God, wars, or terrorist attacks) or (ii) any other circumstances, except, in each case, to the extent that such Losses and Liabilities are directly caused by Bank's gross negligence or willful misconduct.

    D.  **IN NO EVENT WILL BANK BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO BANK, AND REGARDLESS OF THE FORM OF THE CLAIM OR ACTION, OR THE LEGAL THEORY ON WHICH IT IS BASED.**

    E.  Any action against Bank by Borrower or Lender under or related to this Agreement must be brought within twelve (12) months after the cause of action accrues.

[SIGNATURE PAGES FOLLOW]

This Agreement has been signed by the duly authorized officers or representatives of Borrower, Lender and Bank on the date specified below.

**Date:  December [__], 2017**

BORROWER:

**SANTA BARBARA 230, LLC**
TIN: 46-4317649

By:

Name:  James Vosotas

Title:  Authorized Signatory

**GREYSTONE TENANT, LLC**
TIN: 81-3370077

By:

Name:  James Vosotas

Title:  Authorized Signatory

**Address for Notices:**
1941 Liberty Ave, 2nd Floor
Miami Beach, Florida 33139
Attention:  James Vosotas

<u>With a copy to:</u>



LENDER:

**1920 COLLINS AVE ML FUNDING LLC**

By:

Name: 

Title:  Authorized Signatory

**Address for Notices:**



<u>With a copy to:</u>

1920 Collins Ave ML Funding LLC

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Bank**

By: _____

Name: _____

Title: _____

**Address for Notices:**

█████████████ _____

████████████ _____

███████████ _____

**EXHIBIT A**
**FEES**

**Acceptance Fee**..............................................................................**$1,000**

The Acceptance Fee is a one-time fee payable upon execution of this Agreement and includes review of this Agreement and supporting documentation.

**DACA Maintenance Fee**..............................................................**$275/month**

The monthly DACA Maintenance Fee will be assessed upon the opening of the Collection Account and will continue thereafter on a monthly basis for so long as the Collection Account remains open.  The DACA Maintenance Fee is subject to change in Bank's discretion.

**Account/Treasury Management Services Fees** .........................**Amount varies**

These fees will vary based upon usage/volume and include all account and treasury management services fees incurred on a monthly basis in accordance with Bank's standard fees for such services then in effect, including, without limitation, the following: treasury account maintenance fee, funds transfer services fees, credit/disbursement fees, account analysis and statement fees, and treasury reporting and online access fees.

**Out-of-Pocket Expenses** ...............................................................**As incurred**

Out-of-pocket expenses, including without limitation expenses of foreign depositaries, stationery, overnight courier, and messenger costs, will be billed at Bank's cost when incurred.

Exhibit I-10

WEIL:\96218278\17\63946.0005

## SCHEDULE I

## BORROWER ORGANIZATIONAL STRUCTURE



WEIL:\96218278\17\63946.0005

## SCHEDULE II

## LIST OF PLANS AND SPECIFICATIONS

See attached.

WEIL:\96218278\17\63946.0005

**Turner**

October 20, 2016

## Greystone Hotel
### 1920 Collins Avenue
### Miami Beach, FL 33139

## DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| **GENERAL:** | | | |
| G-0.00 Cover Sheet | Permit Set | 2/18/2014 | 11/19/2014 |
| G-1.01 Drawing Index | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| G-1.02 Abbreviations and Symbols | Permit Set | 2/18/2014 | 11/19/2014 |
| G-1.03 General Notes | AHJ 05 | Rev. 01/21/2015 | 1/4/2016 |
| G-1.04 Project Data | AHJ 10 | Rev. 05/04/2014 | 11/19/2014 |
| G-1.05 F.A.R. Calaculations | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| G-1.06 Site Plan | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| G-1.09 ADA Accessible Units and Details | AHJ 10 | Rev. 5/?/15 | 1/4/2016 |
| G-1.10 H.P.B Order Pages 1 Through 6 | Permit Set | 2/18/2014 | 11/19/2014 |
| G-1.11 H.P.B. Order Pages 7 Through 11 | Permit Set | 2/18/2014 | 11/19/2014 |
| G-1.12 Planning Board Order | AHJ 01 | Rev. 6/20/2014 | 11/19/2014 |
| G-1.13 Life Safety Compliance | AHJ 03 | Rev. 11/14/14 | 1/4/2016 |
| G-1.14 Life Safety Compliance Lobby Equivalency | AHJ 03 | Rev. 11/14/14 | 1/4/2016 |
| **CIVIL:** | | | |
| C100 General Notes | Permit Set | 2/18/2014 | 11/17/2014 |
| C200 Drainage Plan | Permit Set | 2/18/2014 | 11/17/2014 |
| C300 Water and Sewer Plan | Permit Set | 2/18/2014 | 11/17/2014 |
| C400 Drainage Details | Permit Set | 2/18/2014 | 11/17/2014 |
| C500 Sedimentation and Erosion Control Plan | Permit Set | 2/18/2014 | 11/17/2014 |
| C600 Sedimentation and Erosion Control Notes | Permit Set | 2/18/2014 | 11/17/2014 |
| **LANDSCAPE & IRRIGATION:** | | | |
| L-1.00 Ground Hardscape Plan | Permit Set | 11/14/2014 | 11/17/2014 |
| L-1.01 Ground Hardscape Layout Plan | Permit Set | 11/14/2014 | 11/17/2014 |
| L-1.02 Rooftop Hardscape Plan | Permit Set | 11/14/2014 | 11/17/2014 |
| L-1.03 Rooftop Hardscape and Layout Plan | Permit Set | Rev. 06/05/15 | 11/17/2014 |
| L-2.00 Sections and Details | Permit Set | 11/14/2014 | 11/17/2014 |
| L-2.01 Sections and Details | Permit Set | 11/14/2014 | 11/17/2014 |
| L-3.00 Ground Floor Planting Plan | Permit Set | 11/14/2014 | 11/17/2014 |
| L-3.01 Rooftop Planting Plan | Permit Set | Rev.08/05/15 | 11/17/2014 |
| L-3.02 General Planting Details | Permit Set | 11/14/2014 | 11/17/2014 |
| L-4.00 Ground Floor Irrigation Plan | Permit Set | Rev. 08/20/14 | 11/17/2014 |
| L-4.01 Rooftop Irrigation Plan | Permit Set | 2/18/2014 | 11/17/2014 |
| L-4.02 Irrigation Details | Permit Set | 11/14/2014 | 11/17/2014 |

Turner Construction Company                 Document List                 1 of 8

Schedule II-2

**Turner**

October 20, 2016

## Greystone Hotel
1920 Collins Avenue
Miami Beach, FL 33139

### DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| L-4.03 Irrigation Specifications | Owner GC Set | 11/14/2014 | 11/17/2014 |
| L-4.04 Irrigation Netafim Notes and Details | Owner GC Set | 11/14/2014 | 1/4/2016 |
| L-5.00 Ground Floor Lighting Plan | Permit Set | 11/14/2014 | 11/17/2014 |
| L5.01 Rooftop Lighting Plan | Permit Set | Rev. 6/5/2015 | 11/17/2014 |
| **LIFE SAFETY:** | | | |
| LS-1.00 Basement Life Safety Plan | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| LS-1.01 First Floor Life Safety Plan | AHJ 07 | Rev. 03/20/2015 | 1/4/2016 |
| LS-1.02 Second Floor Life Safety Plan | AHJ 07 | Rev. 03/20/2015 | 1/4/2016 |
| LS-1.03 Third Floor Life Safety Plan | AHJ 07 | Rev. 03/20/2015 | 1/4/2016 |
| LS-1.04 Roof Floor Life Safety Plan | AHJ 11 | Rev. 06/05/15 | 1/4/2016 |
| **DEMOLITION:** | | | |
| D-1.00 Basement Demolition Plan | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| D-1.01 First Floor Demolition Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| D-1.02 Second Floor Demolition Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| D-1.03 Third Floor Demolition Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| D-1.04 Roof Demolition Plan | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| D-2.01 Demolition Elevations | OWN/COORDINATION 13 | 3/25/2016 | 8/1/2016 |
| D-2.02 Demolition Elevations | OWN/COORDINATION 13 | 3/25/2016 | 8/1/2016 |
| **FLOOR PLANS:** | | | |
| A-1.00 Basement Floor Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-1.01 First Floor Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-1.02 Second Floor Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-1.03 Third Floor Plan | OWN/COORDINATION 13 | 3/25/2016 | 8/1/2016 |
| A-1.04 Interstitial Floor Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-1.04.1 Roof Deck Plan | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-1.11 Lobby & Terrace Plan and RCP | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| A-1.12 Lobby Interior Elevations & Details | OWN 04 | 1/7/2015 | 8/1/2016 |
| **SEATING FLOOR PLANS:** | | | |
| AS-1.01 Basement Seating Plan | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| AS-1.02 First Floor Seating Plan | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| AS-1.03 Roof Deck Seating Plan | AHJ 03 | Rev. 11/14/2014 | 11/19/2014 |
| **BUILDING ELEVATIONS:** | | | |
| A-2.00 Exterior Elevations (North) | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-2.01 Exterior Elevations (East) | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |

Schedule II-3

WEIL:\96218278\17\63946.0005

**Turner**                                                      October 20, 2016

## Greystone Hotel
1920 Collins Avenue
Miami Beach, FL 33139

## DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| A-2.02 Exterior Elevations (West) | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-2.03 Exterior Elevations (South) | OWN/COORDINATION 13 | 3/25/2016 | 8/1/2016 |
| BUILDING SECTIONS: | | | |
| A-3.00 Building Sections (1) | AHJ 6 | 3/13/2015 | 8/1/2016 |
| A-3.01 Building Sections (2) | AHJ 6 | 3/13/2015 | 8/1/2016 |
| A-3.02 Building Sections (3 & 4) | AHJ 6 | 3/13/2015 | 8/1/2016 |
| A-3.03 Building Section (5 & 6) | AHJ 6 | 3/13/2015 | 8/1/2016 |
| WALL SECTIONS: | | | |
| A-4.00 Wall Sections | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-4.01 Wall Sections | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-4.02 Wall Sections | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| ENLARGED VERTICAL CIRCULATION: | | | |
| A-5.01 Stair Sections & Dumbwaiter | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-5.02 Stair Sections | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-5.03 Stair Sections | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-5.04 Ramp & Stair Sections | AHJ 07 | Rev. 03/20/15 | 1/4/2016 |
| DETAILS: | | | |
| A-6.01 Railing & Gate Details | Permit Set | 2/18/2014 | 11/19/2014 |
| A-6.02 Details | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-6.03 Roofing Details | AHJ 01 | Rev. 6/20/2014 | 11/19/2014 |
| A-6.04 Details | OWN 11 | Rev. 06/05/15 | 1/4/2016 |
| A-6.10 Flood Proofing Plans | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-6.11 Dry Flood Proofing Details | Permit Set | 2/18/2014 | 11/19/2014 |
| A-6.12 Flood Proofing Details | Permit Set | 2/18/2014 | 11/19/2014 |
| A-6.14 Flood Barriers | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-6.15 Flood Barriers | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-6.16 Flood Barriers Details | AHJ 05 | Rev. 01/21/15 | 1/4/2016 |
| SCHEDULES: | | | |
| A-7.01 Storefront and Window Schedule | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-7.02 Window Schedule | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-7.03 Door and Gate Schedules and Types | OWN/COORDINATION 13 | 7/28/2016 | 8/1/2016 |
| A-7.04 Wall Types | Permit Set | 2/18/2014 | 11/19/2014 |
| A-7.05 UL Details | Permit Set | 2/18/2014 | 11/19/2014 |
| A-7.06 UL Details | Permit Set | 2/18/2014 | 11/19/2014 |
| A-7.07 UL Details | Permit Set | 2/18/2014 | 11/19/2014 |
| A-7.08 UL Details | AHJ 10 | Rev. 05/22/15 | 1/4/2016 |

Turner Construction Company          Document List          3 of 8

Schedule II-4

WEIL:\96218278\17\63946.0005

**Turner**

October 20, 2016

## Greystone Hotel
1920 Collins Avenue
Miami Beach, FL 33139

## DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| A-7.09 UL Details | AHJ 11 | Rev. 06/05/15 | 1/4/2016 |
| WINDOW & DOOR DETAILS: | | | |
| A-8.01 Window and door Details | Permit Set | 2/18/2014 | 11/19/2014 |
| INTERIOR DESIGN: | | | |
| ID0.00 Title Page, Drawing List, Notes | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| PLANS: | | | |
| ID1.00 Basement Finish Plan | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.01 Basement RCP | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.02 First Floor Finish Plan | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.03 First Floor RCP | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.04 Second Floor Plan | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.05 Second Floor RCP | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.06 Third Floor Finish Plan | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.07 Third Floor RCP | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.08 Roof Plan | Revision 1 | Rev. 6/20/2014 | 11/17/2014 |
| ID1.09 Guestroom Type Plans | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.10 Guestroom Type Plans | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.11 Guestroom Type RCPS | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID1.12 Guestroom Type RCPS | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ELEVATIONS: | | | |
| ID2.00 Basement Elevations | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID2.01 Restaurant Elevations | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID2.02 Lounge and Lobby Elevations | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID2.03 Guestroom and Typical Bathroom Elevations | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID2.04 Corridor Elevation, Roof Section | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| DETAILS: | | | |
| ID3.00 Millwork 0.01 Details | Revision 1 | Rev. 6/20/2014 | 11/17/2014 |
| ID3.01 Millwork 0.02 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.02 Millwork 0.03 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.03 Millwork 0.04 Details | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID3.04 Millwork 1.01 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.05 Millwork 1.02 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.06 Millwork 1.03 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.07 Millwork 1.04 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.08 Millwork 1.05 Details | Permit Set | 2/18/2014 | 11/17/2014 |

Schedule II-5

WEIL:\96218278\17\63946.0005

**Turner**

October 20, 2016

## Greystone Hotel
1920 Collins Avenue
Miami Beach, FL 33139

## DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| ID3.09 Millwork 1.06 Details | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID3.10 Millwork 2.01a Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.11 Millwork 2.0b Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.12 Millwork 2.02 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.13 Millwork 2.03a Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.14 Millwork 2.03b Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.15 Millwork 2.04 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.16 Millwork 3.01 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.17 Millwork 3.02 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.18 Millwork 4.01 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.19 Millwork 2.00 Details | Revision 1 | Rev. 6/20/2014 | 11/17/2014 |
| ID3.20 TA - 01 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.21 Casegood 06 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.22 Casegoods 07 Details | Permit Set | 2/18/2014 | 11/17/2014 |
| ID3.23 Wood Base Details | Revision 8 | Rev. 02/19/15 | 1/4/2016 |
| ID4.01 Finish & Lighting Schedule | Not Received | - | |
| ID4.02 Finish & Lighting Schedule | Not Received | - | |
| **STRUCTURAL:** | | | |
| **GENERAL:** | | | |
| S-1.01 General Structural Notes | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-1.02 General Structural Notes & Abbreviation Lege | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-1.03 Concrete Column Schedule, Beam Schedule & | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-1.04 Pile Cap Details | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-1.05 Foundation/Shearwall Details | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| **PLANS:** | | | |
| S-2.01 Foundation & Basement Floor Plan | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-2.02 First Floor Framing Plan | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-2.03 Second Floor Framing Plan | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-2.04 Third Floor Framing Plan | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-2.05 Interstital Deck Framing Plan | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-2.06 Pool Deck Framing Plan | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-2.07 Design Wind Uplift Pressures for Roofing Syst | Permit Set | 2/18/2014 | 11/19/2014 |
| **SECTIONS:** | | | |
| S-3.01 Sections & Details | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-3.02 Sections | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |

Schedule II-6

WEIL:\96218278\17\63946.0005

**Turner**

October 20, 2016

## Greystone Hotel
1920 Collins Avenue
Miami Beach, FL 33139

## DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| S-3.03 Sections & Details | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-3.04 | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-3.06 | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| ELEVATIONS: | | | |
| S-4.01 North & South Elevations - Structural Repairs | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-4.02 East & West Elevations - Structural Repairs | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| DETAILS: | | | |
| S-4.03 Typical Repair Details | Permit Set | 2/18/2014 | 11/19/2014 |
| S-4.04 Estimated Repair Quantities for Unit Price W | Permit Set | 2/18/2014 | 11/19/2014 |
| ELEVATIONS: | | | |
| S-5.01 North Elevation | Permit Set | 2/18/2014 | 11/19/2014 |
| S-5.02 South Elevation | Permit Set | 2/18/2014 | 11/19/2014 |
| S-5.03 East & West Elevations | Permit Set | 2/18/2014 | 11/19/2014 |
| TEMPORARY BRACING: | | | |
| S-6.01 Existing First Floor Plan - Temporary Bracing | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-6.02 Exist. Second Floor Plan - Temporary Bracing | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-6.03 Exist. Third Floor Plan - Temporary Bracing | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-6.04 Exist. Roof Plan - Temporary Bracing | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-6.05 Tempory Bracing - Sections and Details | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-6.06 Temporary Bracing - Sections and Details | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| S-6.07 | OWN 05 | Rev. X/XX/2016 | 8/1/2016 |
| MECHANICAL: | | | |
| PLANS: | | | |
| M-1.00 Basement Floor Plan | AHJ 05 | Rev. 01/21/2015 | 1/4/2016 |
| M-1.01 First Floor Plan | AHJ 09 | Rev. 03/20/2015 | 1/4/2016 |
| M-1.02 Second Floor Plan | AHJ 05 | Rev. 01/21/2015 | 1/4/2016 |
| M-1.03 Third Floor Plan | AHJ 05 | Rev. 01/21/2015 | 1/4/2016 |
| M-1.04 Fourth Floor Plan | AHJ 08 | 2/11/2015 | 1/4/2016 |
| SCHEDULES: | | | |
| M-1.05 Mechanical Schedules & Notes | OWN 02 | 6/23/2014 | 1/4/2016 |
| M-1.05A Mechanical Schedules & Notes | AHJ 08 | 2/11/2015 | 1/4/2016 |
| M-1.05B Mechanical Riser | OWN 02 | 6/23/2014 | 1/4/2016 |
| DETAILS: | | | |
| M-1.06 Mechanical Details | OWN 02 | 6/23/2014 | 1/4/2016 |
| M-1.06A Mechanical Details | OWN 02 | 6/23/2014 | 1/4/2016 |

