# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

YUANXIAO FENG, et al.,          )
                                     )
         Plaintiffs,        )
                                       )
         v.                     )   **Case No. 19-cv-24138**
                                       )
**JOSEPH WALSH, et al.,**      )
                                       )
         Defendants**.**       )

## PNC BANK, N.A.'S AND RUBEN RAMIREZ'S MOTION TO DISMISS THE AMENDED COMPLAINT

Peter D. Hardy
  *HardyP@ballardspahr.com*
  (admitted *pro hac vice*)
Aliza Karetnick
  *KaretnickA@ballardspahr.com*
  (admitted *pro hac vice*)
**Ballard Spahr LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 864-8838

Nina Stillman Mandel
  *nsm@mandel.law*
  Fla. Bar No. 843016
**MANDEL & MANDEL LLP**
169 East Flagler Street, Suite 1224
Miami, Florida 33131
Telephone: (305) 374-7771

*Counsel for PNC Bank, N.A. and Ruben Ramirez*

## Table of Contents

Page

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................. 2

III.    ARGUMENT ...................................................................................................... 6

        A.      Applicable Legal Standard................................................................... 6

        B.      Plaintiffs Fail to Plausibly Allege Claims for Aiding and Abetting Fraud,
                Breach of Fiduciary Duty, and Conversion. ......................................... 8

                1.      Legal Standard for Proving Aiding and Abetting Claims........................ 9

                2.      Claims of Policy Violations and "Red Flags" Will Not Suffice .............. 10

                3.      Allegations of Actual Knowledge are Required ...................................... 14

                4.      The Collective Knowledge Doctrine Does Not Apply ............................ 16

        C.      Plaintiffs Do Not Plausibly Allege RICO Claims................................... 18

                1.      Plaintiffs Lack Standing to Bring RICO Claims....................................... 19

                2.      Plaintiffs Have Failed to Plausibly Allege a RICO Enterprise ................ 22

        D.      Plaintiffs Do Not Plausibly Allege that PNC and Ramirez Entered Into a
                Conspiracy. ........................................................................................... 24

IV.     CONCLUSION.................................................................................................... 27

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund v. Devine*,
    233 F. Supp. 3d 1297 (M.D. Fla. 2017) ................................................................. 18, 19, 20

*In re Agape Litig.*,
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) ................................................................................ 11

*Allerton v. State Dep't of Ins.*,
    635 So.2d 36 (Fla. 1st DCA 1994) ...................................................................................... 9

*Am. United Life Ins. Co. v. Martinez*,
    480 F.3d 1043 (11th Cir. 2007) ......................................................................................... 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................... 6, 7

*Begualg Inv. Management Inc. v. Four Seasons Hotel Ltd.*,
    No. 10-22153-CIV-MARTINEZ-MCALILEY, 2011 U.S. Dist. LEXIS
    108720 (S.D. Fla. 2011) ....................................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 6, 7, 26

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ........................................................................................... 8

*Bruhl v. PricewaterhouseCoopers Int'l*,
    No. 03-23044, 2008 U.S. Dist. LEXIS 30962 (S.D. Fla. Mar. 31, 2008) ................................ 9

*Catano v. Capuano*,
    No. 18-20223, 2019 U.S. Dist. LEXIS 114983 (S.D. Fla. Jul. 11, 2019) ............................. 22

*Chaney v. Dreyfus Serv. Corp.*,
    595 F.3d 219 (5th Cir. 2010) ............................................................................................. 16

*City of Almaty v. Ablyazov*,
    226 F. Supp. 3d 272, 284 (S.D.N.Y. 2016) ........................................................................ 20

*Colliers Lanard & Axilbund v. Lloyds of London*,
    458 F.3d 231 (3d Cir. 2006) .............................................................................................. 10

*Daccache v. Quiros*,
    No. 16-21575, 2018 U.S. Dist. LEXIS 82256 (S.D. Fla. May 15, 2018) .............................. 11

*Eisenberg v. Wachovia Bank, N.A.*,
  301 F.3d 220 (4th Cir. 2002) ............................................................10

*Evans v. ZB, N.A.*,
  No. 2:17-1123, 2017 U.S. Dist. LEXIS 209632 (E.D. Cal. Dec. 20, 2017) ........................12

*Ferrell v. Durbin*,
  311 F. App'x 253 (11th Cir. 2009) ..........................................................19

*Fullman v. Graddick*,
  739 F.2d 553 (11th Cir. 1984) ...............................................................25

*Gevaerts v. TD Bank, N.A.*,
  56 F. Supp. 3d 1335 (S.D. Fla. Oct. 31, 2014) .................................................10

*Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.*,
  No. 15-60653, 2015 U.S. Dist. LEXIS 194142 (S.D. Fla. Aug. 19, 2015) ..........................25

*Graves v. Plaza Med. Ctrs., Corp.*,
  No. 10-23382-CIV, 2017 U.S. Dist. LEXIS 28049 (S.D. Fla. Feb. 27, 2017) ......................10

*Gross v. State*,
  765 So. 2d 39 (Fla. 2000)...................................................................22

*Heinert v. Bank of America, N.A.*,
  No. 19-06081, 2019 U.S. Dist. LEXIS 180832 (W.D.N.Y. Oct. 18, 2019) ...............11, 15, 16

*Helf v. Chevron U.S.A. Inc.*,
  361 P.3d 63 (Utah 2015).....................................................................17

*Honig v. Kornfeld*,
  339 F. Supp. 3d 1323 (S.D. Fla. 2018) ...................................................26, 27

*Isaiah v. JPMorgan Chase Bank, N.A.*,
  No. 16-21771, 2017 U.S. Dist. LEXIS 190051 (S.D. Fla. Nov. 14, 2017) ......................11, 13

*Jackson v. BellSouth Telecomms.*,
  372 F.3d 1250 (11th Cir. 2004) ..........................................................18, 19

*Julin v. Chiquita Brands Int'l, Inc.* (*In re Chiquita Brands Int'l, Inc.*),
  690 F. Supp. 2d 1296 (S.D. Fla. 2010) ......................................................25

*Lamm*, 889 F. Supp. 2d at 947–51 (S.D. Fla. 2012) ...........................................12, 13

*Lawrence v. Bank of Am., N.A.*,
  455 F. App'x 904 (11th Cir. 2012) .....................................................7, 9, 11, 13

*Litson-Gruenberg v. JPMorgan Chase & Co.*,
  No. 09-56, 2009 U.S. Dist. LEXIS 117749 (N.D. Tex. Dec. 16, 2009) ...........................11

*In re Managed Care Litig.*,
    430 F. Supp. 2d 1336 (S.D. Fla. 2006) ...................................................................9

*McCaul v. First Mont. Bank, Inc.*,
    No. 17-41-BU-BMM-JCL, 2018 U.S. Dist. LEXIS 224274 (D. Mont. Oct. 29,
    2018) ................................................................................................................5, 22

*Meridian Trust Co. v. Batista*,
    No. 17-23051, 2018 U.S. Dist. LEXIS 166556 (S.D. Fla. Sept. 26, 2018) .......................9, 25

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) .............................................................................8

*Mw. Cattle Mktg., LLC v. Legend Bank, N.A.*,
    No. 17-375, 2018 WL 2244339 (N.D. Tex. May 16, 2018) .........................................9

*Palm Beach Cty. Envtl. Coalition v. Florida*,
    651 F. Supp. 2d 1328 (S.D. Fla. 2009) .................................................................19

*Parm v. Nat'l Bank of Cal., N.A.*,
    242 F. Supp. 3d 1321 (N.D. Ga. 2017) ...................................................22, 23, 24

*Patel v. Fendler*,
    No. 15-0366, 2016 U.S. Dist. LEXIS 148282 (S.D. Ill. Oct. 26, 2016) .........................22, 23

*Perlman v. Bank of Am., N.A.*,
    No. 11-80331, 2014 U.S. Dist. LEXIS 193658 (S.D. Fla. Sept. 19, 2014) ............................9

*Perlman v. Wells Fargo Bank, N.A.*,
    559 F. App'x 988 (11th Cir. 2014) (per curiam) ...................................9, 11, 12, 13

