# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 1:19-cv-24138-DPG

YUANXIAO FENG, an individual; KIU
CHUN SAXON HUI, an individual; LAI
KING HUI, an individual; JING KUANG, an
individual; CHUEN PING NG, an individual;
MINYANG TIAN, an individual; HONGSEN
ZHANG, an individual; and YAN ZHANG,
an individual,

       Plaintiffs.

v.

JOSEPH WALSH, et. al.,

       Defendants.

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS, RUBEN RAMIREZ'S AND PNC BANK, N.A.'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Jordan A. Shaw, Esq. (Fla. Bar. No. 111771)
Candace Phillips, Esq. (Fla. Bar No. 1010368)
Steffani M. Russo, Esq. (Fla. Bar No. 1002598)
**ZEBERSKY PAYNE SHAW LEWENZ, LLP**
110 S.E. 6th Street, Suite 2150
Ft. Lauderdale, Florida 33301
Telephone: (954) 595-6060
Primary Email: jshaw@zpllp.com;
cphillips@zpllp.com; srusso@zpllp.com
Secondary Email: mperez@zpllp.com;
jgarcia@zpllp.com

SMS LAW GROUP, APC
Kevin Qi, Esq.
*Pro Hac Vice Granted*
2221 Camino Del Rio S., Ste. 100
San Diego, CA 92108
Telephone: (619) 342-7887
Primary Email: kevinqi@smslawfirm.us

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................. 1

II.  MEMORANDUM OF LAW ................................................................................. 2

   A.  LEGAL STANDARD ................................................................................ 2

   B.  PLAINTIFFS SUFFICIENTLY STATE AIDING AND ABETTING CLAIMS AGAINST DEFENDANTS, PNC BANK AND RAMIREZ ......................................... 3

     1.  Legal Standard for Aiding and Abetting ................................................... 3

     2.  Brief Summary of the Argument ............................................................... 4

     3.  Red Flags ................................................................................................ 5

     4.  Actual Knowledge ................................................................................... 8

     5.  Collective Knowledge Doctrine ............................................................... 10

   C.  PLAINTIFFS PROPERLY ALLEGE RICO VIOLATIONS ....................................... 12

     1.   Plaintiffs Have Standing to Bring RICO Claims ...................................... 12

     2.  Plaintiffs Properly Allege a RICO Enterprise ......................................... 14

   D.  PLAINTIFFS PROPERLY ALLEGE THAT PNC AND RAMIREZ ENTERED INTO THE CONSPIRACY ............................................................................... 18

     1.  Legal Standard ......................................................................................... 18

     2.  Plaintiffs Allege a Conspiratorial Agreement ........................................ 18

     3.  Plaintiffs Allege Ramirez and PNC's Knowledge of the Fraud ............... 21

III. CONCLUSION .................................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Devine*,
233 F. Supp. 3d 1297 (M.D. Fla. 2017) ................................................................. 13

*AmeriFirst Bank v. Bomar*,
757 F. Supp. 1365 (S.D. Fla. 1991) ........................................................................ 8

*Ave. CLO Fund, LTD. v. Bank of Am., N.A.*,
723 F. 3d 1287 (11th Cir. 2013) ............................................................................ 10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) ..................................... 3

*Catano v. Capuano*,
2019 WL 3035752 (S.D. Fla. July 11, 2019) ................................................. 14, 15

*Chang v. JPMorgan Chase Bank, N.A.*,
845 F. 3d 1087 (11th Cir. 2017) ...................................................................... 4, 10

*City of Almaty v. Ablyazov*,
226 F. Supp. 3d 272 (S.D.N.Y. 2016) ................................................................... 13

*Conley v. Gibson*,
355 U.S. 41 (1957) ................................................................................................. 2

*Gross v. State*,
765 So. 2d 39 (Fla. 2000) ...................................................................................... 15

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ................................................................................................. 2

*Honig v. Kornfeld*,
339 F. Supp. 3d 1323 (S.D. Fla. 2018) ................................................................. 22

*Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*,
800 F.2d 1577 (11th Cir. 1986) .............................................................................. 3

*Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*,
792 F. Supp. 1566 (S.D. Fla. 1992) ...................................................................... 12

*Kirby v. Siegelman*,
195 F.3d 1285 (11th Cir. 1999) .............................................................................. 2

*Lawrence v. Bank of America*,
455 F. App'x 904 (11th Cir. 2012)......................................................................... 8

*Lerner v. Fleet Bank, N.A.*,
459 F. 3d 273 (2d Cir. 2006).................................................................................. 4

*Meridian Trust Co. v. Batista*,
2018 WL 4760277 (S.D. Fla. Sept. 30, 2018) ........................................................ 18

*Murphy v. Fed. Deposit Ins. Corp.*,
208 F.3d 959 (11th Cir. 2000)................................................................................ 2

*O'Malley v. O'Neill*,
887 F. 2d 1557 (11th Cir. 1989)............................................................................. 12

*Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc.*,
881 So. 2d 565 (Fla. 3d DCA 2004)....................................................................... 12

*Parm v. Nat'l Bank of Cal., N.A.*,
242 F. Supp. 3d 1321 (N.D. Ga. 2017) .................................................................. 17

*Perlman v. Wells Fargo Bank, N.A.*,
559 Fed. Appx. 988 (11th Cir. 2014) .................................................................. 5, 6

*Primerica Fin. Servs., Inc. v. Mitchell*,
48 F. Supp. 2d 1363 (S.D. Fla. 1999) .................................................................... 2

*RJR Nabisco, Inc. v. European Community*,
136 S. Ct. 2090 (2016)..................................................................................... 13, 14

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ............................................................................................... 2

*St. George v. Pinellas Cnty.*,
285 F. 3d 1334 (11th Cir. 2002)............................................................................. 3

*Trinity Graphic, USA, Inc. v. Tervis Tumbler Company*,
320 F. Supp. 3d 1285 (M.D. Fla. 2018).................................................................. 4

*United States v. Turkette*,
452 U.S. 576 (1981) ............................................................................................... 15

**Statutes**

18 U.S.C. § 1962(c) .................................................................................................. 12

18 U.S.C. § 1964(c) .................................................................................................. 12

**Rules**

Rule 8 of the Federal Rules of Civil Procedure .......................................................................... 2, 3