Schedule II-7

WEIL:\96218278\17\63946.0005

**Turner**                                                                October 20, 2016

## Greystone Hotel
1920 Collins Avenue
Miami Beach, FL 33139

## DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| **ELECTRICAL:** | | | |
| **PLANS:** | | | |
| E-0.01 Legend & Notes | AHJ 08 | 2/11/2015 | 1/4/2016 |
| E-1.00 Basement Floor Plan | AHJ 09 | 3/20/2015 | 1/4/2016 |
| E-1.00A Basement Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| E-1.00B Basement Floor Plan | AHJ 09 | 3/20/2015 | 1/4/2016 |
| E-1.01 First Floor Plan | AHJ 11 | 8/6/2015 | 1/4/2016 |
| E-1.01A First Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| E-1.01B First Floor Plan | AHJ 09 | 3/20/2015 | 1/4/2016 |
| E-1.02 Second Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| E-1.02A Second Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| E-1.02B Second Floor Plan | AHJ 09 | 3/20/2015 | 1/4/2016 |
| E-1.03 Third Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| E-1.03A Third Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| E-1.03B Third Floor Plan | AHJ 09 | 3/20/2015 | 1/4/2016 |
| E-1.04 Fourth Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| E-1.04A Fourth Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| E-1.04B Fourth Floor Plan | AHJ 11 | 8/6/2015 | 1/4/2016 |
| E-1.04C Fourth Floor Plan | AHJ 11 | 8/6/2015 | 1/4/2016 |
| **SCHEDULES:** | | | |
| E-1.05 Panel Schedules | AHJ 11 | 8/6/2015 | 1/4/2016 |
| E-1.06 Panel Schedules | AHJ 11 | 8/6/2015 | 1/4/2016 |
| **RISER DIAGRAMS:** | | | |
| E2-00 Diagrammatic Power Riser | AHJ 11 | 8/6/2015 | 1/4/2016 |
| **PLUMBING:** | | | |
| **PLANS:** | | | |
| P-1.00 Basement Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| P-1.01 First Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-1.02 Second Floor Plan | AHJ 10 | 1/22/2015 | 1/4/2016 |
| P-1.03 Third Floor Plan | AHJ 10 | 1/22/2015 | 1/4/2016 |
| P-1.04 Interstitial Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-1.04.1 Roof Plan | AHJ 11 | 8/6/2015 | 1/4/2016 |
| P-1.05 First Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-1.06 First Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |

Turner Construction Company                    Document List                                        7 of 8

Schedule II-8

WEIL:\96218278\17\63946.0005

**Turner**

October 20, 2016

## Greystone Hotel
1920 Collins Avenue
Miami Beach, FL 33139

### DOCUMENT LIST

| DRAWING TITLE | ISSUE | DATE | Turner Received |
|---|---|---|---|
| RISER DIAGRAMS: | | | |
| P-2.01 Sanitary Riser Diagrams | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-2.02 Sanitary Collection Riser Diagram | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-2.03 Water Distribution Diagram | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-2.04 Storm Riser & Gas Riser | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-3.01 Notes & Details | OWN 02 | 6/23/2014 | 1/4/2016 |
| P-3.02 Notes & Schedules | OWN 02 | 6/23/2014 | 1/4/2016 |
| **Electrical:** | | | |
| PLANS: | | | |
| FA-0.01 Legend & Notes | OWN 02 | 6/23/2014 | 1/4/2016 |
| FA-1.00 Basement Floor Plan | AHJ 10 | 5/22/2015 | 1/4/2016 |
| FA-1.01 First Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| FA-1.02 Second Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| FA-1.03 Third Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| FA-1.04 Fourth Floor Plan | AHJ 08 | 2/11/2015 | 1/4/2016 |
| FA-1.05 Fifth Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| **FIRE PROTECTION:** | | | |
| FP-1.00 Basement Floor Plan | AHJ 05 | 1/21/2015 | 1/4/2016 |
| FP-1.01 First Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| FP-1.02 Second Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| FP-1.03 Third Floor Plan | OWN 02 | 6/23/2014 | 1/4/2016 |
| FP-1.04 Roof Deck Plan | AHJ 08 | 1/11/2015 | 1/4/2016 |
| NOTES & DETAILS: | | | |
| FP-4.1 Notes & Details | OWN 02 | 7/7/2014 | 1/4/2016 |
| FP-4.2 Notes & Details | OWN 02 | 6/23/2014 | 1/4/2016 |
| TCCo Due Diligence Review RFI's and Comments | | | 11/19/2014 |
| Muesler Rutledge Preconstruction Assesment & Test Pit Report | | 7/17/2014 | 7/17/2014 |

Schedule II-9

WEIL:\96218278\17\63946.0005

# SANTA BARBARA HOTEL
## EXHIBIT "B"
## CONTRACT DRAWINGS

| SHEET NO. | TITLE | REVISION # | SHEET NO. | TITLE |
|---|---|---|---|---|
| A-1.0 | BUILDING DATA | | A-5.0 | NORTH ELEVATION |
| A-1.1 | SITE PLAN & ROOM DATA | | A-5.1 | EAST ELEVATION |
| A-1.1a | PROJECT DATA | | A-5.2 | SOUTH ELEVATION |
| A-1.1b | FAR FLOOR AREA RATIO | | A-5.3 | WEST ELEVATION |
| A-1.1c | HPB HISTORIC PRESERVATION BOARD | | A-5.4 | COURTYARD-WEST ELEVATION |
| A-1.1d | HPB HISTORIC PRESERVATION BOARD | | A-5.5 | COURTYARD-EAST ELEVATION |
| A-1.2 | NOT USED | | A-6.0 | SECTION |
| A-1.3 | 1ST FLOOR LIFE SAFETY PLAN & EGRESS | | A-6.1 | SECTION |
| A-1.4 | 2ND FLOOR LIFE SAFETY PLAN & EGRESS | | A-6.2 | SECTION |
| A-1.5 | 3RD FLOOR LIFE SAFETY PLAN & EGRESS | | A-6.3 | SECTION |
| A-1.6 | 4TH FLOOR LIFE SAFETY PLAN & EGRESS | | A-6.4 | BUILDING SECTION |
| A-1.7 | 5TH FLOOR LIFE SAFETY PLAN & EGRESS | | A-6.5 | BUILDING SECTION DETAILS |
| A-1.8 | ROOF LIFE SAFETY & EGRESS | | A-7.0 | WALL SECTION DETAILS |
| A-2.0 | BASEMENT DEMOLITION PLAN | | A-7.1 | WALL SECTION DETAILS |
| A-2.1 | 1ST FLOOR DEMOLITION PLAN | | A-8.0 | ELEVATOR DETAILS |
| A-2.2 | 2ND FLOOR DEMOLITION PLAN | | A-8.1 | ELEVATOR DETAILS |
| A-2.3 | ROOF DEMOLITION PLAN | | A-8.2 | ADA LIFT DETAILS |
| A-2.4 | DEMOLITION ELEVATIONS | | A-9.0 | STAIR 1-07 SECTION |
| A-2.5 | DEMOLITION ELEVATIONS | | A-9.1 | STAIR 1-07 SECTION |
| A-2.6 | DEMOLITION ELEVATIONS | | A-9.2 | STAIR 1-02 SECTION |
| A-3.0 | NOT USED | | A-9.3 | SPIRAL STAIR DETAILS |
| A-3.1 | 1ST FLOOR PLAN & KEY NOTE & TAGGING | | A-9.4 | SPIRAL STAIR DETAILS |
| A-3.1a | 1ST FLOOR DIMENSION PLAN | | A-10.0 | DOOR & WINDOW SCHEDULE |
| A-3.2 | 2ND FLOOR KEY NOTE & TAGGING PLAN | | A-10.1 | DOOR & WINDOW SCHEDULE |
| A-3.2a | 2ND FLOOR DIMENSION PLAN | | A-11.0 | FLOOD PROOFING |
| A-3.3 | 3RD FLOOR KEY NOTE & TAGGING PLAN | | A-12.0 | ADA ROOMS |
| A-3.3a | 3RD FLOOR DIMENSION PLAN | | A-12.1 | ADA ROOM ELEVATIONS |
| A-3.4 | 4TH FLOOR KEY NOTE & TAGGING PLAN | | A-12.2 | ADA ROOM ELEVATIONS |
| A-3.4a | 4TH FLOOR DIMENSION PLAN | | A-12.3 | ADA ROOM ELEVATIONS |
| A-3.5 | 5TH FLOOR KEY NOTE & TAGGING PLAN | | A-12.4 | ADA ROOM ELEVATIONS |
| A-3.5a | 5TH FLOOR DIMENSION PLAN | | A-13.0 | FIRESTOPPING & UL. DETAILS |
| A-3.6 | ROOF KEY NOTE & TAGGING PLAN | | A-14.0 | A.D.A. REQUIREMENTS |
| A-3.6a | ROOF DIMENSION PLAN | | A-15.0 | GENERAL NOTES |
| A-3.6b | ROOF DETAILS | | | |
| A-3.7 | CAFÉ SEATING | | | |
| A-4.0 | NOT USED | | | |
| A-4.1 | 1ST FLOOR REFLECTIVE CEILING PLAN | | | |
| A-4.2 | 2ND FLOOR REFLECTIVE CEILING PLAN | | | |
| A-4.3 | 3RD FLOOR REFLECTIVE CEILING PLAN | | | |
| A-4.4 | 4TH FLOOR REFLECTIVE CEILING PLAN | | | |
| A-4.5 | 5TH FLOOR REFLECTIVE CEILING PLAN | | | |
| A-4.6 | ROOF REFLECTIVE CEILING PLAN | | | |

NOTE:
All Architectural drawings listed have been
labeled Revision # 3 Dated 3-1-2017

**SANTA BARBARA HOTEL**
**EXHIBIT "B"**
**CONTRACT DRAWINGS**

| SHEET NO. | TITLE | REVISION # | SHEET NO. | TITLE |
|---|---|---|---|---|
| S-0.0 | GENERAL NOTES | 1 | | |
| S-1.0 | CONCRETE REPAIR | | | |
| S-1.1 | CONCRETE REPAIR | | | |
| S-1.2 | CONCRETE REPAIR | | | |
| S-2.0 | FIRST FLOOR FRAMING PLAN | 2 | | |
| S-3.0 | SECOND FLOOR FRAMING PLAN | 2 | | |
| S-4.0 | THIRD FLOOR FRAMING PLAN | 2 | | |
| S-5.0 | FOURTH FLOOR FRAMING PLAN | 2 | | |
| S-6.0 | FIFTH FLOOR FRAMING PLAN | 2 | | **NOTE:** |
| S-7.0 | ROOF FRAMING PLAN | 1 | | **All Structural drawings listed Revision # 1** |
| S-7.1 | ROOF PRESSURES | 2 | | **are dated 2-3-17** |
| S-8.0 | GRADE BEAM SCHEDULE & DETAILS | 2 | | |
| S-8.1 | PILE CAP DETAILS (NEW BUILDING) | | | |
| S-8.2 | FOUNDATION DETAILS (OLD BUILDING) | | | **All Structural drawings listed Revision # 2** |
| S-9.0 | COLUMN SCHEDULES & DETAILS | 2 | | **are dated 4-7-17** |
| S-10.0 | SCHEDULE & DETAILS BEAMS | 2 | | |
| S-11.0 | SLAB SCHEDULE & DETAILS | 2 | | |
| S-12.0 | SHEAR WALL DETAILS | 2 | | **All Structural drawings listed Revision # 3** |
| S-13.0 | SECTIONS 1 & 2 | 1 | | **are dated 8-17-17** |
| S-13.1 | SECTION | 1 | | |
| S-13.2 | SECTION 1 | 1 | | |
| S-13.3 | SECTIONS & DETAILS | 1 | | **All Structural drawings with no revision** |
| S-13.4 | STAIR SECTION | 2 | | **are dated 9-30-16** |
| S-13.5 | STAIR SECTION | | | |
| S-14.0 | ELEVATION WIND DESIGN PRESSURE | 1 | | |
| S-14.1 | ELEVATION WIND DESIGN PRESSURE | 1 | | |
| S-14.2 | ELEVATION WIND DESIGN PRESSURE | 1 | | |
| S-14.3 | ELEVATION WIND DESIGN PRESSURE | 1 | | |
| S-15.0 | MASONRY DETAILS | 2 | | |
| S-15.1 | CONNECTION & TYPICAL DETAILS | 3 | | |
| | | | | |
| | | | | |
| C-100 | GENERAL NOTES & SPECIFICATIONS | | | |
| C-200 | PAVING GRADING & DRAINAGE PLAN | | | |
| C-300 | WATER AND SEWER PLAN | | | |
| C-400 | DRAINAGE DETAILS | | | |
| C-500 | SEDIMENTATION & EROSION CONTROL PLAN | | | |
| C-600 | SEDIMENTATION & EROSION CONTROL NOTES | | | |

**All Civil Drawings dated 3-18-16**

| L1.00 | HARDSCAPE PLAN |
|---|---|
| L1.01 | HARDSCAPE LAYOUT PLAN |
| L3.00 | TREE DISPOSITION PLAN |
| L3.01 | LANDSCAPE PLAN |
| L3.03 | GENERAL PLANTING DETAILS |
| L5.00 | IRRIGATION PLAN |

**All Landscape Drawings Date REV.1 COMB 2-2-17**

Schedule II-11

### SANTA BARBARA HOTEL
### EXHIBIT "B"
### CONTRACT DRAWINGS

| SHEET NO. | TITLE | REVISION # | SHEET NO. | TITLE |
|---|---|---|---|---|
| M-0.1 | MECHANICAL SPECIFICATIONS | | P-01 | PLUMBING SPECIFICATIONS |
| M-1.0 | NOT USED | | P-1.1 | PLUMBING PLAN 1ST FLOOR |
| M-1.1 | MECHANICAL PLAN 1ST FLOOR | | P-1.2 | PLUMBING PLAN 2ND FLOOR |
| M-1.2 | MECHANICAL PLAN 2ND FLOOR | | P-1.3 | PLUMBING PLAN 3RD FLOOR |
| M-1.3 | MECHANICAL PLAN 3RD FLOOR | | P-1.4 | PLUMBING PLAN 4TH FLOOR |
| M-1.4 | MECHANICAL PLAN 4TH FLOOR | | P-1.5 | PLUMBING PLAN 5TH FLOOR |
| M-1.5 | MECHANICAL PLAN 5TH FLOOR | | P-1.6 | PLUMBING PLAN ROOF |
| M-1.6 | MECHANICAL ROOF PLAN | | P-2.0 | PLUMBING DETAILS |
| M-2.0 | MECHANICAL PIPING DRAWINGS | | P-2.1 | PLUMBING DETAILS |
| M-3.0 | MECHANICAL DETAILS | | P-3.1 | PLUMBING ISOMETRICS |
| M-3.1 | MECHANICAL DETAILS | | P-3.2 | PLUMBING ISOMETRICS |
| | | | P-3.3 | PLUMBING ISOMETRICS |
| FA-0.1 | FIRE ALARM SPECIFICATIONS | | P-3.4 | PLUMBING ISOMETRICS |
| FA-0.2 | FIRE ALARM DETAILS | | P-3.5 | PLUMBING ISOMETRICS |
| FA-1.1 | FIRE ALARM PLAN 1ST FLOOR | | P-3.6 | PLUMBING ISOMETRICS |
| FA-1.2 | FIRE ALARM PLAN 2ND FLOOR | | P-3.7 | PLUMBING ISOMETRICS |
| FA-1.3 | FIRE ALARM PLAN 3RD FLOOR | | P-3.8 | PLUMBING RISER |
| FA-1.4 | FIRE ALARM PLAN 4TH FLOOR | | P-3.9 | PLUMBING RISER |
| FA-1.5 | FIRE ALARM PLAN 5TH FLOOR | | | |
| FA-1.6 | FIRE ALARM PLAN ROOF PLAN | | E-0.1 | ELECTRICAL DRAWING INDEX, LEGEND & SPECS |
| | | | E-1.1 | ELECTRICAL PLAN 1ST FLOOR |
| FP-0.1 | FIRE PROTECTION SPECIFICATIONS | | E-1.2 | ELECTRICAL PLAN 2ND FLOOR |
| FP-1.1 | FIRE PROTECTION 1ST FLOOR | | E-1.3 | ELECTRICAL PLAN 3RD FLOOR |
| FP-1.2 | FIRE PROTECTION 2ND FLOOR | | E-1.4 | ELECTRICAL PLAN 4TH FLOOR |
| FP-1.3 | FIRE PROTECTION 3RD FLOOR | | E-1.5 | ELECTRICAL PLAN 5TH FLOOR |
| FP-1.4 | FIRE PROTECTION 4TH FLOOR | | E-1.6 | ELECTRICAL PLAN ROOF PLAN |
| FP-1.5 | FIRE PROTECTION 5TH FLOOR | | E-2.1 | ENLARGED LAYOUTS |
| FP-1.6 | FIRE PROTECTION ROOF PLAN | | E-3.1 | ELECTRICAL RISER |
| FP-2.0 | FIRE SPRINKLER RISER | | E-4.1 | PANEL SCHEDULES |
| | | | E-4.2 | PANEL SCHEDULES |