*Platinum Estates, Inc. v. TD Bank, N.A.*,
    No. 11-60670-CIV, 2012 U.S. Dist. LEXIS 30684 (S.D. Fla. Mar. 7, 2012) ......................16

*Ray v. Spirit Airlines, Inc.*,
    836 F.3d 1340 (11th Cir. 2016) ...........................................................................22

*Regions Bank v. Kaplan*,
    258 F. Supp. 3d 1275 (M.D. Fla. 2017)..................................................................25

*RJR Nabisco, Inc. v. European Community*,
    136 S. Ct. 2090, 2106 (2016)......................................................................18, 19, 20

*Super Vision Int'l, Inc. v. Mega Int'l Commer. Bank Co.*,
    534 F. Supp. 2d 1326 (S.D. Fla. Feb. 5, 2008) .......................................................23

*Taylor v. Am. Chemistry Council*,
    576 F.3d 16 (1st Cir. 2009).................................................................................9

*United States v. Air Fla., Inc.*,
   534 F. Supp. 17 (S.D. Fla. 1982) ........................................................7

*United States v. DynCorp Int'l, LLC*,
   253 F. Supp. 3d 89 (D.D.C. 2017) ......................................................16

*United States v. Phillip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) .........................................................16

*United States v. Sci. Applications Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) .........................................................16

*United Techs. Corp. v. Mazer*,
   556 F. 3d 1260 (11th Cir. 2009) ........................................................25

*Vasquez v. H.K. & Shaghai Banking Corp.*,
   18 Civ. 1876 (PAE), 2019 U.S. Dist. LEXIS 90716 (S.D. N.Y. May 29, 2019).....................7

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012).................................................................10

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
   No. 15-6167, 2017 U.S. Dist. LEXIS 202487 (N.D. Cal. Dec. 6, 2017)..............................17

*Wiand v. Wells Fargo Bank, N.A.*,
   938 F. Supp. 2d 1238 (M.D. Fla. 2013) .........................................10, 13

*Worldspan Marine Inc. v. Comerica Bank*,
   No. 18-21924, 2019 U.S. Dist. LEXIS 30421 (S.D. Fla. Feb. 22, 2019) ...............................18

*Zayed v. Associated Bank, N.A.*,
   No. 17-1250, 2019 U.S. App. LEXIS 854 (8th Cir. Jan. 10, 2019)...................................14, 15

*Ziemba v. Cascade Intern., Inc.*,
   256 F.3d 1194 (11th Cir. 2001) ..........................................................8

**Statutes**

18 U.S.C. § 1962(c) ....................................................................18

Fla. Stat. § 895.03 .......................................................................19

RICO ................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 7.1 .......................................................................1

Fed. R. Civ. P. 8(a) ......................................................................6

Fed. R. Civ. P. 9(b) ............................................................................................7, 8, 12, 25

Fed. R. Civ. P. 12 ........................................................................................................13, 14

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 6

Restatement (Second) of Agency, § 275.......................................................................17

Restatement (Third) of Agency, § 5.03 ........................................................................17

Defendants PNC Bank, N.A. ("PNC") and Ruben Ramirez ("Ramirez"), through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6) and Southern District of Florida Local Rule 7.1, hereby move to dismiss with prejudice the Amended Complaint filed by Plaintiffs.[1]

## I.    INTRODUCTION

On October 8, 2019, Plaintiffs filed the instant action against PNC and Ramirez baldly declaring three common law claims against PNC and Ramirez for supposedly aiding and abetting the tortious acts of other defendants named in the Complaint (hereinafter the "Walsh Defendants.").[2]   On December 2, 2019, Plaintiffs filed an Amended Complaint.  Plaintiffs specifically contend that PNC and Ramirez knowingly facilitated and assisted the Walsh Defendants' conversion, fraud in the inducement, and breaches of their fiduciary duty, resulting in significant pecuniary losses to Plaintiffs.  *See id*. ¶¶ 309-30, 367-88, 432-55.  Plaintiffs further assert that PNC and Ramirez violated Florida's Civil RICO statute, the federal RICO statute, and engaged in civil conspiracy.  *See id*. ¶¶ 470-78, 491-98, 577-88.

Generously read in a light most favorable to them, Plaintiffs' claims against PNC and Ramirez are incurably flawed.  The massive Amended Complaint is an unwieldy, meandering and

---

[1]    Plaintiffs are Yuanxiao Feng, Kiu Chub Saxon Hui, Lai King Hui, Jing Kuang, Chuen Ping Ng, Minyang Tian, Hongsen Zhang, and Yan Zhang (collectively, "Plaintiffs").

[2]    Other than PNC and Ramirez, Plaintiffs have sued the following defendants: Joseph Walsh, Joseph, Jr., Anthony Reitz, Leslie Robert Evans, Greystone EB-5 LLLP, South Atlantic Regional Center, LLLC, USREDA, LLC, USREDA Holdings LLC, USREDA Management, LLC, JJW Consultancy, LTD., Daniel Vosotas, James Vosotas, Greystone Hotel Miami LLC, United EB5, LLC, Santa Barbara 230 LLC, Greystone Terra Firma, LLC, VOS Holdings I, LLC, VOS CRE I, LLC, Greystone Hospitality, LLC, Greystone Holdco LLC, Greystone Managing Member, LLC, Greystone Master Tenant, LLC, Greystone Tenant, LLC, Greystone Option Holder, LLC, WWB Trust LLC, Trans Inns Associates Inc., Evans Carrol & Associates Inc., VOS Hospitality, LLC, BBM 3, LLC, BBM 3 II, LLC, and Brandon Muhl.

convoluted tale of fraud involving a host of shell companies and multiple individuals.  PNC and Ramirez are peripheral actors, and the allegations relating to them fail to state a claim.  Indeed, the Amended Complaint lays bare Plaintiffs' clear misapprehension of applicable law.  It repeatedly invokes the trope that PNC and Ramirez "knew or should have known" about the Walsh Defendants' alleged fraud scheme but is devoid of any allegation that PNC or Ramirez possessed actual knowledge of the purported scheme and substantially assisted that scheme, as the law demands. Plaintiffs' RICO claims are similarly doomed.  Plaintiffs do not argue that they suffered a domestic injury, and do not allege a scheme constituting an "enterprise" in which PNC or Ramirez knowingly participated.   PNC and Ramirez now move to dismiss with prejudice Plaintiffs' woefully insufficient claims at Counts IIX, IX, XVI, XVII, XXII, XXIII, XXVI, XXIX, and XXXXI of the Amended Complaint.

## II.      STATEMENT OF FACTS

Plaintiffs, foreign nationals seeking permanent residence in the United States through the federally-sanctioned Immigrant Investor Program ("EB-5 Program"), sometimes known as the "Golden Visa," claim to have been defrauded.  Am. Compl. ¶¶ 1-3, 9.  Purportedly under the false pretense that their "investment" was a lawful path to reside in this country, Plaintiffs invested millions of dollars in a government-approved EB-5 Program administered and controlled by defendant Joseph Walsh.  *Id*. ¶¶ 6-9.  Walsh, however, appears to have absconded with Plaintiffs' investment – the funds are not "accounted for" – and Plaintiffs' EB-5 Program applications eventually were uniformly denied by the government.  *Id*. ¶¶ 8, 21, 161-68.  Now, Plaintiffs' seek misdirected remuneration for their investment from defendants PNC – a deep pocket – and its retired employee, Ramirez.

Despite containing 124 pages and 588 paragraphs of allegations, Plaintiffs' repetitive Amended Complaint articulates only a handful of threadbare and conclusory assertions pertaining to defendants PNC or Ramirez:

- Walsh, through his entity defendant Greystone EB-5 LLLP ("Greystone EB-5"), offered and sold limited partnership units to foreign investors seeking to participate in an approved EB-5 Program. *Id*. ¶¶ 6-7.

- Walsh falsely represented to investors, *without the involvement of Ramirez or anyone else at PNC*, that Greystone EB-5 would develop, renovate and operate two adjacent properties in Miami Beach, Florida (the "Property"). *Id*. ¶¶ 117-21.