Plaintiffs, YUANXIAO FENG, KIU CHUN SAXON HUI, LAI KING HUI, JING KUANG, CHUEN PING NG, MINYANG TIAN, HONGSEN ZHANG, and YAN ZHANG ("Plaintiffs"), by and through the undersigned counsel, hereby file their Response in Opposition to Defendant RUBEN RAMIREZ's ("Ramirez") and Defendant PNC BANK, N.A.'s ("PNC") Motion to Dismiss and Incorporated Memorandum of Law ("Motion to Dismiss"), and in support thereof state as follows:

## I.  <u>INTRODUCTION</u>

As alleged in Plaintiffs' Amended Complaint (ECF No. 44), this case arises out of Defendants' fraudulent scheme to solicit "investments" from Plaintiffs by promising them returns on their investments in the Greystone Project as well as EB-5 immigrant visas. At the direction of Defendant Joseph J. Walsh (Walsh), his entities and co-conspirators[1] have defrauded Plaintiffs into investing tens of millions of dollars. Defendants represented to Plaintiffs that their investments would be used for the Greystone Project, which would comply with the EB-5 Program requirements, and even represented to USCIS that Plaintiffs' funds would be EB-5 compliant by creating ten (10) qualifying United States jobs per investor.

The false details of the Greystone Project are contained in the Investment Portfolio, which includes an Escrow Agreement mandating that Plaintiffs' funds be held in escrow pending EB-5 approval. Plaintiffs' funds were never placed in an escrow account. Instead Defendants Walsh and SARC shopped around for a bank that would allow them free range of accounting procedures. They found Defendants Ramirez and PNC who suggested to Defendants Walsh and SARC that if they did not want to open a true escrow account with the required escrow agreement, restrictions,

---

[1] Co-conspirators include Walsh, Joseph Walsh Jr., the South Atlantic Regional Center ("SARC"), WWB Trust, USREDA, LLC, USREDA, Holdings, Daniel Vosotas, James Vosotas, the Vosotas Entities, Branden Muhl, BBM 3, LLC, BBM 3 II, LLC, Anthony Reitz, Rubin Ramirez, and PNC Bank.

and an escrow agent, they could instead open a checking account, name it an "escrow account," and use PNC's "escrow service modules" to thereby give Walsh unrestricted access to Plaintiffs' funds (hereinafter the "Fake Escrow Account").

Ramirez's and PNC's Motion to Dismiss Plaintiffs' Amended Complaint asks this Court to ignore the over 500-paragraph allegations and determine that Plaintiffs have not sufficiently pled Aiding and Abetting Fraud in the Inducement, Aiding and Abetting Breach of Fiduciary Duty, Aiding and Abetting Conversion, RICO, and Conspiracy. For the reasons explained below, the Motion to Dismiss should be denied.

## II.   MEMORANDUM OF LAW

### A.   LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. *See Murphy v. Fed. Deposit Ins. Corp.,* 208 F.3d 959, 962 (11th Cir. 2000) (citing *Kirby v. Siegelman*, 195 F.3d 1285, 1289 (11th Cir. 1999)).

The court should not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the court must accept all material allegations of the complaint as true and liberally construe those allegations in favor of the plaintiff. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). "The issue is not whether the plaintiff will ultimately prevail but whether [plaintiff] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Thus, "the threshold of sufficiency that a complaint must meet is exceedingly low." *Primerica Fin. Servs., Inc. v. Mitchell*, 48 F. Supp. 2d

1363, 1366 (S.D. Fla. 1999). The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted). As such, a plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. (citation omitted). While the Court must assume that all of the allegations in the complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right to relief above the speculative level." *Id*. (citation omitted).

The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations. *See Jackam v. Hosp. Corp. of Am. Mideast, Ltd*., 800 F.2d 1577, 1579 (11th Cir. 1986). Importantly, at a motion to dismiss stage, the Court cannot consider anything beyond the four corners of the complaint. *See St. George v. Pinellas Cnty.*, 285 F. 3d 1334, 1337 (11th Cir. 2002) (when evaluating a motion to dismiss, "[t]he scope of the review must be limited to the four corners of the complaint.").

## B.   PLAINTIFFS SUFFICIENTLY STATE AIDING AND ABETTING CLAIMS AGAINST DEFENDANTS PNC BANK AND RAMIREZ

### 1.   Legal Standard for Aiding and Abetting

To state a cause of action for aiding and abetting fraud, breach of fiduciary duty, or conversion, the plaintiff must allege: (1) the existence of an underlying fraud, breach of fiduciary duty, or conversion; (2) that the defendant had knowledge of the fraud, breach of fiduciary duty, or conversion; and (3) that the defendant provided substantial assistance to advance the

commission of the fraud, breach of fiduciary duty, or conversion. *See Chang v. JPMorgan Chase Bank, N.A.,* 845 F. 3d 1087, 1097 (11th Cir. 2017) (holding that plaintiff stated a cause of action for aiding and abetting fraud where the plaintiff alleged the existence of an underlying fraud, the bank's knowledge of the fraud, and that the bank provided substantial assistance to advance the commission of the fraud); *see also Trinity Graphic, USA, Inc. v. Tervis Tumbler Company,* 320 F. Supp. 3d 1285, 1296 (M.D. Fla. 2018). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Chang,* 845 F. 3d at 1097 (citing *Lerner v. Fleet Bank, N.A.*, 459 F. 3d 273, 295 (2d Cir. 2006).

### 2.  Brief Summary of the Argument

Like the plaintiffs in *Chang*, Plaintiffs state a cause of action for aiding and abetting. Specifically, Plaintiffs' Amended Complaint (ECF No. 44) alleges, *inter alia*: "Defendants created a fake escrow account to obtain and control Plaintiffs' funds without being stifled by standard banking escrow requirements" (¶131); "Ramirez and PNC proposed opening a business checking account with PNC's escrow services modules. The effect of this would be to allow Walsh to operate a business checking account that appeared to be an escrow account. However, crucially, the account would not in fact be a real escrow account, nor would it have the restrictions of a real escrow account." (¶140); "Defendants, Ramirez and PNC agreed to allow Defendants, Walsh and SARC to open and operate a business checking account with PNC's escrow services. The purpose of this was to make the business checking account appear as a legitimate escrow account to outside investors. Walsh and SARC would then be able to falsely demonstrate to potential EB-5 investors that their funds were being transferred to and held by SARC's 'Escrow Account.'" (¶142); "As described above, Ramirez and PNC had specific knowledge that the Plaintiffs' funds that would be deposited into the Fake Escrow Account would be EB-5 investments… monies [not] legally

permitted to be used for any reason until their I-526 Petitions were approved…" (¶159). And, in paragraph 150, Plaintiffs specifically and unequivocally allege that:

> **Defendant, PNC did this or permitted this, despite <u>knowing</u> that the account was not an escrow account. By so doing, Ramirez and PNC <u>knowingly</u> made the Fake Escrow Account look like a legitimate escrow account with <u>specific knowledge</u> that while it was not one, it would appear and be used like one.**

*See* Amended Complaint at ECF No. 44 (emphasis added).