Note: All Mechanical & Electrical drawings listed are Revision #1 dated 2-9-17

Schedule II-12

## SANTA BARBARA HOTEL
## EXHIBIT "B"
## CONTRACT DRAWINGS

| SHEET NO. | TITLE | REVISION # | SHEET NO. | TITLE |
|-----------|-------|------------|-----------|-------|
| ID-00.00 | COVER PAGE | | ID-03.00 | COURTYARD ELEVATIONS |
| ID-01.00 | TITLE PAGE DIRECTORY | | ID-03.01 | EVENT ELEVATIONS |
| ID-02.00 | OVERALL KEY PLAN LVL 1 | | ID-03.02 | CORRIDOR ELEVATIONS |
| ID-02.10 | OVERALL KEY PLAN LVL 2 | | ID-03.03 | CORRIDOR ELEVATIONS |
| ID-02.20 | OVERALL KEY PLAN LVL 3 | | ID-06.00 | FINISH SCHEDULE |
| ID-02.30 | OVERALL KEY PLAN LVL 4 | | ID-06.10 | FF&E, PLUMBING & HARDWARE SCHEDULE |
| ID-02.40 | OVERALL KEY PLAN LVL 5 | | ID-07.00 | STANDARD GUESTROOM TYPE SBK-1 ENLARGED PLAN |
| ID-02.50 | OVERALL ROOF KEY PLAN | | ID-07.01 | STANDARD GUESTROOM TYPE SBK-1 ELEVATIONS |
| ID-02.60 | OVERALL CONSTRUCTION PLAN LVL 1 | | ID-09.00 | COURTYARD PLANTER DETAILS |
| ID-02.70 | OVERALL CONSTRUCTION PLAN LVL 2 | | ID-09.01 | COURTYARD WATER FEATURE DETAIL |
| ID-02.80 | OVERALL CONSTRUCTION PLAN LVL 3 | | | |
| ID-02.90 | OVERALL CONSTRUCTION PLAN LVL 4 | | | |
| ID-02.100 | OVERALL CONSTRUCTION PLAN LVL 5 | | | |
| ID-02.110 | OVERALL ROOF CONSTRUCTION PLAN | | | |
| ID-02.120 | OVERALL REFLECTIVE CEILING PLAN LVL 1 | | | |
| ID-02.130 | OVERALL REFLECTIVE CEILING PLAN LVL 2 | | | |
| ID-02.140 | OVERALL REFLECTIVE CEILING PLAN LVL 3 | | | |
| ID-02.150 | OVERALL REFLECTIVE CEILING PLAN LVL 4 | | | |
| ID-02.160 | OVERALL REFLECTIVE CEILING PLAN LVL 5 | | | |
| ID-02.170 | OVERALL FINISH FLOOR PLAN LVL 1 | | | |
| ID-02.180 | OVERALL FINISH FLOOR PLAN LVL 2 | | | |
| ID-02.190 | OVERALL FINISH FLOOR PLAN LVL 3 | | | |
| ID-02.200 | OVERALL FINISH FLOOR PLAN LVL 4 | | | |
| ID-02.210 | OVERALL FINISH FLOOR PLAN LVL 5 | | | |
| ID-02.220 | OVERALL ROOF FLOOR FINISH PLAN | | | |
| ID-02.230 | OVERALL FURNITURE PLAN LVL 1 | | | |
| ID-02.240 | OVERALL FURNITURE PLAN LVL 2 | | | |
| ID-02.250 | OVERALL FURNITURE PLAN LVL 3 | | | |
| ID-02.260 | OVERALL FURNITURE PLAN LVL 4 | | | |
| ID-02.270 | OVERALL FURNITURE PLAN LVL 5 | | | |
| ID-02.280 | OVERALL ROOF FURNITURE PLAN | | | |

NOTE:    ALL ID Drawings are dated 1-15-16

WEIL:\96218278\17\63946.0005

## <u>SCHEDULE III</u>

## <u>INITIAL LOAN ADVANCE PURPOSE</u>

Paying pre-development and development costs in accordance with the Budget as well as reserves, fees and expenses incurred in connection with developing the Project and entering into the Loan.

WEIL:\96218278\17\63946.0005

## SCHEDULE IV

## EXISTING TRADE CONTRACTS

| Greystone Trades Buy Log | | Updated | 12/11/2017 |
|---|---|---|---|
| | | Date Contract Signed | Original GMP Amount |
| Demolition and Excavation | Complete Property Services, Inc. | 3/25/2016 | $485,900 |
| Concrete and Masonry | Emerald Construction Corporation | 5/2/2017 | $2,063,000 |
| Structural Steel | Suncor, Inc. | 4/8/2016 | $1,307,300 |
| Waterproofing | Deluxe Waterproofing & Caulking, Inc. | 6/21/2017 | $504,750 |
| Roofing | Triple M Roofing, Corp. | 9/21/2017 | $87,200 |
| Pool and Pool Equipment | Chester Pool Systems, Inc. | 10/9/2017 | $232,930 |
| LULA & Dumbwaiter | Access Lifts and Elevators, Inc. | 11/9/2017 | $102,400 |
| Fire Protection | Summers Fire Sprinklers, Inc. | 10/13/2017 | $111,600 |
| Plumbing | Right Way Plumbing Co. | 5/16/2017 | $1,207,400 |
| HVAC & Controls | Hart Mechanical Contractors, Inc. | 6/21/2017 | $956,900 |
| Electrical & Fire Alarm | E - Tech Electric, Inc. | 6/21/2017 | $624,900 |
| SWPPP, Utilities, Paving & Site | Solution Construction, Inc. | 3/23/2016 | $298,700 |
| Soil Improvement | Hayward Baker, Inc. | 3/25/2016 | $2,206,800 |
| Temporary Fencing and Gates | Gomez & Son Fence Corp. | 3/21/2016 | $48,400 |
| Wells | A.C. Schultes of Florida, Inc. | 3/8/2016 | $63,000 |
| | | Total Bought to Date | $10,301,180 |
| | | Original GMP Total | $19,172,236 |
| | | Percentage of GMP | 54% |

WEIL:\96218278\17\63946.0005

## <u>SCHEDULE V</u>

## <u>LITIGATION DISCLOSURE</u>

None

WEIL:\96218278\17\63946.0005

**<u>SCHEDULE VI</u>**

**<u>LIST OF MATERIAL AGREEMENTS</u>**

1. Construction Management Agreement
2. Development Agreement

WEIL:\96218278\17\63946.0005

### SCHEDULE VII

### DEFINITION OF SINGLE PURPOSE ENTITY

"**Single Purpose Entity**" means a Person, other than a natural person, which, at all times, on and after the date hereof until such time as the Debt has been indefeasibly paid in full, shall at all times comply with the following requirements:

a.       was, is and will be formed solely for the purpose of (i) in the case of Borrower, acquiring, developing, constructing, owning, holding, selling, leasing, ground leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; (ii) in the case of Greystone Hotel Miami, acting as the managing member of the limited liability company that owns the Fee Land; or (iii) in the case of Greystone Holdco, acting as the managing member of the limited liability company that owns the Leasehold Land and the managing member of the limited liability company that holds the Option;

b.       has not been, is not, and will not be engaged in any business unrelated to (i) in the case of Borrower, acquiring, developing, constructing, owning, holding, selling, leasing, ground leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, (ii) in the case of Greystone Hotel Miami, acting as the managing member of the limited liability company that owns the Fee Land; or (iii) in the case of Greystone Holdco, acting as the managing member of the limited liability company that owns the Leasehold Land and the managing member of the limited liability company that holds the Option;

c.       has not had, does not have and will not have any assets other than (i) in the case of Borrower, those related to the Property, (ii) in the case of Greystone Holdco, its membership interest in the limited liability company that owns the Leasehold Land and its membership interest in the limited liability company that holds the Option, or (iii) in the case of Greystone Hotel Miami, its membership interest in the limited liability company that owns the Fee Land;

d.       will, to the fullest extent permitted by law, not engage in, seek or consent to, (i) any dissolution, winding up, liquidation, consolidation, merger, or sale of all or substantially all of its assets, (ii) except as permitted under the terms of this Agreement, any transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company), or (iii) any amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition without the written consent of Lender;

e.       has been, is and intends to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same have or shall become due, and has maintained, is currently

WEIL:\96218278\17\63946.0005

maintaining and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, the foregoing shall not require any member or any other Person of Borrower to make any additional capital contribution;

f.      has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

g.      has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own tax returns, except to the extent that it (i) has been or is required to file consolidated tax returns by law or (ii) is treated as a disregarded entity for federal or state tax purposes;

h.      has maintained and will maintain its own records, books, resolutions and agreements;

i.      other than as provided in this Agreement and the other Loan Documents, (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) has not participated and will not participate in any cash management system with any other Person;

j.      other than as provided in this Agreement and the other Loan Documents, has held and will hold its assets in its own name;

k.      has conducted and will conduct its business in its name or trade name;

l.      has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

m.      has paid and will pay its own liabilities and expenses, including the salaries of its own employees (if any), out of its own funds and assets, and has maintained and will maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided, however, the foregoing shall not require any member to make any additional capital contributions to Borrower;

n.      has observed and will observe in all material respects material to its separateness, all partnership, corporate or limited liability company formalities, as applicable;

o.      has no and will have no Indebtedness other than (i) in the case of Borrower, (A) the Debt, and (B) the Permitted Debt;

p.      except in connection with the Loan Documents, has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any

other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Agreement;

q.      has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate (other than the securities of Borrower, Greystone Hotel Miami or Option Holder, as applicable, held by Borrower Holdco);

r.      has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including paying for shared office space and services performed by any employee of an Affiliate;

s.      has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name, and all stationery, invoices, and checks utilized by such Person or utilized to collect its funds or pay its expenses have borne and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being such Person's agent;

t.      other than as provided in this Agreement and the other Loan Documents, has not pledged and will not pledge its assets for the benefit of any other Person;

u.      has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name or trade name;

v.      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

w.      has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity) except that Borrower, from time to time in the ordinary course of business, may agree with Tenants under Leases of all or any portion of the Property to make certain tenant improvement allowances available to such Tenants;

x.      has not identified and will not identify its constituent partners, members or shareholders (as applicable), or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

y.      other than the Management Agreement with Hotel Manager and capital contributions and Tax Distributions or distributions permitted under the terms of its organizational documents, has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are substantially similar to those that would be obtained in a comparable arm's-length transaction with an unrelated third party, and (ii) in connection with this Agreement;

z.      has not had and will not have any obligation to indemnify, and has not indemnified and will not indemnify, its partners, officers, directors, managers or members, as the

WEIL:\96218278\17\63946.0005

case may be, unless such an obligation was and is fully subordinated to the Obligations and will not constitute a claim against the Obligations in the event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation;

aa.     intentionally omitted;

bb.     except as provided in the Loan Documents, does not and will not have any of its obligations guaranteed by any Affiliate;

cc.     if such entity is a limited partnership, has had, now has and will have (i) as its only general partners, Single Purpose Entities that are corporations or Acceptable LLCs that own at least one percent (1.00%) of the equity of the limited partnership, and (ii) a partnership agreement providing that (A) such entity will not dissolve upon the bankruptcy of any partner, including any general partner, (B) the vote of a majority-in-interest of the remaining partners is sufficient to, and such partners shall, continue the life of the partnership in the event of such bankruptcy of the general partner, and (C) if the vote of a majority-in-interest of the remaining partners to continue the life of the partnership following the bankruptcy of the general partner is not obtained, the partnership may not liquidate the Property without the consent of Lender for as long as the Loan is outstanding;

dd.     if such entity is a corporation, has had, now has and will have at least two (2) Independent Directors, and has not caused or allowed, and will not cause or allow, the board of directors of such entity to take any Bankruptcy Action (or to collude with, or otherwise assist, solicit, or cause to be solicited an involuntary Bankruptcy Action) or any other action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless at least two (2) Independent Directors shall have participated in such vote and all of the directors have participated in such vote;

ee.     if such entity is a limited liability company, has been, now is, and will be a limited liability company formed under the laws of the State of Delaware that will have an operating agreement which provides that as long as any portion of the Debt remains outstanding: (i) the company shall have at least two (2) Independent Managers, and the limited liability company shall not take any Bankruptcy Action (or to collude with, or otherwise assist, solicit, or cause to be solicited an involuntary Bankruptcy Action) unless, such Bankruptcy Action is approved by the prior unanimous written consent of all of the member(s) of the limited liability company and the Independent Managers;  (ii) upon the occurrence of any event that causes the last member of the limited liability company to cease to be a member of such limited liability company (other than upon an assignment by such member of all of its limited liability company interest in such limited liability company and the admission of the transferee in accordance with the limited liability company agreement), (1) the person(s) acting as Independent Manager(s) of such limited liability company shall, without any action of any Person and simultaneously with such member ceasing to be a member of such limited liability company, automatically be admitted as the "**Special Member**" and shall preserve and continue the existence of such limited liability company without dissolution, and (2) without limiting the provisions of <u>clause (1)</u>, upon the occurrence of any event that causes the last remaining member of the limited liability company to cease to be a member of the limited liability company or that causes the sole member to cease to be a member of the limited liability company (other than upon continuation

of the limited liability company without dissolution upon an assignment by the member of all of its limited liability company interest in the limited liability company and the admission of the transferee in accordance with the limited liability company agreement), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in such limited liability company, agree in writing to continue the limited liability company without dissolution and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such limited liability company, effective as of the occurrence of the event that terminated the continued membership of such member in such limited liability company; (iii) no Special Member may resign or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to such limited liability company as a Special Member, and (B) such successor Special Member has also accepted its appointment as an Independent Manager and executed a counterpart to the limited liability company agreement; provided, however, the Special Member shall automatically cease to be a member of the limited liability company upon the admission to the limited liability company of a substitute member; the Special Member shall be a member of the limited liability company that has no interest in the profits, losses and capital of the limited liability company and has no right to receive any distributions of limited liability company assets; pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the limited liability company and shall not receive a limited liability company interest in the limited liability company; (iv) a Special Member, in its capacity as Special Member, may not bind the limited liability company; (v) except as required by any mandatory provision of the Act, a Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the limited liability company, including, without limitation, the merger, consolidation or conversion of the limited liability company; (vi) in order to implement the admission to the limited liability company of each Special Member, each Person acting as an Independent Manager shall execute a counterpart to the limited liability company agreement; (vii) prior to its admission to the limited liability company as Special Member, each Person acting as an Independent Manager shall not be a member of the limited liability company; (viii) such limited liability company shall be dissolved, and its affairs shall be would up only upon the first to occur of the following (but subject to clause (ii) above): (A) the termination of the legal existence of the last remaining member of such limited liability company or the occurrence of any other event which terminates the continued membership of the last remaining member of such limited liability company in such limited liability company unless the business of such limited liability company is continued in a manner permitted by its limited liability company agreement or the Act, or (B) the entry of a decree of judicial dissolution of the limited liability company under Section 18-802 of the Act; (ix) neither the bankruptcy of any member of the limited liability company or the Special Member shall cause such member or Special Member, respectively, to cease to be a member of such limited liability company and upon the occurrence of such an event, the business of such limited liability company shall continue without dissolution; (x) in the event of dissolution of such limited liability company, such limited liability company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of such limited liability company in an orderly manner), and the assets of such limited liability company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (xi) to the fullest extent permitted by law, except as otherwise expressly provided in the limited liability company agreement, each member

of the limited liability company and the Special Members shall irrevocably waive any right or power that they might have to cause such limited liability company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of such limited liability company, to compel any sale of all or any portion of the assets of such liability company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such limited liability company (a limited liability company meeting the criteria of this clause (ee) is referred to herein as an "**Acceptable LLC**");

ff.      the organizational documents of such entity shall further provide that:  (i) the board of directors or managers of such entity and the constituent members or other equity owners of such entity (the "**Constituent Equity Members**") shall not take any action which, under the terms of any organizational documents of such entity, requires a unanimous written consent of the board of directors or managers of such entity unless at the time of such action there shall be at least two (2) Independent Directors or Independent Managers engaged as provided by the terms hereof;  (ii) no Independent Director or Independent Manager may be removed or replaced except for Cause; (iii) any resignation, removal or replacement of any Independent Director or Independent Manager shall not be effective without five (5) Business Days prior written notice to Lender and, if a Securitization has occurred, the Rating Agencies accompanied by a statement as to the reasons for such removal, the identity of the proposed replacement Independent Director or Independent Manager, and a certificate that the replacement Independent Director or Independent Manager satisfies the applicable terms and conditions of the definition of "**Independent Director**" or "**Independent Manager**"; (iv) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors or Independent Managers shall consider only the interests of the Constituent Equity Members and such entity (including such entity's creditors) in acting or otherwise voting on a Bankruptcy Action (which such fiduciary duties to the Constituent Equity Members and such entity's creditors, in each case, shall be deemed to apply solely to the extent of their respective economic interests in such entity exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Equity Members), (y) the interests of other affiliates of the Constituent Equity Members and such entity and (z) the interests of any group of affiliates of which the Constituent Equity Members or such entity is a part); (v) other than as provided in subsection (iv) above, to the fullest extent permitted by law the Independent Directors or Independent Managers shall not have any fiduciary duties to any Constituent Equity Members, any directors of such entity or any other Person; (vi) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (vii) to the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, an Independent Director or Independent Manager shall not be liable to such entity, any Constituent Equity Member or any other Person bound by the limited liability company agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director or Independent Manager acted in bad faith or engaged in willful misconduct;

gg.      has complied and will comply with all of the terms and provisions contained in its organizational documents;

hh.      intentionally omitted;

       ii.      has and will have an express acknowledgment in its organizational documents that, during the Term of the Loan, Lender is intended third-party beneficiaries of the "special purpose/separateness/bankruptcy remote" provisions (as applicable) of such organizational documents; and

       jj.      other than as provided in this Agreement and the other Loan Documents, has not and will not consent to any other Person (i) operating its business in the name of such Person, (ii) acting in the name of such Person, (iii) using such Person's stationery or business forms, (iv) holding out its credit as being available to satisfy the obligations of such Person, (v) having contractual liability for the payment of any of the liabilities of such Person (except pursuant to the limited extent provided under the Loan Documents), or (vi) failing to at all times specify to all relevant third parties that it is acting in a capacity other than as the applicable Single Purpose Entity.