- Each partnership unit required an investment of $500,000 and an additional $60,000 in administrative and legal fees, which were collectively authorized to renovate the Property. *Id*. ¶ 94. Walsh further represented and purportedly guaranteed that Plaintiffs' funds would be used in compliance with EB-5 Program regulations by, among other things, creating ten qualifying jobs per investor. *Id*. ¶¶ 31, 99.

- To enable his scheme, Walsh owned and operated several other entities related to the Greystone EB-5, such as defendants South Atlantic Regional Center, LLC and WWB Trust. *Id*. ¶¶ 24-25, 32-36.

- Although Walsh told Plaintiffs that the funds would be held in an escrow account and then loaned to the Greystone EB-5, the investment money was placed in a PNC business checking account (the "Account"). *Id*. ¶ 386.

- The Account was accompanied by PNC's escrow service module, typical of an escrow account. *Id*. ¶ 142. According to Plaintiffs, this was made possible by defendant Ramirez, then a Vice-President at PNC's Boynton Beach, Florida location, and PNC Treasury Department employee, Daniel Ossaba,[3] who were told that the Walsh Defendants needed access to the Account. *Id*. at 139, 142.[4]

---

[3] The Amended Complaint consistently misspells Mr. Ossaba's name as "Osaba." This pleading will employ the correct spelling of his name.

[4] The Amended Complaint is conspicuously silent as to *when* the Account was opened, although it acknowledges that the Account was opened before any Greystone Hotel investors wired money, *id*. ¶ 149, which did not occur until 2014 to 2017. *Id*. ¶¶ 6, 94. Despite the Amended Complaint's careful efforts to gloss over the time elapsed between when the Account was opened and when Plaintiffs invested in the Greystone Hotel, Plaintiffs concede that there was a significant temporal gap, which undercuts any contention that Ramirez or anyone else at PNC was knowingly attempting to assist a fraud scheme.

- Anthony Reitz, Chief Financial Officer for certain Walsh Entities, was the only point of contact for Ramirez, Ossaba and PNC. He allegedly stated to Ramirez and Ossaba that Plaintiffs' funds: (1) were EB-5-related; (2) would amount to tens of millions of dollars; (3) would be controlled by Walsh; and (4) were subject to an escrow agreement. Reitz stated that Walsh had an escrow account with SunTrust Bank, which was too restrictive. *Id*. ¶ 137. Neither Ramirez nor anyone else at PNC saw the alleged escrow agreement.

- The fraudulent agreement enabling Walsh to steal Plaintiffs' funds through a troubled real estate deal was consummated when Ramirez purportedly told Reitz "if you need functionality of an escrow account, we can provide the escrow service modules with this type of business checking account." *Id*. ¶ 140.

- Although the Amended Complaint asserts that "Ramirez and PNC knew, or should have known, they were assisting Walsh and Walsh Entities in creating a fake escrow account," *id*. ¶ 143, Plaintiffs do not allege that Ramirez or PNC knew they were planning to steal Plaintiffs' investments.

- The agreement with Walsh violated PNC's internal rules and policies. *Id*. ¶ 144.

- At Reitz's request, PNC named the Account the "South Atlantic Regional Center LLC – Greystone EB-5, LLP Escrow Account," and eventually re-named it "South Atlantic Regional Center LLC – Escrow Account." Plaintiffs contend that the Account was the "conduit that fed [Walsh's] fraud machine." *Id*. ¶¶ 147-48, 154.

- Millions of dollars in investment funds were deposited into the Account, financially benefiting both Ramirez and PNC. *Id*. ¶¶ 145-46.

- After deposit, Plaintiffs' funds were transferred to another account of an entity controlled by Walsh, rather than used for the Greystone Hotel project. *Id*. ¶¶ 14, 325, 383.[5] Noticeably, the Amended Complaint does not allege that Plaintiffs' funds were used to pay for improper expenditures in a way either known or recognizable to PNC. Rather, the Amended Complaint merely suggests that investor funds left the Account, which says nothing about PNC's knowledge of downstream use. Nor does the Amended Complaint even allege with particularity how any funds at issue actually were spent.

---

[5]     Confusingly, the Amended Complaint mentions for the first time in paragraph 145 – and without any detail – a "Clearing Account." Am. Compl. ¶ 159. Specifically, it asserts that PNC and Ramirez did not prevent the Walsh Defendants "from moving money stolen from the Fake Escrow Account into the Clearing Account." *Id*. But Plaintiffs fail to explain, for example, whether the "Clearing Account" was even held at PNC, or what entity held the Clearing Account. This claim also contradicts other vague claims in the Amended Complaint that money went directly to personal accounts.

- Although PNC and Ramirez knew the Account would be accepting EB-5 Program investor money, they did not take any affirmative action to warn Plaintiffs or stop the Walsh Defendants from transferring money from the Account. *Id*. ¶¶ 159, 328.

Notably, the Amended Complaint is devoid of fundamental and critical facts. *First*, there is no plausible allegation that Ramirez, Ossaba or anyone else at PNC intended to facilitate Walsh's alleged misconduct. *Second*, Plaintiffs do not assert with any factual specificity that Ramirez, Ossaba, or anyone else at PNC actually knew that Walsh and the Walsh Entities intended to misappropriate investor funds for themselves or other improper purposes, rather than make transfers in furtherance of the Greystone project. *Third*, Plaintiffs conspicuously neglect to allege that Ramirez, Ossaba or anyone else at PNC agreed to combine with, or assist, Walsh and the Walsh Entities in their misconduct over time. *Fourth*, the Amended Complaint does not contain a single allegation suggesting how Ramirez, Ossaba or anyone else at PNC could have known, from the Account activity itself, that Walsh was engaged in nefarious activity. Indeed, the Amended Complaint does not allege that Ramirez or Ossaba were actively monitoring the Account activity, or that they had *any* involvement in *anything* after the Account was opened.

*Fifth*, there is no claim that Ramirez, Ossaba or anyone else at PNC knew what Walsh and the Walsh Entities actually communicated to Plaintiffs to persuade them to invest in the Greystone Hotel project. The Amended Complaint does not allege, nor could it, that Ramirez or anyone else at PNC was involved in meetings with investors; communications with investors; any false statements made to investors; the offering materials provided for the hotel project; or any of the advertising materials for the project. *Id*. ¶¶ 117-28. *Sixth*, there is no suggestion that Ramirez, Ossaba or anyone else at PNC reviewed or otherwise knew the substance of Plaintiffs' agreements with Walsh and the Walsh Entities, including any loan agreements or purported escrow

agreements.[6] *Seventh*, there is not a single allegation that Ramirez, Ossaba or anyone else at PNC met or had contact with any Plaintiff before, or even after, they transferred their investment funds. *Eighth*, there is no allegation that Ramirez, Ossaba or anyone else at PNC made a misrepresentation to any Plaintiff or other investor. *Ninth*, there is no allegation that Ramirez, Ossaba or anyone else at PNC received an improper payment from the Walsh Defendants, or otherwise had some sort of improper relationship with any of the defendants beyond a traditional, professional banking relationship. *Finally*, Plaintiffs do not contend that they shared a contractual relationship with PNC.

On the basis of these naked allegations and omissions, Plaintiffs attempt to assert multiple claims against PNC and Ramirez. Specifically, they allege: Aiding and Abetting Conversion (Counts 8 and 9); Aiding and Abetting Fraud in the Inducement (Counts 16 and 17); Aiding and Abetting Breach of Fiduciary Duty (Counts 22 and 23); Florida Civil RICO violations (Count 26); Civil Conspiracy (Count 29), and Federal RICO violations (Count 41). PNC and Ramirez now move to dismiss these claims.

## III.   ARGUMENT

### A.   Applicable Legal Standard

Pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6), a claim must be dismissed if the plaintiff fails to allege facts supporting its essential elements or otherwise fails to state a

---

[6]      The Amended Complaint repeatedly uses the phrase "fake escrow account." But Plaintiffs do not and cannot allege that PNC served as escrow agent in regards to the Greystone Hotel project. To the contrary, a review of Exhibit 11 to Plaintiffs' Complaint – the purported "Escrow Agreement," Am. Compl. ¶ 127(c) – references PNC, but makes clear that the bank is not party to the agreement. The only signatories are Greystone EB-5 LLLP (with Walsh as signatory) and WWB Trust, LLC (with Reitz as signatory), which supposedly served as the escrow agent. *Id.* ¶ 102. On its face, therefore, the Complaint admits that PNC was <u>not</u> involved in any escrow agreement, and the talismanic invocation of "fake escrow account" does not make it so.

facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

A plaintiff cannot meet his burden by raising unreasonable inferences or averring either "conclusions of law or sweeping legal conclusions cast in the form of factual allegations . . . ." *United States v. Air Fla., Inc.*, 534 F. Supp. 17, 20 (S.D. Fla. 1982). Indeed, the Federal Rules "require[] more than labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Rules "demand[] more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. None of Plaintiffs' claims clear these basic pleading hurdles.