By this allegation alone, the legal standard is met and exceeded. However, as will be fully briefed below, there are literally dozens of allegations that directly contradict Ramirez's and PNC's arguments. There is no reliance on attenuated "red flags" nor do Plaintiffs rely on the collective knowledge doctrine. The allegations in this case are, on their face, wholly opposite the allegations found to be inadequate in Ramirez's and PNC's cited authority. The allegations here are direct, descriptive, and unequivocal. Ramirez and PNC do not, and cannot, dispute that Plaintiffs properly allege an underlying fraud, breach of fiduciary duty, and conversion. And, in the unambiguous allegations in the Amended Complaint, Plaintiffs allege that PNC and its vice president, Ramirez, had "specific," actual knowledge, and that Ramirez and PNC not only provided substantial assistance in the commission of the bad acts, but also that Ramirez and PNC provided concrete suggestions about how to further conceal and perpetuate these bad acts. Plaintiffs state a claim upon which relief may be granted. *See e.g.* ECF No. 44 at ¶¶ 1-2, 4-7, 9, 11, 14-15, 85-86, 97-104, 129-156, 159, 200, 309-330, 367-388, 432-455, 470-478, 491-498, 577-588.

### 3. Red Flags

Ramirez and PNC claim that Plaintiffs' count for aiding and abetting fraud, breach of fiduciary duty, and conversion should be dismissed because "claims of policy violations" and "red flags" do not suffice to demonstrate actual knowledge. To support this argument, Ramirez and PNC rely on *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed. Appx. 988 (11th Cir. 2014). In *Perlman*,

the plaintiffs alleged a "multitude of atypical transactions and procedural oddities," but failed to include specific allegations of knowledge, and the Eleventh Circuit found that those allegations fell short of raising a plausible inference that the bank knew of its customer's fraudulent activity. *Id.* at 993. Here, Plaintiffs allege that Ramirez and PNC "***knew***" of Defendant Walsh's and Defendant SARC's EB-5 Investment Program, "***knew***" that Walsh and SARC wanted to operate an escrow account without a formal escrow agreement, and "***substantially assisted***" them in doing so by: suggesting a work-around to allow them to operate a fake escrow account guised as a checking account; using PNC's escrow account modules in a checking account to deceive investors; purporting to investors that they had an escrow account at PNC Bank; and collecting investment funds through the fake escrow account. *See* Amended Complaint, ECF No. 44 at ¶¶ 7, 14, 15, 29, 102, 103, 104, 129-156, 159, 309-319, 320-330, 368-376, 378-388, 432-443, 444-455. This is not a case where Plaintiffs are claiming that the bank merely missed some red flags, failed to investigate some atypical transactions, or declined to follow bank policies. As alleged, Ramirez and PNC were knees-deep in this scheme to defraud investors.

Plaintiffs' allegations directed at Ramirez and PNC unambiguously allege that these two aiders and abettors not only had actual knowledge of, but also actually participated in, made suggestions for, and collaborated in the underlying bad acts, amounting to far more than just knowledge of "red flags" or "suspicious activities." Plaintiffs allege that "Defendants created a fake escrow account to obtain and control Plaintiffs' funds without being stifled by standard banking escrow requirements." (¶131); "Ramirez and PNC proposed opening a business checking account with PNC's escrow services modules. The effect of this would be to allow Walsh to operate a business checking account that appeared to be an escrow account. However, crucially, the account would not in fact be a real escrow account, nor would it have the restrictions of a real

escrow account." (¶140); "Defendants, Ramirez and PNC agreed to allow Defendants, Walsh and SARC to open and operate a business checking account with PNC's escrow services. The purpose of this was to make the business checking account appear as a legitimate escrow account to outside investors. Walsh and SARC would then be able to falsely demonstrate to potential EB-5 investors that their funds were being transferred to and held by SARC's 'Escrow Account.'" (¶142); "As described above, Ramirez and PNC had specific knowledge that the Plaintiffs' funds that would be deposited into the Fake Escrow Account would be EB-5 investments, and they knew or should have known of the legal implications of same. Despite the fact that none of Plaintiffs' EB-5 investment monies were legally permitted to be used for any reason until their I-526 Petitions were approved, PNC and Ramirez did absolutely nothing to…" (¶159).

Even before the atypical transactions were made in this case, Ramirez and PNC "permitted Defendant, Walsh to create business checking account with PNC's escrow services, and, in fact caused the account to be developed and opened. The effect of this was to make the business checking account appear as a legitimate escrow account to outside investors while providing no actual escrow protections." *See* Amended Complaint, ECF No. 44, ¶¶ 130-131. Again, Plaintiffs' claims that Ramirez and PNC aided and abetted fraud, breach of fiduciary duty, and conversion are not merely based on the fact that they should have known about atypical transactions. Plaintiffs' claims are rooted in the repeatedly alleged fact that Ramirez and PNC knew that Defendants Walsh and SARC needed to operate an escrow account and have unrestricted access to the investor funds. Based on this knowledge, Ramirez and PNC allowed and even suggested a workaround to Walsh and SARC to allow them to: open a fake escrow account that was really a checking account; use escrow account modules in a checking account; purport to investors that they had an escrow account at PNC Bank; collect investment funds through the fake escrow account; and have

unrestricted access to the fake escrow account's funds. *See e.g.* Amended Complaint, ECF No. 44 at ¶¶ 7, 14, 15, 29, 102, 103, 104, 129-156, 159, 317, 327, 328, 375, 376, 386, 387, 440, 441, 442, 447, 451, 453, 454.