As used in the definition of Single Purpose Entity, the term "**<u>Indebtedness</u>**" means, with respect to any Person at any time, (i) indebtedness or liability of such Person for borrowed money whether or not evidenced by bonds, debentures, notes or other instruments, or for the deferred purchase price of property or services (excluding trade obligations); (ii) obligations of such Person as lessee under leases which should have been or should be, in accordance with GAAP, recorded as capital leases; (iii) current liabilities of such Person in respect of unfunded vested benefits under plans covered by Title IV of ERISA; (iv) obligations issued for, or liabilities incurred on the account of, such Person; (v) obligations or liabilities of such Person arising under letters of credit, credit facilities or other acceptance facilities; (vi) obligations of such Person under any guarantees or other agreement to become secondarily liable for any obligation of any other Person, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person or otherwise to assure a creditor against loss; (vii) obligations of such Person secured by any Lien on any property of such Person, whether or not the obligations have been assumed by such Person; or (viii) obligations of such Person under any interest rate or currency exchange agreement.

**SCHEDULE VIII**

**CONSTRUCTION SCHEDULE**

See attached.



| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| **PROCUREMENT** | | | | | |
| **Precon Process** | | | | | |
| *Milestones* | | | | | |
| A7530 | Mobilization of Jobsite Office and Turner Staff | 0 | 0 | 28-Mar-16 A | |
| A7660 | Site Fence Set up | 0 | 0 | 28-Mar-16 A | |
| A7540 | Phase 1a Demo Completion (Enabling work) | 0 | 0 | | 01-Jun-16 A |
| A7700 | Micropile installation Complete | 0 | 0 | | 16-Jul-16 A |
| A7550 | Bracing Installation complete | 0 | 0 | | 06-Sep-16 A |
| A7590 | Phase 1b Demo Complete | 0 | 0 | | 28-Oct-16 A |
| A7630 | Permeation Grout Complete | 0 | 0 | | 03-Nov-16 A |
| A7620 | Jet Grout complete | 0 | 0 | | 24-Jan-17 A |
| A7970 | Receive Phase 2 (Interior Drawings) | 0 | 0 | 05-Jun-17 A | |
| A7610 | Piles (PHASE 1) Complete | 0 | 0 | | 18-Sep-17 |
| A7690 | Start Dewatering | 0 | 0 | 18-Sep-17 | |
| A7600 | PH 1.5 Foundations Complete | 0 | 0 | | 18-Sep-17 |
| A7720 | Light Fixtures on Site | 0 | 0 | | 10-Apr-18 |
| A7570 | PH 1.5 Dry In | 0 | 0 | | 19-Apr-18 |
| A7560 | PH 1.5 Top Out of Structure | 0 | 0 | | 20-Apr-18 |
| A7730 | Plumbing Fixtures on Site | 0 | 0 | | 18-May-18 |
| A7740 | Millwork on Site | 0 | 0 | | 22-Jun-18 |
| A7760 | Furniture on Site | 0 | 0 | | 16-Jul-18 |
| A7750 | Window Treatments on Site | 0 | 0 | | 19-Jul-18 |
| A7580 | PH 2 Certificate of Completion | 0 | 0 | | 05-Sep-18 |
| *Greystone* | | | | | |
| A7520 | PH 1.5 Financing Closed | 25 | 0 | 19-May-15 A | 23-Dec-15 A |
| A1200 | Prepare/Review & Approve PH 1 GMP | 20 | 0 | 07-Jan-16 A | 02-Mar-16 A |
| A1830 | NTP Phase I | 0 | 0 | 02-Mar-16 A | |
| A1150 | Receive Finalized Drawings for Phase 1.5 GMP Pricing | 0 | 0 | 02-Aug-16 A | |
| A1160 | PH 1.5 Phase 1.5 GMP Process | 31 | 0 | 15-Aug-16 A | 20-Oct-16 A |
| A1170 | PH 1.5 Phase 1.5 GMP Approval/Financing in Place/NTP Issued | 15 | 0 | 21-Oct-16 A | 07-Mar-17 A |
| A7980 | NTP Phase 1.5 | 20 | 0 | 07-Mar-17 A | 14-Mar-17 A |
| A8100 | Receive finalized drawings for phase 2 Pricing | 5 | 0 | 29-May-17 A | 05-Jun-17 A |
| A8110 | Phase 2 GMP process | 65 | 10 | 06-Jun-17 A | 29-Sep-17 |
| A8120 | Phase 2 GMP Approval/Financing in place/NTP Issued | 20 | 20 | 02-Oct-17 | 27-Oct-17 |
| A8130 | Receive phase 2 NTP | 1 | 1 | 30-Oct-17 | 30-Oct-17 |
| *Santa Barbara* | | | | | |
| **Permit Process** | | | | | |
| A1210 | Master Permit Processing | 5 | 0 | 24-May-14 A | 08-Jan-16 A |
| A1290 | MOT Permit for 20th Street Underground Work | 30 | 0 | 09-Mar-16 A | 23-Mar-16 A |
| A1270 | Temp Power Permit | 15 | 0 | 28-Mar-16 A | 15-Apr-16 A |
| A1230 | Utility Pole Relocation Permits | 20 | 0 | 02-May-16 A | 13-Jun-16 A |
| A1250 | Well Permit | 60 | 0 | 16-May-16 A | 19-Sep-16 A |
| A1260 | Dewatering Permit | 60 | 0 | 16-May-16 A | 15-Jul-16 A |
| A1280 | Civil Permits (on site) | 5 | 0 | 02-Aug-16 A | 08-Aug-16 A |
| A1240 | MDWASA Permit | 60 | 10 | 08-Aug-16 A | 29-Sep-17 |

Legend:
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- ◆ Milestone

TASK filter: All Activities

© Oracle Corporation

Greystone Hotel GMP/Baseline 1.5 Update 09/18/17 — Classic Schedule Layout — 20-Sep-17

Schedule VIII-1

WEIL:\96218278\17\63946.0005



| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A8030 | MOT on Collins for Well | 20 | 20 | 18-Sep-17 | 13-Oct-17 |
| A1300 | PH 2 Pool Permit | 30 | 30 | 13-Nov-17 | 27-Dec-17 |
| **Sub Permits** | | | | | |
| A1850 | Well & Dewatering (Permanent & Temp) | 20 | 0 | 28-Mar-16 A | 13-Jun-16 A |
| A1350 | Elevator Permit | 10 | 10 | 27-Sep-17 | 10-Oct-17 |
| A1330 | PH 2 Fire Alarm Permit | 10 | 10 | 16-Oct-17 | 27-Oct-17 |
| A2090 | PH 2 Landscaping & Irrigation | 20 | 20 | 21-Nov-17 | 20-Dec-17 |
| A1340 | PH 2 Fire Sprinkler Permit | 10 | 10 | 29-Nov-17 | 12-Dec-17 |
| A1360 | PH 2 Window Permit | 10 | 10 | 13-Dec-17 | 27-Dec-17 |
| **Enabling** | | | | | |
| A1380 | LOI for Enabling | 5 | 0 | 20-May-14 A | 21-May-14 A |
| A1400 | Test Pits for Foundations | 5 | 0 | 09-Jun-14 A | 13-Jun-14 A |
| A1390 | Survey of Existing Structure | 5 | 0 | 09-Jun-14 A | 13-Jun-14 A |
| A1410 | Site Survey | 5 | 0 | 11-Jul-14 A | 01-Aug-14 A |
| A1420 | Monitoring of Water Level | 5 | 0 | 30-Jul-14 A | 30-Sep-14 A |
| **ENGINEERING** | | | | | |
| **Procurement** | | | | | |
| **Scope & Award (Durations include owner participation)** | | | | | |
| A1470 | Steel (Bracing) Structural/PH 2 Misc Metals/PH 2 Railings | 5 | 0 | 10-Feb-16 A | 11-Feb-16 A |
| A1520 | Testing (Materials Per Spec & Building Dept) | 15 | 0 | 02-Mar-16 A | 22-Mar-16 A |
| A1530 | GR's/GC's (Dumpsters/Toilets/Cleaning) | 2 | 0 | 04-Mar-16 A | 08-Mar-16 A |
| A1460 | Piles (Jet & Chemical GRT/Micro & Auger Cast) | 5 | 0 | 07-Mar-16 A | 13-Apr-16 A |
| A1440 | MOT & Fence | 5 | 0 | 07-Mar-16 A | 18-Mar-16 A |
| A1450 | Well & Dewatering (Permanent & Temp) | 15 | 0 | 07-Mar-16 A | 21-Mar-16 A |
| A1460 | Surveying (Pre/During/Post) | 15 | 0 | 07-Mar-16 A | 10-Mar-16 A |
| A1550 | Civil (Drainage/Grease Trap/Water/Sewer) | 15 | 0 | 26-Aug-16 A | 31-Aug-16 A |
| A1540 | PH 1.5 Concrete | 15 | 0 | 14-Mar-17 A | 16-Mar-17 A |
| A1560 | PH 1.5 Masonry | 15 | 0 | 14-Mar-17 A | 16-Mar-17 A |
| A1580 | PH 1.5 Waterproofing | 15 | 0 | 15-Mar-17 A | 21-Aug-17 A |
| A1510 | PH 1.5 Electrical/Fire Alarm | 15 | 0 | 03-Apr-17 A | 21-Jun-17 A |
| A1670 | PH 1.5 Low Voltage / Security | 15 | 0 | 03-Apr-17 A | 23-Jun-17 A |
| A1500 | PH 1.5 Plumbing | 15 | 0 | 03-Apr-17 A | 21-Apr-17 A |
| A1630 | Elevator / Lula | 15 | 2 | 20-Apr-17 A | 19-Sep-17 |
| A1590 | PH 1.5 HVAC | 15 | 0 | 05-Jun-17 A | 21-Jun-17 A |
| A1680 | PH 1.5 Roofing | 15 | 0 | 22-Aug-17 A | 19-Sep-17 A |
| A2100 | PH 1.5 Flood Barrier Panels | 35 | 10 | 04-Sep-17 A | 29-Sep-17 |
| A1610 | PH 1.5 Windows | 15 | 15 | 18-Sep-17 | 06-Oct-17 |
| A1650 | PH 1.5 Spray On Fire Proofing | 15 | 15 | 18-Sep-17 | 06-Oct-17 |
| A1660 | PH 1.5 Fire Stopping | 15 | 15 | 18-Sep-17 | 06-Oct-17 |
| A1620 | PH 1.5 Rolling Doors | 15 | 15 | 18-Sep-17 | 06-Oct-17 |
| A1640 | PH 1.5 Swimming Pool | 15 | 15 | 18-Sep-17 | 06-Oct-17 |
| A1490 | PH 1.5 Fire Sprinkler | 15 | 15 | 18-Sep-17 | 06-Oct-17 |
| A8000 | PH 2 Decorative metals | 20 | 20 | 31-Oct-17 | 29-Nov-17 |
| A1570 | PH 2 Rough Carpentry | 5 | 5 | 31-Oct-17 | 06-Nov-17 |
| A1710 | PH 2 Millwork (Finish Carpentry) | 20 | 20 | 31-Oct-17 | 29-Nov-17 |

| Legend | | | |
|---|---|---|---|
| ▬▬ Actual Level of Effort | ▭▭ Remaining Work | ◆ ◆ Milestone | |
| ▬▬ Actual Work | ▬▬ Critical Remaining Work | | |

Greystone Hotel GMP/Baseline 1.5 Update 09/18/17          Classic Schedule Layout          20-Sep-17

Page 2 of 15

TASK filter: All Activities

© Oracle Corporation

Schedule VIII- 2



Schedule VIII- 3



| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A2120 | PH 2 Millwork (Finish Carpentry) | 60 | 60 | 30-Nov-17 | 27-Feb-18 |
| A2170 | PH 2 Terrazzo | 30 | 30 | 30-Nov-17 | 12-Jan-18 |
| **Material Fabrication & Delivery** | | | | | |
| A2220 | Bracing Steel Material | 15 | 0 | 26-May-16 A | 06-Jun-16 A |
| A7820 | Shoring for rotted wood area material procurement | 5 | 0 | 02-Jun-16 A | 15-Jun-16 A |
| A2230 | Micro Pile Material Procurement | 10 | 0 | 22-Jun-16 A | 08-Jul-16 A |
| A7850 | Chemical grouting material procurement | 15 | 0 | 28-Sep-16 A | 07-Oct-16 A |
| A7790 | Jet grouting material procurement | 5 | 0 | 26-Oct-16 A | 03-Nov-16 A |
| A7800 | Augercast Material Procurement | 15 | 0 | 21-Dec-16 A | 10-Jan-17 A |
| A2250 | PH 1.5 Rebar | 10 | 0 | 14-Apr-17 A | 22-May-17 A |
| A2270 | PH 2 Plumbing Fixtures | 20 | 18 | 10-Jul-17 A | 11-Oct-17 |
| A2340 | Elevators | 60 | 60 | 27-Sep-17 | 21-Dec-17 |
| A2290 | PH 1.5 Louvers | 30 | 30 | 02-Oct-17 | 10-Nov-17 |
| A2310 | PH 1.5 Mechanical Equipment | 40 | 40 | 02-Oct-17 | 28-Nov-17 |
| A2260 | PH 2 Light Fixtures | 40 | 40 | 16-Oct-17 | 12-Dec-17 |
| A2350 | PH 1.5 Flood Barrier Panels | 90 | 93 | 23-Oct-17 | 05-Mar-18 |
| A2280 | PH 1.5 Electrical Gear | 50 | 50 | 23-Oct-17 | 04-Jan-18 |
| A2300 | PH 1.5 Rolling Door | 20 | 20 | 06-Nov-17 | 05-Dec-17 |
| A2360 | PH 1.5 Windows | 60 | 60 | 13-Dec-17 | 12-Mar-18 |
| A2320 | PH 2 Doors, Frames & Hardware | 30 | 30 | 29-Dec-17 | 12-Feb-18 |
| A1730 | PH 2 Drywall & Framing | 15 | 15 | 29-Dec-17 | 22-Jan-18 |
| A2380 | PH 2 Misc Specialties (FECs, Toilet Accs ...) | 30 | 30 | 08-Jan-18 | 20-Feb-18 |
| A2370 | PH 2 Flooring, Tile & Stone | 60 | 60 | 16-Jan-18 | 10-Apr-18 |
| A2330 | PH 2 Decorative Rails | 30 | 30 | 23-Jan-18 | 06-Mar-18 |
| A2390 | PH 2 Millwork | 60 | 60 | 28-Feb-18 | 22-May-18 |
| **BASEMENT** | | | | | |
| **Mobilization** | | | | | |
| A1430 | Utility Pole Relocation Process | 190 | 0 | 05-Aug-14 A | 04-Aug-16 A |
| A1880 | Surveying for Steel Shop Drawing Processing | 9 | 0 | 11-Mar-16 A | 23-Mar-16 A |
| A2420 | Set up 20th Street & Collins MOT. | 5 | 0 | 21-Mar-16 A | 29-Mar-16 A |
| A2400 | Mobilization of Site Office and Staff | 5 | 0 | 23-Mar-16 A | 29-Mar-16 A |
| A2410 | Set Up Construction Fence | 2 | 0 | 28-Mar-16 A | 29-Mar-16 A |
| **Foundation** | | | | | |
| A7680 | RFI Response for access point demolition | 5 | 0 | 18-Apr-16 A | 11-May-16 A |
| A2430 | Demo Access Points into Building Basement | 8 | 0 | 19-Apr-16 A | 01-Jun-16 A |
| A5390 | Demo out all elevator shaft contents to enable chemical grout | 5 | 0 | 26-Apr-16 A | 28-Apr-16 A |
| A5400 | Mob Steel Contractor to perform prep activities | 5 | 0 | 06-Jun-16 A | 10-Jun-16 A |
| A2470 | Install Steel Frame to support the Exterior walls | 25 | 0 | 14-Jun-16 A | 06-Sep-16 A |
| A7810 | Shoring and Demo of rotted wood area for micropile rig access | 20 | 0 | 16-Jun-16 A | 15-Jul-16 A |
| A2460 | Micro Piles Installation | 15 | 0 | 11-Jul-16 A | 16-Jul-16 A |
| A2480 | Demo Interior Floors (top Down) | 40 | 0 | 06-Sep-16 A | 31-Oct-16 A |
| A2440 | Install Temp Well for Dewatering | 4 | 0 | 26-Sep-16 A | 11-Oct-16 A |
| A2450 | Chemical Grout | 20 | 0 | 12-Oct-16 A | 03-Nov-16 A |
| A2490 | Jet Grout Basement Area / Underpinning | 40 | 0 | 04-Nov-15 A | 24-Jan-17 A |