For allegations of fraud or mistake, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply. Here, Rule 9(b) is applicable to Plaintiffs' claims for aiding and abetting and for civil conspiracy, which are premised on fraud – that is, the misappropriation of EB-5 investment money through a scheme masterminded by the Walsh Defendants. Am. Compl. ¶¶ 309, 320, 367, 378, 434–42, 445–54; *see also Vasquez v. H.K. & Shaghai Banking Corp.*, 18 Civ. 1876 (PAE), 2019 U.S. Dist. LEXIS 90716, *42 (S.D. N.Y. May 29, 2019).

"In alleging fraud . . . a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). The Eleventh Circuit has held that:

> Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of

> omissions, not making) same, and (3) the content of such statements
> and the manner in which they misled the plaintiff, and (4) what the
> defendants obtained as a consequence of the fraud."

*Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue*

*Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)).  Rule 9(b) therefore

requires plaintiffs to plead "the who, what, when, where, and how of the allegedly false

statements."  *Begualg Inv. Management Inc. v. Four Seasons Hotel Ltd.*, No. 10-22153-CIV-

MARTINEZ-MCALILEY, 2011 U.S. Dist. LEXIS 108720, at * 2 (S.D. Fla. 2011) (quoting

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)).  Plaintiffs' allegations fall

far, far short of this heightened pleading requirement.

Plaintiffs' RICO claims fare no better.  Their alleged injuries were sustained outside of the

United States, and there are no allegations constituting an "enterprise," as required by both the

Federal and Florida RICO statutes.

**B.**   **Plaintiffs Fail to Plausibly Allege Claims for Aiding and Abetting Fraud, Breach of Fiduciary Duty, and Conversion.**

Plaintiffs do not plausibly allege Ramirez or anyone else at PNC had actual knowledge of

the underlying scheme carried out by the Walsh Defendants, much less that they provided

substantial assistance to further that scheme.  Indeed, Plaintiffs evince a fundamental and fatal

misunderstanding of the actual knowledge component of these claims.  The Amended Complaint

is replete with unsupported claims that PNC and Ramirez knew *or should have known* about the

alleged underlying fraud scheme.  *See, e.g.,* Am. Compl. ¶ 143 ("Ramirez and PNC knew, *or*

*should have known*, they were assisting Walsh and Walsh Entities in creating a fake escrow

account.") (emphasis added); ¶ 159 ("As described above, Ramirez and PNC had specific

knowledge that the Plaintiffs' funds that would be deposited into the Fake Escrow Account would

be EB-5 investments, and they knew, *or should have known* of the legal implications of that fact.")

(emphasis added).  Contrary to Plaintiffs' attempts, "*should have known*" is *not* the legal standard. Actual, subjective knowledge is a mandatory requirement.

Plaintiffs seek to circumvent actual knowledge by cobbling together the supposed mental states of disparate PNC employees and departments.  Once again, this is not the law:  actual, subjective knowledge requires at least one individual to possess complete "guilty" knowledge.  So-called "collective knowledge" will not suffice.

1.   <u>Legal Standard for Proving Aiding and Abetting Claims</u>

To state a claim for aiding and abetting under Florida law, a plaintiff must allege: (1) an underlying violation on the part of the primary wrongdoer; (2) actual knowledge of the underlying violation by the alleged aider and abettor; *and* (3) intentional and substantial assistance by the alleged aider and abettor to the primary wrongdoer in furtherance of the underlying violation.  *See Lawrence v. Bank of America*, 455 F. App'x 904, 906–07 (11th Cir. 2012); *Meridian Trust Co. v. Batista*, No. 17-23051, 2018 U.S. Dist. LEXIS 166556, *3, *10 (S.D. Fla. Sept. 26, 2018); *see also Bruhl v. PricewaterhouseCoopers Int'l*, No. 03-23044, 2008 U.S. Dist. LEXIS 30962, at *13 (S.D. Fla. Mar. 31, 2008) (noting that aiding and abetting liability attaches "only when a defendant *actively participates* in the alleged violation") (emphasis added).

Because aiding and abetting is an intentional tort, *Perlman v. Bank of Am., N.A.*, No. 11-80331, 2014 U.S. Dist. LEXIS 193658, at *9 n.1 (S.D. Fla. Sept. 19, 2014); *Allerton v. State Dep't of Ins.*, 635 So.2d 36, 39 (Fla. 1st DCA 1994), allegations of "substantial assistance" must show that the defendant actually shared the primary actors' bad intent to commit the underlying tort.  *See Taylor v. Am. Chemistry Council*, 576 F.3d 16, 35 (1st Cir. 2009); *Mw. Cattle Mktg., LLC v. Legend Bank, N.A.*, No. 17-375, 2018 WL 2244339, at *6 (N.D. Tex. May 16, 2018); *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1357 (S.D. Fla. 2006).

"[T]he knowledge element is really the crux of aiding and abetting liability." *Perlman*, 2011 U.S. Dist. LEXIS 161084, at *16; *see also Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (per curiam); *Lawrence*, 455 F. App'x at 907.   Establishing actual knowledge requires subjective knowledge by a particular defendant, and not merely that the defendant had a reason to know of the fraud.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012) ("The phrase 'actual knowledge,' . . . is frequently used to denote subjective belief."); *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 237 (3d Cir. 2006) (equating "actual knowledge" with "subjective awareness"); *Graves v. Plaza Med. Ctrs., Corp.*, No. 10-23382-CIV, 2017 U.S. Dist. LEXIS 28049, at *17 (S.D. Fla. Feb. 27, 2017).

Importantly, when analyzing such claims against banks, Florida courts are "[m]indful of the potentially devastating impact aiding and abetting liability might have on commercial relationships."  *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) (citations omitted); *see also Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 226 (4th Cir. 2002) (explaining that to extend a bank's duty of care to non-customers would "expose banks to unlimited liability for unforeseeable frauds").  Courts are hesitant to impute "actual knowledge" to financial institutions of the alleged underlying wrongdoing and "necessarily set[] a high standard for liability to be found." *Gevaerts v. TD Bank, N.A.*, 56 F. Supp. 3d 1335, 1343 (S.D. Fla. Oct. 31, 2014).  Otherwise, significant liability could arise inequitably from sloppy and vague claims.

## 2.   Claims of Policy Violations and "Red Flags" Will Not Suffice

Plaintiffs claim that, "on information and belief," the "agreement" between Walsh and PNC and Ramirez violated the bank's internal rules and policies.  Am. Compl. at ¶ 144.  Plaintiffs further claim at various points throughout the Amended Complaint that PNC and Ramirez knew or should have known that the Walsh Defendants were committing a fraud scheme against the Plaintiffs because, after the funds were deposited into the Account, they were transferred to other

10

accounts.  When construed generously on behalf of the Plaintiffs, this claim appears to be a claim that PNC and Ramirez *should* have scrutinized the Account and realized that the Account involved atypical or improper financial transactions, and therefore concluded that a fraud scheme was occurring.   Such allegations do not suffice to demonstrate actual knowledge.