### 4. Actual Knowledge

To state a claim for aiding and abetting, "a plaintiff must allege…(2) knowledge of the underlying violation by the alleged aider and abetter." *Lawrence v. Bank of America*, 455 F. App'x 904, 906-07 (11th Cir. 2012) (citing *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991) (finding that plaintiff set forth allegations sufficient to meet this pleading requirement where plaintiff alleged that defendants were involved in an illicit scheme to overstate profits, were aware of the scheme, and knowingly assisted in the plan).

That standard is met and exceeded here by the allegations in the Amended Complaint. The facts pled in *Lawrence* do not hold a candle to the facts alleged here. The *Lawrence* Court found that the plaintiff did not sufficiently allege knowledge on the part of the bank where the bank only provided routine banking services and was not required to investigate transactions, "[t]o be liable, the bank would have had to have actual knowledge of [] fraudulent activities." As explained above, Plaintiffs here explicitly pled that Defendants Ramirez and PNC did more than simply fail to investigate transactions – they sought Walsh and SARC's business and created a loophole to accommodate them, they facilitated Walsh and SARC's fraudulent transactions, knew the fraudulent transactions were taking place, and continued to allow them to take place.

> Defendant, Ramirez offered, created and implemented the Fake Escrow Account, he knew that Defendants, Walsh, the Walsh Entities, and co-conspirators were holding Plaintiffs EB-5 investment funds in a checking account fraudulently represented as an escrow account. Ramirez also knew Plaintiffs had made substantial transfer[s] to a named "Escrow Account" which was in fact a business checking account and those funds were immediately transferred to Defendant, Walsh's holding account with PNC bank, without a requirement to follow any terms of a PNC escrow

agreement.

*See* Amended Complaint, ECF No. 44 at ¶317. *See also* ¶328.

While Ramirez and PNC cherry-picked allegations, which they contend support their strawman claims, Plaintiffs' Amended Complaint alleges much more than: "Defendants should have known" about the fake escrow account. Plaintiffs surpassed the pleading requirements for knowledge. *See* ECF No. 44 at ¶¶ 143, 149-151, 153, 156, 159, 310-314, 317, 321-325, 328-329, 368-372, 375-376, 378-380, 382, 386-387, 433-438, 442, 445-450, 453-454.

---

Case 1:19-cv-24138-DPG   Document 44   Entered on FLSD Docket 12/02/2019   Page 47 of 129

159.   As described above, Ramirez and PNC had specific knowledge that the Plaintiffs' funds that would be deposited into the Fake Escrow Account would be EB-5 investments, and they knew, or should have known of the legal implications of same. Despite the fact that none of Plaintiffs' EB-5 investment monies were legally permitted to be used for any reason until their I-526 Petitions were approved, PNC and Ramirez did absolutely nothing to:

    a.  Prevent the Walsh, the Walsh Entities, and Defendants from taking Plaintiffs' money from the Fake Escrow Account;

    b.  Prevent the Walsh, the Walsh Entities, and Defendants from moving the money stolen from the Fake Escrow Account into the Clearing Account;

    c.  prevent the Walsh, the Walsh Entities, and Defendants from wiring money out of the Clearing Account to various other companies, individuals, or accounts controlled by the Walsh, the Walsh Entities, and Defendants;

    d.  close the Fake Escrow Account until, on information and belief, May 2017;

    e.  close the Clearing Account until, on information and belief, May 2017;

    f.  inform Plaintiffs of Walsh, the Walsh Entities, and Defendants fraudulent acts;

    g.  inform Plaintiffs the misappropriation of their EB-5 investment monies from the Fake Escrow Account; or

    h.  inform Plaintiffs of the further transfer of the EB-5 investment monies out of the Clearing Account.

---

Rather than attempting to attack Plaintiffs' solid allegations of actual knowledge, Ramirez and PNC instead argue that Plaintiffs' allegations of actual knowledge are insufficient because they

do not claim that "Ramirez received any sort of improper payment from the Walsh Defendants, or otherwise had a relationship with them beyond a traditional banking relationship." *See* Motion to Dismiss, ECF No. 51, pg 21. While Ramirez's motivation for aiding and abetting Walsh and SARC is not an issue that is ripe for the Court's determination until sufficient discovery is accomplished, Plaintiffs still plead that: "Ramirez stood to gain from this agreement by increasing profits for his employer, PNC. Through his Vice President position at PNC, Ramirez received increase[d] salary, awards, and promotion opportunities for increasing PNC's deposits. Ramirez's title, as a Vice President at PNC, included Business Banking." (¶145); and "PNC stood to gain a new business from an account with tens of millions in deposits. This included significant service fees, interest, and profits." (¶146).

Even if Plaintiffs did not specifically allege that Ramirez and PNC had actual knowledge of the fraud, breach of fiduciary duty, and conversion (they did in ¶¶ 143, 149, 150, 151, 153, 156, 159, 310, 311, 312, 313, 314, 317, 321, 322, 323, 324, 325, 328, 329, 368, 369, 370, 371, 372, 375, 376, 378, 379, 380, 382, 386, 387, 433, 434, 435, 436, 437, 438, 442, 445, 446, 447, 448, 449, 450, 453, 454), like in *Chang*, the Court here should find that Plaintiffs' direct allegations of Ramirez's and PNC's actions regarding the fake escrow account supports an inference that Ramirez and PNC knew Walsh and SARC were committing fraud. *See Chang*, 845 F. 3d at 1097 (citing *Ave. CLO Fund, LTD. v. Bank of Am., N.A.*, 723 F. 3d 1287, 1297 (11th Cir. 2013) (recognizing that actual knowledge may be established through inference).