Schedule VIII- 4



| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | Greystone Hotel GMP/Baseline 1.5 Update 09/18/17 | | | Classic Schedule Layout | 20-Sep-17 |
| A7930 | Approve CCR of engineering of shoring for stair | 5 | 0 | 23-Nov-16 A | 13-Dec-16 A |
| A7940 | Ongoing Unforseen Oil Tank Delay | 10 | 0 | 12-Jan-17 A | 26-Jan-17 A |
| A7950 | (2) Micro Piles Delayed By Oil Tank (includes project Rig new availability date) | 1 | 0 | 03-Feb-17 A | 04-Feb-17 A |
| A2500 | Install Basement Augercast Piles | 20 | 0 | 06-Feb-17 A | 28-Feb-17 A |
| A5410 | Test Pile Program | 15 | 0 | 27-Feb-17 A | 18-Mar-17 A |
| A7920 | Engineer shoring for stair | 5 | 0 | 28-Feb-17 A | 14-Mar-17 A |
| A7960 | Approval of Shoring proposal and Installation of Shoring | 20 | 0 | 06-Mar-17 A | 15-Mar-17 A |
| A8010 | Dig & Remove ARSENIC SPOILS to allow Tie Back Anchor Installation | 5 | 0 | 08-Mar-17 A | 14-Mar-17 A |
| A8020 | Add Tie Back Anchors to Micro Piles | 5 | 0 | 15-Mar-17 A | 24-Mar-17 A |
| A7910 | Demo of stair | 5 | 0 | 20-Mar-17 A | 25-Mar-17 A |
| A2520 | PH 1.5 Excavation of Basement | 15 | 0 | 28-Mar-17 A | 28-Apr-17 A |
| A2540 | PH 1.5 Chip & Pile Cut Offs | 13 | 0 | 05-Apr-17 A | 03-Aug-17 A |
| A5420 | PH 1.5 Pile Cap Excavation | 6 | 0 | 20-Apr-17 A | 05-Jun-17 A |
| A2550 | PH 1.5 Form and pour, strip & Backfill  Pile Caps | 5 | 0 | 03-May-17 A | 15-Jun-17 A |
| A5810 | PH 1.5 Waterproof and Pour bottomand sides of Pits (Grease Trap, Sewage P | 7 | 0 | 05-Jun-17 A | 24-Jul-17 A |
| A2530 | PH 1.5 Install Lula Pit with Waterproofing | 7 | 0 | 05-Jun-17 A | 16-Jul-17 A |
| A8070 | DELAY due stop work order and final decision on waterproofing Manufacturer. | 4 | 0 | 19-Jun-17 A | 22-Jun-17 A |
| A8150 | DELAY due to rework of pits for CCD 8 | 3 | 0 | 23-Jun-17 A | 27-Jun-17 A |
| A8080 | DELAY due to final design of water proofing details | 17 | 0 | 28-Jun-17 A | 21-Jul-17 A |
| A2570 | PH 1.5 Underground MEP's | 10 | 0 | 11-Jul-17 A | 18-Aug-17 A |
| A7470 | PH 1.5 Spread 57 Stone under structural slab | 3 | 0 | 15-Jul-17 A | 08-Aug-17 A |
| A8050 | Shotcrete walls | 2 | 0 | 27-Jul-17 A | 27-Jul-17 A |
| A8060 | Final grade dirt at pressure slab | 2 | 0 | 27-Jul-17 A | 28-Jul-17 A |
| A2580 | PH 1.5 Compact and install waterproofing | 10 | 0 | 09-Aug-17 A | 15-Aug-17 A |
| A2560 | PH 1.5 Set Matt Rebar and Anchor bolts for Columns | 7 | 0 | 16-Aug-17 A | 21-Aug-17 A |
| A2590 | PH 1.5 Pour basement Slab | 7 | 0 | 22-Aug-17 A | 22-Aug-17 A |
| A7900 | Install Permanent Weir for Discharge | 5 | 5 | 16-Oct-17 | 20-Oct-17 |

**STRUCTURE**

**Concrete & Steel**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A2600 | Basement Walls Waterproofing | 10 | 3 | 26-Aug-17 A | 21-Sep-17 |
| A5430 | Basement Walls Rebar and Formwork | 10 | 3 | 30-Aug-17 A | 26-Sep-17 |
| A8090 | Delay due to hurricane Irma | 7 | 0 | 06-Sep-17 A | 14-Sep-17 A |
| A2610 | Pour Ground Shear Walls at Basement Level | 1 | 1 | 27-Sep-17 | 27-Sep-17 |
| A2630 | Backfill Basment perimter | 5 | 5 | 28-Sep-17 | 04-Oct-17 |
| A5440 | Install Angles to support Epic Deck at Basement Walls | 4 | 4 | 28-Sep-17 | 03-Oct-17 |
| A2620 | Ground Steel Columns at Basement Level | 7 | 7 | 28-Sep-17 | 06-Oct-17 |
| A5450 | Install Waterproofing above backfill | 5 | 5 | 05-Oct-17 | 11-Oct-17 |
| A2650 | Install Shoring for concrete placement on metal deck | 5 | 5 | 09-Oct-17 | 13-Oct-17 |
| A2640 | Install 1st FL-Metal Deck | 7 | 7 | 09-Oct-17 | 17-Oct-17 |
| A2660 | MEP Floor Penetration Sleeving | 3 | 3 | 18-Oct-17 | 20-Oct-17 |
| A5770 | 1st Floor Rebar | 4 | 4 | 23-Oct-17 | 26-Oct-17 |
| A2670 | 1st Floor Pour | 1 | 1 | 27-Oct-17 | 27-Oct-17 |
| A5460 | Install 1st Floor Tie Columns | 14 | 14 | 30-Oct-17 | 16-Nov-17 |
| A2680 | Install 1st floor Shear Walls | 10 | 10 | 30-Oct-17 | 10-Nov-17 |
| A2690 | Install 1st floor Steel Columns and Steel Angles | 10 | 10 | 30-Oct-17 | 10-Nov-17 |

Actual Level of Effort   Remaining Work   ◆ Milestone
Actual Work   Critical Remaining Work

TASK filter: All Activities

© Oracle Corporation

Schedule VIII- 5

WEIL:\96218278\17\63946.0005

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A2700 | Install 2nd floor metal decking | 7 | | 13-Nov-17 | 21-Nov-17 |
| A2720 | Install Shoring for 2nd floor deck pour | 1 | | 22-Nov-17 | 22-Nov-17 |
| A2730 | MEP Floor Penetration Layout for 2nd floor Deck | 3 | | 22-Nov-17 | 28-Nov-17 |
| A2740 | 2nd floor Rebar install and cut ext wall horizontally | 4 | | 29-Nov-17 | 04-Dec-17 |
| A5470 | 2nd Floor Deck Pour | 1 | | 05-Dec-17 | 05-Dec-17 |
| A5480 | Install Tie Columns at 2nd Floor Ext Wall | 14 | | 06-Dec-17 | 26-Dec-17 |
| A2750 | Install 2nd Floor shear walls | 7 | | 05-Dec-17 | 14-Dec-17 |
| A2760 | Install 2nd Floor steel columns and angles | 10 | | 06-Dec-17 | 19-Dec-17 |
| A2780 | Install Shoring for 3rd Floor Pour | 1 | | 20-Dec-17 | 20-Dec-17 |
| A2770 | Install Metal decking for 3rd floor pour | 7 | | 20-Dec-17 | 29-Dec-17 |
| A2800 | MEP Floor Penetration Sleeves | 3 | | 02-Jan-18 | 04-Jan-18 |
| A2810 | 3rd Floor Deck Rebar and Horizontal ext wall cut | 4 | | 05-Jan-18 | 10-Jan-18 |
| A5490 | 3rd Floor Pour | 1 | | 11-Jan-18 | 11-Jan-18 |
| A5500 | Install Tie Columns 3rd to 11" slab | 14 | | 12-Jan-18 | 01-Feb-18 |
| A5510 | Chip/Cut 1.5" of ext Tie Beam along entire perimeter to receive Angle | 10 | 10 | 12-Jan-18 | 26-Jan-18 |
| A2820 | Install 3rd Floor Shear Walls | 5 | 5 | 12-Jan-18 | 19-Jan-18 |
| A2830 | Install 3rd floor Steel Columns & Beams | 5 | 5 | 22-Jan-18 | 26-Jan-18 |
| A5520 | Install Angles on ext Tie Beams | 5 | 5 | 29-Jan-18 | 02-Feb-18 |
| A2840 | Install Shoring and form work for 11" Inter/Mech Slab | 7 | 7 | 01-Feb-18 | 09-Feb-18 |
| A2850 | MEP Floor penetration layout for Mech/Inter Slab | 3 | 3 | 12-Feb-18 | 14-Feb-18 |
| A2860 | Inter/Mech Floor Rebar for 11" deck | 5 | 5 | 15-Feb-18 | 22-Feb-18 |
| A5530 | Pour 11" Slab | 1 | 1 | 23-Feb-18 | 23-Feb-18 |
| A5660 | 11" Slab Cure Time For Stripping | 5 | 5 | 26-Feb-18 | 02-Mar-18 |
| A2880 | Install Inter/Mech Shear/stem/Block walls | 5 | 5 | 26-Feb-18 | 02-Mar-18 |
| A2890 | Install Inter/Mech Steel Columns and Angles | 5 | 5 | 26-Feb-18 | 02-Mar-18 |
| A5600 | Elevation 38' Form & Deck | 5 | 5 | 05-Mar-18 | 09-Mar-18 |
| A2930 | Remove Shoring 3rd floor to Inter/Mech | 6 | 6 | 05-Mar-18 | 12-Mar-18 |
| A2950 | Remove Building Exterior wall Bracing | 5 | 5 | 05-Mar-18 | 09-Mar-18 |
| A2710 | Remove Shoring ground 1st Elevated Deck | 3 | 3 | 07-Mar-18 | 09-Mar-18 |
| A2790 | Remove Shoring on 1st floor for 2nd Floor | 3 | 3 | 12-Mar-18 | 14-Mar-18 |
| A5590 | Elevation 38' MEP Sleeving | 1 | 1 | 12-Mar-18 | 12-Mar-18 |
| A5580 | Elevation 38' Rebar | 4 | 4 | 13-Mar-18 | 16-Mar-18 |
| A2870 | Remove Shoring on 2nd floor for 3rd Floor | 3 | 3 | 15-Mar-18 | 19-Mar-18 |
| A5570 | Elevation 38' Roof Pour | 1 | 1 | 19-Mar-18 | 19-Mar-18 |
| A5620 | Elevation 38' Cure for Stripping | 5 | 5 | 20-Mar-18 | 26-Mar-18 |
| A5610 | Elevation 38' Strip Formwork | 3 | 3 | 27-Mar-18 | 29-Mar-18 |
| A2900 | Elevation 36-9' Form/Deck | 5 | 5 | 06-Apr-18 | 12-Apr-18 |
| A2910 | Elevation 36'-9' MEP Sleeving | 1 | 1 | 13-Apr-18 | 13-Apr-18 |
| A5640 | Elevation 36-9' Rebar | 4 | 4 | 16-Apr-18 | 19-Apr-18 |
| A2920 | Elevation 36-9' Roof Pour | 1 | 1 | 20-Apr-18 | 20-Apr-18 |
| A2940 | Elevation 36-9' Strip Formwork | 3 | 3 | 30-Apr-18 | 02-May-18 |
| **Stairs** | | | | | |
| **Stair # 1 9 Landings** | | | | | |
| A2990 | Concrete Stairs Basement to 1st Floor | 10 | 10 | 30-Oct-17 | 10-Nov-17 |
| A5760 | Concrete Stairs 1st Floor to 2nd Floor | 10 | 10 | 06-Dec-17 | 19-Dec-17 |
| A5750 | Concrete Stairs 2nd Floor to 3rd Floor | 10 | 10 | 12-Jan-18 | 25-Jan-18 |
| A5740 | Concrete Stairs 3rd Floor to 11" Slab | 10 | 10 | 26-Feb-18 | 09-Mar-18 |

Legend: Actual Level of Effort | Remaining Work | ◆ Milestone | Actual Work | Critical Remaining Work

Page 8 of 15

TASK filter: All Activities

© Oracle Corporation

Schedule VIII- 6

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | Greystone Hotel GMP/Baseline 1.5 Update 09/18/17 | | | Classic Schedule Layout | 20-Sep-17 |
| A3000 | Remove Shoring | 7 | 7 | 12-Mar-18 | 20-Mar-18 |
| A3010 | Masonry work | 5 | 5 | 21-Mar-18 | 27-Mar-18 |
| A3040 | Handrail Installation | 5 | 5 | 28-Mar-18 | 03-Apr-18 |
| A3020 | Paint | 3 | 3 | 04-Apr-18 | 06-Apr-18 |
| A3030 | MEP in Stairs | 5 | 5 | 09-Apr-18 | 13-Apr-18 |
| **Stair #2 Existing & Extended to 10 Landings** | | | | | |
| A3080 | Masonry work Below 11" Slab | 5 | 5 | 12-Mar-18 | 16-Mar-18 |
| A3090 | Handrail Installation @ Existing Stair | 5 | 5 | 19-Mar-18 | 23-Mar-18 |
| A5680 | Field Measure for Stair #2 Fabrication 3rd Flr to Elevation 38' | 5 | 5 | 30-Mar-18 | 05-Apr-18 |
| A5690 | Fabrication of Stair #2 3rd flr to Elev 38' | 30 | 30 | 06-Apr-18 | 17-May-18 |
| A5670 | Install New Steel Stair from 3rd Floor to Roof | 5 | 5 | 18-May-18 | 24-May-18 |
| A5700 | Handrails with Pan Stair | 5 | 5 | 25-May-18 | 01-Jun-18 |
| A3100 | Paint | 3 | 3 | 04-Jun-18 | 06-Jun-18 |
| A3110 | MEP in Stairs | 5 | 5 | 07-Jun-18 | 13-Jun-18 |
| **Stair #4 2 Landings** | | | | | |
| A3130 | Concrete Stairs | 20 | 20 | 13-Nov-17 | 12-Dec-17 |
| A3140 | Remove Shoring | 7 | 7 | 13-Dec-17 | 21-Dec-17 |
| A3150 | Masonry work | 5 | 5 | 22-Dec-17 | 29-Dec-17 |
| A3160 | Handrail Installation | 4 | 4 | 02-Jan-18 | 05-Jan-18 |
| A3170 | Paint | 1 | 1 | 08-Jan-18 | 08-Jan-18 |
| A3180 | MEP in Stairs | 4 | 4 | 09-Jan-18 | 12-Jan-18 |
| **Stair #5 2 Landings** | | | | | |
| A3200 | Concrete Stairs | 15 | 15 | 13-Dec-17 | 04-Jan-18 |
| A3210 | Remove Shoring | 7 | 7 | 05-Jan-18 | 16-Jan-18 |
| A3220 | Masonry work | 5 | 5 | 17-Jan-18 | 23-Jan-18 |
| A3230 | Handrail Installation | 4 | 4 | 24-Jan-18 | 29-Jan-18 |
| A3240 | Paint | 1 | 1 | 30-Jan-18 | 30-Jan-18 |
| A3250 | MEP in Stairs | 4 | 4 | 31-Jan-18 | 05-Feb-18 |
| **Stair #6 1 Landing** | | | | | |
| A3260 | Concrete Stairs | 7 | 7 | 06-Dec-17 | 14-Dec-17 |
| A3270 | Remove Shoring | 2 | 2 | 15-Dec-17 | 18-Dec-17 |
| A3280 | Masonry work | 2 | 2 | 19-Dec-17 | 20-Dec-17 |
| A3290 | Handrail Installation | 2 | 2 | 21-Dec-17 | 22-Dec-17 |
| A3300 | Paint | 1 | 1 | 26-Dec-17 | 26-Dec-17 |
| A3310 | MEP in Stairs | 2 | 2 | 27-Dec-17 | 28-Dec-17 |
| **Stair #7 1 Landing** | | | | | |
| A3320 | Concrete Stairs | 5 | 5 | 06-Dec-17 | 12-Dec-17 |
| A3330 | Remove Formwork | 1 | 1 | 13-Dec-17 | 13-Dec-17 |
| A3340 | Masonry work | 1 | 1 | 14-Dec-17 | 14-Dec-17 |
| A3350 | Handrail Installation | 1 | 1 | 15-Dec-17 | 15-Dec-17 |
| A3360 | Paint | 1 | 1 | 18-Dec-17 | 18-Dec-17 |
| A3370 | MEP in Stairs | 1 | 1 | 19-Dec-17 | 19-Dec-17 |
| **Stair #8 2 Landings** | | | | | |
| A3380 | Concrete Stairs | 15 | 15 | 06-Dec-17 | 27-Dec-17 |
| A3390 | Remove Shoring | 7 | 7 | 28-Dec-17 | 08-Jan-18 |
| A3400 | Masonry work | 5 | 5 | 09-Jan-18 | 16-Jan-18 |
| A3410 | Handrail Installation | 4 | 4 | 17-Jan-18 | 22-Jan-18 |

| | Actual Level of Effort | Remaining Work | ◆ Milestone | Page 7 of 15 | TASK filter: All Activities | |
|---|---|---|---|---|---|---|
| | Actual Work | Critical Remaining Work | | | | © Oracle Corporation |