"[M]erely alleging that a bank should have known about [the underlying violation] based solely on a series of purportedly atypical transactions is not sufficient to survive" a motion to dismiss.  *Perlman*, 559 F. App'x at 993; *see also Heinert v. Bank of America, N.A.*, No. 19-06081, 2019 U.S. Dist. LEXIS 180832, at *6 (W.D.N.Y. Oct. 18, 2019) ("[P]laintiffs must plausibly allege actual knowledge . . . constructive knowledge is *not* sufficient, nor is a lower standard such as recklessness of willful blindness.") (citations omitted) (emphasis in original).   Nor is actual knowledge pleaded where the plaintiff offers nothing more "than allegations that a bank had knowledge of suspicious activities or even 'skullduggery[.]'" *Litson-Gruenberg v. JPMorgan Chase & Co.*, No. 09-56, 2009 U.S. Dist. LEXIS 117749, at *2 (N.D. Tex. Dec. 16, 2009); *see also Perlman*, 559 F. App'x at 993-94.   Alleged cause for suspicion is simply not the same as actual knowledge.  *See In re Agape Litig.*, 773 F. Supp. 2d 298, 310 (E.D.N.Y. 2011) ("red flags" that might arise from account transactions do not give rise to "actual knowledge"); *Isaiah v. JPMorgan Chase Bank, N.A.*, No. 16-21771, 2017 U.S. Dist. LEXIS 190051, at *6-10 (S.D. Fla. Nov. 14, 2017) (granting bank's motion to dismiss because plaintiff did not show that bank had actual knowledge of customer's fraud).

It is well-settled that, under Florida law, financial institutions are not required to investigate their customers' transactions.  *See Lawrence*, 455 F. App'x at 907; *Perlman v. Wells Fargo Bank*, 559 F. App'x 988, 993 (11th Cir. 2014).   Consequently, mere allegations of "red flags," including the commingling of funds and large or rapid transfers, are insufficient to establish actual

11

knowledge. *Daccache v. Quiros*, No. 16-21575, 2018 U.S. Dist. LEXIS 82256, at *3, *40 (S.D. Fla. May 15, 2018) ("Red flags do not amount to actual knowledge and are insufficient to meet the particularity requirement of Federal Rule of Civil Procedure 9(b)."); *Lamm*, 749 F.3d at 950 ("Alleging that a bank disregarded 'red flags' such as 'atypical activities' on a customer's account is insufficient to establish actual knowledge."); *see also Evans v. ZB, N.A.*, No. 2:17-1123, 2017 U.S. Dist. LEXIS 209632, at *1, *3 (E.D. Cal. Dec. 20, 2017) ("Because a bank does not have a duty to investigate or police its accounts, [the bank]'s 'alleged knowledge of [a depositor's] suspicious account activities – even money laundering – without more, does not give rise to tort liability for the banks.'") (citations omitted).

In *Perlman*, for example, the Eleventh Circuit dismissed aiding and abetting claims based on "a multitude of atypical transactions and procedural oddities." *See* 559 F. App'x at 993. In that case, a Ponzi schemer opened four accounts at Wells Fargo for his entity, Creative Capital, that were classified as "investment business" and "securities/commodities" business activity. *Id.* at 990-91. Within five weeks, other individuals, including the schemer's wife and sister, opened an additional 36 "feeder accounts" at Wells Fargo. *Id.* Large amounts of cash were then transferred between the "feeder" and the initial accounts. *Id.* In one instance, Wells Fargo placed a freeze on a feeder account due to detected suspicious activity. *Id.* Four days later, however, Wells Fargo lifted the freeze after receiving a business plan with obvious misinformation. *Id.* Over the next few months, over $10 million was transferred between the accounts, with substantial portions disbursed directly to the schemer and his wife. *Id.* By the time Wells Fargo closed the accounts, the fraudster had transferred $38 million between the various accounts, including more than $1 million in over-the-counter transactions. *Id.*

12

A court-appointed receiver filed claims against Wells Fargo for, among other things, aiding and abetting (1) breach of fiduciary duty, (2) conversion, and (3) fraudulent transfers. *Id.* at 991–92. The district court dismissed those claims with prejudice. *Id.* at 992. In affirming, the Eleventh Circuit explained that, "[a]t most, [the allegations] list facts that could arouse suspicions, and are not sufficient to trigger any obligation by Wells Fargo to investigate." *Id.* at 993–94.

Here, Plaintiffs' allegations are far short of even those asserted in the *Perlman* case, which were recognized as legally insufficient to pass muster under Rule 12. Indeed, courts routinely dismiss aiding and abetting claims based on a "red flags" argument. *See, e.g.*, *Isaiah*, 2017 U.S. Dist. LEXIS 190051, at *9–10 (dismissing aiding and abetting claim because "even if [the bank] detected suspicious activity on the accounts as alleged, this only demonstrates knowledge of the symptoms of the Ponzi scheme, not [the bank]'s actual knowledge of the scheme"); *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1245–46 (M.D. Fla. 2013) (dismissing such claims based on red flags, including atypical transfers, commingling of funds, and fraud alerts); *Lawrence*, 455 F. App'x. at 906 (affirming dismissal of such claims because allegations of "numerous deposits, withdrawals, and wire transfers involving large amounts of money" were insufficient to establish knowledge); *Lamm*, 889 F. Supp. 2d at 947–51 (S.D. Fla. 2012) ("[A]llegations that a bank's disregard of 'obvious red flags' such as atypical and non-routine business banking transactions were insufficient to establish the conscious awareness of wrongdoing necessary to maintain an aiding and abetting cause of action.").

Far from establishing actual knowledge, Plaintiffs' allegations here do not even amount to "red flags." Essentially, Plaintiffs' aiding and abetting claims against PNC and Ramirez hinge on the naked allegations that: (1) both defendants "knew or should have known" that they were assisting the Walsh Defendants in creating a "fake" escrow account; (2) PNC changed the name

of the "fake escrow account" to help Walsh make it look like a "legitimate" escrow account; and (3) PNC had "knowledge of the EB-5 program."  Am. Compl. ¶¶ 143, 149, 312.  As a threshold matter, none of these three allegations, even if true, establishes that Ramirez or anyone else at PNC had actual knowledge of the Walsh Defendants' purportedly fraudulent scheme.  Indeed, nowhere in the Amended Complaint do the Plaintiffs allege that PNC or Ramirez *actually* knew of the underlying wrongs at issue—*i.e.*, that the Walsh Defendants purportedly lied to potential investors to induce their investors and misappropriate their investments—or that Ramirez or anyone else at PNC took any action to assist the alleged fraud after the Account was opened.  The case law is unequivocal – the Amended Complaint must show actual, subjective knowledge *of the alleged fraud scheme at issue*, and not just claim that defendants should have discovered some ill-defined impropriety.

### 3.    Allegations of Actual Knowledge are Required

As noted in Section II, the Amended Complaint fails to allege critical facts, including that Ramirez received any sort of improper payment from the Walsh Defendants, or otherwise had a relationship with them beyond a traditional banking relationship.  To be clear, it is these sorts of egregious allegations – "the business banker was bribed by the bad guy" – that have allowed plaintiffs to survive a Rule 12 motion.  Such allegations are non-existent here, for good reason.

The Eighth Circuit's decision in *Zayed v. Associated Bank, N.A.*, No. 17-1250, 2019 U.S. App. LEXIS 854 (8th Cir. Jan. 10, 2019), underscores the high standard necessary to show that a bank had actual knowledge of its customer's specific fraud.   In *Zayed*, the Court rejected a Receiver's claim that the bank actually knew about a customer's Ponzi scheme, despite claims that a former bank employee: (1) advised the fraudsters to open one of the accounts under a domestic – as opposed to foreign – LLC and opened the account without proof of registration with the

Secretary of State;[7] (2) socialized with the fraudsters by drinking, discussing business, and quoting movie lines glorifying greed; (3) attended "pitch" meetings where the fraudsters discussed "risk-free" and "completely safe" investments with clients and suspect wire transfers between Swiss and domestic accounts; (4) improperly approved money transfers from accounts of two fraudsters into a third fraudster's account, at the third fraudster's direction; and (5) observed transactions in the domestic account after Swiss authorities closed the Swiss account. *Id.* at *8, 10-17, 24-26, 31. At one meeting, the fraudsters even discussed the fact that the Swiss account had a $13 million shortfall and needed a "friendly banker" to "make it look clean" and "get around [another bank's] questioning all the wiring transfers and that bank's growing suspicions." *Id.* at *25.