### 5. Collective Knowledge Doctrine

Plaintiffs agree that the collective knowledge doctrine does not apply here, which is why rather than "piecing together scraps of innocent knowledge held by various corporate officials," Plaintiffs allege specific knowledge on the part of Ramirez both individually and as Vice President of PNC. Plaintiffs specifically do not allege that Defendants were dealing with various

representatives at PNC. Instead, they specifically allege that Defendants Walsh, SARC, and Reitz worked with PNC under the leadership of Ramirez and Daniel Osaba, a member of PNC's Treasury Department, to create, bolster, enhance, and conceal the underlying bad acts. *See* ECF No. 44: "From his former employment with PNC, Defendant, Reitz had a personal and professional relationship with Defendant, Ramirez, a Vice-President at PNC's Boynton Beach, Florida branch. Defendant, Reitz used his contact with Ramirez to set up a meeting with Daniel Osaba…a member of PNC's Treasury Department." (¶135); "Defendants, Reitz, Walsh and the Walsh Entities' representative, met with Defendant, Ramirez and Osaba at Walsh's office. At this meeting Defendant, Reitz disclosed Defendant, Walsh's EB-5 business and escrow requirements and discussed Defendant, PNC's escrow account requirements and procedures." (¶ 136); "Reitz informed Ramirez and PNC that Walsh required a banking [arrangement][2] without the restrictions of an escrow administration agreement." (¶139); "Defendants, Ramirez and PNC agreed to accommodate Defendant, Walsh's demands. Defendant, Ramirez told Reitz that 'if you need functionality of an escrow account, we can provide the escrow service modules with this type of business checking account.' Ramirez and PNC proposed opening a business checking account with PNC's escrow service modules. The effect of this would be to allow Walsh to operate a business checking account that appeared to be an escrow account. However, crucially, the account would not in fact be a real escrow account, nor would it have the restrictions of a real escrow account." (¶140); "Upon information and belief, Defendants', Ramirez and PNC, agreement with Walsh violated PNC's internal rules, regulations and policies." (¶144).

Plaintiffs' repeated allegations regarding Ramirez's knowledge and actions refute any argument that the collective knowledge doctrine would apply here to bar Plaintiffs' claims for

---

[2] There is an obvious scrivener's error in ¶139 where Plaintiffs type "arraignment" instead of "arrangement."

aiding and abetting.

### C.      PLAINTIFFS PROPERLY ALLEGE RICO VIOLATIONS

To establish a RICO § 1962(c) violation, it must be alleged that: (1) Defendant was associated with an enterprise; (2) Defendant knowingly committed at least two predicate acts; (3) the predicate acts formed a pattern by having the same or similar purposes, results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics so that they were not isolated events; (4) the predicate acts amounted to or threatened the likelihood of continued criminal activity posing a threat of continuity projecting into the future; (5) the enterprise was engaged in or its activities affected interstate commerce; and (6) Plaintiffs were injured in their business or property as a result of Defendant's commission of the pattern of racketeering activity. 18 U.S.C. § 1962(c); 11th Cir. Pattern Civil Jury Instr. 5.1 (2000).

Ramirez's and PNC's Motion to Dismiss Plaintiffs' RICO claims solely argues that Plaintiffs (1) lack standing; and (2) failed to allege a RICO enterprise. *See* ECF No. 51, page 25. For that reason, Plaintiffs will only address those two arguments here.

### 1.      Plaintiffs Have Standing to Bring RICO Claims

Ramirez and PNC misconstrue the applicable law regarding standing in RICO claims. To have standing under RICO, a plaintiff must allege: (1) violation of the statute; (2) injury to business or property; and (3) that the violation caused the injury. *See Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F. Supp. 1566, 1577 (S.D. Fla. 1992) (citing *O'Malley v. O'Neill*, 887 F. 2d 1557, 1560-61 (11th Cir. 1989); 18 U.S.C. § 1964(c)). The inquiry for RICO standing is whether the alleged injury was directly caused by the RICO violation, not whether such harm was reasonably foreseeable. *See Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc.*, 881 So. 2d 565, 573 (Fla. 3d DCA 2004), *rev. denied*, 895 So. 2d 406 (Fla. 2005).

With regard to standing of foreign plaintiffs, standing focuses on the "geographic location

of the injury to plaintiffs, not the location of a defendant's wrongful acts." *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1325 (M.D. Fla. 2017).

Ramirez and PNC argue that Plaintiffs lack standing to bring a RICO claim in reliance on *City of Almaty v. Ablyazov*, 226 F. Supp. 3d 272, 284 (S.D.N.Y. 2016). In *City of Almaty*, the Court dismissed a RICO count where plaintiffs were aliens who did not hold assets, "maintain any operations, instrumentalities, or other presence in the United States" and were not "working, travelling, or doing business" in the United States. *Id.* Contrary to the facts of *City of Almaty*, the Plaintiffs here invested in operations and instrumentalities in the United States, owned an interest in those United States ventures, and traveled to conduct business in the United States. Specifically, Defendants solicited investments from Plaintiffs for the Greystone Hotel Project or Greystone EB-5 LLP in Miami Beach, Florida (¶5), the equity and interest in the Greystone properties was in Miami Beach, Florida (¶6), Plaintiffs relied upon representations that their funds would be invested in Greystone Hotel Miami in Miami, Florida (¶220), and Plaintiffs made deposits to the fake escrow account operated out of Boynton Beach, Florida (¶ 57).

Ramirez and PNC further argue that "Plaintiffs do not contend that they have ever entered the United States." *See* ECF No. 51, at page 28. This is simply untrue. Plaintiffs specifically allege: "Prior to investing in the project, Plaintiff Chuen Ping Ng traveled to Miami Florida to meet with Mitch Garrett, the Vice President – Acquisition & Development of VOS Hospitality." *See* ECF No. 44, ¶128.

In their Motion to Dismiss, Ramirez and PNC rely on *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2106 (2016), for the proposition that a plaintiff must suffer a domestic injury to have standing to bring a civil RICO claim. However, Ramirez and PNC completely fail to explain that the Supreme Court intentionally left open the question of what constitutes a

"domestic injury." In *RJR Nabisco,* the plaintiffs stipulated that they had not suffered any domestic injury. *RJR Nabisco,* at 2111. In this matter, there is no such stipulation. Plaintiffs here have alleged the opposite: Defendants solicited investments from Plaintiffs for the Greystone Hotel Project or Greystone EB-5 LLP in Miami Beach, Florida (¶5); the equity and interest in the Greystone properties was in Miami Beach, Florida (¶6); the materials provided to Plaintiffs were for purported investments in properties located in Miami Beach, Florida (¶6), and the investment was made, misappropriated, and lost in Miami, Florida and the surrounding areas; Plaintiffs relied upon representations that their funds would be invested in Greystone Hotel Miami in Miami, Florida (¶220); Plaintiffs' investments were lost in the United States (¶8); Plaintiffs' EB-5 Visa applications have accordingly been denied by the United Sates Citizenship and Immigration Services (¶8); Plaintiffs made deposits to the fake escrow account operated out of Boynton Beach, Florida (¶ 57); Plaintiffs believed their investments would be secured by real property in Miami, Florida, and it was not (¶230). Plaintiffs' injuries are, based on the allegations in the Amended Complaint, almost exclusively domestic despite the location of Plaintiffs.