Schedule VIII- 7



| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A3420 | Paint | 1 | 1 | 23-Jan-18 | 23-Jan-18 |
| A3430 | MEP in Stairs | 4 | 4 | 24-Jan-18 | 29-Jan-18 |
| **Stair #9 1 Landing** | | | | | |
| A3440 | Concrete Stairs | 5 | 5 | 06-Dec-17 | 12-Dec-17 |
| A3450 | Remove Formwork | 1 | 1 | 13-Dec-17 | 13-Dec-17 |
| A3460 | Masonry work | 1 | 1 | 14-Dec-17 | 14-Dec-17 |
| A3470 | Handrail Installation | 1 | 1 | 15-Dec-17 | 15-Dec-17 |
| A3480 | Paint | 1 | 1 | 18-Dec-17 | 18-Dec-17 |
| A3490 | MEP in Stairs | 1 | 1 | 19-Dec-17 | 19-Dec-17 |
| **ELEVATOR & LULA** | | | | | |
| A3500 | Installation of Lula | 30 | 30 | 20-Mar-18 | 30-Apr-18 |
| A3510 | Survey Existing Elevator | 5 | 5 | 03-May-18 | 09-May-18 |
| A3520 | New Elevator in Existing Hoistway Installation | 45 | 45 | 10-May-18 | 13-Jul-18 |
| **INTERIOR** | | | | | |
| **Basement Bar/Lower Lounge/Kitchen (Speak Easy)** | | | | | |
| A2960 | Spray On Fire Proofing 1st floor | 3 | 3 | 12-Mar-18 | 14-Mar-18 |
| A3530 | Layout Walls | 5 | 5 | 15-Mar-18 | 21-Mar-18 |
| A5200 | Grease Trap Installation (includinf back fill and slab pour) | 10 | 10 | 22-Mar-18 | 04-Apr-18 |
| A3610 | Mechanical Ductwork in Ceiling | 15 | 15 | 22-Mar-18 | 11-Apr-18 |
| A3540 | Frame Walls | 5 | 5 | 05-Apr-18 | 11-Apr-18 |
| A3580 | Install Door Frames | 3 | 3 | 05-Apr-18 | 09-Apr-18 |
| A3600 | Electrical / Data / Fire Alarm Ceiling Rough | 10 | 10 | 12-Apr-18 | 25-Apr-18 |
| A3550 | Electrical / Fire Alarm / Wall Rough (Three inspections) | 7 | 7 | 12-Apr-18 | 20-Apr-18 |
| A3570 | Data / TV / Audio / Wall Rough | 7 | 7 | 12-Apr-18 | 20-Apr-18 |
| A3630 | Ceiling Framing | 5 | 5 | 12-Apr-18 | 18-Apr-18 |
| A3620 | Fire Protection and Plumbing Ceiing Rough | 10 | 10 | 12-Apr-18 | 25-Apr-18 |
| A3560 | Plumbing Wall Rough | 7 | 7 | 12-Apr-18 | 20-Apr-18 |
| A3760 | Install Sewer Pump | 5 | 5 | 12-Apr-18 | 18-Apr-18 |
| A3660 | Drywall Walls | 5 | 5 | 23-Apr-18 | 27-Apr-18 |
| A3680 | Tape and Finish Walls | 7 | 7 | 30-Apr-18 | 08-May-18 |
| A3700 | Tile 4 Bathrooms Full Height | 10 | 10 | 30-Apr-18 | 11-May-18 |
| A5820 | Install Ceiling Grid | 4 | 4 | 09-May-18 | 14-May-18 |
| A3720 | Bathroom Accessories & Partitions | 4 | 4 | 14-May-18 | 17-May-18 |
| A3640 | MEP Drops Cans in Ceiling Framing | 7 | 7 | 15-May-18 | 23-May-18 |
| A5840 | Plumbing Trim out in Bathrooms | 5 | 5 | 18-May-18 | 24-May-18 |
| A3670 | Drywall Ceilings | 5 | 5 | 24-May-18 | 31-May-18 |
| A3770 | Stone Flooring | 15 | 15 | 01-Jun-18 | 21-Jun-18 |
| A3690 | Tape and Finish Ceilings | 10 | 10 | 01-Jun-18 | 14-Jun-18 |
| A3800 | Painting of Walls and Ceilings | 10 | 10 | 15-Jun-18 | 28-Jun-18 |
| A3790 | Millwork Installation | 15 | 15 | 22-Jun-18 | 13-Jul-18 |
| A6220 | Install Doors and Hardware | 5 | 5 | 22-Jun-18 | 28-Jun-18 |
| A5830 | Install Ceiling Panels | 5 | 5 | 22-Jun-18 | 28-Jun-18 |
| A3740 | BOH Equipment | 10 | 10 | 22-Jun-18 | 06-Jul-18 |

Greystone Hotel GMP/Baseline 1.6 Update 09/18/17    Classic Schedule Layout    20-Sep-17

- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- ◆ Milestone

Page 8 of 15    TASK filter: All Activities    © Oracle Corporation

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | Greystone Hotel GMP/Baseline 1.5 Update 09/18/17 | | | | Classic Schedule Layout | 20-Sep-17 |
| A3750 | Coolers/Freezer Installation (by Other) | 10 | 10 | 22-Jun-18 | 06-Jul-18 |
| A3810 | Kitchen Equipment Installation | 10 | 10 | 22-Jun-18 | 06-Jul-18 |
| A3840 | Handrails at Lounge | 5 | 5 | 29-Jun-18 | 06-Jul-18 |
| A3830 | Mirrors on the Walls | 5 | 5 | 29-Jun-18 | 06-Jul-18 |
| A3820 | MEP Trim Out of Ceilings | 10 | 10 | 29-Jun-18 | 13-Jul-18 |
| A3850 | Furniture By Owner | 7 | 7 | 16-Jul-18 | 24-Jul-18 |

### Elevation 0' - Lobby

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A5800 | Spray On Fire Proofing 2nd Floor | 3 | 3 | 15-Mar-18 | 19-Mar-18 |
| A5790 | Layout Walls | 5 | 5 | 20-Mar-18 | 26-Mar-18 |
| A6170 | Install Steel for Won Door | 5 | 5 | 27-Mar-18 | 02-Apr-18 |
| A6260 | Restor Historic Rails at Stair #2 | 5 | 5 | 27-Mar-18 | 02-Apr-18 |
| A5850 | Mechanical Ductwork in Ceiling | 10 | 10 | 27-Mar-18 | 09-Apr-18 |
| A3650 | Won Door Track & Rough In | 5 | 5 | 03-Apr-18 | 09-Apr-18 |
| A5870 | Frame Walls | 5 | 5 | 03-Apr-18 | 09-Apr-18 |
| A5880 | Install Door Frames | 3 | 3 | 03-Apr-18 | 05-Apr-18 |
| A5890 | Electrical / Fire Alarm / Wall Rough | 7 | 7 | 10-Apr-18 | 18-Apr-18 |
| A5910 | Data / TV / Audio / Wall Rough | 7 | 7 | 10-Apr-18 | 18-Apr-18 |
| A5920 | Electrical / Data / Fire Alarm Ceiling Rough | 10 | 10 | 10-Apr-18 | 23-Apr-18 |
| A5940 | Ceiling Framing | 5 | 5 | 10-Apr-18 | 16-Apr-18 |
| A5930 | Fire Protection and Plumbing Ceiling Rough | 10 | 10 | 10-Apr-18 | 23-Apr-18 |
| A6280 | Above Celing Plumbing Rough | 5 | 5 | 10-Apr-18 | 16-Apr-18 |
| A6010 | MEP Drops Cans in Ceiling Framing | 5 | 5 | 17-Apr-18 | 23-Apr-18 |
| A5960 | Cement Board and Plywood Walls | 5 | 5 | 19-Apr-18 | 25-Apr-18 |
| A6030 | Cement Board Ceilings | 5 | 5 | 24-Apr-18 | 30-Apr-18 |
| A6040 | Plaster Ceilings | 15 | 15 | 01-May-18 | 21-May-18 |
| A3780 | New Terrazzo | 10 | 10 | 22-May-18 | 05-Jun-18 |
| A6210 | Keystone Wainscoat & Wall Base | 5 | 5 | 06-Jun-18 | 12-Jun-18 |
| A5970 | Plaster Walls | 15 | 15 | 13-Jun-18 | 03-Jul-18 |
| A6230 | Install Historic Adaptation (Glass) | 5 | 5 | 05-Jul-18 | 11-Jul-18 |
| A6090 | Millwork Installation | 15 | 15 | 05-Jul-18 | 25-Jul-18 |
| A6120 | Painting of Walls and Ceilings | 10 | 10 | 05-Jul-18 | 18-Jul-18 |
| A6270 | Final Polish and Restoration of Terrazzo Floors | 5 | 5 | 05-Jul-18 | 11-Jul-18 |
| A6130 | MEP Trim Out of Ceilings | 10 | 10 | 10-Jul-18 | 23-Jul-18 |
| A6240 | Install Linear Diffusers | 5 | 5 | 10-Jul-18 | 16-Jul-18 |
| A3710 | Restore Terrazzo Steps | 5 | 5 | 12-Jul-18 | 18-Jul-18 |
| A6160 | Furniture By Owner | 7 | 7 | 26-Jul-18 | 03-Aug-18 |

### Elevation 0' - Lower Restaurant/Lower Bar/Finishing Kitchen

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A6290 | Spray On Fire Proofing 1st floor | 3 | 3 | 15-Mar-18 | 19-Mar-18 |
| A6300 | Layout Walls | 5 | 5 | 20-Mar-18 | 26-Mar-18 |
| A6310 | Mechanical Ductwork in Ceiling | 15 | 15 | 27-Mar-18 | 16-Apr-18 |
| A6330 | Frame Walls | 5 | 5 | 10-Apr-18 | 16-Apr-18 |
| A6340 | Install Door Frames | 3 | 3 | 10-Apr-18 | 12-Apr-18 |
| A6360 | Plumbing Wall Rough | 7 | 7 | 12-Apr-18 | 20-Apr-18 |
| A6350 | Electrical / Fire Alarm / Wall Rough (Three inspections) | 7 | 7 | 13-Apr-18 | 23-Apr-18 |

| Legend | |
|---|---|
| Actual Level of Effort | Remaining Work |
| Actual Work | Critical Remaining Work |
| ◆ Milestone | |

TASK filter: All Activities

© Oracle Corporation

Schedule VIII- 9

WEIL:\96218278\17\63946.0005

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | Greystone Hotel GMP/Baseline 1.5 Update 09/18/17 | | | Classic Schedule Layout | 20-Sep-17 |
| A6370 | Data / TV / Audio / Wall Rough | 7 | 7 | 13-Apr-18 | 23-Apr-18 |
| A6390 | Fire Protection and Plumbing Ceiling Rough | 10 | 10 | 13-Apr-18 | 26-Apr-18 |
| A6180 | Install Won Door Rough | 3 | 3 | 17-Apr-18 | 19-Apr-18 |
| A6380 | Electrical / Data / Fire Alarm Ceiling Rough | 10 | 10 | 17-Apr-18 | 30-Apr-18 |
| A6400 | Ceiling Framing | 5 | 5 | 17-Apr-18 | 23-Apr-18 |
| A6410 | Install Sewer Pump | 5 | 5 | 17-Apr-18 | 23-Apr-18 |
| A6420 | Drywall Walls | 5 | 5 | 24-Apr-18 | 30-Apr-18 |
| A6430 | Tape and Finish Walls | 7 | 7 | 01-May-18 | 09-May-18 |
| A6450 | Install Ceiling Grid | 4 | 4 | 10-May-18 | 15-May-18 |
| A6470 | MEP Drops Cans in Ceiling Framing | 7 | 7 | 16-May-18 | 24-May-18 |
| A6490 | Drywall Ceilings | 5 | 5 | 25-May-18 | 01-Jun-18 |
| A6510 | Stone Flooring | 15 | 15 | 04-Jun-18 | 22-Jun-18 |
| A6500 | Tape and Finish Ceilings | 10 | 10 | 04-Jun-18 | 15-Jun-18 |
| A6520 | Painting of Walls and Ceilings | 10 | 10 | 18-Jun-18 | 29-Jun-18 |
| A6550 | Millwork Installation | 15 | 15 | 25-Jun-18 | 16-Jul-18 |
| A6560 | Install Doors and Hardware | 5 | 5 | 25-Jun-18 | 29-Jun-18 |
| A6590 | MEP Trim Out of Ceilings | 10 | 10 | 25-Jun-18 | 09-Jul-18 |
| A6610 | Handrails at Lounge | 5 | 5 | 02-Jul-18 | 09-Jul-18 |
| A6600 | Mirrors on the Walls | 5 | 5 | 02-Jul-18 | 09-Jul-18 |
| A6630 | Install WON Door itself | 3 | 3 | 02-Jul-18 | 05-Jul-18 |
| A6920 | Finishing Kitchen Equipment Installation | 10 | 10 | 02-Jul-18 | 16-Jul-18 |
| A6640 | Bar Plumbing Trim | 5 | 5 | 17-Jul-18 | 23-Jul-18 |
| A6620 | Furniture By Owner | 7 | 7 | 17-Jul-18 | 25-Jul-18 |
| **Elevation 4'-6" Upper Bar/Upper Lounge/Pantry & Dishwashing** | | | | | |
| A6650 | Spray On Fire Proofing 1st floor | 3 | 3 | 15-Mar-18 | 19-Mar-18 |
| A6660 | Layout Walls | 5 | 5 | 20-Mar-18 | 26-Mar-18 |
| A6670 | Mechanical Ductwork in Ceiling | 15 | 15 | 27-Mar-18 | 16-Apr-18 |
| A6690 | Frame Walls | 5 | 5 | 10-Apr-18 | 16-Apr-18 |
| A6700 | Install Door Frames | 3 | 3 | 10-Apr-18 | 12-Apr-18 |
| A6720 | Plumbing Wall Rough | 7 | 7 | 12-Apr-18 | 20-Apr-18 |
| A6710 | Electrical / Fire Alarm / Wall Rough (Three inspections) | 7 | 7 | 13-Apr-18 | 23-Apr-18 |
| A6730 | Data / TV / Audio / Wall Rough | 7 | 7 | 13-Apr-18 | 23-Apr-18 |
| A6740 | Electrical / Data / Fire Alarm Ceiling Rough | 10 | 10 | 13-Apr-18 | 26-Apr-18 |
| A6750 | Fire Protection and Plumbing Ceiling Rough | 10 | 10 | 13-Apr-18 | 26-Apr-18 |
| A6760 | Ceiling Framing | 5 | 5 | 17-Apr-18 | 23-Apr-18 |
| A6780 | Drywall Walls | 5 | 5 | 24-Apr-18 | 30-Apr-18 |
| A6790 | Tape and Finish Walls | 7 | 7 | 01-May-18 | 09-May-18 |
| A6800 | Tile 4 Bathrooms Full Height | 10 | 10 | 01-May-18 | 14-May-18 |
| A6810 | Install Ceiling Grid | 4 | 4 | 10-May-18 | 15-May-18 |
| A6820 | Bathroom Accessories & Partitions | 4 | 4 | 15-May-18 | 18-May-18 |
| A6830 | MEP Drops Cans in Ceiling Framing | 7 | 7 | 16-May-18 | 24-May-18 |
| A6840 | Plumbing Trim out in Bathrooms | 5 | 5 | 21-May-18 | 25-May-18 |
| A6850 | Drywall Ceilings | 5 | 5 | 25-May-18 | 01-Jun-18 |
| A6860 | Tape and Finish Ceilings | 10 | 10 | 04-Jun-18 | 15-Jun-18 |
| A6870 | Stone Flooring | 15 | 15 | 18-Jun-18 | 09-Jul-18 |
| A6880 | Painting of Walls and Ceilings | 10 | 10 | 25-Jun-18 | 09-Jul-18 |