The *Zayed* court nonetheless held:

> [e]ven assuming [former bank employee] Sarles knew there was shortfall . . . , and that the scammers wanted to avoid disclosing that, it does not follow that Sarles knew their enterprise was a Ponzi scheme or that they were engaged in tortious conduct. If true, this should have been a red flag, *but it does not show actual knowledge.*

*Id.* at *15 (emphasis added). The court held that even these strong allegations evidenced, as a matter of law, nothing more than "'sloppy banking' or 'red flags' that, with the benefit of hindsight, should have prompted further investigation or inquiry." *Id.* at *8, 18. Plaintiffs' thin allegations here fall far short of the detailed conduct alleged in *Zayed* and still deemed to be insufficient as a matter of law.

An analogous recent district court case similarly highlights Plaintiffs' heavy burden. In *Heinert*, the plaintiffs alleged that Ponzi schemers had a relationship with a "dirty insider" at the bank, and that the insider "was a 'key player' in the fraudulent scheme, coordinating the opening

---

[7]     The Court held that "[c]oncluding that Sarles opened the [accounts] because he knew that Cook and others were engaged in a Ponzi scheme rather than simply out of an effort to please an important client, would require speculation and is not a reasonable inference." *Id.* at *11-12.

of new accounts, expediting the availability of funds, lying to creditors, and placing quarterly calls to American Express on [the primary fraudster's] behalf, falsely confirming that his accounts held sufficient funds to cover his debts, when they did not." 2019 U.S. Dist. LEXIS 180832, at *3.  The allegations of direct lies by a bank employee on behalf of the fraudster, made to promote the specific underlying fraud scheme at issue, were insufficient to establish the required actual, subjective knowledge of the scheme by the bank.  The Court dismissed the plaintiffs' complaint. *Id.* at *15.  The Amended Complaint at issue here does not even come close to alleging the facts present in *Heinert*, which involved direct lies to investors.

Ultimately, "[c]onclusory statement[s] that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest[] that the defendant 'should have known' that something was amiss." *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11-60670-CIV, 2012 U.S. Dist. LEXIS 30684 (S.D. Fla. Mar. 7, 2012).  In *Platinum Estates*, the court dismissed an aiding and abetting fraud claim against a bank arising from its alleged involvement in the Rothstein Ponzi scheme.  The complaint contained allegations that the bank: (1) permitted hundreds of millions of dollars in Ponzi scheme funds to flow through it, in violation of banking regulations and internal procedures; (2) lulled scheme victims into a false sense of security by providing verbal and/or written assurances that settlement funds existed and could be disbursed only directly to the investors; and (3) allowed fraudsters to use its conference rooms to pitch investors and directly participated in same. *Id*.  These claims, much stronger than the allegations here, nonetheless failed to surmount the actual knowledge standard.

4.    The Collective Knowledge Doctrine Does Not Apply

As discussed at length, the applicable legal standard for intentional torts based on fraud is actual – not constructive – subjective knowledge by a particular individual. *Heinert*, 2019 U.S. Dist. LEXIS 180832, at *6.  Claims of actual, subjective knowledge of fraud cannot be

16

manufactured by artificially combining various items allegedly known to disparate persons across a large organization.  *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241 (5th Cir. 2010); *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1122 (D.C. Cir. 2009); *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 103 (D.D.C. 2017) ("[C]ollective knowledge provides an inappropriate basis for proof of scienter because it allows a plaintiff to prove scienter by piecing together scraps of innocent knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds."); *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, No. 15-6167, 2017 U.S. Dist. LEXIS 202487, at *684-85 (N.D. Cal. Dec. 6, 2017) ("[W]here, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency."); *Helf v. Chevron U.S.A. Inc.,* 361 P.3d 63, 66 (Utah 2015) ("Collective knowledge cannot be used to establish agency liability for intentional torts.").  *See also* Restatement (Second) of Agency, § 275; Restatement (Third) of Agency, § 5.03.

Plaintiffs attempt to circumvent this rule.  They vaguely assert that "PNC" and Ramirez were familiar with the EB-5 program by pointing – with ill-defined and contradictory timeframes – to a single PNC article about the EB-5 program, one 2016 third-party website posting about the program that referenced PNC, and PNC's financing of a single EB-5 project.  *See id*. ¶¶ 151-53.[8]

---

[8]    The Complaint also alleges that "PNC was on notice that Plaintiffs believed they were transferring funds to a legitimate escrow account as the Plaintiffs' wire transfers named the receiving account as "EB-5 Investment Fund Escrow," citing to Exhibit 14.  Am. Compl. at ¶ 155.

Even if liability attached on the basis of collective knowledge – and it does not – these three random examples hardly establish that PNC or Ramirez collectively possessed knowledge about the Walsh Defendants' purported fraud.  And, this assertion falls well short of satisfying the legal standard – actual knowledge.  The fact that certain "other" PNC employees may have been familiar with certain aspects of the EB-5 program cannot impute knowledge about the Walsh Defendants' alleged scheme to Ramirez or PNC.  Perhaps most importantly, Plaintiffs' breezy and disingenuous insinuations concerning the supposed knowledge by Ramirez and PNC about the "legal implications" of Plaintiffs' funds involving an EB-5 investment project, is entirely specious.  In fact, there is no legal requirement under EB-5 law and regulation that an escrow agreement be used.  The Court need only look to Plaintiffs' own allegations about the content of the EB-5 program, *id*. at ¶¶ 63-66, which say nothing about any escrow account requirement.

### C.    Plaintiffs Do Not Plausibly Allege RICO Claims.

Civil RICO is a claim often invoked by plaintiffs – due to its draconian sweep when the statute is appropriate – but frequently without success, and for good reason.  Civil RICO, like criminal RICO, is a serious and complex claim that must be supported by clear facts.  Plaintiffs' attempt to bring Federal and Florida RICO claims against PNC and Ramirez based on the same conclusory and vague allegations.  Both claims must fail.

To state a claim under the Federal RICO Act, Plaintiffs must establish: (1) conduct or participation in an enterprise; (2) through a pattern of racketeering activity.  *See* 18 U.S.C. § 1962(c); *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004).  In addition, Plaintiffs must show RICO standing by alleging a *domestic* injury proximately caused by

---

The face of Exhibit 14 makes clear that it is not an actual PNC document, reflecting the sloppiness of the Plaintiffs' allegations as to the most basic facts, much less nuanced claims as to knowledge.

the alleged racketeering activity.  *See See RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2106 (2016); *Absolute Activist Value Master Fund v. Devine*, 233 F. Supp. 3d 1297, 1327-28 (M.D. Fla. 2017).  Conclusory and general allegations of damages resulting from the actions of multiple defendants is insufficient.  *See Worldspan Marine Inc. v. Comerica Bank*, No. 18-21924, 2019 U.S. Dist. LEXIS 30421, *1, *18 (S.D. Fla. Feb. 22, 2019).  Instead, RICO allegations must "clearly identify the injury suffered and the predicate acts from which the injury flowed[.]"  *Id.*

The Florida RICO Act mirrors the federal statute. Fla. Stat. § 895.03.  Thus, Florida courts generally look to case law interpreting the Federal RICO statute.  *See Jackson*, 372 F.3d at 1263 ("We have explained that interpretation of Florida's RICO law is informed by case law interpreting the federal RICO statute . . . .").  Where, as here, the federal and state RICO claims are based on the same allegations, "it is unnecessary to evaluate the Florida RICO count separately."  *Palm Beach Cty. Envtl. Coalition v. Florida*, 651 F. Supp. 2d 1328, 1350 (S.D. Fla. 2009); *see also Ferrell v. Durbin*, 311 F. App'x 253, 256 n. 5 (11th Cir. 2009) ("[A]nalysis of the Federal RICO claims is equally applicable to the Florida RICO claims.")  Here, Plaintiffs' Federal and Florida RICO claims should be dismissed for the following two distinct reasons: (1) Plaintiffs allege only foreign injuries and lack standing to bring RICO claims; and (2) Plaintiffs fail to adequately allege PNC and Ramirez were part of the alleged enterprise.

1.      Plaintiffs Lack Standing to Bring RICO Claims

The Federal and Florida civil RICO statutes do <u>not</u> apply extraterritorially, so plaintiffs must allege that they have suffered a domestic injury arising from the alleged predicate acts.  *RJR Nabisco, Inc.*, 136 S. Ct. at 2106; *Devine*, 233 F. Supp. 3d at 1327-28.  Plaintiffs – eight foreign nationals – allege they lost their investment funds and the opportunity to immigrate to the United States, which amount to injuries suffered outside the United States.