Therefore, Plaintiffs have not only alleged a RICO violation, loss of their investments, and that Ramirez's and PNC's bad acts caused their damages, but also that the location of their injury was in the United States, where their investments were sent, wrongfully misappropriated, and forever lost.

## 2. Plaintiffs Properly Allege a RICO Enterprise

Ramirez's and PNC's argument that Plaintiffs did not allege a RICO enterprise must fail for several reasons. They argue that Plaintiffs did not establish a "common purpose" and that PNC and Ramirez did not "knowingly participate" in the enterprise. A RICO enterprise is "a group of persons associated together for a common purpose" and "is proved by evidence of an ongoing organization…and by evidence that the various associates function as a continuing unit." *Catano*

*v. Capuano*, 2019 WL 3035752, at *5 (S.D. Fla. July 11, 2019) (granting summary judgment for defendants and holding that there was insufficient evidence to prove the existence of an enterprise) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). There is no knowledge requirement. Even if the Court eventually were to consider Ramirez's and PNC's knowledge in its determination of the existence of an enterprise, such a determination would need to occur after sufficient discovery of facts to establish such a state of mind.

### i.   *Common Purpose*

Ramirez and PNC argue that "[t]o establish a common purpose under RICO, plaintiffs must allege that all of the participants 'knowingly cooperated' in a course of conduct 'pursuant to a unified agenda.'" *See* ECF No. 51, page 29. This contention is not supported by this Court's established pleading requirements, the elements required to be pled for a RICO violation, or any of the case law cited in the Motion to Dismiss. *See Gross v. State*, 765 So. 2d 39, 46 (Fla. 2000) (affirming the Fourth District Court of Appeal's finding that the state presented sufficient evidence at trial to support the enterprise element and Gross's RICO conviction).

Ramirez and PNC quote *Gross v. State*, 765 So. 2d 39, 46 (Fla. 2000), for the proposition that sufficient evidence of common purpose exists where defendants "discussed and coordinated robberies well before their commission." Here, those facts are alleged. The allegations directed at Ramirez's and PNC's participation and coordination of events in the commission of Walsh and SARC's fraud go far beyond what is required to allege a common purpose in committing the bad acts.

Ramirez and Osaba met with Walsh and the Walsh Entities' representative at Walsh's office (¶136). Reitz disclosed Walsh's EB-5 business and escrow requirements and discussed PNC's escrow account requirements and procedures (¶136). In addition, PNC had intimate knowledge of the strict requirements of EB-5 (¶¶136, 151-153). Reitz told Ramirez and Osaba that Walsh and

the Walsh Entities had EB-5 investors who would invest tens of millions of dollars into Defendants' EB-5 program, that the EB-5 investments were subject to escrow agreements, that the EB-5 investors believed they were depositing money into escrow, that Walsh sought escrow account services with less restrictions and oversight, and that Walsh and Walsh Entities wanted a PNC escrow account that was free of these restrictions and oversight (¶137).

The common purpose of the conspiracy was to give the appearance of a legitimate escrow agreement while allowing Defendants to avoid oversight and restrictions of a "real" escrow account. In pursuit of this common enterprise, Ramirez and Osaba had a second meeting with Reitz to work out a deal that would allow Walsh to facilitate his fraud plan (¶138). PNC initially informed Reitz that Walsh and Walsh Entities would have to strictly follow the terms of the escrow administration agreement (¶138). They knew it was wrong. This would not work for Reitz, Walsh, and the Walsh Entities, as it would prevent Walsh from having unrestricted access to investor's funds (¶139). Reitz informed Ramirez and PNC of Walsh's need for an "arrangement" without escrow restrictions (¶139). Ramirez and PNC agreed to accommodate Walsh's demands (¶140) and devised a plan that would allow Walsh to execute his fraud by passing tens of millions of dollars through their banking services (¶¶140-142).

Shockingly, Ramirez's and PNC's argument for dismissal is that this is a "traditional banking relationship" and "routine banking transactions." *See* ECF No. 51, pages 30-31. As alleged, this plainly cannot be the case. The very fact that Ramirez and PNC made an exception to traditional procedures and allowed Walsh and SARC to operate a checking account as an escrow account shows that this was not "routine banking." If it is Ramirez's and PNC's contention that it is their regular business practice to indulge the needs of criminals to induce investment from their victims through false representations, then perhaps there are even more concerns than those

already detailed in the Amended Complaint. Indeed, as alleged in the Amended Complaint, Ramirez and PNC made suggestions and exceptions outside of the bank's normal business practices for the common purpose of misrepresenting the legitimacy of the escrow account to collect Plaintiffs' investments.

### ii.    *Knowing Participation*

First and foremost, Plaintiffs allege Ramirez's and PNC's knowledge even though it is not required. *See* ECF No. 44 at ¶¶ 143, 149, 150, 151, 153, 156, 159, 310, 311, 312, 313, 314, 317, 321, 322, 323, 324, 325, 328, 329, 368, 369, 370, 371, 372, 375, 376, 378, 379, 380, 382, 386, 387, 433, 434, 435, 436, 437, 438, 442, 445, 446, 447, 448, 449, 450, 453, 454. Defendants attempt to require this Court to abide by a "knowledge" requirement that simply does not exist by incorporating all of their arguments regarding lack of knowledge for aiding and abetting into their argument for establishing a RICO enterprise.

Not only did Plaintiffs explain, in excruciating detail, the intricate enterprise Defendants created to defraud foreign investors, but Plaintiffs specifically allege Ramirez's and PNC's knowing participation in the enterprise. *See id*. Ramirez's and PNC's attempt to rely on *Parm* here is no different than its previous misplaced reliance on the "red flag" cases. *See Parm v. Nat'l Bank of Cal., N.A.*, 242 F. Supp. 3d 1321 (N.D. Ga. 2017). In *Parm*, the Court dismissed RICO claims finding that plaintiffs allegations merely demonstrated that the bank was "acting as a bank processing electronic transactions or allowing access to the ACH network." *Id.* at 1346. As explained above, Ramirez and PNC were not simply acting like a bank, engaging in routine banking procedures, failing to investigate red flags, or failing to adhere to banking procedures. Here, Ramirez and PNC actually ***knew*** what Walsh and SARC wanted to accomplish. They knew it was wrong, but nonetheless made suggestions and took steps in furtherance of those wrongful acts and made exceptions from normal banking procedures.