Actual Level of Effort | Remaining Work | ◆ Milestone
Actual Work | Critical Remaining Work

Page 10 of 15 | TASK filter: All Activities | © Oracle Corporation

WEIL:\96218278\17\63946.0005

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | Greystone Hotel GMP/Baseline 1.5 Update 09/18/17 | | | Classic Schedule Layout | 20-Sep-17 |
| A6900 | Dishwasher equipment and pantry (by Owner) | 10 | 10 | 28-Jun-18 | 12-Jul-18 |
| A6890 | BOH Equipment | 10 | 10 | 28-Jun-18 | 12-Jul-18 |
| A6910 | Millwork Installation | 15 | 15 | 02-Jul-18 | 23-Jul-18 |
| A6950 | MEP Trim Out of Ceilings | 10 | 10 | 02-Jul-18 | 16-Jul-18 |
| A6970 | Handrails at Lounge | 5 | 5 | 10-Jul-18 | 16-Jul-18 |
| A6960 | Mirrors on the Walls | 5 | 5 | 10-Jul-18 | 16-Jul-18 |
| A6940 | Install Doors and Hardware | 5 | 5 | 10-Jul-18 | 16-Jul-18 |
| A6980 | Furniture By Owner | 7 | 7 | 24-Jul-18 | 01-Aug-18 |
| **2nd Floor Guest Rooms** | | | | | |
| A2980 | Spray On Fire Proofing 2nd Floor | 2 | 2 | 20-Mar-18 | 21-Mar-18 |
| A3860 | Layout Walls | 3 | 3 | 22-Mar-18 | 26-Mar-18 |
| A3930 | Electrical Ceiling Rough | 10 | 10 | 27-Mar-18 | 09-Apr-18 |
| A3870 | Frame Walls | 10 | 10 | 27-Mar-18 | 09-Apr-18 |
| A3960 | Install Door Frames | 3 | 3 | 27-Mar-18 | 29-Mar-18 |
| A3980 | Fire Protection Ceiling Rough | 10 | 10 | 27-Mar-18 | 09-Apr-18 |
| A3920 | Mechanical Ceiling Rough (FCUs) | 10 | 10 | 27-Mar-18 | 09-Apr-18 |
| A3970 | Mechanical Exhaust Duct Rough | 10 | 10 | 27-Mar-18 | 09-Apr-18 |
| A3940 | Install Rippers & Ceiling Framing | 10 | 10 | 04-Apr-18 | 17-Apr-18 |
| A3880 | Electrical & Fire Alarm Rough | 10 | 10 | 10-Apr-18 | 23-Apr-18 |
| A3890 | Data and TV Wall Rough | 10 | 10 | 10-Apr-18 | 23-Apr-18 |
| A3990 | Build out of Main Electrical Room | 10 | 10 | 10-Apr-18 | 23-Apr-18 |
| A4060 | Install Shower Pans | 11 | 11 | 10-Apr-18 | 24-Apr-18 |
| A3900 | Plumbing Wall Rough | 10 | 10 | 10-Apr-18 | 23-Apr-18 |
| A4010 | Install Tubs | 3 | 3 | 10-Apr-18 | 12-Apr-18 |
| A3910 | Mechanical Wall Rough (T-Stats) | 3 | 3 | 10-Apr-18 | 12-Apr-18 |
| A3950 | Electrical Cans in Ceilings | 10 | 10 | 18-Apr-18 | 01-May-18 |
| A4000 | Fire Protection Drops | 5 | 5 | 18-Apr-18 | 24-Apr-18 |
| A4200 | MEP Trimout in Hallway | 4 | 4 | 24-Apr-18 | 27-Apr-18 |
| A4020 | Drywall Walls | 14 | 14 | 24-Apr-18 | 11-May-18 |
| A4030 | Drywall Ceilings | 14 | 14 | 02-May-18 | 21-May-18 |
| A4040 | Tape and Finish Walls | 14 | 14 | 02-May-18 | 21-May-18 |
| A4090 | Install Wood Base in Rooms | 10 | 10 | 22-May-18 | 05-Jun-18 |
| A4050 | Tape and Finish Ceilings | 10 | 10 | 22-May-18 | 05-Jun-18 |
| A4080 | Tile Bathroom Full height | 15 | 15 | 04-Jun-18 | 22-Jun-18 |
| A4070 | Wood Trim in Hallways | 10 | 10 | 06-Jun-18 | 19-Jun-18 |
| A4110 | Glass at Shower enclosures | 10 | 10 | 25-Jun-18 | 09-Jul-18 |
| A4100 | Paint Walls and Ceilings | 10 | 10 | 25-Jun-18 | 09-Jul-18 |
| A4190 | Bathroom Accessories installation | 7 | 7 | 25-Jun-18 | 03-Jul-18 |
| A4180 | Install Headboard and Millwork Cabinets | 10 | 10 | 05-Jul-18 | 18-Jul-18 |
| A4170 | Install Curtain/Mirrors | 5 | 5 | 10-Jul-18 | 16-Jul-18 |
| A4210 | Install Doors and Hardware | 7 | 7 | 10-Jul-18 | 18-Jul-18 |
| A4140 | Electrical Wall and Ceiling Trim Out | 7 | 7 | 10-Jul-18 | 18-Jul-18 |
| A4150 | Fire Alarm Trim Out | 7 | 7 | 10-Jul-18 | 18-Jul-18 |
| A4160 | Carpet Installation in Rooms | 7 | 7 | 10-Jul-18 | 18-Jul-18 |
| A4130 | Fire Protection Trim out | 7 | 7 | 10-Jul-18 | 18-Jul-18 |
| A4120 | Plumbing Trim out | 7 | 7 | 10-Jul-18 | 18-Jul-18 |

| Legend | |
|---|---|
| Actual Level of Effort | Remaining Work |
| Actual Work | Critical Remaining Work |
| ◆ Milestone | |

Page 11 of 15

TASK filter: All Activities

© Oracle Corporation

Schedule VIII- 11

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | Greystone Hotel GMP/Baseline 1.6 Update 09/18/17 | | | Classic Schedule Layout | 20-Sep-17 |
| A4220 | Carpet Installation in Hallway | 1 | 1 | 19-Jul-18 | 19-Jul-18 |
| A4230 | Signage Installation | 1 | 1 | 19-Jul-18 | 19-Jul-18 |
| **3rd Floor Guest Rooms** | | | | | |
| A6990 | Spray On Fire Proofing 3rd Floor | 2 | 2 | 13-Mar-18 | 14-Mar-18 |
| A7000 | Layout Walls | 3 | 3 | 15-Mar-18 | 19-Mar-18 |
| A7030 | Electrical Ceiling Rough | 10 | 10 | 20-Mar-18 | 02-Apr-18 |
| A7010 | Frame Walls | 10 | 10 | 20-Mar-18 | 02-Apr-18 |
| A7040 | Install Door Frames | 3 | 3 | 20-Mar-18 | 22-Mar-18 |
| A7060 | Fire Protection Ceiling Rough | 10 | 10 | 20-Mar-18 | 02-Apr-18 |
| A7020 | Mechanical Ceiling Rough (FCUs) | 10 | 10 | 20-Mar-18 | 02-Apr-18 |
| A7050 | Mechanical Exhaust Duct Rough | 10 | 10 | 20-Mar-18 | 02-Apr-18 |
| A7070 | Install Rippers & Ceiling Framing | 10 | 10 | 28-Mar-18 | 10-Apr-18 |
| A7080 | Electrical & Fire Alarm Rough | 10 | 10 | 03-Apr-18 | 16-Apr-18 |
| A7090 | Data and TV Wall Rough | 10 | 10 | 03-Apr-18 | 16-Apr-18 |
| A7120 | Build out of Main Electrical Room | 10 | 10 | 03-Apr-18 | 16-Apr-18 |
| A7100 | Plumbing Wall Rough | 10 | 10 | 03-Apr-18 | 16-Apr-18 |
| A7130 | Install Tubs | 3 | 3 | 03-Apr-18 | 05-Apr-18 |
| A7140 | Install Shower Pans | 11 | 11 | 03-Apr-18 | 17-Apr-18 |
| A7110 | Mechanical Wall Rough (T-Stats) | 3 | 3 | 03-Apr-18 | 05-Apr-18 |
| A7150 | Electrical Cans in Ceilings | 10 | 10 | 11-Apr-18 | 24-Apr-18 |
| A7160 | Fire Protection Drops | 5 | 5 | 11-Apr-18 | 17-Apr-18 |
| A7180 | MEP Trimout in Hallway | 4 | 4 | 17-Apr-18 | 20-Apr-18 |
| A7170 | Drywall Walls | 14 | 14 | 17-Apr-18 | 04-May-18 |
| A7190 | Drywall Ceilings | 14 | 14 | 25-Apr-18 | 14-May-18 |
| A7200 | Tape and Finish Walls | 14 | 14 | 02-May-18 | 21-May-18 |
| A7210 | Tape and Finish Ceilings | 10 | 10 | 15-May-18 | 29-May-18 |
| A7220 | Install Wood Base in Rooms | 10 | 10 | 22-May-18 | 05-Jun-18 |
| A7230 | Tile Bathroom Full height | 15 | 15 | 25-May-18 | 15-Jun-18 |
| A7240 | Wood Trim in Hallways | 10 | 10 | 30-May-18 | 12-Jun-18 |
| A7260 | Glass at Shower enclosures | 10 | 10 | 18-Jun-18 | 29-Jun-18 |
| A7250 | Paint Walls and Ceilings | 10 | 10 | 18-Jun-18 | 29-Jun-18 |
| A7270 | Bathroom Accessories Installation | 7 | 7 | 18-Jun-18 | 26-Jun-18 |
| A7280 | Install Headboard and Millwork Cabinets | 10 | 10 | 27-Jun-18 | 11-Jul-18 |
| A7340 | Install Curtain/Mirrors | 5 | 5 | 02-Jul-18 | 09-Jul-18 |
| A7350 | Install Doors and Hardware | 7 | 7 | 02-Jul-18 | 11-Jul-18 |
| A7310 | Electrical Wall and Ceiling Trim Out | 7 | 7 | 02-Jul-18 | 11-Jul-18 |
| A7320 | Fire Alarm Trim Out | 7 | 7 | 02-Jul-18 | 11-Jul-18 |
| A7330 | Carpet Installation in Rooms | 7 | 7 | 02-Jul-18 | 11-Jul-18 |
| A7300 | Fire Protection Trim out | 7 | 7 | 02-Jul-18 | 11-Jul-18 |
| A7290 | Plumbing Trim out | 7 | 7 | 02-Jul-18 | 11-Jul-18 |
| A7360 | Carpet Installation in Hallway | 1 | 1 | 12-Jul-18 | 12-Jul-18 |
| A7370 | Signage Installation | 1 | 1 | 12-Jul-18 | 12-Jul-18 |
| **EXTERIOR** | | | | | |
| **Pool Deck** | | | | | |

Actual Level of Effort | Remaining Work | ◆ Milestone
Actual Work | Critical Remaining Work

Page 12 of 15

TASK filter: All Activities

© Oracle Corporation

Schedule VIII- 12

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | Greystone Hotel GMP/Baseline 1.5 Update 09/18/17 | | | Classic Schedule Layout | 20-Sep-17 |
| A8250 | Cure Time for 6" Slab to receive "Hot" applied waterproofing | 20 | 20 | 23-Apr-18 | 18-May-16 |
| A4880 | Layout | 3 | 3 | 23-Apr-18 | 25-Apr-18 |
| A4900 | Masonry Walls at Pool Deck Level | 7 | 7 | 26-Apr-18 | 04-May-16 |
| A4890 | Electrical Rough in at planter walls prior to secondary pours | 5 | 5 | 26-Apr-18 | 02-May-18 |
| A4930 | MEP Wall Rough | 3 | 3 | 26-Apr-18 | 30-Apr-18 |
| A4970 | Install Pool | 20 | 20 | 26-Apr-18 | 23-May-18 |
| A4950 | Fly In Mech Equip into Mech Area | 3 | 3 | 26-Apr-18 | 30-Apr-18 |
| A4920 | Bathroom Walls | 3 | 3 | 30-Apr-18 | 02-May-18 |
| A5070 | Pool Equipment | 10 | 10 | 01-May-18 | 14-May-18 |
| A4960 | Stucco CMU and Concrete Walls at Pool Deck | 10 | 10 | 07-May-18 | 18-May-18 |
| A5020 | Waterproofing Roof Deck | 10 | 10 | 21-May-18 | 04-Jun-18 |
| A5000 | Bathroom Tiles | 8 | 8 | 21-May-18 | 31-May-18 |
| A5040 | MEP Trim Out at Bathrooms | 8 | 8 | 01-Jun-18 | 12-Jun-18 |
| A5010 | Painting of Walls | 5 | 5 | 01-Jun-18 | 07-Jun-18 |
| A5090 | Keystone Paving at Pool Deck | 15 | 15 | 05-Jun-18 | 25-Jun-18 |
| A5060 | Install Doors and Hardware | 2 | 2 | 05-Jun-18 | 06-Jun-18 |
| A5100 | Handrails at Ramps and Stairs | 6 | 6 | 08-Jun-18 | 19-Jun-18 |
| A5110 | Benches | 10 | 10 | 08-Jun-18 | 21-Jun-18 |
| A5150 | Stair Canopy | 5 | 5 | 08-Jun-18 | 14-Jun-18 |
| A5140 | Floating Bar & Day Beds by Owner | 5 | 5 | 08-Jun-18 | 14-Jun-18 |
| A4940 | Roof Deck Lighting | 5 | 5 | 26-Jun-18 | 02-Jul-18 |
| A5120 | Plumbing Drain Trim Out | 5 | 5 | 26-Jun-18 | 02-Jul-18 |
| A4910 | Install Planters | 5 | 5 | 26-Jun-18 | 02-Jul-18 |
| A5050 | Stone Cladding at Planter Walls | 15 | 15 | 03-Jul-18 | 24-Jul-18 |
| A4990 | Waterproof Planters | 7 | 7 | 03-Jul-18 | 12-Jul-18 |
| A4980 | Install Planter Drains | 7 | 7 | 03-Jul-18 | 12-Jul-18 |
| A5030 | Load Planters with Soil and Larger of the Trees | 7 | 7 | 13-Jul-18 | 23-Jul-18 |
| A5080 | 1" Stone Caps at Planters | 5 | 5 | 25-Jul-18 | 31-Jul-18 |
| A5130 | Complete Small Landscape Items | 4 | 4 | 26-Jul-18 | 31-Jul-18 |
| **Envelope** | | | | | |
| A4630 | Demolition of Exterior Elements | 10 | 10 | 18-Sep-17 | 29-Sep-17 |
| A4680 | Demo Opening for Future New Window | 5 | 5 | 02-Oct-17 | 06-Oct-17 |
| A7400 | Close in Access Openings | 10 | 10 | 17-Nov-17 | 04-Dec-17 |
| A4720 | Glass Block Installation | 10 | 10 | 12-Jan-18 | 26-Jan-18 |
| A4730 | Exterior Doors/Flood Doors and Louvers | 15 | 15 | 26-Feb-18 | 16-Mar-18 |
| A4800 | Install Railings at Roof Level | 10 | 10 | 26-Feb-18 | 09-Mar-18 |
| A4840 | Install Rolling Door | 5 | 5 | 26-Feb-18 | 02-Mar-18 |
| A5560 | Cure Time for 11" Slab & Stem Walls | 20 | 20 | 05-Mar-18 | 30-Mar-18 |
| A7380 | Erect Scaffold around Exterior of Building | 10 | 10 | 12-Mar-18 | 23-Mar-18 |
| A4710 | Window Installation | 20 | 20 | 13-Mar-18 | 09-Apr-18 |
| A4700 | Concrete Eyebrow Restoration / Waterproofing | 10 | 10 | 26-Mar-18 | 06-Apr-18 |
| A7390 | Scaffold Rental Period | 35 | 35 | 26-Mar-18 | 11-May-18 |
| A7430 | Restore Existing Metal Flag Poles | 15 | 15 | 27-Mar-18 | 16-Apr-18 |
| A4740 | 11" Slab Deck Waterproof Under Elevation 36-9 Area | 4 | 4 | 02-Apr-18 | 05-Apr-18 |
| A5550 | Roofing Mechanical Area | 10 | 10 | 02-Apr-18 | 13-Apr-18 |
| A4770 | Caulking at Windows Doors and Louvers | 10 | 10 | 03-Apr-18 | 16-Apr-18 |

Legend: Actual Level of Effort — Remaining Work ◆ Milestone / Actual Work — Critical Remaining Work