In *RJR Nabisco, Inc. v. European Community*, the Supreme Court held that the federal RICO Act's civil remedy provision "does not allow recovery for foreign injuries." 136 S. Ct. 2090, 2106 (2016). Thus, "[a] private RICO plaintiff [] must allege and prove a domestic injury to its business or property." *Id.* (emphasis in original). The court in *Devine*, which explained that the civil remedy for the Federal RICO provision is "nearly identical" to the civil remedy for Florida's RICO provision, explicitly imported this holding to Florida civil RICO claims. 233 F. Supp. 3d at 1328 ("The Court finds that Florida courts would now apply the holding of *RJR Nabisco, Inc.* to determine if a domestic injury for Florida civil RICO claims is adequately pleaded.").

To determine if an alleged injury is domestic or foreign, courts look to the "geographic location of the injury to plaintiffs, not the location of a defendant's wrongful acts." *Devine*, 233 F. Supp. 3d at 1326. In *Devine*, Cayman Islands companies brought claims under both the federal and Florida RICO statutes based on alleged economic injuries suffered from a penny stock scheme. *Id.* at 1325-28. In dismissing the RICO claims for lack of standing, the court explained that the "economic injuries were suffered by plaintiffs in the only location where the plaintiffs were located – in the Cayman Islands." *Id.* Similarly, the court in *City of Almaty v. Ablyazov* dismissed RICO claims because the plaintiffs were aliens who did not hold any assets, or "maintain any operations, instrumentalities, or other presence in the United States." 226 F. Supp. 3d 272, 284 (S.D.N.Y. 2016) (pointing out that plaintiffs were not "working, travelling, or doing business" in the United States when they incurred their alleged injuries) (citations omitted).

Indeed, in *Li v. Walsh*, currently pending before the Southern District of Florida, the Honorable Kenneth A. Marra dismissed with prejudice RICO claims arising from essentially the same set of facts. No. 16-81871, 2017 U.S. Dist. LEXIS 114553, at *32 (S.D. Fla. July 22, 2017).

20

In *Li*, foreign nationals, the alleged victims of an EB-5 fraud scheme perpetrated by many of the same Walsh Defendants, alleged economic injuries from "the loss of their investments." Compl. ¶ 518, ECF No. 1, No. 9:16-cv-81871-KAM (S.D. Fla. Nov. 14, 2016). They also asserted that, because of the fraud, they were "unable to leave their respective countries and have cost their entire lifesavings." *Id*. ¶ 6. When dismissing the plaintiffs' RICO claims, Judge Marra emphasized that the complaint contained "no allegations demonstrating that the economic impact on Plaintiffs was felt in the United States or that Plaintiffs were working, traveling, or doing business in the United States." *Li*, 2017 U.S. Dist. LEXIS 114553, at *32. The Court reasoned:

> Here, the majority of the alleged RICO conduct took place in the foreign countries where Plaintiffs received the alleged false information and induced to invest their money and are now unable to come to the United States. Even accepting Plaintiffs' claim that the basis of the RICO claim occurred in the United States because Defendants moved the money around in the United States and diverted funds from the Palm House real estate project, that does not change the fact that the injury was felt by Plaintiffs in their home countries.

*Id*. at *33–34.

In this matter, Plaintiffs allege they were fraudulently induced to invest money in a purported EB-5 project in Florida run by the Walsh Defendants. They contend that, because of the fraud scheme, they are "unable to immigrate to the United States, in addition to losing a large investment." Am. Compl. ¶ 21. As in *Li*, Plaintiffs do not contend that they have ever entered the United States. Rather, they assert that certain of the Walsh Defendants travelled to China to solicit Plaintiffs' investments through the use of misleading and false advertising materials. *Id*. ¶¶ 117-21. Like *Li*, an alleged fraud scheme prevented the Plaintiffs here from coming to the United States. *Id*. ¶ 21. The economic impact of Plaintiffs' supposed injury – the loss of their investments – would clearly be felt abroad. Accordingly, Plaintiffs lack standing to sue under the Federal and Florida RICO statutes, and their claims should be dismissed on this basis alone.

2.      <u>Plaintiffs Have Failed to Plausibly Allege a RICO Enterprise</u>

Even if Plaintiffs had standing to sue under the RICO statutes – and they do not – their RICO claims must fail because they have not plausibly alleged the existence of a RICO "enterprise" and that PNC and Ramirez knowingly participated in the enterprise.  The existence of an enterprise under the federal and Florida RICO statutes is shown by (1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit.  *See Catano v. Capuano*, No. 18-20223, 2019 U.S. Dist. LEXIS 114983, *1, *15 (S.D. Fla. Jul. 11, 2019); *Gross v. State*, 765 So. 2d 39, 44 (Fla. 2000).  Plaintiffs must provide detailed pleadings about the enterprise "to push the existence of the enterprise from a possibility to a probability."  *Patel v. Fendler*, No. 15-0366, 2016 U.S. Dist. LEXIS 148282, *2, 6 (S.D. Ill. Oct. 26, 2016).

To establish a common purpose under RICO, plaintiffs must allege that all of the participants "knowingly cooperated"[9] in a course of conduct "pursuant to a unified agenda."  *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1353 (11th Cir. 2016); *McCaul v. First Mont. Bank, Inc.*, No. 17-41-BU-BMM-JCL, 2018 U.S. Dist. LEXIS 224274, *1, 11 (D. Mont. Oct. 29, 2018) (same); *see also Gross*, 765 So. 2d at 46 (finding sufficient evidence of common purpose when defendants discussed and coordinated robberies well before their commission).  Common purpose cannot be established by facts merely suggesting that alleged participants "conducted only their own ordinary business affairs and purposes."  *McCaul*, 2018 U.S. Dist. LEXIS 224274, at *11; *see also Parm v. Nat'l Bank of Cal., N.A.*, 242 F. Supp. 3d 1321, 1347 (N.D. Ga. 2017) ("the mere existence of routine business relationships among the defendants is insufficient to establish an enterprise under RICO").

---

[9]      We incorporate here all arguments regarding lack of knowledge in Section III.B *supra*.

Here, Plaintiffs generally contend that all "Defendants" – over 30 individuals and entities – "acted as an 'enterprise' . . . designed to solicit foreign investors to invest in a USCIS approved EB-5 program in the United States."  Am. Compl. ¶ 471.  Plaintiffs seemingly allege that, at most, Ramirez or others at PNC somehow participated in this "enterprise" by providing banking services to Walsh.  *Id*. ¶¶ 140-44.  For example, Plaintiffs state that PNC and Ramirez "agreed to allow Walsh and SARC to open and operate a business checking account with PNC's escrow services." *Id*. ¶ 142.  Plaintiffs also declare that Ramirez and PNC "stood to gain" from the "agreement" – Ramirez in the form of "salary, awards, and promotion opportunities," and PNC in the form of "service fees, interest, and profits."  *Id*. ¶¶ 145-46.  What Plaintiffs describe is simply the existence of a traditional banking relationship.

These allegations do not come close to establishing that PNC, Ramirez, and the Walsh Defendants shared a "unified agenda" to solicit and later misappropriate EB-5 investments.  The Amended Complaint does not contain any facts showing how each of these defendants acted in furtherance of an enterprise, let alone in an ongoing or continuous manner.  Plaintiffs' allegations against PNC and Ramirez, however creatively worded, amount to no more than assertions that they opened bank accounts and conducted traditional banking transactions.  This hardly implicates them in a RICO enterprise.  *See Super Vision Int'l, Inc. v. Mega Int'l Commer. Bank Co.*, 534 F. Supp. 2d 1326, 1338 (S.D. Fla. Feb. 5, 2008) ("[b]ankers do not become racketeers by acting like bankers") (citations omitted).