In the first step of their workaround, Ramirez and PNC made an exception to their typical banking policies by allowing Walsh and SARC to operate an "escrow" account and use the bank's escrow services without any escrow restrictions or an escrow agent. *See* ECF No. 44, (¶¶135-148). "In the second step of the Workaround, in order to create the illusion that the Analysis Business Checking Account was really an escrow account, PNC changed the name of the Fake Escrow Account from South Atlantic Regional Center LLC – Greystone EB-5, LLLP to South Atlantic Regional Center LLC – Escrow Account." (¶149). "Defendant, PNC did this or permitted this, despite knowing that the account was not an escrow account. By doing so, Ramirez and PNC knowingly made the Fake Escrow Account look like a legitimate escrow account with specific knowledge that while it was not one, it would appear like one and be used like one." (¶150); *See also ¶¶* 151-153. Plaintiffs specifically alleged how these were not "routine banking procedure" and how Ramirez and PNC took specific steps in furtherance of Walsh's criminal enterprise.

### D.  PLAINTIFFS PROPERLY ALLEGE THAT PNC AND RAMIREZ ENTERED INTO THE CONSPIRACY

#### 1.  Legal Standard

To state a claim for civil conspiracy, a plaintiff must allege "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts done in the conspiracy." *Meridian Trust Co. v. Batista*, 2018 WL 4760277 at *8 (S.D. Fla. Sept. 30, 2018) (dismissing civil conspiracy claim where plaintiff failed to state a claim for common law fraud, RICO violations, false advertisements, and FUFTA violations).

#### 2.  Plaintiffs Allege a Conspiratorial Agreement

Contrary to Ramirez's and PNC's arguments, Plaintiffs allege far more than "vague and conclusory" references to an alleged agreement between Ramirez/PNC and Walsh/Walsh

Entities/Reitz/SARC. Plaintiffs specifically allege that Ramirez and PNC had an agreement with Walsh, the Walsh Entities, and SARC: "Defendants, Ramirez and PNC *agreed* to accommodate Defendant, Walsh's demands." (¶139); "Defendants, Ramirez and PNC *agreed* to allow Defendants, Walsh and SARC to open and operate a business checking account with PNC's escrow services." (¶142); "Defendants, Ramirez and PNC's *agreement* with Walsh violated PNC's internal rules, regulations, and policies." (¶144); "Ramirez stood to gain from this *agreement* by increasing profits for his employer, PNC." (¶145); "PNC had knowledge of the EB-5 program prior to entering this *agreement* with Walsh." (¶151) (emphasis added).

Plaintiffs meet any necessary particularity requirements by specifically pleading the details of who, what, where, when, and why pertaining to the above-referenced agreements:

**Who:** "Ramirez, a Vice-President at PNC's Boynton Beach, Florida branch." (¶135); "Daniel Osaba, a member of PNC's Treasury Department." (¶135); "Walsh employed Reitz from approximately January 2011 though February 2015 as Chief Financial Officer of SARC and USREDA." (¶134); "Reitz was a former employee of PNC bank and had extensive knowledge of PNC's lax policies." (¶135).

**What:** "At this meeting Defendant, Reitz disclosed Defendant, Walsh's EB-5 business and escrow requirements and discussed Defendant, PNC's escrow account requirements and procedures." (¶136); "Defendant, PNC suggested a policy loophole to assist Defendants, Walsh, Reitz and SARC in perpetuating their fraud, conspiracy and other bad acts." (¶141); "Defendants, Ramirez and PNC agreed to allow Defendants, Walsh and SARC to open and operate a business checking account with PNC's escrow services." (¶142); "Ramirez and PNC engineered the opening of an Analysis Business Checking Account in the name of South Atlantic Regional Center LLC – Greystone EB-5, LLP Escrow Account." (¶147); "In the second step of the Workaround, in

order to create the illusion that the Analysis Business Checking Account was really an escrow account, PNC changed the name of the Fake Escrow Account from South Atlantic Regional Center LLC – Greystone EB-5, LLLP to South Atlantic Regional Center LLC – Escrow Account." (¶149); "Defendants, Walsh, PNC Bank… and the other Defendants conspired to misname and place Plaintiffs' funds in Defendant, Walsh's business checking account to mislead and deceive Plaintiffs. Upon receiving Plaintiffs' funds in the fake escrow account, Defendants Walsh and co-conspirators transferred Plaintiffs' funds to their personal accounts and dissolved Defendant WWB Trust." (¶15).

**Where:** "Defendants, Reitz, Walsh, and the Walsh Entities' representative met with Ramirez and Osaba at Walsh's office." (¶136); "At a second meeting, Defendant, Reitz was told that PNC, like SunTrust Bank, would require SARC and PNC to enter an escrow administration agreement as a prerequisite for creating an escrow account." (¶138); "The offering materials provided to investors represented that the Greystone EB-5 Partnership would loan investor funds to Greystone Hotel Miami, LLC… to develop, renovate, and operate two (2) adjacent properties located at 1920 Collins Avenue and 230 20th Street, Miami Beach, Florida." (¶6); "The Fake Escrow Account and Business Checking account at issue herein were opened in Boynton Beach, Florida." (¶57).

**When:** "This occurred before any of the Plaintiffs were defrauded into wiring money into the Fake Escrow Account." (¶150); "From 2014 to 2016, Defendant, Greystone EB-5 Partnership offered and sold limited partnership 'units' totaling up to Twenty-Two Million Dollars ($22,000,000.00) to at least eight (8) foreign investors through the EB-5 Program." (¶6); "By way of a partnership agreement, security agreement, loan agreement and contact, in 2014-2017, Plaintiffs invested Five Hundred Thousand Dollars ($500,000.00) into the Greystone Partnership

in exchange for…" (¶94); "From 2014 to 2016, Greystone EB-5 Partnership's offering materials contained material misrepresentations about Greystone Partnership use of an escrow account for investor funds. Greystone Partnership falsely and fraudulently claimed that investor funds would be held at an escrow account at PNC Bank, pursuant to an escrow agreement…no escrow account even existed for investor funds." (¶200).