Page 13 of 15

TASK filter: All Activities

© Oracle Corporation

Schedule VIII- 13



| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| A4750 | Waterproofing Parapets etc.. | 10 | 10 | 06-Apr-18 | 19-Apr-18 |
| A5630 | 11" Slab Deck Waterproof Under Elevation 38 Area | 4 | 4 | 06-Apr-18 | 11-Apr-18 |
| A4760 | Restore Stucco | 20 | 20 | 17-Apr-18 | 14-May-18 |
| A4780 | New Stucco | 20 | 20 | 17-Apr-18 | 14-May-18 |
| A4790 | Dry In | 0 | 0 | 19-Apr-18 | |
| A7410 | Remove Scaffold | 10 | 10 | 14-May-18 | 25-May-18 |
| A7420 | Stucco Cure for Painting | 5 | 5 | 15-May-18 | 21-May-18 |
| A4810 | Paint Exterior Walls | 10 | 10 | 22-May-18 | 05-Jun-18 |
| A4820 | Install Flood Panels | 10 | 10 | 06-Jun-18 | 19-Jun-18 |
| A4870 | Install Exterior "Greystone" Sign | 5 | 5 | 06-Jun-18 | 12-Jun-18 |
| **Civil & Landscaping** | | | | | |
| A5170 | Mobilization of Underground Crews | 3 | 3 | 02-Oct-17 | 04-Oct-17 |
| A5190 | Water/Sewer/Irrigation/Fire Line on 20th St | 15 | 15 | 05-Oct-17 | 25-Oct-17 |
| A5160 | Drainage Well Installation | 10 | 10 | 05-Oct-17 | 18-Oct-17 |
| A5230 | B.F.P/R.P.Z.D.D.C.V. Installation | 10 | 10 | 26-Oct-17 | 08-Nov-17 |
| A5260 | Water/Sewer/Irrigation/Fire Line in West Alley | 15 | 15 | 26-Oct-17 | 15-Nov-17 |
| A7440 | MDWASA Conveyance Package | 50 | 50 | 16-Nov-17 | 31-Jan-18 |
| A7450 | Water Meter Installation | 1 | 1 | 01-Feb-18 | 01-Feb-18 |
| A5180 | Grade Around Building | 3 | 3 | 29-May-18 | 31-May-18 |
| A5210 | Exterior Lighting | 10 | 10 | 01-Jun-18 | 14-Jun-18 |
| A5220 | Asphalt on 20th Street | 4 | 4 | 01-Jun-18 | 06-Jun-18 |
| A5240 | Site Concrete & Ramps | 15 | 15 | 01-Jun-18 | 21-Jun-18 |
| A4850 | Railings at ground level | 3 | 3 | 22-Jun-18 | 26-Jun-18 |
| A5250 | Landscape Large Plants | 7 | 7 | 22-Jun-18 | 02-Jul-18 |
| A4650 | Complete Landscaping | 7 | 7 | 22-Jun-18 | 02-Jul-18 |
| A5270 | Keystone Paving | 10 | 10 | 03-Jul-18 | 17-Jul-18 |
| **FINAL INSPECTIONS** | | | | | |
| A5310 | Final Inspections Hotel Rooms | 15 | 15 | 20-Jul-18 | 09-Aug-18 |
| A5300 | Final Inspections Speak easy, Lobby and Restaurant | 15 | 15 | 25-Jul-18 | 14-Aug-18 |
| A5290 | Final Inspections Pool Deck | 15 | 15 | 01-Aug-18 | 21-Aug-18 |
| A4660 | C of O for the Project | 10 | 10 | 22-Aug-18 | 05-Sep-18 |
| **HOTEL OPENING** | | | | | |
| A5350 | Room FF&E Installation | 25 | 25 | 10-Aug-18 | 14-Sep-18 |
| A5330 | Lobby Level FF&E Installation | 15 | 15 | 15-Aug-18 | 05-Sep-18 |
| A5340 | Operations Training | 15 | 15 | 06-Sep-18 | 26-Sep-18 |
| A5360 | Soft Opening | 1 | 1 | 27-Sep-18 | 27-Sep-18 |
| A5370 | Final Prep for Grand Opening | 10 | 10 | 28-Sep-18 | 11-Oct-18 |
| A5380 | Grand Opening | 1 | 1 | 12-Oct-18 | 12-Oct-18 |
| **No 1-PROJECT STRUCTURE - LEVEL 1** | | | | | |
| **Foundation** | | | | | |

Legend:
- ■ Actual Level of Effort
- ■ Remaining Work
- ◆ Milestone
- ■ Actual Work
- ■ Critical Remaining Work

Greystone Hotel GMP/Baseline 1.5 Update 09/18/17   Classic Schedule Layout   20-Sep-17

Page 14 of 15        TASK filter: All Activities        © Oracle Corporation

WEIL:\96218278\17\63946.0005



WEIL:\96218278\17\63946.0005

# SANTA BARBARA HOTEL
## PRELIMINARY CONSTRUCTION SCHEDULE



| | Activity Name | Duration (Days) | Start Date | Finish Date |
|---|---|---|---|---|
| 1 | Contract / GC | 300.00 | 11/6/17 | 12/28/18 |
| 2 | Commence Construction / NOC | 1.00 | 11/6/17 | 11/6/17 |
| 3 | Construction Team Mobilization | 10.00 | 11/6/17 | 11/17/17 |
| 4 | Building Construction | 270.00 | 11/20/17 | 11/30/18 |
| 5 | Site/Courtyard Selective Demolition | 7.00 | 11/20/17 | 11/28/17 |
| 6 | Interior Demolition - Soft Demo -2 Floors | 16.00 | 11/17/17 | 12/8/17 |
| 7 | Building Demolition - Rear - Hand Demo | 25.00 | 12/1/17 | 1/4/18 |
| 8 | Shoring/Bracing - Steel Fabrication | 24.00 | 12/11/17 | 1/11/18 |
| 9 | Historic Bldg-Gr Fl, 2nd Fl & Roof Demo | 15.00 | 1/2/18 | 1/22/18 |
| 10 | Auger Cast & Helical Piling Installation | 25.00 | 1/22/18 | 2/23/18 |
| 11 | Concrete Shell - Pile Caps | 10.00 | 2/5/18 | 2/16/18 |
| 12 | Concrete Shell - Gr Fl Slab / Walls / Columns | 15.00 | 2/19/18 | 3/9/18 |
| 13 | Waterproofing Ground Floor Slab & Beams | 3.00 | 3/12/18 | 3/14/18 |
| 14 | Concrete Shell - 2nd Fl Beams/Slab/ Walls/Cols | 15.00 | 3/12/18 | 3/30/18 |
| 15 | Concrete Shell - 3rd Fl Beams/Slab/ Walls/Cols | 15.00 | 4/2/18 | 4/20/18 |
| 16 | Shoring / Bracing Removal | 10.00 | 4/23/18 | 5/4/18 |
| 17 | Concrete Shell - 4th Fl Bms/Slab/Walls/Cols | 10.00 | 5/1/18 | 5/14/18 |
| 18 | Concrete Shell - 5th Fl Bms/Slab/Walls/Cols | 10.00 | 5/14/18 | 5/25/18 |
| 19 | Concrete Shell - Roof Bms/Slab/Walls/Cols | 10.00 | 5/28/18 | 6/8/18 |
| 20 | Underground & Slab Rough Sewer & Water | 10.00 | 1/8/18 | 1/19/18 |
| 21 | Underground & Slab Rough Electric | 66.00 | 1/9/18 | 4/10/18 |
| 22 | Interior Framing 1st - 5th Floor | 40.00 | 6/4/18 | 7/27/18 |
| 23 | Plumbing Rough 1st - 5th Floor | 30.00 | 5/2/18 | 6/12/18 |
| 24 | Electrical Rough 1st - 5th Floor | 30.00 | 5/2/18 | 6/12/18 |
| 25 | Mechanical Rough 1st - 5th Floor | 30.00 | 5/7/18 | 6/15/18 |
| 26 | Site Work Ground Floor | 10.00 | 1/8/18 | 1/19/18 |
| 27 | HM Door Frame Installation | 60.00 | 3/26/18 | 6/15/18 |

**A.V.I. CONTRACTORS, INC.**

Schedule VIII- 16

WEIL:\96218278\17\63946.0005

# SANTA BARBARA HOTEL
## PRELIMINARY CONSTRUCTION SCHEDULE

| | Activity Name | Duration (Days) | Start Date | Finish Date | 2017 | | 2018 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
| 28 | Window Installation | 25.00 | 7/5/18 | 8/8/18 | | | | | | | | | ▬ | ▬ | | | | |
| 29 | Roofing System | 15.00 | 6/26/18 | 7/16/18 | | | | | | | | ▬ | ▬ | | | | | |
| 30 | Exterior Stucco | 20.00 | 7/19/18 | 8/15/18 | | | | | | | | | ▬ | ▬ | | | | |
| 31 | Elevator Installation | 20.00 | 7/9/18 | 8/3/18 | | | | | | | | | ▬ | | | | | |
| 32 | Drywall Installation & Finishing | 30.00 | 8/6/18 | 9/14/18 | | | | | | | | | | ▬ | ▬ | | | |
| 33 | Painting First Coat | 15.00 | 9/4/18 | 9/24/18 | | | | | | | | | | | ▬ | | | |
| 34 | Tile Flooring & Walls | 50.00 | 8/6/18 | 10/12/18 | | | | | | | | | | ▬ | ▬ | ▬ | | |
| 35 | Millwork & Countertops | 5.00 | 9/24/18 | 9/28/18 | | | | | | | | | | | ▬ | | | |
| 36 | Mechanical / Electrical / Plumbing Trim | 25.00 | 9/24/18 | 10/26/18 | | | | | | | | | | | ▬ | ▬ | | |
| 37 | Misc Metals Railings & Mesh Screens | 25.00 | 9/4/18 | 10/8/18 | | | | | | | | | | | ▬ | ▬ | | |
| 38 | Final Painting | 20.00 | 10/8/18 | 11/2/18 | | | | | | | | | | | | ▬ | | |
| 39 | Landscape / Irrigation | 10.00 | 10/8/18 | 10/19/18 | | | | | | | | | | | | ▬ | | |
| 40 | Ground Floor Pavers | 14.00 | 10/15/18 | 11/1/18 | | | | | | | | | | | | ▬ | | |
| 41 | Punch Out | 30.00 | 11/5/18 | 12/14/18 | | | | | | | | | | | | | ▬ | ▬ |
| 42 | Inspections TCO / CO | 70.00 | 9/17/18 | 12/21/18 | | | | | | | | | | | ▬ | ▬ | ▬ | ▬ |
| 43 | Building Turnover | 1.00 | 12/21/18 | 12/21/18 | | | | | | | | | | | | | | ▬ |
| | | | | | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |

**A.V.I. CONTRACTORS, INC.**

Schedule VIII- 17

WEIL:\96218278\17\63946.0005

## **<u>SCHEDULE IX</u>**

Intentionally Omitted.

## SCHEDULE X

## DESCRIPTION OF GROUND LEASE

Ground Lease, dated December 23, 2015, executed by and between Greystone Terra Firma, LLC, a Florida limited liability company, as landlord, and Greystone Tenant, LLC, a Florida limited liability company, as tenant, and covering the property more particularly described on **Exhibit A-2**, as described in that certain Memorandum of Lease, dated as of December 23, 2015, recorded on December 31, 2015 as CFN #20150824059 in Book 29910, Page 4226 in the Office of the Clerk of Court of Miami-Dade County, Florida, as amended by that certain First Amendment to Ground Lease dated as of November 3, 2016, as described in that certain Amendment to Memorandum of Ground Lease dated as of November 3, 2016, recorded on November 8, 2016 as CFN #20160644605 in Book 30299, Page 2813 in the Office of the Clerk of Court of Miami-Dade County, Florida, and that certain First Amendment to Option Agreement, Amendment to Ground Lease and Amendment to Trust Agreement dated as of the Effective Date between Greystone Option Holder, LLC, Greystone Delaware Administrative, Inc., Hollywood-Harrison Development, LLC, Benjamin Cohen and Sara Cohen and joined in by Greystone Terra Firma, LLC and Greystone Tenant, LLC.

WEIL:\96218278\17\63946.0005

## SCHEDULE XI

## DESCRIPTION OF OPTION AGREEMENT

Option Agreement dated as of December 30, 2015 between Greystone Hotel Miami, LLC, Greystone Delaware Administrative, Inc., Hollywood Harrison, LLC, Greystone Delaware Statutory Trust, Benjamin Cohen and Sara Cohen, as affected by Assignment of Option Agreement dated November 3, 2016 between Greystone Hotel Miami, LLC, as assignor, and Greystone Option Holder, LLC, as assignee, as amended by First Amendment to Option Agreement, Amendment to Ground Lease and Amendment to Trust Agreement dated as of the Effective Date between Greystone Option Holder, LLC, Greystone Delaware Administrative, Inc., Hollywood-Harrison Development, LLC, Benjamin Cohen and Sara Cohen and joined in by Greystone Terra Firma, LLC and Greystone Tenant, LLC.

WEIL:\96218278\17\63946.0005

## SCHEDULE XII

## LIST OF QUALIFIED MARKETING AGENTS

Preferred Hotels and Resorts

WEIL:\96218278\17\63946.0005

## **SCHEDULE XIII**

## **LIST OF QUALIFIED MANAGERS**

Vos Hospitality, LLC, a Florida limited liability company

WEIL:\96218278\17\63946.0005

## SCHEDULE XIV

## DESCRIPTION OF MASTER LEASE

Master Lease, dated November 3, 2016, executed by and between Greystone Tenant, LLC, a Florida limited liability company, as landlord, and Greystone Master Tenant, LLC, a Florida limited liability company, as tenant, and covering the property more particularly described on **Exhibit A-2**, as described in that certain Memorandum of Lease, dated as of November 3, 2016, recorded on November 8, 2016 as CFN #20160644608 in Book 30299, Page 2910 in the Office of the Clerk of Court of Miami-Dade County, Florida.

WEIL:\96218278\17\63946.0005

## <u>SCHEDULE XV</u>

## <u>LIST OF CDE LOAN DOCUMENTS</u>

1.      Loan Agreement dated November 3, 2016 by and between CDE and Leasehold Borrower;

2.      Promissory Note A dated November 3, 2016 by and between CDE in favor of Leasehold Borrower;

3.      Promissory Note A dated November 3, 2016 by and between CDE in favor of Leasehold Borrower;

4.      Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing;

5.      Assignment of Plans and Contracts dated November 3, 2016 executed by Leasehold Borrower for the benefit of CDE;

6.      General Contractor's Consent to Assignment dated November 3, 2016 executed by the Turner Construction Company;

7.      Architect's Consent to Assignment dated November 3, 2016 executed by Shulman + Associates;

8.      Payment and Completion Guaranty dated November 3, 2016 executed by Principals (as defined in the CDE Loan Documents) in favor of CDE;

9.      Fee Reserve Account Pledge Agreement;

10.     Fee Reserve Account Control Agreement;

11.     Bank Account Pledge Agreement (Loan Disbursement Account) dated November 3, 2016 executed by Leasehold Borrower;

12.     Blocked Account Control Agreement (Loan Disbursement Account) dated November 3, 2016 executed by Leasehold Borrower in favor of CDE;

13.     Financing statements;

14.     Certificate and Indemnity Regarding Hazardous Substances dated November 3, 2017 executed by Leasehold Borrower and Principals in favor of CDE;

15.     Construction and Disbursing Escrow Agreement dated November 3, 2017 among Leasehold Borrower, Master Tenant, CDE, and U.S. Bank;

16.     SNDA by and among Leasehold Borrower, Master Tenant, and CDE.

WEIL:\96218278\17\63946.0005

## SCHEDULE XVI

## LIST OF EB-5 LOAN DOCUMENTS

1. Loan and Security Agreement dated July 25, 2014 by and between Greystone EB-5 LLLP, a Florida limited liability limited partnership ("***EB-5 Lender***") and Greystone Hotel Miami, LLC, a Florida limited liability company  ("***EB-5 Borrower***");

2. Promissory Note dated July 25, 2014 by EB-5 Borrower in favor or EB-5 Lender;

3. Subscription Agreement dated July 25, 2014 for an equity interest in EB-5 Borrower;

4. Interest Pre-Payment Addendum to Loan Documents dated August 8, 2014 by and between EB-5 Lender and   EB-5 Borrower;

5. Private Placement Memorandum dated July 30, 2014 for EB-5 Borrower;

6. Escrow Agreement by an among EB-5 Lender, South Atlantic Regional Centers, LLC, a Florida limited liability company and PNC Bank, a Pennsylvania banking corporation as Escrow Agent dated July 16, 2014;

7. Limited Partnership Agreement by and among the EB-5 Lender, South Atlantic Regional Centers, LLC, a Florida limited liability company and the limited partners dated July 25, 2014.

WEIL:\96218278\17\63946.0005

## <u>SCHEDULE XVII</u>

### <u>LIST OF OCTAGON LOAN DOCUMENTS</u>

1. Loan Agreement dated November 3, 2016, by and between Octagon and Greystone Managing Member;

2. Promissory Note dated November 3, 2016, by Greystone Managing Member in favor of Octagon;

3. Collateral Assignment and Pledge of Limited Liability Company Interests dated November 3, 2016, by and among Octagon, Greystone Managing Member, and Guarantor;

4. Payment Direction Letter dated November 3, 2016, by Octagon to Master Tenant for the benefit of Octagon; and

5. Certain Uniform Commercial Code Financing Statements.

WEIL:\96218278\17\63946.0005

## SCHEDULE XVIII

## DESCRIPTION OF MASTER TENANT JV AGREEMENT

Operating Agreement of Greystone Master Tenant, LLC, a Florida limited liability company, dated as of November 3, 2016, by and between Greystone Managing Member, LLC, a Florida limited liability company, and U.S. Bancorp Community Development Corporation, a Minnesota corporation

WEIL:\96218278\17\63946.0005