The holding in *Parm* is instructive here.  In that case, plaintiff-borrowers entered into illegal payday loans with a payday lender. 242 F. Supp. 3d at 1326-27.  The lender, in turn, entered into contracts with the National Bank of California to gain access to the bank's Automatic Clearing House ("ACH") network that enabled him to misappropriate the plaintiffs' funds.  *Id*.  Plaintiffs

brought RICO claims against the bank, arguing that it: (1) charged the lenders a fee for every transaction; (2) "knew that [the lender] was engaged in the business of illegal payday lending, and knew that payday loans were illegal and unenforceable" in a number of states; and (3) agreed to associate with the lender "for the purpose of using their respective roles in the ACH network to profit through the collection of these unlawful debts." *Id*. at 1344-45.  The court dismissed the RICO claims, finding that the plaintiffs' allegations demonstrated only that the bank was "acting as bank processing electronic transactions or allowing access to the ACH network." *Id*. at 1346. The court reasoned that the allegations established nothing more than that the bank "conduct[ed] its own business initiatives" and that "while creative, [the allegations] essentially attempt to recast a contractual relationship as a RICO enterprise." *Id*. at 1347-48.

Similarly, Plaintiffs here attempt to recast routine banking transactions as evidence of PNC's participation in a RICO enterprise.  *See Parm*, 242 F. Supp. 3d at 1348 ("The consensus among courts reflects the judgement that the statutory requirements of RICO cannot be circumvented by attempting to characterize a routine contractual relationship for services as an independent enterprise.") (internal quotation marks omitted).  Plaintiffs fail to specifically allege – as they must – that Ramirez or anyone else at PNC and the Walsh Defendants possessed a shared purpose and took specific steps in furtherance of the enterprise.  Indeed, the notion that PNC knowingly joined a RICO enterprise is facially absurd.  Thus, Plaintiffs' RICO claims must fail.

### D.    Plaintiffs Do Not Plausibly Allege that PNC and Ramirez Entered Into a Conspiracy.

Finally, Plaintiffs assert that all Defendants are parties to a conspiracy.  Plaintiffs allege that the Defendants agreed "and acted in concert to market at fraudulent investment scheme to Plaintiffs, steal their money, and then distribute and dissipate the money among themselves." Am. Compl. ¶ 494.  To further the conspiracy, Plaintiffs allege that the Defendants took "overt acts"

"with the full knowledge and awareness that the investment scheme was designed to fraudulently procure and steal Plaintiffs' funds" and "commit the unlawful acts herein." *Id.* ¶¶ 492, 495–96.

To state a claim for civil conspiracy, a plaintiff must allege "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts done in the conspiracy." *Meridian Trust Co.*, 2018 U.S. Dist. LEXIS 166556, at *16-17 (quoting *United Techs. Corp. v. Mazer*, 556 F. 3d 1260, 1271 (11th Cir. 2009)). Conspiracy claims must specifically allege "the scope of the conspiracy, its participants, and when the agreement was entered into." *Julin v. Chiquita Brands Int'l, Inc.* (*In re Chiquita Brands Int'l, Inc.*), 690 F. Supp. 2d 1296, 1311 (S.D. Fla. 2010); *see Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("A complaint must justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy."). Moreover, to establish a civil conspiracy, a plaintiff must show that the perpetrators had knowledge of the unlawful scheme forming the basis of the conspiracy. *See Regions Bank v. Kaplan*, 258 F. Supp. 3d 1275, 1299 (M.D. Fla. 2017) (finding no agreement to conspire when defendants had no knowledge of the Ponzi scheme). In addition, conspiracy claims sounding in fraud are subject to the particularity requirements of Rule 9(b). *See also Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) ("[W]here a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiff must also plead this act with specificity."); *Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.*, No. 15-60653, 2015 U.S. Dist. LEXIS 194142, *1, 13 (S.D. Fla. Aug. 19, 2015) (same).

Here, as argued at length, Plaintiffs do not specifically and sufficiently allege the existence of any conspiratorial agreement required to satisfy Rule 9(b). The only references to an alleged agreement are, at best, vague and conclusory. *See* Am. Compl. ¶ 140 (Ramirez blandly stating to

Reitz at an unspecified date when the Account was opened that "if you need functionality of an escrow account, we can provide the escrow service modules with this type of business checking account."); *Id*. ¶ 144 (referring vaguely to "Ramirez and PNC's agreement with Walsh"); *Id*. ¶ 492 ("[t]here was an agreement between the Defendants to do an unlawful act . . . "); *Id*. ¶ 497 ("[t]here was a meeting of minds between and among Defendants").   Bare recitations of the elements of civil conspiracy, however, fall short of satisfying the threshold burden for stating a claim for civil conspiracy.   The only other relevant allegation set forth in the Amended Complaint is that "Ramirez and PNC agreed to allow Walsh and SARC" to open a bank account.   *Id*. ¶ 142.   Notably, this allegation fails to include the requisite details – the who, what, where, when, and why – of this alleged agreement.   *See Twombly*, 550 U.S. at 655 n. 10 (noting that a failure to allege the parties to an agreement, "or when and where the illicit agreement took place," would leave defendant with insufficient notice of conspiracy claims).

Moreover, even if Plaintiffs' allegations met the particularity requirement – though they do not – they fail to allege that Ramirez, Ossaba or anyone else at PNC *knowingly* entered into any agreement to conspire.   *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1347 (S.D. Fla. 2018) (emphasis added).   Mere allegations that PNC employees were "unwittingly helping . . . perpetrate the scheme" would "fall[] far short of the necessary agreement to plead a civil conspiracy."   *Id*.

The recent decision in *Honig* is applicable here.   In *Honig*, victims of a Ponzi scheme brought civil conspiracy claims against sales agents used by the main perpetrators to solicit investments.   *Id*. at 1333.   The main perpetrators provided the sales agents with uniform, scripted information and sales materials that allegedly contained false information that the sales agents then provided to investors.   *Id*. at 1346.   In exchange, the perpetrators paid the sales agents and provided them with other incentives.   *Id*.   For establishing actual knowledge, the court found insufficient

the plaintiffs' allegations that the sales agents "utilized the false and misleading [] sales script" and that they "knew or should have known" that the investments were fraudulent. *Id*. at 1344-45. The court likewise concluded that these allegations failed to establish that the sales agents knowingly agreed to do anything unlawful. *Id*. at 1346. The court reasoned that, besides conclusory allegations that the sales agents entered into an express or tacit agreement with the perpetrators, there were no factual allegations to show that the agents "knowingly entered into an agreement with [the perpetrators] to recommend and sell unregistered [] securities using the [] script." *Id*.

Here, as in *Honig*, Plaintiffs have failed to demonstrate that Ramirez and PNC actually knew about the underlying fraud. Therefore, Plaintiffs essentially seek to pile inference upon inference to establish – however tenuously – that Ramirez and PNC knowingly entered into an agreement to conspire to defraud Plaintiffs. The mere fact that PNC accounts were used to perpetrate the fraud, without PNC's knowledge, falls far short of establishing a civil conspiracy. Accordingly, Plaintiffs' claim for civil conspiracy should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, PNC and Ramirez respectfully request this Court to GRANT their Motion to Dismiss the Amended Complaint. Further, and pursuant to Local Rule 7.1(b)(2), PNC hereby requests that the Court conduct oral argument on this Motion. Due to the complexities of issues involved herein, PNC believes oral argument will materially assist the Court.

Dated: December 10, 2019    Respectfully submitted,

         */s/   Nina Stillman Mandel*    
         Nina Stillman Mandel
         Fla. Bar No. 843016
         **MANDEL & MANDEL LLP**
         169 East Flagler Street, Suite 1224
         Miami, Florida 33131
         Telephone: 305.374.7771
         nsm@mandel.law

         */s/   Peter D. Hardy*     
         Peter D. Hardy (admitted pro hac vice)
         Aliza R. Karetnick (admitted *pro hac vice*)
         Mary K. Treanor (admitted *pro hac vice*)
         Mansi G. Shah (admitted *pro hac vice*)
         Nicholas A.R. Kato (admitted *pro hac vice*)
         **BALLARD SPAHR LLP**
         1735 Market Street, 51st Floor
         Philadelphia, PA 19103

         *Counsel for PNC Bank, N.A. and Ruben Ramirez*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing document was filed via CM/ECF on this 10th

day of December 2019, and was therefore served by electronic mail on all parties.


*/s/ Nina Stillman Mandel*