**Why:** "Ramirez stood to gain from this agreement by increasing profits for his employer, PNC. Through his Vice President position at PNC, Ramirez received increase salary, awards and promotion opportunities for increasing PNC's deposits. Ramirez's title, as a Vice President at PNC, included Business Banking." (¶145); "PNC stood to gain a new business from an account with tens of millions in deposits. This included significant service fees, interest, and profits." (¶146); "Defendants, PNC and Ramirez benefitted by conspiring with Defendants to create the Fake Escrow Account." (¶148); "Throughout the existence of the Fake Escrow Account, PNC received fees for the services it provided to Walsh and Walsh Entities indirectly to Defendants in connection with the Fake Escrow Account. In addition, PNC was able to invest the tens of millions of dollars that ran though the Fake Escrow Account, for its own benefit, while the money was held in the Fake Escrow Account." (¶150).

These allegations meet and exceed the *Iqbal*/*Twombly* pleading standards as they pertain to conspiracy.

### 3. Plaintiffs Allege Ramirez and PNC's Knowledge of the Fraud

While not an element of conspiracy,[3] Plaintiffs' Amended Complaint alleges Ramirez's and PNC's actual knowledge of the underlying fraud and the specific efforts they took to perpetuate

---

[3] Ramirez's and PNC's Motion to Dismiss (DE 51) does not dispute that the elements of a claim for civil conspiracy are: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts done in the conspiracy. However, Ramirez and PNC still argue that Plaintiffs' count for Conspiracy should be dismissed for failing to plead adequate knowledge on the part of Ramirez and PNC.

the fraud by helping Walsh and the Walsh Entities create and operate a fake escrow account.

Plaintiffs' allegations demonstrate that Ramirez and PNC did more than "unwittingly helping…perpetrate the scheme." *See* ECF No. 51, pages 33-34 (citing *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1347 (S.D. Fla. 2018)). Unlike *Honig,* Plaintiffs do not merely plead that Ramirez and PNC "should have known" of underlying fraud or make conclusory allegations regarding knowledge. Ramirez and PNC had actual knowledge of Defendants' underlying fraud, which Plaintiffs plead repeatedly. Ramirez's and PNC's argument that Plaintiffs allegations are inferences is plainly refuted by the text of the Amended Complaint: "Defendants, Reitz, Walsh and the Walsh Entities' representative, met with Defendant, Ramirez and Osaba at Walsh's office. At this meeting Defendant, Reitz disclosed Defendant, Walsh's EB-5 business and escrow requirements and discussed Defendant, PNC's escrow account requirements and procedures." (¶136); "PNC had knowledge of the EB-5 program prior to entering this agreement with Walsh. PNC's website included an article entitled 'PNC Assists Ironstate Development in Rebuilding the Waterfront.' In this article, PNC demonstrates detailed knowledge of the EB-5 program" (¶151); "Defendant, Reitz disclosed that (1) Walsh, and Walsh Entities had potential EB-5 clients/investors from China; (2) Each EB-5 client would invest Five Hundred Thousand Dollars ($500,000.00) plus an administrative fee of between Forty Thousand Dollars ($40,000.00) and Sixty Thousand Dollars ($60,000.00); (3) Walsh expected a total investment in the tens of millions of dollars; (4) the EB-5 investment funds were subject to escrow agreements; (5) Walsh and Walsh Entities would manage the EB-5 investment on behalf of the EB-5 clients; (6) Walsh and SARC currently had an escrow account at SunTrust Bank; (7) Walsh was seeking escrow account services with less restrictions and oversight; and (8) Walsh and the Walsh Entities wanted a PNC escrow account that was free of these restrictions and oversight." (¶137); "Defendants, Ramirez and PNC agreed to

accommodate Defendant, Walsh's demands.  Defendant, Ramirez told Reitz that 'if you need functionality of an escrow account, we can provide the escrow service modules with this type of business checking account.' Ramirez and PNC proposed opening a business checking account with PNC's escrow service modules. The effect of this would be to allow Walsh to operate a business checking account that appeared to be an escrow account. However, crucially, the account would not in fact be a real escrow account nor would it have the restrictions of a real escrow account." (¶140); "In other words, Defendant, PNC suggested a policy loophole to assist Defendants, Walsh, Reitz, and SARC in perpetuating their fraud, conspiracy and other bad acts." (¶141). *See also* ¶¶ 143, 149, 150, 151, 153, 156, 159, 368, 369, 370, 371, 372, 375, and 376.

As alleged, Ramirez and PNC made an agreement to conspire with Walsh, the Walsh Entities, and SARC to operate a fake escrow account, allowed them to use escrow modules and purport that their checking account was an escrow account, and allowed them to collect and misappropriate the money in the fake escrow account, causing Plaintiffs substantial damages.

## III.   <u>CONCLUSION</u>

Plaintiffs' Amended Complaint alleges far more than the pleading requirements and should survive a motion to dismiss. The Amended Complaint clearly explains how Ramirez and PNC were intimately involved in perpetrating the underlying fraud, breach of fiduciary, and conversion by creating a workaround to allow Walsh and SARC to use PNC's banking services to create a fake escrow account, collect investments from Plaintiffs, and have unrestricted access to Plaintiffs' life savings. Ramirez's and PNC's Motion to Dismiss Counts 8, 9, 16, 17, 22, 23, 26, 29, and 41, should therefore be denied.

Respectfully submitted,

ZEBERSKY PAYNE SHAW LEWENZ, LLP
110 S.E. 6th Street, Suite 2150
Ft. Lauderdale, Florida 33301
Telephone: (954) 595-6060
Facsimile: (954) 989-7781
Primary Email: jshaw@zpllp.com;
srusso@zpllp.com
Secondary Email: mperez@zpllp.com;
jgarcia@zpllp.com

By:   */s/ Candace Phillips*
JORDAN A. SHAW, ESQ.
Fla. Bar No. 111771
CANDACE PHILLIPS, ESQ.
Fla. Bar. No. 1010368
STEFFANI M. RUSSO, ESQ.
Fla. Bar No. 1002598

and

SMS LAW GROUP, APC
*Co-Counsel for Plaintiffs*
Kevin Qi, Esq.
CA Bar No. 284314
*Pro Hac Vice Granted*
2221 Camino Del Rio S.
Ste. 100
San Diego, CA 92108
Telephone: (619) 342-7887
Facsimile: (619) 255-9559
Primary Email: kevinqi@smslawfirm.us

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of January, 2020, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF which will notify all parties.

*/s/ Candace Phillips*
Candace Phillips, Esq.